# Exhibit A

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION

Plaintiff(s)

vs.

CITY OF HIGHLAND PARK

Defendant(s)

13 CH 3414

Gen No: __________

**PLEASE SERVE:**

**Ghida Neukirch, City Clerk**
**City of Highland Park**
**1707 St. Johns Avenue**
**Highland Park, IL 60035**

SUMMONS

To each defendant:

You are summoned and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, in the office of the Clerk of this Court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

To the officer:

This summons must be returned by the officer or other person to whom it was given for service, with indorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so indorsed.

This summons may not be served later than 30 days after its date.

SEAL
OF
COURT

WITNESS DECEMBER 12, 2013

Keith Brin

KEITH BRIN, Clerk of Court

Prepared by:
Attorney's Name: James B. Vogts / SWANSON, MARTIN & BELL, LLP
Address: 330 North Wabash, Suite 3300
City: Chicago State: IL
Phone: 312-321-9100 Zip Code: 60611
Fax: 312-321-0990
ARDC: 6188442

(If service by facsimile transmission will be accepted, the telephone number of the plaintiff or plaintiff's attorney's facsimile machine is additionally required.)

Date of Service 12/12, 20_____ (to be inserted by officer on copy left with defendant or other person).

171-138 Rev 6/13

Luis A. Berrones

IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

FILED
DEC 12 20
Keith Brin
CIRCUIT CLERK

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION | ) | |
| Plaintiffs, | ) | |
| v. | ) | No: 13 CH 3414 |
| CITY OF HIGHLAND PARK | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

NOW COME the Plaintiffs, Dr. Arie S. Friedman and the Illinois State Rifle Association, by their attorneys, and for their Verified Complaint for Declaratory Judgment and Injunctive Relief against the Defendant City of Highland Park state that the Defendant has by City Code §136.001 *et seq.* unconstitutionally infringed the fundamental right of law-abiding citizens under the Second Amendment of the United States Constitution to keep and bear arms for lawful purposes, including the defense of his home and family.

## THE PARTIES

1. Dr. Arie S. Friedman ("Dr. Friedman") is an adult resident of Highland Park, Illinois. He is a law-abiding citizen, who is lawfully entitled to own and possess firearms under all applicable Federal and State laws and regulations. Plaintiff owns and possesses firearms in Highland Park for lawful purposes, including the defense of his home and family. Neither Plaintiff nor his firearms pose a threat to the community.

2. The Illinois State Rifle Association ("ISRA") is a non-profit educational foundation incorporated under the laws of Illinois, with its principal place of business in Chatsworth, Illinois. ISRA has more than 30,000 members residing throughout the State of Illinois, including Highland Park. The purposes of the ISRA include the protection of the rights of citizens to keep and bear arms for the lawful defense of their families, persons and property, and to promote public safety and law and order.

3. Highland Park is a municipal corporation located in Lake County, Illinois. Defendant is governed by a Mayor and an elected six-member City Council, which, among other things, is empowered to enact Ordinances under its home rule authority.

**STANDING**

4. Dr. Friedman owns and possesses firearms in Highland Park that are banned under the Highland Park City Code §136.001 *et seq.* ("Ordinance"). Plaintiff must take certain actions by December 14, 2014 to be in compliance with the Ordinance, including removing the firearms from Highland Park, rendering them inoperable or surrendering them to the Chief of Police. The actions required of Plaintiff under the Ordinance constitute continuing harm to his constitutional right to keep and bear arms under the Second Amendment to the United States Constitution.

5. ISRA brings this action on behalf of its members residing in Highland Park, who own firearms and ammunition magazines prohibited by the Ordinance, desire to acquire prohibited for lawful purposes and would otherwise have standing to bring this action in their own right. The claims made in this action and the interests this action advances are germane to ISRA's organizational purpose. The relief requested in this action does not require participation of individual ISRA members

**THE ORDINANCE**

6. On June 24, 2013, the Highland Park City Council passed an ordinance titled, "Assault Weapons", which in part provided:

> No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity Magazine, unless expressly exempted in Section 136.0006 of this Chapter.

City Code §136.010.

7. An "Assault Weapon" is defined under the Ordinance to include certain specific models of semiautomatic rifles, shotguns and pistols and duplicates thereof; and semiautomatic firearms having certain features, including a pistol grip without an attached stock; a protruding grip; a folding, telescoping or thumbhole stock; a barrel shroud; a muzzle brake; and a muzzle compensator. City Code §136.001(C).

8. A "Large Capacity Magazine" is defined under the Ordinance as an ammunition feeding device with the capacity to accept more than ten rounds. City Code §136.001(G).

9. Effective December 14, 2103, any person in possession of an "Assault Weapon or Large Capacity Magazine" is required by the Ordinance to (a) "remove" it from "the limits of the City;" (b) "modify" it to make them "permanently inoperable;" (c) "surrender" it to the Chief of Police of his designee for "disposal;" or (d) "take the steps necessary" to cause it to fall within one of the exemptions set forth in Section 136.006. City Code §136.020.

10. Failure to take any of the above actions by December 14, 2013 shall constitute a "misdemeanor, punishable by not more than six months in prison or a fine of not less than $500 and not more than $1,000, or both." City Code §136.999.

**COMMON OWNERSHP OF FIREARMS**
**AND MAGAZINES BANNED UNDER THE ORDINANCE.**

11. Some of the most commonly owned firearms in the United States are among the firearms banned under the "Assault Weapons" Ordinance. Between 1990 and 2012 approximately 4.8 million semiautomatic rifles built on the AR-style platform have been produced in the United States for commercial sale to law-abiding citizens. Additionally, approximately 3.4 million AR-style and AK-style firearms have been imported into the United States for commercial sale and civilian use. AR-style firearms are manufactured by 37 federally-licensed firearms manufacturers in the United States, including Smith & Wesson, Colt's, Remington, Sig Sauer and Sturm, Ruger. AR-style semiautomatic rifles are sold by nearly every federally-licensed retail seller in the United States, and more than one out of every five firearms sold today is an AR-style semiautomatic rifle. Referred to by many as modern sporting rifles, AR-style rifles are sold today in greater numbers than traditionally-styled rifles. Modern sporting rifles are owned by more than 4.8 million persons in the United States.

12. The common ownership and popularity of modern sporting rifles is based on their ready adaptability for different lawful uses, including home defense, hunting and target shooting. They are also lighter in weight, shorter in length and have less recoil than most traditionally-styled wooden stock rifles, making them easier to handle and shoot. AR-style semiautomatic rifles are also very accurate and reliable, and typically have greater ammunition capacity than more traditionally-styled rifles. Most are sold with ammunition capacities of greater than ten rounds.

13. Most AR-style rifles and many of the other firearms banned by Defendant by model designation or type have features prohibited by the Ordinance. None of the prohibited features make the firearm a dangerous and unusual weapon. A "pistol grip without a stock

attached" is the by-product of the raised butt-stock design of AR-style rifles, which serves to reduce muzzle flip during recoil, allowing the shooter to have better control of the firearm and achieve better accuracy. A "protruding grip that can be held by the non-trigger hand" also serves to enhance control of the firearm and improve accuracy. A "folding stock" simply makes a gun more compact for storage or transport. A "telescoping stock" permits the firearm to be adjusted to fit persons of different stature. A "thumbhole stock", which is present on many target competition firearms, merely allows for a more comfortable grip and better control of the firearm. A "barrel shroud" is present in most firearms to protect the non-trigger hand from heat build-up in the firearm's barrel. A "muzzle break" redirects muzzle gas to reduce recoil. A "muzzle compensator" also redirects muzzle gas but does so to keep the muzzle down and provide better control of the firearm for successive shots. Each of these features contributes to the accuracy and safety of the firearm for use in situations where safety and accuracy are paramount concerns, including a home defense situation.

14.     Most AR-style rifles are chambered for .223 ammunition, a relatively inexpensive cartridge that is particularly well-suited for home defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. Although most pistol rounds have less muzzle velocity than a .223 round, they have greater mass, maintain velocity after passing through walls and other objects and pose substantially greater risk to unintended targets in the home. There is a consensus among those with expertise in home defense and ballistics that an AR-15 rifle chambered for .223 ammunition is an optimal firearm to rely on in a home defense encounter.

15. A survey of more than 20,000 owners of AR-style and AK-style firearms across the country revealed that recreational target shooting was the number one ranked reason for owning a modern sporting rifle, followed closely by home defense. A survey of firearm owners in Northern Illinois revealed that more than 50% of those surveyed owned a semiautomatic rifle with a detachable magazine for the purpose of personal protection.

16. Encounters with criminal intruders in the home are not uncommon. The United States Department of Justice, Bureau of Justice Statistics reported that approximately 1 million residential burglaries occur each year while a household member is present. Household members became victims of violent crimes in 266,560 of those home invasions. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms defend themselves or their property.

## OWNERSHIP AND POSSESSION OF PROHIBITED FIREARMS AND MAGAZINES

17. Dr. Friedman owns and keeps in Highland Park certain semiautomatic firearms and ammunition magazines that are subject to the prohibition set forth in the Ordinance, including a Smith & Wesson M & P 15 rifle, a Springfield M1A rifle and multiple magazines capable of holding more than ten rounds of ammunition. Dr. Friedman's Smith & Wesson M & P 15 rifle is an AR-style rifle, and has a pistol grip without a stock attached, a barrel shroud and a collapsible, telescoping stock. Dr. Friedman's Springfield M1A rifle has a barrel shroud and a muzzle brake.

18. Dr. Friedman keeps and maintains the firearms and ammunition magazines described above for lawful purposes, including recreational target shooting and defense of his home and family. Plaintiff is trained on their use and stores them safely. He keeps the Smith & Wesson M & P 15 rifle available for defense of his home and family should the need arise.

**COUNT I – DECLARATORY JUDGMENT**

19. The allegations set forth in paragraphs 1 through 18 are re-alleged as though fully set forth herein.

20. Ownership of firearms that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home against a criminal intruder, is a fundamental right under the Second Amendment to the United States Constitution.

21. Defendant has infringed the fundamental Second Amendment right of Plaintiff Friedman and Plaintiff ISRA members to keep and bear arms by prohibiting his ownership and of possession of firearms in his home that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

22. Defendant does not have a compelling governmental interest in depriving Plaintiff of his Second Amendment right to own and possess firearms that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

WHEREFORE, Plaintiffs respectfully request that City of Highland Park City Code §136.001 *et seq*. be declared unconstitutional and that judgment be entered in their favor and against the Defendant, including an award of costs.

**COUNT II – INJUNCTIVE RELIEF**

23. The allegations set forth in paragraphs 1 through 22 are re-alleged as though fully set forth herein.

24. Plaintiffs have a clear and ascertainable right to own and possess firearms in their homes that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

25. Plaintiffs will suffer irreparable harm if Defendant is not enjoined from enforcing City Code §136.001*et seq*. and they are prohibited from owning and possessing firearms in their home that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

26. Plaintiffs have no adequate remedy at law for Defendant's infringement of their fundamental right under the Second Amendment to the United States Constitution.

WHEREFORE, Plaintiffs respectfully request that an order be entered permanently enjoining the Defendant from enforcing City of Highland Park City Code §136.001 *et seq*. and that judgment be entered in their favor and against the Defendant, including an award of costs.

by:____________________________
One of Plaintiffs' Attorneys

James B. Vogts / ARDC 6188442
Swanson, Martin & Bell, LLP
330 N. Wabash Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com

Brett M. Henne / ARDC 6276545
Swanson, Martin & Bell, LLP
1860 West Winchester Road
Libertyville, Illinois 60048
(847) 949-0057
bhenne@smbtrials.com

Victor D. Quilici / ARDC 3123067
P.O. Box 428
River Grove, Illinois 60171
(847) 298-2566
victorq@ameritech.net

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Verified Complaint for Declaratory and Injunctive Relief are true and correct.

DR. ARIE S. FRIEDMAN

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT,
LAKE COUNTY, ILLINOIS

ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION )
vs. ) General No. 13 CH 3414
CITY OF HIGHLAND PARK )

FILED
DEC 12 2013
Keith Brin
CIRCUIT CLERK

**CERTIFICATE OF ATTORNEY – CIVIL DIVISION**

1) Pursuant to Local Rule 3.01(c), I hereby certify that:

- ☒ There has been no previous Voluntary or Involuntary Dismissal of the subject matter of this litigation.
- ☐ There has been a previous Voluntary or Involuntary Dismissal of the subject matter of this litigation and at the time of dismissal that Case No. ________ was assigned to the Honorable ________
- ☒ There is no other litigation presently pending in the county involving these parties.
- ☐ There is other litigation presently pending in the county involving the parties to or subject matter to this lawsuit and that case(s) is/are assigned Case No.(s)________ which is/are assigned to the Honorable ________

2) Are you seeking any injunctive relief?

- ☒ Yes - Select the appropriate case subtype under the Chancery-CH heading below.
- ☐ No - Select the appropriate non-Chancery case subtype below.

This data is being gathered for administrative purposes and will not be used for any other purpose.

**Arbitration – AR**
- ☐ Arbitration/Tort
- ☐ Arbitration/Contract

**Chancery – CH**
- ☐ Residential Mortgage Foreclosure
- ☐ Residential Mortgage Foreclosure w/Mechanics Lien
- ☐ Non-Residential Mortgage Foreclosure
- ☒ Injunction
- ☐ Specific Performance
- ☐ Mechanics Lien Foreclosure
- ☐ Complaint for Rescission
- ☐ Partition
- ☐ Quiet Title
- ☐ Class Action
- ☐ Miscellaneous

**Eminent Domain – ED**
- ☐ Eminent Domain
- ☐ Condemnation

**Law Magistrate – LM**
- ☐ Forcible Entry and Detainer
- ☐ Replevin
- ☐ Detinue
- ☐ Distress for Rent
- ☐ Enroll Judgment
- ☐ Confirm Arbitrator's Award
- ☐ Confession of Judgment

**Law – L**
- ☐ Tort
- ☐ Contract
- ☐ Product Liability
- ☐ Medical Malpractice
- ☐ Legal Malpractice
- ☐ Forcible Entry and Detainer
- ☐ Replevin
- ☐ Accounting Malpractice
- ☐ Enroll Judgment
- ☐ Confirm Arbitrator's Award

**Municipal Corporation – MC**
- ☐ Annexation
- ☐ Disconnection

**Miscellaneous Remedy – MR**
- ☐ Declaratory Judgment
- ☐ Corporation Dissolution
- ☐ Election Contest
- ☐ Mandamus
- ☐ Habeas Corpus
- ☐ Review of Administrative Proceeding/Statutory
- ☐ Review of Administrative Proceeding/Certiorari
- ☐ Quo Warranto
- ☐ Change of Name
- ☐ Forfeiture
- ☐ Fugitive from Justice
- ☐ Search Warrant
- ☐ Application for Eavesdropping Device
- ☐ Registration of Foreign Judgment
- ☐ Request for Subpoena/ Foreign Jurisdiction
- ☐ Miscellaneous

**Probate – P**
- ☐ Decedent/Testate > $15,000
- ☐ Decedent/Intestate > $15,000
- ☐ Decedent/Testate $15,000 or less
- ☐ Decedent/Intestate $15,000 or less
- ☐ Guardianship of Person/ Disabled Person
- ☐ Guardianship of Estate/ Disabled Person
- ☐ Guardianship of a Person and Estate/Disabled Person
- ☐ Guardianship of Person/ Minor
- ☐ Guardianship of Estate/Minor
- ☐ Guardianship of Person and Estate/Minor
- ☐ Proof of Heirship Alone

**Tax – TX**
- ☐ Deeds
- ☐ Objections
- ☐ Disposition of Collections of Judgment of Settlement

Print Name Brett M. Henne / ARDC 6276545

Signature [signature]

☒ Attorney ☐ Pro-se

STATE OF ILLINOIS )
) SS
COUNTY OF LAKE )

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION,

Plaintiffs,

vs.

CITY OF HIGHLAND PARK,

Defendant.

No. 13 CH 3414

## NOTICE OF MOTION

TO: Mr. Steven M. Elrod, HOLLAND & KNIGHT, LLP
131 South Dearborn Street, 30th Floor, Chicago, IL 60603

PLEASE TAKE NOTICE that on **December 20, 2013**, at **9:00 a.m.**, or as soon thereafter as counsel may be heard, we shall appear before the **Honorable Luis A. Berrones**, or any judge sitting in his stead in the courtroom usually occupied by him, **Courtroom C301,** of the Lake County Courthouse, 18 North County Street, Waukegan, Illinois, and then and there present the enclosed **Motion for Preliminary Injunction**.

James B. Vogts / ARDC 6188442
SWANSON, MARTIN & BELL, LLP
330 North Wabash, Suite 3300
Chicago, IL 60611
Tel: 312-321-9100
Fax: 312-321-0990

Brett M. Henne / ARDC 6276545
SWANSON, MARTIN & BELL, LLP
1860 West Winchester Road, Suite 201
Libertyville, IL 60048
Tel: 847-949-0025
Fax: 847-247-0555

Victor D. Quilici / ARDC 3123067
P.O. Box 428
River Grove, IL 60171
Tel: 847-298-2566

## CERTIFICATE OF SERVICE

Under penalties of perjury as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that he served this Notice by placing a true and correct copy thereof in an envelope(s) via hand delivery, on **December 17, 2013**, by 5:00 p.m.

James B. Vogts

**IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION | ) | |
| Plaintiffs, | ) | |
| | ) | No: 13 CH 3414 |
| v. | ) | |
| CITY OF HIGHLAND PARK | ) | |
| Defendant. | ) | |

**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs, Arie S. Friedman, M.D. and the Illinois State Rifle Association, move for a preliminary injunction against Defendant City of Highland Park enjoining Defendant and its agents from enforcing Highland Park City Code §136.001 *et seq.* on the ground that it violates Plaintiffs' rights under the Second Amendment to the United States Constitution to keep and bear arms. In support of their Motion, Plaintiffs submit their Memorandum of Law in Support of Motion for Preliminary Injunction and supporting Affidavits. Plaintiffs ask the Court to exercise its discretion and not require them to provide bond as a condition to granting their motion. Defendant will not incur damages while a preliminary injunction is in effect.

James B. Vogts / ARDC 6188442
Swanson, Martin & Bell, LLP
330 N. Wabash Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com

Brett M. Henne / ARDC 6276545
Swanson, Martin & Bell, LLP
1860 West Winchester Road
Libertyville, Illinois 60048
(847) 949-0057
bhenne@smbtrials.com

Victor D. Quilici / ARDC 3123067
P.O. Box 428
River Grove, Illinois 60171
(847) 298-2566
victorq@ameritech.net

**IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION | ) | |
| Plaintiffs, | ) | No: 13 CH 3414 |
| v. | ) | |
| CITY OF HIGHLAND PARK | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

Laws prohibiting possession of commonly owned firearms by law-abiding citizens for self-defense in the home are categorically unconstitutional under the Second Amendment to the United States Constitution. The Defendant has enacted just such a law. Highland Park City Code section 136.001 *et seq.* (hereafter the "Ordinance") prohibits possession of firearms owned by Plaintiffs and millions of other Americans for defense of the home and family, and other entirely lawful purposes. Plaintiffs respectfully submit that the status quo prior to December 14, 2013 should be preserved and Defendant should be preliminarily enjoined from enforcing the Ordinance until the merits of Plaintiffs' claims can be addressed.

## LAW AND ARGUMENT

### I. THE FRAMEWORK FOR ANALYSIS OF SECOND AMENDMENT RIGHTS AND INFRINGEMENT.

The Ordinance provides that "[N]o person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity

Magazine, unless expressly exempted in Section 136.006 of this Chapter." City Code §136.015. The Ordinance broadly and improperly defines "Assault Weapon" and "Large Capacity Magazine" to include semi-automatic firearms and standard ammunition magazines that are commonly and appropriately owned by Plaintiffs and countless other Americans for self-defense and other lawful purposes, including hunting and recreational target shooting. (A copy of the Ordinance is attached as Exhibit 1).

In *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), the United States Supreme Court held that the "central component" of the Second Amendment right to keep and bear arms is the personal right of armed self-defense, most notably in the home. *Id.* at 595.[1] The Court in *Heller* held the District of Columbia ban on handgun possession to be unconstitutional because "the inherent right of self-defense has been central to the Second Amendment right" and the District of Columbia's restrictions "extend[] … to the home, where the need for defense of self, family and property is most acute." *Id.* at 628-29; *see also People v. Aguilar*, 2013 IL 112116, ¶20 ("[I]f *Heller* means what it says … 'individual self-defense' is indeed 'the central component' of the Second Amendment right to keep and bear arms.'"). While ownership of "dangerous and unusual" firearms is not protected by the Second Amendment, ownership of firearms that are in "common use" for lawful purposes is categorically protected. *Id.* at 627.

In *Wilson v. County of Cook*, 2012 IL 112026, the Illinois Supreme Court applied the *Heller* and *McDonald* decisions and reversed a trial court's dismissal of a Second Amendment

[1] In *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3050 (2010), the Court held the Second Amendment right to possess firearms in the home for self-defense applicable to the States under the Due Process Clause of the Fourteenth Amendment.

challenge to an "assault weapons" ordinance nearly identical to the Highland Park ban.[2] The court remanded the case to the trial court for further proceedings, including an "empirical inquiry" into whether the ordinance prohibited ownership of firearms "that are typically possessed by law-abiding citizens for lawful purposes and fall outside the scope of the dangers sought to be protected under the ordinance." *Id.* at ¶49. The court reasoned:

> Without a national uniform definition of assault weapons from which to judge these weapons, it cannot be ascertained at this stage of the proceedings whether these arms with these particular attributes as defined in this Ordinance are well-suited for self-defense or sport or would be outweighed completely by the collateral damage resulting from their use, making them "dangerous and unusual" as articulated in *Heller*.

*Id.* Historical examples of "dangerous and unusual" weapons cited by the *Wilson* court include machine guns, sawed-off shotguns, grenade launchers and pipe bombs. *Id.* at ¶ 46.

The court in *Wilson* observed that following the *Heller* and *McDonald* decisions, courts have followed a "two-pronged approach" when analyzing "the newly enunciated Second Amendment guarantee." *Id.* at ¶41. The threshold question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment right. "If the government can establish that the challenged law regulates activity falling outside the scope of the second amendment right, then the regulated activity is categorically unprotected." *Id. citing Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011)(defendant preliminarily enjoined from banning firing ranges because range training is not categorically unprotected by the Second Amendment and defendant provided no justification for total prohibition). If the challenged law regulates activity firmly within the Second Amendment right – such as ownership of handguns for home defense – the activity is categorically protected and an inquiry into the government's

2 The Cook County Code §54-211 (amended by Cook County Ordinance No. 06-O-50)(approved Nov. 14, 2006)) is set forth at *Wilson*, 2012 IL 112026, ¶16-18.

justification of law is not required. *See Heller*, 554 U.S. at 628-29; *see also Aguilar*, 2013 IL 112116 ¶21 (Illinois aggravated unlawful use of weapons statute held unconstitutional because it categorically prohibited possession of firearms for self-defense outside the home); *accord Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).

The Illinois Supreme Court held, however, that if the evidence is "inconclusive or suggests that the regulated activity is not categorically unprotected -- then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of the Second Amendment right." *Wilson*, 2012 IL 112026, ¶42. The Court in *Heller* and *McDonald* did not articulate what standard of review should be applied to government actions infringing on Second Amendment rights, but it rejected rational basis review. *Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *Ezell*, 651 F.3d at 706 (*Heller* and *McDonald* "make it clear that the deferential rational-basis standard is out, and with it the presumption of constitutionality."). Indeed, the Court's reasoning suggests that the categorical approach applied in *Heller* and *McDonald* should be applied in all Second Amendment cases and that interest balancing tests like intermediate scrutiny are never appropriate. *See, e.g. Heller v. District of Columbia*, 670 F.3d 1244, 1271-86 (D.C.Cir. 2011)(Kavanaugh, J., dissenting). In any event, to the extent a level-of-scrutiny analysis applies, a heightened form of scrutiny into the government's justification for infringing would be required.

