IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| ARIE S. FRIEDMAN, M.D. and | ) | | |
| the Illinois State Rifle Association | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | No: | 13-cv-9073 |
| v. | ) | | |
| | ) | | |
| CITY OF HIGHLAND PARK, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

Laws prohibiting possession of commonly owned firearms by law-abiding citizens for self-defense in the home are categorically unconstitutional under the Second Amendment to the United States Constitution. The Defendant has enacted just such a law. Highland Park City Code section 136.001 *et seq*. (hereafter the "Ordinance") prohibits possession of firearms owned by Plaintiffs and millions of other Americans for defense of the home and family, and other entirely lawful purposes. Plaintiffs respectfully submit that the status quo prior to December 14, 2013 should be preserved and Defendant should be preliminarily enjoined from enforcing the Ordinance until the merits of Plaintiffs' claims can be addressed.

**LAW AND ARGUMENT**

I.      **THE FRAMEWORK FOR ANALYSIS OF SECOND AMENDMENT**
        **RIGHTS AND INFRINGEMENT.**

The Ordinance provides that "[N]o person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity

1

Magazine, unless expressly exempted in Section 136.006 of this Chapter." City Code §136.015. The Ordinance broadly and improperly defines "Assault Weapon" and "Large Capacity Magazine" to include semi-automatic firearms and standard ammunition magazines that are commonly and appropriately owned by Plaintiffs and countless other Americans for self-defense and other lawful purposes, including hunting and recreational target shooting. (A copy of the Ordinance is attached as Exhibit 1.)

In *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), the United States Supreme Court held that the "central component" of the Second Amendment right to keep and bear arms is the personal right of armed self-defense, most notably in the home. *Id*. at 595.[1] The Court in *Heller* held the District of Columbia ban on handgun possession to be unconstitutional because "the inherent right of self-defense has been central to the Second Amendment right" and the District of Columbia's restrictions "extend[] … to the home, where the need for defense of self, family and property is most acute." *Id*. at 628-29; *see also People v. Aguilar*, 2013 IL 112116, ¶ 20, 2013 Ill. LEXIS 1626 (Il. 2013) ("[I]f *Heller* means what it says … 'individual self-defense' is indeed 'the central component' of the Second Amendment right to keep and bear arms.'"). While ownership of "dangerous and unusual" firearms is not protected by the Second Amendment, ownership of firearms that are in "common use" for lawful purposes is categorically protected. *Id*. at 627.

In *Wilson v. County of Cook*, 2012 IL 112026, 968 N.E.2d 641 (Il. 2012), the Illinois Supreme Court applied the *Heller* and *McDonald* decisions and reversed a trial court's dismissal of a Second Amendment challenge to an "assault weapons" ordinance nearly identical to the

---

[1]     In *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3050 (2010), the Court held the Second Amendment right to possess firearms in the home for self-defense applicable to the States under the Due Process Clause of the Fourteenth Amendment.

Highland Park ban.[2] The court remanded the case to the trial court for further proceedings, including an "empirical inquiry" into whether the ordinance prohibited ownership of firearms "that are typically possessed by law-abiding citizens for lawful purposes and fall outside the scope of the dangers sought to be protected under the ordinance." *Id*. at ¶ 49. The court reasoned:

> Without a national uniform definition of assault weapons from which to judge these weapons, it cannot be ascertained at this stage of the proceedings whether these arms with these particular attributes as defined in this Ordinance are well-suited for self-defense or sport or would be outweighed completely by the collateral damage resulting from their use, making them "dangerous and unusual" as articulated in *Heller*.

*Id*. Historical examples of "dangerous and unusual" weapons cited by the *Wilson* court include machine guns, sawed-off shotguns, grenade launchers and pipe bombs. *Id*. at ¶ 46.

