# EXHIBIT F

1

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MARYLAND

3

4    SHAWN J. TARDY, et al.

5               PLAINTIFFS

6        VS.                    CIVIL NO. CCB-13-2841

7    MARTIN J. O'MALLEY, in his
     official capacity as Governor
8    of the State of Maryland, et al.

9               DEFENDANTS

10         – – – – – – – – – – – – – –

11   JANE DOE, et al.

12              PLAINTIFFS

13       VS.                    CIVIL NO. CCB-13-2861

14   MARTIN J. O'MALLEY, in his
     official capacity as Governor
15   of the State of Maryland, et al.

16              DEFENDANTS

17

                              Baltimore, Maryland
18
                              October 1, 2013
19

20

        The above-entitled case came on for a Temporary
21
     Restraining Order proceedings before the Honorable
22
     Catherine C. Blake, United States District Judge
23

24

25   Gail A. Simpkins, RPR
     Official Court Reporter

2

1                    A P P E A R A N C E S

2

   For the Plaintiffs:

3

        Tara Sky Woodward, Esquire
4       John Parker Sweeney, Esquire
        James W. Porter, III, Esquire

5

6  For the Defendants:

7       Matthew J. Fader, Esquire
        Dan Friedman, Esquire

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          P R O C E E D I N G S

2          THE CLERK:  The matter now pending before this

3    Court is Civil Docket Number CCB-13-2841, Shawn J.

4    Tardy, et al. versus Martin J O'Malley, et al.

5          Counsel for the plaintiffs, Tara Woodward, John

6    P. Sweeney and James Porter.  Counsel for the

7    defendants, Matthew Fader and Dan Friedman.

8          This matter now comes before the Court for the

9    purpose of a temporary restraining order.

10         THE COURT:  All right.  Good morning again,

11   everyone.  I am ready to hear from you.  I have read

12   the papers from both sides.  That includes the second

13   case, the handgun licensing case, Doe.  I understand

14   from the State's response that they are ready to

15   discuss that today as well today if the plaintiffs

16   want to do that.

17         Mr. Sweeney.

18         MR. SWEENEY:  May it please the Court, Your

19   Honor, my name is John Parker Sweeney, and I am here

20   representing the plaintiffs.

21         May I introduce today in the courtroom, we have

22   Shawn Tardy for the plaintiff in the Tardy lawsuit.

23         We have Carol and Gary Wink also in the Tardy

24   suit and the Doe suit, owners of Wink's Sporting

25   Goods.

4

1          We have Steve Schneider, who is the owner of

2   Atlantic Guns and is the President of Maryland

3   Licensed Firearms Association, and John Josselyn,

4   Legislative Vice President for the Associated Gun

5   Clubs of Baltimore.

6          THE COURT:  All right.  Happy to have everybody

7   here.

8          MR. SWEENEY:  Thank you, Your Honor, for making

9   yourself available on such short notice.

10          Ms. Woodward will address the Tardy motion for a

11   TRO, and then following that I will address the

12   handgun qualification license TRO.

13          THE COURT:  All right.

14          MS. WOODWARD:  Thank you, Your Honor.  May I use

15   the podium?

16          THE COURT:  Sure, wherever you are comfortable.

17          MS. WOODWARD:  May it please the Court, Sky

18   Woodward on behalf of the plaintiffs.  My colleague,

19   Mr. Sweeney, has introduced them to Your Honor.

20          For the record, they include Andrew Turner,

21   Shawn J. Tardy, Matthew Godwin, Wink's Sporting Goods,

22   Atlantic Guns, Inc., and Association Plaintiffs,

23   Associated Gun Clubs of Baltimore, Maryland Shall

24   Issue, Maryland State Rifle and Pistol Association,

25   the National Shooting Sports Foundation, and the

1    Maryland Licensed Firearms Dealers Association.

2         These plaintiffs, Your Honor, come to the Court

3    today as the people of the State of Maryland, the real

4    people, and not the government.  In a democracy, the

5    state represents at best a political majority of the

6    people.

7         When the plaintiffs speak on behalf of enshrined

8    individual rights, particularly those that are

9    disfavored rights, they speak for all of the people,

10   even those who may hate the right and wish its

11   suppression.

12        The Court performs no more sacred duty than as

13   it sits today, to protect the civil rights of the

14   minority when disfavored by the political will of the

15   majority.  Whether that civil right is to marry the

16   person you love, exercise your reproductive rights, or

17   to exercise your Second Amendment rights, to keep and

18   bear arms, it is in that vein that the plaintiffs come

19   today seeking a TRO under Federal Rule 65.

20        I will address first, Your Honor, that the

21   plaintiffs are likely to succeed on the merits of

22   their claims.

23        THE COURT:  Well, if you wouldn't mind, if you

24   would first address why this lawsuit was not filed

25   until the Friday before the Tuesday on which it was to

6

1    take effect.

2         MS. WOODWARD:  The law obviously is set to take

3    effect today, Your Honor.  Had the plaintiffs come

4    before the Court prior to the effective date of the

5    Act, we are confident we would have been met with a

6    standing challenge or a ripeness challenge.

7         Because the law allowed the purchase of the

8    to-be-banned firearms up until yesterday, Your Honor,

9    there is no reason to come before the Court for a law

10   that is only to be in effect as of today.

11        THE COURT:  But you anticipated.  You obviously

12   knew that it was going to be coming into effect, and

13   you could have brought this suit, it seems to me.

14        I mean if you had standing on Friday, then you

15   had standing sometime ago.  It would have permitted a

16   much more deliberate consideration of the law than

17   what seems to be possible by filing it as late as you

18   did.

19        MS. WOODWARD:  Well, certainly a deliberate

20   consideration, Your Honor, comes in the form of a

21   preliminary injunction style hearing.

22        There is nothing in the rules or the law that

23   suggests that the plaintiffs needed to come before

24   this Court or any court prior to the effective date of

25   the Act, and we would have been, to put it in a

7

1    certain way, Your Honor, I think damned if we did and

2    damned if we didn't.

3         Because had we come to the Court as of the

4    signing of the Bill in May, any time between now and

5    then, Your Honor, the plaintiffs or the defendants

6    would have been able to say to the Court they can

7    exercise their right.  There is no ban.  They have the

8    ability to purchase the things that are to be banned

9    as of October 1.  It's only as of today that the

10   infringement of the right will begin, because it is

11   the acquisition of the firearms to be banned that is

12   the exercise of the right that as of today cannot

13   occur.

14        THE COURT:  Okay.

15        MS. WOODWARD:  As to whether plaintiffs are

16   likely to succeed on the merits of their claims, Your

17   Honor, the plaintiffs and the individual association

18   plaintiff members have clear fundamental individual

19   rights under the Second Amendment to the United States

20   Constitution to acquire and possess firearms and

21   ammunition magazines in their home for defense of

22   themselves, their family, and their property.

23        This is clear under the Heller case.  It is

24   clear under the McDonald case, as applied to the

25   states.  It is also clear under Fourth Circuit law

1    under Chester and Masciandaro.

2        As of today, as I've noted, that right, the

3    Second Amendment right to keep and bear arms will be

4    infringed as to an entire class of firearms that are

5    in common use by plaintiffs and association members

6    for use in their home.

7        THE COURT:  When you call it an entire class,

8    you're assuming that assault rifles are a class as

9    compared to a subclass?

10        I mean there are certainly plenty of long guns,

11    rifles and shotguns that are still perfectly legal for

12    your clients to possess.

13        It appears to me more like a subclass, a limited

14    group of weapons that your clients are not allowed to

15    possess.

16        MS. WOODWARD:  Well, Your Honor --

17        THE COURT:  Acquire.  They are not allowed to

18    acquire going forward.  Obviously, what they already

19    have they are allowed to keep.

20        MS. WOODWARD:  The list includes 68 to-be-banned

21    firearms, Your Honor.

22        THE COURT:  Uh-huh.

23        MS. WOODWARD:  Whether one considers that class

24    or subclass, it's a still a comprehensive class of a

25    significant number of firearms that are in common use

9

1    and are desired to be purchased by law-abiding,

2    responsible Marylanders for the purposes of

3    self-defense and defense of home.

4         So whether an entire class or a subclass, these

5    are nonetheless an entire category of weapons to be

6    banned as of today.

7         Under Heller, under McDonald, under Chester, and

8    Masciandaro, the Court has said that a class of

9    firearms commonly used for defense of home, and if it

10   is banned, that is unconstitutional.

11        THE COURT:  Well, Heller, of course, was talking

12   about handguns, and the Supreme Court made it quite

13   clear that they thought handguns were the preferred

14   weapon for self-defense for various reasons.

15        Now, you are not challenging, as I understand

16   it, the continuing ban on certain types of assault

17   pistols.  This is just directed at the long guns and

18   the magazines.

19        Let me just be clear about that.  Is that

20   correct?

21        MS. WOODWARD:  That is correct vis-a-vis this

22   lawsuit, Your Honor.  The Doe lawsuit deals with

23   handguns.

24        THE COURT:  Yes.

25        MS. WOODWARD:  But that's within the licensing

10

1   scheme, not the ban, not a ban.

2        THE COURT:  Right.  I understand that.  But just

3   talking about this case, it's the rifles and the

4   magazines.  Of course, as you alluded to, Heller said

5   you can't have a total ban on handguns.

6        Now what evidence do you have that assault-style

7   long guns and detachable magazines carrying more than

8   ten rounds are ordinarily or commonly used for defense

9   of the home?

10       MS. WOODWARD:  Your Honor, the plaintiffs will

11  proffer that there will be expert testimony that will

12  be provided to the Court initially through

13  declaration, affidavit, and through live testimony, if

14  the Court will entertain it, in a preliminary

15  injunction hearing.  There will be testimony of

16  experts that will address the Court's question, that

17  these types of firearms to be banned are in common

18  use.

19       THE COURT:  Uh-huh.

20       MS. WOODWARD:  In fact, one of the declarations

21  presented in support of the TRO by Mr. Schneider has

22  identified for the Court that the types of weapons to

23  be banned are commonly purchased and commonly used.

24       The second point, Your Honor, on commonly used

25  for defense of home, self and home, we will be able to

11

1    proffer that there will be expert testimony on that

2    point as well, Your Honor, that it's not just the

3    handguns that the U.S. Supreme Court in Heller found

4    to be specifically protected and off the table for a

5    state to ban, but that these types of weapons are also

6    the types of weapons that responsible, law-abiding

7    citizens in the State of Maryland would use in defense

8    of home.