Courts engaging in a level-of-scrutiny analysis have indicated that when a law imposes a "severe burden on the core Second Amendment right of armed self-defense," strict scrutiny is to be applied and "an extremely strong public interest justification and a close fit between the

government's means and its end" is required. *Ezell*, 651 F.3d at 708; *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)(strict scrutiny means the law must be narrowly tailored to serve a compelling governmental interest). However, if a law restricting activity lies "closer to the margins of the Second Amendment right" because the law "regulates rather than restricts" exercise of the right, intermediate scrutiny may apply. *Ezell*, 651 F.3d at 708; *see United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)(intermediate scrutiny requiring a "substantial relation" between prohibiting firearms possession by persons convicted of misdemeanor domestic abuse and the "important governmental goal of preventing armed mayhem" applied). [3]

When the merits of Plaintiffs' claims are reached in this case, the Ordinance should be found categorically unconstitutional because it prohibits activity firmly within the Second Amendment right. The evidence will establish that the Ordinance bans possession of a large category of firearms and magazines that are owned and used by millions of law-abiding citizens in the United States for lawful purposes, including self-defense in the home. But regardless of whether the Ordinance is found categorically unconstitutional or analyzed under the strict scrutiny or intermediate scrutiny test, Defendant should be preliminarily enjoined from enforcing the Ordinance because Plaintiffs can satisfy each of the four factors for an interlocutory injunction: (a) they have a clearly ascertainable right to relief; (b) there is a fair question as to the likelihood of their success on the merits; (c) they will suffer continuing irreparable harm; and (d) they do not have an adequate remedy at law. *See Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 886 N.E.2d 85 (2006).

---

[3] This framework is similar to that used in First Amendment cases, and the Court in both *Heller* and *McDonald* relied on First Amendment analogues in reaching its decisions. *See Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045. As a result, other courts have adapted First Amendment doctrine to the Second Amendment. *See Ezell*, 651 F.3d at 706-07; *Skoien*, 614 F.3d at 641; *Wilson*, 2012 IL 112026, ¶47.

## II. PLAINTIFFS' RIGHT TO PRELIMINARY INJUNCTIVE RELIEF.

Plaintiffs ask that Defendant be preliminarily enjoined from enforcing the Ordinance and that the status quo that existed prior to the December 14, 2013 deadline to remove, surrender or make inoperable prohibited firearms be preserved. Preserving the status quo will permit Plaintiffs and others to possess their firearms and ammunition magazines in their homes in Highland Park, as they have been safely possessed without harm to the community, until the merits of Plaintiffs' case can be decided.

### (A) Plaintiffs Have a Clearly Ascertainable Right in Need of Protection.

Plaintiffs need only raise a fair question as to an ascertainable right to relief. *Ford Motor Credit Co. v. Cornfield*, 395 Ill. App. 3d 896, 904, 918 N.E.2d 1140, 1148 (2d Dist. 2009), *appeal denied*, 236 Ill. 2d 503 (2010). Plaintiff Friedman owns firearms for lawful purposes, including self-defense in his home, which are now illegal in Highland Park. (Ex. 2, Ver. Compl. ¶¶ 17-18). As of December 14, 2013, Friedman was required under the Ordinance to surrender his firearms to the Chief of Police, remove them from his home in Highland Park or render the firearms inoperable. (Ex. 2, Ver. Compl. ¶ 9).[4] Plaintiff ISRA and its members residing in Highland Park are also prohibited from keeping and acquiring banned firearms and magazines for lawful purposes, including the defense of their homes and families. (Ex. 2, Ver. Compl. ¶ 5). There can be little question that Plaintiffs have been injured by operation of the Ordinance and that their Verified Complaint states a cognizable cause of action for violation of their Second Amendment rights.

---

[4] The Ordinance provides that persons "legally in possession of an Assault Weapon of Large Capacity Magazine" ... "shall have 60 days from the effective date" of the Ordinance to remove, modify or surrender them to the Chief of Police. City Code §136.020. However, it is not clear on the face of the Ordinance when the Ordinance became effective and when the 60 day period expired. Plaintiffs' counsel received written confirmation from Gerald Cameron of the Highland Park Police Department that the 60 day period expired on December 14, 2013.

**(B) There Is At Least a Fair Question as to the Likelihood of Success on the Merits of Plaintiffs' Claim.**

Plaintiffs need only raise a fair question as to the likelihood they will succeed on the merits of their claim. *Buzz Barton & Associates, Inc. v. Giannone,* 108 Ill. 2d 373, 382, 483 N.E.2d 1271, 1275 (1985). The allegations of Plaintiffs' Verified Complaint and the Affidavits submitted in support of this motion raise a fair question on the merits of their claim that the Ordinance unconstitutionally infringes on their Second Amendment rights.

**(i) Firearms and Ammunition Magazines Prohibited Under the Ordinance Are Commonly Owned by Law-Abiding Citizens for Lawful Purposes, Including Self-Defense in the Home.**

The Ordinance prohibits lawful ownership of firearms in Highland Park that are not dangerous and unusual. The firearms banned include many of the most commonly manufactured, purchased and owned firearms in America – including AR-type rifles that the United States Supreme Court has held have been "traditionally … widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994). Indeed, rifles built on the AR-platform, like the Smith & Wesson M & P 15 rifle owned by Plaintiff Friedman, are among the most popular and commonly owned firearms today. (Ex. 3, Lombardo Aff. ¶3). Between 1990 and 2012, nearly 4.8 million AR-type rifles have been produced and sold in the United States. *(Id.).* An additional 3.4 million AR-type and AK-type rifles, also banned under the Ordinance, were imported into the United States between during those same years. (*Id.*). In 2012 alone, nearly 1 million of these rifles were sold in the United States for civilian use, more than double the number of the most commonly sold vehicle in the United States, the Ford F-150. (*Id.*). Thirty-seven different United States manufacturers have produced AR-type rifles, including some of the most widely known and respected firearms manufacturers in the world – Smith & Wesson, Colt, Remington, Sig Sauer and Sturm, Ruger. (Ex. 4, Curcuruto Aff. ¶ 4).

It has been estimated that more than 4.8 million people in the United States own an AR-type or AK-type rifle. (*Id.*). They are sold by more than 90% of licensed firearm retailers and in greater numbers than traditionally-styled wooden stock rifles. (*Id.* at ¶ 6). In fact, more than one out of every five new firearms sold in the United States is an AR-type or AK-type rifle. (*Id.*). A nationwide survey of nearly 22,000 owners of these firearms revealed that a typical owner of these rifles is over 35 years old, married and has some college education, and nearly half are current or former members of the military or law enforcement. (*Id.* at ¶ 5).

The same nationwide survey asked owners to identify the purpose for which they purchased their rifles. Recreational target shooting was ranked as the number reason, followed closely by home defense. (*Id.*). In another survey of firearm owners, nearly 60% of those surveyed indicated that they own a semi-automatic rifle with a detachable magazine for home protection. (Ex. 3, Lombardo Aff. ¶5).

The popularity of these rifles is based, in part, on their ready adaptability for different uses. They have an upper receiver into which the barrel is mounted and a lower receiver that holds the firing assembly and on which the butt stock and lower grip are mounted. The two receivers can be disconnected easily, allowing the shooter to mount a different upper receiver and barrel and thus use a wide variety of rifle cartridges and change the length and weight of the barrel to suit the shooter's needs. Because of its adaptability, a single AR-type rifle can be used for target matches, home defense, and small and large game hunting. (*Id.*). AR-type rifles are also lighter in weight, shorter in length and have less recoil than most traditionally-styled wooden stock semi-automatic rifles, making them easier to handle and shoot. They are also very accurate and reliable. (Ex. 3, Lombardo Aff. ¶ 4).

The majority of AR-platform rifles are chambered for .223 ammunition, which is a relatively inexpensive rifle cartridge and is particularly well-suited for home defense purposes. Approximately three out of every four AR-type rifle sold are chambered for .223 ammunition. (Ex. 4, Curcuruto Aff. ¶ 5). Although the .223 round has sufficient stopping power in the event a home intruder is encountered, the round loses velocity relatively quickly after passing through walls and other objects, thus decreasing the chance that errant shot inadvertently strikes an unintended target in a home defense situation. (*Id.* at ¶ 4). For that reason, the .223 round is considered by ballistics experts to be ammunition offering ideal intruder incapacitation and less penetration risks to unintended targets in the home (i.e. family members) than typical handgun bullets and shotgun projectiles. (Ex. 5, Roberts Aff. ¶¶ 3-6). An AR-15 rifle chambered for .223 ammunition is believed to be the most ergonomic, safe and effective firearm for self-defense purposes. (Ex. 5, Roberts Aff. ¶ 6). And persons seeking formal instruction on self-defense in their homes are informed of the attributes of AR-type rifles and their use is recommended by those with expertise in firearms training and safety. (Ex. 3, Lombardo Aff. ¶4). The overwhelming majority of these rifles are equipped with ammunition magazines with a capacity to hold more than 10 rounds of ammunition. (Ex. 4, Curcuruto Aff. ¶5).

The firearms Defendant has chosen to ban, including AR-type and AK-type rifles, simply reflect technological advancement in firearms design, the primary goal of which is to improve reliability, accuracy, ergonomics, ease of reloading and safety. (Ex. 6, Supica Aff. ¶ 4). None of the prohibited firearms are fully automatic "machine guns." (*Id.* at ¶ 5). They are semi-automatic firearms that will fire only one round when the trigger is pulled, as is the case with many firearms that Defendant chose to not ban, including revolvers, bolt-action, lever action, pump action and single-shot firearms. (*Id.*).

The origin of semi-automatic firearms dates back to the late 19th century, and the first semi-automatic rifles designed specifically for the civilian market were introduced early in the 20th century. (*Id.* at ¶ 6). Throughout the 20th century, civilian and military firearms design largely followed the same track. For example, the wood-stocked bolt-action rifle, used by hunters for generations, gained popularity following World War I, where it was the battlefield rifle. It represented a step forward in handling, reliability and accuracy. Soon after the U.S. military began using the semi-automatic rifle in World War II, a wide range of semi-automatic rifles gained increased popularity among civilians. Modern sporting rifles, most notably rifles built on the AR-platform, were developed in the early 1960's based on the M-16 rifle used by U.S. forces in Viet Nam. Modern sporting rifles, like many of those banned under the Highland Park ordinance, are simply modern state-of-the-art firearms, just as their precursors once were generations ago. (Id. at ¶ 7).

The firearms Defendant has chosen to ban are not "military grade weapons," as gun control advocates frequently describe them. (*Id.* at ¶ 8). Military forces around the world since the end of World War II have primarily used selective-fire rifles as standard service rifles. (*Id.*). A selective-fire rifle has the ability to fire both fully automatic, meaning it continues to fire with a single pull of the trigger as long as the trigger is pulled back, or in bursts of multiple rounds with each pull of the trigger, as well as semi-automatic, meaning a separate pull of the trigger is required for each shot. (*Id.*). And the design features Defendant has chosen to ban do not make the firearms more dangerous. (*Id.* at ¶10; Ex. 3, Lombardo Aff. ¶ 6). In fact, the presence of one or more of the features is typically integral to the safe handling of the firearm and enables the shooter accurately and reliably fire the gun. (Ex. 3, Lombardo Aff. ¶ 6; Ex. 6, Supica Aff. ¶ 10).

At bottom, the firearms and magazines Defendant has prohibited law-abiding Highland Park residents from possessing are not dangerous and unusual. (Ex. 6, Supica Aff. ¶ 3). They are simply modern firearms and accessories owned by millions of law-abiding American for lawful purposes, including self-defense in the home. A fair question exists as to whether Defendant's decision to prohibit the lawful possession of these firearms in Highland Park has infringed Plaintiffs' Second Amendment right to keep and bear arms.

**(ii) Defendant Cannot Justify Infringement of Plaintiffs' Second Amendment Rights.**

Presumably, Defendant will attempt to justify the Ordinance with an argument that the prohibition on firearms ownership by law-abiding citizens will enhance public safety in Highland Park. Under *Heller's* categorical approach such an argument fails. Under a heightened level of scrutiny there is a fair question as to whether Defendant can support the argument and refute the claim that the Ordinance is just a symbolic political gesture. [5]

According to publicly available FBI Uniform Crime Reports, Highland Park has a very low incidence of crime of any kind, particularly violent crime. For example, statistics for 2010 indicate that Highland Park experienced just 17 incidents of violent crime (defined as murder and non-negligent manslaughter, forcible rape, robbery and aggravated assault). None of these incidents were murders. In fact, publicly available data indicates that no murder has been

[5] The Ordinance was not passed by the Highland Park City Council in response to any real or perceived need to protect Highland Park residents. It was enacted because the Illinois legislature passed the "Firearms Concealed Carry Act," which contained preemption language making regulation, possession and ownership of "assault weapons" the exclusive power of the State. 430 ILCS 65/13.1(c)(effective July 9, 2013). However, the Act provided that any ordinance or regulation enacted on, before or within 10 days of its effective date would be valid provided it was not inconsistent with the Act. *Id.* Highland Park was one of a handful of municipalities that considered regulating "assault weapons" to avoid preemption, but one of the few that enacted an ordinance.

committed in Highland Park since 2003. The same data reveals that residents of Highland Park are substantially more likely to be victims of property crimes, including residential burglaries, larceny and vehicle theft. (Ex. 7, Kleck Aff. ¶ 3).

Even if Highland Park had a violent crime problem, prohibiting possession of the firearms identified in the Ordinance by law-abiding citizens would not be a solution. Plaintiffs and other lawful firearm owners in Highland Park pose no threat to public safety. Banning a category of firearms rarely used in crime for the ostensible purpose of protecting the public from criminal firearms violence in not only illogical, it may actually put the public at greater risk. (Ex. 7, Kleck Aff. ¶ 9).[6] According to a United States Department of Justice, Bureau of Justice Statistics report, *Victimization During Household Burglary*, dated September 2010, a household member is present during the commission of approximately 1 million burglaries in the United States each year and became victims of violent crimes in 266,560 of those home intrusions. A large nationally representative survey revealed that there are between 2.2 to 2.5 million defensive uses of firearms annually (whether fired or not) to protect property at home, at work or elsewhere. This number dwarfs the number of violent crimes that occur each year in which the offender possessed a firearm. For example, according to the National Crime Victimization Survey, 847,652 such violent crimes occurred in 1992, the peak year for gun crime. (Ex. 7, Kleck Aff. ¶¶ 3 & 9).

Prohibitionist measures, like the Highland Park ban, are aimed at disarming criminals and non-criminals alike. These measures therefore discourage and presumably decrease the frequency of defensive gun use among non-criminal crime victims because even minimally

6 Empirical research demonstrates that criminals do not prefer to use "assault weapons." Criminals overwhelmingly prefer and use more concealable handguns in commission of crimes. Research has also revealed that drug dealers and juvenile gang members virtually never use "assault weapons." (Ex. 7, Kleck Aff. ¶ 9)

effective gun bans disarm some law-abiding citizens. The evidence will establish that reducing the availability of firearms among law-abiding citizens will also reduce defensive gun uses that would otherwise save lives, prevent injuries, thwart rape attempts, drive off burglars and help victims retain their property. (Ex. 7, Kleck Aff. ¶ 10).

**(C) Plaintiffs Have No Adequate Remedy at Law and Will Suffer Irreparable Harm.**

Infringement of the Second Amendment right to possess firearms for personal protection cannot be compensated by damages. *Ezell*, 651 F.3d at 699. And a continuing violation of a constitutional right that cannot be compensated with money constitutes a *per se* irreparable harm. *C.J. v. Department of Human Services*, 331 Ill. App. 3d 871, 891, 771 N.E.2d 539, 557 (1st Dist. 2002); *Elrod v. Burns*, 427 U.S. 347, 373 (1976)(The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury). "In a facial challenge ... the claimed constitutional violation inheres in the terms of the statute, not its application. [citation omitted] The remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied to *anyone*." *Ezell*, 651 F.3d at 698 (emphasis in original). Here, there can be no dispute that Plaintiffs do not have an adequate legal remedy and Defendant's infringement of their constitutional right is an irreparable injury.

## CONCLUSION

For the foregoing reason, Plaintiffs request that a preliminary injunction order be entered enjoining Defendant from enforcing Highland Park City Code §136.001 *et seq.* until such time as the merits of Plaintiffs' claims can be addressed.

James B. Vogts / ARDC 6188442
Swanson, Martin & Bell, LLP
330 N. Wabash Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com

Brett M. Henne / ARDC 6276545
Swanson, Martin & Bell, LLP
1860 West Winchester Road
Libertyville, Illinois 60048
(847) 949-0057
bhenne@smbtrials.com

Victor D. Quilici / ARDC 3123067
P.O. Box 428
River Grove, Illinois 60171
(847) 298-2566
victorq@ameritech.net

EXHIBIT 1

# CHAPTER 136: ASSAULT WEAPONS

SECTION

| | |
|---|---|
| 136.001 | Definitions |
| 136.005 | Possession and Sale Prohibited |
| 136.006 | Exemptions |
| 136.010 | Safe Storage or Display of Weapons and Magazines |
| 136.015 | Possession or Sale in Violation of Chapter |
| 136.020 | Disposition of Weapons and Magazines |
| 136.025 | Destruction of Weapons and Magazines |
| 136.999 | Penalty |

Sec. 136.001 Definitions.

Whenever the following words and phrases are used, they shall, for purposes of this Chapter, have the meanings ascribed to them in this Section 136.001, except when the context otherwise indicates.

(A) "Ammunition" means any self-contained cartridge, shot, bullet or projectile by whatever name known, which is designed to be used, or adaptable to use, in a Firearm and shot or discharged therefrom.

(B) "Antique Firearm" means:

(1) Any Firearm (including any Firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

(2) Any replica of any Firearm described in Paragraph (1) of this definition, but only if such replica;

(a) Is not designed or redesigned for using rimfire or conventional centerfire Ammunition; or

(b) Uses rimfire or conventional centerfire fixed Ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels or commercial trade.

(C) "Assault Weapon" means:

(1) A semiautomatic rifle that has the capacity to accept a Large Capacity Magazine detachable or otherwise and one or more of the following:

(a) Only a pistol grip without a stock attached;

(b) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(c) A folding, telescoping or thumbhole stock;

(d) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the Firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or

(e) A Muzzle Brake or Muzzle Compensator;

(2) A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of Ammunition;

(3) A semiautomatic pistol that has the capacity to accept a Detachable Magazine and has one or more of the following:

(a) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(b) A folding, telescoping or thumbhole stock;

(c) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the Firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

(d) A Muzzle Brake or Muzzle Compensator; or

(e) The capacity to accept a Detachable Magazine at some location outside of the pistol grip;

(4) A semiautomatic shotgun that has one or more of the following:

(a) Only a pistol grip without a stock attached;

(b) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(c) A folding, telescoping or thumbhole stock;

(d) A fixed magazine capacity in excess of five rounds; or

(e) An ability to accept a Detachable Magazine;

(5) Any shotgun with a revolving cylinder;

(6) Conversion kit, part or combination of parts, from which an Assault Weapon can be assembled if those parts are in the possession or under the control of the same person;

(7)     Shall include, but not be limited to, the Assault Weapons models identified as follows:

(a)     The following rifles or copies or duplicates thereof:

(i)     AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR;

(ii)    AR-10;

(iii)   AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR;

(iv)    AR70;

(v)     Calico Liberty;

(vi)    Dragunov SVD Sniper Rifle or Dragunov SVU;

(vii)   Fabrique National FN/FAL, FN/LAR, or FNC;

(viii)  Hi-Point Carbine;

(ix)    HK-91, HK-93, HK-94, or HK-PSG-1;

(x)     Kel-Tec Sub Rifle;

(xi)    Saiga;

(xii)   SAR-8, SAR-4800;

(xiii)  SKS with Detachable Magazine;

(xiv)   SLG 95;

(xv)    SLR 95 or 96;

(xvi)   Steyr AUG;

(xvii)  Sturm, Ruger Mini-14;

(xviii) Tavor;

(xix)   Thompson 1927, Thompson M1, or Thompson 1927 Commando; or

(xx)    Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).

(b)     The following pistols or copies or duplicates thereof:

  (i) Calico M-110;

(ii) MAC-10, MAC-11, or MPA3;

(iii) Olympic Arms OA;

(iv) TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or

(v) Uzi.

(c) The following shotguns or copies or duplicates thereof:

(i) Armscor 30 BG;

(ii) SPAS 12 or LAW 12;

(iii) Striker 12; or

(iv) Streetsweeper.

"Assault Weapon" does not include any Firearm that has been made permanently inoperable, or weapons designed for Olympic target shooting events.

(D) "Curios or Relics" has the meaning set forth in 27 C.F.R. § 478.11, as may be amended.

(E) "Detachable Magazine" means any Ammunition feeding device, the function of which is to deliver one or more Ammunition cartridges into the firing chamber, which can be removed from the Firearm without the use of any tool, including a bullet or Ammunition cartridge.

(F) "Firearm" means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas, excluding however:

(1) Any pneumatic gun, spring gun or B-B gun which expels a single globular projectile not exceeding .18 inches in diameter;

(2) Any device used exclusively for signaling or safety and required or recommended by the United States Coast Guard or the Interstate Commerce Commission;

(3) Any device used exclusively for the firing of stud cartridges, explosive rivets or similar industrial Ammunition; and

(4) Model rockets used to propel a model vehicle in a vertical direction.

(G) "Large Capacity Magazine" means any Ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

(1) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

(2) A 22 caliber tube Ammunition feeding device.

(3) A tubular magazine that is contained in a lever-action Firearm.

(H) "Muzzle Brake" means a device attached to the muzzle of a weapon that utilizes escaping gas to reduce recoil.

(I) "Muzzle Compensator" means a device attached to the muzzle of a weapon that utilizes escaping gas to control muzzle movement.

Sec. 136.005 Possession and Sale Prohibited.

No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity Magazine, unless expressly exempted in Section 136.006 of this Chapter.

Sec. 136.006 Exemptions

The prohibitions set forth in Section 136.005 of this Chapter shall not apply to:

(A) The sale or transfer to, or possession by any officer, agent, or employee of the City or any other municipality or state or of the United States, members of the armed forces of the United States, or the organized militia of this or any other state; or peace officers, but only to the extent that any such person named in this Section 136.006(A) is otherwise authorized to acquire or possess an Assault Weapon and/or Large Capacity Magazine and does so while acting within the scope of his or her duties;

(B) Any qualified retired law enforcement officer, as that term is defined in 18 U.S.C. § 926C(c), but only to the extent that the Assault Weapon and/or Large Capacity Magazine is safely stored or displayed by the officer in compliance with Section 136.010 of this Chapter;

(C) Transportation of Assault Weapons or Large Capacity Magazine if such weapons are broken down and in a nonfunctioning state and are not immediately accessible to any person;

(D) Antique Firearms, but only to the extent that the Antique Firearm is safely stored or displayed in compliance with Section 136.010 of this Chapter; or

(E) Curios or Relics, but only to the extent that both: (a) the owner of the Curio or relic has obtained a federal license for collectors of Curios or Relics; and (b)

the Curio or relic is safely stored or displayed in compliance with Section 136.010 of this Chapter.

Sec. 136.010 Safe Storage or Display of Weapons and Magazines.

Any Assault Weapon or Large Capacity Magazine that is exempt from the requirements of Section 136.005 of this Chapter, and that must be safely stored or displayed pursuant to Section 136.006 of this Chapter, must be secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon or magazine inoperable by any person other than the owner or other lawfully authorized user. Specifically, and without limitation of the foregoing, any Assault Weapon or Large Capacity Magazine that may be kept within the City pursuant to this Chapter must be secured from access by minors. For purposes of this Section 136.010, such weapon or magazine shall not be deemed stored or kept when being carried by or under the control of the owner or other lawfully authorized user.

Sec. 136.015 Possession or Sale in Violation of Chapter.

Any Assault Weapon or Large Capacity Magazine possessed, sold or transferred in violation of Section 136.005 of this Chapter is hereby declared to be contraband and shall be seized and destroyed of in accordance with the provisions of Section 136.025 of this Chapter.

Sec. 136.020 Disposition of Weapons and Magazines.