The court in *Wilson* observed that following the *Heller* and *McDonald* decisions, courts have followed a "two-pronged approach" when analyzing "the newly enunciated Second Amendment guarantee." *Id*. at ¶ 41. The threshold question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment right. "If the government can establish that the challenged law regulates activity falling outside the scope of the second amendment right, then the regulated activity is categorically unprotected." *Id*. (*citing Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011) (defendant preliminarily enjoined from banning firing ranges because range training is not categorically unprotected by the Second Amendment and defendant provided no justification for total prohibition)). If the challenged law regulates activity firmly within the Second Amendment right – such as ownership of handguns for home defense – the activity is categorically protected and an inquiry into the government's

---

[2]     The Cook County Code §54-211 (amended by Cook County Ordinance No. 06-O-50) (approved Nov. 14, 2006)) is set forth at *Wilson*, 2012 IL 112026, ¶¶ 16-18.

justification of law is not required. *See Heller*, 554 U.S. at 628-29; *see also Aguilar*, 2013 IL 112116, ¶ 21 (Illinois aggravated unlawful use of weapons statute held unconstitutional because it categorically prohibited possession of firearms for self-defense outside the home); *accord Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).

The Illinois Supreme Court held, however, that if the evidence is "inconclusive or suggests that the regulated activity is not categorically unprotected – then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of the Second Amendment right." *Wilson*, 2012 IL 112026, ¶ 42. The Court in *Heller* and *McDonald* did not articulate what standard of review should be applied to government actions infringing on Second Amendment rights, but it rejected rational basis review. *Heller*, 554 U.S. at 628 n. 27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *Ezell*, 651 F.3d at 706 (*Heller* and *McDonald* "make it clear that the deferential rational-basis standard is out, and with it the presumption of constitutionality."). Indeed, the Court's reasoning suggests that the categorical approach applied in *Heller* and *McDonald* should be applied in all Second Amendment cases and that interest balancing tests like intermediate scrutiny are never appropriate. *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1271-86 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). In any event, to the extent a level-of-scrutiny analysis applies, a heightened form of scrutiny into the government's justification for infringing would be required.

Courts engaging in a level-of-scrutiny analysis have indicated that when a law imposes a "severe burden on the core Second Amendment right of armed self-defense," strict scrutiny is to be applied and "an extremely strong public interest justification and a close fit between the

4

government's means and its end" is required. *Ezell*, 651 F.3d at 708; *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (strict scrutiny means the law must be narrowly tailored to serve a compelling governmental interest). However, if a law restricting activity lies "closer to the margins of the Second Amendment right" because the law "regulates rather than restricts" exercise of the right, intermediate scrutiny may apply. *Ezell*, 651 F.3d at 708; *see United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (intermediate scrutiny requiring a "substantial relation" between prohibiting firearms possession by persons convicted of misdemeanor domestic abuse and the "important governmental goal of preventing armed mayhem" applied).[3]

When the merits of Plaintiffs' claims are reached in this case, the Ordinance should be found categorically unconstitutional because it prohibits activity firmly within the Second Amendment right. The evidence will establish that the Ordinance bans possession of a large category of firearms and magazines that are owned and used by millions of law-abiding citizens in the United States for lawful purposes, including self-defense in the home. But regardless of whether the Ordinance is found categorically unconstitutional or analyzed under the strict scrutiny or intermediate scrutiny test, Defendant should be preliminarily enjoined from enforcing the Ordinance because Plaintiffs can demonstrate (a) a reasonable likelihood of success on the merits of their claim; (b) there is no adequate remedy at law; and (c) irreparable injury. *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Public Health*, 699 F.3d 962, 972 (7th Cir. 2012). And no harm will be imposed on Defendant should it be preliminarily enjoined from enforcing the ordinance. *Id.*; *see also ACLU v. Alvarez*, 679 F.3d 583, 590-91 (7th

---

[3]     This framework is similar to that used in First Amendment cases, and the Court in both *Heller* and *McDonald* relied on First Amendment analogues in reaching its decisions. *See Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045. As a result, other courts have adapted First Amendment doctrine to the Second Amendment. *See Ezell*, 651 F.3d at 706-07; *Skoien*, 614 F.3d at 641; *Wilson*, 2012 IL 112026, ¶ 47.