9          There are certain characteristics, Your Honor,

10   of the firearms to be banned that make them more

11   effective for defense of home, and there will be

12   expert testimony and expert proof to support that.

13         THE COURT:  Now I assume some of this would have

14   been presented to the D.C. Circuit in the Heller case,

15   the second Heller case, if you will.  Are you going to

16   be able to distinguish your evidence and the result

17   here from what the D.C. Circuit did?

18         MS. WOODWARD:  Yes, Your Honor, we will.  We

19   will be able to distinguish between.

20         We will also be able to demonstrate that the

21   plaintiffs who we have in this case, and the members

22   of association plaintiffs, that these are the types of

23   firearms, these to-be-banned firearms are the types

24   that for their personal self-protection and protection

25   of the home, are the types of firearms that they

12

1    desire.

2            There is nothing in Heller, and there is nothing

3    in McDonald, there is nothing in Chester, or

4    Masciandaro, that restricts the application of the

5    Second Amendment and the right to keep and bear arms

6    to simply handguns.  It is an open question, but one

7    that requires strict scrutiny in our estimation as

8    well, Your Honor.

9            THE COURT:  Would you like to tell me why you

10   think strict scrutiny would be applicable to this when

11   we are talking -- again, I invite you to distinguish

12   the D.C. Circuit's decision in Heller.

13           We are not talking about a ban, as I see it, on

14   an entire class of weapons, and at least at this

15   point, I don't believe there's evidence that they are

16   commonly used for defense of the home.  Why wouldn't

17   intermediate scrutiny be the appropriate standard?

18           MS. WOODWARD:  Well, the Fourth Circuit has not,

19   as the State has said, adopted an intermediate

20   scrutiny standard.  The Heller case identifies strict

21   scrutiny on a categorical ban of common firearms that

22   are to be used in the home.

23           The Fourth Circuit --

24           THE COURT:  I'm sorry.  Where does the Heller

25   case do that?  I thought the Heller --

13

1    Do you mean the Supreme Court case?

2    MS. WOODWARD:  Yes, yes.

3    THE COURT:  I guess we should distinguish

4 between the Supreme Court and --

5    MS. WOODWARD:  Yes, the Supreme Court Heller,

6 Your Honor.

7    THE COURT:  I thought that they said we don't

8 even need to decide what level of scrutiny applies.

9    MS. WOODWARD:  Correct, Your Honor.  I misspoke.

10    THE COURT:  I haven't seen actually -- I

11 certainly have not in this limited time read all the

12 case law out there on this issue, but I haven't

13 actually seen strict scrutiny applied.

14    MS. WOODWARD:  In the context of these

15 to-be-banned firearms in this instance.

16    THE COURT:  Right.

17    MS. WOODWARD:  At least within the Fourth

18 Circuit, Your Honor, that is correct.  There has not

19 been an application of a level of scrutiny vis-a-vis

20 these to-be-banned firearms.

21    The State has argued that it would be a lesser

22 standard, that strict scrutiny would not apply.  It is

23 our position that the Fourth Circuit, to the extent it

24 has spoken on this, and again, Chester and

25 Masciandaro, which I probably continue to butcher --

14

1    it's a tough one.  I'm not sure if the C is hard or

2    it's soft.

3          THE COURT:  I know which one you mean.

4          MS. WOODWARD:  In any event, I presume that Your

5    Honor knows the case of which I speak.

6          THE COURT:  I do.

7          MS. WOODWARD:  In both of those cases, Your

8    Honor, before the Fourth Circuit, that Court has

9    alluded to the fact that strict scrutiny would apply.

10         In fact, in Masciandaro, the Court said we

11    assume that any law that would burden the fundamental

12    core right of self-defense in the home by a

13    law-abiding citizen would be subject to strict

14    scrutiny.

15         There is nothing that the State has brought

16    before this Court that they have even attempted to

17    justify the ban, a categorical ban under a strict

18    scrutiny standard.  And ultimately, the government

19    will bear the burden of proof to justify a ban, and

20    must do so under strict scrutiny, in our estimation,

21    consistent with Fourth Circuit precedent --

22          THE COURT:  Well, as you --

23          MS. WOODWARD:  Or even if it's under

24    intermediate scrutiny.

25          THE COURT:  Okay.  Because Masciandaro assumes,

1    I think, but certainly does not decide, that strict

2    scrutiny would apply.  I think that it also said, as I

3    believe you just quoted, that it would apply to any

4    law that burdens the fundamental core right of

5    self-defense.

6         So we sort of get back to the original question,

7    if the fundamental core right of self-defense is

8    implicated by the particular to-be-banned weapons on

9    this list.

10        I mean there's at least an argument to be made,

11   and I know that generally courts have tried to avoid

12   making that decision at the first prong, but there is

13   at least an argument to be made that these weapons

14   don't even fall with the protection of the Second

15   Amendment, that they are unusual and dangerous as

16   opposed to common and ordinary.

17        MS. WOODWARD:  If I may address that point, Your

18   Honor, on the unusual and dangerous piece of this?

19        The defendants have made reference to the

20   Heller, Supreme Court Heller decision, and the Court's

21   discussion of M16 assault rifles, assault weapons.

22   The defendants make much of this in their opposition

23   papers to justify the categorical ban on semiautomatic

24   rifles.

25        The State doesn't disclose to the Court a

16

1    critical difference between an M16 and the

2    semiautomatic rifles that are to banned here under

3    this state law.  The defendants attempt to equate the

4    categorical ban of firearms, of the dangerous and

5    unusual type, to be as outside the scope of the Second

6    Amendment.

7         So to that point, Your Honor, the M16, as

8    referenced in Supreme Court Heller, and as referenced

9    in the State's papers as the type of weapon to be

10   banned, the M16 is a fully automatic, military-only

11   version, which is adapted from a Colt AR-15 that was

12   manufactured over 50 years ago.

13        The AR-15, which is one of the models of

14   semiautomatic rifles that the defendants have now

15   banned, was developed for the civilian market before

16   its military M16 version was developed.

17        Just some of the mechanics here, Your Honor.

18        THE COURT:  Uh-huh.

19        MS. WOODWARD:  If you are handling an M16, that

20   firearm will continuously shoot bullets at a high rate

21   of speed until the trigger is released, the gun jams,

22   or it runs out of bullets.  That's the M16.

23        When one operates one of the banned

24   semiautomatic rifles, it's one bullet and only one

25   shot until another is reloaded, and it cannot be shot

1     until there is another pull of the trigger.  There is

2     a mechanical distinction between the M16 assault

3     weapon and an AR-15-style semiautomatic rifle, which

4     is in the category of to be banned.

5         THE COURT:  When you said reloaded, you just

6     mean pulling the trigger again, right?

7         I mean on the semiautomatic, you don't have

8     to -- you've got a magazine of at least ten rounds.

9         MS. WOODWARD:  Correct, Your Honor.

10        THE COURT:  Okay.

11        MS. WOODWARD:  That's correct.

12        A couple more points on these mechanics.

13        A fully automated M16 can shoot over ten bullets

14     per second.  A semiautomatic AR-15 shoots

15     approximately one bullet every two seconds.

16        Fully automatic weapons have been the subject of

17     regulation since the 1930's.  Fully automatic weapons

18     are not in common use for the defense of the home.

19        The defendants also rely upon a faulty

20     assumption, Your Honor, that the Court's focus should

21     be on keeping banned classes of firearms off the

22     streets and generalized public safety.  It is our

23     position, Your Honor, that the only focus of location

24     would be the home, and that these to-be-banned

25     semiautomatic firearms are entirely for the purpose of

1     self-defense in the home.

2         If I may touch upon magazine capacities, Your

3     Honor?

4         THE COURT:  Sure.

5         MS. WOODWARD:  The defendants have

6     mischaracterized the law as banning the possession of

7     magazines holding more than ten rounds.  The law in

8     fact is that one can possess.  One simply cannot

9     acquire.

10        The State also states that firearm dealers would

11    be able to simply alter the magazines to hold less

12    than ten rounds, but that is not accurate.  The

13    firearm dealers are not able to simply alter magazines

14    to hold less than ten.

15        The State does not address the critical fact

16    that we have put forth to the Court, which is that the

17    magazines in excess of ten rounds are necessary for

18    our individual plaintiffs and individual members of

19    associations to use their firearms at home.

20        THE COURT:  Now there has been a 20-round limit

21    in place for sometime; is that correct?

22        MS. WOODWARD:  Yes.  It is a 30 round maximum,

23    20 round, yes, Your Honor, 20 round --

24        THE COURT:  Do you think that's unconstitutional?

25        MS. WOODWARD:  We are not challenging that

19

1    today, Your Honor.  We are challenging this law which

2    would limit to ten rounds per magazine.

3         Again, we will have expert testimony, as well as

4    the testimony of our plaintiffs, that the limitation

5    of a ten-round capacity essentially for individuals

6    makes the use of the firearm --

7         It essentially prevents the use of the firearm

8    in a way to defend one's self against a surprise

9    attack or any attack in the home.

10        Your Honor, if we look to Heller, Supreme Court

11   Heller, it is instructive.

12        The District of Columbia's law required that a

13   handgun be kept inoperable, and the Supreme Court

14   deemed that an unconstitutional requirement, because

15   it made it impossible for citizens to use that firearm

16   for self-defense.  Rendering it inoperable meant it

17   was of no use.

18        Individual plaintiffs and association

19   plaintiffs, Your Honor, have the same situation as it

20   relates to limitations of magazine capacities.  As the

21   affidavit or declarations demonstrate, and as would be

22   demonstrated in an injunction hearing, Your Honor,

23   there would be testimony to show that there are

24   physical limitations of the plaintiffs that make

25   magazines in excess of ten rounds useful and necessary

20

```
1    to exercise the fundamental right of that firearm in

2    the home.

3         THE COURT:  As I recall, that depends in part on

4    your first argument, that the bullets that are going

5    to be fired, many of them will miss their intended

6    target, that it is very hard to be accurate in firing

7    these bullets and, therefore, one needs to be able to

8    fire more, which to me raises a question of what

9    unintended targets are all those extra bullets going

10   to hit?

11        MS. WOODWARD:  Well, Your Honor, the instance

12   that we are focused on is the defense of self in one's

13   home.  There are any number of scenarios that could

14   play out, but a very specific one to your concern of

15   where do the bullets go, Your Honor, we are talking

16   about defensive situations of a law-abiding,

17   responsible citizen in one's home, protecting the

18   home, protecting one's self against an intruder,

19   against a criminal.

20        We are not talking about an instance where there

21   is gunfire in the streets, where there is activity

22   outside the home.  It is the ability of an individual

23   to exercise that right, and to be able to do so

24   effectively.

25        Our plaintiffs and members of association
```

21

1      plaintiffs are in positions, Your Honor, because of

2      physical limitations to desire and to demonstrate that

3      magazines in excess of ten are necessary for them to

4      be able to use the firearms for self-protection and

5      defense of home.