Any person who, prior to the effective date of this Chapter, was legally in possession of an Assault Weapon or Large Capacity Magazine prohibited by this Chapter shall have 60 days from the effective date of this Chapter to do any of the following without being subject to prosecution hereunder:

(A) Remove the Assault Weapon or Large Capacity Magazine from within the limits of the City;

(B) Modify the Assault Weapon or Large Capacity Magazine either to render it permanently inoperable or to permanently make it a device no longer defined as an Assault Weapon or Large Capacity Magazine;

(C) Surrender the Assault Weapon or Large Capacity Magazine to the Chief of Police or his or her designee for disposal as provided in Section 136.025 of this Chapter; or

(D) Take the steps necessary to cause the Assault Weapon or Large Capacity Magazine to fall within one of the exemptions set forth in Section 136.006 of this Chapter.

Sec. 136.025 Destruction of Weapons and Magazines.

The Chief of Police shall cause to be destroyed each Assault Weapon or Large Capacity Magazine surrendered or confiscated pursuant to this Chapter; provided, however, that no Assault Weapon or Large Capacity Magazine shall be destroyed until such time as the Chief of Police determines that the Assault Weapon or Large Capacity Magazine is not needed as evidence in any matter. The Chief of Police shall cause to be kept a record of the date and method of destruction of each Assault Weapon or Large Capacity Magazine destroyed pursuant to this Chapter.

Sec. 136.999 Penalty.

The violation of any provision of this Chapter is a misdemeanor, punishable by not more than six months imprisonment or a fine of not less than $500 and not more than $1000, or both.

# EXHIBIT 2

Luis A. Berrones

FILED
DEC 12
Circuit Clerk

IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION

Plaintiffs,

v.

CITY OF HIGHLAND PARK

Defendant.

No: 13 CH 3414

**VERIFIED COMPLAINT FOR**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

NOW COME the Plaintiffs, Dr. Arie S. Friedman and the Illinois State Rifle Association, by their attorneys, and for their Verified Complaint for Declaratory Judgment and Injunctive Relief against the Defendant City of Highland Park state that the Defendant has by City Code §136.001 *et seq.* unconstitutionally infringed the fundamental right of law-abiding citizens under the Second Amendment of the United States Constitution to keep and bear arms for lawful purposes, including the defense of his home and family.

**THE PARTIES**

1. Dr. Arie S. Friedman ("Dr. Friedman") is an adult resident of Highland Park, Illinois. He is a law-abiding citizen, who is lawfully entitled to own and possess firearms under all applicable Federal and State laws and regulations. Plaintiff owns and possesses firearms in Highland Park for lawful purposes, including the defense of his home and family. Neither Plaintiff nor his firearms pose a threat to the community.

2. The Illinois State Rifle Association ("ISRA") is a non-profit educational foundation incorporated under the laws of Illinois, with its principal place of business in Chatsworth, Illinois. ISRA has more than 30,000 members residing throughout the State of Illinois, including Highland Park. The purposes of the ISRA include the protection of the rights of citizens to keep and bear arms for the lawful defense of their families, persons and property, and to promote public safety and law and order.

3. Highland Park is a municipal corporation located in Lake County, Illinois. Defendant is governed by a Mayor and an elected six-member City Council, which, among other things, is empowered to enact Ordinances under its home rule authority.

**STANDING**

4. Dr. Friedman owns and possesses firearms in Highland Park that are banned under the Highland Park City Code §136.001 *et seq.* ("Ordinance"). Plaintiff must take certain actions by December 14, 2014 to be in compliance with the Ordinance, including removing the firearms from Highland Park, rendering them inoperable or surrendering them to the Chief of Police. The actions required of Plaintiff under the Ordinance constitute continuing harm to his constitutional right to keep and bear arms under the Second Amendment to the United States Constitution.

5. ISRA brings this action on behalf of its members residing in Highland Park, who own firearms and ammunition magazines prohibited by the Ordinance, desire to acquire prohibited for lawful purposes and would otherwise have standing to bring this action in their own right. The claims made in this action and the interests this action advances are germane to ISRA's organizational purpose. The relief requested in this action does not require participation of individual ISRA members

## THE ORDINANCE

6. On June 24, 2013, the Highland Park City Council passed an ordinance titled, "Assault Weapons", which in part provided:

> No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity Magazine, unless expressly exempted in Section 136.0006 of this Chapter.

City Code §136.010.

7. An "Assault Weapon" is defined under the Ordinance to include certain specific models of semiautomatic rifles, shotguns and pistols and duplicates thereof; and semiautomatic firearms having certain features, including a pistol grip without an attached stock; a protruding grip; a folding, telescoping or thumbhole stock; a barrel shroud; a muzzle brake; and a muzzle compensator. City Code §136.001(C).

8. A "Large Capacity Magazine" is defined under the Ordinance as an ammunition feeding device with the capacity to accept more than ten rounds. City Code §136.001(G).

9. Effective December 14, 2103, any person in possession of an "Assault Weapon or Large Capacity Magazine" is required by the Ordinance to (a) "remove" it from "the limits of the City;" (b) "modify" it to make them "permanently inoperable;" (c) "surrender" it to the Chief of Police of his designee for "disposal;" or (d) "take the steps necessary" to cause it to fall within one of the exemptions set forth in Section 136.006. City Code §136.020.

10. Failure to take any of the above actions by December 14, 2013 shall constitute a "misdemeanor, punishable by not more than six months in prison or a fine of not less than $500 and not more than $1,000, or both." City Code §136.999.

## COMMON OWNERSHP OF FIREARMS AND MAGAZINES BANNED UNDER THE ORDINANCE.

11. Some of the most commonly owned firearms in the United States are among the firearms banned under the "Assault Weapons" Ordinance. Between 1990 and 2012 approximately 4.8 million semiautomatic rifles built on the AR-style platform have been produced in the United States for commercial sale to law-abiding citizens. Additionally, approximately 3.4 million AR-style and AK-style firearms have been imported into the United States for commercial sale and civilian use. AR-style firearms are manufactured by 37 federally-licensed firearms manufacturers in the United States, including Smith & Wesson, Colt's, Remington, Sig Sauer and Sturm, Ruger. AR-style semiautomatic rifles are sold by nearly every federally-licensed retail seller in the United States, and more than one out of every five firearms sold today is an AR-style semiautomatic rifle. Referred to by many as modern sporting rifles, AR-style rifles are sold today in greater numbers than traditionally-styled rifles. Modern sporting rifles are owned by more than 4.8 million persons in the United States.

12. The common ownership and popularity of modern sporting rifles is based on their ready adaptability for different lawful uses, including home defense, hunting and target shooting. They are also lighter in weight, shorter in length and have less recoil than most traditionally-styled wooden stock rifles, making them easier to handle and shoot. AR-style semiautomatic rifles are also very accurate and reliable, and typically have greater ammunition capacity than more traditionally-styled rifles. Most are sold with ammunition capacities of greater than ten rounds.

13. Most AR-style rifles and many of the other firearms banned by Defendant by model designation or type have features prohibited by the Ordinance. None of the prohibited features make the firearm a dangerous and unusual weapon. A "pistol grip without a stock

attached" is the by-product of the raised butt-stock design of AR-style rifles, which serves to reduce muzzle flip during recoil, allowing the shooter to have better control of the firearm and achieve better accuracy. A "protruding grip that can be held by the non-trigger hand" also serves to enhance control of the firearm and improve accuracy. A "folding stock" simply makes a gun more compact for storage or transport. A "telescoping stock" permits the firearm to be adjusted to fit persons of different stature. A "thumbhole stock", which is present on many target competition firearms, merely allows for a more comfortable grip and better control of the firearm. A "barrel shroud" is present in most firearms to protect the non-trigger hand from heat build-up in the firearm's barrel. A "muzzle break" redirects muzzle gas to reduce recoil. A "muzzle compensator" also redirects muzzle gas but does so to keep the muzzle down and provide better control of the firearm for successive shots. Each of these features contributes to the accuracy and safety of the firearm for use in situations where safety and accuracy are paramount concerns, including a home defense situation.

14. Most AR-style rifles are chambered for .223 ammunition, a relatively inexpensive cartridge that is particularly well-suited for home defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. Although most pistol rounds have less muzzle velocity than a .223 round, they have greater mass, maintain velocity after passing through walls and other objects and pose substantially greater risk to unintended targets in the home. There is a consensus among those with expertise in home defense and ballistics that an AR-15 rifle chambered for .223 ammunition is an optimal firearm to rely on in a home defense encounter.

15. A survey of more than 20,000 owners of AR-style and AK-style firearms across the country revealed that recreational target shooting was the number one ranked reason for owning a modern sporting rifle, followed closely by home defense. A survey of firearm owners in Northern Illinois revealed that more than 50% of those surveyed owned a semiautomatic rifle with a detachable magazine for the purpose of personal protection.

16. Encounters with criminal intruders in the home are not uncommon. The United States Department of Justice, Bureau of Justice Statistics reported that approximately 1 million residential burglaries occur each year while a household member is present. Household members became victims of violent crimes in 266,560 of those home invasions. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms defend themselves or their property.

**OWNERSHIP AND POSSESSION OF**
**PROHIBITED FIREARMS AND MAGAZINES**

17. Dr. Friedman owns and keeps in Highland Park certain semiautomatic firearms and ammunition magazines that are subject to the prohibition set forth in the Ordinance, including a Smith & Wesson M & P 15 rifle, a Springfield M1A rifle and multiple magazines capable of holding more than ten rounds of ammunition. Dr. Friedman's Smith & Wesson M & P 15 rifle is an AR-style rifle, and has a pistol grip without a stock attached, a barrel shroud and a collapsible, telescoping stock. Dr. Friedman's Springfield M1A rifle has a barrel shroud and a muzzle brake.

18. Dr. Friedman keeps and maintains the firearms and ammunition magazines described above for lawful purposes, including recreational target shooting and defense of his home and family. Plaintiff is trained on their use and stores them safely. He keeps the Smith & Wesson M & P 15 rifle available for defense of his home and family should the need arise.

**COUNT I – DECLARATORY JUDGMENT**

19. The allegations set forth in paragraphs 1 through 18 are re-alleged as though fully set forth herein.

20. Ownership of firearms that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home against a criminal intruder, is a fundamental right under the Second Amendment to the United States Constitution.

21. Defendant has infringed the fundamental Second Amendment right of Plaintiff Friedman and Plaintiff ISRA members to keep and bear arms by prohibiting his ownership and of possession of firearms in his home that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

22. Defendant does not have a compelling governmental interest in depriving Plaintiff of his Second Amendment right to own and possess firearms that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

WHEREFORE, Plaintiffs respectfully request that City of Highland Park City Code §136.001 *et seq.* be declared unconstitutional and that judgment be entered in their favor and against the Defendant, including an award of costs.

**COUNT II – INJUNCTIVE RELIEF**

23. The allegations set forth in paragraphs 1 through 22 are re-alleged as though fully set forth herein.

24. Plaintiffs have a clear and ascertainable right to own and possess firearms in their homes that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

25. Plaintiffs will suffer irreparable harm if Defendant is not enjoined from enforcing City Code §136.001*et seq.* and they are prohibited from owning and possessing firearms in their home that are commonly possessed by law-abiding citizens for lawful purposes, including self-defense in the home.

26. Plaintiffs have no adequate remedy at law for Defendant's infringement of their fundamental right under the Second Amendment to the United States Constitution.

WHEREFORE, Plaintiffs respectfully request that an order be entered permanently enjoining the Defendant from enforcing City of Highland Park City Code §136.001 *et seq.* and that judgment be entered in their favor and against the Defendant, including an award of costs.

by: ______________________
One of Plaintiffs' Attorneys

James B. Vogts / ARDC 6188442
Swanson, Martin & Bell, LLP
330 N. Wabash Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com

Brett M. Henne / ARDC 6276545
Swanson, Martin & Bell, LLP
1860 West Winchester Road
Libertyville, Illinois 60048
(847) 949-0057
bhenne@smbtrials.com

Victor D. Quilici / ARDC 3123067
P.O. Box 428
River Grove, Illinois 60171
(847) 298-2566
victorq@ameritech.net

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Verified Complaint for Declaratory and Injunctive Relief are true and correct.

DR. ARIE S. FRIEDMAN

# EXHIBIT 3

**IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION | ) | |
| Plaintiffs, | ) | |
| | ) | No: 13 CH 3414 |
| v. | ) | |
| CITY OF HIGHLAND PARK | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF DAVID A. LOMBARDO**

If sworn as a witness, I could competently testify to the following:

1. I offer this Affidavit based on my expertise and experience in firearms training, safety and use.

2. I am the founder and President of Safer USA, an organization dedicated to providing knowledge and training on the safe and responsible use of firearms for self-defense and recreation by law-abiding citizens. I am also an Illinois Certified Firearms Instructor, an NRA Law Enforcement Instructor and an NRA Training Counselor on pistols, rifles, shotguns, home firearms safety, personal protection in the home and personal protection outside the home. I also serve as the Executive Director of the Clyde Howell NRA Youth Shooting Sports Camp and the President of the Aurora Sportsmen's Club. I have personally taught firearms safety and firearms use to both experienced and novice shooters and have interacted with the gun owning public in a variety of ways for 25 years. I am qualified to testify on the types of firearms that are

commonly and appropriately owned for lawful purposes, including home defense, hunting and recreational shooting. My qualifications are further described in my resume, attached to this Affidavit as Exhibit A.

3. I have reviewed City of Highland Park City Code section 136.001 *et seq*. Many of the firearms banned under the ordinance are commonly owned by residents of Illinois and elsewhere for lawful purposes, including home defense, hunting and recreational target shooting. For example, the most popular and commonly owned firearms today are rifles built on an AR-platform. The popularity of these rifles is based, in part, on their modular in design. They have an upper receiver into which the barrel is mounted and a lower receiver that holds the firing assembly and onto which the butt stock and lower grip are mounted. The two receivers can be disconnected easily, allowing the shooter to mount a different upper receiver and barrel and thus use a wide variety of rifle cartridges and change the length and weight of the barrel to suit the shooter's needs. Because of its adaptability, a single AR-type rifle can be used for target matches, home defense, and small and large game hunting.

4. The popularity of AR-platform rifles is based not only on their ready adaptability for different uses. They are also lighter in weight, shorter in length and have less recoil than most traditionally-styled wooden stock semi-automatic rifles, making them easier to handle and shoot. They are also very accurate and reliable. Many of the most commonly owned AR-platform rifles are chambered for .223 ammunition, a relatively inexpensive rifle cartridge that is particularly well-suited for home defense purposes. Although the .223 round has sufficient stopping power in the event a home intruder is encountered, the round loses velocity relatively quickly after passing through walls and other objects, thus decreasing the chance that errant shot inadvertently strikes an unintended target in a home defense situation. Although the right home

defense firearm is the firearm with which an individual homeowner has most familiarity, AR-platform rifles are an excellent and commonly made choice, and I instruct his students on their virtues and recommend their use for personal defense.

5. I personally surveyed students in the firearm classes I taught in 2013 to determine what type of firearm they keep in their home for self-defense purposes. Of those I surveyed, 58.8% keep a semi-automatic rifle with a detachable magazine available in the event it was needed defend them, their family of their property.

5. AR-platform rifles are also appropriately and commonly used for small game hunting for many of the same reasons they are well-suited for home defense – accuracy, reliability and ease of handling. They are also used in the very popular "3 Gun" shooting competitions, the fastest growing shooting sport in the country, in which shooters use a pistol, a shotgun and an AR-platform rifle to move through different stages and engage different targets from a variety of positions.

6. The firearm design features that Highland Park has chosen to ban, including pistol grips; protruding grips; folding, telescoping and thumbhole stocks; so-called "barrel shrouds;" and muzzle breaks, are typically integral to safe handling of the firearm and enable the shooter to accurately and reliably use his gun. The presence on a firearm of one or more of the features that Highland Park has chosen to ban and criminalize do not make the firearm any more lethal or dangerous if it is misused.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Affidavit are true and correct.



David A. Lombardo



# DAVID A. LOMBARDO

1113 S. Raven Road; Shorewood, Illinois 60431-9165 U.S.A.
Tel: 815-741-3474; Fax: 815-741-3479; Email: dlombardo@saferusa.com

## EDUCATION

University of Illinois; Urbana, IL

| | |
|---|---|
| Jan 77 - Jan 79 | Coursework completed for Ph.D. Department of Educational Psychology |
| Jan 74 - Jan 77 | M.Ed. Vocational/Technical Education. Emphasis on curriculum design/development |
| Jun 72 - Jan 74 | BS Industrial Education Emphasis on aviation flight & maintenance training |
| Jan 70 - Jun 72 | Institute of Aviation graduate Professional Pilot and Aircraft Maintenance Curricula |

## Additional Training

| | |
|---|---|
| Apr 27, 2011 | The Bulletproof Mind (7 hrs) - LTC David Grossman. Tri-River Police Training Region. |
| Apr 10, 2011 | Armed Citizens' Rules of Engagement (20 hrs). Massad Ayoob |
| Feb 23, 2011 | Firearms Training Course: Revolver, Semi-automatic, rifle & shotgun. Illinois Dept of Financial & Professional Regulation. |
| Nov 19, 2010 | Law Enforcement Handgun Instructor School (48 hrs). NRA Law Enforcement Division. |
| Jul 20, 2006 | Underwater Egress Training (8 hrs). Stark Survival Training. |
| Jul 19, 2006 | Open Water Survival Training(12 hrs). Stark Survival Training. |
| Feb 14, 2001 | NBAA 10th Annual Corporate Aviation Leadership Conference. "Your Most Important Asset? People!" Embry-Riddle Aeronautical University Executive Management Institute. Anaheim, CA. |
| Jul 19, 2000 | Strategic Management for Aviation Services. Kellogg Graduate School of Management, Transportation Center, Northwestern University; Evanston, IL |
| Feb 29, 2000 | Glock Armorer's Course (8 hrs). Glock Firearms. |
| Jul 11, 1999 | Advanced Handgun Skills(24 hrs) Massad Ayoob Lethal Force Institute |
| May 15, 1999 | Hazardous Materials Awareness Course (8 hrs). Illinois Emergency Management Agency. |
| Mar 10, 1998 | Verbal Judo (8 hrs). Northeast Multi-Regional Law Enforcement Training. |
| Dec 16, 1997 | Edged Weapons Defense Training (8 hrs). Tri-River Police Training Region. |
| Nov 23, 1996 | Use of Force Protocol Training (24 hrs). Will County Sheriff's Department |
| Apr 13, 1996 | Part time/Reserve Basic Law Enforcement Training (250 hrs). Tri-River Police Training Region. |
| Jul 2, 1994 | Mandatory 40-hour Firearms Training. State of Illinois Law Enforcement Officers Training Board. |

## NRA COURSES I TEACH

Basic Pistol
Basic Rifle
Basic Shotgun
Home Firearm Safety

EXHIBIT
A

Personal Protection in the Home
Personal Protection outside the Home
Chief Range Safety Officer
Range Safety Officer
Metallic Cartridge Reloading
Shotgun Shell Reloading
Refuse To Be A Victim
Basic Instructor Training
Instructor courses for all of the above

**OTHER COURSES I TEACH**

State of Illinois 40-hour Armed Security program
Home Protection & Concealed Carry Seminar
Winchester Marksmanship Qualification Program: Handgun
Winchester Marksmanship Qualification Program: Rifle
Chicago Firearm Certification
Utah Concealed Carry
Florida Concealed Carry
Concealed Carry (practical)
Long Range Rifle
Tactical Pistol
Basic Practical Ballistics

**FIREARMS INSTRUCTOR CERTIFICATION & QUALIFICATION**

U.S. Army Marksman (Rifle)
NRA Marksmanship Qualification: Distinguished Expert Handgun
Illinois Certified Firearms Instructor
NRA Law Enforcement Instructor (Handgun)
Utah Concealed Carry Instructor
NRA Training Counselor/Instructor
Chief Range Safety Officer
NRA Regional Counselor - Refuse To Be A Victim program
Chicago Firearm Certification Instructor
Tactical Pistol instructor
Illinois Hunter Safety Master Instructor (6/00 - 6/05)

Aurora Sportmen's Club (Waterman, IL); 1400 member, 255 acre shooting club

10/11 - present President
9/11 - 10/11 Vice President
1/10 - 9/11 Board of Directors

National Rifle Association (Endowment Life member).
NRA Recruiter

Wood County, Ohio Sheriff's Auxiliary, Special Deputy (6/90 - 8/91)

1/22/91 - FBI Domestic Counter-Terrorism Briefing. (4 hrs)
4/13/91 - Ohio Peace Officer Asc Seminar: Control Non-Violent Crowds, Confronting Hostile Crowds & Riot Formations. (4 hrs)
6/3-8/91 USAF/USCG Inland Search & Rescue School. Madison, WI. (40 hrs)
6/25-27/91 - Review, briefing and evaluation of US Army ROTC Leadership Assessment Program. Fort Knox, KY. (45 hrs)
7/13/91 - Hazardous Materials Awareness Level. Ohio Fire Academy & Haz Mat Bureau. Bowling Green, OH. (6 hrs)

Will County Sheriff's Department Auxiliary Deputy

**Leadership**

8/03-11/11 Sergeant & Executive Board member
5/97-11/11 Background investigations
4/93-11/11 Auxiliary Deputy

**Training**

12/10/05 - CDP/AED refresher training (4.0 hrs)
01/29/04 - Tactical training (simunition) (4.0 hrs)
01/27/04 - Use of deadly force and floor fighting (4.0 hrs)
04/15/03 - Hazmat refresher (1.0 hr)
03/22/03 - Tactical firearms - Use of shield and move-and-shoot (4.0 hrs)
03/22/03 - Active Shooter Immediate Action Rapid Deployment (4.0 hrs).
02/20/03 - CPR & AED recertification (8.0 hrs)
05/17/02 - Mgmt of Incidents Involving Subjects w/Mental Illness(2.0 hr).
05/14/02 - Hazardous Materials Awareness Refresher Training (4.0 hr).
05/14/02 - Clandestine Laboratory Awareness (3.0 hrs).
03/12/02 - Active Shooter Immediate Action Rapid Deployment (6.0 hrs).
01/17/02 - Building Searches (5.0 hrs).
01/15/02 - Building Searches (4.0 hrs).
11/17/01 - Use of force refresher & night shooting (8.0 hrs).
10/16/01 - Tactical Firearms Training: pistol & shotgun (2.0 hr).
09/20/01 - Strategies & Tactics of Patrol Stops (S.T.O.P.S.) (8.0 hr).
04/26/01 - Sexual, Ethnic, Racial or Religious Harassment (2.0 hr).
04/24/01 - Hazardous Materials Awareness Refresher Training (4.0 hr).
08/24/00 - Ethics and Policing (2.0 hr).
08/22/00 - Hazardous Materials Awareness Refresher Training (4.0 hr).
08/22/00 - Sexual, Ethnic, Racial or Religious Harassment (2.0 hr).
07/14/00 - Automated External Defibrillator certification (3.0 hrs)
04/18/00 - Gang Awareness Training (1.5 hrs)
02/21/00 - CPR Recertification (3.0 hrs)
01/18/00 - Managing Force Escalation (0.75 hr)
11/07/99 - Tactical Firearms (8.0 hr)
05/15/99 - Hazardous Materials Awareness Course (29CFR 1910.120) for Hazardous Waste Operations & Emergency Response Trng (8.0 hr).
05/01/99 - Sexual, Ethnic, Racial or Religious Harassment (2.0 hr).
05/01/99 - Blood-borne Pathogens (1.0 hr).
05/01/99 - Police Ethics (1.0 hr).
10/03/98 - Motor Vehicle Pursuit, Emergency/High Speed Response Driving, & Pursuit Termination Devices (3.0 hrs)
03/10/98 - Verbal Judo; North East Multi-Regional Training, Inc. (8.0 hrs)
12/16/97 - PPCT Edged Weapons Defense Training; Flores & Associates Law Enforcement & Security Training Consultants (8.0 hr)
05/20/97 - AIDS Awareness/Prevention for Emer Svc Personnel (0.5 hr)
04/15/97 - Severe Weather Spotter certification - Will County Emergency Management (1.0 hr)
02/18/97 - Use of Seat Belts and Crash Survival (0.5 hr)
02/18/97 - Protection: Filipino-style Knife Tactics (0.5 hrs)
01/21/97 - Disguised & Street Weapons (0.5 hrs)
11/23/96 - Use of Force Protocol Training (24 hrs)
05/04/96 - ASP Baton certification (8 hrs)
04/13/96 - Tri-River Police Training: 250 Hr Part-Time/Reserve Law Enforcement Training (Scholastic Standing - 3rd Place 95.5%)
06/20/95 - Oleoresin Capsicum certification (2 hrs)
02/21/95 - Gang Awareness training (1 hr)
08/14/94 - Building Search training exercise (16 hrs)

04/05/93 - Firearm Qualification Course (40 hrs)

**Howell Shooting Club**

6/11 - Exec Director 13th Clyde Howell NRA Youth Shooting Sports Camp
6/10 - Director 12th Clyde Howell NRA Youth Shooting Sports Camp
6/09 - Director 11th Clyde Howell NRA Youth Shooting Sports Camp
6/08 - Director 10th Clyde Howell NRA Youth Shooting Sports Camp
6/07 - Director 9th Clyde Howell NRA Youth Shooting Sports Camp
6/06 - Director 8th Clyde Howell NRA Youth Shooting Sports Camp
6/05 - Director 7th Clyde Howell NRA Youth Shooting Sports Camp
6/04 - Director 6th Clyde Howell NRA Youth Shooting Sports Camp

01/14-18/04 Chicagoland Outdoor Show Air Rifle Range (772 shooters: 576 males, 196 females including 510 males under 18 and 127 females under 18)

11/03 - President & member of the Board of Directors. Developed new Constitution, By-laws and Operating Rules for the organization.