Cir. 2012) (the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional). In contrast, Plaintiffs' constitutional rights will remain violated if the injunction is not granted.

## II.    PLAINTIFFS' RIGHT TO PRELIMINARY INJUNCTIVE RELIEF.

Plaintiffs ask that Defendant be preliminarily enjoined from enforcing the Ordinance and that the status quo that existed prior to the December 14, 2013 deadline to remove, surrender or make inoperable prohibited firearms be preserved. Preserving the status quo will permit Plaintiffs and others to possess their firearms and ammunition magazines in their homes in Highland Park, as they have been safely possessed without harm to the community, until the merits of Plaintiffs' case can be decided.

### (A)    There Is At Least a Reasonable Likelihood of Success on the Merits of Plaintiffs' Claim.

Plaintiff Friedman owns firearms for lawful purposes, including self-defense in his home, which are now illegally possessed in Highland Park by law-abiding citizens. (Ex. 2, Ver. Compl. ¶¶ 17-18.) As of December 14, 2013, Friedman was required under the Ordinance to surrender his firearms to the Chief of Police, remove them from his home in Highland Park or render the firearms inoperable. (Ex. 2, Ver. Compl. ¶ 9.)[4] Plaintiff ISRA members residing in Highland Park are also prohibited from keeping and acquiring banned firearms and magazines for lawful purposes, including the defense of their homes and families. (Ex. 2, Ver. Compl. ¶ 5.) There can be little question that Plaintiffs have been injured by operation of the Ordinance, that their

---

[4]    The Ordinance provides that persons "legally in possession of an Assault Weapon of Large Capacity Magazine" "shall have 60 days from the effective date" of the Ordinance to remove, modify or surrender them to the Chief of Police. City Code §136.020. However, it is not clear on the face of the Ordinance when the Ordinance became effective and when the 60 day period expired. Plaintiffs' counsel received written confirmation from Gerald Cameron of the Highland Park Police Department that the 60 day period expired on December 14, 2013.

Verified Complaint states a cognizable cause of action for violation of their Second Amendment rights and that there is at least a reasonable likelihood they will succeed on the merits of their claim.

**(i)** **Firearms and Ammunition Magazines Prohibited Under the Ordinance Are Commonly Owned by Law-Abiding Citizens for Lawful Purposes, Including Self-Defense in the Home.**

The Ordinance prohibits lawful ownership of firearms in Highland Park that are not dangerous and unusual. The firearms banned include many of the most commonly manufactured, purchased and owned firearms in America – including AR-type rifles that the United States Supreme Court has held to be "traditionally … widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994). Indeed, rifles built on the AR-platform, like the Smith & Wesson M & P 15 rifle owned by Plaintiff Friedman, are among the most popular and commonly owned firearms today. (Ex. 3, Lombardo Aff. ¶ 3.) Between 1990 and 2012, nearly 4.8 million AR-type rifles have been produced and sold in the United States. (*Id.*) An additional 3.4 million AR-type and AK-type rifles, also banned under the Ordinance, were imported into the United States between during those same years. (*Id.*) In 2012 alone, nearly 1 million of these rifles were sold in the United States for civilian use, more than double the number of the most commonly sold vehicle in the United States, the Ford F-150. (*Id.*) Thirty-seven different United States manufacturers have produced AR-type rifles, including some of the most widely known and respected firearms manufacturers in the world – Smith & Wesson, Colt, Remington, Sig Sauer and Sturm, Ruger. (Ex. 4, Curcuruto Aff. ¶ 4.)