6           THE COURT:  But you're not asking that only

7      individuals with similar disabilities be allowed to

8      have 20 rounds or higher magazines.

9           MS. WOODWARD:  We are not limiting this, Your

10     Honor, to individuals with physical limitations.  We

11     have identified for Your Honor individuals with such

12     limitations.

13          THE COURT:  Right.

14          MS. WOODWARD:  And it is not to the exclusion of

15     other law-abiding, responsible Maryland citizens to

16     have the continued access to magazines in excess of

17     ten rounds.

18          Your Honor, the plaintiffs have also, on the

19     counts that we have brought to the Court, and again,

20     on the likelihood of success on the merits, we have

21     also brought a claim under the Equal Protection

22     Clause.

23          The ban unfairly favors retired law enforcement

24     officers.

25          THE COURT:  What's the suspect classification,

1    suspect category?

2        MS. WOODWARD:  Well, again, Your Honor, we have

3    to start with the premise of Second Amendment applies,

4    fundamental right, fundamental right to keep and bear

5    arms of the type to be banned, and what the State has

6    done is said that one class of citizens, law

7    enforcement officers and retired law enforcement

8    officers, will be able to continue to have access to

9    these to-be-banned firearms.  Non-law enforcement

10   officers will not as of today.

11       THE COURT:  So it essentially is still a Second

12   Amendment right, isn't it, not an equal protection

13   challenge?

14       MS. WOODWARD:  It is a Second Amendment right,

15   Your Honor.  Our argument is that the State unfairly

16   and unconstitutionally favors one segment of the

17   population over another segment of the population.

18       There is no distinction, Your Honor, between a

19   retired law enforcement agent, a law enforcement

20   officer needing the protection of these types of

21   to-be-banned firearms in one's home for

22   self-protection compared to another citizen of the

23   State of Maryland.

24       There is no distinction between who would need

25   that in a time of attack in one's home, which is what

23

1    our point is vis-a-vis law enforcement officers

2    compared to the citizens of Maryland.

3         We also challenge on vagueness of the Act, Your

4    Honor, and this is essentially the copycat provision

5    of the law.

6         The State has responded by suggesting that there

7    is Office of the Attorney General guidance that says a

8    similarity between the internal components and a

9    function of the firearms in question is not vague.

10        The defendants translate this in other words to

11   say an unlisted weapon must have interchangeable

12   internal parts with the listed weapon to qualify as a

13   copy, not merely a similar appearance.

14        That doesn't help.  The State has offered an

15   Attorney General's Opinion, but that is not in the

16   law, and there are real questions, Your Honor, as to

17   whether or not law-abiding, responsible citizens of

18   Maryland actually know what these copycat weapons are.

19        It is not to be left --

20        THE COURT:  I'm sorry.  Just let me understand.

21        The copycat provisions of this new law, are they

22   different from what has been in effect?

23        I mean obviously most of these assault rifles

24   have been listed and regulated for sometime.  The

25   copycat provision, is that new?  Did something change?

24

1        MS. WOODWARD:  That is a new provision, Your

2   Honor, that a firearm that's a copycat of a previously

3   restricted is now banned.  But it is that point, Your

4   Honor, that is where the challenge lies, because one

5   cannot distinguish between these firearms as an

6   average, law-abiding responsible citizen of Maryland.

7        So one does not know if there's an attempt to

8   purchase a copycat of a banned or not.  It's too vague

9   for the citizens to be able to know where there will

10  be criminal penalties, and it is likewise challenging

11  for the dealers, Your Honor, to be able to assess

12  their sales in light of the vagueness of the copycat

13  provisions.

14       THE COURT:  Obviously you cited general case law

15  on vagueness.  Are you aware of this particular issue

16  of vagueness being applied or resolved or ruled on in

17  any other case applicable to copycat weapons?

18       Is there anything similar to what you are

19  presenting to me now, any court ruling that you know

20  of so far?

21       MS. WOODWARD:  I don't have anything that comes

22  to the ready, Your Honor.  If I may take a --

23       THE COURT:  Well, there may not be any.  I don't

24  know.

25       MS. WOODWARD:  Right, right.

25

```
1            THE COURT:  I mean I'm asking you.

2            MS. WOODWARD:  Right.

3            THE COURT:  May we can get to that later.

4.           MS. WOODWARD:  Your Honor, I was going to move

5    from likelihood of success on the merits to balance of

6    equities and the other factors of Winter, the

7    requirements of Winter in a TRO.

8            THE COURT:  Sure.

9            MS. WOODWARD:  The balance of equities favors

10   maintaining the status quo, Your Honor.

11           The defendants' enforcement of these

12   unconstitutional provisions of the Act will

13   irreparably injure plaintiffs' fundamental

14   constitutional rights insofar as the plaintiffs will

15   be unable to acquire and possess these certain

16   commonly used firearms and standard-issued magazines

17   for the purpose of defending themselves in their

18   homes, and that is as of today.

19           This does potentially expose the individual

20   plaintiffs and the individual members of the

21   association plaintiffs to a risk of injury, perhaps

22   even death, should a defensive need for a firearm

23   arise or criminal prosecution should occur should they

24   decide to exercise this fundamental constitutional

25   right, despite the Act's provisions.
```

1      The benefits to the plaintiffs in obtaining a

2   temporary restraining order, which would enable the

3   plaintiffs to continue to exercise this fundamental

4   right to purchase and keep these commonly used

5   firearms for purposes of self-defense, greatly

6   outweighs any potential harm to the defendants that

7   would result from the granting of a TRO.

8      THE COURT:  Now let me ask you, in this case,

9   and again, we are not talking about Doe at the moment,

10  if I recall correctly from the affidavits, most of

11  your clients, the individual ones, that would want

12  them for the home already have a number of these kind

13  of to-be-banned weapons, and they are not being

14  precluded from keeping those, as best I understand.

15     MS. WOODWARD:  There's no preclusion on the

16  keeping, Your Honor.  But there's also no rationing of

17  the right within Heller, or any of the Fourth Circuit

18  case law, to suggest that by the mere ownership of one

19  available firearm means that one does not have the

20  constitutional right to secure another.

21     THE COURT:  But if you are talking about

22  likelihood of harm and balancing of the equities, and

23  the need to have these weapons for self-defense in the

24  home, they have that ability now with the weapons that

25  they've got.

27

1          MS. WOODWARD:  The individual plaintiffs, as

2     part of this complaint, that is correct, Your Honor.

3          The association plaintiffs, the individual

4     members of association plaintiffs, of which there are

5     potentially 8,000 of which we know in the State of

6     Maryland, also are affected by this ban, the

7     to-be-banned firearms.

8          The possibility that a firearm that one

9     currently has in one's home being rendered inoperable,

10    broken, a failure of some type, these plaintiffs,

11    although there may be firearms in their homes at this

12    time, they will be prevented from acquiring the types

13    of firearms that they have previously chosen, and

14    would choose again, for defense of self in the home.

15         So I appreciate Your Honor's point that at least

16    as to the individual plaintiffs who are before Your

17    Honor on this motion have access, and may continue to

18    have in their home, but it doesn't mean that the right

19    is restricted simply because you already possess.

20         Again, for the purposes of self-defense, the

21    desire to acquire new is a valid choice in this

22    instance, Your Honor.

23         The public interest that the State puts forth,

24    social science evidence that suggests that the types

25    of firearms to be banned are used in an overwhelming

28

1    number of crimes, that social science evidence, Your

2    Honor, the plaintiffs will be able to demonstrate that

3    that evidence will show that it's less than three

4    percent of crimes that these to-be-banned firearms are

5    involved in.

6         For what it's worth, Your Honor, the State's

7    attempt to put forth its social science evidence on

8    this point, they suggest that it is only under a

9    rational basis review or at most, intermediate

10   scrutiny.  But again, our argument is we are looking

11   at these issues under strict scrutiny, and the State's

12   burden is much higher than the mere introduction of

13   social science evidence, as they have done.

14        The balance of equities, Your Honor, still on

15   that point, there is a recent case by Judge Garbis in

16   this district, PJK Food Service Corp. v Panache

17   Cuisine, 2013 U.S. District LEXIS 50028 at 2 and 3.

18   It was a 2013 case by Judge Garbis.

19        The Court stated that the balance of equities

20   can include the courts considering, one, any

21   irreparable harm that would be sustained by plaintiff

22   if a TRO turns out to be erroneously denied against,

23   two, any irreparable harm that would be sustained by

24   the defendant if a preliminary injunction or TRO turns

25   out to be erroneously granted.

29

1          So with that construct, Your Honor, I would also

2     point the Court to Chase v. Town of Ocean City, also

3     District of Maryland, at 825 F.Supp.2d 599.

4          In that case, Your Honor, there was a challenge

5     to a city ordinance that threatened the plaintiffs

6     with fines for exercising a First Amendment right.

7     Ordinarily, such a threatened injury to plaintiff will

8     easily outweigh whatever burden the injunction may

9     impose because the government is in no way harmed by

10    the issuance of an injunction that prevents the State

11    from enforcing unconstitutional restrictions.

12         That Town of Ocean City case obviously was

13    within the context of the First Amendment.  We would

14    submit to Your Honor that the Fourth Circuit case of

15    Chester would liken the Second Amendment fundamental

16    right to bear arms with the First Amendment free

17    speech right, and that the Court could look to First

18    Amendment context and find it equally applicable to

19    the case here, and that in this instance, Your Honor,

20    the State does not have an interest in the enforcement

21    of an unconstitutional regulation.

22         Our plaintiffs, on the other hand, Your Honor,

23    have a daily violation of constitutional rights that

24    outweighs the government's purported interest.  As we

25    move into public interest supporting a TRO, obviously

30

1    those two factors, we can kind of morph in and out of

2    the two of them.