5/03 - Ombudsman & Security 5th Clyde Howell NRA Youth Shooting Sports Camp (88 students).

11/02 - 11/03 Vice president & member of the Board of Directors, Membership Chairman, develop by-laws and organizational chart for Youth Shooting Camp. Organize and staff promotional booth at numerous trade shows.

8/02 - 11/02 Range Safety Office & member of the Board of Directors

5/02 - Security 4th Clyde Howell NRA Youth Shooting Sports Camp (75 students).

6/01 - Intern Coordinator 3rd Clyde Howell NRA Youth Shooting Sports Camp (74 students).

7/21-22/00 - Illinois Valley Woodland Expo, Oglesby, IL. Trained 17 adults and 33 youth using the FATS Hunter Interactive Training Simulator for 12-gauge shotgun.

6/00 - Pistol Instructor & Registrar 2nd Clyde Howell NRA Youth Shooting Sports Camp (58 students).

6/99 - Pistol Instructor 1st Annual Clyde Howell NRA Youth Shooting Sports Camp (50 students)

**EMPLOYMENT**

**Sep 12 - On Target Radio - AM560 WIND**
**Executive Producer & Host.** A weekly (Sunday 9:00 - 10:00 p.m.) live radio talk show covering Second Amendment, firearms, hunting and personal protection issues with in-studio guests. Over 10,000 broadcast listeners and several thousand more Internet live stream listeners and podcast download listeners worldwide.

**Oct 06 - SAFER USA; Shorewood, IL**

**Founder, President & NRA Training Counselor/Instructor:** Firearm safety education school. SAFER USA's ten NRA certified instructors offer over 35 different courses and has taught over 4500 students. SAFER USA has also provided consulting on various law enforcement and military contract research projects helping to design safety protocols and supplying firearms, ammunition, marksmanship and range safety services.

**Oct 09 - SAFER USA Outreach Fund, NFP; Shorewood, IL**
**Founder, President.** An IRS 501C3 not for profit educational foundation with a three part mission. First: To provide firearm safety training and second amendment education to non-traditional shooters (women, youth, minorities and persons with disabilities). Our Clyde Howell NRA Youth Shooting Sports Camp, now in its 13th year, has trained over a thousand youth ages 10 to 16. Second: To offer post secondary school academic scholarships to individuals with a demonstrated history of support and involvement in the shooting sports. Third: To provide basic and tactical training to law enforcement agencies that lack the budget to provide their own training.

**Sep 00 - Present Aviation International News; Midland Park, NJ**
**Senior Editor:** Features and news. **AINtv:** Producer/news anchor/reporter. Write features and news for monthly Aviation International News (cover Asian market and write columns: Hot Section News and Hot Section Profile); Write monthly industry blog; Business Jet Traveler (write column Safety Matters and occasionally Getaways column), Convention News issues, weekly online column AINmxReports, and produce/anchor AINtv news broadcasts from the world's major air shows: Paris, Farnborough, Dubai, Singapore, Geneva, etc. Over 1500 articles published. Over 1.5 million airline miles covering stories and six time runner-up for the International Aerospace Journalist of the Year award.

**May 93 - Sep 00 Self-employed Journalist, Writer, Actor, and Speaker**
**WRITER:** Midwest Correspondent - Aviation International News, Contributing editor - Aviation Maintenance Magazine and Rotor&Wing magazine, and frequent contributor to numerous international publications, newsletter articles, and research publications. Developed numerous grant proposals, speech writing and promotional materials. **AUTHOR:** Aircraft Systems - Understanding Your Airplane; Aircraft Systems (Spanish version); Aircraft Systems (Chinese version); Advanced Aircraft Systems; Aerospace Facts & Figures - 1999 - 2000; and Vertical Flight Training: Alternative Training Systems. **ACTOR:** Numerous independent films, television productions, commercials, and industrial films. Over 40 years acting experience in community and regional theaters. **SPEAKER:** Over 6,000 hours of motivational speaking and seminars. Established reputation for an informal, humorous style. As a contract speaker I have traveled all over North America and spoken to groups ranging in size from a few, to as large as 20,000 (appx 120 seminars).

**Sep 81 - Sep 00 Lombardo & Associates**
International aviation consultant: Flight, maintenance and simulation training program development and prudent pilot expert witness. Taught over 200 aviation safety seminars and flight instructor refresher clinics. Clients have included the Departments of Transportation for the states of Illinois, Louisiana, Ohio, Mississippi, Michigan, Wisconsin and Missouri; the Civil Air Patrol; EAA AirVenture '03-Oshkosh, The 99's; Federal Aviation Administration, NASA, numerous colleges, universities and aviation organizations, and domestic and international corporations.

**Jan 95 - Jun 95 "Five By Five" - WAUR AM 930**
Host and Programming Director of live, aviation call-in radio program. Develop programming and conduct live interviews. Broadcast coverage area included most of the Greater Chicago Metro area.

**Aug 91 - May 93 Lewis University; Romeoville, IL**
Associate Dean of Aviation and Associate Professor, Division of Aviation. Responsible for all aviation budgets, strategic planning, resource management, 540+ students, 25+ faculty/staff members, FAR 141 and 147 schools, and all programming for 11 academic majors in Aviation Maintenance Management, Aviation Administration and Aviation Flight Management. Facility management of three academic buildings and coordination of $2.25 M new facility project planning.

**Aug 88 - Aug 91 Bowling Green State Univ.; Bowling Green, OH**
Assistant Professor, Aerotechnology Program, Dept of Tech Systems. Promoted May 1991: Director, Division of Aviation Studies. Teach primary and advanced lecture and flight courses. Coordinate all facets of Aerotechnology program: flight, maintenance and management. Extensive curriculum, program and facility development. Airport facility management including extensive space reclamation, development and reorganization. Advisor Alpha Eta Rho professional aviation fraternity- increased active membership 400+%. Seek and write grant proposals; received $30,000 research grant. Lay foundation for interdisciplinary human factor aviation research program. Member graduate faculty, advisor to 120 undergraduate and graduate students. Administer $400,000+ budget and 20+ employees. Major research interest: flight simulation.

**Mar 85 - Aug 88 Frasca International; Champaign, IL**
Director of Training: International consultant on effective use of simulators in flight training, research, pilot selection, and training program development. Conduct domestic and offshore training for numerous international organizations. Editor and feature writer Simulation Newsletter. Other responsibilities include: internal human factors design consultant, marketing, advertising, civilian and government proposal writing, and technical documentation. Produce and direct promotional video programming. Supervise 3 employees. Work with numerous outside contractors, and high-ranking international government, corporate, airline and military personnel. Set up and staff numerous trade shows.

**Sep 82 - Mar 85 Louisiana Tech University; Ruston, LA**
Assistant Professor, Department of Professional Aviation - taught courses in aerodynamics, multiengine theory, Boeing 727 flight engineer theory, instrument flight instructor, and airline transport pilot. Maintenance supervisor of 13 aircraft. Developed and taught career development and job search seminars (appx 10 taught). Part 141 Phase check pilot. Faculty advisor Alpha Eta Rho professional aviation fraternity - increased membership 500+%. Advisor 2 other organizations. Supervise flight dispatch operation and 13 employees. Conducted and published interdisciplinary research project in emergency aircraft lighting.

**Sep 81 - Jun 82 GAITS Teaching Seminars; Milwaukee, WI (Part time)**
Part time instructor teaching flight instructor refresher clinics. Specialized in ed psych, safety and prudent pilot techniques, communication, and multiengine operations (appx 10 seminars taught).

**Jun 81 - Jun 82 Airmanship, Inc; Rockford, IL**
Director of Program Development: responsible for design and development of all written, audio, and visual aviation education programs and materials for a professional pilot refresher flight and simulation training programs.

Development of research/ reference library; working supervision of in-house graphic arts, printing, photo lab, television studio and support staff. Taught appx 20 seminars.

**Mar 81 - May 81 U.S. Navy; Newport, RI**
Basic officer course

**Feb 80 - Mar 81 FlightSafety International, St. Louis, MO**
King Air Learning Center
King Air 200 and Beech C-12 simulator instructor for U.S. and international flight crews. Design, develop, instruct classroom courses in FAA regulations, air traffic control procedures, and flight safety. Developed research/reference library. Taught appx 125 seminars.

**Jun 79 - Feb 80 Mason Oil Company; Champaign, IL (Part time)**
Chief pilot and mechanic - Cessna 421. Develop flight department & hire full time crew.

**May 77 - Feb 80 Accelerated Ground Schools; Atlanta, GA (Part time)**
Chief instructor, CFI Refresher Clinic teaching team - responsible for conducting and organizing clinics. Teaching specialty: regulations, educational psychology, stress and physiology. Ground school instructor - private and instrument courses. Taught appx 150 seminars.

**May 77 - Dec 79 McCollum Aviation; Danville, IL (Part time)**
Aircraft ferrying, demonstrations, delivery and checkouts.

**Apr 77 - Aug 79 University of Illinois; Urbana, IL (half-time)**
Career Development and Placement Office Assistant Director - Career Information. Professional career counselor. Instructor - career education seminars (taught appx 10 seminars). Developed computerized career/job search programs.

**Mar 76 - Apr 77 US Army Corps of Engineers; Champaign, IL (Half-time)**
Graduate research assistant - the effect of living, working and training environment on job performance. Designed computer-assisted instructional courseware.

**Sep 74 - Jun 75 York Community High School; Elmhurst, IL**
Teacher - Science Department. Taught aerospace education, private pilot, meteorology, & introductory physical science.

**May 74 - Aug 79 University of Illinois; Urbana, IL (Part time)**
Author PLATO computer-assisted instructional courseware. Subject areas: aviation weather, introduction to aerodynamics, and career information.

**Jun 73 - Aug 74 Consolidated Camera Centre; Champaign, IL (Part time)**
Chief pilot and store manager. Supervised 5 employees.

**Sep 71 - Aug 74 Univ. of IL; Savoy, IL - Institute of Aviation (Half-time)**
Graduate research assistant and flight instructor - private and commercial. Project: Effects of simulation on transfer of learning to aircraft. Curriculum design/evaluation specialist and research flight instructor.

**Sep 69 - Jan 70 United Air Lines; Chicago, IL**
Passenger Service Agent - O'Hare Airport.

**May 66 - May 69 U.S. Army Medical Corps**

Medical administration and medic. 1 year duty Vietnam. Instructor for two rotations of basic training (Ft. Benning, GA).

**RESEARCH GRANTS**

Mar 89 – Aug 90 Ohio Board of Regents Research Challenge Effectiveness of Computer-Based Flight Simulation. $30,875 grant to study transfer of training from personal computer-based flight simulation software to a flight training device.

**OTHER GRANTS WRITTEN**

Dec 03 Howell Shooting Club 6th Annual Clyde Howell NRA Youth Shooting Sports Camp. $10,500 programming grant from Friends of the NRA for equipment to support the camp and a non-traditional shooter outreach program.

Apr 07 Howell Shooting Club 9th Annual Clyde Howell NRA Youth Shooting Sports Camp. $3.100 Portable Air Rifle Range grant from Friends of the NRA for equipment to support the camp and a non-traditional shooter outreach program.

Apr 07 Howell Shooting Club 9th Annual Clyde Howell NRA Youth Shooting Sports Camp. $3,200 Advanced Handgun Training program grant from Friends of the NRA for equipment to support the camp and a non-traditional shooter outreach program.

**PROFESSIONAL ACTIVITIES**

Apr 05 Professional Aviation Maintenance Association (PAMA) Board of Directors

Jul 98 U.S. Government Accounting Office – Presentation on Personal Computer-Aviation Training Devices (PCATD)

Nov 97 U.S. House of Representatives Subcommittee on Aviation – Testify on PCATD flight hour credit for Instrument Rating – Airplane

May 94 – May 95 University Aviation Association – Member: Technical Evaluation Committee

Sep 92 – Sep 93 University Aviation Association – National Organization Treasurer & Chair, Finance Committee.

May 92 – May 93 Aviation Aerospace Teacher Education Committee – Illinois Department of Transportation.

Jan 92 – May 93 Society of Automotive Engineers – Member: Simulation Committee

Nov 91 – May 93 Illinois Transportation Research Center. – Illinois Department of Transportation – Executive Board & Research Committee

Nov 91 – Public Works Committee, Shorewood, IL.

Sep 91 – Sep 96 University Aviation Association – Member, Ab Initio Pilot Training Committee

Apr 90 – Sep 95 UAA/FAA Flight Training Device Task Force – Chair a 5-year task force to formulate certification requirements & training allowances and conduct supporting research for Level 1-3 Flight Training Devices.

Jan 90 Federal Aviation Administration Atlanta, GA - FAA's Industry Working Committee on the Revision of AC 120-45A Airplane Flight Training Devices (FTD). This on-going committee defined and classified FTDs. I was involved in the relationship of generic FTDs to the goals of the document.

Mar 89 Federal Aviation Administration - Booz Allen Hamilton Study, Washington, DC. "Futures" Discussion Panel - To assist the FAA in a regulatory review of Parts 61, 141, and 143 of the Federal Aviation Regulations. Review of issues related to technologies that will affect the pilot and flight instructor in the future. Panel will provide data to assist FAA in re-writing the regulations with emphasis on the use of emerging aviation technologies.

Feb 89 Federal Aviation Administration - Booz Allen Hamilton Study, Daytona Beach, FL. Multiengine flight instructor task analysis study to provide data to assist the FAA in re-writing certification requirements for multiengine pilots and flight instructors.

Oct 86 - Oct 93 UAA Simulation Committee Chairman - Provide a presence, resource, and source of advice and counsel for flight and ATC simulation within the collegiate aviation community. Maintain a database of the extent of simulation use. Disseminate information on the use of simulation. Provide a forum for collegiate users, researchers, and suppliers to consider mutual interests, needs, and capabilities in simulation. Encourage and support collegiate research and the effectiveness of simulation in the educational process. Represent collegiate aviation interests to industry, FAA and NASA.

Aug 85 - Sep 87 UAA Publications Committee - Provide medium for review & publication of professional aviation research. Foster research in aviation education.

Dec 79 - present Federal Aviation Administration - Aviation Safety Counselor: Flight and Maintenance. Assist in the initial development of the FAA Airworthiness Accident Prevention Program. Perform flight safety checks, conduct safety clinics, attempt to correct and/or report safety hazards on or about airports, serve as safety resource counselor to all interested pilots and non-pilots. Associated with FAA General Aviation District Offices in St. Louis, MO; Decatur, IL; Chicago, IL; and Shreveport, LA.

## Organizational Affiliations - Present

**Organizational Affiliation - Past**

Association of Aviation Psychologists

Civil Air Patrol, Illinois Wing (rank of Captain) Wing Staff Ops Officer (1 yr); Commander: Group V (2 yrs); Ops & Safety Officer: Group IX (2 yrs)

Flying Illini, Inc (100 member non-profit flying club). President (7 years) increased membership 300%; Chief Flight Instructor (4 years); Mechanic (4 years)

Greater St. Louis Flight Instructor Association.
Board of Directors (1 year); Chief Instructor 1981

Human Factors Society

Illinois Pilot's Association. Charter member (5 yrs); Board of Directors (2 yrs)

City of Ruston, LA (Mayor Elton Pody)
Economic Development Committee (2 yrs); Downtown Renovation Committee (1 yr); Old Ford Complex Arts Center Renovation Comm (2 yrs); Hill Country Arts Council - Founding Director (1 yr)

Ruston Community Theater; Ruston, LA
Board of Directors (1 yr); Resident Technical Director (2 yrs); Creative Director (1 yr)

HONORS

**2010**
Plaque of Appreciation - Director 2010 NRA Shooting Sports Camp Program

**2009**
**Finalist - Aerospace Journalist of the Year Award - Best Breaking News Submission.** "As wolves circle."
**Finalist - Aerospace journalist of the Year Award - Best Safety Submission.** "Sleep apnea."
Plaque of Appreciation - Director 2009 NRA Shooting Sports Camp Program

**2008**
Plaque of Appreciation - Director 2008 NRA Shooting Sports Camp Program

**2007**
**Finalist - Aerospace Journalist of the Year Award - Best General Aviation Submission.** "Focus on fuel: From oilfield to airport."
**Finalist - Aerospace Journalist of the Year Award - Best Business Aircraft Submission.** "China leads Asia's Bizav Market."
Plaque of Appreciation - Director 2007 NRA Shooting Sports Camp Program

**2006**
**Finalist - Aerospace Journalist of the Year Award - The Northrop Grumman Award for Best Breaking News Submission 2005.** "Katrina recovery efforts get a lift from business aviation"
**Finalist - Aerospace Journalist of the Year Award - The Airbus Award for Best Safety submission 2005.** "Fuel quality evaluation requires pilot vigilance."
Certificate of Appreciation - 2006 NRA Shooting Sports Camp Program
Plaque of Appreciation - Director 2006 NRA Shooting Sports Camp Program

**2005**
Plaque of Appreciation - Director 2005 NRA Shooting Sports Camp Program

**2004**
Plaque of Appreciation - Director 2004 NRA Shooting Sports Camp Program

**2003**
Cert of Appreciation for speaking at 2003 EAA AirVenture, Oshkosh, WI presented by the FAA Regional Administrator, Great Lakes Region.

**2002**
Certificate of Appreciation (shotgun instructor) - Women in the Outdoors Event.
NBAA Journalism Award for Oct '01 Aviation International News
Northrop Grumman Int'l Journalist of the Year - Breaking News (finalist)
Howell Shooting Club, Inc. Certificate of Appreciation - "For valuable contributions of time for the year 2001."
Cert of Apprec - Leadership & invaluable service - NRA Shooting Sports Camp
Cert of Apprec - sponsorship 4th annual Howell NRA Youth Shooting Sports Camp

**2001**
Will County Sheriff's Police Letter of appreciation for incident intervention.
Certificate of appreciation - 2001 NRA Youth Shooting Sports Camp.
City of Joliet Police Department - "Letter of appreciation for assistance as a Will County Deputy."
Howell Shooting Club, Inc. Certificate of Appreciation - "For valuable contributions of time for the year 2000."

2000
Certificate of Appreciation of Leadership - NRA Shooting Sports Camp Program

1995
Will County Sheriff's Police Appreciation Service Award

1994
Official Letter of Appreciation, Mgr, Flight Standards Div (AGL-200),FAA. Re: Charles Taylor Master Mechanic Award Program.
Univ. of Illinois - Institute of Aviation Certificate of Appreciation. Re: 4th Annual Alumni/Student Career Night.

1993
Accident Prevention Counselor's Premier Group 1992 - FAA DuPage Flight Standards District Office

1992
Recognition of Appreciation, In School Explorer Career Awareness program, Chicago Area Council BSA
Cert of Award, for the Advancement of Aviation Education Excellence. Aviation Management Society, Lewis Univ.

1991
Plaque of Appreciation, In School Explorer Career Awareness program, Chicago Area Council BSA
Cert of Appreciation, Greater St. Louis CFI Association

1990
Nominee - Bowling Green State University/Undergraduate Alumni Assc Master Teacher Award
Cert of Appreciation, Aerotechnology Program
Epsilon Pi Tau - Int'l Honorary Professional Frat for Education in Technology

1989
Aviation/Space Writers Assc 1989 Midwest Region Journalism Award of Excellence:
Aircraft Systems: Understanding Your Airplane,
Bowling Green State University Aerotech Program - Instructor of the Year

1988
Bowling Green State University Authors & Artists Honoree
Who's Who in America - 45th Edition
St. Louis & Southern Illinois' 13th Annual Super Safety Seminar Lecturers Plaque of Appreciation
Certificate of Appreciation Greater St. Louis CFI Association

1987
Illinois Dept Transportation Plaque of Appreciation - Outstanding Contribution To Aviation Safety
Illinois Dept Transportation Certificate of Appreciation -FAA/State of Illinois Super Safety Clinic

1986
Illinois Pilot's Association - Gateway Chapter Appreciation Award
Certificate of Appreciation, Greater St. Louis CFI Association

1984

Teaching Excellence Award - Department of Professional Aviation, Louisiana Tech University

**1981**
FAA Pilot Proficiency Award Phase IV
Plaque of Appreciation, Greater St. Louis CFI Association

**1980**
FAA Pilot Proficiency Award Phase III

**1979**
Arkansas Traveler Award - contributions to Ark aviation community

**1978**
Delta Flying Colonel Plaque

**1976**
Phi Delta Kappa - Honorary Professional Education Fraternity Certificate of Recognition.

**1975**
Chi Gamma Iota (Military Scholastic Achievement Fraternity) Certificate of Appreciation.

**1974**
Service Award - Flying Illini
Certificate of Appreciation - Flying Illini

**1972**
Certificate of Achievement - National Headquarters, Civil Air Patrol

**1968**
Certificate of Recognition - Society of First Infantry Div

**AVIATION EXPERIENCE & CERTIFICATION**

**Certificates and Ratings**
Airline Transport Pilot - multiengine land
Commercial Pilot - single engine land
Flight Instructor - single & multiengine land and instrument
Ground Instructor - Advanced & instrument
Airframe & Powerplant Mechanic
FAA Accident Prevention Counselor: Operations & Airworthiness

# EXHIBIT 4

**IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

ARIE S. FRIEDMAN, M.D. and )
The ILLINOIS STATE RIFLE )
ASSOCIATION )
)
Plaintiffs, )
v. ) No: 13 CH 3414
)
CITY OF HIGHLAND PARK )
)
Defendant. )

**AFFIDAVIT OF JAMES CURCURUTO**

If sworn as a witness, I could competently testify to the following:

1. I am the Director, Industry Research and Analysis, at the National Shooting Sports Foundation (NSSF). The NSSF is the trade association for the firearms industry. Its mission is to promote, protect and preserve hunting and the shooting sports. The NSSF has a membership of more than 9,000 manufacturers, distributors, firearm retailers, shooting ranges, sportsmen's organizations and publishers.

2. In my position as Director of Industry Research and Analysis, I am responsible for most of the research activities at NSSF, and I direct the activities of an internal research coordinator and outside companies retained to conduct research and gather market and consumer information useful to NSSF members.

3. Many NSSF members manufacture, distribute and sell firearms, and as is usual and customary for trade associations, the NSSF collects and disseminates industry-specific, non-sensitive data reflecting consumer preferences, market trends and other information for use in their

business decisions. Among the firearm products sold by NSSF members are modern sporting rifles, a category of firearms comprised primarily of semiautomatic rifles built on the AR- and AK-platforms.[1] A "semiautomatic," or self-loading, rifle is a firearm which fires, extracts, ejects and reloads a cartridge once for each pull and release of the trigger.[2] These rifles have the capacity to accept a detachable magazine. Additionally, they come in a range of calibers, including 22 rimfire, 223 Remington, and larger calibers used for hunting big game (e.g., white-tailed deer). Research conducted by the NSSF and under my direction demonstrates that modern sporting rifles are very popular and are commonly owned by millions of persons in the United States for a variety of lawful purposes, including, but not limited to, recreational and competitive target shooting, home defense, collecting and hunting.