It has been estimated that more than 4.8 million people in the United States own an AR-type or AK-type rifle. (*Id.*) They are sold by more than 90% of licensed firearm retailers and in greater numbers than traditionally-styled wooden stock rifles. (*Id*. at ¶ 6.) In fact, more than one

out of every five new firearms sold in the United States is an AR-type or AK-type rifle. (*Id*.)  A nationwide survey of nearly 22,000 owners of these firearms revealed that a typical owner of these rifles is over 35 years old, married and has some college education, and nearly half are current or former members of the military or law enforcement. (*Id*. at ¶ 5.)

The same nationwide survey asked owners to identify the purpose for which they purchased their rifles. Recreational target shooting was ranked as the number reason, followed closely by home defense. (*Id*.) In another survey of firearm owners, nearly 60% of those surveyed indicated that they own a semi-automatic rifle with a detachable magazine for home protection. (Ex. 3, Lombardo Aff. ¶ 5.)

The popularity of these rifles is based, in part, on their ready adaptability for different uses. They have an upper receiver into which the barrel is mounted and a lower receiver that holds the firing assembly and on which the butt stock and lower grip are mounted.  The two receivers can be disconnected easily, allowing the shooter to mount a different upper receiver and barrel and thus use a wide variety of rifle cartridges and change the length and weight of the barrel to suit the shooter's needs.  Because of its adaptability, a single AR-type rifle can be used for target matches, home defense, and small and large game hunting. (*Id*.)  AR-type rifles are also lighter in weight, shorter in length and have less recoil than most traditionally-styled wooden stock semi-automatic rifles, making them easier to handle and shoot.  They are also very accurate and reliable. (Ex. 3, Lombardo Aff. ¶ 4.)

The majority of AR-platform rifles are chambered for .223 ammunition, which is a relatively inexpensive rifle cartridge and is particularly well-suited for home defense purposes. Approximately three out of every four AR-type rifle sold are chambered for .223 ammunition. (Ex. 4, Curcuruto Aff. ¶ 5.)  Although the .223 round has sufficient stopping power in the event a

home intruder is encountered, the round loses velocity relatively quickly after passing through walls and other objects, thus decreasing the chance that errant shot inadvertently strikes an unintended target in a home defense situation. (*Id*. at ¶ 4.) For that reason, the .223 round is considered by ballistics experts to be ammunition offering ideal intruder incapacitation and less penetration risks to unintended targets in the home (*i.e.*, family members) than typical handgun bullets and shotgun projectiles. (Ex. 5, Roberts Aff. ¶¶ 3-6.) An AR-15 rifle chambered for .223 ammunition is believed to be the most ergonomic, safe and effective firearm for self-defense purposes. (Ex. 5, Roberts Aff. ¶ 6.) And persons seeking formal instruction on self-defense in their homes are informed of the attributes of AR-type rifles and their use is recommended by those with expertise in firearms training and safety. (Ex. 3, Lombardo Aff. ¶ 4.) The overwhelming majority of these rifles are equipped with ammunition magazines with a capacity to hold more than 10 rounds of ammunition. (Ex. 4, Curcuruto Aff. ¶ 5.)

The firearms Defendant has chosen to ban, including AR-type and AK-type rifles, simply reflect technological advancement in firearms design, the primary goal of which is to improve reliability, accuracy, ergonomics, ease of reloading and safety. (Ex. 6, Supica Aff. ¶ 4.) None of the prohibited firearms are fully automatic "machine guns." (*Id*. at ¶ 5.) They are semi-automatic firearms that will fire only one round when the trigger is pulled, as is the case with many firearms that Defendant chose to not ban, including revolvers, bolt-action, lever action, pump action and single-shot firearms. (*Id*.)