3           But moving to the more specific on public

4    interest, it is our position, Your Honor, that a TRO

5    is necessary to preserve the status quo of the

6    plaintiffs' right to acquire these certain commonly

7    used firearms and magazines for self-defense in the

8    home pending this Court's determination of whether to

9    grant a preliminary injunction.

10          The granting of the plaintiffs' request for a

11   TRO would allow both plaintiffs and defendants an

12   opportunity to fully brief this issue at the

13   preliminary injunction stage.  But as I said a moment

14   ago, the public has no interest in the enforcement of

15   an unconstitutional law.

16          The public interest is best served by granting

17   our requested TRO because it would ensure that the

18   defendants do not impermissibly prevent law-abiding,

19   responsible citizens from exercising a fundamental

20   right to acquire and possess commonly used firearms in

21   their homes for self-defense.

22          I would note, Your Honor, that if the public

23   interest is so strong in banning these firearms and

24   magazines as of today, why was it not so strong as to

25   require an immediate ban earlier this year?

31

```
1        The General Assembly passed this Act on April
2   4th.  Defendant O'Malley signed the Act on May 16th.
3   The State has identified nothing in the interim that
4   suggests that the public is any more at risk today
5   than they were yesterday.
6        THE COURT:  Isn't it fairly common to give the
7   public some time to adjust to a new law?  I mean are
8   you complaining that there was not time between April
9   and October for folks to make plans, perhaps acquire
10  additional weapons, perhaps file a lawsuit earlier?
11       MS. WOODWARD:  That is not our point, Your
12  Honor.  Our point is, as it relates to the State's
13  argument that it is in the public interest to deny a
14  TRO today, our point is if it is in the public
15  interest to deny the TRO such that the to-be-banned
16  firearms -- such that the firearms ban goes into
17  effect today, and the limitation on magazine
18  capacities goes into effect today, why is today any
19  more of a risk to public safety than was yesterday?
20       The State has not been able to demonstrate, has
21  not refuted that particular point, that yesterday is
22  any different from today.
23       To the point of irreparable harm, Your Honor,
24  plaintiffs will suffer irreparable harm without a TRO.
25       At the very heart of this, Your Honor, is a
```

32

1    fundamental constitutional right.  To be able to

2    exercise that fundamental constitutional, enumerated

3    right, one must be able to purchase a firearm of

4    choice for use in the home that is in common use, and

5    is not dangerous and unusual.  It is that fundamental

6    right that we are here on today.

7        A fundamental right is no right at all if a

8    restraint on its exercise cannot be addressed by the

9    Court the day of its implementation.

10       THE COURT:  I'm going to need to ask you to wrap

11   up so I have time for the rest of the arguments.

12   Thanks.

13       MS. WOODWARD:  I am concluding, Your Honor.

14       Your Honor has already pointed out some of the

15   arguments that actually the State had made in its

16   opposition papers, which was that the individuals

17   perhaps already own a firearm for self-defense.

18   Again, we submit that there is no rationing of the

19   right available to the defendants.

20       This Court has the jurisdiction to enter a TRO.

21   The defendants don't dispute that there is a

22   constitutional right of individual business and member

23   associations.

24       Plaintiffs, they do not dispute that beginning

25   today the plaintiffs will be unable to acquire and

33

```
1    possess in their homes for self-protection certain

2    commonly used firearms that will be banned, and the

3    defendants have pointed to no adequate remedy at law

4    by which the plaintiffs may exercise their rights in

5    the absence of equitable relief from this Court.

6              Thank you, Your Honor.

7              THE COURT:  Thank you very much.  I appreciate

8    it.

9              Mr. Fader.

10             MR. FADER:  Good morning.  May it please the

11   Court.

12             By enacting Chapter 427 of the 2013 laws of

13   Maryland, the General Assembly created a comprehensive

14   measure to stem gun violence in Maryland.  Two of the

15   provisions that were critical in Chapter 427 were the

16   provisions that are at issue in the Tardy case, a ban

17   on the future purchase of assault weapons, and a ban

18   on the future purchase of high-capacity magazines.

19             Through a lot of evidence that was presented to

20   the General Assembly, the General Assembly determined

21   that the public interest of the State of Maryland was

22   best served by banning these very dangerous weapons

23   that have led to significant -- that have led to mass

24   shootings and other things that the General Assembly

25   was very concerned about.
```

34

1          THE COURT:  On that point, the evidence that was

2     presented to the General Assembly, have you given me a

3     comprehensive set of that in your memorandum response

4     so far?

5          There were a few -- there were some exhibits

6     attached, and you did refer to some testimony, but I'm

7     not sure if I've got sort of, as of yet, a full

8     picture of what evidence was presented to the General

9     Assembly and whether it made any specific findings

10    about this law.

11         MR. FADER:  I don't believe we've given you a

12    comprehensive set.  As I understand it, the General

13    Assembly did not make specific findings with respect

14    to this law.  It's the unusual case in which the

15    General Assembly makes specific findings, and it's the

16    information before it.  In fact, I think the Court's

17    review is not limited to the information before the

18    General Assembly.

19         THE COURT:  That's true.

20         MR. FADER:  The Court can consider other

21    evidence as well, and we've cited other evidence,

22    including the evidence relied on by the District of

23    Columbia Court of Appeals in the Heller II case,

24    addressing exactly the same laws that are being

25    challenged in this case before Your Honor.

35

```
1          THE COURT:  Right.

2          MR. FADER:  I just diverge for one second

3    because in describing the law with respect to assault

4    weapons, I believe there was some confusion before.

5          The law with respect to assault weapons is

6    accomplished in three ways.  One is there's a specific

7    list of specific assault long guns that are covered.

8          Second, the law also applies to their copies.

9          THE COURT:  Right.

10         MR. FADER:  And third, there's a separate

11   copycat provision.  So the copies and copycat are two

12   separate things.

13         Copies is what was briefed by the two parties.

14   That's what has been in the law since 1996.  That has

15   not changed.  There's nothing that has changed with

16   respect to having copies covered.

17         There's a new provision that is a copycat

18   provision that specifically identifies as copycat

19   weapons weapons that have any two of three different

20   features, being a folding stock, a grenade launcher or

21   a flash suppressor.

22         That's the only thing that's new.  It's not

23   subject to any vagueness challenge that was raised in

24   the complaint.  In fact, it seems very

25   straightforward.  You have two of those things or you
```

36

1    don't.

2         The provision that was raised in the complaint

3    by the plaintiffs as a claim of vagueness was the

4    copies provision, which has not changed in the last 17

5    years.

6         It is not vague, and even if it were otherwise

7    to be determined that it could be ambiguous, it has

8    been interpreted by the Maryland State Police and the

9    Attorney General to basically be not just a cosmetic

10   similarity, but it has to really be the same gun.  It

11   has to have interchangeable parts, and that's not

12   something that there has been any concern raised with

13   the way that has been enforced or lack of

14   understanding of that in the 17 years that it has been

15   in the law.

16        THE COURT:  That was one of my questions.  So

17   that has not been challenged since 1996, I mean at

18   least in the form of a lawsuit or any ruling on it by

19   the Court of Appeals, anything?

20        MR. FADER:  Certainly nothing that I am aware

21   of, Your Honor, and I think that provision is not only

22   in Maryland law, but it is a common provision in other

23   states' laws that have banned assault weapons that are

24   in place now as well.

25        I've just confirmed that there have been no

1    lawsuits that people who are even more familiar with

2    this than I am are aware of either.

3         THE COURT:  Okay.  As to the copycat weapons, as

4    you said, there has to be two of the three

5    specifically identified features in order for it to be

6    a copycat.

7         MR. FADER:  That's correct, and these are some

8    of the features that make these weapons so dangerous

9    and able to be used in these incidents, some of which

10   we referred to, some of these mass shooting incidents

11   that have occurred in recent years that have been so

12   devastating to society.

13        One more point of clarification.  I think Ms.

14   Woodward incorrectly said that we identified in our

15   brief these assault weapons to be banned as the ones

16   used in most crimes.  I don't think that we said that

17   in our brief.  In fact, that's not true.  The vast

18   majority of weapons used in crimes as a general matter

19   are handguns.

20        It's the use of assault weapons in a minority of

21   crimes, but in the particularly heinous crimes that

22   give rise to mass casualties that make them so

23   particularly dangerous.

24        I wanted to clarify that as well.

25        THE COURT:  Sure.

38

1          MR. FADER:  Assault weapon bans in fact are not

2     new, nor are challenges to their constitutionality.

3     But what would be completely unprecedented would be a

4     finding that assault weapon bans are unconstitutional.

5          Your Honor has already referred to the Heller II

6     decision in which the Court of Appeals for the

7     District of Columbia reviewed essentially the same

8     bans, did a careful review of legislative history in

9     those cases, other social science evidence, and

10    concluded they were in fact constitutional.

11         A California intermediate appellate court in the

12    People v. James decision also reviewed these laws and

13    came to the same conclusion.  We cited that case in

14    our brief as well.

15         And it is the dangerousness of these weapons

16    that are derived from military weapons that separates

17    them from weapons that have been found to be

18    protected, such as handguns, which were the issue in

19    Heller and McDonald, and in other cases that have been

20    before the Court.

21         On the point that was addressed as far as the

22    similarity between these types of items and the M16,

23    the Heller II decision I think deals with that very

24    explicitly, and that's at page 1263, 670 F.3d 1263,

25    where it dealt with this very issue of the quote from

39

1    _Heller_ about M16 rifles.

2         And looking at evidence that was before the

3    District Court in that case, it noted that the M16 is

4    automatic and the AR-15 is semiautomatic, but said

5    semiautomatics still fire almost as rapidly as

6    automatics, based on evidence that was presented in

7    that case.

8         The District of Columbia Court of Appeals

9    specifically said it is difficult to draw meaningful

10   distinctions between the AR-15 and the M16 based on

11   that evidence.  In fact, the Supreme Court in prior

12   cases also reviewed in that _Heller_ II decision has

13   drawn comparisons between those two.

14        So by virtue of that, the Supreme Court's

15   reference to seemingly, without the need for further

16   analysis, the right to ban M16's and that kind of

17   military weapon strongly suggests that the same result

18   would be reached in this case.

19        Turning to the specific factors that the

20   plaintiffs need to prove to demonstrate a right to

21   preliminary injunctive relief, and that applies to

22   preliminary injunction, as well as a temporary

23   restraining order, they, of course, need to satisfy

24   all four of those factors, not just one, two or three.