4. Between 1990 and 2012, United States manufacturers produced approximately 4,796,400 AR-type rifles for sale in the United States commercial marketplace. Approximately thirty-seven different manufacturers produced these rifles, including Smith & Wesson, Colt, Remington, Sig Sauer and Sturm, Ruger. During those same years, approximately 3,415,000 AR-type and AK-type rifles were imported into the United States for sale in the commercial marketplace. In 2012 alone, nearly 1 million of these rifles were manufactured and imported for sale. By way of comparison, in 2012, the number of modern sporting rifles manufactured in or imported to the U.S. was more than double the number of the most commonly sold vehicle in the United States, the Ford F-150. See www.edmunds.com/car-reviews/top-10-top-10-bestsellin-

---

[1] The AR in "AR-platform" rifle stands for ArmaLite, the company that in the 1950s developed this style of rifle, which eventually became both the military's M16 rifle and the civilian semi-automatic sporting rifle known as the AR-15, or modern sporting rifle. "AR" does NOT stand for "assault rifle" or "automatic rifle." http://www.nssfblog.com/%E2%80%98ar%E2%80%99-stands-for-armalite/.

[2] "Semiautomatic" rifles should not be confused with "automatic" rifles, which fire when the trigger is pulled and continue to fire until the trigger is released or ammunition is exhausted. Sporting Arms and Ammunition ("SAAMI") Glossary of Industry Terms, http://www.saami.org/Glossary/display.cfm?letter=S

vehicles-for-2012. (434,585 sold). Modern sporting rifles have been available to civilians since at least the late 1950s.[3] Thus, many more AR- and AK-platform rifles were either manufactured in the U.S. or imported to the U.S. for sale in the commercial marketplace prior to 1990. A true and correct copy of the NSSF Report - 1990 - 2012 Data for US Firearm Production is attached as Exhibit B. More than 4.8 million people in the United States own AR-type or AK-type rifles.

5. In 2013, the NSSF published its Modern Sporting Rifle (MSR) Comprehensive Consumer Report 2013. The findings in the report were based on on-line responses from 21,942 owners of modern sporting rifles. Included among the findings were that the typical owner of a modern sporting rifle is male, over 35 years old, married with a household income above $75,000 and has some college education. Approximately 35 percent of all owners of modern sporting rifles are current or former members of the military or law enforcement.[4] The survey found that three out of every four recently purchased modern sporting rifles are chambered for 223 Remington ammunition. Standard capacity magazines capable of holding more than ten rounds of ammunition are the most popular magazines used in modern sporting rifles. Owners of modern sporting rifles consider accuracy and reliability to be the most important attributes of a modern sporting rifle. Other reasons cited by survey respondents for their purchase of modern sporting rifles include ergonomics, low recoil, ease with which they can be shot and their light weight. Recreational target shooting was ranked as the number one reason why owners purchased a modern sporting rifle, followed closely by home defense. Other reasons for owning

---

[3] http://world.guns.ru/civil/usa/ar-15-e.html. The original AR-15 Sporter rifles were manufactured for the civilian market by Colt's Firearms since 1963. See advertisement Attached as Exhibit A..

[4] By contrast, the NSSF Modern Sporting Rifle (MSR) Comprehensive Consumer Report 2010 found that 44% of all owners of modern sporting rifles were current or former members of the military or law enforcement. Consistent with general sales trend data, it is reasonable to infer that this difference is attributable to an increase in the popularity and ownership of modern sporting rifles in the general civilian population.

a modern sporting rifle include, but are not limited to, varmint hunting, big game hunting, competitive target shooting and collecting. The average price paid for a modern sporting rifle by survey respondents was $1,058.00. Applicable true and correct excerpts from the Modern Sporting Rifle Comprehensive Consumer Report 2103 are attached as Exhibit C.

6.      In 2013, the NSSF published its Firearms Retailer Survey Report. The report set forth finding based on an on-line survey of 752 firearm retailers located in all 50 states. Among the findings were that 92.5% of those responding to the survey currently sell new modern sporting rifles compared to 89.2% who sell new traditionally-styled rifles. Of the modern sporting rifles sold, those chambered for 223 Remington ammunition were by far the most commonly purchased. Respondents reported that 20.3% of the firearms they sold in 2012 were a modern sporting rifle. In contrast, 14% of the firearms sold were traditionally styled rifles. Applicable true and correct excerpts from the Firearms Retailer Survey Report, 2013 Edition, are attached as Exhibit D.

7.      In 2013, the NSSF published its Sports Shooting Participation in the United States in 2012 report. The report, based upon 8,335 telephone interviews, indicates that participation in any target shooting or sport shooting increased 18.6 percent from 34.4 million participants in 2009 to 40.8 million participants in 2012, an increase of 6.4 million participants. The report also indicates that participation in target shooting with a modern sporting rifle increased 35.0 percent from approximately 8.9 million participants in 2009 to nearly 12.0 million participants in 2012. Applicable true and correct excerpts from the Sports Shooting Participation in the United States report, are attached as Exhibit E.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Affidavit are true and correct.

/James Curcuruto

EXHIBIT A

# superb hunting partner...Colt's new AR-15 Sporter

With Colt's new AR-15 Sporter you're ready for a new hunting adventure.

The AR-15 Sporter weighs only six pounds. Its .223 cal., 55-grain bullet has a muzzle velocity of 3,100 fps. Every AR-15 Sporter is factory targeted at 100 yards.

If you're a hunter, camper or collector, you'll want the AR-15 Sporter. At any Registered Colt Dealer. $189.50

Colt's Firearms Hartford, Connecticut

**Colt Industries Inc**
**Colt Firearms Division**



EXHIBIT
B
tabbies

NSSF® Report. 1990 -2012 Data for US firearm production - export + imports of MSR/AR, AK, MP5... platforms

| YEAR | US Production less exports of MSR/AR platform | US Import less exports of MSR/AR, AK, MP5 platform | Annual Total |
|---|---|---|---|
| 1990 | 52,000 | 24,000 | 76,000 |
| 1991 | 57,300 | 62,000 | 119,300 |
| 1992 | 37,900 | 68,000 | 105,900 |
| 1993 | 68,200 | 236,000 | 304,200 |
| 1994 | 116,400 | 172,000 | 288,400 |
| 1995 | 63,500 | 76,000 | 139,500 |
| 1996 | 36,500 | 41,000 | 77,500 |
| 1997 | 54,300 | 80,000 | 134,300 |
| 1998 | 78,700 | 74,000 | 152,700 |
| 1999 | 121,900 | 123,000 | 244,900 |
| 2000 | 95,700 | 135,000 | 230,700 |
| 2001 | 68,700 | 122,000 | 190,700 |
| 2002 | 111,700 | 149,000 | 260,700 |
| 2003 | 133,000 | 273,000 | 406,000 |
| 2004 | 107,300 | 215,000 | 322,300 |
| 2005 | 152,400 | 166,000 | 318,400 |
| 2006 | 209,400 | 203,000 | 412,400 |
| 2007 | 285,000 | 228,000 | 513,000 |
| 2008 | 472,000 | 183,000 | 655,000 |
| 2009 | 696,600 | 321,000 | 1,017,600 |
| 2010 | 435,900 | 135,000 | 570,900 |
| 2011 | 594,000 | 80,000 | 674,000 |
| 2012 | 748,000 | 249,000 | 997,000 |
| *Totals* | *4,796,400* | *3,415,000* | *8,211,400* |

NSSF Sources: ATF AFMER, USITC, Industry contacts

| US Manufacturers: |
|---|
| Aero Precision |
| Anvil Arms |
| Armalite |
| Bravo Company Mfg Inc |
| Bushmaster |
| Colt's |
| CMMG |
| Daniel Defense |
| Double Star |
| Del-ton |
| DPMS |
| DS Arms Inc. |
| Eagle Arms |
| Essential Arms |
| FN Manufacturing LLC |
| I.O. Inc |
| Kel-Tec CNC Industries |
| Lewis Machine & Tool Co |
| LRB of Long Island Inc |
| LWRC |
| Maverick |
| O F Mossberg & Sons |
| Noveske |
| Olympic Arms |
| Patriot Ordn. |
| PTR.Industries |
| PWA |
| Remington |
| Rock River |
| Sabre Defense |
| Sig Sauer Inc / SIGARMS |
| Smith & Wesson |
| Springfield (Armory) Inc |
| Stag Arms |
| Sturm, Ruger & Co., Inc. |
| TNW Firearms inc. |
| Yankee Hill |

EXHIBIT
C

# NSSF® REPORT

## MODERN SPORTING RIFLE (MSR) COMPREHENSIVE CONSUMER REPORT 2013

### Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles

Conducted for National Shooting Sports Foundation
by Sports Marketing Surveys

SPORTS MARKETING SURVEYS USA.

NSSF.ORG

National Shooting Sports Foundation
Promote • Protect • Preserve

# 1 METHODOLOGY

The MSR Consumer Study employed an online survey methodology. With no database available of known MSR owners, NSSF promoted participation in this study via online banner ads on various websites, blogs and e-newsletters geared toward firearms ownership and hunting such as:

- AR-15.com e-newsletter
- Bushmaster Website and Facebook page
- DPMS Website and Facebook page
- Field & Stream blog
- Gun Digest website
- Guns and Ammo website
- NSSF Facebook page & Twitter post
- NSSF/GunBroker *Pull the Trigger* e-newsletter
- Remington Facebook page
- Smith & Wesson Facebook page & Twitter post
- 3-Gun Nation website and Facebook page
- Tapco website and Facebook page
- Winchester ammunition e-newsletter

A contest to win one of three $500 Cabela's gift cards was included as an incentive to complete the survey in full. The term "Modern Sporting Rifle" was clearly defined as AR- or AK-platform rifles such as an AR-15, AR-10, AK-47 or other semi-automatic rifles with detachable magazines. Photographs of both AR- and AK-platform MSR's were shown on the survey landing page. To further pair down response to those that would correctly complete the survey, the survey's initial question asked "Do you own at least one Modern Sporting Rifle? (If you do not own a MSR but would still like to be entered in the contest, select "No".) These safeguards narrowed the usable responses from 26,719 to 21,942.

This gives a very high confidence level. The Confidence Interval for the full "MSR Owner" sample ranges from +/- 0.29 percentage points to +/- 0.68 percentage points at the 95% confidence level. So, for example, if the survey shows 50% of MSR owners shoot at ranges, we can be confident 95 times out of 100 that the real value lies within +/- 0.68 percentage points so between 49.32% and 50.68%. Or to put it another way: Less than 5 times out of 100 would we expect to find a difference of more than 0.68 percentage points due to sampling.

Survey was live April and May 2013.

© 2013 NSSF

## 2 EXECUTIVE SUMMARY

In the spring of 2013, The National Shooting Sports Foundation (NSSF) contracted with Sports Marketing Surveys (SMS) of Jupiter, Florida to conduct a large consumer study to learn more about the growing category of MSR Modern Sporting Rifle (MSR) ownership. This survey was formatted to follow the 2010 MSR Consumer Report from NSSF and SMS first collaboration in 2010. In the 2013 survey, MSRs were specified as either an AR platform, AK platform or other semi-automatic rifle with a detachable magazine. Prior to the start of the survey, the NSSF gathered together a panel of industry leaders and experts from the manufacturing, retailing and law enforcement/military backgrounds to ensure that right questions were asked to provide the most amount of information possible.

The survey was conducted using an Internet based methodology. Links were posted on many of the popular consumer oriented web sites in the industry in order to solicit responses. An incentive was used in order to facilitate this process. At the end of the fielding period, well over 26,000 total responses were received of which over 21,942 came from MSR owners. This response was a significant increase from the 2010 study of 11,400 respondents. This large sample meant that we were able to perform a number of very specific survey cross tabs to look at some differences among MSR owners.

MSRs owners are predominantly male (99%). Over 75% of male MSR owners are married, of those married, more than half indicated their wife went target shooting with them and 14% own her own MSR. Even though only 1% of respondents were female, there appeared to be a large interest in MSRs and MSR related recreational shooting activities within the female population.

Most owners are older, with 61% over the age of 45 and most don't have children living in the home (58%). The more MSR's owned, the more likely they are to lock up their weapons.

35% reported having either military or law enforcement background. This is down from the 44% reported in 2010. Although the veteran status has increased slightly, the 2013 survey seemed to tap more into the civilian MSR population.

Although Range membership is down from 51% in 2010 to 48% in 2013, members have increased the usage of their MSRs compared to 2010. Range members tend to be older and have an income greater than $75,000. In regards to weapon and accessory purchase, the Range and Non-Range member have relatively the same habits with the exception of price. Over 60% are recent MSR buyers and plan on purchasing accessories in the next 12 months.

The rate of ownership has increased dramatically since 2010. Those who only own one MSR, 49% purchased their first in 2012 and 2013. Overall, 2012 was the highest (17%) for new ownership since prior to 1994. 91% of all MSR owners own at least one AR Platform weapon. Just over a quarter of owners report having 4 or more MSR's, with 14% being only AR Platforms. Most own only one AK Platform (67%). Those who one multiple MSR's (2 or more) tend to be more active with almost half of them hunting, 92% target shooting and 19% shoot in competitions with an MSR.

© 2013 NSSF

MSR ownership is not limited to one category of guns. Many MSR owners own at least one other non-MSR weapon. Handguns are the most popular at 90%, followed by the traditional rifle and shotgun (82%). Muzzleloaders (28%) and Paintball guns (15%) are less favorable. Those under the age of 35 are more likely to own a paintball gun and less likely to own a muzzleloader. Only 1% of MSR owners, whether a single or multiple owner, own only MSRs.

Over a third of MSR owners first gain interest in MSRs through a friend and a quarter through the military. Most MSR owners target shoot with at least one other person (84%) which mimics the 2010 report. MSRs are mostly used for rifle target shooting (89%), either at a public range (52%) or private range (51%). Almost half of all MSR owners target shoot on family land, which could indicate target shooting as a family activity. 94% of MSR owners used at least one MSR in the past 12 months. Most (40%) used their MSR on average once a month. Frequency of use increases with number of MSR owned.

Most MSRs were bought from an independent retail store. The average cost of a MSR was $1,058, $25 less than the average spent in 2010. .223/5.56mm was the prefer caliber for the AR Platform, where the AK platform was usual 7.62mm x 39mm caliber. Almost two thirds of MSR owners have at least a few accessories, added within 12 months of purchase, on their most recent MSR with an average of $400 dollars spent.

| | 2010 | 2013 |
|---|---|---|
| Average # MSRs Owned | 2.6 | 3.1 |
| Average $ Spent on MSRs | $1,083 | $1,058 |
| Average $ Spent on MSRs Accessories | $211 | $381 |

*NOTE: 2013 NSSF Survey identified AR and AK platforms separately. 2010 NSSF Survey included AK but was tailored more toward the AR platform owner.

© 2013 NSSF



MSR Consumer Report 2013

# 4 SAMPLE PROFILE

## 4.1 Overall profile of MSR owners

- N= 21,942

Overall Sample Profile
0%
20%
40%
60%
80%
100%
Gender
Male
99%
Female
1%
Age
Under 35
17%
35 to 44
20%
45 to 54
25%
55 to 64
25%
65+
11%
Income
$45,000 and Under
15%
$45,001 to $75,000
25%
$75,001 to $110,000
27%
>$110,000
27%
Education
Some high school or less
1%
High school graduate or GED equivalent
12%
Some college but did not graduate
28%
Associate degree
14%
Bachelors degree
27%
Post -graduate degree
14%
Other professional degree
5%
Children in home
42%
No children in home
57%
Married
75%
Not Married
25%
Military/L.E. Background
35%
Non-Military/ L.E.
65%

© 2013 NSSF
Page 9

## 5.7 Price paid

- N= 21,942

**What was the initial price of your most recent MSR (new out of the box cost)?**

0%
10%
20%
30%
40%
50%
Under $500
9%
10%
9%
9%
8%
$500 - $1,000
46%
49%
46%
46%
41%
$1,001 - $1,500
29%
29%
31%
29%
29%
$1,501 - $2,000
9%
8%
9%
9%
12%
$2,001 - $2,500
3%
2%
3%
4%
5%
$2,500 - $3,500
2%
1%
2%
2%
3%
$3,500+
1%
0%
0%
1%
1%
Don't Know
1%
2%
1%
1%
1%
MSR's Owned
Total
1
2
3
4+
[redacted]
[redacted]

- 55% of MSR owners paid under $1,000 for their most recent MSR.
- The more MSR's owned, the more likely the owner would pay more for another gun.

## 5.9 Reasons for purchase

How important were each of the following reasons for buying your most recent MSR?

- On a scale of 1=Not at all important to 10=Very important

| Top 5 Reason for buying their most recent MSR | Total | Military/L.E. | Non-Military/L.E. |
|---|---|---|---|
| **Reliable** | 9.01 | 9.10 | 8.96 |
| **Accuracy** | 8.77 | 8.88 | 8.72 |
| **Reputation of Manufacturer** | 8.27 | 8.32 | 8.24 |
| **Fits Body Type/Good Ergonomics** | 8.23 | 8.32 | 8.18 |
| **Easy to Shoot** | 8.11 | 8.13 | 8.09 |

Total
AR Platform
AK Platform
0.0 1.0 2.0 3.0 4.0 5.0 6.0 7.0 8.0 9.0 10.0
Reliable 9.01 9.01 8.99
Accuracy 8.77 8.99 7.37
Reputation of Manufacturer 8.27 8.40 7.26
Good Ergonomics/Fits Body Type 8.23 8.40 7.15
Easy to Shoot 8.11 8.19 7.70
Availability of Parts 7.90 8.02 7.48
Availability of Ammunition 7.73 7.67 8.10
Ability to Accessorize 7.39 7.64 6.14
Aesthetically Pleasing 7.31 7.36 6.92
Low Cost of Ammunition 7.10 7.03 7.67
Price 6.96 6.92 7.28
Light Weight 6.79 6.98 5.74
To Avoid Any Future Ban 6.75 6.78 6.84
Low Recoil 6.41 6.60 5.31
To Shoot Competitively 5.60 5.83 4.23
Taught to Use in Military/L.E. 4.36 4.55 3.46
Recommended by Retailer 4.17 4.29 3.60
My Friends/Family Had One 3.97 4.08 3.52
Top 3 Reasons
2010 2013
Accuracy Reliable
Reliable Accuracy
Reputation Reputation

MSR Consumer Report 2013

# 6 MSR AND ACCESSORY SPECIFICATION

## 6.1 MSR Caliber

- N= 21,942

What caliber is your most recent MSR?
0%
10%
20%
30%
40%
50%
60%
70%
.223 / 5.56mm
69%
7.62mm x 39mm
10%
0.308
6%
0.22
4%
7.62mm x 51mm or x 54mm
2%
.300 Blackout
2%
6.8
2%
5.45 x 39mm
1%
9mm Para
1%
Other
3%

- Over half of recent MSR purchases were chambered in .223 / 5.56mm.

AR Platform
AK Platform
Other
0%
10%
20%
30%
40%
50%
60%
70%
80%
90%
.223 / 5.56mm
80%
11%
34%
0.308
6%
3%
18%
0.22
4%
1%
10%
6.8
2%
0%
0%
.300 Blackout
2%
0%
0%
7.62mm x 39mm
1%
71%
15%
7.62mm x 51mm or x 54mm
1%
3%
9%
9mm Para
1%
0%
3%
5.45 x 39mm
0%
8%
0%
Other
2%
2%
10%

© 2013 NSSF

Page 23



What type of scope do you have on your most recent MSR purchase?

100%
80%
60%
40%
20%
0%
25%
8%
33%
16%
11%
1%
6%
AR Platform
35%
11%
34%
8%
6%
2%
4%
AK Platform
1 - 4x power scope
2 -7x power scope
3 - 9x power scope
4 - 14x power scope
6 - 20x + power scope
Don't know
Other

## 6.7 Magazine capacity

Which magazine capacity do you use the most in your most recent MSR?

- 2013 N= 21,942

Other 2%
5 round capacity 3%
10 round capacity 12%
15 round capacity 2%
20 round capacity 21%
25 round capacity 4%
30+ round capacity 56%

- 56% of all MSR owners use 30+ round capacity magazines in their most recent MSR purchase.
- The next most popular magazine capacity is 20 round.

# 8 MSR USAGE

## 8.1 Reasons for owning a MSR

- 2013 N= 21,942

**Please rank the following reasons for owning a MSR.**
**(1=Not Important to 10=Very Important)**

0.00
2.00
4.00
6.00
8.00
10.00
Recreational Target Shooting
8.99
8.88
9.01
8.98
9.11
Home Defense
8.15
7.95
8.13
8.18
8.43
Collecting
7.05
6.37
6.96
7.27
7.88
Varmint Hunting
6.52
6.33
6.55
6.63
6.67
Competition Shooting
5.13
4.60
5.09
5.33
5.76
Big Game Hunting
4.75
4.38
4.74
4.88
5.18
Professional Use/Job Related
2.90
2.59
2.82
3.00
3.31
MSR's Owned
Total
1
2
3
4+

Multiple (4+) MSR owners gave higher importance ratings for:

- Recreational Target Shooting
- Home Defense
- Collecting
- Varmint Hunting

Top 3 Reasons

| 2010 | 2013 |
|---|---|
| Rec Target Shooting: [illegible] | Rec Target Shooting: 8.99 |
| Home Defense: [illegible] | Home Defense: 8.15 |
| Collecting: [illegible] | Collecting: 7.05 |

© 2013 NSSF

Case: 1:13-cv-09073

FIFTH ANNUAL

EXHIBIT D

# NSSF®
# FIREARMS RETAILER SURVEY REPORT

2013 EDITION • TREND DATA 2008-2012

NATIONAL SHOOTING SPORTS FOUNDATION®

SOUTHWICK ASSOCIATES
FISH AND WILDLIFE ECONOMICS AND STATISTICS

Prepared by: Southwick Associates, P.O. Box 6435, Fernandina Beach, FL 32035
Phone: (904) 277-9765, Fax: (904) 261-1145

WWW.NSSF.ORG

# OVERVIEW

This report is the result of an in-depth analysis of the U.S. firearms retail industry sponsored by the National Shooting Sports Foundation. The information for the report was collected through an online survey of retailers that was conducted in April, 2013. The survey respondents included 752 retail establishments located in all 50 states. They range in size from single proprietors to large outdoor specialty retailers.



Figure 1. Locations of retailers who responded to the survey.