The origin of semi-automatic firearms dates back to the late 19th century, and the first semi-automatic rifles designed specifically for the civilian market were introduced early in the 20th century. (*Id*. at ¶ 6.) Throughout the 20th century, civilian and military firearms design largely followed the same track. For example, the wood-stocked bolt-action rifle, used by hunters

for generations, gained popularity following World War I, where it was the battlefield rifle. It represented a step forward in handling, reliability and accuracy. Soon after the U.S. military began using the semi-automatic rifle in World War II, a wide range of semi-automatic rifles gained increased popularity among civilians. Modern sporting rifles, most notably rifles built on the AR-platform, were developed in the early 1960's based on the M-16 rifle used by U.S. forces in Viet Nam. Modern sporting rifles, like many of those banned under the Highland Park ordinance, are simply modern state-of-the-art firearms, just as their precursors once were generations ago. (*Id*. at ¶ 7.)

The firearms Defendant has chosen to ban are not "military grade weapons," as gun control advocates frequently describe them. (*Id*. at ¶ 8.) Military forces around the world since the end of World War II have primarily used selective-fire rifles as standard service rifles. (*Id*.) A selective-fire rifle has the ability to fire both fully automatic, meaning it continues to fire with a single pull of the trigger as long as the trigger is pulled back, or in bursts of multiple rounds with each pull of the trigger, as well as semi-automatic, meaning a separate pull of the trigger is required for each shot. (*Id*.) And the design features Defendant has chosen to ban do not make the firearms more dangerous. (*Id*. at ¶ 10; Ex. 3, Lombardo Aff. ¶ 6.) In fact, the presence of one or more of the features is typically integral to the safe handling of the firearm and enables the shooter accurately and reliably fire the gun. (Ex. 3, Lombardo Aff. ¶ 6; Ex. 6, Supica Aff. ¶ 10.)

At bottom, the firearms and magazines Defendant has prohibited law-abiding Highland Park residents from possessing are not dangerous and unusual. (Ex. 6, Supica Aff. ¶ 3.) They are simply modern firearms and accessories owned by millions of law-abiding American for lawful purposes, including self-defense in the home. A reasonable likelihood exists that Plaintiffs will succeed in demonstrating that Defendant's decision to prohibit the lawful possession of these

firearms in Highland Park has infringed Plaintiffs' Second Amendment right to keep and bear arms.

### (ii) Defendant Cannot Justify Infringement of Plaintiffs' Second Amendment Rights.

Presumably, Defendant will attempt to justify the Ordinance with an argument that the prohibition on firearms ownership by law-abiding citizens will enhance public safety in Highland Park. Under *Heller's* categorical approach, such an argument fails. Under a heightened level of scrutiny, there is a fair question as to whether Defendant can support the argument and refute the claim that the Ordinance is just a symbolic political gesture.[5]

According to publicly available FBI Uniform Crime Reports, Highland Park has a very low incidence of crime of any kind, particularly violent crime. For example, statistics for 2010 indicate that Highland Park experienced just 17 incidents of violent crime (defined as murder and non-negligent manslaughter, forcible rape, robbery and aggravated assault). None of these incidents were murders. In fact, publicly available data indicates that no murder has been committed in Highland Park since 2003. The same data reveals that residents of Highland Park are substantially more likely to be victims of property crimes, including residential burglaries, larceny and vehicle theft. (Ex. 7, Kleck Aff. ¶ 3.)

Even if Highland Park had a violent crime problem, prohibiting possession of the firearms identified in the Ordinance by law-abiding citizens would not be a solution. Plaintiffs

---

[5]  The Ordinance was not passed by the Highland Park City Council in response to any real or perceived need to protect Highland Park residents. It was enacted because the Illinois legislature passed the "Firearms Concealed Carry Act," which contained preemption language making regulation, possession and ownership of "assault weapons" the exclusive power of the State. 430 ILCS 65/13.1(c) (effective July 9, 2013). However, the Act provided that any ordinance or regulation enacted on, before or within 10 days of its effective date would be valid provided it was not inconsistent with the Act. *Id*. Highland Park was one of a handful of municipalities that considered regulating "assault weapons" to avoid preemption, but one of the few that enacted an ordinance.