25        Taking first the factor of irreparable harm, I

40

1     thin it's pretty clear on this record that there is no

2     prospect of irreparable harm to any of the plaintiffs

3     as a result of this lawsuit going into effect.

4           The delay in bringing this lawsuit has been

5     noted by the Fourth Circuit as an indication of an

6     absence of irreparable harm.  The plaintiffs are

7     simply incorrect in stating that they would have been

8     met by a standing challenge if a lawsuit had been

9     filed earlier.

10          A declaratory judgment action to challenge a law

11     in advance of its effective date is a common thing and

12     helps to avoid last-minute challenges, for people to

13     walk in and have created an emergency of their own.

14     That itself is a factor that the Fourth Circuit has

15     looked at and said is an indication of the absence of

16     irreparable harm.

17          Moreover, as has been noted, each of the

18     individual plaintiffs already possesses the weapons

19     and magazines that are at issue, and if it really were

20     essential to self-defense, would have the ability to

21     use them.  There simply has been no indication of any

22     irreparable harm at all.

23          With respect to the likelihood of success on the

24     merits, as to the assault weapons ban, first of all,

25     every court that has looked at the constitutionality

41

1    of such ban before, and there haven't been many, but

2    they have universally upheld them.

3        In fact, the Supreme Court in <u>Heller</u> did not

4    identify a right to any category, a subcategory of

5    weapons that somebody wants for self-defense.  The

6    Supreme Court identified an individual right protected

7    by the Second Amendment for self-defense, for

8    self-defense in the home, and in that context,

9    recognized that handguns were unquestionably the

10   category of weapon most used for self-defense within

11   the home.  I think the word the Supreme Court used was

12   the overwhelming choice.  If handguns are the

13   overwhelming choice, then no other firearm can be the

14   overwhelming choice.

15       Here, we are dealing with a specific subclass of

16   long guns that is not the overwhelming choice of

17   individuals for self-defense within the home, and is

18   not protected as such, and, therefore, lies outside,

19   at a minimum, outside the core protection of the

20   Second Amendment.

21       That gets to the scrutiny issue that was being

22   discussed earlier.  The Fourth Circuit has very

23   clearly identified that when the burden of a

24   regulation falls on a right that is outside the core

25   right of self-defense within the home, it is subject

42

1    not to strict scrutiny, but to intermediate scrutiny.

2         THE COURT:  Assuming for the moment that we are

3    talking about intermediate scrutiny, would you

4    articulate for me just specifically the substantial

5    purpose, the governmental substantial purpose served

6    by this law, and the reasonable fit.

7         MR. FADER:  Certainly, Your Honor.

8         The substantial purpose is the protection, is

9    public safety from gun violence, and that certainly

10   has been recognized as a compelling governmental

11   interest, including by the Fourth Circuit in the

12   Woollard case and the Masciandaro case, and the

13   Chester case as well.  So it is protecting the public

14   from gun violence and furthering public safety.

15        The reasonable fit lies in the harm, protecting

16   the public from the harm that these weapons can

17   inflict.  That was, of course, the subject of the

18   testimony and some of the evidence that we presented,

19   and a lot of the evidence that was before the General

20   Assembly, and considered by the United States Court of

21   Appeals for the District of Columbia Circuit in Heller

22   II, that identifies the public safety risks of these

23   guns, of course, as culminated in some of the

24   tragedies that the General Assembly had very fresh in

25   its mind when it enacted this law.

43

1        So the substantial fit is from the fact that

2     these very dangerous weapons, to the extent that they

3     proliferate and end up causing a danger to public

4     safety, that the General Assembly has the right to

5     determine that they are too dangerous in light of

6     their specific features, the features that have caused

7     them to be on this list, when people have access to

8     handguns and other types of long guns for the lawful

9     purpose of self-defense within the home, as well as

10    for other purposes, like hunting and sport shooting,

11    and things of that nature.

12        So it is not a ban on all weapons that could be

13    used for self-defense.  Those rights are preserved,

14    the rights that the Heller court and the Fourth

15    Circuit following from that have found must be

16    protected by having weapons that can be used for

17    self-defense within the home.

18        This does not affect that.  This affects a

19    particularly dangerous class of weapons suited for

20    military-style assaults, not the weapon overwhelmingly

21    chosen and best suited for self-defense within the

22    home.

23        THE COURT:  You have alluded to this a little

24    bit.  As I understood your papers, of course, the

25    purpose generally is public safety, but specifically,

44

1    you are focused on the particular dangerousness of

2    these weapons in connection with what I'll just call

3    mass murders.

4        I also saw a reference to the safety of law

5    enforcement officers.  Is that something --

6        MR. FADER:  It certainly is, Your Honor, and

7    that was another issue that was discussed in

8    particular in the Heller two decision, that these pose

9    particular risks to law enforcement.

10       They are, again, they are designed to be able to

11   be used for, you know, military-style assaults, and

12   that's why they are called assault weapons, and that

13   poses a particular risk to police officers in the

14   field if they were to come in contact with somebody

15   with these types of weapons, as distinct from a

16   handgun or a different type of long gun.  It's a

17   particular danger to law enforcement.

18       THE COURT:  As opposed to an argument that

19   crimes generally are more likely to be committed by

20   long guns.  I mean you're not making that --

21       MR. FADER:  Not at all.  In fact, the opposite

22   is true.  Crimes generally are more likely to be

23   committed using handguns.

24       THE COURT:  Right.  If we go forward with the

25   preliminary injunction hearing -- I'm just curious at

45

1     this point -- do you have in mind additional evidence?

2     Would you expect me simply to be looking at what's in

3     your memorandum now and what's discussed in the Heller

4     II, the D.C. Circuit Heller opinion, or have you

5     contemplated that yet?

6          MR. FADER:  We haven't gotten to the point of

7     what additional evidence we might put in at that

8     point.  I think a couple of things on that.

9          First of all, I think the evidence that's there

10    is certainly sufficient to show the reasonable fit to

11    the government's interest.

12         Secondly, I think that obviously we are not here

13    on the preliminary injunction, but there are a number

14    of factors that I think could not be overcome on a

15    preliminary injunction motion by the plaintiffs,

16    including the complete absence of irreparable harm.

17         So I would question the utility of that at this

18    point as opposed to proceeding to a hearing on the

19    merits on a permanent injunction.  But we have not

20    gotten to the point of deciding what other evidence

21    there might be.  This was filed on Friday.

22         THE COURT:  Sure, sure.  Again, this is

23    something I may just wind up discussing additionally

24    with counsel, but I would have a question about

25    whether, assuming it goes forward to an injunction

46

1    hearing, whether we even need to call it a preliminary

2    injunction or whether it would make sense to just get

3    to the merits, and whether there is or is not going to

4    be a permanent injunction so that you all could get to

5    the Fourth Circuit.

6           MR. FADER:  I think there is a lot of sense in

7    that, Your Honor.

8           I will only touch on briefly, I think that it is

9    very clear that there is no evidence in the record

10   that one needs more than ten rounds at one time in

11   order to have a defense of the home.  I think the

12   plaintiffs have promised such evidence to come, but it

13   is certainly not in this record and not something that

14   the Court can rule on.

15          As far as the equal protection claim, that is a

16   claim that would be subject to a rational basis.

17   There is no suspect class involved in this, and for

18   reasons we -- unless Your Honor has questions, I don't

19   feel the need to go into further -- we think it's

20   clear that retired law enforcement officers are not

21   similarly situated with respect to this specific

22   provision.

23          I addressed the vagueness issue I think already.

24          As far as the public interest, the General

25   Assembly of the State of Maryland has identified what

47

1       is in the public interest here based on the evidence

2       that the public safety requires this.

3               The fact that the General Assembly did not enact

4       this as an emergency law to take effect immediately is

5       irrelevant to that.  The General Assembly determined

6       that the public safety required this Act.

7               Moreover, Your Honor is correct.  It's not

8       unusual to have a time period.  In fact, it is much

9       more usual for all laws to go into effect in Maryland

10      on October 1st.  That's the standard.  That's the

11      norm.

12              Whether the recent dramatic increase in sales of

13      these weapons in the last few months, if the General

14      Assembly had to do it over again, whether it would

15      have done it the same away is a question that nobody

16      will know.  But the General Assembly's choice was to

17      have it go into effect in the normal course on October

18      1st, and that doesn't at all implicate whether there

19      is in fact a public interest basis for the law.

20              Unless Your Honor has further questions on this,

21      I think I'll sit down.

22              THE COURT:  That's fine.

23              MR. FADER:  Thank you.

24              THE COURT:  Thank you.

25              Do you all want to move on to the Doe case?

48

1          MS. WOODWARD:  Your Honor, if I could just add

2     two things to the record vis-a-vis this particular

3     motion?

4          THE COURT:  Sure.

5          MS. WOODWARD:  Your Honor had asked a question

6     regarding vagueness, and whether there was a case to

7     bring to the Court's attention.

8          There is a case, Your Honor, People's Rights

9     Organization versus City of Columbus, Court of Appeals

10    for the Sixth Circuit.  The court had noted in

11    reference to other cases that nothing in the ordinance

12    provided sufficient information to enable a person of

13    average intelligence to determine whether a weapon

14    they wish to purchase has a design history of the sort

15    which would bring it within the ordinance's coverage,

16    and there was a holding of a similar provision invalid

17    because ascertaining the design history and action of

18    a pistol is not something that can be expected of a

19    person of common intelligence.

20         The record in that case indicated that the

21    average gun owner knows very little about how the gun

22    actually operates vis-a-vis its design features.

23         Now I don't want to suggest that a firearm user

24    does not know how to operate their firearm.  I don't

25    want to put that out there and suggest that people

49

1    don't know what they are doing, but the mechanical

2    distinctions, Your Honor, are beyond the common

3    citizen.

4            THE COURT:  Do you have a cite to that Sixth

5    Circuit case?

6            MS. WOODWARD:  The cite to the Sixth Circuit

7    case, Your Honor, 152 F.3d 522, 1998.

8            THE COURT:  Thank you.

9            MS. WOODWARD:  Also on magazine rounds, Your

10   Honor, you had a specific question regarding really,

11   what's the difference between 10 and 20, I think to

12   get to the heart of that question.

13           We would submit, Your Honor, that it is a

14   15-to-19 round magazine that is common in popular

15   handguns and commonly used handguns.  There are no

16   10-round magazines available for certain popular

17   commonly used handguns.