**Which type(s) of NEW rifles do you currently sell (check all that apply)?**

100%
95%
90%
85%
80%
75%
AR-style / modern sporting rifles
Traditional rifles
2008
2009
2010
2011
2012

| Item | 2008 Percent | 2009 Percent | 2010 Percent | 2011 Percent | 2012 Percent | # of 2012 Responses |
|---|---|---|---|---|---|---|
| AR-style / modern sporting rifles | 88.1% | 87.8% | 85.6% | 91.4% | 92.5% | 596 |
| Traditional rifles | 90.3% | 93.7% | 88.5% | 89.2% | 89.2% | 589 |

Total 2012 responses to this question: N=644

**Please check the top three calibers sold for NEW modern sporting rifles (AR platforms).**

| Item | 2009 Percent | 2010 Percent | 2011 Percent | 2012 Percent | # of 2012 Responses |
|---|---|---|---|---|---|
| 223 cal | 92.7% | 94.9% | 96.8% | 96.8% | 451 |
| 308 cal | 60.4% | 69.0% | 66.5% | 66.5% | 310 |
| 22 cal | 43.8% | 39.7% | 43.1% | 43.1% | 201 |
| 7.62x39 Soviet | 18.5% | 16.8% | 17.2% | 17.2% | 80 |
| 30-06 Springfield | 10.0% | 9.8% | 9.2% | 9.2% | 43 |
| 243 cal | 3.8% | 7.4% | 6.4% | 6.4% | 30 |
| 300 Win Mag | n/a | 1.7% | 3.9% | 3.9% | 18 |
| 270 Remington | n/a | 3.0% | 3.4% | 3.4% | 16 |
| 17 cal | 3.8% | 3.4% | 2.8% | 2.8% | 13 |
| 204 Ruger | 6.9% | 7.4% | 2.6% | 2.6% | 12 |
| 22-250 cal | 3.8% | 2.7% | 2.1% | 2.1% | 10 |
| 30-30 cal | 0.8% | 1.3% | 2.1% | 2.1% | 10 |
| 7mm Remington Mag | 1.5% | 1.7% | 1.7% | 1.7% | 8 |
| 300 WSM | n/a | n/a | 1.3% | 1.3% | 6 |
| 270 Winchester | n/a | n/a | n/a | 1.3% | 6 |
| 7 mm-08 | n/a | 1.3% | 1.3% | 1.3% | 6 |
| 270 WSM | 0.8% | 1.3% | 0.6% | 0.6% | 3 |
| 44 Rem | n/a | n/a | 0.6% | 0.6% | 3 |
| 300 Rem. Magnum | n/a | 1.3% | 0.4% | 0.4% | 3 |
| 300 Savage | n/a | n/a | n/a | 0.4% | 2 |
| 30 Carbine | n/a | n/a | n/a | 0.2% | 2 |
| 300 Weatherby Magnum | n/a | n/a | n/a | 0.2% | 1 |
| 375 H&H Magnum | n/a | n/a | n/a | 0.2% | 1 |
| 7 mm Mauser | n/a | n/a | n/a | 0.2% | 1 |
| Other | 10.4% | 7.1% | 12.0% | 12.0% | 56 |

Total 2012 responses to this question: N=596

**Out of every 100 firearms you sold, approximately how many were new vs. used?**

2011
New
77.7
Used
22.3
2012
New
78.2
Used
21.0
0
20
40
60
80
100

| | 2011 Avg. Response | 2012 Avg. Response | # of 2012 Responses |
|---|---|---|---|
| New | 77.7 | 78.2 | 591 |
| Used | 22.3 | 21.0 | 591 |

**Out of every 100 firearms you sold, approximately how many were:**

2011
40.0
18.9
15.0
12.4
11.4
2012
39.0
20.3
14.0
13.0
11.4
0
20
40
60
80
100
Semi-auto pistol
AR/ modern sporting rifle
Traditional rifle
Shotgun
Revolver
Muzzleloader
Other

| | 2011 Avg. Response | 2012 Avg. Response | # of 2012 Responses |
|---|---|---|---|
| Semi-auto pistol | 40.0 | 39.0 | 585 |
| AR/ modern sporting rifle | 18.9 | 20.3 | 585 |
| Traditional rifle | 15.0 | 14.0 | 585 |
| Shotgun | 12.4 | 13.0 | 585 |
| Revolver | 11.4 | 11.4 | 585 |
| Muzzleloader | 1.3 | 1.5 | 585 |
| Other | 0.9 | 0.8 | 585 |

EXHIBIT E

# NSSF® REPORT
# SPORT SHOOTING PARTICIPATION IN THE UNITED STATES IN 2012

NATIONAL SHOOTING SPORTS FOUNDATION®

Responsive Management

Conducted for the National Shooting Sports Foundation by Responsive Management

WWW.NSSF.ORG

# INTRODUCTION AND METHODOLOGY

This study was conducted for the National Shooting Sports Foundation (NSSF) to determine the national participation rates in target shooting and sport shooting. The study entailed a telephone survey of 8,335 U.S. residents ages 18 years old and older. Specific aspects of the research methodology are discussed below.

For the survey, telephones were selected as the preferred sampling medium because of the almost universal ownership of telephones among U.S. residents (both landlines and cell phones were called in their proper proportions relative to all telephones owned in the general population). Additionally, telephone surveys, relative to mail or Internet surveys, allow for more scientific sampling and data collection, provide higher quality data, obtain higher response rates, are more timely, and are more cost-effective. Telephone surveys also have fewer negative effects on the environment than do mail surveys because of reduced use of paper and reduced energy consumption for delivering and returning the questionnaires.

A central polling site at the Responsive Management office allowed for rigorous quality control over the interviews and data collection. Responsive Management maintains its own in-house telephone interviewing facilities. These facilities are staffed by interviewers with experience conducting computer-assisted telephone interviews on the subjects of natural resources and outdoor recreation.

The telephone survey questionnaire was developed cooperatively by Responsive Management and the NSSF. Responsive Management conducted a pre-test of the questionnaire to ensure proper wording, flow, and logic in the survey.

Because the main objective of the survey was to determine regional and national participation rates in the shooting sports, a strategy was devised in the survey questioning to avoid bias that would arise from the tendency for those who do *not* shoot to refuse to participate in a survey about shooting. Therefore, the survey starts by asking about some general activities, mixing shooting and hunting participation in with participation in other non-shooting activities. In this way, the respondent would not know that the survey was about shooting. Some of the activities were those that large majorities were expected to have done (e.g., watching television with a friend, eating a meal in a sit-down restaurant) and some were those that hardly anybody at all was expected to have done (e.g., play lacrosse, play racquetball) as a way to calibrate the results. Starting with an activity (the first in the survey was "watching TV with a friend") that almost all would have done helps ensure that non-shooters continue with the survey. Shooting participation was gleaned from that first question in which shooting and hunting were mixed with those other non-shooting activities.

To ensure the integrity of the telephone survey data, Responsive Management has interviewers who have been trained according to the standards established by the Council of American Survey Research Organizations. Methods of instruction included lecture and role-playing. The Survey Center Managers and other professional staff conducted project briefings with the interviewers prior to the administration of this survey. Interviewers were instructed on type of study, study goals and objectives, handling of survey questions, interview length, termination points and qualifiers for participation, interviewer instructions within the survey instrument, reading of the survey instrument, skip patterns, and probing and clarifying techniques necessary for specific

questions on the survey instrument. The Survey Center Managers and statisticians monitored the data collection, including monitoring of the actual telephone interviews without the interviewers' knowledge, to evaluate the performance of each interviewer and ensure the integrity of the data. After the surveys were obtained by the interviewers, the Survey Center Managers and/or statisticians checked each completed survey to ensure clarity and completeness.

The sampling methodology entailed random digit dialing, which ensures that all telephone numbers have an equal chance of being called, and the sample included both landlines and cell phones. The sample was obtained from Survey Sampling International and DatabaseUSA, companies specializing in providing scientific telephone samples. Calling times were Monday through Friday from 9:00 a.m. to 9:00 p.m., Saturday from noon to 5:00 p.m., and Sunday from 5:00 p.m. to 9:00 p.m., local time. A five-callback design was used to maintain the representativeness of the sample, to avoid bias toward people easy to reach by telephone, and to provide an equal opportunity for all to participate. When a respondent could not be reached on the first call, subsequent calls were placed on different days of the week and at different times of the day. The survey was conducted in January and February 2013. Responsive Management obtained a total of 8,335 completed interviews.

The software used for data collection was Questionnaire Programming Language (QPL). The survey data were entered into the computer as each interview was being conducted, eliminating manual data entry after the completion of the survey and the concomitant data entry errors that may occur with manual data entry. The survey instrument was programmed so that QPL branched, coded, and substituted phrases in the survey based on previous responses to ensure the integrity and consistency of the data collection. The analysis of data was performed using Statistical Package for the Social Sciences as well as proprietary software developed by Responsive Management. The results were weighted slightly by age and gender to be exactly proportional to the total population of each region and of the United States as a whole. Note that each state was sampled proportionately to preserve proper distribution within each region and in the U.S. as a whole, and each respondent was then assigned a region based on the state; the analysis was conducted on a regional basis and on the U.S. as a whole, but not at the state level. The number of completed interviews from each state is shown in the tabulation below:

| State of Residence | Completed Interviews | State of Residence | Completed Interviews | State of Residence | Completed Interviews |
|---|---|---|---|---|---|
| Alabama | 127 | Louisiana | 118 | Ohio | 301 |
| Alaska | 18 | Maine | 43 | Oklahoma | 101 |
| Arizona | 162 | Maryland | 159 | Oregon | 110 |
| Arkansas | 75 | Massachusetts | 175 | Pennsylvania | 346 |
| California | 972 | Michigan | 265 | Rhode Island | 28 |
| Colorado | 139 | Minnesota | 139 | South Carolina | 121 |
| Connecticut | 95 | Mississippi | 76 | South Dakota | 21 |
| Delaware | 22 | Missouri | 165 | Tennessee | 171 |
| Florida | 514 | Montana | 28 | Texas | 625 |
| Georgia | 249 | Nebraska | 55 | Utah | 66 |
| Hawaii | 42 | Nevada | 70 | Vermont | 17 |
| Idaho | 42 | New Hampshire | 38 | Virginia | 226 |
| Illinois | 393 | New Jersey | 237 | Washington | 244 |
| Indiana | 166 | New Mexico | 54 | West Virginia | 49 |
| Iowa | 93 | New York | 521 | Wisconsin | 151 |
| Kansas | 79 | North Carolina | 253 | Wyoming | 14 |
| Kentucky | 118 | North Dakota | 20 | Washington D.C. | 22 |
| | | | | TOTAL | 8,335 |

As mentioned, the states were also grouped into regions to aid in comparison and analysis. The four main U.S. Census Bureau regions were used. The following map from the U.S. Census Bureau website shows each region:



The sampling error on the entire sample is 1.07 percentage points at the 95% confidence interval.

## TRENDS IN PARTICIPATION IN TARGET AND SPORT SHOOTING

The current survey is similar to a survey conducted regarding Americans' target shooting activities in 2009, to which the current survey's results are compared. The current survey found a 17.4% participation rate in any type of target or sport shooting, which is a slight increase over the 15.1% rate among Americans in 2009. Additionally, as shown in the trends graph below, the participation rate in each shooting activity increased, with the exception of shooting sporting clays (its participation rate stayed essentially the same). The tabulation compares estimated numbers of participants; the estimated number of target/sport shooters in 2012 increased 18.61% over the 2009 number.

| Activity | Estimated Total Participants (ages 18 years and older) in 2009 | Estimated Total Participants (ages 18 years and older) in 2012 | Percent Increase Over 2009 Number |
|---|---|---|---|
| **National** | | | |
| Any target shooting or sport shooting | 34,382,566 | 40,779,651 | 18.61% |
| Target shooting with a handgun | 22,169,700 | 28,209,283 | 27.24% |
| Target shooting with a rifle | 24,045,795 | 26,822,425 | 11.55% |
| Skeet shooting | 6,979,680 | 12,090,346 | 73.22% |
| Target shooting with a modern sporting rifle | 8,868,085 | 11,976,702 | 35.05% |
| Trap shooting | 7,582,479 | 10,116,684 | 33.42% |
| Sporting clays | 8,399,989 | 8,789,340 | 4.64% |

# EXHIBIT 5

**IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION | ) | |
| Plaintiffs, | ) | No: 13 CH 3414 |
| v. | ) | |
| CITY OF HIGHLAND PARK | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF DR. GARY ROBERTS**

If sworn as a witness, I could competently testify to the following:

1. I offer this Affidavit based on my expertise in wound and terminal ballistics.

2. I studied wound and terminal ballistics at the Army Wound Ballistics Research Laboratory at the Letterman Army Institute of Research while on active military duty. I thereafter became one of the first members of the International Wound Ballistics Association. Since that time, I have performed military, law enforcement and privately funded wound ballistic testing and analysis. As a U.S. Navy Reserve Officer from 1986 to 2008, I served on the Joint Service Wound Ballistic IPT and served as a consultant to the Joint FBI-USMC munitions testing program. Over the years, I have been a technical advisor to the Association of Firearms and Toolmark Examiners and to a variety of Federal, State and municipal law enforcement agencies. I also served as a Reserve Police Officer in the San Francisco Bay area and I currently serve in a law enforcement training role. I am currently on staff at Stanford University Medical

Center, a large teaching hospital and Level I Trauma Center, where I perform hospital dentistry and surgery. A full description of my qualifications is set forth on my *Curriculum Vitae*, a true and correct copy of which is attached to this Affidavit as Exhibit A.

3. Terminal ballistics is the study of projectile behavior from the time the first target, intermediate barrier, or other object is hit, until the projectile stops moving. Wound ballistics is the branch of terminal ballistics that addresses the interaction between penetrating projectiles and tissue; essentially the pathophysiology of gunshot wounds. Terminal ballistics and wound ballistics are of interest to military and law enforcement personnel as well as private citizens, who depend on firearms to protect them and their families.

4. All projectiles discharged by firearms have the capacity to kill. None are more "lethal" than others. When law enforcement agencies select munitions for potential lethal force use, the primary requirement is to choose ammunition that can reliably and rapidly incapacitate and stop hostile persons who pose an immediate life threatening danger to public safety and prevent them from continuing their actions. In addition, munitions are carefully selected to minimize danger to innocent bystanders. The correct choice of ammunition by a civilian for use in a potential self-defense encounter should be based on the same objectives: reliable incapacitation while minimizing danger to innocent bystanders.

5. In my opinion and as stated by the FBI and virtually all others with expertise in wound and terminal ballistics, well designed .223/5.56 mm ammunition offers ideal penetration characteristics with less risk of over penetration than with the typical handgun bullets and shotgun projectiles that are commonly recommended for self-defense by individuals lacking competence in wound ballistics. In general, .223/5.56 mm bullets demonstrate less penetration after passing through building structural materials, including material commonly used in

household walls, than other common ammunition, including common handgun bullets, traditional hunting rifle ammunition and shotgun projectiles (buckshot and slugs).

6. The .223/5.56 mm round is most commonly used in rifles built on an AR-15 platform. The AR-15 rifle is extremely common in America. It is a highly versatile design that can be adapted for a variety of uses, including self-defense, hunting, target shooting and other sporting purposes. In my opinion, the AR-15 chambered for .223/5.56 ammunition is the most ergonomic, safe and effective firearm for law enforcement general purpose use and for civilian self-defense.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Affidavit are true and correct.

Gary K. Roberts, DDS

Dr. Gary Roberts

EXHIBIT
A

# CURRICULUM VITAE

**Gary K. Roberts, D.D.S.**

March 2013

***BIOGRAPHIC INFORMATION***

CONTACT INFORMATION

| | |
|---|---|
| Address: | 750 Welch Road, Suite 118 Palo Alto, CA 94304 |
| Telephone: | (650) 328-6684 |
| FAX | (650) 328-6685 |
| E-Mail | GKRDDS@hotmail.com |

EDUCATION

| | |
|---|---|
| 1989 | United States Navy Hospital Oakland, General Practice Residency |
| 1988 | University of the Pacific, School of Dentistry, D.D.S. |
| 1984 | University of the Pacific, College of the Pacific, B.A. |

LICENSURE

| | |
|---|---|
| 1993 | California Conscious Sedation Permit (*CS257*) |
| 1990 | DEA Controlled Substance Registration Certificate (*BR2268705*) |
| 1989 | California State Dental License (*37762*) |
| 1988 | National Dental Board |

EMPLOYMENT

| | |
|---|---|
| 1989-Present | Private Practice: Palo Alto, CA (*General and Hospital Dentistry*) |
| 1986-2008 | United States Navy Reserve (*2205 General Dentistry/1705S Oral Surgery*) |

HOSPITAL and CLINIC APPOINTMENTS

| | |
|---|---|
| 1997-Present | Stanford University Hospital, Palo Alto, CA |
| 1997-Present | Lucille Salter Packard Children's Hospital, Palo Alto, CA |
| 1992-2001 | Sequoia Hospital, Redwood City, CA |
| 1990-1997 | Naval Dental Center, San Francisco, CA |
| 1989-1996 | Naval Hospital Oakland, CA |
| 1989-1990 | Naval Hospital Roosevelt Roads, Puerto Rico |
| 1989-1990 | Naval Dental Clinic, Long Beach, CA |

HONORS and AWARDS

| | |
|---|---|
| 1992 | Federal Employee of the Year for Scientific Research |
| 1992 | American Society for Public Administration, San Francisco Bay Area Chapter: William J. Sheppard Award for exemplary public service |
| 1980 | Eagle Scout Award |

PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 1993-Present | Dental Board of California (*Anesthesia Evaluator*) |
| 1992-Present | Mid-Peninsula Dental Society (*Peer Review Committee--2005 to present; Ethics Committee—2012 to present*) |
| 1992-Present | American Dental Society of Anesthesiology/California Dental Society of Anesthesiology |
| 1989-2001 | Association of Firearms and Toolmark Examiners (*Technical Advisor*) |
| 1989-1999 | International Wound Ballistics Association |
| 1988-2008 | Association of Military Surgeons of the United States |
| 1988-2005 | Academy of Osseointegration |
| 1988-Present | California Dental Association (*Council on Peer Review—2012 to present*) |
| 1988-Present | American Dental Association |

## *SCHOLARLY AND TEACHING ACTIVITIES*

OPEN SOURCE PUBLICATIONS

1. Lau G, Kulkarni V, Roberts GK, Brock-Utne, J: "*Where Are My Teeth? A Case of Unnoticed Ingestion of a Dislodged Fixed Partial Denture*". **Anesthesia & Analgesia**. 109(3):836-838, 2009.
2. Roberts GK: "Time for a Change -- U.S. Military Small Arms Ammunition Failures and Solutions". NDIA. May 2008; http://www.dtic.mil/ndia/2008Intl/Roberts.pdfRoberts
3. Roberts G, Lazzarini D, Pomerleau P. "*Wounding Effects of Choke™ 12 Gauge 00 Buckshot Loads Intended for Law Enforcement Duty Using 10% Ordnance Gelatin*". **AFTE Journal**. 34(3):287-288, Summer 2002.
4. Roberts GK & Lazzarini D: "*Preliminary Evaluation of .357 Sig Jacketed Hollow Point Bullets Intended for Law Enforcement Duty Using 10% Ordnance Gelatin as a Tissue Simulant.*" **Wound Ballistic Review**. 4(4):32-33, Fall 2000.
5. Roberts GK: "*Terminal Performance of .38 Special and .380 ACP Hollow Point Bullets Intended for Law Enforcement Back-up and Off Duty Self-Defense Using 10% Ordnance Gelatin as a Tissue Simulant*". **Wound Ballistic Review**. 4(3):35-38, Spring 2000.
6. Roberts GK: "*Law Enforcement General Purpose Shoulder Fired Weapons--The Wounding Effects of 5.56mm/.223 Carbines Compared With 12 ga. Shotguns and Pistol Caliber Weapons using 10% Ordnance Gelatin as a Tissue Simulant*". **Wound Ballistics Review**. 3(4):16-27, 1998.
7. Roberts GK: "*Terminal Performance of 9mm 147 gr Jacketed Hollow Point Bullets fired from the HK MP-5, using 10% Ordnance Gelatin as a Tissue Simulant*". **AFTE Journal**. 30(2):330-333, Spring 1998.
8. Roberts GK: "*Preliminary Evaluation of the Terminal Performance of the 5.7 x 28 mm 23 Grain FMJ Bullet Fired by the New FN P-90 Using 10% Ordnance Gelatin as a Tissue Simulant*". **AFTE Journal**. 30(2):326-329, Spring 1998.
9. Roberts GK: "*Comparison of the Terminal Performance of 9mm Parabellum, .40 S&W, and .45 ACP Jacketed Hollow Point Bullets Intended for Law Enforcement and Military Special Operations Applications, Using 10% Ordnance Gelatin as a Tissue Simulant*". **Wound Ballistics Review.** 1 (4):32-37, 1994.
10. Roberts GK and Bullian ME: "*Protective Ability of the Standard U.S. Military Personal Armor System for Ground Troops (PASGT) Fragmentation Vest Against Common Small Arms Projectiles*". **Military Medicine**. 158:560-563, August 1993.
11. Roberts GK and Bullian ME: "*Comparison of the Wound Ballistic Potential of 9mm vs. 5.56mm (.223) Cartridges for Law Enforcement Entry Applications*". **AFTE Journal**. 25(2):142-148, April, 1993.
12. Roberts GK: "*Preliminary Report on the Performance of the New Winchester .45 ACP 230 Grain Jacketed Hollow Point Bullets in 10% Ordnance Gelatin*". **Wound Ballistics Review**. 1(2):21-23, Winter 1992.
13. Roberts GK and Wolberg EJ: "*Book Review—Handgun Stopping Power: The Definitive Study by Marshall EP and Sanow EJ. Boulder, Paladin Press, 1992*". **AFTE Journal**. 24(3):383-387, October 1992.
14. Corzine AJ and Roberts GK: "*Correlation of Ordnance Gelatin Penetration Results Between 20% Gelatin at 10°C and 10% Gelatin at 4°C*". **AFTE Journal**. 25(1):2-5, January 1993.
15. Fackler ML and Roberts GK: "*Failure to Expand: Federal 7.62x39mm Soft Point Bullets*". **Wound Ballistics Review**. 1(2):18-20, Winter 1992.

RESTRICTED ACCESS PUBLICATIONS AND SEMINARS

List available to authorized entities on request.

RECENT LECTURES AND SEMINARS PRESENTED

| | |
|---|---|
| 2/26/13 | "Introduction to Oral Pathology" -- Stanford University Medical Center (1 hour) |
| 1/15/13 | "Dental Concerns in the Geriatric Patient" -- Stanford University Medical Center (1 hour) |
| 1/14/13 | "Introduction to Wound Ballistics; Pathophysiology of Penetrating Trauma" -- Stanford University Medical Center (1 hour) |

| | |
|---|---|
| 10/11/12 | "Oral Pathology Review" – Vaden Health Center, Stanford University (1 hour) |
| 9/5/12 | "Introduction to Dentistry"-- Stanford University Medical Center (1 hour) |
| 8/20/12 | "TMJ Disorders, Mandibular Dislocations, Maxillofacial Fractures"-- Stanford University Medical Center (1 hour) |
| 4/13/12 | "LE Wound Ballistics"—Morgan Hill and Gilroy Police Departments (3 hours) |
| 3/16/12 | "Oral Health Concerns Following Oropharyngeal Cancer Therapy" -- Stanford University OHNS (1 hour) |
| 3/1/12 | "Introduction to Oral Pathology" -- Stanford University Medical Center (1 hour) |
| 1/18/12 | "Dental Concerns in the Geriatric Patient" -- Stanford University Medical Center (1 hour) |

RECENT CONTINUING EDUCATION COURSES ATTENDED

| | |
|---|---|
| 3/14/13 | "Always Being Prepared for the Unexpected; Cognitive and Procedural Errors in Office-Based Anesthesia" — Robert Campbell, Joel Weaver, & CDSA (7 hours) |
| 2/21/13 | "Anesthesia Evaluator" – CA State Dental Board (2 hours) |
| 10/19/12 | "Mastering Adhesive & Restorative Dentistry" – Jeff Brucia/ADA (2.5 hours) |
| 10/19/12 | "Root Canals Gone Wild" – David Beach/ADA (2.5 hours) |
| 10/18/12 | "Adhesive Material Update" – Jeff Brucia/ADA (2.5 hours) |
| 10/18/12 | "Pulp Therapy for Young Permanent Teeth" – Joe Camp/ADA (2.5 hours) |
| 6/29/12 | "Basic Bone Grafting for the Dentist" – Mike Chen (7 hours) |
| 6/8/12 | "Dental Trauma" – Paul Suber & Stanford University Medical Center (1 hour) |
| 5/7/12 | "Anesthesia Evaluator" – CA State Dental Board (2 hours) |
| 4/20/12 | "Global Diagnosis" -- William Robbins & MPDS (7 hours) |
| 4/4/12 | "OSHA Blood Borne Pathogen Training" – Carolyn Mortensen (2 hours) |
| 3/23/12 | "Recent Advances in Implant Treatment" – Dennis Tarnow & MPDS (7 hours) |
| 3/9/12 | "Metabolic Concerns and Oral Health" – Nasser Said-Al-Naieff & Stanford University Medical Center (1 hour) |
| 3/8/12 | "Patient Evaluation for Office Based Sedation & GA: Patient Safety for All Ages" – Steven Ganzburg & CDSA (7 hours) |
| 3/2/12 | "Peer Review Calibration" – CDA (7 hours) |

# EXHIBIT 6

**IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION | ) | |
| Plaintiffs, | ) | No: 13 CH 3414 |
| v. | ) | |
| CITY OF HIGHLAND PARK | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF JAMES W. SUPICA, JR.**

If sworn as a witness, I could competently testify to the following:

1. I offer this Affidavit based on my expertise on the historical development and function of semi-automatic firearms and more specifically semi-automatic rifles.