and other lawful firearm owners in Highland Park pose no threat to public safety. Banning a category of firearms rarely used in crime for the ostensible purpose of protecting the public from criminal firearms violence in not only illogical, it may actually put the public at greater risk. (Ex. 7, Kleck Aff. ¶ 9.)[6] According to a United States Department of Justice, Bureau of Justice Statistics report, *Victimization During Household Burglary*, dated September 2010, a household member is present during the commission of approximately 1 million burglaries in the United States each year and became victims of violent crimes in 266,560 of those home intrusions. A large nationally representative survey revealed that there are between 2.2 to 2.5 million defensive uses of firearms annually (whether fired or not) to protect property at home, at work or elsewhere. This number dwarfs the number of violent crimes that occur each year in which the offender possessed a firearm. For example, according to the National Crime Victimization Survey, 847,652 such violent crimes occurred in 1992, the peak year for gun crime. (Ex. 7, Kleck Aff. ¶¶ 3 & 9.)

Prohibitionist measures, like the Highland Park ban, are aimed at disarming criminals and non-criminals alike. These measures therefore discourage and presumably decrease the frequency of defensive gun use among non-criminal crime victims because even minimally effective gun bans disarm some law-abiding citizens. The evidence will establish that reducing the availability of firearms among law-abiding citizens will also reduce defensive gun uses that would otherwise save lives, prevent injuries, thwart rape attempts, drive off burglars and help victims retain their property. (Ex. 7, Kleck Aff. ¶ 10.)

---

[6]    Empirical research demonstrates that criminals do not prefer to use "assault weapons." Criminals overwhelmingly prefer and use more concealable handguns in commission of crimes. Research also reveals that drug dealers and juvenile gang members virtually never use "assault weapons." (Ex. 7, Kleck Aff. ¶ 9.)

**(B)** **Plaintiffs Have No Adequate Remedy at Law and Will Suffer Irreparable Harm.**

Infringement of the Second Amendment right to possess firearms for personal protection cannot be compensated by damages. *Ezell*, 651 F.3d at 699. And a continuing violation of a constitutional right that cannot be compensated with money constitutes a *per se* irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury). "In a facial challenge … the claimed constitutional violation inheres in the terms of the statute, not its application. [citation omitted] The remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied to *anyone*." *Ezell*, 651 F.3d at 698 (emphasis in original). Here, there can be no dispute that Plaintiffs do not have an adequate legal remedy and Defendant's infringement of their constitutional right is an irreparable injury.

**CONCLUSION**

For the foregoing reason, Plaintiffs request that a preliminary injunction order be entered enjoining Defendant from enforcing Highland Park City Code §136.001 *et seq.* until such time as the merits of Plaintiffs' claims can be addressed.

Respectfully submitted,

/s/ James B. Vogts
James B. Vogts
Brett M. Henne
Andrew A. Lothson
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com
bhenne@smbtrials.com

13

alothson@smbtrials.com

Victor D. Quilici
P.O. Box 428
River Grove, Illinois 60171
(847) 298-2566
victorq@ameritech.net

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I, James B. Vogts, hereby certify that on the 24th day of December, 2013, I caused to be served a copy of the foregoing document on all counsel of record listed below, via the Court's ECF system and/or by U.S. Mail.

1.  Christopher James Murdoch
    Holland & Knight, LLP
    131 South Dearborn Street
    30th Floor
    Chicago, IL 60603
    (312) 263-3600
    Email: chris.murdoch@hklaw.com

2.  Hart M. Passman
    Holland and Knight, LLP
    131 South Dearborn
    30th Floor
    Chicago, IL 60603
    (312) 578-6634
    Email: hart.passman@hklaw.com

3.  Steven M. Elrod
    Holland & Knight, LLP
    131 South Dearborn Street
    30th Floor
    Chicago, IL 60603
    (312) 263-3600
    Email: steven.elrod@hklaw.com

*/s/  James B. Vogts*
James V. Vogts