18           We are not asking for unlimited capacity.  What

19   we are talking about here is what would be used on

20   standard handguns that are protected by Heller.

21           I just wanted to make sure that we had

22   information in the record that it is in excess of 10,

23   perhaps less than 20, in that 15 to 19 range, Your

24   Honor, that a plaintiff would use to have the

25   effective use of a handgun in the home.

50

1         THE COURT:  Okay.

2         MS. WOODWARD:  Thank you, Your Honor.

3         THE COURT:  Thank you.

4         MR. SWEENEY:  May it please the Court, this is

5  John Parker Sweeney again for the plaintiffs,

6  addressing the Doe lawsuit.

7         We are here simply asking to be able to acquire

8  handguns for use in the home for defense.  This is the

9  core right of the Second Amendment that was addressed

10  by Heller and has been embraced by the Fourth Circuit.

11         The Fourth Circuit characterized it in Chester

12  as the right of a law-abiding, responsible citizen to

13  possess and carry a weapon for self-defense.

14         These rights are newly articulated, Your Honor.

15  It has only been five years since Heller was decided

16  in the Supreme Court, only three since McDonald came

17  down, clearly applying Heller to the states.

18         Maryland, as you know, has no constitutional

19  right to bear arms.  It is one of the few states that

20  doesn't.  It never has.  There's no tradition here in

21  Maryland.

22         And it's not surprising that we hear hostility

23  not only in this courtroom, but throughout the state,

24  to the exercise of that newly articulated right.

25         I submit, Your Honor --

51

1        THE COURT:  I will just interject to say that I

2    am not hearing hostility to the core fundamental right

3    of having at least handguns in the home for

4    self-defense.  I don't think that's what this case is

5    about, not in this courtroom.

6        MR. SWEENEY:  Well, Your Honor, when a hundred

7    thousand individuals flocked to the shops, to the

8    sporting good stores, to the Winks, to the Atlantic

9    Guns to purchase firearms this year, they

10    overwhelmingly chose handguns, and that is the vote

11    with the feet of the citizens of Maryland for their

12    weapon of choice for self-protection in the home.

13        Now the State said they regret that this has

14    happened.  The Maryland State Police have issued a

15    number of releases, and this is not my first time in

16    court with Mr. Fader and Mr. Friedman with respect to

17    handgun regulation in Maryland.  But this is my first

18    time in federal court, Your Honor.

19        The reason we are here in federal court today is

20    that today there is a de facto ban on acquiring

21    handguns.  Unless you are active or retired law

22    enforcement or military, today you cannot go to the

23    Winks, you cannot go to Atlantic Guns and fill out a

24    Form 77R to purchase a handgun.  You will be turned

25    away.  There is a moratorium.

52

1          When the General Assembly passed the handgun

2     qualification requirement, I cannot believe, and there

3     is no indication, that they would require on October 1

4     a handgun qualification license for the purchase of a

5     handgun if there was none that could be obtained in

6     the State of Maryland, because the State of Maryland

7     had not implemented the system.

8          We have learned from the State's response,

9     Captain Dalaine Brady's affidavit, that they were

10    aware of this qualification requirement being put into

11    the Bill even before the Bill was introduced, that

12    they had millions of dollars that were allocated for

13    implementing the handgun qualification license

14    requirement.

15         Today we've learned that they are going to offer

16    them for the first time by application today, and that

17    the State does not expect applications to come in

18    right away.  As Dalaine Brady's affidavit says, she

19    expects they will be staggered as they come in.

20         Why is that?  That's because the training and

21    fingerprinting requirements for the new handgun

22    qualification license aren't fully up and running and

23    available to citizens.

24         I think it is quite telling that the State, in

25    its opposition papers to our motion, nowhere says a

53

1    date certain when the first handgun qualification

2    license will issue.  They don't know, or if they know,

3    they certainly are not sharing it with us.

4         This is hostility to the exercise of the right

5    to acquire a handgun for self-protection in the home.

6         THE COURT:  You're not challenging the licensing

7    law is unconstitutional, are you?

8         MR. SWEENEY:  I am not, but as implemented, it

9    is becoming closer and closer to an implemented

10   challenge.  But that's not what I am here for today,

11   Your Honor.

12        Today, no one, if you are not police or

13   military, can purchase a handgun.  No one can go to a

14   store and apply, fill out a Form 77R for a handgun,

15   because they don't have a handgun qualification

16   license.  This is a de facto moratorium.

17        Citizens of Maryland cannot buy a handgun today,

18   and we don't know how long that period will last.

19   We've asked.  They haven't told us.  We don't know.

20        So the denial of a right certainly starts with

21   the delay in allowing its exercise.  Individuals,

22   individual members of association plaintiffs here

23   today who want a handgun can't purchase it.

24        THE COURT:  But you are not suggesting that it

25   is unconstitutional, are you, that one --

54

1          MR. SWEENEY:  I am suggesting -- I'm sorry.

2     Excuse me, Your Honor.

3          THE COURT:  I'm sorry.  Let me just finish.

4          That there be licensing and regulation schemes

5     in effect that would require, for example, a

6     background check, a delay?

7          I mean it is not unusual, I don't think, for

8     people to have to wait some period of time to purchase

9     a weapon.

10          MR. SWEENEY:  The law of Maryland establishes a

11     seven-day waiting period, Your Honor, for the purchase

12     of a handgun.  That law has been on the books for many

13     years.  It certainly predates Heller.  No one has

14     reviewed its constitutionality under Heller, and we

15     are not here today challenging the constitutionality

16     of that requirement.  What we are challenging is

17     something more than that.

18          The seven-day waiting period associated with the

19     77R application to purchase a handgun has long been on

20     the books.  We have established only earlier this year

21     that once that waiting period expires, a handgun may

22     be transferred.

23          That is not the issue.  The issue is when will

24     anyone even be able to fill out a 77R to start that

25     seven-day waiting period running?  We don't know when

55

1    that could be.  At the earliest, it will be sometime

2    in November, at the earliest.

3        We have a de facto moratorium.  They are not

4    ready.  They don't have the process in place.  Their

5    failure to implement the handgun qualification license

6    in a timely manner has resulted in a catch-22.  You

7    need a license, but you can't get one.  That's where

8    we are today, and they haven't told us when it will

9    happen.

10        Now, there is also a problem of the confusion

11   which has been created by the conflicting signals from

12   two of the defendants with respect to the massive

13   backlog of applicants for handguns.

14        We have something approaching 50,000 applicants

15   for handguns right now whose applications have not

16   been processed and approved or not disapproved by the

17   Maryland State Police.

18        The Attorney General's Office earlier this year,

19   in response to a delegate inquiry, opined that anyone

20   in the backlog as of October 1 could not receive

21   transfer of that handgun, once approved, unless they

22   had a handgun qualification license.

23        Suddenly, last week, the Maryland State Police

24   said well, we're not going to enforce that

25   requirement.  It's not required, or maybe it's

56

1    required, but we are not going to enforce it, and has

2    thrown complete confusion into the community.

3         What we are asking for here today, Your Honor,

4    is a temporary restraining order and/or a preliminary

5    injunction for at least 90 days to allow the State to

6    get its act together, to have the handgun

7    qualification license process up and running, to allow

8    an opportunity for citizens to apply for a handgun

9    qualification license, to take that license down to a

10   shop and apply for a firearm.  That's what we are

11   asking for today.

12        As I understand it, the State has not challenged

13   that this is a core Second Amendment right, but you

14   can't exercise it if you can't buy a handgun.

15        They said this is a temporary, a temporary

16   processing delay, and that we do not have a right to

17   immediate possession.

18        We're not asking for immediate possession.

19   That's not what we are asking here.  We are asking for

20   the law to be stayed that will allow us to continue to

21   fill out Form 77R's and apply for the purchase of

22   handguns while the process is implemented, and that's

23   all we are asking for today.  During this period of

24   time the backlog can be processed and resolved.

25        Now one thing very important, and I want to be

57

1    very careful to distinguish because I fear that I may

2    have struck with a little too broad a blade in my

3    motions papers.  We are not asking for this Court to

4    stay all of Public Safety Article 5-117.1.  We are

5    only asking that the Court stay provisions (b) and (c)

6    of that Article.

7         The reason we are only asking for those, those

8    are what we call in the paper the handgun

9    qualification license requirements.  That is those

10   provisions of the law that prohibit the sale, rental

11   or transfer of a handgun to anyone without a handgun

12   qualification license, and prohibit anyone from

13   accepting that sale, rental or transfer without a

14   handgun qualification license.

15        That's all we are asking to be stayed today,

16   Your Honor.  The State obviously misconstrued my

17   papers, and we were all working on a tight deadline.

18   We are not asking the application process to be

19   stayed.  We are not here for that today.

20        If the State is up and running today as they say

21   they are -- and God bless them.  I hope it works well,

22   and things are up and running -- that's fine.  We are

23   not asking for a stay of that.  What we want is a stay

24   of the prohibitions, a stay of the prohibitions from

25   our purchase today of handguns until the system is up

58

1    and running and handgun qualification licenses can be

2    issued.  Until then, only the police and the military

3    can buy handguns.

4         We are proudly known as the Free State, Your

5    Honor, but the Second Amendment and the Fourteenth

6    Amendment to the Constitution were designed entirely

7    so that we did not become a police state.

8         Citizens are entitled to purchase handguns for

9    self-defense, and that is not happening today, and

10   only Your Honor can change that.

11        Thank you.

12        THE COURT:  Thank you, Mr. Sweeney.

13        Mr. Fader.

14        MR. FADER:  Thank you, Your Honor.

15        I would just like to begin -- obviously Your

16   Honor noted that you are not here in hostility to the

17   fundamental right, nor is the State here in hostility

18   to the fundamental right to self-defense in the home,

19   including through the use of handguns, and this law is

20   not hostile to that right.

21        This law requiring handgun qualification

22   licenses in order to purchase handguns was enacted, as

23   the rest of the package of laws in Chapter 427, for

24   the purposes of protecting public safety based on

25   scientific evidence of the value of this registration

1      system in keeping guns out of the hands of criminals.

2           Especially the fingerprint requirement that is

3      part of the handgun qualification license severely

4      curtails straw gun purchases that allow guns to get

5      into the hands of people who should not possess them.

6           This is not a law that bans handguns or comes

7      close to that, and the fact that there's an

8      administrative process that individuals need to go

9      through in order to get their handgun qualification

10     license does not burden the Second Amendment right to

11     ultimately possess those guns, and to have those guns

12     in their homes for the purpose of self-defense.