2. I am employed as the Director of NRA Museums. The museums I direct and manage are the National Firearms Museum in Fairfax, Virginia and the NRA Sporting Arms Museum in Springfield, Missouri. The museums attract 40,000 to 45,000 visitors per month and conserve a collection of around 7,000 guns. My responsibilities include management of the museum and its collections. I have authored or co-authored numerous books relating firearms history including, *Illustrated History of Firearms; Standard Catalogue of Smith & Wesson; Handguns; Shotguns; Guns*; and *Treasures of the NRA National Firearms Museum.* I served as a contributing editor to *American Rifleman* magazine from 1996 to 2009 and the *Standard Catalog of Firearms* from 1999 to 2010. A full description of my qualifications is set forth on my *Curriculum Vitae*, a true and correct copy of which is attached to this Affidavit as Exhibit A.

3. I have reviewed City of Highland Park City Code section 136.001 *et seq.* In my opinion, the firearms that Highland Park has chosen to ban by model, type and design feature are not dangerous and unusual firearms. Many of the firearms banned under the ordinance are among the most safe and commonly owned firearms in the United States, and are widely used for a variety of purposes including target shooting, hunting and personal defense.

4. Semi-automatic firearms have been manufactured and commonly used for lawful civilian purposes for well over a century. Their development and continued refinement over the years reflects technological advancement in firearms design and function, with the primary goals of improving reliability, accuracy, ergonomics, ammunition capacity, ease of reloading and safety. Almost all of the firearms banned under the Highland Park ordinance simply represent the technological evolution of the basic purpose of a firearm – to more reliably and more safely deliver effective rounds on target and to repeat delivery if necessary.

5. As the name indicates, semi-automatic firearms are not fully automatic firearms, which are commonly referred to as "machine guns." Semi-automatic firearms use some of the energy of the fired cartridge to move a fresh cartridge into firing position. Thus, the semi-automatic nature of these firearms is actually in reference to their self-loading capability and has nothing to do with the manner in which they are fired. Semi-automatic firearms will fire only one round when the trigger is pulled, as is the case with bolt-action, lever action, pump or slide action, single-shot firearms and revolvers.

6. The origin of semi-automatic firearms dates back to the late 19th century, when Ferdinand Ritter von Mannlicher and John Moses Browing developed experimental self-loading rifles in the 1880s, and some types of semi-auto firearms gained commercial acceptance before the turn of the century. In 1903 and 1905, Winchester Repeating Arms Company introduced the

first semi-automatic rifles designed specifically for the civilian market. In 1906, Remington Arms introduced the "Remington Auto-loading Repeating Rifle" for civilian sporting purposes. The rifle was renamed the Model 8 in 1911 and was widely popular and commonly owned by civilians and law enforcement agencies, who valued its semi-automatic action and relatively powerful rifle cartridges. Other manufacturers also introduced semi-automatic rifles for civilian use in the early 20th century.

7. Firearm development goals have largely been the same for civilian, military and law enforcement firearms from the earliest period of firearms design and construction until today – to safely, accurately and reliably discharge rounds. Civilian firearms design and military firearms design have largely followed the same track. Improvements made in military firearms have been rapidly adopted for civilian firearms and vice versa. For example, the wood-stocked bolt-action rifle, used by hunters for generations, gained popularity following World War I, where it was the battlefield rifle. It represented a step forward in handling, reliability and accuracy. Soon after the U.S. military began using the semi-automatic rifle in World War II, a wide range of semi-automatic rifles gained increased popularity among civilians. Modern sporting rifles, most notably rifles built on the AR-platform, were developed in the early 1960's based on the M-16 rifle used by U.S. forces in Viet Nam. Modern sporting rifles, like many of those banned under the Highland Park ordinance, are simply modern state-of-the-art firearms, just as their precursors once were generations ago.

8. Any suggestion that the firearms banned under the Highland Park ordinance are all "military grade weapons" is incorrect. Military forces around the world since the end of World War II have primarily used selective-fire rifles as standard service rifles. A selective-fire rifle has the ability to fire both fully automatic, meaning it continues to fire with a single pull of

the trigger as long as the trigger is held back, or fires a burst of multiple rounds with each pull of the trigger, as well as semi-automatic, meaning a separate pull of the rigger is required for each shot.

9. Historically, speaking there is no such thing as a "semi-automatic assault weapon." Application of the "assault weapon" label to civilian semi-automatic firearms has, in my opinion, served as a political device for those seeking to prohibit firearms ownership. Public confusion over the actual function of semi-automatic firearms has been fostered for political purposes and has resulted in nonsensical prohibitions on firearms ownership based on a firearm's appearance rather than its basic function.

10. For example, the firearm features prohibited under the Highland Park ordinance do not have an effect on the basic action of a semi-automatic firearm – to discharge one round with each pull of the trigger. The pistol grip configuration of a typical AR-style rifle is the by-product of designs that raised the butt-stock of selective-fire rifles in order to reduce "muzzle flip" during recoil. If the pistol grip remained integral with the raised butt-stock, the hand holding the grip would be in unnatural position. The solution was to place the pistol grip below and separate from the butt-stock. And contrary to a politicized myth, pistol grips make it more difficult, not less difficult, to fire a rifle "from the hip." Folding and telescoping stocks have been in use for over a century as a means to make firearms easier to transport and store. Most adjustable stocks on AR-style rifles shorten the stock by just a few inches and do not in any sense make the rifle "concealable." Although adjustable stocks can be used to adapt the firearm to a shooter's stature, enhancing accuracy and safety, and allowing persons of smaller stature, including many women to use and control the firearm, they do not affect a semi-automatic firearm's basic function of delivering one round with each trigger pull. Thumbhole stocks are

widely used by Olympic and other slow precision shooting competitors. They can be found on bolt action target rifles over one hundred years old and generally enhance accuracy, but do not have an effect on the basic function of semi-automatic firearm. Barrel shrouds also do not affect a firearm's basic function. Moreover, nearly all rifles have some sort of fore end that "shrouds" or encases the barrel, fully or partially. Although a purpose of a fore end or shroud is to allow the shooter to have a secure grasp of his firearm, on an AR-style rifle it also protects the aluminum gas tube, which carries powder gasses back to work the rifle's action. Muzzle brakes and compensators simply serve to redirect recoil, causing it to press back into the shooter's shoulder or hand rather than raising the barrel. This feature enhances practical accuracy for repeat shots, reduces danger to unintended targets and can be especially helpful to small-statured persons. Muzzle brakes and compensators do not affect the basic function of semi-automatic firearms.

11.    The ordinance's characterization of a magazine capable of accepting more than ten rounds as a "large capacity magazine" is, in my opinion, wholly arbitrary, disregards firearms history and the practical implications of having too little ammunition in a self-defense encounter. A firearm capable of accepting more than ten rounds is not new or unusual. Lewis and Clark took a 20-shot .46 caliber repeating air rifle with them on their journey across the continent. A 12-shot superposed load flintlock was designed around the same time. Pepperbox percussion and pin-fire pistols with capacities of 18 to 21 shots were available in the mid-19th Century. Lever action rifles that could fire 15 shots were used in the Civil War, and widely popular in the late 19th and early 20th Centuries, and a 34-shot rifle enjoyed success in the 1870's. The Browning P35 semi-automatic pistol with a detachable 13-round magazine was introduced in 1935 and continues to be popular today.

12.     Sufficient ammunition capacity in any type of firearm allows the shooter to focus on successive accurate shots rather than on reloading his firearm. This can be critically important in a self-defense encounter, and also contributes to safety, in that firearms are more likely to be handled unsafely during reloading. The availability of sufficient rounds may be especially important to a person who owns a firearm for self-defense but does not practice regularly and does not practice reloading.

13.     In summary, the Highland Park "Assault Weapons" ordinance, in my opinion, bans a category of commonly owned firearms, which are not dangerous and unusual from either a historical or functional perspective.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Affidavit are true and correct.

James W. Supica, Jr.

EXHIBIT
A

# James W. Supica, Jr. (Jim)
## Curriculum Vitae

## EMPLOYMENT

**NATIONAL RIFLE ASSOCIATION OF AMERICA (NRA)**

**Director of NRA Museums**, 2013 to present.

**Formerly Director of National Firearms Museum and Gun Collector Programs**, 2008- 2013.

Direction and management of the NRA National Firearms Museum in Fairfax VA, which is recognized as one of the leading firearms museums in the world. The Museum attracts around 50,000 visitors annually and conserves a collection of approximately 7,000 guns.

Direction, installation and thematic design of the NRA National Sporting Arms Museum, in Springfield MO, opened August 2013, with a projected annual visitation of around 400,000.

Direction and management of the NRA Museum's media outreach which includes regular and special guest participation in various educational television programs, magazine articles, and book publication. Electronic media outreach includes the NRAmuseum.com website which tallies over 2.6 million page views per year and ranks #1 on Google for both "Gun Museum" and "Firearms Museum", NFMcurator YouTube channel with over six million views of over 340 videos, and the Museum's Facebook page with an annual total of daily reaches of over 6 million.

**Old Town Station, Ltd.**

**Owner and President, national level antique and collectable firearms retailer,** 1992 to 2008

As a federally licensed firearms dealer, sold antique and collectable firearms via mail order catalog, website and live auctions. Wrote and published 54 issues of Old Town Station Dispatch, which combined photo illustrated listings of old firearms for sale with historical gun information and tips for collectors. Developed and managed ArmchairGunShow.com website, which combined firearms information with listing of collectable firearms for sale. When the website was sold in 2008, Google rankings were: #1 for Gun Collector, Old Firearms, Antique Pistol; #2 for Gun Values, Old Guns, Historic Firearms; #3 for Collectable Guns, Collectable Firearms; #4 for Antique Firearms; #14 for Gun Info; #17 for Gun Safety; and #26 for Guns.

**Kull & Supica Firearms Auction**

**Principal and auctioneer for national level firearms specialty auction house**, 2001 to 2008.

Conducted national level cataloged firearms auctions. Produced the catalogs including firearms research and description, worked as co-auctioneer, and developed and managed the Armsbid.com website, which Google regularly ranked #1 on the internet for "Live gun auction" and "Live firearms auction".

**United Construction Co., Inc.**

**Vice President and Counsel for heavy and highway construction company,** 1980 to 1992.

**Headquarters, Inc.**

**Director of Crisis Center,** 1975 to 1977.

Managed United Way service agency providing 24/7 telephone hotline, walk-in, and outreach crisis intervention and suicide prevention services, along with drug abuse programs.

## EDUCATION

University of Kansas School of Law, Juris Doctorate, 1980
University of Kanas, B.A. Psychology, 1977

## PUBLICATIONS

### Books

- Treasures of the NRA National Firearms Museum by Jim Supica, Doug Wicklund and Philip Schreier, 2013, Chartwell Books, Inc.
- Illustrated History of Firearms by Jim Supica, Doug Wicklund and Philip Schreier, 2011, Chartwell Books, Inc.
- Standard Catalog of Smith & Wesson by Jim Supica and Richard Nahas; 1997, 2001, and 2006. Gun Digest Books.
- Handguns by Jim Supica, 2010, Thunder Bay Press
- Rifles by Jim Supica and Doug Wicklund, 2010, Thunder Bay Press
- Shotguns by Jim Supica and Philip Schreier, 2010, Thunder Bay Press
- Guns introduction by Jim Supica, 2005, TAJ Books, Ltd.
- Guns of the Old West, publication scheduled for 2014

### Columns

- "I Have This Old Gun", American Rifleman – monthly column, in rotation with other writers, 2005 to 2008
- "Ask the Gun Guy", Shotgun News – monthly column, 2000 to 2008

### Contributing Editor

- American Rifleman, 1996 to 2009
- Standard Catalog of Firearms, 9th through 20th Editions, 1999 through 2010.

### Articles and Chapters

- "Cuban New Model Number Threes", Smith & Wesson Journal, 1991
- "Three Lives of a Schofield", CADA Gun Journal, 1992
- "Quincy 1992", Smith & Wesson Journal, 1992
- "Antique or Not Antique", CADA Gun Journal, Dec. 1993
- "SWCA 1993 Annual Meeting", Smith & Wesson Journal, 1993
- "Condition Condition Condition Baloney!", CADA Gun Journal, Jan. 1994
- "The Brady Crunch", CADA Gun Journal, Jan, 1994
- "Insights with Jim Supica", CADA Gun Journal, March 1994
- "In my Experience – Affordable Collectables", American Rifleman, Feb. 1994
- "Baby Hammerless Revolvers", Man at Arms, Jan/Feb. 1994
- "Living with Brady", Blue Book of Gun Values, 15th Ed. 1994

- "A Brady Retrospective", CADA Gun Journal, Nov. 2005
- "Pieces of History – A Proposed Rating System for Historically Attributed Firearms", Blue Book of Gun Values, 16th & 17th Ed's., 1995 & 1996
- "Collecting S&W", with Richard Nahas, American Rifleman, 1996
- "Guns on the Auction Block", Blue Book of Gun Values, 18th Ed., 1997
- "Firearms Engraving", Insights, March 1998
- "Fake!" Blue Book of Gun Values, 19th Ed., 1998
- "The Last Twenty Years in Gun Collecting", Blue Book of Gun Values, 20th Ed., 1999
- "Is a Collectors License for You?", 2002 through 2005 Standard Catalog of Firearms
- "The State of Collecting", 2004 Standard Catalog of Firearms
- "Collecting S&W Model 3 Revolvers", 2005 Standard Catalog of Firearms
- "Gun Auction Buying Tips", 2006 Standard Catalog of Firearms
- "How to Ship Guns and Ammo", 2006 Standard Catalog of Firearms
- "100 Years of the M1911", American Rifleman, Nov. 2011
- "National Firearms Museum", Blue Book of Gun Values, 32nd Ed., 2012
- "Your NRA National Firearms Museum", The Texas Gun Collector, Fall 2012
- Foreward, Smith & Wesson American Model by Charles Pate, 2006
- Preface, History of Smith & Wesson Firearms by Dean Boors, 2002

**Acknowledged Contributor**

- Blue Book of Gun Values by S.P. Fjestad, 13th through 34th Editions, 1992 through 2013
- Flayderman's Guide to Antique American Firearms and their Values by Norm Flayderman, 6th, 7th, 8th, & 9th Editions; 1994 through 2007.
- Complete Guide to United States Military Combat Shotguns by Bruce N. Canfield, 2007
- S&W Sixguns of the Old West by David Chicoine, 2004
- Old Guns and Whispering Ghosts by Jesse Wolf Hardin, 2006
- 331 Tips and Tricks – a How-to Guide for the Gun Collector by Stuart C. Mowbray, 2006.

**Recorded media**

- Featured lecturer, American Gunsmithing Institute Certified Firearms Appraiser Course, CD & DVD, 2012.

## TELEVISION

**Co-Host**, "Guns and Gold", Sportsman Channel, 2012 & 2013 seasons. Series has been picked up by Outdoor Channel for 2014, to be renamed.

**Regular guest expert:**

- "Gun Stories", Outdoors Channel, 2011, 2012 & 2013
- "American Rifleman Television", "I have this old gun" segment, Outdoors Channel, 2006 to present
- "NRA News", "Curator's Corner" segment, Sportsman Channel, 2013. Same segment on Cam & Co. webcast and Sirius radio, 2008 to present
- "Cowboys", Outdoors Channel, 2009

**Single episode appearances:**

- "After Newtown – Guns in America", PBS, 2013
- "Triggers", The Military Channel, 2013
- "101 Weapons that Changed the World", the History Channel, 2013
- Network affiliate broadcast programs in Washington DC, Kansas City, Tulsa, Tucson, Springfield MO and others.

## OTHER FIREARMS RELATED ACTIVITIES

### Training

- NRA Certified Instructor – "Pistol" and "Personal Protection in the Home", 2004-present.
- Kansas Concealed Carry Instructor, 2007-2010.
- Defensive shooting training: Chapman Academy (Ray Chapman), Lethal Force Institute (Masad Ayoob), Jim Cirillo.
- Reserve Police Officer, Shawnee KS, early 1980's.

**Gun show participation** – Attended half a dozen to a dozen or more gun shows every year for the past 25 years, usually as an exhibitor, and prior to 2008 as a commercial dealer. Educational exhibits have won numerous awards. First person to be awarded both of the highest educational awards offered by NRA, the Gun Collectors Committee Trophy (1996), and the Andrew E. Mowbray Educational Trophy (1997). Other first place awards at national level shows include:

- S&W Collectors Association Calhoun Norton Award
- Missouri Valley Arms Collectors Association Best of Show (1992)
- Texas Gun Collectors Association First Place (1993)
- Indian Territory Gun Collectors Association First Place.

**Guest speaker** – Guest speaker on firearms and gun collecting topics for numerous events and groups since the early 1990's, including:

- NRA National Gun Collector Leadership Seminars
- NRA National Gun Show & Conference
- Smith & Wesson Collectors Association Annual Meeting
- Dallas Arms Collectors Association Meeting
- Texas Gun Collectors Association Annual Banquets
- Ohio Gun Collectors Association Annual Banquets
- Missouri Valley Arms Collectors Association Meetings

## MEMBERSHIPS

National Rifle Association of America – Board of Directors, 2001-2008.

- Vice Chairman Gun Collector Committee, 2007-2008
- Chairman, Publications Policy Committee, 2008
- Benefactor Member.

S&W Collectors Association – President 2003-2005. Board of Directors. Life Member.

Missouri Valley Gun Collector Association – President 1993 & 1995. First Honorary Life Member.

Colt Collectors Association – Board of Directors, 2001-2003

American Society of Arms Collectors – Member

Kansas State Rifle Association – Life Member

Single Action Shooting Society – Life Member

National Congress of Old West Shooters – Life Member

**Other gun collecting memberships, current or past** – Smith and Wesson Historical Foundation, Buffalo Bill Historic Center, Ohio Gun Collectors Assoc., Colorado Gun Collectors Association, Winchester Collectors Association, Remington Society, Texas Gun Collectors Association, Indian Territory Gun Collectors Association, Remington Society, Parker Gun Collectors Association.

**Professional and other memberships, current or past** – American Alliance of Museums, Collector Arms Dealers Association, American Auctioneer Association, Kansas Auctioneer Association, Kansas Bar Association, American Bar Association, Kansas Chamber of Commerce and Industry (Board of Directors), Mensa, International Society for Philosophical Inquiry.

# EXHIBIT 7

**IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and the ILLINOIS STATE RIFLE ASSOCIATION | ) | |
| Plaintiffs, | ) | |
| | ) | No: 13 CH 3414 |
| v. | ) | |
| CITY OF HIGHLAND PARK | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF GARY KLECK**

If sworn as a witness, I could competently testify to the following:

1. I am a Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology. I am currently the David J. Bordua Professor of Criminology at Florida State University, where I have been on the faculty since 1978. My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime."

I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which informs and serves as part of the basis of my opinions. I am the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology." More recently, I authored *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate*

(1997) and *Armed* (2001).

I have also published scholarly research in all of the leading professional journals in my field. Specifically, my articles have been published in the *American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and Delinquency, Journal of Quantitative Criminology, Law & Contemporary Problems, Law and Human Behavior, Law & Policy Quarterly, Violence and Victims, Journal of the American Medical Association,* and other scholarly journals.

I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force, and, most recently, as a member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

Finally, I teach doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on research design and causal inference, statistical techniques, and survey research methodology. A complete list of my scholarly publications and a full description of my qualifications are set forth on my *Curriculum Vitae*, a true and correct copy of which is attached to this Affidavit as Exhibit A.

2. I have reviewed Highland Park City Code section 136.001 et seq. and have been asked to provide my opinion on whether Highland Park's ban on ownership and possession of "assault weapons" and magazines with the capacity to accept more than ten rounds of

ammunition is likely to have an impact on the frequency and lethality of firearms violence. In my opinion, Highland Park's ban will have no impact on criminal firearms violence and is a symbolic political gesture at best. More problematically, the ban may very well leave potential crime victims less able to protect themselves, their property and their families.

3. According to publicly available FBI Uniform Crime Reports, Highland Park has a very low incidence of violent crime. Statistics for 2010 indicate that Highland Park experienced just 17 incidents of violent crime (defined as murder and non-negligent manslaughter, forcible rape, robbery and aggravated assault). None of these incidents were murders. In fact, publicly available data indicates that no murder has been committed in Highland Park since 2003. The same data reveals that residents of Highland Park are substantially more likely to be victims of property crimes, including residential burglaries, larceny and vehicle theft. According to a United States Department of Justice, Bureau of Justice Statistics report, *Victimization During Household Burglary*, dated September 2010, a household member is present during the commission of approximately 1 million burglaries in the United States each year and became victims of violent crimes in 266,560 of those burglaries.

4. The firearms Highland Park has chosen to ban are all semi-automatic firearms, which in most instances are mechanically identical to, though cosmetically different from, countless non-banned firearms. All semi-automatic firearms, including those that Highland Park has not banned, are capable of firing a single shot as fast as the shooter can make successive trigger pulls. I do not why Highland Park chose to prohibit law-abiding citizens from owning the firearms it defined as "assault weapons" but advocates elsewhere of strict control over these types of firearms typically propose a number of rationales for their claim that these firearms are especially dangerous or useful for criminal purposes: (a) alleged greater lethality, shot for shot,

of the guns or ammunition they use; (b) the supposed ease with which the firearms can be converted to fully automatic fire; (c) the high rate of fire of the firearms in their semi-automatic mode; and (d) their ability to accept large capacity detachable magazines, and therefore fire many times without reloading. None of these rationales are supported by empirical evidence.

5. The firearms banned by Highland Park are not more lethal, shot for shot, than firearms that are not banned. This is true because the cartridges most commonly used in "assault rifles" have smaller, pointed bullets which do not flatten out and expand when they hit human flesh. They therefore tend to produce smaller wounds, which are correspondingly less lethal.

6. The argument that some of the banned firearms are easily converted to fully automatic fire is not true. No semi-automatic firearm available for sale in the United States since 1989 is readily converted to fully automatic fire. Technical experts with the Bureau of Alcohol, Tobacco, Firearms and Explosives disassemble, test and examine samples of all semi-automatic firearms marketed in the United States to make a formal determination on whether they can be readily converted. Any model found to be readily converted to fully automatic fire is declared illegal and cannot be sold.

7. The total volume of fire which some of the banned firearms are capable without reloading is not an attribute of the firearm but the ammunition magazine. Many of the banned firearms are capable of accepting many different magazine sizes, containing three rounds or thirty or more. However, it is unlikely that large capacity magazines (LCMs) (defined by Highland Park as capable of accepting more than ten rounds) are relevant to the outcome of violent incidents because very few incidents involve large numbers of shots fired. Firearm assaults usually involve no shots fired or only a few shots fired, typically fewer than the six rounds ordinary revolvers hold.

8. Even in mass shootings, where large numbers of rounds are fired, it is extraordinarily rare that the presence of a large capacity magazine had any impact on the number of victims injured or killed. I have reviewed media accounts of the 57 mass shootings that have occurred in the United States between 1994 and 2013 (defined as more than six persons injured or killed) and found that in only one, or possibly two, of the shootings did the presence of an LCM have an impact on the number of casualties. The use of an LCM was not necessary for the shooter to fire many rounds because (a) the shooter possessed multiple firearms; (b) the shooter possessed multiple magazines; and/or (c) the shooter reloaded without interference from others.

9. Empirical research has revealed that criminals do not "prefer" to use "assault weapons." Criminals overwhelmingly prefer and use more concealable handguns in commission of crimes. Research has also revealed that drug dealers and juvenile gang members virtually never use "assault weapons." A survey of a representative national sample of state prison inmates provided information on the guns that criminals owned in the month before the arrest that lead to their imprisonment, as well as the guns they actually *used* in their crimes. Of those who owned a handgun of any kind in the preceding month, 71% were armed with a handgun when they committed the crime that got them sent to prison. However, of those who possessed a "military-type" gun, only 16.7% were armed with such a gun when they committed their crimes (computed from U.S. Bureau of Justice Statistics 1993). Thus, compared to their availability, AWs were *under*represented among the guns these felons actually used to commit crimes. These results were confirmed specifically with respect to "assault rifles" by surveys of inmates in Virginia prisons in 1992-93, which revealed that although 20% of the offenders had previously possessed "assault rifles," none had carried or fired one in their latest crime . Thus, criminals not only did not "prefer" military-style guns, they were strongly disinclined to carry them during commission of their crimes, even when they owned one. In sum, under any meaningful interpretation of "preference," criminals do not prefer assault weapons.