13          There are administrative delays.  There have

14     been administrative delays in processing the firearm

15     application, which I hope we made clear in our papers

16     is a completely separate issue from the handgun

17     qualification license that goes into effect today.

18          In fact, the process is up and running.  I

19     signed on this morning myself to make sure that it

20     was, and established a log-in ID to get to the screen

21     where you can start putting in your information to

22     apply for one.  So the system is up and running today.

23          The argument that Mr. Sweeney made about we know

24     that there's not going to be any handgun qualification

25     license issued until November, I certainly don't know

60

1     that.  The process is underway for the application.

2          The State, by law, has 30 days to complete the

3     review, but I don't think there's any indication that

4     it is necessarily going to take that long for the

5     first license to be issued, and there is not a

6     challenge here to the underlying constitutionality of

7     the requirement.

8          It's pure speculation to say that there are

9     going to be delays out into the indefinite future in

10    the issuance of these licenses, and as we noted in our

11    papers, there's no case that we are aware of that says

12    there is an immediate right to possession, without

13    going through a reasonable administrative process that

14    would result in background checks, including now

15    through the extra layer of security of the fingerprint

16    that is so important to making sure that the weapons

17    don't get into the hands of people in whose hands they

18    should not be.

19         There are two claims or at least two ways in

20    which the plaintiffs have articulated their claim, the

21    first, an allegation that there is essentially a de

22    facto ban on possession of handguns, or the

23    acquisition of handguns.  It is certainly not a ban on

24    the possession of handguns.  Everybody who has a

25    handgun and has had one continues to have one, and

61

1    handguns can be possessed and used for self-defense

2    within the home.

3        With respect to future acquisition, the State

4    has simply imposed a reasonable qualification process,

5    and if there are going to be problems in that process,

6    it's reasonable to let the process take its course and

7    see how it actually functions before exercising the

8    extraordinary equitable relief of enjoining a state

9    statute that was enacted for the protection of public

10    safety and protection to the citizens of the State of

11    Maryland.

12        The second claim that has been made by the

13    plaintiffs is really a complaint in search of a cause

14    of action, and there is no legal claim or legal cause

15    of action that they have articulated that could

16    provide the basis for a temporary restraining order

17    issued by the Court.

18        Their claim is that there is some sort of

19    conflict between the Attorney General's Opinion that

20    the law means what it says, which is you need a

21    handgun qualification license to buy a handgun as of

22    October 1st on the one hand, and the Maryland State

23    Police's press release saying that they do not intend

24    to enforce that requirement with respect to people who

25    have applications to purchase firearms pending as of

62

1    October 1st.

2         There's no conflict between, on the one hand,

3    the statement of what the law is, and on the other

4    hand, the statement of an agency saying how they

5    intend to enforce that law.

6         First of all, there's no conflict.  Secondly,

7    even if there were, the plaintiffs haven't identified

8    an actual legal right or cause of action that would be

9    implicated by that and that would provide any basis

10   for equitable relief from this Court.

11        So the State does not believe that there is a

12   likelihood of success with respect to either of the

13   claims that the plaintiffs have raised on the merits,

14   and much to the contrary, the likelihood of success

15   weighs strongly in favor of the State.

16        With respect to irreparable harm, we also don't

17   believe that there have been any allegations that rise

18   to the level of a likelihood of irreparable harm on

19   behalf of the plaintiffs.  There has been a

20   significant increase in purchases of handguns over the

21   course of time since Chapter 427 has been enacted.

22        Handguns are possessed and have been acquired

23   and will, through this new administrative process, be

24   able to be acquired going forward, and there has not

25   been any assertion of actual irreparable harm as a

63

1    result of either the past delays in processing of

2    firearm applications, which are not even at issue in

3    their lawsuit, or the speculation as to potential

4    future delays in the process that has just gotten

5    underway today.

6         The General Assembly of the State of Maryland

7    determined, based on very strong scientific evidence

8    linking these fingerprinting requirements to keeping

9    handguns out of the hands of criminals, that it was in

10   the public interest to the State of Maryland that this

11   requirement went into place.  The public interest,

12   therefore, certainly weighs against issuing equitable

13   relief.

14        And for the same reason, the balance of

15   equities, based on the public interest supported by

16   this law and this requirement going into effect, as

17   contrasted with, really, an absence of anything other

18   than possible economic harm to the dealer plaintiffs,

19   also weighs against the issuance of preliminary

20   equitable relief.

21        Unless Your Honor has any questions, thank you.

22        THE COURT:  Thank you.

23        Mr. Sweeney.

24        MR. SWEENEY:  If I may, Your Honor, very briefly

25   respond?

64

1        One, the seven-day statutory requirement for

2    Maryland State Police to act on 77R background checks

3    has now morphed into almost four months.  It takes

4    four months after you apply for a handgun for you to

5    hear back from the Maryland State Police on whether or

6    not they have approved your application.

7        We have no idea how the handgun qualification

8    license processing will go, but they have to do all

9    the checks that are involved in the 77R application

10   checking process, plus they have to look at and check

11   fingerprints, and they have to look at and check

12   training requirement satisfactions that aren't present

13   in the current 77R.

14       So we expect it would take longer.  We know

15   there will be different personnel involved, but all

16   I've heard again from Mr. Fader is speculation as to

17   when it will be offered.

18       We have asked for very specific relief, Your

19   Honor, very specific relief which will resolve this

20   situation satisfactorily, consistent with the

21   Constitution and the rights of the plaintiffs, as well

22   as the needs of the State of Maryland, and that is

23   that this Court issue a declaratory judgment that the

24   de facto prohibition created by the State's catch-22

25   is a violation of the Second Amendment, and a staying

65

1   of the effective date of only the prohibited

2   paragraphs of Section 5-117.1(b) and (c), and allow

3   the State to go ahead and process applications.

4        Thank you, Your Honor.

5        THE COURT:  Thank you very much.

6        All right.  Thank you all for your arguments.

7   I'm going to take about a ten-minute recess, and I'll

8   come back and give you a ruling.

9        (A recess was taken.)

10       THE COURT:  Let me start by thanking counsel for

11  their thorough arguments and briefing on short notice.

12  I am here to consider the request for a temporary

13  restraining order first in the Tardy v. O'Malley case

14  and then in the Doe case.

15       Starting, of course, with the standards for a

16  temporary restraining order, which will be the same in

17  both cases, it is clear under current law, and I think

18  this at least is not debated, that the plaintiffs have

19  the burden of making a clear showing on all four

20  factors in regard to a TRO or, for that matter, a

21  preliminary injunction:

22       First, that they are likely to succeed on the

23  merits; second, that they are likely to suffer

24  irreparable harm; third, that a balance of hardships

25  tips in the plaintiffs' favor; and fourth, that the

66

1    injunction is in the public interest, paying

2    particular regard for the public consequences.

3         A couple of cases to cite for that are a 2013

4    Fourth Circuit case, Pashby versus Delia, 709 F.3d

5    307, and, of course, The Real Truth about Obama, 575

6    F.3d 343, simply for the standard.

7         It is also worth noting that in terms of the TRO

8    request, this is extraordinary relief.  You need to

9    demonstrate a true emergency, and I will point out

10   again that it seems to me the plaintiffs have known

11   for months that this law would take effect October

12   1st, but the challenge was not filed until last

13   Friday.

14        What the law does, and I am speaking now of the

15   law at issue in Tardy, the challenge in Tardy,

16   generally speaking, and I am not going to be precise

17   about every statutory provision, but generally on and

18   after October 1st, this law prohibits the sale and

19   possession and receipt of assault weapons.  These are

20   defined as certain semiautomatic pistols, which are

21   not the subject of the challenge.  There are also

22   certain semiautomatic rifles and shotguns that are

23   defined as assault weapons and are affected by this

24   new law.

25        The new law also generally prohibits sale and

67

1    receipt of detachable magazines with the capacity of

2    over ten rounds of ammunition.

3         The law imposes criminal penalties for

4    violation, but it permits individuals to retain,

5    without penalty, all such long guns that were lawfully

6    acquired, or where the purchase has been applied for

7    prior to October 1st.  Again, the assault pistol issue

8    is not challenged.

9         So turning to the likelihood of success on the

10   Second Amendment challenge, let me review some of the

11   relevant case law.  Of course, Heller, a Supreme Court

12   case, established that the core element of the Second

13   Amendment is an individual's right to use weapons in

14   the defense of their home.  Those weapons are those

15   commonly possessed by law-abiding responsible citizens

16   for that purpose, and the Court noted that handguns

17   are far and away the preferred self-defense weapon for

18   persons in their homes.

19        Heller, of course, involved a total ban on

20   handguns.

21        This challenged law, the aspect of the law that

22   is challenged, does not prohibit an entire class of

23   weapons.  It is a subclass of long guns only,

24   classified as assault rifles.

25        The Second Amendment, as the Supreme Court

68

1    explained, does not protect dangerous and unusual

2    weapons, which the Court in that Heller opinion at

3    least mentioned included short barreled shotguns.

4         Heller was followed by the McDonald case, which

5    described Heller as holding that the Second Amendment

6    protects the right to possess a handgun in the home

7    for the purpose of self-defense, and, of course, held

8    the Second Amendment applicable to the states under

9    the due process clause of the Fourteenth Amendment.

10   So that's in part why we are here.

11        Counsel have referred to, and I agree it is a

12   very significant Fourth Circuit opinion, U.S. versus

13   Chester, 628 F.3d 673, from the Fourth Circuit, in

14   2010.  The Fourth Circuit adopted, as a number of

15   other circuits have done, a two-part test, which is

16   first whether the challenged law imposes a burden on

17   conduct that falls within the scope of the Second

18   Amendment's guarantee.

19        If it does not, and the example they gave was

20   carrying a sawed-off shotgun, then the law is valid.

21   At least it is not subject to a Second Amendment

22   challenge.

23        If it does burden conduct within the scope of

24   the Second Amendment, then the Court needs to

25   determine, and then apply, the appropriate level of

69

1    means-end scrutiny.

2         In Chester, which, as you all know, criminalized

3    possession of a firearm after a misdemeanor conviction

4    for a crime of domestic violence, the Fourth Circuit

5    chose intermediate scrutiny.  The Court explained that

6    the level of scrutiny to be applied depends on both

7    the nature of the conduct that is being regulated and

8    the degree to which the challenged law burdens those

9    rights.