10. Banning a category of firearms that are rarely used in crime for the ostensible purpose of protecting the public from criminal firearms violence in not only illogical, it may actually put the public at greater risk. In 1993, I conducted a survey addressing defensive gun use. A large nationally representative sample covering all adults age 18 and over were asked, among other questions, whether the respondent or a family member had used a firearm, even if it was not fired, for the protection of property at home, at work or elsewhere during the past five years. Based on this question and follow-up questions, I determined that there were about 2.2 to 2.5 million defensive gun uses by civilians in the United States in 1992. This number dwarfs the number of violent crimes that occurred that year in which the offender possessed a firearm. According to the National Crime Victimization Survey, 847,652 such violent crimes occurred in 1992, the peak year for gun crime.

11. Prohibitionist measures, like the Highland Park ban, are aimed at disarming criminals and non-criminals alike. These measures therefore discourage and presumably decrease the frequency of defensive use of "assault weapons" and LCMs among non-criminal crime victims because even minimally effective gun bans disarm some law-abiding citizens. In my opinion, reducing the availability of firearms among law-abiding citizens also reduces defensive gun uses that would otherwise save lives, prevent injuries, thwart rape attempts, drive off burglars and help victims retain their property.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Affidavit are true and correct.



Gary Kleck

EXHIBIT
A

# CURRICULUM VITAE
GARY KLECK
(Updated April 15, 2013)

PERSONAL

Address: College of Criminology and Criminal Justice
306 Hecht House
The Florida State University
Tallahassee, Florida 32306-1127

Telephone Numbers: Office: (850) 644-7651
Office FAX: (850) 644-9614

e-mail Address: gkleck@fsu.edu

CURRENT POSITION
David J. Bordua Professor of Criminology, Florida State University

COURTESY APPOINTMENT
Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS
American Society of Criminology
Academy of Criminal Justice Sciences

EDUCATION

| | |
|---|---|
| A.B. | 1973 - University of Illinois, with High Honors and with Distinction in Sociology |
| A.M. | 1975 - University of Illinois at Urbana, in Sociology |
| Ph.D. | 1979 - University of Illinois at Urbana, in Sociology |

ACADEMIC HONORS
National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of Criminology, for the book that made "the most outstanding contribution to criminology" (for Point Blank: Guns and Violence in America).

TEACHING POSITIONS

Fall, 1991 to present. Professor, College of Criminology and Criminal Justice, Florida State University

Fall, 1984 to Spring, 1991. Associate Professor, School of Criminology, Florida State University.

Fall, 1979 to Spring, 1984,. Assistant Professor, School of Criminology, Florida State University.

Fall, 1978 to Spring, 1979. Instructor, School of Criminology, Florida State University.

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and Causal Inference.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership: An Aggregate Analysis of U.S. Homicide Trends from 1947 to 1976. Department of Sociology, University of Illinois, Urbana. 1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991, 2005 Point Blank: Guns and Violence in America. Hawthorne, N.Y.: Aldine de Gruyter. Winner of the 1993 Michael J. Hindelang award of the American Society of Criminology. Republished in 2005 in paperback by Transaction Publishers. Reviewed in Contemporary Sociology, American Journal of Sociology, Social Forces, Journal of Criminal Law and Criminology, The Criminologist, The Public Interest, Criminal Law Forum, Social Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and Law Enforcement, Newsletter of Public Policy Currents, Commonweal, Choice, and others.

1997 Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997 The Great American Gun Debate: Essays on Firearms and Violence (with Don B. Kates, Jr.). San Francisco: Pacific Research Institute for Public Policy.

2001 (with Don B. Kates) Armed: New Perspectives on Gun Control. N.Y.: Prometheus Books. Selected to Choice: Current Reviews for Academic Libraries' 39th annual "Outstanding Academic Title List," awarded for "excellence in scholarship and presentation, the significance of their

contribution to their field, and their value as an important treatment of their topic." Awarded to less than one percent of books.

## RESEARCH MONOGRAPH

1979 Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms Ownership, Use and Regulation in Illinois. A Report to the Illinois Law Enforcement Commission, Springfield, Illinois.

## ARTICLES IN PEER-REVIEWED JOURNALS

1979 "Capital punishment, gun ownership, and homicide." American Journal of Sociology 84(4):882-910.

1981 "Racial discrimination in criminal sentencing: A critical evaluation of the evidence with additional evidence on the death penalty." American Sociological Review 46(6):783-804.

1982 "On the use of self-report data to determine the class distribution of criminal behavior." American Sociological Review 47(3):427-33.

1983 (with David Bordua) "The factual foundation for certain key assumptions of gun control." Law and Policy Quarterly 5(3):271-298.

1985 "Life support for ailing hypotheses: modes of summarizing the evidence on racial discrimination in criminal sentencing." Law and Human Behavior 9(3):271-285.

1985 "Policy lessons from recent gun control research." Law and Contemporary Problems 49(1):35-62.

1986 "Evidence that 'Saturday Night Specials' not very important for crime." Sociology and Social Research 70(4):303-307.

1987 "Americans' foreign wars and the legitimation of domestic violence." Sociological Inquiry 57(3):237-250.

1988 "Crime control through the private use of armed force." Social Problems 35(1):1-21.

1988 "Miscounting suicides." Suicide and Life-Threatening Behavior 18(3):219-236.

1990 (with Susan Sayles) "Rape and resistance." Social Problems 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence." Social Forces 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery." Journal of Quantitative Criminology 9(1):55-82.

1993    (with E. Britt Patterson) "The impact of gun control and gun ownership levels on violence rates." Journal of Quantitative Criminology 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control." Violence and Victims 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field." Social Pathology 1(1):12-47.

1995    "Using speculation to meet evidence." Journal of Quantitative Criminology 11(4):411-424.

1995    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun." Journal of Criminal Law & Criminology 86(1):150-187.

1996    "Crime, culture conflict and sources of support for gun control: a multi-level application of the General Social Surveys." American Behavioral Scientist 39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

1996    (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding." Law & Society Review 30(2):393-397.

1996    (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful vigilante imagery vs. reality: results from the National Self-Defense Survey." Journal of Criminal Justice 26(3):251-258.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the defensive gun use estimate down." Journal of Criminal Law and Criminology 87(4):1446-1461.

1998    (with Marc Gertz) "Carrying guns for protection: results from the National Self-Defense Survey." Journal of Research in Crime and Delinquency 35(2):193-224.

1998 "What are the risks and benefits of keeping a gun in the home?" Journal of the American Medical Association 280(5):473-475.

1998 (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of habitual offenders." Criminology 36(3):481-511.

1999 (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Social Problems 46(2):275-293.

1999 "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals." St. Louis University Public Law Review 18(1):23-45.

2001 "Can owning a gun really triple the owner's chances of being murdered?" Homicide Studies 5:64-77.

2001 (with Theodore Chiricos) "Unemployment and property crime: a target-specific assessment of opportunity and motivation as mediating factors." Criminology 40(3):649-680.

2004 "Measures of gun ownership levels for macro-level crime and violence research." Journal of Research in Crime and Delinquency 41(1):3-36.

2004 (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crimes." Criminology 42(4):861-909.

2005 (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general deterrence research." Criminology 43(3):623-660.

2006 (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently used in research in criminology and criminal justice?" Journal of Criminal Justice 34(2):147-152.

2007 "Are police officers more likely to kill African-American suspects?" Psychological Reports 100(1):31-34.

2007 (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2000-2005." Journal of Criminal Justice Education 18(3):385-405.

2008 (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime victimization and divorce." International Review of Victimology 15(1):1-17.

2009 "The worst possible case for gun control: mass shootings in schools." American Behavioral Scientist 52(10):1447-1464.

2009 (with Shun-Yung Wang) "The myth of big-time gun trafficking and the overinterpretation of gun tracing data." UCLA Law Review 56(5):1233-1294.

2009 (with Tomislav Kovandzic) "City-level characteristics and individual handgun ownership: effects of collective security and homicide." Journal of Contemporary Criminal Justice 25(1):45-66.

2009 (with Marc Gertz and Jason Bratton) "Why do people support gun control?" Journal of Criminal Justice 37(5):496-504.

2011 (with James C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009." Journal of Criminal Justice Education 22(1):43-66.

2011 (with Tomislav Kovandzic, Mark Saber, and Will Hauser). "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." Journal of Criminal Justice 39(4):312-319.

2013 (with Will Hauser) "Guns and fear: a one-way street?" Crime and Delinquency 59:271-291.

2013 "Gun control after Heller and McDonald: what cannot be done and what ought to be done." Fordham Urban Law Journal 39(5):1383-1420.

2013 (with James C. Barnes) "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?" Crime and Delinquency 59(2): (forthcoming, c. September 2013).

2013 (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach." Journal of Quantitative Criminology 28(4): (forthcoming c. September 2013).

2014 (with Jongyeon Tark) "Resisting rape: the effects of victim self-protection on rape completion and injury." Violence Against Women 23(3): (forthcoming March 2014).

2014 (with James C. Barnes) "Do more police generate more crime deterrence?" Crime and Delinquency 59(4): (forthcoming c. January 2014).

OTHER PUBLISHED ARTICLES

1992 "Assault weapons aren't the problem." New York Times September 1, 1992, p. A15. Invited Op-Ed page article.

1993 "The incidence of violence among young people." The Public Perspective 4:3-6. Invited article.

1994 "Guns and self-protection." Journal of the Medical Association of Georgia 83:42. Invited editorial.

1996 "Using speculation to meet evidence: reply to Alba and Messner." Journal on Firearms and Public Policy 9:13-49.

1998 "Has the gun deterrence hypothesis been discredited?" Journal on Firearms and Public Policy 10:65-75.

1999 "There are no lessons to be learned from Littleton." Criminal Justice Ethics 18(1):2, 61-63. Invited commentary.

1999 "Risks and benefits of gun ownership - reply." Journal of the American Medical Association 282(2):136-136.

1999 "The misfire that wounded Colt's." New York Times October 23, 1999. Invited Op-Ed page article.

1999 "Degrading scientific standards to get the defensive gun use estimate down." Journal on Firearms and Public Policy 11:77-137.

2000 "Guns aren't ready to be smart." New York Times March 11, 2000. Invited Op-Ed page article.

2000 (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact." Journal on Firearms and Public Policy 12:197-247.

2001 "School lesson: armed self-defense works." Wall Street Journal March 27, 2001. Invited opinion article.

2001 "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth." Journal of Quantitative Criminology 17(1):75-80.

2001 "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement." Journal on Firearms and Public Policy 13:1-43.

2002 "Research agenda on guns, violence, and gun control." Journal on Firearms and Public Policy 14:51-72.

2006 "Off target." New York Sun January 5, 2006. Invited opinion article.

2009 "How not to study the effect of gun levels on violence rates." Journal on Firearms and Public Policy 21:65-93.

2011 "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes." Wall Street Journal January 15, 2011. Invited opinion article.

2011 "The myth of big-time gun trafficking." Wall Street Journal May 21, 2011. Invited opinion article.

BOOK CHAPTERS

1984 (with David Bordua) "The assumptions of gun control." Pp. 23-48 in Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambridge, Mass.: Ballinger. (Also appeared in Federal Regulation of Firearms, report prepared by the Congressional Research Service, Library of Congress, for the Committee on the Judiciary, United States Senate, 198-2).

1984 "The relationship between gun ownership levels and rates of violence in the U.S." Pp. 99-135 in Kates, above.

1984 "Handgun-only gun control: a policy disaster in the making." Pp. 167-199 in Kates, above.

1996 "Racial discrimination in criminal sentencing." Pp. 339-344 in Crime and Society, Volume III – Readings: Criminal Justice, edited by George Bridges, Robert D. Crutchfield, and Joseph G. Weis. Thousand Oaks, Calif.: Pine Forge Press.

1996 "Gun buy-back programs: nothing succeeds like failure." Pp. 29-53 in Under Fire: Gun Buy-Backs, Exchanges and Amnesty Programs, edited by Martha R. Plotkin. Washington, D.C.: Police Executive Research Forum.

2000 "Firearms and crime." Pp. 230-234 in the Encyclopedia of Criminology and Deviant Behavior, edited by Clifton D. Bryant. Philadelphia: Taylor & Francis, Inc.

2001 (with Leroy Gould and Marc Gertz) "Crime as social interaction." Pp. 101-114 in What is Crime?: Controversy over the Nature of Crime and What to Do About It, edited by Stuart Henry and Mark M. Lanier. Lanham, Md.: Rowman and Littlefield.

2003 "Constricted rationality and the limits of general deterrence." Chapter 13 in Punishment and Social Control: Enlarged Second Edition, edited by Thomas G. Blomberg. New York: Aldine de Gruyter.

2003 "The great American gun debate: what research has to say." Pp. 470-487

in The Criminal Justice System: Politics and Policies, 9th edition, edited by George F. Cole, Marc Gertz, and Amy Bunger. Belmont, CA: Wadsworth-Thomson.

2008 "Gun control." Article in The Encyclopedia of Social Problems, edited by Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009 "Guns and crime." Invited chapter. Pp. 85-92 in 21st Century Criminology: A Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012 Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias." Chapter 6, pp. 76-92 in The Sage Handbook of Criminological Research Methods, edited by David Gadd, Susanne Karstedt, and Steven F. Messner. Thousand Oaks, CA: Sage.

2012 (with Kelly Roberts) "What survey modes are most effective in eliciting self-reports of criminal or delinquent behavior?" Chapter in Handbook of Survey Methodology, edited by Lior Gideon. NY: Springer.

2013 "Deterrence: actual vs. perceived risk of punishment. Article in Encyclopedia of Criminology and Criminal Justice. Berlin: Springer Verlag.

2013 "An overview of gun control policy in the United States." Pp. 562-579 in The Criminal Justice System, 10th edition, Edited by George F. Cole and Marc G. Gertz. Wadsworth.

BOOK REVIEWS

1978 Review of Murder in Space City: A Cultural Analysis of Houston Homicide Patterns, by Henry Lundsgaarde. Contemporary Sociology 7:291-293.

1984 Review of Under the Gun, by James Wright et al. Contemporary Sociology 13:294-296.

1984 Review of Social Control, ed. by Jack Gibbs. Social Forces 63: 579-581.

1987 Review of Armed and Considered Dangerous, by James Wright and Peter Rossi, Social Forces 66:1139-1140.

1987 Review of Sociological Justice, by Donald Black, Contemporary Sociology 19:261-3.

1988 Review of The Citizen's Guide to Gun Control, by Franklin Zimring and Gordon Hawkins, Contemporary Sociology 17:363-364.

1991 Review of Equal Justice and the Death Penalty, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr. Contemporary Sociology 20:598-9.

1999 Review of Crime is Not the Problem, by Franklin E. Zimring and Gordon Hawkins. American Journal of Sociology 104(5):1543-1544.

2001 Review of Gun Violence: the Real Costs, by Philip J. Cook and Jens Ludwig. Criminal Law Bulletin 37(5):544-547.

2010 Review of Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates, by J. D. Monroe. Criminal Justice Review 35(1):118-120.

## LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987 "Accidental firearm fatalities." American Journal of Public Health 77:513.

1991 "Suicide in the home in relation to gun ownership." The New England Journal of Medicine 327:1878.

1991 "Gun ownership and crime." Canadian Medical Association Journal 149:1773-1774.

1999 "Risks and benefits of gun ownership." Journal of the American Medical Association 282:136.

1999 (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates." Journal of the American Medical Association 284:2718-2719.

2001 "Violence, drugs, guns (and Switzerland)." Scientific American 284(2):12.

2002 "Doubts about undercounts of gun accident deaths." Injury Prevention Online (September 19, 2002). Published online at http://ip.bmjjournals.com/cgi/eletters /8/3/252.

2005 "Firearms, violence, and self-protection." Science 309:1674. September 9, 2005.

## UNPUBLISHED REPORT

1987 Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

RESEARCH FUNDING

1991 "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1996 "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between actual and perceived punishment levels.

PRESENTED PAPERS

1976 "Firearms, homicide, and the death penalty: a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979 "The assumptions of gun control." Presented at the Annual Meetings of the American Sociological Association, New York City.

1980 "Handgun-only gun control: A policy disaster in the making." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1980 "Life support for ailing hypotheses: Modes of summarizing the evidence on racial discrimination." Presented at the Annual Meetings of the American Society of Criminology, Toronto.

1984 "Policy lessons from recent gun control research." Presented at the Duke University Law School Conference on Gun Control.

1985 "Policy lessons from recent gun control research." Presented at the Annual Meetings of the American Society of Criminology, San Diego.

1986 "Miscounting suicides." Presented at the Annual Meetings of the American Sociological Association, Chicago.

1987 (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects." Annual meetings of the American Society of Criminology, Montreal.

1988 "Suicide, guns and gun control." Presented at the Annual Meetings of the

Popular Culture Association, New Orleans.

1988 (with Susan Sayles) "Rape and resistance."     Presented at the Annual Meetings of the American Society of Criminology, Chicago, Ill.

1989 (with Karen McElrath) "The impact of weaponry on human violence." Presented at the Annual Meetings of the American Sociological Association, San Francisco.

1989 (with Britt Patterson) "The impact of gun control and gun ownership levels on city violence rates." Presented at the Annual Meetings of the American Society of Criminology, Reno.

1990 "Guns and violence: a summary of the field." Presented at the Annual Meetings of the American Political Science Association, Washington, D.C.

1991 "Interrupted time series designs: time for a re-evaluation." Presented at the Annual Meetings of the American Society of Criminology, New Orleans.

1993 (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact." Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1992 "Crime, culture conflict and support for gun laws: a multi-level application of the General Social Surveys." Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1994 (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."     Presented at the Annual Meetings of the American Society of Criminology, Miami.

1995 (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban drug use levels and crime rates." Presented at the Annual Meetings of the American Society of Criminology, Boston.

1996 (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

1997 "Evaluating the Brady Act and increasing the utility of BATF tracing data." Presented at the annual meetings of the Homicide Research Working Group, Shepherdstown, West Virginia.

1997 "Crime, collective security, and gun ownership: a multi-level application of the General Social Surveys." Presented at the Annual Meetings of the American Society of Criminology, San Diego.

1998 (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of deterrence-based crime control policy." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1998 "Measuring macro-level gun ownership levels." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1999 "Can owning a gun really triple the owner's chances of being murdered?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2000 "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement." Presented at the Annual Meetings of the American Society of Criminology, San Francisco.

2001 (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime rates." Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001 "Measures of gun ownership levels for macro-level violence research." Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001 "The effects of gun ownership levels and gun control laws on urban crime rates." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

2003 (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends on who has them." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2003 (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence." Presented at the Annual Meetings of the American Society of Criminology, Denver.

2004 (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in the community influence whether individuals own guns?" Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004 (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004 (with Jongyeon Tark) "The impact of self-protection on rape completion and injury." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2004 (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the Annual Meetings of the American Society of Criminology, Nashville.

2005 (with Jongyeon Tark) "Who resists crime?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2005 (with Jongyeon Tark and Laura Bedard) "Crime and marriage." Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2006 (with Shun-Yang Kevin Wang)"Organized gun trafficking, 'crime guns,' and crime rates." Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2006 "Are police officers more likely to kill black suspects?" Presented at the Annual Meetings of the American Society of Criminology, Los Angeles.

2007 (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2007 (with Marc Gertz and Jason Bratton) "Why do people support gun control?" Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2008 (with J.C. Barnes) "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?" Presented at the Annual Meetings of the American Society of Criminology, St. Louis.

2009 "The myth of big-time gun trafficking." Presented at UCLA Law Review Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller." January 23, 2009, Los Angeles.

2009 (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment." Presented at the Annual Meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009 (with J. C. Barnes) "Do more police generate more deterrence?" Presented at the Annual Meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010 (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009." Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010 (with Will Hauser) "Fear of crime and gun ownership." Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010 "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments." Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010 (with Mark Faber and Tomislav Kovandzic) "Perceived risk, criminal victimization, and prospective gun ownership." Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011 (with Shun-young Wang) "The impact of job quality and career commitment on delinquency: conditional or universal?" Presented at the annual Meetings of the American Society of Criminology, November 17, 2011.

2011 (with Moonki Hong) "The short-term deterrent effect of executions on homicides in the United States, 1984-1998." Presented at the annual Meetings of the American Society of Criminology, November 16, 2011.

2011 (with Kelly Roberts) "Which survey modes are most effective in getting people to admit illegal behaviors?" Presented at the annual Meetings of the American Society of Criminology, November 17, 2011.

2011 (with Will Hauser) "Pick on someone your own size: do health, fitness, and size influence victim selection?" Presented at the annual Meetings of the American Society of Criminology, November 18, 2011.

2011 (with Tomislav Kovandzic) "Is the macro-level crime/punishment association spurious?" Presented at the annual Meetings of the American Society of Criminology, November 18, 2011.

2012 (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study." Presented at the annual Meetings of the American Society of Criminology, November 15, 2012.

CHAIR

1983 Chair, session on Race and Crime. Annual meetings of the American Society of Criminology, Denver.

1989 Co-chair (with Merry Morash), roundtable session on problems in analyzing the National Crime Surveys. Annual meetings of the American Society of Criminology, Reno.

1993 Chair, session on Interrupted Time Series Designs. Annual meetings of

the American Society of Criminology, New Orleans.

1993    Chair, session on Guns, Gun Control, and Violence. Annual meetings of the American Society of Criminology, Phoenix.

1994    Chair, session on International Drug Enforcement. Annual meetings of the American Society of Criminology, Boston.

1999    Chair, Author-Meets-Critics session, More Guns, Less Crime. Annual meetings of the American Society of Criminology, Toronto.

2000    Chair, session on Defensive Weapon and Gun Use. Annual Meetings of the American Society of Criminology, San Francisco.

2002    Chair, session on the Causes of Gun Crime. Annual meetings of the American Society of Criminology, Chicago.

2004    Chair, session on Protecting the Victim. Annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981    Session on Gun Control Legislation, Annual Meetings of the American Society of Criminology, Washington, D.C.

1984    Session on Criminal Sentencing, Annual Meetings of the American Society of Criminology, Cincinnati.

1986    Session on Sentencing, Annual Meetings of the American Society of Criminology, Atlanta.

1988    Session on Gun Ownership and Self-protection, Annual Meetings of the Popular Culture Association, Montreal.

1991    Session on Gun Control, Annual Meetings of the American Statistical Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, Annual Meetings of the American Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, Annual Meetings of the American Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson. Annual meetings of the American Society of Criminology, Nashville.

2007 Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown. MD, June 4, 2007.

2009 Session on Guns and Crime, at the DeVoe Moore Center Symposium On The Economics of Crime, March 26-28, 2009.

2012 Panel discussion of news media coverage of high profile crimes. Held at the Florida Supreme Court On September 24-25, 2012, sponsored by the Florida Bar Association as part of their 2012 Reporters' Workshop.

PROFESSIONAL SERVICE

Editorial consultant -

American Sociological Review
American Journal of Sociology
Social Forces
Social Problems
Law and Society Review
Journal of Research in Crime and Delinquency
Social Science Research
Criminology
Journal of Quantitative Criminology
Justice Quarterly
Journal of Criminal Justice
Violence and Victims
Violence Against Women
Journal of the American Medical Association
New England Journal of Medicine
American Journal of Public Health
Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene LeCarte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami, November, 1994.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of Justice Quarterly, 2007.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to present.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology, Fall, 1987.

Member, Recruitment Committee, School of Criminology, Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology, Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to present.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-present.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-present.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-present.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-present.

Member, University Promotion and Tenure Committee, Fall, 2003 to present.

Member of University Graduate Policy Committee, Fall 2003 to present.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2011.

PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty. Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day, Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future, February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, June 29, 1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence," Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 15-16, 2001, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment," New York City, March 9, 2012.

Invited panelist, community forum on "Students, Safety & the Second Amendment," sponsored by the Tallahassee Democrat.

Invited address at University of West Florida, Department of Justice Studies, titled "Guns, Self-Defense, and the Public Interest," April 12, 2013.

Member of the Institute of Medicine/National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence, 2013.

OTHER ITEMS

Listed in:
Marquis Who's Who, 2009
Marquis Who's Who in the South and Southwest, 25th edition
Who's Who of Emerging Leaders in America, 1st edition
Contemporary Authors
Directory of American Scholars, 10th edition, 2002
Writer's Directory, 20th edition, 2004.

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008. Podcast distributed through National Public Radio. Further details are available at http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in Florida State University Research in Review, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.