10        Under intermediate scrutiny, of course, the

11   government has to demonstrate a reasonable fit between

12   the challenged law and a substantial government

13   objective.

14        In that case, the Fourth Circuit remanded to

15   permit the government to offer evidence to establish

16   that relationship.

17        I would note that in that case, one of the

18   judges on the panel, Judge Davis, concurred, but added

19   that he thought strict scrutiny would be unwarranted

20   in a Second Amendment case.

21        Since then there have been other challenges to

22   these criminal statutes.  In Section 922(g)

23   convictions, challenges have been denied by the Fourth

24   Circuit under intermediate scrutiny.  An example of

25   that is United States versus Mahin, at 668 F.3d 119.

70

1        Now another case that counsel appropriately

2   referred to, and I may or may not also pronounce it

3   correctly, is United States versus Masciandaro, at 638

4   F.3d 458, which applied intermediate scrutiny to

5   uphold a conviction for carrying a loaded firearm in a

6   car, in violation of National Park regulations.  The

7   Court did assume, but not decide in that case, that

8   strict scrutiny would apply to any law that burdened

9   the fundamental core right of self-defense in the home

10  by law-abiding citizens.

11       Similarly, we have Woollard versus Gallagher --

12  I believe that's the most recent one here from the

13  Fourth Circuit -- 712 F.3d 865, where the Fourth

14  Circuit again upheld under intermediate scrutiny the

15  requirement that a person show good and substantial

16  reason to wear and carry a handgun outside the home,

17  again assuming, without deciding, that strict scrutiny

18  would apply if the requirement were applied to

19  carrying handguns inside the home.  Again, a broader

20  and different class of weapons was involved.

21       So it seems to me the question here first, on

22  likelihood of success, when I at some point get to an

23  actual decision on the merits, is whether the Second

24  Amendment applies to these assault weapons at all or

25  whether these are unusual and dangerous, like the

71

1      sawed-off shotgun; assuming, and again, a number of

2      courts have just gone on to that second prong and

3      assumed that some Second Amendment protection applies,

4      what's the level of scrutiny?

5           I think an extremely persuasive opinion in this

6      regard is Heller versus D.C., the D.C. Circuit case,

7      at 670 F.3d 1244. Again, simply at this point for

8      purposes of the temporary emergency relief and the

9      factors that I need to look at, likelihood of success,

10     I am likely to agree with the D.C. Circuit -- assuming

11     that the Second Amendment applies at all, intermediate

12     scrutiny is the correct standard; though, I am not

13     making that determination at this point.

14          I note that despite some of the language about

15     strict scrutiny in the Fourth Circuit cases, if you go

16     back to the Chester case, the Fourth Circuit tells you

17     that you also have to look at the degree to which the

18     conduct burdens a core right, and this law is a

19     prohibition only of a limited number of long guns that

20     we are talking about. It does not affect law-abiding,

21     responsible citizens' right to possess handguns in the

22     home for self-defense, and the Supreme Court has told

23     us that's the weapon of choice for self-defense. It

24     does not impinge on law-abiding, responsible citizens'

25     right to possess most long guns in the home for

72

1    self-defense as well.

2        Of course, those citizens can still have

3    magazines that fire up to ten rounds without

4    reloading.

5        The Heller case, assessing a very similar law,

6    did note that assault rifles were in common use, and

7    in this case plaintiffs have presented some evidence

8    about the sale and common purchase of these kind of

9    rifles; but the D.C. Circuit noted that they were not

10   necessarily in common use for self-defense.

11       Plaintiffs' counsel tells me that they will be

12   able to provide that evidence.  There is certainly no

13   evidence of that yet, that it is necessary or common

14   for assault rifles and high capacity magazines to be

15   used for self-defense in the home.

16       The D.C. Circuit decided that even if the Second

17   Amendment were implicated, this ban on assault rifles

18   and high capacity magazines was not a substantial

19   burden on a core Second Amendment right, and that the

20   government had showed a reasonable fit between this

21   prohibition and the substantial governmental interest

22   of protecting law enforcement officers and controlling

23   crimes, especially those involving mass tragedies,

24   mass wounding and murder, and there were a number of

25   studies that were cited for that proposition in the

73

1    D.C. case.

2        So I do not find at this point that the

3    plaintiffs have made a clear showing of a likelihood

4    of success on the merits, as would be required to

5    grant the extraordinary relief they seek, nor have

6    they made a clear showing of the likelihood of

7    irreparable harm.

8        First of all, I do believe that the delay in

9    bringing this suit undercuts their argument of

10   irreparable harm.  This could have been brought months

11   ago and was not.

12       Second of all, the individuals, and particularly

13   the individual plaintiffs here, still have the assault

14   weapons and high capacity magazines that were acquired

15   legally before October 1st and have those available

16   for self-defense.

17       There is a very limited amount of potentially

18   economic harm that has been proffered on behalf of the

19   dealers.  Again, we are talking about not a

20   necessarily lengthy period of time, so I don't think

21   that's an irreparable harm that has been shown by the

22   plaintiffs.

23       So turning for the moment to the public

24   interest, I believe there is a strong public interest

25   in upholding a duly enacted law that is directed at

74

1    the protection of public safety, including lessening

2    the risk of mass tragedies, like Newtown, and others

3    in the news, and lessening the risk of harm to law

4    enforcement officers.

5         In some of the information and evidence provided

6    by the State, which they have said they may wish to

7    supplement, there is even reference to the fact that a

8    necessity to pause to reload has enabled citizens in

9    some instances to intervene and disarm people who are

10   involved in these horrific crimes.

11        In any event, I do not find that the balance of

12   harm, therefore, tips in favor of the plaintiffs,

13   quite the contrary.

14        I don't find the plaintiffs' need to be able to

15   fire more bullets, again, in the absence of some kind

16   of evidence that this is necessary for self-defense,

17   the need to fire more bullets in defense of the home,

18   which appears to be based on the lack of accuracy that

19   they propose the citizens would have in firing these

20   weapons, I can't see that as tipping the balance in

21   favor of the plaintiffs, or arguing against the strong

22   public interest here.

23        The equal protection argument, to the extent

24   that it is here to be made, I think the State has

25   clearly shown a rational basis for distinction between

75

1    retired law enforcement officers and other citizens.

2    Just to mention the training that they receive would

3    be one element of that distinction.

4         And it is not a general right, as I understand

5    it, for retired law enforcement officers to purchase

6    any assault weapon they might want to in the future.

7    It has to be connected to their retirement.

8         In terms of the vagueness challenge and

9    likelihood of success, it appears that the law on

10   copies has been the same since 1996, and it has not

11   been shown that it has been difficult for the

12   plaintiffs in this case, particularly dealers, and

13   those experienced in firearms, to understand those

14   definitions.  The copycats are fairly clearly defined

15   under the law, I believe, in terms of the features

16   that are required.

17        Again, just in terms of likelihood of success, I

18   am not making a final ruling, and I will certainly

19   look at the Sixth Circuit case that the plaintiffs

20   have mentioned, as well as any other information they

21   might want to present about these definitions; but I

22   do not, on the current record, believe that the

23   plaintiffs have met the requirements for a temporary

24   restraining order, for the reasons that I have just

25   stated.

1        In terms of a preliminary injunction hearing, I

2    think the most sensible thing for me to do is to ask

3    counsel to confer and contact chambers, and we will

4    set up a conference call to discuss a reasonable

5    schedule for a preliminary injunction and what

6    evidence either side might want to present, and again,

7    the question of whether it should be purely a

8    preliminary injunction hearing or a hearing on the

9    merits.  We can talk about that more with a conference

10   call and consider further all the issues that both

11   sides have raised today.

12       I will enter a separate very brief order -- this

13   is obviously my oral opinion -- denying the temporary

14   restraining order in the Tardy case.

15       Regarding the Doe case, I will also find that

16   the plaintiffs have failed to meet the requirements

17   for a temporary restraining order.  This seems to me

18   at this stage particularly speculative.  The

19   plaintiffs have not shown any irreparable harm.

20       There's a handgun qualification licensing system

21   that is not challenged.  It begins today.  There is no

22   showing yet of any unreasonable delay.

23       There is an administrative delay in place now

24   for processing the applications.  That is not the

25   issue.  That's not part of the new law.  Of course,

77

1    that is caused by the extreme increase in applications

2    for guns of various kinds that has occurred between

3    the enactment of this law and the effective date here

4    in October.

5         But as far as the handgun qualification

6    licensing requirement, on the record in front of me,

7    it is up and running today.  Whether, or what degree

8    of delay there will be, at this point is speculative.

9         With no challenge to the underlying

10   constitutionality of the handgun qualification

11   licensing requirements, and there being no right to

12   immediate possession of even handguns, and no harm

13   that I can see shown from the Maryland State Police

14   saying that they may choose not to enforce some

15   provisions in this law, I certainly can't see that

16   there is a sufficient showing of likelihood of

17   imminent harm, or a likelihood of success on the

18   merits that would outweigh the public interest in

19   permitting, again, a duly enacted law that is aimed at

20   protecting public safety and keeping guns out of the

21   hands of criminals from proceeding in effect as it is

22   today.

23        So I will do a separate short order denying that

24   and again can discuss with counsel in a separate

25   conference call what schedule may be necessary for

78

1    further proceedings on that issue.

2          Anything I have not addressed, anything else

3    anybody needs to say?  I understand you disagree, but

4    anything you feel I have not addressed or would like

5    me to clarify?

6          MR. SWEENEY:  Nothing further, Your Honor.

7    Thank you.

8          MS. WOODWARD:  Thank you, Your Honor.

9          MR. FADER:  Nothing further, Your Honor.

10         THE COURT:  All right.  Thank you all.

11         (The proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

79

1                    REPORTER'S CERTIFICATE

2          I hereby certify that the foregoing transcript in

3     the matter of Shawn J. Tardy, et al., Plaintiffs vs.

4     Martin J. O'Malley, in his official capacity as

5     Governor of the State of Maryland, et al., Defendants,

6     Civil Action No. CCB-13-2841, and Jane Doe, et al.,

7     Plaintiffs vs. Martin J. O'Malley, in his official

8     capacity as Governor of the State of Maryland, et al.,

9     Defendants, Civil Action No. CCB-13-2861, before the

10    Honorable Catherine C. Blake, United States District

11    Judge, on October 1, 2013 is true and accurate.

12

13                    _____

14                       Gail A. Simpkins

15                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25