# EXHIBIT G



# Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012

## OFFICE OF THE STATE'S ATTORNEY
## JUDICIAL DISTRICT OF DANBURY
### Stephen J. Sedensky III, State's Attorney

### November 25, 2013

TABLE OF CONTENTS

EXECUTIVE SUMMARY ..................................................................................1

INTRODUCTION ...........................................................................................5

PURPOSE AND SCOPE OF REPORT ................................................................6

SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE ...........................9

SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION ..............................16

SANDY HOOK ELEMENTARY SCHOOL - AUTOPSY INFORMATION ............................23

36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE ....................24

36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION ........................24

36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION ......................27

SHOOTER – AUTOPSY INFORMATION..............................................................27

INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS ........27

EVENTS AND BACKGROUND INFORMATION LEADING UP TO DEC. 14, 2012 ............28

EVIDENCE EXAMINATION .............................................................................35

MISCELLANEOUS INVESTIGATIVE LEADS .......................................................38

DETERMINATIONS OF CRIMES COMMITTED ...................................................40

CONCLUSION.............................................................................................43

ACKNOWLEDGEMENTS .................................................................................44

## APPENDIX[1]

Search Warrants

Honda Civic – 12/14/2012 ..................................................................................A1

36 Yogananda Street - 12/14/2012 at 5:29 p.m ...........................................A10

36 Yogananda Street - 12/14/2012 at 7:25 p.m ...........................................A21

36 Yogananda Street - 12/15/2012 at 3:03 p.m ...........................................A31

36 Yogananda Street - 12/16/2012 at 4:31 p.m ...........................................A38

ATT telephone – 4/10/2013 at 10:43 a.m. ...................................................A47

ATT telephone – 4/10/2013 at 10:47 a.m. ...................................................A54

Verizon telephone – 4/10/2013 at 10:51 a.m. ..............................................A61

Combat Arms – Nexon – 08/27/2013 at 9:46 a.m. ......................................A68

World of Warcraft – Blizzard - 8/27/2013 at 9:50 a.m. ...............................A76

Time Line ................................................................................................................A84

SHES Floor Plan ...................................................................................................A116

SHES and Parking Lot Map ................................................................................A117

SHES Ballistics Diagram .....................................................................................A118

SHES Exterior Description ..................................................................................A119

SHES Lobby, Hallway, Room 9 and Ballistics Description .........................A125

SHES Classroom 8 Ballistics Description ........................................................A134

SHES Classroom 10 Ballistics and Shooter Description ..............................A136

SHES Weight – Guns and Ammunition ............................................................A141

---

[1] Because of its volume, the Appendix to this report is published as a separate document. Some of the search warrants and reports contained in the Appendix have been redacted to meet court orders, exceptions to the Freedom of Information Act, protect the identity of witnesses, protect records of child abuse or personal identification information.

SHES Newtown Emergency Response Plan...........................................................................A144

SHES Photographs.....................................................................................................................A165

Yogananda Scene Description ..................................................................................................A180

Yogananda Digital Image Report ............................................................................................A188

Yogananda Photographs ...........................................................................................................A193

Yogananda Review of Electronic Evidence ...........................................................................A211

Yogananda - Book of Granny ..................................................................................................A220

Yogananda GPS Routes ............................................................................................................A223

Lanza, Adam – Toxicology.......................................................................................................A231

# EXECUTIVE SUMMARY

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut, on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

The State's Attorney for the Judicial District of Danbury is charged, pursuant to Article IV, Section 27 of the Constitution of the State of Connecticut and Connecticut General Statutes (C.G.S.) Sec. 51-276 *et seq.*, with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred.

Since December 14, 2012, the Connecticut State Police and the State's Attorney's Office have worked with the federal authorities sharing responsibilities for various aspects of this investigation. Numerous other municipal, state and federal agencies assisted in the investigation. The investigation materials reflect thousands of law enforcement and prosecutor hours. Apart from physical evidence, the materials consist of more than seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and returns, as well as evaluations of those items.

In the course of the investigation, both state and federal law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter. Although many times these "leads" would go nowhere, each one was evaluated and often required substantial law enforcement time to pursue. An abundance of caution was used during the investigation to ensure that all leads were looked into, despite the fact that more than 40 such "leads" proved, after investigation, to be unsubstantiated. Information that was substantiated and relevant was made part of the investigation.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report. While no report is statutorily required of the State's Attorney once an investigation is complete, it has been the practice of State's Attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the State's Attorney determines that some type of public statement is necessary. Given the gravity of the crimes committed on December 14, 2012, a report is in order.

On the morning of December 14, 2012, the shooter, age 20, heavily armed, went to Sandy Hook Elementary School (SHES) in Newtown, where he shot his way into the locked school building with a Bushmaster Model XM15-E2S rifle. He then shot and killed the principal and school psychologist as they were in the north hallway of the school responding to the noise of the shooter coming into the school. The shooter also shot and injured two other staff members who were also in the hallway.

The shooter then went into the main office, apparently did not see the staff who were hiding there, and returned to the hallway.

After leaving the main office, the shooter then went down the same hallway in which he had just killed two people and entered first grade classrooms 8 and 10, the order in which is unknown. While in those rooms he killed the two adults in each room, fifteen children in classroom 8 and five in classroom 10. All of the killings were done with the Bushmaster rifle.

He then took his own life with a single shot from a Glock 20, 10 mm pistol in classroom 10.

Prior to going to the school, the shooter used a .22 caliber Savage Mark II rifle to shoot and kill his mother in her bed at the home where they lived at 36 Yogananda Street in Newtown.

The response to these crimes began unfolding at 9:35:39 a.m. when the first 911 call was received by the Newtown Police Department. With the receipt of that call, the dispatching and the arrival of the police, the law enforcement response to the shootings began. It was fewer than four minutes from the time the first 911 call was received until the first police officer arrived at the school. It was fewer than five minutes from the first 911 call, and one minute after the arrival of the first officer, that the shooter killed himself. It was fewer than six minutes from the time the first police officer arrived on SHES property to the time the first police officer entered the school building. In fewer than 11 minutes twenty first-grade pupils and six adults had lost their lives.

The following weapons were recovered in the course of this investigation: (1) a Bushmaster Model XM15-E2S semi-automatic rifle, found in the same classroom as the shooter's body. All of the 5.56 mm shell casings from the school that were tested were found to have been fired from this rifle. (2) a Glock 20, 10 mm semi-automatic pistol found near the shooter's body and determined to have been the source of the self-inflicted gunshot wound by which he took his own life. (3) a Sig Sauer P226, 9 mm semi-automatic pistol found on the shooter's person. There is no evidence this weapon had been fired. (4) a Izhmash Saiga-12, 12 gauge semi-automatic shotgun found in the shooter's car in the parking lot outside the school, and which was secured in the vehicle's trunk by police responding to the scene. There is no evidence this weapon had been fired. (5) a Savage Mark II rifle found at 36 Yogananda Street on the floor of the master bedroom near the bed where the body of the shooter's mother was found. This rifle also was found to have fired the four bullets recovered during the autopsy of the shooter's mother.

All of the firearms were legally purchased by the shooter's mother. Additionally, ammunition of the types found had been purchased by the mother in the past, and there is no evidence that the ammunition was purchased by anyone else, including the shooter.

At the date of this writing, there is no evidence to suggest that anyone other than the shooter was aware of or involved in the planning and execution of the crimes that were committed on December 14, 2012, at Sandy Hook Elementary School and 36 Yogananda Street. From the time an unknown male was encountered by the Newtown police outside of the school during the initial response, until well after the staff and children had been evacuated, the thought that there may have been more than one shooter was a condition all responding law enforcement worked under as they cleared the school. Individuals located in the wooded areas surrounding the school

as the searches and evacuations were taking place were initially treated as suspect and handled accordingly (including being handcuffed) until their identity could be determined. The circumstances surrounding all of these individuals were fully investigated and revealed no additional shooters. DNA testing of evidence recovered from both the school and 36 Yogananda Street also revealed no potential accessories or co-conspirators.

It is the conclusion of this State's Attorney that the shooter acted alone and was solely criminally responsible for his actions of that day. Moreover, none of the evidence developed to date demonstrates probable cause to believe that any other person conspired with the shooter to commit these crimes or aided and abetted him in doing so.

Unless additional – and at this time unanticipated – evidence is developed, there will be no state criminal prosecution as result of these crimes. With the issuance of this report, the investigation is closed. Should additional reliable information related to the existence of accessories or co-conspirators come to the attention of the investigators, the investigation will be reopened.[2]

In the course of his rampage the shooter committed a number of crimes in violation of our Connecticut Penal Code. The most significant are those where lives were taken and people were physically injured. In Sandy Hook Elementary School, the crime of Murder under Special Circumstances, in violation of C.G.S. Sec. 53a-54b, was committed twenty-six times and Attempted Murder under Special Circumstances in violation of C.G.S. Secs. 53a-49 and 53a-54b was committed twice as it relates to the two individuals who were shot by the shooter and survived. The crime of Murder in violation of C.G.S. Sec. 53a-54 was committed by the shooter in killing his mother.

The obvious question that remains is: "Why did the shooter murder twenty-seven people, including twenty children?" Unfortunately, that question may never be answered conclusively, despite the collection of extensive background information on the shooter through a multitude of interviews and other sources. The evidence clearly shows that the shooter planned his actions, including the taking of his own life, but there is no clear indication why he did so, or why he targeted Sandy Hook Elementary School.

It is known that the shooter had significant mental health issues that affected his ability to live a normal life and to interact with others, even those to whom he should have been close. As an adult he did not recognize or help himself deal with those issues. What contribution this made to the shootings, if any, is unknown as those mental health professionals who saw him did not see anything that would have predicted his future behavior. He had a familiarity with and access to firearms and ammunition and an obsession with mass murders, in particular the April 1999 shootings at Columbine High School in Colorado. Investigators however, have not discovered any evidence that the shooter voiced or gave any indication to others that he intended to commit such a crime himself.

---

[2] It should be noted that potentially important evidence, i.e., a computer hard drive recovered from the shooter's home, as of this date remains unreadable. Additional insight could be gained should efforts to recover data from the hard drive ever prove successful, which at this time appears highly improbable. It is because of this improbability, coupled with the current determination of no accessories or co-conspirators that the case is being closed.

This State's Attorney expresses his sincere sympathy and condolences to the victims of the incident of December 14, 2012, and to their families. He also expresses his appreciation for their continued patience and understanding during the course of the investigation and preparation of this report. He acknowledges and thanks law enforcement, which responded to Sandy Hook Elementary School in minutes and entered the building believing someone could be there ready to take *their* lives as well. He also acknowledges and thanks the staff of the Sandy Hook Elementary School who acted heroically. The combination saved many children's lives.

This report would not have been possible if not for the assistance and cooperation of numerous agencies at the state, local and federal levels of government. The State's Attorney expresses his sincere gratitude and appreciation to all of these agencies and to all of the men and women who contributed so much to this investigation. The assistance of federal authorities has been invaluable. Particularly worthy of special note are the men and women of the Connecticut State Police, and in particular, the Western District Major Crime Squad. The thoroughness and sensitivity with which they conducted their investigation is unmatched in my experience.

## INTRODUCTION

On the morning of December 14, 2012, Adam Lanza, the shooter,[3] age 20, went to Sandy Hook Elementary School (also SHES) in Newtown, Connecticut, where he shot his way into the building and killed twenty children and six adults and wounded two other adults, all with a Bushmaster Model XM15-E2S rifle. The shooter then took his own life with a single shot from a Glock 20, 10 mm handgun. From the time the doors of the school were locked at 9:30 a.m. until the time it is believed the shooter killed himself at 9:40:03, fewer than 11 minutes had elapsed.

Prior to going to the school, the shooter used a .22 caliber Savage Mark II rifle to shoot and kill his mother in her bed. This occurred at the home where they lived at 36 Yogananda Street, also in Newtown.

With these unprecedented horrific crimes came a responsibility for an investigation to determine what crimes were committed and, more importantly, if the shooter acted alone. Any person who aided and abetted the shooter or who conspired with him had to be held accountable.

Beginning on December 14, 2012, the Connecticut State Police and the State's Attorney's Office worked in cooperation with the federal authorities sharing responsibilities for various aspects of the case. The federal involvement has been invaluable. Though some evidence is still being examined, there is no indication in the investigation by either state or federal authorities to date that the shooter acted with anyone on December 14, 2012, or had co-conspirators or accessories who could be prosecuted.

In addition to physical evidence,[4] the investigation materials contain over seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and search warrant returns as well as evaluations of those items. Investigators interviewed individuals who were present at SHES on December 14, 2012, and witnessed the incident, among them students, staff members, parents of students and neighbors. Special attention and consideration was given to the interviewing of child witnesses, given their traumatic experience. Also interviewed were police officers and other first responders who were present at SHES during the course of the incident itself and in the course of the subsequent search, evacuation of the school and processing of the scenes.

Investigators attempted to obtain as much information about the shooter's life as possible in an effort to determine the reasons or motives for his actions on December 14, 2012. Interviews were conducted with members of the shooter's family, those who knew the shooter or his family throughout his life, as well as teachers and school personnel who had been involved with him and his family over his time in Newtown.

Efforts were made within the limits of privacy laws to gather information on medical consultations and/or treatments the shooter was involved with over the course of his years in Newtown. In doing so, investigators found no evidence to suggest the shooter had taken any

---

[3] Throughout the remainder of this report Adam Lanza will be referred to as "the shooter."

[4] Over 270 evidence designations were used, many grouping related items as one number.

medication that would affect his behavior or by any means to explain his actions on December 14, 2012.

An investigation of this magnitude requires careful planning and review. The interviews took substantial time, first to identify which individuals should be interviewed and then to conduct the actual interviews. Physical evidence had to be examined and forensically reviewed. This included ballistics, fingerprint and DNA analysis. Additionally, all of the information collected had to be reviewed and summarized in written statements that have since become a part of the investigation, reflecting thousands of dedicated law enforcement and prosecutor hours.

I had been working closely with the Connecticut State Police, who conducted the state investigation, and federal law enforcement officers since December 2012. Once the investigation was delivered for my review, I took the time to read, digest, evaluate and summarize the material, mindful of the privacy interests involved and the approaching December 14, 2012, anniversary.

The federal authorities have stated that under federal law many of their reports and materials cannot become part of the public record due to rules regarding the dissemination of information obtained pursuant to grand jury subpoenas, sealed search warrants, and federal Freedom of Information law. Therefore, information obtained by federal authorities will not, for the most part, be incorporated into the Connecticut State Police criminal investigation file.

While the reports and materials will not be part of the state investigation record, such materials have been examined and considered by state law enforcement authorities. Based upon a review of all of the documentation, both state and federal, we are left confident at this time that the evidence developed to date does not reveal co-conspirators or accessories. Accordingly, as a result of the investigation to date, there will be no state criminal prosecution of anyone.

## PURPOSE AND SCOPE OF REPORT

The State's Attorney's Office for the Judicial District of Danbury is charged, pursuant to Article IV, Sec. 27 of the Connecticut State Constitution[5] and Connecticut General Statutes (C.G.S.) Sec. 51-276[6] *et seq.*, with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred. The investigation has been

---

[5] Connecticut Constitution Article 4, Sec. 27. There shall be established within the executive department a division of criminal justice *which shall be in charge of the investigation and prosecution of all criminal matters.* Said division shall include the chief state's attorney, who shall be its administrative head, and the state's attorneys for each judicial district, which districts shall be established by law. The prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district.

[6] Sec. 51-276. Division established. There is hereby established the Division of Criminal Justice within the Executive Department, which shall be in charge of the investigation and prosecution of all criminal matters in the Superior Court. The Division of Criminal Justice shall be an agency within the Executive Department with all management rights except appointment of all state's attorneys.

tirelessly conducted by the Connecticut State Police (also CSP) with the assistance of multiple local, state and federal agencies, both in and out of Connecticut.

While no report is statutorily required of the State's Attorney once the investigation is complete, it has been the practice of state's attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the state's attorney determines that some type of public statement is necessary.[7] Given the gravity of the crimes committed on December 14, 2012, a report is in order.

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut,[8] on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

Many witnesses to this case have expressed great concern that their identities will be disclosed publicly and make them susceptible to threats or intimidation as a result of their cooperation or connection with the investigation.[9] This cooperation has been essential and greatly appreciated. As a result of the witnesses' concerns, this report will not identify lay witnesses, except where necessary.

Consistent with Public Act 13-311,[10] exceptions to the state Freedom of Information Act[11] and C.G.S. Sec. 17a-101k(a) [12] this report will not list the names of the twenty children killed in

---

[7] See for example: Statement of David I. Cohen, State's Attorney for the Judicial District of Stamford/Norwalk, in reference to the February 16, 2009, attack on Charla Nash by the Chimpanzee Named Travis, Issued December 7, 2009;  Statement of the State's Attorney for the Judicial District of Stamford-Norwalk Concerning the Fatal Fire on December 25, 2011, at 2267 Shippan Avenue, Stamford, Issued June 8, 2012; and Report of the State's Attorney for the Judicial District of Ansonia-Milford on the Murder of Shangyl Rasim on January 17, 2010, Issued May 24, 2010.

[8] Newtown, Connecticut is within the Judicial District of Danbury.

[9] In fact, some witnesses have had that occur to them.

[10] An Act Limiting the Disclosure of Certain Records of Law Enforcement Agencies and Establishing a Task Force Concerning Victim Privacy Under the Freedom of Information Act.

[11] See C.G.S. Sec. 1-210.

[12] Sec. 17a-101k. Registry of findings of abuse or neglect of children maintained by Commissioner of Children and Families. Notice of finding of abuse or neglect of child. Appeal of finding. Hearing procedure. Appeal after hearing. Confidentiality. Regulations. (a) The Commissioner of Children and Families shall maintain a registry of the commissioner's findings of abuse or neglect of children pursuant to section 17a-101g that conforms to the requirements of this section. The regulations adopted pursuant to subsection (i) of this section shall provide for the use of the registry on a twenty-four-hour daily basis to prevent or discover abuse of children and the establishment of a hearing process for any appeal by a person of the commissioner's determination that such person is responsible for the abuse or neglect of a child pursuant to subsection (b) of section 17a-101g. The information contained in the registry and any other information relative to child abuse, wherever located, shall be confidential, subject to such statutes and regulations governing their use and access as shall conform to the requirements of federal law or regulations. Any violation of this section or the regulations adopted by the commissioner under this section shall be punishable by a fine of not more than one thousand dollars or imprisonment for not more than one year.

Sandy Hook Elementary School, nor will it recite 911 calls made from within the school on that morning or describe information provided by witnesses who were in the classrooms or heard what was occurring in the classrooms.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report.

---

To conclude that *all* such information, including the basic facts of the incident itself is confidential would prohibit even the disclosure of the children being killed. Such an interpretation would be unworkable and is not taken here. It is concluded though that the C.G.S. Sec. 17a-101k(a) is applicable in the present case and will be applied in the manner described.

## SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE

### Incident

On the morning of December 14, 2012, the shooter parked his 2010 Honda Civic next to a "No Parking" zone outside of Sandy Hook Elementary School in Newtown, Connecticut.[13] Shortly after 9:30 a.m. he approached the front entrance to the school.[14]  He was armed with a Bushmaster Model XM15-E2S rifle (also Bushmaster rifle), a Glock 20, 10 mm pistol and a Sig Sauer P226, 9 mm pistol and a large supply of ammunition.

The doors to the school were locked, as they customarily were at this time, the school day having already begun. The shooter proceeded to shoot his way into the school building through the plate glass window to the right of the front lobby doors.

The main office staff reported hearing noises and glass breaking at approximately 9:35 a.m. and saw the shooter, a white male with a hat and sunglasses, come into the school building with a rifle type gun. The shooter walked normally, did not say anything and appeared to be breathing normally. He was seen shooting the rifle down the hallway.

Just down the hallway from the main office, in the direction that the shooter was to be seen firing, a 9:30 a.m. Planning and Placement Team (PPT) meeting was being held in room 9, a conference room. It was attended by Principal Dawn Hochsprung and School Psychologist Mary Sherlach, together with a parent and other school staff. Shortly after the meeting started, the attendees heard loud banging. The principal and school psychologist then left the room followed shortly after by a staff member. After leaving the room, Mrs. Hochsprung yelled "Stay put!"

As the staff member left the room, the staff member heard gunshots and saw Mrs. Hochsprung and Mrs. Sherlach fall down in front of the staff member. The staff member felt a gunshot hit the staff member's leg. Once down, the staff member was struck again by additional gunfire, but laid still in the hallway. Not seeing anyone in the hallway, the staff member crawled back into room 9 and held the door shut. A call to 911 was made and in the ensuing moments the telephone in room 9 was also used to turn on the school wide intercom system. This appears to have been done inadvertently, but provided notice to other portions of the building.[15]

---

[13] On December 13, 2012, the student enrollment was 489. Official attendance had not yet been recorded as of 9:30 a.m. on December 14, 2012. The staff for the school is 91, but on December 14, 2012, there were nine staff members absent. The staffing was at 82 for the day.

[14] A more complete description of the school building and the front entrance starts on page A119 of the Appendix. For the purposes of this report, the front of SHES faces north.

[15] Intercom system could be accessed from nine phones located in seven rooms. These telephones and rooms were three phones in the main office, the principal's office, the nurse's office (room 57), room 9 conference room, room 29, room 32 and room 60. The "All Call" which opens the intercom to the entire school was accessed by pressing "#0" from the telephones mentioned. The All Call-except quiet rooms was accessed by pressing "#1."

At the same time the shooter was firing in the hallway, another staff member was at the far east end of the hallway near classroom 1. The staff member was struck by a bullet in the foot and retreated into a classroom.

Both Dawn Hochsprung, age 47, and Mary Sherlach, age 56, died as a result of being shot. Both wounded staff members shot in the hallway were later evacuated to the hospital and survived.

After shooting and killing the two adults and wounding the two others, the shooter entered the main office. The office staff had taken shelter in the office. They heard sounds of the office door opening, footsteps walking inside the office and then back toward the office door. Staff members heard the door open a second time and then heard more gunfire from outside the office. They called 911.

Where the shooter specifically went next is unclear. The evidence and witness statements establish the shooter went down the hallway in an easterly direction ultimately entering first grade classrooms 8 and 10. The order is not definitively known. While in classrooms 8 and 10, the shooter shot and killed four adults and twenty children with the Bushmaster rifle. Twelve children survived, one from classroom 8 and eleven from classroom 10.

The shooter finally killed himself in classroom 10 with one gunshot to his head from a Glock 20, 10 mm pistol. This is believed to have occurred at 9:40:03.[16]

Classroom 8's substitute teacher was Lauren Rousseau, age 30, who was assisted by Rachel D'Avino, age 29, a behavioral therapist. Fifteen children were found by police. Fourteen who were deceased and one who was transported to Danbury Hospital and later pronounced dead. The two adults were found deceased close to the children. In all, seventeen people were killed in classroom 8. A sixteenth child survived and exited classroom 8 after the police arrived.

Classroom 10's teacher was Victoria Soto, age 27. Working with her was Anne Marie Murphy, age 52, a behavioral therapist. Five children were found, with Mrs. Murphy partially covering one child. Four of the five children were deceased. One of the five children was transported to the hospital and pronounced dead. Miss Soto was found deceased in the room near the north wall with a set of keys nearby. Nine children had run out of the room and survived. A police officer found two uninjured children in the class restroom.

In all, eighteen children and six adult school staff members were found deceased within the school. Two more children were pronounced dead at Danbury Hospital. Two other adult school staff members were injured and were treated at nearby hospitals and survived.

The two classrooms on either side of 8 and 10 were numbered 6 and 12. Classroom 6 was on the eastern side of classroom 8 and classroom 12 was on the western side of classroom 10. Staff and students hid in the class restrooms, locking the restroom doors from the inside.

---

[16] See the time line in the Appendix starting at page A84.

10

Throughout the rest of the school, staff and students hid themselves wherever they happened to be at the time they became aware of gunfire. The staff used various ways to keep the children calm, from reading to having them color or draw pictures. Those hiding in rooms closest to the shooter kept silent. Some people were able to escape out of the building prior to the police arrival and went to Sandy Hook center, nearby residences, or received rides from parents going to the school or from passersby.

One staff member heard a loud crashing noise and ran toward the front lobby. As the staff member got closer, bullet holes could be seen and gun powder smelled. Realizing what was going on, the staff member immediately called 911, turned and went back down the hall from where the staff member had come. During the incident, while staying on the line with the 911 operator, this staff member sent other staff to their rooms or had them stay in their rooms and this staff member went about locking doors. The staff member remained in the hallway on the telephone with the 911 operator until the police arrived.

**Response**

Upon the receipt of the first 911 call, law enforcement was immediately dispatched to the school. It was fewer than four minutes from the time the first 911 call was received until the first police officer arrived at SHES. It was fewer than five minutes from the time the first 911 call was received until the shooter killed himself. It was fewer than six minutes from the time the first police officer arrived on SHES property to the time the first police officer entered the school building.

Below is an abbreviated time line from the first 911 call received to the time the police entered the school building.[17]

9:35:39 - First 911 call to Newtown Police Department is received.

9:36:06 - Newtown Police Department dispatcher broadcasts that there is a shooting at Sandy Hook Elementary School.

9:37:38 - Connecticut State Police are dispatched to SHES for active shooter.

9:38:50 - CSP are informed that SHES is in lockdown.

9:39:00 - First Newtown police officer arrives behind SHES on Crestwood Rd.

9:39:13 - Two more Newtown officers arrive at SHES and park on the driveway near the ball field. Gunshots are heard in the background.

---

[17] See page A84 of the Appendix for full time line put together by the Connecticut State Police Western District Major Crime Squad. This time line was compiled from 911 calls, witness statements, police car cameras, police radio and police dispatch transmissions.

9:39:34 - Newtown officer encounters unknown male running along the east side of SHES with something in his hand.

9:40:03 - Last gunshot is heard. This is believed to be the final suicide shot from the shooter in classroom 10.

9:41:07 - Information is relayed as to the location of the last known gunshots heard within SHES, the front of the building.

9:41:24 - Newtown officer has unknown male prone on ground, starting information relay regarding possibly more than one shooter.

9:42:39 - Newtown officer calls out the license plate of the shooter's car.

9:44:47 - Newtown officers enter SHES.

9:46:23 - CSP arrive at SHES.

9:46:48 - CSP enter SHES.

As the gravity of the situation became known, local, state and federal agencies responded to the scene to assist.

From the time the unknown male was encountered by the Newtown police outside of SHES until after the staff and children were evacuated, all responding law enforcement operated under the belief that there may have been more than one shooter and acted accordingly.[18]

For example, K-9 units were brought in to search the area and officers were posted to act as lookouts to ensure the safety of those evacuating the school building. Some people were located in the areas surrounding the school as the searches and evacuations were taking place. Some of those individuals were treated initially as suspects and handled accordingly, including being handcuffed, until their identities and reason for being there could be determined.

Some of these detentions included:

1. The initial unknown male who turned out to be a parent with a cell telephone in his hand;
2. Two reporters located in the woods around SHES, who were held at gun point by Department of Energy and Environmental Protection (DEEP) police officers until their identities could be determined; and
3. A man from New York who was working in a nearby town and went to SHES after an application on his cell telephone alerted him to the situation at the school. He drove to the firehouse and went up to the school on foot. He was taken from the scene

---

[18] In fact, the possibility that there was more than one shooter remained a consideration beyond December 14, 2012. It was only after potential leads were investigated that investigators became confident that the shooter was not aided in any way by others and that no one knew of the shooter's plan prior to December 14, 2012.

of the school in handcuffs and later to Newtown Police Department. It was later determined that he did not have a connection to the shooting and had gone to SHES to see what was going on.

As noted above, on December 14, 2012, there was a concern that there may have been more than one shooter. This was based upon a number of factors:

1. The initial police encounter with the unknown male outside SHES;[19]
2. Reports by school personnel during the shooting on a 911 call of seeing someone running outside the school while the shooting was ongoing;
3. The location of two black zip up sweat jackets on the ground outside of the shooter's car;
4. The discovery of an Izhmash Saiga-12, 12 gauge shotgun and ammunition in the passenger compartment of the shooter's car. A police officer moved this shotgun and ammunition to the car's trunk for safety purposes;
5. Shell casings that were located outside of the school; and
6. The apparent sound of gunfire coming from outside of the school;

The subsequent investigation revealed there were no additional shooters based upon:

1. Searches of the area and examinations of local business security surveillance videos;
2. Persons detained revealed they were not connected to the shootings. In the case of the initial unknown male, he was identified as the parent of a student and had a cell telephone, rather than a weapon, in his hand;
3. Witness interviews which indicated that no witness saw anyone other than the shooter, with a firearm;
4. Witness interviews in which it was determined that a number of SHES staff had escaped from the school through a window and had been running outside the school building during the shootings;
5. The shotgun located in the shooter's car had been purchased by the shooter's mother previously;
6. The two sweat jackets were both C-Sport brand black zip up hooded sweat jackets with no size listed and were located immediately outside the shooter's car;[20] Both are believed to have been brought there by the shooter;[21]
7. The live shotgun shells (other than the one found on the shooter and the ones found in the shooter's car) that were located inside and outside of the school were in locations where first responders had been. Additionally, there were first responders who

---

[19] The man was determined to be the parent of one of the school's children and the item in his hand was a cell telephone.

[20] See the Appendix at page A174.

[21] A parent who arrived at SHES as the shooting was taking place saw the shooter's car parked in front of the school with the passenger side door open and the two sweat jackets on the ground near the car. To the parent, the jackets looked like two black blankets on the ground.

reported missing live shotgun rounds. Moreover, the shells were found in locations where there had not been reported sightings of any non-law enforcement individuals;

8. There were no expended shotgun shells found in the actual crime scene nor were any expended 12 gauge shotgun pellets or slugs recovered;

9. The only expended casings located outside of the school building were 5.56 mm casings located just outside the school's front entrance, consistent with the shooter's entry into the school; and

10. The officer who heard what he believed to be outside gunfire was in a position to have heard the shooter's gunfire coming from window openings in the classroom in which the shooter was firing.

Stopping the active shooter was the first priority. Once that occurred, the location and treatment of the victims, the search for additional shooters, and the safe evacuation of the school were of primary importance.[22] The collection of evidence and the preservation and documentation of the crime scene, while important, came second.

Two command centers were set up, one at the firehouse on Riverside Road and the other at Newtown's Emergency Operations Center, located on the Newtown Fairfield Hills Campus. In the week immediately after the shootings, services to victims' families and victims, as well as support to the investigators in the school were handled out of the firehouse. All other aspects of the investigation not related to the school itself were run out of the Emergency Operations Center.

Investigation responsibilities were handled as follows:[23]

**Connecticut State Police (CSP)**

> **CSP-Western District Major Crime (WDMC)** squad was the lead CSP unit for the entire investigation and acted as the coordinating law enforcement agency for other agencies and units of the CSP.[24] The van unit processed the interior of SHES.

> **CSP-Central District Major Crime (CDMC)** squad van unit processed the exterior of SHES, including the shooter's car, and established the temporary morgue[25] with the

---

[22] One of the difficulties encountered was the inability of state police radios to operate within SHES.

[23] This report does not include a listing of all of the law-enforcement and non-law enforcement service providers and their actions. In the days and weeks that followed the tragedy, local, state and federal agencies provided help to the Town of Newtown and its families through counseling, funeral protection, traffic control, handling bomb threats as well as many other services. Additionally, the CSP set up an invaluable law enforcement liaison program with the families of the deceased victims in which a state or local police officer was specifically assigned to the family of a deceased victim to provide communication and protection in the days and weeks that followed December 14th.

[24] WDMC Squad and Van, as the lead CSP unit, over the course of the week that followed was there for seven days processing the interior scene, the shooter and victims' personal effects, including assisting with the packing and removal of furniture from the immediate scene.

[25] The Department of Public Health provided and set up the portable tent used for the temporary morgue.

OCME to identify and document the decedents prior to their being moved to the OCME in Farmington.[26] CDMC also attended the autopsies at the OCME and did a secondary search of 36 Yogananda Street, as well as photographing doors and locks in SHES.

**Eastern District Major Crime (EDMC)** squad processed the scene at 36 Yogananda Street and were the investigators for the shooting of Nancy Lanza, the shooter's mother.

**CSP-Emergency Services Unit (ESU), Tactical Teams**, were assigned to both SHES and 36 Yogananda Street to handle the clearing of the scenes and rendering them safe.[27]

**CSP – Troop A, Southbury and CSP from other troops and units,** in addition to being first responders, worked to secure the scene and worked with WDMC and the OCME.

**Computer Crimes and Electronic Evidence Unit** handled the seizure and examination of additional electronic evidence from 36 Yogananda Street together with EDMC, CDMC and WDMC.

**CSP - Collision, Analysis and Reconstruction Squad (CARS)** was assigned to produce the sketch maps for both the interior and exterior of the school.

**CSP** - On December 14, 2012, virtually every aspect of the CSP was engaged in the response to SHES and 36 Yogananda Street. For example, included in the first responders were troopers and detectives, not only from Troop A in Southbury, but other troops and units as well, including the Statewide Narcotics Task Force.

**Department of Energy and Environmental Protection (DEEP)** provided first responders at SHES.

**Forensic Science Laboratory, Division of Scientific Services, Department of Emergency Services and Public Protection (DESPP)** examined items seized and collected from SHES and 36 Yogananda Street.

**Office of the Chief Medical Examiner (OCME)** was responsible for investigating the cause and manner of the deaths involved in this case and worked with the CSP in setting up the temporary morgue at SHES that was used to identify and document the deceased prior to their being moved to Farmington.

**Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)** in addition to responding to both scenes, worked on the firearms aspect of the investigation.

---

[26] WDMC and CDMC personnel were also assigned and paired with the FBI to conduct interviews and neighborhood canvasses as well as assist with the identification of victims, investigate a report of another shooter at a hospital, as well as prepare search warrants and attend autopsies.

[27] There were numerous law enforcement agencies that worked on the clearing of SHES and the protection of those who were doing the clearing.

**Federal Bureau of Investigation (FBI)** – in addition to responding to the scenes, handled interviewing of witnesses and investigation both at a local level and on a national level. The Tactical Team assisted with the clearing of the school. The Behavioral Analysis Unit (BAU), as part of the search warrant execution for 36 Yogananda Street, was provided with materials for review. They provided their expertise in the preparation of witness interviews. The Victim Assistance Unit worked with victims' families, victims and witnesses.

**United States Attorney's Office** was stationed at the Emergency Operations Center overseeing the investigation into the possible commission of federal crimes and the issuance of federal legal process, as well as coordinating the various federal agencies involved in assisting with the state investigation.

**United States Marshals Service, Technical Operations Group** provided technical and investigation assistance.

**United States Postal Service** looked for mail that may have been relevant to the investigation.

**Municipal Police Departments** from around the state assisted throughout the Town of Newtown, including being first responders at SHES, handling calls in town and the tremendous inflow of media and visitors to the Town in the weeks after December 14, 2012.

**Newtown Police Department** in addition to being first responders, worked to secure the scene and assisted WDMC.

**Office of the State's Attorney, Judicial District of Danbury (SAO)** – oversaw the state investigation, working with the Connecticut State Police. Together with the assistance of the Office of the Chief State's Attorney, the SAO was stationed at the Emergency Operations Center starting December 14, 2012, and oversaw the legal issues and state aspect of the investigation including search warrant review, child witness issues, working with the federal authorities, etc.

## SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION

On the afternoon of December 14, 2012, the WDMC and CDMC van units began documenting the crime scene and collecting evidence. The units could not begin this process until the scene was declared safe. The scene processing took seven days.

The scene was thoroughly processed, with the WDMC van unit handling the interior of SHES and the CDMC van unit covering the exterior. This processing included extensive written documentation as well as taking videos and thousands of photographs and measurements. In addition to the recovery of evidence, bullet trajectories were analyzed and documented.

My description of the scene processing starts with the front entrance and moves into the school building itself. This does not necessarily reflect the actual order in which the crime scene was processed. Many descriptions come directly from the investigation reports but are not in quotation marks to ease reading.

16

The conditions of windows and doors were documented, but some may have been disturbed by police and emergency personnel during the emergency response and protective sweep of the building. Similarly, other items of evidence, such as shell casings, may not have been found in their original positions because, as mentioned previously, the first priority was to locate and neutralize any active shooter, followed by the location and treatment of the victims, the search for additional shooters and the safe evacuation of the school. Only then could evidence collection begin.

**Interior**

Sandy Hook Elementary School was[28] a one story brick public school building of approximately 66,000 square feet, built in 1954. The building was on Dickinson Drive off of Riverside Road in the Sandy Hook section of Newtown. The front of the building sat in a magnetic northeast direction, but will be considered north for the purposes of this report. See the diagram at page 19.

SHES was rectangular in shape with four hallways in the main building and portable classrooms attached to the rear (south) side which were accessed from the south side of the main building. Classrooms on the exterior walls had even numbers and interior classrooms had odd numbers.

- **Main entrance**

The main entrance to the school was located next to the large glass window that the shooter shot out to enter the school. A patio area was just before the entrance doors. The entrance to the lobby consisted of two sets of locked full glass doors that opened outwardly using a pull handle. They were separated by a small vestibule. The doors were secured with an electronic locking mechanism. The doors could be opened from the inside with a horizontal push bar across the middle of the door.

The broken area of the window that the shooter shot out measured approximately 35.33 inches wide and 42.5 inches high.[29]

The exterior of the main entrance door way had a call box, buzzer system with a video camera. The call box was installed in 2005. The video camera did not record, but the video could be viewed live on three monitoring systems on the secretaries' desks in the main office, with no recording capabilities. The electronic unlocking of the front doors was done by using a "key button" on any of the three monitoring systems.

Glass shards were located just before and to the side of the outside entrance doors on the patio and plantings in the area and also on the floor in the lobby.[30] Eight expended brass colored 5.56

---

[28] SHES was demolished in October and November 2013.

[29] See the Appendix starting at page A168.

[30] See the Appendix at page A169 and A171.

mm bullet casings stamped with "S&B 60 5.56x45"[31] were located in the area outside the broken window and front entrance doors. These were seized.

The front entrance led into the school's lobby. The lobby measured approximately 28 feet north to south and 36 feet east to west. The southeast corner of the lobby allowed open access to the north hallway of the school. Sixteen brass colored expended 5.56 mm bullet casings were located on the floor within the lobby area and were seized. Furniture in the lobby area had holes consistent with having been struck by a bullet. There were eleven damaged areas consistent with bullet strikes in the lobby.

- **North Hallway**

The hallway on the north side of the building, where the shootings occurred, ran east to west and contained the lobby and main office, inside of which was the nurse's office. The hallway also contained rooms numbered 1-10, 11A-5 and 12. The bulk of the scene processing occurred in this area. See the diagram on page 19.

The ceiling as in the lobby was 8 feet high. And the width of the hall was 8.5 feet. The even numbered rooms were on the north side of the hallway with classroom 12 being the western most classroom and classroom 2 being the eastern most. The odd numbered rooms were on the south side of the hallway with the main office being the western most room and classroom 1 being the eastern most. East of the main office was a closet labeled "11A-5 storage" and the east of the closet was a conference room identified as Room 9.

The doors in the hallway all locked from the outside with a key. The interior door handles had no locking mechanism. All of the doors opened outwardly toward the hallway. All doors were solid wood with a circular window in the upper half of the door.[32]

All classrooms in the north hallway had a restroom and a closet. The restrooms were uniformly designed, approximately 4 feet 7 inches by 3 feet 6 inches with a solid wood door. The door of each restroom opened inward and away from the toilet. Each restroom door had a knob push button lock on the inside handle and a key lock on the outside handle.[33] The conference room did not have a restroom.

Classrooms in the north hallway 12 and 10, 8 and 6, 6 and 4, and 3 and 5 respectively had an interior door that was shared by the two classrooms.

---

[31] The ammunition used by the shooter in the Bushmaster rifle has been described as .223 caliber, 5.56 mm NATO and 5.56 X 45. All of these descriptions are for similar bullets (cartridges) that can be fired from the Bushmaster rifle. The ammunition that the shooter used in this case for the Bushmaster bore the stamp "S&B 60 5.56 X 45" on the base of the cartridges and will be referred to as a 5.56 mm round. The distinction between a .223 cal. and a 5.56 mm is not relevant to this report.

[32] See the Appendix at page A178 for an example of classroom door locks.

[33] See the Appendix at page A177 for an example of restroom door locks.



The bodies of Mrs. Hochsprung and Mrs. Sherlach were located in the western-most area of the north hallway, near the lobby. One brass colored expended 5.56 mm casing was located and seized from the floor in the area of Mrs. Hochsprung and Mrs. Sherlach.[34] In addition to the 5.56 mm ballistics, one 10 mm shell casing was found in the north hallway and was later identified as having been fired from the Glock 20, 10 mm pistol found near the shooter.

-   **Conference Room (Room 9)**

Conference room 9 was on the south side of the north hallway on the opposite side of the hallway and approximately 16 feet east of the door for classroom 12. The room had a telephone mounted in the center of the west wall.

-   **Classroom 12**

Classroom 12 was located on the north side of the north hallway and was the first classroom east of the front lobby. The classroom door was located 23 feet east of the lobby. The window to the door was covered on the hallway side with dark colored paper that was there from a previous lockdown drill.

-   **Classroom 10**

Classroom 10 was located on the north side of the north hallway and was the second classroom east of the front lobby. The hallway door was approximately 27 feet east of classroom 12. The window was not completely covered, but did have a decoration over part of the inside of the window.

The room measured 27 feet east to west and 30 feet north to south with carpeted floors and painted cinder block walls. There were large windows across the north wall, which provided a view into the front (north) parking lot. Fluorescent ceiling lights turned on automatically when the room was entered. As mentioned previously, there was a restroom in the room and a closet. This closet door had no lock. The door that provided access to classroom 12 was on the center of the west wall. This had a key lock on both sides and the door was unlocked. There was a telephone mounted on the south side of the east wall north of the closet. An Emergency Response Packet Plan was hanging on the south wall. The packet was above a map depicting the emergency evacuation route for this classroom.

The classroom door that opened into the north hallway could only be locked with a key from the outside (hallway side). The door was unlocked with no signs of forced entry.

In the window area for classroom 10 there were no less than nine holes consistent with being bullet holes. Investigators conducted a trajectory analysis of the shots that went through the window area of classroom 10. No determination could be made as to whether the shots through the window area were intended for the outside of the building. In other words, it could not be determined whether the shooter, while in classroom 10, had intentionally fired at something or

---

[34] See the Appendix starting at page A130 for a description of the ballistics evidence from the north hallway.

someone outside of the building. There was no indication that any shots through the window area of classroom 10 came from outside of the school. All of the evidence indicates that shots went out of the window area of classroom 10 and into the parking area north of the school.

Classroom 10 evidence is further described below.

- **Classroom 8**

Classroom 8 was located on the north side of the north hallway and was the third classroom east of the front lobby, with its entrance door approximately 27 feet east of classroom 10. As with the others, its classroom door opened out into the hallway and could only be locked from the hallway side with a key. The window was not covered. The classroom door to the hallway was unlocked with no signs of forced entry.

The room dimensions and construction were similar to those of classrooms 10 and 12. There was also a restroom in this classroom. The closet door in classroom 8 had no locking device. There were also large glass windows across the north wall providing a view into the front (north) parking lot of the school. There was a wall telephone in the room on the south side of the east wall, north of the closet. An "Emergency Response Plan" packet was hanging on the south wall adjacent to the east side of the entrance door. This packet was above a map depicting the emergency evacuation route for the classroom.

The door that connected into classroom 6 was on the north side of the east wall, had key locks on both sides of the door. The door was unlocked.

Ballistic evidence located in classroom 8 is described in the Appendix at page A134, which includes a total of twenty-four rounds of 5.56 mm ammunition found, of which ten rounds were in one PMAG 30 magazine, thirteen rounds were in another such magazine and one live round was on the floor. There was a third empty PMAG 30 magazine seized. There were a total of eighty expended 5.56 mm casings seized from classroom 8.

- **Classrooms 6 and 4**

Located on the floor of classroom 6 was one live round "Federal Tactical" 12 gauge shotgun slug shell (Exhibit 49). This shotgun shell was made of clear-like plastic and was different in color from the shotgun shell that was seized on the shooter's person. On the floor of classroom 4 was a blue colored 12 gauge slug shotgun shell with the word "Federal Premium Tactical Rifled slug" stamped on the side and "12 GA Made in USA stamped on the head of the shell (Exhibit 99). This shotgun shell was made of a blue colored plastic and also was different in color from the shotgun shell that was seized from the shooter's person.

As mentioned previously, the loose shotgun shells not found on the shooter were in locations where first responders had been and had reported missing shotgun shells. Additionally, there were no witness reports of any persons being seen with firearms other than first responders in those locations, there were no expended shotgun shell casings or projectiles recovered at the scene and the live shotgun shell on the shooter's person and those recovered from his car did not

match any of those recovered from the three locations. No shotgun was recovered from the school. It is believed that these live shells were dropped by first responders.

- **Shooter**

Responding police officers found the shooter in classroom 10 northwest of the hallway entrance dead from a self-inflicted gunshot wound to the head. He was wearing a pale green pocket vest over a black polo style short sleeve shirt over a black t-shirt. He had yellow colored earplugs in each ear. He was wearing black cargo pocket pants, black socks, black sneakers, a black canvas belt and black fingerless gloves on each hand. He had an empty camouflage drop holster that was affixed to his right thigh.

After all of the victims were removed from the school, the shooter's body was removed once all firearms and ballistic evidence were recovered from his person. The body was moved to the OCME on December 15, 2012.

- *Weapons on Shooter and Ammunition in Classroom 10*

The weapons on the shooter together with a description of items seized related to the shooting are contained in the Appendix starting at page A136. On the shooter's person was a loaded semi-automatic Sig Sauer P226, 9 mm pistol and additional ammunition. Located near the shooter was a partially loaded Glock 20, 10 mm semi-automatic pistol that appeared to be jammed.

A Bushmaster Model XM15-E2S rifle was located some distance away from the shooter. The rifle's shoulder strap was attached in the front but disconnected at the butt of the rifle. The disconnected rear portion was the result of a failed nut attachment. It is unknown if the nut failed while the rifle was being used or as the result of being dropped or thrown to the floor.

The Bushmaster rifle was found with the safety in the "fire" position. There was one live 5.56 mm round in the chamber and one PMAG 30 magazine in the magazine well. The magazine contained fourteen live 5.56 mm rounds of ammunition. The rifle did not appear to have malfunctioned when observed by the WDMC van unit, but a CSP-ESU report described the weapon as appearing to have jammed. When tested later, the rifle functioned properly.

Two empty PMAG 30 magazines that were duct-taped together in a tactical configuration and one live 5.56 mm round were found near the rifle.

Officers found two-hundred-fifty-three live rounds on the shooter's body: one-hundred-sixteen 9 mm rounds, seventy-five rounds of 10 mm, sixty-one rounds of 5.56 mm and one 12 gauge shotgun shell. Officers also seized forty-six 5.56 mm live rounds. This consisted of fifteen from the rifle, one from the floor and thirty from the magazine under the body of the shooter, as well as thirteen 10 mm live rounds (nine from the Glock and four from the floor). There were forty-nine expended 5.56 mm casings seized and one 10 mm casing from classroom 10. Total live rounds seized were three-hundred-twelve and total expended casings seized from classroom 10 were fifty.

**Exterior**

CDMC processed the exterior of SHES.

- **Shooter's Car**

The shooter's car was found parked in front of the school, west of the front entrance, next to a "No Parking" zone. It was a black 2010 Honda Civic with Connecticut registration 872YEO. The car was registered to his mother, Nancy Lanza, but had been purchased for him.

Recovered from the car was an Izhmash Saiga-12, 12 gauge shotgun with two magazines containing a total of twenty rounds of ammunition.[35] The shotgun and ammunition were originally seen in the passenger compartment of the car and were moved by police to the car's trunk for safekeeping during the initial response and evacuation.

- **Parking Lot**

There were a number of cars parked in the north parking lot of SHES. Three of these cars were struck by gunfire. None of the cars struck belonged to law enforcement. A total of five strikes to those three cars were identified as having come from classroom 10. It could not be determined whether these shots were intended to go outside of the classroom.

Also found in the north parking lot, was a shotgun shell that was dropped by a first responder.


## SANDY HOOK ELEMENTARY SCHOOL – AUTOPSY INFORMATION

Deceased victims were removed from the school building to a large military-style tent located in the north parking lot, near the front of the school. The Office of the Chief Medical Examiner sought to make positive identification of the victims through photos, school records and personal and clothing descriptions.

On Saturday, December 15, 2012, all of the victims were transported to the OCME in Farmington for autopsies; autopsies were performed the same day. The cause of death for all of the victims was determined to have been gunshot wounds; the manner of death was determined to have been homicide.[36]

Evidence collected during the autopsies was turned over to CDMC and forwarded to the Division of Scientific Services for examination. The Evidence Examination section of this report contains a summary of the results.

---

[35] A search warrant was obtained for the car. The search warrant return originally reported the amount of ammunition as seventy rounds. This was corrected to twenty rounds and the search warrant return was amended.

[36] Our law defines homicide as the killing of one human being by another human being.

## 36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE

### Incident

Sometime on the morning of December 14, 2012, before 9:30 a.m., the shooter shot and killed his mother, Nancy Lanza, in her bed at 36 Yogananda Street, Newtown. The weapon used was a .22 caliber Savage Mark II rifle. Someone in the area reported hearing "two or three" gunshots in the neighborhood between 8:00 a.m. and 9:00 a.m. That person thought them to be from hunters, though the person indicated the shots did "sound unusually close."

Between 9:30 a.m. and 10:00 a.m. there was a delivery made to the house. The delivery driver saw no one, did not see any vehicles in the driveway and the garage door was closed. A delivery slip was left and the driver continued on.

The mother was found by police dead in her bed when they entered the house. The rifle was found on the floor next to the bed.

### Response

Once it was determined that the shooter's car was registered to his mother at 36 Yogananda Street, Newtown, Connecticut, the Newtown police went to the house and evacuated the surrounding homes. The CSP-ESU came to the scene to clear the residence of potential hazards, such as booby traps or trip wires.

## 36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION

After the body of the shooter's mother was found and the scene declared safe, the process of obtaining search warrants for the house began, with the first warrant being reviewed and signed by a judge of the Superior Court at 5:29 p.m. on December 14, 2012, at the Emergency Operations Center.[37]

Additional search warrants were approved and issued as the search disclosed additional evidence. The investigation of the shooter's mother's killing and the scene processing was done by EDMC and the search for evidence at 36 Yogananda Street related to the shootings at SHES was investigated by both CDMC and WDMC. A list of the items seized from the home is contained in the search warrant returns in the Appendix, with some descriptions in the "Digital Image Report," starting at page A188 in the Appendix.[38]

---

[37] The Judicial Branch and the Honorable John F. Blawie are to be commended for their response to the SHES shootings. Judge Blawie was available at the Emergency Operations Center to review search warrants.

[38] A description of the home is also in the Appendix starting at page A181.

The weapon used to kill Nancy Lanza, the .22 cal. Savage Mark II rifle, was found near her bed and seized. In the chamber of the rifle was a spent .22 cal. shell casing and three live rounds were in the magazine. Three other spent .22 cal. shell casings were found in the room and seized.

The shooter's second floor bedroom windows were taped over with black trash bags. The second floor computer room also had its windows covered. There, investigators found a computer hard drive that appeared to have been intentionally damaged. To date, because of the extensive damage, forensic experts have not yet been able to recover any information from that hard drive.

In a typical criminal case, the investigation would remain open when potentially important evidence was still being examined. Given the improbability of any information being recovered from the damaged hard drive, this outstanding piece of evidence is not preventing the closure of this case now. Should any relevant information related to the existence of any accessory or co-conspirator be obtained from the hard drive, the case will be reopened.

Investigators found a large number of firearms and related items in the home. All firearms involved in these incidents were legally purchased by the shooter's mother over the years. The home also contained many edged weapons, knives, swords, spears, etc. A prescription bottle in the shooter's name for acetaminophen with codeine was found in the mother's bathroom, which was part of the master bedroom.

During the search of 36 Yogananda Street, a global positioning system (GPS) device was located in the shooter's room with various routes in the memory from April 25, 2012, through December 13, 2012. Investigation revealed that the GPS was purchased for the shooter.

The routes taken indicate a number of trips from 36 Yogananda Street to the area of a local theater where a commercial version of the game "Dance Dance Revolution" is located. Over that time period, trips were made that took the driver in the vicinity of some schools in Newtown, including SHES. On December 13, 2012, a trip was recorded from 2:09 p.m. to 2:32 p.m. starting and ending on Yogananda Street and driving in Sandy Hook, which is in the area of SHES, though the route does not indicate the shooter drove up to the school.

Numerous video games were located in the basement computer/gaming area. The list of video games includes, but is not limited to:

-"Left for Dead"          -"Grand Theft Auto"
-"Metal Gear Solid"       -"Shin Megami Tensei"
-"Dead Rising"            -"Dynasty Warriors"
-"Half Life"              -"Vice City"
-"Battlefield"            -"Team Fortress"
-"Call of Duty"           -"Doom"

Other items found and noted for this report are:

- A Christmas check from the mother to the shooter to purchase a CZ 83 firearm;[39]
- A New York Times article from February 18, 2008, regarding the school shooting at Northern Illinois University;
- Three photographs of what appear to be a dead human, covered in blood and wrapped in plastic;
- The book *Amish Grace: How Forgiveness Transcended Tragedy*, Jossey-Bass, 2007, by Donald B. Kraybill, Steven Nolt and David Weaver-Zercher;[40] and
- Photocopied newspaper articles from 1891 pertaining to the shooting of school children

While the vast majority of persons interviewed had no explanation for the shooter's actions, a review of electronic evidence or digital media that appeared to belong to the shooter, revealed that the shooter had a preoccupation with mass shootings, in particular the Columbine shootings[41] and a strong interest in firearms. For example, there was a spreadsheet with mass murders over the years listing information about each shooting.

The review of the electronic evidence also found many things that are on a typical hard drive or memory card that would probably have no relevance to the investigation either because of creation date or subject matter. That being said, the following selected topics or items were found within the digital evidence seized:

- Bookmarks pertaining to firearms, military, politics, mass murder, video games, music, books, Army Ranger, computers and programs, ammunition, candy, economic books
- Web page design folders
- Two videos showing suicide by gunshot
- Commercial movies depicting mass shootings
- The computer game titled "School Shooting" where the player controls a character who enters a school and shoots at students
- Screen shots (172) of the online game "Combat Arms"
- "Dance Dance Revolution" (DDR) game screen shots
- Videos of shooter playing DDR
- Images of the shooter holding a handgun to his head
- Images of the shooter holding a rifle to his head
- Five-second video (dramatization) depicting children being shot
- Images of shooter with a rifle, shotgun and numerous magazines in his pockets
- Documents on weapons and magazine capacity

---

[39] The return for the December 16, 2012, search warrant indicates that Exhibit #612 was a check for a "C183." A closer inspection of the check makes it clear that "CZ83" is written. A CZ 83 is a type of pistol. The check reads "Christmas Day" in the check's date section.

[40] In October 2006 a gunman entered a one-room Amish school in Pennsylvania, killed five children and leaving others wounded.

[41] The Columbine High School shootings occurred in April 1999 at Columbine High School in Colorado. Two shooters, in a planned attack, killed a number of students and a teacher and injured others.

- A document written showing the prerequisites for a mass murder spreadsheet
- A spreadsheet listing mass murders by name and information about the incident
- Materials regarding the topic of pedophilia and advocating for rights for pedophiles (not child pornography)[42]
- Large amount of materials relating to Columbine shootings and documents on mass murders
- Large amount of materials on firearms
- Comedy videos
- Music
- Images of hamsters
- Images of Lego creations


## 36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION

The OCME performed an autopsy on the body of Nancy Lanza, age 52, on December 16, 2012, at the OCME. The cause of death was determined to be multiple gunshots to the head. The manner of death was homicide.


## SHOOTER - AUTOPSY INFORMATION

The autopsy of the shooter was conducted on December 16, 2012, at the OCME. The shooter, age 20, was 72 inches tall and weighed 112 pounds. No drugs were found in the shooter's system. The cause of death was determined to be a gunshot wound to the head. The manner of death was suicide.


## INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS

The investigation sought to determine if the shooter was aided by or had conspired with anyone to commit these crimes. As detailed above, none of the persons found in the vicinity of SHES on December 14, 2012, played any role in the shootings. Most were attempting to escape the area; others were responding to the school after learning of the shootings. None had any association with the shooter.

Investigators then sought to determine if anyone had conspired with or aided the shooter before the shootings. To that end, investigators examined social contacts, writings, e-mails, internet blogs, telephone records and his general internet presence. One of the internet blogs on which the shooter posted focused on mass shootings and in particular the Columbine shootings. The shooter also exchanged e-mails with others who were interested in the topic of mass shootings. None of these communications, however, related to SHES or in any way suggested that the shooter intended to commit a mass shooting. Thus, the evidence as developed to date, does not demonstrate that any of those with whom he communicated conspired with the shooter or criminally aided and abetted him in committing the murders on December 14, 2012.

---

[42] No child pornography was seen on any of the digital media.

## EVENTS AND BACKGROUND INFORMATION LEADING UP TO DECEMBER 14, 2012

### Recent Background Information

As of December 14, 2012, the shooter and his mother lived at 36 Yogananda Street. This had been the family home for years, although only the shooter and his mother had resided in the house for an extended time.

Both the shooter's and his mother's bedrooms were on the second floor; the mother occupied the master bedroom.

In November 2012, the mother sought to buy the shooter another computer or parts for a computer for the shooter to build one himself. She was concerned about him and said that he hadn't gone anywhere in three months and would only communicate with her by e-mail, though they were living in the same house. The mother never expressed fear of the shooter, for her own safety or that of anyone else.

The mother said that she had plans to sell her home in Newtown and move to either Washington state or North Carolina. She reportedly had told the shooter of this plan and he apparently stated that he wanted to move to Washington. The intention was for the shooter to go to a special school in Washington or get a computer job in North Carolina. In order to effectuate the move, the mother planned to purchase a recreational vehicle (RV) to facilitate the showing and sale of the house and the eventual move to another state. The RV would provide the shooter with a place to sleep as he would not sleep in a hotel. In fact, during Hurricane Sandy in October 2012, with no power in the house, the shooter refused to leave the home and go to a hotel.

The mother wanted to buy the shooter a CZ 83 pistol for Christmas and had prepared a check for that purchase to give the shooter.

On December 10, 2012, the mother indicated to a friend that the shooter had bumped his head badly, there was some bleeding, but he was okay. This appeared to have occurred at 5:30 a.m. She then prepared for her trip to New Hampshire and cooked for the shooter before she left, leaving him his favorites.

During the week of December 10, 2012, the shooter's mother was out of town in New Hampshire. She arrived home Thursday evening December 13, 2012, at approximately 10:00 p.m.

As mentioned above, the GPS found in the home, revealed that on Thursday, December 13, 2012, the device was used. It recorded a trip from and back to 36 Yogananda Street with a route in the Sandy Hook area of Newtown between 2:09 p.m. and 2:32 p.m. The GPS did not report that the driver drove up to SHES. Presumably this was the shooter driving the black Honda Civic as this would have been the only car available to the shooter and it was reportedly his, having been purchased for him.

## General Background Information

Investigators conducted many interviews with persons who knew the shooter and members of his family. As explained above, they did so principally to determine if anyone had conspired with the shooter or aided his crimes. But they also sought to ascertain what might have motivated him to murder children and their teachers and his mother.

The first question was whether the shooter had a reason specifically to target SHES or any student, teacher, or employee. No evidence suggests that he did. In fact, as best as can be determined, the shooter had no prior contact with anyone in the school that day. And, apart from having attended the school as a child, he appears to have had no continuing involvement with SHES.

More generally, those who knew the shooter describe him in contradictory ways. He was undoubtedly afflicted with mental health problems; yet despite a fascination with mass shootings and firearms, he displayed no aggressive or threatening tendencies. In some contexts he was viewed as having above-average intelligence; in others below-average. Some recalled that the shooter had been bullied; but others – including many teachers – saw nothing of the sort. With some people he could talk with them and be humorous; but many others saw the shooter as unemotional, distant, and remote.

What follows are some observations that investigators developed in attempting to determine the shooter's motive.

## Parents

The shooter's mother and father Peter Lanza had been married to each other. They moved from New Hampshire to the Sandy Hook section of Newtown in 1998. In addition to the shooter, they had another son Ryan Lanza, who was four years older than the shooter.[43] In 2001 the shooter's parents separated. The children continued to reside with the mother. The parents subsequently divorced. The father remarried in 2011; the mother never remarried.

After college, the brother moved out of state. He reached out to the shooter a few times but the shooter did not respond. As of December 14, 2012, the older brother had not had contact with the shooter since 2010. The brother believed that the shooter and his mother had a close relationship. After his older brother left for college, the shooter reportedly became interested in firearms and at one point considered joining the military.

Both the shooter's mother and father indicated that the shooter was bullied growing up. The father indicated that it was not excessive and concerned his social awkwardness and physical gait. As expanded upon in the Education and Mental Health section below, other witnesses did not recall the shooter being overtly bullied. Nonetheless, the shooter appears to have had few friends growing up.

---

[43] Both the shooter's father and brother cooperated fully with the investigation.

29

The shooter's father saw him regularly until he turned 18. They would go hiking, play video games and other activities. They went shooting twice. The shooter had a cell phone but never used it. Calls all went to voice mail. His father would just e-mail him when he wanted to reach him.

The shooter's relationship with his father deteriorated in the last quarter of 2010 and the father last saw the shooter in that year. After that the father would reach out to the shooter by mail or through e-mails regularly, asking him to join him at various places for different activities. The shooter stopped responding at some point prior to December 2012.

One witness who knew the shooter in 2011 and 2012 said that he rarely mentioned his father or his brother; though he would mention briefly something he did with his father or brother in the past.

While it appears that the shooter's mother did volunteer at SHES, it was when the shooter was a student. There is no indication that she volunteered there in recent years.

The mother took care of all of the shooter's needs. The mother indicated that she did not work because of her son's condition. She worried about what would happen to the shooter if anything happened to her.

One witness indicated that the shooter did not have an emotional connection to his mother. Recently when his mother asked him if he would feel bad if anything happened to her, he replied, "No." Others, however, have indicated that they thought the shooter was close to his mother and she was the only person to whom the shooter would talk.

A person who knew the shooter in 2011 and 2012 said the shooter described his relationship with his mother as strained because the shooter said her behavior was not rational.

The shooter was particular about the food that he ate and its arrangement on a plate in relation to other foods on the plate. Certain types of dishware could not be used for particular foods. The mother would shop for him and cook to the shooter's specifications, though sometimes he would cook for himself. Reportedly the shooter did not drink alcohol, take drugs, prescription or otherwise, and hated the thought of doing any of those things.

The mother did the shooter's laundry on a daily basis as the shooter often changed clothing during the day. She was not allowed in the shooter's room, however, even to clean. No one was allowed in his room.

The shooter disliked birthdays, Christmas and holidays. He would not allow his mother to put up a Christmas tree. The mother explained it by saying that shooter had no emotions or feelings. The mother also got rid of a cat because the shooter did not want it in the house.

**People Outside the Family**

When the shooter had his hair cut, he did not like to be touched and did not like the sound of clippers, so they were not used much. He would sit with his hands in his lap and always look down, giving one word answers if the cutter tried to engage him in conversation.

Those who worked on the property at 36 Yogananda Street never entered the home. They spoke with the mother outside in the yard or at the bottom of driveway. They were instructed never to ring the doorbell and to make prior arrangements before using power equipment as her son had issues with loud noises. The shooter was observed at times coming and going from the residence.

There were a number of people who knew the mother over the years, some fairly well, who had never met the shooter – although were aware of his existence – and had never been inside her residence.

**Shooter's Interests**

Over the years his hobbies included building computers,[44] writing poetry and hiking. The shooter worked briefly at a computer repair shop. When he was younger he played the saxophone. The shooter had a cell phone but never used it.

Shooting was a pastime in which the family engaged. Over the years the shooter enjoyed target shooting and would go to a range with his brother and mother. The mother had grown up with firearms and had a pistol permit. The shooter did not. Both the mother and the shooter took National Rifle Association (NRA) safety courses. The mother thought it was good to learn responsibility for guns. Both would shoot pistols and rifles at a local range and the shooter was described as quiet and polite.

He played video games often, both solo at home and online. They could be described as both violent and non-violent. One person described the shooter as spending the majority of his time playing non-violent video games all day, with his favorite at one point being "Super Mario Brothers."

Another said he used the computer to play games online and communicate. Sometimes the shooter would not respond to e-mails and be unavailable for a couple of weeks. The shooter explained that he was "moping around." The shooter frequently formatted the hard drive of his computer as a way of "staying off the grid" and minimizing his internet trace.

Initially the shooter did not drive but he eventually got a driver's license and the Honda was purchased for him. The shooter was issued a driver's license in July 2010.

The shooter liked to play a game called "Dance Dance Revolution" (DDR), which is a music video game in which the player stands on a platform, watches a video screen and moves his feet

---

[44] By all accounts the shooter was extremely computer savvy.

31

as directed by the video. A home version of this was seen and photographed in the shooter's home.[45] Several videos of him playing DDR were found on digital media taken from the home.

The GPS found in the home and reportedly belonging to the shooter indicated that he regularly went to the area of a theater that had a commercial version of the DDR game in the lobby. In 2011 and up until a month before December 14, 2012, the shooter went to the theater and played the game. He went most every Friday through Sunday and played the game for four to ten hours.

The shooter was specific about the clothes he wore. He typically wore the same clothing when at the theater: a grey hoodie and slacks. After a snowstorm in 2011 the shooter was not seen at the theater until about February 2012. At that time he seemed more anti-social and no longer played DDR with others.

An acquaintance of the shooter from 2011 to June 2012 said that the shooter and the acquaintance played DDR quite a bit. They would play the game and occasionally see a movie. They did not play first person shooter games at the theater.[46] The shooter had stamina for DDR and never appeared winded unless really exhausted.

The acquaintance said the shooter seemed to enjoy nature and mentioned the possibility of going hiking more than once. The shooter was capable of laughing, smiling and making jokes, though always in a dry fashion. The shooter never mentioned being bullied while growing up. Topics of conversation included world and current events, and included chimpanzee society and how they interacted.

In the course of their conversations, the shooter indicated that he had an interest in mass murders and serial killing. They never spent a lot of time discussing them, but it would be a topic of conversation.[47] There were no conversations about weapons or shooting at a gun range.

**Shooter – Education and Mental Health**

The following background information is compiled from a variety of sources and may at times appear to be inconsistent. This is a function of the differing perspectives of those interviewed. The information also varied based upon the time period during which the witness knew or associated with the shooter or his family.

The shooter went through the Newtown public school system, though part of seventh grade and part of eighth grade were done at St. Rose of Lima School in Newtown.

---

[45] See the Appendix at page A197.

[46] Online first person shooter games that the shooter did play as determined by a search of the digital media in the home, "Combat Arms" and "World of Warcraft" were played on the computer using a keyboard to control the player.

[47] The shooter also wrote about all of these topics. Other topics of discussion included human nature, perception, judgment, morality, lack of control, prejudice, empathy, suicide, mental illness, existential crisis, urban exploration of abandoned areas, hiking and cookies.

While the shooter did attend SHES from 1998 to 2003, the first through fifth grade, he was never assigned to the classrooms where the shootings occurred. The shooter went for walks with his family around and near SHES after he had gotten out of the school. The shooter indicated that he loved the school and liked to go there.

According to some, the shooter was more social when he first moved to Connecticut and was younger. He would attend play groups and parties. The early school years have him portrayed as a nice kid, though sort of withdrawn. He loved music and played saxophone.

As he got older his condition seemed to worsen, he became more of a loner. As the shooter got into the higher grades of middle school, he did not like noise and confusion and began to have issues when he had to walk to different classes. As a result, in high school, the shooter was home schooled for a period of time. Though not in a mainstream setting, he could sit through a quiet lecture. The mother drove the shooter where he needed to go. He did not want to go to events with crowds.

He attended Newtown High School (NHS) with a combination of home schooling, tutoring and classes at NHS and Western Connecticut State University (WCSU). At NHS he was considered a special education student. Having enough credits, the shooter graduated from NHS in 2009. He continued to take classes at WCSU after high school graduation.

Various witnesses made the following observations about the shooter through his school years:

1. In the 2002-2003 school year, when the shooter was in the fifth grade, he was quiet, reluctant, very bright and had good ideas regarding creative writing. He wouldn't necessarily engage in conversation, but wouldn't ignore one. There was no recollection of him being bullied or teased.
2. The fifth grade was also the year that, related to a class project, the shooter produced the "Big Book of Granny" in which the main character has a gun in her cane and shoots people. The story includes violence against children. There is no indication this was ever handed in to the school.[48]
3. In the fifth grade the shooter indicated that he did not like sports, did not think highly of himself and believed that everyone else in the world deserved more than he did.
4. In intermediate school from 2002-2004 he was a quiet shy boy who participated in class and listened. He did not show enthusiasm, extreme happiness or extreme sadness. He was neutral.
5. In the fifth and sixth grades from 2003 to 2004 the shooter participated in concerts at school. He was not remembered by the teacher as having been bullied and the shooter had at least one friend.
6. A sixth grade teacher described the shooter as an average student with A's and B's; homework was never an issue. The shooter never made trouble or distracted others. He had friends and was friendly to others. He was a normal child with no oddities and there were no reports of bullying or teasing.

---

[48] See the Appendix starting at page A220.

7. In 2004 while at the intermediate school he was described as respectful and cooperated with others.
8. One person who remembered him from the middle school never saw the shooter bullied.
9. In seventh grade, a teacher described the shooter as intelligent but not normal, with anti-social issues. He was quiet, barely spoke and did not want to participate in anything. His writing assignments obsessed about battles, destruction and war, far more than others his age. The level of violence in the writing was disturbing. At the same time, when asked to write a poem, he was able to write a beautiful one and presented it in public.
10. In the ninth and tenth grades the shooter was reclusive, shutting himself in the bedroom and playing video games all day. In the upper classes the shooter compiled a journal instead of attending physical education.
11. In high school the shooter did not have good social skills. He did not show any signs of violence.
12. In high school the shooter would have "episodes"[49] and his mother would be called to the school. The episodes would last about fifteen minutes each. There were no signs of violence during any of these episodes and the shooter was more likely to be victimized than to act in violence against another.
13. In high school the shooter was not willing to talk much, hard to communicate with and had poor social skills. He often became withdrawn in a social environment. The shooter would have both inclusive class time and leave the class for specialized sessions.
14. At NHS the shooter was in the "Tech Club" in 2007–2008. He was remembered in a variety of ways including as a quiet person who was smart. He wore the same clothing repeatedly and might not speak to you, even if you were talking to him. He was not remembered to have been bullied or to have spoken about violence. The advisor looked out for him and tried to have him included wherever possible. He was also remembered for pulling his sleeves over his hand to touch something. He was not known to be a violent kid at all and never spoke of violence.
15. The shooter had a LAN party[50] at his home in 2008 with Tech Club members; no firearms were seen at the shooter's home.
16. In terms of video games, the shooter liked to play "Phantasy Star Online" (a role playing game), "Paper Mario," "Luigi's Mansion" and "Pikmin." He also liked Japanese animated films and television.

Over the years from the late 1990s and into the 2000s, the shooter had evaluations of various types, some of which were available to the investigators. In the late 1990s he was described as having speech and language needs. At that time he was also being followed medically for seizure activities. In preschool his conduct included repetitive behaviors, temper tantrums, smelling things that were not there, excessive hand washing and eating idiosyncrasies.

In 2005, the shooter was diagnosed with Asperger's Disorder and was described as presenting with significant social impairments and extreme anxiety. It was also noted that he lacked empathy and had very rigid thought processes. He had a literal interpretation of written and

---

[49] What these episodes were was unclear.

[50] This is a party where attendees eat pizza and play video games.

34

verbal material. In the school setting, the shooter had extreme anxiety and discomfort with changes, noise, and physical contact with others.

In 2006 the shooter had an overall IQ in the average range. He had no learning disability. Depending on the psychological test taken he could be average, below average or above average. Testing that required the touching of objects could not be done. It was reported that his school issues related to his identified emotional and/or Pervasive Developmental Disorder (PDD) spectrum behaviors. His high level of anxiety, Asperger's characteristics, Obsessive Compulsive Disorder (OCD) concerns and sensory issues all impacted his performance to a significant degree, limiting his participation in a general education curriculum. Tutoring, desensitization and medication were recommended. It was suggested that he would benefit by continuing to be eased into more regular classroom time and increasing exposure to routine events at school.

The shooter refused to take suggested medication and did not engage in suggested behavior therapies.

Over the years his mother consistently described the shooter as having Asperger's syndrome. She had a number of books in the home on the topic. She also described the shooter as being unable to make eye contact, sensitive to light and couldn't stand to be touched. Over time he had multiple daily rituals, an inability to touch door knobs,[51] repeated hand washing and obsessive clothes changing, to the point that his mother was frequently doing laundry.

In 2006, the shooter's mother noted that there were marked changes to the shooter's behavior around the seventh grade. Prior to that, he would ride his bike and do adventurous things such as climbing trees or climbing a mountain. He had stopped playing the saxophone. He had been in a school band but dropped out. He had withdrawn from playing soccer or baseball which he said he did not enjoy.

It is important to note that it is unknown, what contribution, if any, the shooter's mental health issues made to his attack on SHES. Those mental health professionals who saw him did not see anything that would have predicted his future behavior.

## EVIDENCE EXAMINATION

### Electronics

Examinations of the following seized items were done by the WDMC squad and the Computer Crimes and Electronic Evidence Laboratory of the Department of Emergency Services and Public Protection (DESPP).

Sony PlayStation 2: An older games history was found. Games located included "Dynasty Tactics," "Kingdom Hearts," "Kingdom Hearts 2," "Onimusha," "Dynasty Warriors," and "The Two Towers." The PlayStation 2 games could not be played with others over the internet.

---

[51] This included not opening doors for himself because he did not like touching the door handle or other metal objects, often going through a box of tissues a day to avoid the contact.

Xbox: A game history for the console and an indication of an Xbox Live user account were found. Games found in the gaming history included "Call of Duty 2: Big Red One," "Call of Duty: Finest Hour," "Dead or Alive 3," "Halo," "Halo 2," "Lego Star Wars," "MechAssault," "Mercenaries," "MGS2 Substance," "Panzer Dragoon ORTA," "PSO," "Shenmue II," "Spiderman," "Splinter Cell 2," "Splinter Cell-CT," "Star Wars Battlefront," "Star Wars Republic Commando," "Tenchu: Return from Darkness," "The Return of the King," and "Worms Forts Under Seige."

It was noted on both of the above items that the gaming history found may not be the complete history of those actually played. No evidence regarding the existence of any accessories or co-co-conspirators was found.

Xbox 360: Found to be damaged and inoperable.

**Firearms and Related Evidence**

Of the firearms seized in this case, five are directly involved, four from SHES and one from 36 Yogananda Street.

- **History**

All of the firearms below and involved in these cases were legally purchased by the shooter's mother. Additionally, ammunition of the type used in these cases had been purchased by the shooter's mother in the past. There is no reason to believe the ammunition used here was purchased by anyone else. The evidence does not show any ammunition purchases by the shooter.

The shooter did not have a permit to carry a pistol, nor had he ever had one. His mother had a valid pistol permit.

A pistol is defined as "… any firearm having a barrel less than twelve inches."[52] Both the Glock 20, 10 mm and the Sig Sauer P226, 9 mm qualify as pistols. They are firearms and their barrel lengths were less than 12 inches.

- **Firearms, Recovered Bullets and Fragments**

Recovered from Shooter's Honda Civic Outside of SHES

Izhmash Saiga-12, 12 gauge, semiautomatic shotgun: The Izhmash Saiga-12 was found in the shooter's Honda Civic that was parked outside SHES. It was tested and found to be operable without malfunction. There was no physical evidence indicating this weapon had been fired at SHES, i.e., the bullets, bullet fragments and expended shell casings recovered at the scene and from the OCME could not have been fired from this weapon.

---

[52] C.G.S. Sec. 53a-3(18).

Recovered from Classroom 10, SHES

Bushmaster Model XM15-E2S semiautomatic rifle: The Bushmaster rifle was found in classroom 10. The Bushmaster was tested and found to be operable without malfunction. All of the 5.56 mm shell casings from SHES that were tested were found to have been fired from this rifle. All of the bullets and fragments, recovered from SHES and the OCME that were tested, with the exception of those mentioned immediately below, are consistent with having been fired from the Bushmaster rifle.[53] They could not have been fired from the Saiga-12, the Glock 20 or the Sig Sauer P226.

Glock 20, 10 mm, semiautomatic pistol: The Glock 20 was found in classroom 10 near the shooter's body. The Glock 20 was tested and found to be operable without malfunction. It was found to have fired both of the 10 mm shell casings recovered at SHES. It was consistent with having fired the bullet that was recovered from the ceiling of classroom 8 in a location along the trajectory of the suicide shot of the shooter in classroom 10. It could have fired the three bullet fragments recovered from classroom 10. The three fragments together weigh less than one bullet and are presumed to have been parts of the same one bullet. Though all lacked sufficient striate for a positive identification, all had polygonal rifling consistent with the Glock 20. They could not have been fired from the Saiga-12, the Bushmaster or the Sig Sauer P226.

Sig Sauer P226, 9 mm, semiautomatic pistol: The Sig Sauer P226 was found in classroom 10 on the shooter's person. The Sig Sauer P226 was tested and found to be operable without malfunction. There was no physical evidence found indicating that this weapon had been fired at SHES, i.e. casings, bullets and bullet fragments recovered at the scene and from the OCME could not have been fired from this weapon.

The total weight of the guns and ammunition from the shooter at SHES was 30.47 lbs.[54]

Recovered from 36 Yogananda Street, Newtown, CT

Savage Mark II, .22 cal. Long Rifle, bolt action: The Savage Mark II rifle was found on the floor of the master bedroom near the bed where the body of the shooter's mother was found. The rifle was found to be operable without malfunction. The rifle was found to have fired the .22 cal. casing recovered from the rifle's chamber and the three .22 cal. casings found in the master bedroom. The rifle also was found to have fired the four bullets recovered during the autopsy of the shooter's mother.

---

[53] "No positive identification could be made to any of the bullet evidence submissions noted ... ... in 5.56 mm caliber. The physical condition of the bullet jacket surfaces were severely damaged and corroded. They all lacked individual striated marks of sufficient agreement for the identification process. The test fires also exhibited a lack of individual striated marks on the bullet surface for comparison purposes. This condition can be caused by fouling in the barrel of the rifle and the ammunition itself. The Bushmaster rifle cannot be eliminated as having fired the 5.56 caliber bullet evidence examined," quoting from the 6/19/13 Forensic Science Laboratory report.

[54] See the Appendix at page A141.

**Other Testing**

In the course of the investigation swabbings to test for DNA were taken from various pieces of evidence in the case, both at Sandy Hook Elementary School and 36 Yogananda Street. The purpose was to determine if anyone else had actively been involved in the planning or carrying out of the shootings. These swabbings were tested and compared to known samples in the case and no potential accessories or co-conspirators were revealed by the testing.[55]

## MISCELLANEOUS INVESTIGATIVE LEADS

In the course of the investigation, law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter. This applied to both state and federal law enforcement. Information that was substantiated and relevant was made part of the investigation. Other information, after investigation was not substantiated.

Typically someone would call the CSP and leave a message that they had information relevant to the shootings at Sandy Hook Elementary School. In an abundance of caution, a detective was assigned to follow up on every "lead," regardless of its presumed validity.

Some of the more than forty unsubstantiated leads and information are described below because of their nature or mention in investigation documents.

1. In the December 14, 2012, 7:25 p.m. search warrant for 36 Yogananda Street, paragraphs 8 and 9 read as follows:

   8. That investigators determined that on 12/12/12, an individual logged onto a website called 4Chan.com and anonymously posted "I'm going to kill myself on Friday and it will make the news. be watching at 9:00 am." That another anonymous individual asked "Where at?" The first individual responded "I live in Connecticut, that's as much as I'll say."
   9. That additionally on 12/14/12, a concerned individual in Texas contacted the Hartford Police Department and reported that her son was playing a video game named 'Call of Duty' approximately 20 hours ago. She continued that a gamer with the screen name [RaWr]i<3EmoGirls (hereinafter "User") stated; "next week or very soon there maybe a shooting at my school and other schools so if i die remember me plz if I don't get on for 3-5 not including weeks that means i died and im being 100 percent serious." The User then stated: "something might go bad tomorrow this could possibly be my last moments alive.-." Finally, User stated, "as far as I know theres a list of ppl that are gunna get shot-. I hope I aint on it."

---

[55] Two of the items examined from outside the building of SHES, one from the shotgun in the shooter's car and a second from 36 Yogananda Street yielded DNA profiles consistent with the DNA profiles of two victims killed in SHES, one in each. It is strongly believed that this resulted from an accidental transference as a result of the unique circumstances of this case. There is no reason to believe that either victim would ever have come in contact with these items. The DESPP is conducting a separate protocol inquiry in an attempt to determine the reason that the DNA appears on the items.

Both of these leads were immediately investigated by federal law enforcement and found to have no validity and no relation to Newtown.[56]

2. A December 14, 2012, search of the Stamford residence of Peter Lanza, the father of the shooter, was conducted with the FBI. Some illegal fireworks were seized and secured. After consultation with David I. Cohen, the State's Attorney for the Judicial District of Stamford/Norwalk, and based on all of the circumstances involved, this state's attorney has decided to exercise his discretion and not prosecute Mr. Lanza for possession of the fireworks, which are in no way related to the events of December 14, 2012.

3. Dick's Sporting Goods – Police received a lead that the shooter had tried to buy ammunition at a Dick's Sporting Goods store. Store security surveillance videos were recovered and reviewed. None of the individuals depicted in the videos appear to be the shooter or connected to shooter.

4. A person called the police indicating that the shooter had tried to rent a room from her and indicated he was having problems with his mother. This proved to be unsubstantiated after an investigation.

5. Some callers indicated that they chatted with the shooter online in postings. These postings were determined to be false.

6. Numerous citizens in Newtown received calls on their telephones with messages left saying "I am [the shooter's name] and I am going to kill you." It was determined that these calls were made from out of state and the investigation is ongoing. Preliminary investigation results establish that the callers were not associated with the shooter.

7. CSP investigated a lead that the shooter went to Newtown High School before going to SHES. In the course of this investigation one parent refused to let her high school child be interviewed by police and related that a friend of the child had told the child they saw the shooter in the parking lot before the shooting. A review of Newtown High School video did not substantiate this claim.

8. There were reports of the shooter being at SHES on December 12, 2012, that were investigated and found not to be substantiated.

9. A report that a man claimed that while in Oklahoma a woman told him about the planned shooting before the shooting occurred. Federal law enforcement investigated this and found that it could not be true.

---

[56] These search warrants were applied for with information that was available at the time. Some of the information was later determined to be inaccurate.

## DETERMINATIONS OF CRIMES COMMITTED

In the course of his rampage the shooter committed a number of state crimes. The most significant are those where lives were taken and people were specifically injured.

At Sandy Hook Elementary School, the crime of Murder under Special Circumstances[57] in violation of C.G.S. Sec. 53a-54b was committed twenty-six times. Attempted Murder under Special Circumstances[58] in violation of C.G.S. Secs. 53a-49 and 53a-54b was committed twice as it relates to the two individuals who were shot and survived. These crimes reflect the killings of the children and adults, as well as those physically injured.[59] The crime of Murder in violation of C.G.S. Sec. 53a-54a was committed by the shooter in killing his mother at 36 Yogananda Street.[60]

Also listed are other major crimes committed by the shooter on December 14, 2012.[61]

The major felonies[62] committed by the shooter in this case are:

- Murder with Special Circumstances
- Attempted Murder with Special Circumstances
- Assault in the First Degree[63]

---

[57] Sec. 53a-54b. Murder with special circumstances. A person is guilty of murder with special circumstances who is convicted of any of the following: (1)... ... (7) murder of two or more persons at the same time or in the course of a single transaction; or (8) murder of a person under sixteen years of age.

[58] Sec. 53a-49. Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: ... ... (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

[59] Though state law as to who is a "victim" in a criminal case is very broad, only those victims mentioned above will be discussed. Connecticut defines a "victim of crime" as an individual who suffers direct or threatened physical, emotional or financial harm as a result of a crime and includes immediate family members of a minor, incompetent individual or homicide victim and a person designated by a homicide victim in accordance with section 1-56r. See C.G.S. Sec. 1-1k.

[60] Sec. 53a-54a. Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

[61] The investigation has not discovered any evidence that Nancy Lanza was in any way aware of her son's plans.

[62] In any given situation, the facts giving rise to the commission of one crime will suffice to meet the elements of additional crimes. Here the focus will be on the major crimes committed and not go into every possible felony justified by the evidence.

- Burglary in the First Degree[64]
- Risk of Injury to a Minor[65]
- Possession of a Weapon on School Grounds[66]
- Carrying a Pistol Without a Permit,[67]

The crimes listed above all require some type of mental state whether it is a specific intent, knowledge or a general intent to do the prohibited act.

The intent to kill for the crime of murder can be seen in the circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wounds inflicted and the events leading to and immediately following the deaths, as well as with the shooter intending the natural consequences of his voluntary acts.[68]

Here the intent is clear from the evidence that the shooter intentionally armed himself heavily, drove to SHES, parked in a manner out of direct sight of the front door, shot his way into the building and immediately killed those who confronted him as well as those in classrooms 8 and 10. The evidence found at his home on the digital media further support his intentions to kill, both at the school and with his mother. Further the manner in which he killed his mother reflects the shooter's intent to kill her.

---

[63] Sec. 53a-59. Assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; ... ... or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm.

[64] Sec. 53a-101. Burglary in the first degree: Class B felony. (a) A person is guilty of burglary in the first degree when (1) such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with explosives or a deadly weapon or dangerous instrument, or (2) such person enters or remains unlawfully in a building with intent to commit a crime therein and, in the course of committing the offense, intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone, or .....

[65] Sec. 53-21. Injury or risk of injury to, or impairing morals of, children. Sale of children. (a) Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or ... ..., shall be guilty of a class C felony for a violation of subdivision (1) ....

[66] Sec. 53a-217b. Possession of a weapon on school grounds: Class D felony. (a) A person is guilty of possession of a weapon on school grounds when, knowing that such person is not licensed or privileged to do so, such person possesses a firearm or deadly weapon, as defined in section 53a-3, (1) in or on the real property comprising a public or private elementary or secondary school, or ....

[67] Sec. 29-35. Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28.

[68] State v. Otto, 305 Conn. 51, 66-67 (2012).

Murder with Special Circumstances is met both in the killing of the children and in the killing of more than one person at the same time.

In this case the shooter's mental status is no defense to his conduct as the evidence shows he knew his conduct to be against the law. He had the ability to control his behavior to obtain the results he wanted, including his own death. This evidence includes his possession of materials related to mass murders, his removal of the GPS from his car, his utilization of ear plugs, the damaging of the hard drive and waiting for his mother's return from New Hampshire.[69]

The existence of an extreme emotional disturbance for which there is a reasonable explanation or excuse is also not present in this case.[70] It is clear that the shooter planned his crimes in advance and was under no extreme emotional disturbance for which there was a reasonable explanation or excuse.

---

[69] Sec. 53a-13. Lack of capacity due to mental disease or defect as affirmative defense. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

[70] Sec. 53a-54a. Murder. (a) A person is guilty of murder when, … …with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

## CONCLUSION

With the issuance of this report, the investigation is closed.[71] If additional reliable information, related to the existence of others' involvement in the case, comes to the attention of the investigators, it is subject to being reopened. I do not anticipate that occurring. As of now, there will be no state prosecution of anyone as an accessory or co-conspirator.

Many people have asked why the shooter did what he did on December 14, 2012. Or, in the vernacular of the criminal justice system, "Did he have a motive to do what he did?" This investigation, with the substantial information available, does not establish a conclusive motive.

What we do know is that the shooter had significant mental health issues that, while not affecting the criminality of the shooter's mental state for the crimes or his criminal responsibility for them, did affect his ability to live a normal life and to interact with others, even those to whom he should have been close. Whether this contributed in any way is unknown. The shooter did not recognize or help himself deal with those issues. He had a familiarity with and access to firearms and ammunition and an obsession with mass murders, in particular the Columbine shootings.

There is no clear indication why Sandy Hook Elementary School was selected, other than perhaps its close proximity to the shooter's home.

What is clear is that on the morning of December 14, 2012, the shooter intentionally committed horrendous crimes, murdering 20 children and 6 adults in a matter of moments, with the ability and intention of killing even more. He committed these heinous acts after killing his own mother. The evidence indicates the shooter planned his actions, including the taking of his own life.

It is equally clear that law enforcement arrived at Sandy Hook Elementary School within minutes of the first shots being fired. They went into the school to save those inside with the knowledge that someone might be waiting to take *their* lives. It is also clear that the staff of Sandy Hook Elementary School acted heroically in trying to protect the children. The combination saved many children's lives.

November 25, 2013

Stephen J. Sedensky III
State's Attorney
Judicial District of Danbury

---

[71] There remain some outstanding reports, returns and an evidence examination evaluation to be filed.

43

## ACKNOWLEDGEMENTS

Over the course of the last eleven months many agencies, governmental and private, have come together to assist the victims' families, victims, first responders, others affected by the crimes, the Connecticut State Police and the State's Attorney's Office for the Judicial District of Danbury.

I wish to thank the below agencies, listed alphabetically, for their investigative work, cooperation and assistance in this investigation. Though I have tried to list all of the agencies that provided assistance to the investigation, I suspect some will be inadvertently left out.  For this I apologize.

- Connecticut State Police and in particular Western District Major Crime Squad[72]*
- Connecticut Intelligence Center (CTIC)
- Bureau of Alcohol, Tobacco, Firearms and Explosives
- Department of Emergency Services and Public Protection Forensic Science Laboratory
- Faculty of Finding Words-Connecticut, A ChildFirst State[73]
- Family & Children's Aid of Danbury[74]
- Federal Bureau of Investigation,[75] including Victim Services and Behavior Analysis units
- Gundersen Health System's National Child Protection Training Center
- Hoboken, New Jersey, Police Department
- Homeland Security
- Municipal police departments in Connecticut
- Newtown Police Department
- Office of the Chief Medical Examiner
- Office of the Chief State's Attorney[76]*
- State of Connecticut Judicial Branch
- United States Attorney's Office for the District of Connecticut*
- United States Drug Enforcement Agency
- United States Marshals Service

I would also like to thank the members of the Danbury State's Attorney's Office, in particular, Supervisory Assistant State's Attorney Warren Murray and Inspectors Donald Brown and John Mahoney for their assistance and support.

---

[72] The Western District Major Crime Squad under the leadership of Lt. David Delvecchia investigated this case with a thoroughness and sensitivity that is unmatched in my experience.

[73] Connecticut is a ChildFirst state whose one week program Finding Words Connecticut, Interviewing Children and Preparing for Court is funded by the Governor's Task Force on Justice for Abused Children.

[74] Family & Children's Aid of Danbury hosts the Multidisciplinary Investigation Team.

[75] This includes FBI agents across the country who sought out evidence and interviewed witnesses in many states.

[76] Chief State's Attorney Kevin T. Kane's counsel and assistance has been an invaluable asset to me and this case, together with the assistance of those in his office who worked on the case.

* I am grateful for the suggestions, editing and reviews of the drafts of this report provided by these organizations. Any errors that remain are mine.

# EXHIBIT H

**Proposals to Reduce Gun Violence:**
**Protecting Our Communities While Respecting the Second Amendment.**

Senate Judiciary Committee
Subcommittee on the Constitution, Civil Rights and Human Rights

February 12, 2013

Prepared Testimony by Laurence H. Tribe[*]

Mr. Chairman and members of the Committee:

I am honored and grateful for the invitation to testify before you today.  I know I am not alone in wanting us to do all we can, consistent with the Constitution, to reduce the awful specter of rampant gun violence and the far too frequent massacres of our children, our friends, and our fellow citizens.

Like all decent Americans, I felt a pang of unspeakable horror on December 14, when I learned that twenty first-grade children had been brutally slaughtered in their first-grade classroom in Newtown, Connecticut.  Those children, and the brave grown-ups who died at Adam Lanza's hands as they tried to save the young lives entrusted to their care, deserve every effort to translate our shared grief into shared national action.  That action must not be deterred by the defeatist argument that, because we will never solve this problem in its entirety, we might as well give up. Nor should it be deterred by distorted interpretations of the United States Constitution. As others have often reminded us about that great and enduring document, it is many things to many people, but one thing it is *not* is a suicide pact.

---

[*] Carl M. Loeb University Professor and Professor of Constitutional Law, Harvard Law School. The institutional affiliation is noted for identification purposes only.

While we debate the pending proposals to reduce gun violence through measures focused on gun safety as part of a holistic national response, it's crucial that we not permit any part of our Constitution to become a collateral casualty of our conversation. Proposals to disarm the American people, to leave firearms solely in the hands of the military and the police, have been decisively taken off the table – if they were ever truly *on* the table – by the Supreme Court's Second Amendment decisions in 2008 and 2010. "Slippery slope" arguments predicated on the unsettled state of the law prior to 2008 have been rendered irrelevant. The only proposals under serious consideration in this body are reasonable measures that would fully respect the basic rights of responsible citizens to use ordinary firearms for self-defense and other lawful purposes. They cannot lead to unacceptably extreme measures as long as the Supreme Court sits.

Having examined those proposals, having looked at the steps announced by the President under his power faithfully to execute the laws of the United States, and having studied the decisions of the Supreme Court and lower courts around the country, I am convinced that nothing under discussion in the Senate Judiciary Committee represents a threat to the Constitution or even comes close to violating the Second Amendment or the Constitution's structural limits either on congressional power or on executive authority.

Undoubtedly we should have a national debate about how best to reconcile the Second Amendment rights of every individual with the full range of proposals to reduce gun violence in America. As someone who has studied and taught constitutional law for four decades and argued dozens of cases in the Supreme Court and dozens more in the lower courts, I am obviously interested in engaging those questions.  In today's testimony, however, I will focus not on

competing theories of how the Second Amendment ought to have been interpreted but on the law as it stands. I am here not as an academic theorist but as a constitutional lawyer. As a lawyer, I've won some and I've lost some, and I know a losing argument when I see it. And the argument that any of the proposals to reduce gun violence currently being considered here might be struck down as unconstitutional is decidedly a losing argument.

There is plenty of room for policy debate over the best steps to take to reduce gun violence, but we mustn't confuse those policy differences or the ideological and cultural divisions that underlie them with genuine constitutional doubts about whether any of those steps crosses the constitutional line. Everyone in this room knows that anything Congress or the President does in this field will confront opposition. And in a nation as litigious as ours, some of that opposition will no doubt find its way into the courts. But there is no basis to suppose that the courts will or should rebuff any of the steps being debated here today. They should not, and they will not.

What I hope to do this morning, setting all hyperbole aside and approaching the law on the books with a fair-minded eye, is explain why reforms such as those this committee is considering clearly pass constitutional muster.

# I. Introduction:

## Taking the Second Amendment Seriously, But Applying it Cautiously

I begin by reaffirming my agreement with the Supreme Court that the Second Amendment guarantees Americans the right as individuals to possess guns for reasonable self-defense.   Some of my friends and colleagues devoted to the cause of responsible firearms regulation evidently wish to relitigate this point.  They continue to insist that the best reading of the Second Amendment would secure gun rights only in connection with service in the state militia and not for individual possession and use.  For nearly a decade and a half, I have disagreed with them and have defended the individual rights view ultimately taken by the Supreme Court in 2008.  In October of 1999, for example, I joined a fellow constitutional law scholar in publishing an op-ed in *The New York Times* arguing that "bearing arms [is] a 'privilege' of each citizen."[1]  I continue to defend this position today.

That matters only insofar as it bears on my credibility as a witness in today's hearing. If I were among those who had *opposed* the individual rights interpretation adopted by the Supreme Court in *Heller*, some might wonder whether my conclusions about the regulations *Heller* permits Congress to adopt reflect wishful thinking rather than a realistic and sympathetic appraisal of what the Court that decided *Heller* would in fact permit. But there is no wishful thinking here. I am being a hard-headed realist in reading the *Heller* decision and extrapolating conclusions from the majority opinion.

---

[1] Laurence H. Tribe & Akhil Reed Amar, *Well Regulated Militias and More*, N.Y. TIMES, Oct. 28, 1999, at A25; 1 Laurence H. Tribe, *American Constitutional Law* 900–902 (3d ed. 2000).

Although many in the community advocating gun rights had long assumed that the individual rights interpretation governed the scope of the Second Amendment, it was not until the Supreme Court's 2008 ruling in *District of Columbia v. Heller*[2] that a majority of the Court's Justices agreed.  In so doing, the Court recognized that the core individual liberty protected by the amendment affords Americans the right to purchase and store operable firearms for self-defense in the home.  Two years later, in *McDonald v. City of Chicago*,[3] the Court extended the *Heller* ruling to cover restrictions imposed by state and local governments, making it unmistakably clear that the right at issue was not and is not simply a right of the state-organized militia against being overrun by federal authority.

Despite this fundamental affirmation, the *Heller* decision is exceedingly narrow in many important respects.  As Judge Brett Kavanaugh of the D.C. Circuit Court of Appeals recently put it, "It bears emphasis that *Heller*, while enormously significant jurisprudentially, was not revolutionary in terms of its immediate real-world effects on American gun regulation."  "Indeed," he continued, "*Heller* largely preserved the status quo of gun regulation in the United States."[4]  To understand what he meant, it helps to look first to the Washington, DC ordinance implicated in the *Heller* case.  The District had in place one of the most restrictive firearms regulations in the nation; it essentially outlawed the possession of handguns in the home, where the need for self-defense is, as Justice Scalia wrote, "most acute."[5]  For the majority on the Court, a policy like the one the District had adopted, a policy on the outer edge of gun control's reach in the United States, was irreconcilable with the Second Amendment.

---

[2] 554 U.S. 570 (2008).
[3] 130 S.Ct. 3020 (2010).
[4] Heller v. Dist. of Columbia, 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).
[5] *Heller*, 544 U.S. at 628.

The *Heller* decision took great pains to emphasize its relative modesty.  It repeated the mantra that the Second Amendment right "is not unlimited"[6] and devoted an entire section to listing types of regulation – for example, limits on gun ownership "by felons and the mentally ill" and, most relevant to today's hearing, regulation of "dangerous and unusual weapons" – the constitutionality of which the Court had no intention of casting into doubt.[7]  The decision paused to note that, by specifically giving a constitutional green light to some regulatory efforts, the Court did not mean to signal that others were constitutionally dubious.[8]  Justice Scalia closed his opinion for the Court with an expression of solicitude for the regulatory goals that Washington, DC sought to advance and, more importantly, an invitation to pursue those goals with the "variety of tools" still available to the District and to other states and localities across the country even in *Heller*'s wake.[9]

Since that decision and its extension to state and local laws in 2010, the vast majority of federal and state courts to adjudicate Second Amendment claims have responsibly hewed to the cautious approach espoused by the Supreme Court in *Heller* and *McDonald*.  For example, in a ruling highly relevant to the topic of this hearing, the D.C. Circuit recently upheld the constitutionality of Washington D.C.'s assault weapons ban, which included a restriction on

---

[6] *Id.* at 595, 626.
[7] *Id.* at 626 – 28.
[8] *Id.* at 627 n. 26. There is no doubt, for instance, that regulatory provisions targeting firearms and ammunitions *manufacturers* in addition to those who transfer, possess, carry, or use the resulting weapons are at least as easy to defend from Second Amendment challenge as are measures that do not take effect until the point of sale.
[9] *Id.* at 636.

high-capacity magazines, as well as gun registration requirements.[10] The majority in the case,

following the broad consensus that has emerged among federal and state judges,[11] evaluated the

regulations against a standard of heightened judicial scrutiny while preserving both the option to

adopt a more skeptical mode of review for restrictions on core self-defense firearm possession

and the option to exempt other laws from Second Amendment review entirely when they do not

enter the amendment's zone of protected conduct.[12] In another notable decision staking out a

similar approach, a panel of the Seventh Circuit Court of Appeals struck down Chicago's firing-

range ban given the close nexus between regular firing practice and training and safe, responsible

self-defense in the home.[13] And state appellate courts from North Carolina to Wisconsin to

California have joined with their federal brethren in upholding state restrictions on firearms

ownership under this middle-of-the-road approach that molds the degree of judicial scrutiny to

the extent of a law's burden on the core self-defense right secured by the Second Amendment.[14]


The central message of *Heller* and its lower-court progeny is thus to take the application

of the Second Amendment seriously but also cautiously. When necessary to vindicate the core

right to self-defense respected by *Heller*, neither courts nor lawmakers should be shy about

invoking the Second Amendment. But because few public responsibilities are as important to

---

[10] Heller v. Dist. of Columbia, 670 F.3d 1244 (D.C. Cir. 2011).

[11] *See, e.g.,* Kachalsky v. County of Westchester, 701 F.3d 81, 93 – 94 (2d Cir. 2012); United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) cert. denied, 132 S. Ct. 1538 (U.S. 2012); United States v. Masciandaro, 638 F.3d 458, 469-70 (4th Cir. 2011) cert. denied, 132 S. Ct. 756 (U.S. 2011); United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010);

[12] *Heller*, 670 F.3d at 1256 – 58.

[13] The court applied what it called "not quite strict scrutiny" because the law's burden struck so close to the core Second Amendment right to self-defense in the home. Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011).

[14] *See, e.g.,* Johnston v. State, 735 S.E.2d 859 (N.C. Ct. App. 2012); State v. Brown, 815 N.W.2d 407 (Ct. App. Wisc. 2012); People v. Ellison, 196 Cal. App. 4th 1342, 1347 (2011).

good governance as legislating to secure public safety, lawmakers and jurists should not casually give the amendment an expansive scope nor unduly scrutinize reasonable firearm regulations. In the wake of the Newtown massacre and the push to propose sensible new rules about firearms, the Obama administration and many leaders in Congress have conducted themselves precisely along these lines.

## II. The Second Amendment Propriety of Recent Policy Proposals

### Limits on Large-Capacity Magazines

A core feature of the Assault Weapons Ban of 2013, introduced by Senator Dianne Feinstein, as well as the primary component of a freestanding bill championed by Senator Frank Lautenberg, is a ban on magazines capable of firing more than ten rounds of ammunition without reloading.[15] Before moving into the weeds of the constitutional analysis, it would be useful to contrast such a high-capacity magazine restriction to the law *Heller* struck down. *Heller* axed a local ordinance that adopted about as blunt an approach to restraining gun violence as possible: By its very design, the DC law espoused disagreement with the whole idea of law-abiding gun ownership for self-defense in the home. A limit on large-capacity magazines, by contrast, is a regulation of an entirely different caliber. It does not challenge the fundamental recognition that gun possession for self-defense is a right of every citizen; it merely seeks to reset the parameters of responsible ownership to advance the cause of public safety. It operates with a scalpel rather than an ax. Even Robert Levy, the man who largely funded the challenge to DC's sweeping

---

[15] The Assault Weapons Ban of 2013 also prohibits firearms with fixed magazines capable of holding more than ten rounds of ammunition.

handgun ban in *Heller* and served as an attorney on the case, concedes that bans on both high-capacity magazines and assault weapons almost certainly do not infringe the Second Amendment rights he successfully fought to vindicate in court.[16]

By any reasonable reckoning, this crucial measure might not even trigger heightened Second Amendment review at the threshold stage that the *Heller* ruling requires courts to undertake. But even if the high-capacity magazine prohibition does require further analysis, it safely falls within a zone of regulations that do not unconstitutionally abridge Second Amendment rights.

Most constitutional challenges require lawyers and scholars to carry out two stages of analysis. First, we must assess whether a given government policy even *implicates* a given right in the first place. For example, in 1915, the Supreme Court entertained a First Amendment challenge to a filmmaker's punishment under an Ohio censorship law but, in a clear misjudgment the Court would later correct, decided that movies were not even a form of "speech" entitled to First Amendment protection.[17] More recently, in a ruling that may perhaps give pause to members of this committee (despite the distinct protections of the Constitution's Speech and Debate Clause), the Court concluded that votes by legislators are not a form of "speech" over which any public official can claim a personal First Amendment right.[18] Assuming that a law *does* implicate the right in question, the government must then proceed to justify the challenged

---

[16] Interview with Robert A. Levy by the Washington Post (Jan. 10, 2013), *transcript available at* http://articles.washingtonpost.com/2013-01-10/lifestyle/36272630_1_assault-weapons-high-capacity-magazines-military-style-guns.
[17] Mut. Film Corp. v. Indus. Comm'n of Ohio, 236 U.S. 230, 243 (1915).
[18] Nevada Comm'n on Ethics v. Carrigan, 131 S. Ct. 2343, 2350 (2011).

law so that the court hearing the challenge may evaluate, roughly speaking, whether the justification is strong enough to permit the law to stand or, alternatively, whether the measure goes too far and thus violates the Constitution.

I begin with this return to fundamentals because it never ceases to surprise me how often those engaged in legal debate talk past one another by conflating these distinct steps. In the Second Amendment context particularly, there is no excuse for making that mistake. For *Heller* itself makes it absolutely plain that not every gun regulation even triggers Second Amendment review. In other words, sometimes governments may enact regulations addressing the manufacture, transfer, possession or use of firearms that categorically fall outside the Second Amendment's scope, freeing governments of any burden even to make detailed defenses of the provisions in question. For example, the *Heller* opinion specifically named "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as illustrative examples of regulations that should not even receive further constitutional review.[19] The importance of this point should not be underemphasized. If too many entirely reasonable firearm regulations, like assault weapon bans and background checks, or rules about trafficking and straw purchases, are subjected to heightened Second Amendment review, it will become difficult if not impossible to separate those regulations categorically from the restrictions that *Heller* specifically approved without subjecting them to any "scrutiny" at all.

---

[19] Dist. of Columbia v. Heller, 554 U.S. 570, 626 - 27 (2008).

Beyond the examples appearing in the decision, *Heller* also identifies the three primary factors to consider in judging whether other types of regulation trip the Second Amendment's alarm. First, the Court carefully frames the scope of the Second Amendment to cover *only* firearms "in common use at the time."[20]

Second, *Heller* recognized that "dangerous or unusual" weapons may be and have historically been heavily regulated or banned.[21] It is not inconceivable – indeed, it seems quite likely – that the Court's pause to distinguish unusually dangerous weapons from widely possessed handguns had precisely the 1994 Assault Weapons Ban, which included a prohibition on high-capacity magazines, in mind. At the very least, the *Heller* majority recognized that the government could keep machine guns —"M-16 rifles and the like"—out of the hands of civilians.[22] The Supreme Court thus emphatically rejected the extravagant, or as Justice Scalia characterized it, "startling" notion, still promoted by some, that the Second Amendment could fulfill its original purposes only if citizens were guaranteed a right to arm themselves to the teeth, matching in their private armories essentially the full array of weapons possessed by the United States Military.[23]

Third and finally, the Court emphasized the importance of a nexus to core self-defense needs.[24] The majority in *Heller* had no trouble recognizing that handguns represented the

---

[20] *Id.* at 627.
[21] *Id.*
[22] *Id.*
[23] *Id.* at 624.
[24] *Id.* at 599 ("Justice Breyer's assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms . . . is profoundly mistaken. He bases that assertion

"quintessential self-defense weapon," particularly in the home.[25]  Moreover, handguns were not

categorically more dangerous than other types of firearms.  So Washington D.C.'s handgun ban

clearly fell within the scope of the Second Amendment.

The clarity of *Heller*'s guidance on how to apply these threshold factors begins to

dissipate, however, when they no longer align so strikingly in one direction.  To begin with, the

Court left "dangerousness" undefined, and what the Court meant by that term is not entirely self-

evident.  In an obvious sense, *all* firearms are dangerous; that is what makes them effective

instruments of self-defense.  The *Heller* ruling, therefore, asks us to balance any *exceptional*

dangerousness of particular firearm design features against the potential self-defense value of

those features.  For example, even if home possession of machine guns for self-defense might, on

rare occasion, deter criminal trespassers more than home possession of handguns, that benefit is

simply not sufficient to overcome the substantial hazards to innocent bystanders and intentional

targets, in particular the police.  *Heller* obviously does not contemplate asking the government to

provide an intricately reasoned justification for banning machine guns; instead, it recognizes –

and it surely authorizes Congress, and indeed all of us, to recognize – excessive dangerousness in

the inherent design of the weapon[26] so as to cut off Second Amendment review at the threshold.

---

solely upon the prologue—but that can only show that self-defense had little to do with the
right's *codification;* it was the *central component* of the right itself." (emphasis in original)).
[25] *Heller,* 544 U.S. at 629.
[26] Throughout this debate, opponents of restrictions on large-capacity magazines have repeatedly
demanded empirical evidence showing a link between magazine capacity and gun violence.
Studies in that mold certainly exist, and I discuss them later. *See, e.g.,* text accompanying notes
48 – 50.  But at this threshold stage of the Second Amendment inquiry, the *Heller* decision's
meaning of dangerousness cannot be equivalent to an empirically demonstrated effect on public
safety.  Rather, the standard is one that asks us to examine design features to assess whether the

All things considered, I conclude that reasonably restricting magazine size and availability does not implicate the core Second Amendment right as *Heller* conceived of it. The reason is not the first factor, that of "common use," because, of course, large-capacity ammunition magazines and the firearms outfitted for them are, by any reasonable measure, in quite common use in the United States. I note here just a few examples. The standard Glock pistol, the firearm that one reporter called "America's handgun" in a recent book on the subject, comes equipped with a seventeen-round magazine.[27] And America's most popular rifle, the AR-15 model,[28] typically comes with a thirty-round magazine and can accommodate magazines with even larger capacities.[29]

But to contend that the sizeable market presence of a particular firearm feature is sufficient in itself to trigger full Second Amendment scrutiny is to misrepresent the lesson of *Heller*. The relative dangerousness and self-defense-serving capacity of a firearm or design

---

weapon poses an aggravated threat to safety as a common-sense matter. First, if the former were the meaning of dangerousness, the threshold inquiry, which may lead courts to conclude that the Second Amendment does not even apply, would become indistinguishable from the more advanced stage of review, in which courts scrutinize a government's public safety rationale. Second, making empirical evidence of salutary public-safety impacts a prerequisite to gun regulation would defeat efforts to respond to new technologies and lethal features that pose a substantial threat to public safety. The Second Amendment does not require that Americans afford the gun industry a "wait and see" grace period on the (in)famous theory that even a vicious dog deserves one free bite.

[27] Erin McCarthy, *Why the Glock Became America's Handgun*, POPULAR MECHANICS (Jan. 12, 2012, 6:30 AM), http://www.popularmechanics.com/technology/military/weapons/why-the-glock-became-americas-handgun

[28] Erica Goode, *Rifle Used in Killings, America's Most Popular, Highlights Regulation Debate*, N.Y. TIMES (Dec. 16, 2012), http://www.nytimes.com/2012/12/17/us/lanza-used-a-popular-ar-15-style-rifle-in-newtown.html?pagewanted=all.

[29] Steven Almasy, *Newton Shooter's Guns: What We Know*, CNN (Dec. 19, 2012, 10:11 AM), http://www.cnn.com/2012/12/18/us/connecticut-lanza-guns/index.html.

feature are also crucial considerations. This approach makes complete sense. The common use and possession of a given firearm feature is, at best, just one helpful indicator of whether restricting that feature will stymie or frustrate the exercise of the core Second Amendment protection of lawful self-defense to a constitutionally cognizable degree. For instance, in the case of high-capacity magazines, significant market presence does not necessarily translate into heavy reliance by American gun owners on those magazines for self-defense. Analysis of the modern development of the U.S. gun market demonstrates that the firearms industry, driven by an obvious profit motive, ushered in a revolution in the state of the market during the 1980s. Manufacturers began to roll out increasing numbers of pistols with ever-larger-capacity magazines rather than revolvers, which take just six rounds of ammunition and had traditionally been the most popular firearm for personal self-defense.[30] The frequent purchase of such large-capacity magazines, then, may not be attributable purely or even primarily to actual gun-owner preferences, much less to gun-owner needs. Rather, guns equipped with or ready for large-capacity magazines may simply be the weapons most readily made available on the market. And even if this market presence begins to influence more Americans to purchase firearms with high-capacity magazines because they fear attacks from criminals possessing guns outfitted with the same high-capacity magazines, nothing in *Heller* suggests that it is improper for the government to halt the escalation of this arms race in its tracks. The one-way ratchet of ever more powerful firearms is not a constitutional inevitability. For unlike the doctrine of mutually assured destruction that some say maintained an uneasy peace during the nuclear arms buildup of the

---

[30] *See* DC Reedy & CS Koper, *Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers*, 9 INJURY PREVENTION 151, 151 (2002), *available at* http://injuryprevention.bmj.com/content/9/2/151.full#aff-1.
VIOLENCE POLICY CENTER, BACKGROUNDER ON GLOCK 19 PISTOL AND AMMUNITION MAGAZINES USED IN ATTACK ON REPRESENTATIVE GABRIELLE GIFFORDS AND OTHERS 1 (2011), *available at* www.vpc.org/fact_sht/AZbackgrounder.pdf.

Cold War, the propagation of increasingly dangerous guns on American streets has already taken an all-too- violent toll.  In other words, tempering the trend toward more dangerous weapons actually *vindicates* the core Second Amendment right of self-defense and personal safety that *Heller* recognizes. In this context, as in many others, less is more.

But even looking beyond the market saturation of large-capacity magazines, this feature runs headlong into the other threshold obstacles that *Heller* requires Second Amendment claims to clear.   As experts in effective firearms regulation have preached for years and particularly fervently in recent weeks, higher-capacity magazines pose greater dangers to public safety.  By permitting shooters using semi-automatic weapons to continue firing more bullets without interruption, these magazines increase the potential lethality of armed killers.[31]  Though well-trained gun users can change magazines quickly, this interruption may, as we saw last year in the Arizona shooting of Rep. Gabby Giffords, afford time for heroic men or women to intervene and disarm the shooter.[32]  Moreover, this interruption gives our police a chance to return fire.[33]  And it may even provide time for reflection and rethinking before murder becomes massacre.

---

[31] BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, ASSAULT-STYLE WEAPONS: HIGH-CAPACITY MAGAZINES, http://www.bradycampaign.org/legislation/msassaultweapons/highcapacity (last visited Feb. 2, 2013).

[32] Ken Dolak & Justin Wealer, *Woman Wrestled Fresh Ammo Clip From Tucson Shooter as He Tried to Reload*, ABC NEWS (Jan. 9, 2011), http://abcnews.go.com/Politics/patricia-maisch-describes-stopping-gunman-reloading/story?id=12577933.

[33] I believe I can speak for many Americans when I thank Baltimore County Police Chief Jim Johnson for the illuminating insights he has publicly offered on the threats of high-capacity weapons not just to public safety in general but also law enforcement officer safety more specifically.  *See, e.g.*, John Quinones, *Baltimore Police Chief Wants to Ban High-Capacity Firepower*, ABC NEWS (Dec. 20, 2012), http://abcnews.go.com/US/baltimore-police-chief-ban-high-capacity-firepower/story?id=18030163

Against the evident dangerousness of high-capacity magazines as a design feature, we must evaluate the strength and plausibility of asserted self-defense interests. Critics of recent proposals to reestablish a limit on high-capacity magazines have argued that firing more than ten rounds without changing a magazine is necessary for effective self-defense. While I have no doubt that subscription to this perspective among some law-abiding gun owners is sincere, I doubt that it is well-founded. It's rhetorically effective to ask, "How many bullets do *you* want in your magazine when an intruder breaks into your home?" But the answer tells us little that is of relevance to the Second Amendment as *Heller* conceives that provision. I might want a magazine with twice as many bullets as any possible home intruder; I might want a machine gun too. But in the end that can't be the measure of what the Second Amendment says I have a *right* to own and deploy.

Despite the emotional resonance of this kind of appeal, incidents like burglaries and home invasions – even when they lead to the exchange of fire – are unlikely to *require* firing many shots. The NRA publishes a regular column featuring newspaper clippings of gun owners protecting themselves against intruder attacks, and an analysis of these reports over a five-year period demonstrated that in 50% of all cases, two or fewer shots were fired, and the average number of shots fired across the entire data sample was also about two.[34] Of course, this data comes from the episodes the NRA chooses to report, so selection bias is possible, meaning the

---

[34] Claude Verner performed the analysis of reporting over the period 1997 to 2001. The findings further show that when many shots were fired, a (presumably frightened) gun owner finished an entire magazine rather than firing the number of shots that necessarily had to be fired in light of the scenario. The analysis can be found reprinted with the author's permission at *Analysis of Five Years of Armed Encounters (With Data Tables)*, GunsSaveLives.net (March 12, 2012), http://gunssavelives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables/.

average number of shots fired per incident could be even lower.[35]   Even police officers

traditionally found revolvers with six-bullet magazines sufficient for their own safety until more

dangerous guns flooded the market.[36] And we should not lose track of the bigger picture: studies

show that self-defense in the home with firearms is rare.[37] Additionally, firearms accidents are

all too common: between 1965 and 2000, unintentional shootings accounted for the deaths of

over 60,000 Americans.[38]   Firing more bullets quickly may compound their damage.

Another version of the critics' response is that in scary situations, like home invasions,

gun owners may go through bullets too quickly in a fit of nervousness or panic.[39] That may be

true, but it also aggravates the downside hazard in cases of error,[40] so it is not at all clear that

increased access to large-capacity magazines for shooters subject to fragile nerves represents a

---

[35] It seems likely, for example, that merely brandishing a weapon may often lead intruders to flee.  A non-exhaustive review of the NRA column reveals several examples of exactly this scenario, giving me the impression that the NRA's reporting is not demonstrably biased toward extreme scenarios or even those in which some shots are fired.  *See, e.g.*, Armed Citizen, NRA (March 2012), http://www.nrapublications.org/index.php/12492/armed-citizen-23/ ("[The resident] met the intruder at her bedroom door, pointed the gun at him and demanded he leave. The trespasser fled without hesitation.").

[36] *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. REV. 1443, 1489 (2009).

[37] A study of Atlanta police records, for example, found that victims of burglaries used guns in self-defense just 3% of the time.  For a description of the study and a rich discussion of self-defense uses for firearms, see DAVID HEMENWAY, PRIVATE GUNS, PUBLIC HEALTH 67 (2004). The study is A.L. Kellermann et al., *Weapon involvement in home invasion crises*, 273 J. OF THE AM. MED. ASSOC. 1759 (1995).

[38]  HEMENWAY, *supra* note 38, at 27 – 35.

[39] *See, e.g.*, Heller v. Dist. of Columbia, 670 F.3d 1244, 1261 (D.C. Cir. 2011); Emily Miller, *The High Capacity Magazine Myth*, WASHINGTON TIMES (Jan. 27, 2013), http://www.washingtontimes.com/news/2013/jan/27/the-high-capacity-magazine-myth/; Jacob Sullum, *The Threat Posed by Gun Magazine Limits*, REASON (Jan. 16, 2013), http://reason.com/archives/2013/01/16/the-threat-posed-by-gun-magazine-limits.

[40] *Heller*, 670 F.3d at 1263 - 64 ("[T]he tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." (internal quotations omitted)).

net gain for home security or public safety. Finally, some critics of magazine-capacity limits have pointed out that, realistically, many gun owners have not received proper training and for that reason, may fire bullets indiscriminately; a larger magazine – so the thinking presumably goes – will increase the chances that at least one of their wayward shots will hit its mark.[41] As the Supreme Court recognized in *Heller*, however, the Second Amendment protects only the right of "*responsible* citizens to use arms in defense of hearth and home."[42] In other words, a dangerous firearms feature otherwise outside the Second Amendment's scope cannot become subject to heightened constitutional scrutiny because of the shortcomings of *irresponsible* gun owners.

To be sure, *some* gun owners may struggle to change magazines quickly not for lack of adequate training but rather by reason of disability or old age.[43] Perhaps a ban on high-capacity magazines without any exception for the disabled or elderly might, for this reason, trigger heightened scrutiny of such a ban as applied specifically to those individuals. But the possibility that a prohibition could raise constitutional questions in some subset of its applications does not mean that the prohibition is constitutionally vulnerable on its face.[44] And it remains the case that

---

[41] *See, e.g.*, Stephen Hunder, *Why 33 rounds makes sense in a defensive weapon*, WASHINGTON POST (Feb. 6, 2011),
 http://www.washingtonpost.com/wp-dyn/content/article/2011/02/04/AR2011020407083.html
[42] Dist. of Columbia v. Heller, 554 U.S. 570, 635 (2008) (emphasis added).
[43] Yih Chau-Chang, *High-Capacity Magazines And Their Critical Role In Lawful Self-Defense*, THE EXAMINER (March 10, 2011), http://www.examiner.com/article/high-capacity-magazines-and-their-critical-role-lawful-self-defense
[44] The Supreme Court has exhibited an extreme reluctance to strike down laws on their face – meaning in all applications – when only some applications would fall afoul of a constitutional provision (with the exception of the First Amendment, as facially overbroad laws may chill protected free speech). *See* RICHARD H. FALLON, DANIEL J. MELTZER & DAVID L. SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 162, 168 (6th ed. 2009).

large-capacity magazines are highly unlikely to be necessary to self-defense in the vast majority

of home invasions or burglaries, even those that resort to the exchange of fire. The facial validity

of a high-capacity magazine ban is therefore clear.

Despite the considerable market presence of high-capacity magazines, the danger they

pose to public safety and the weakness of the self-defense justification for their possession means

that two of the three threshold *Heller* factors point strongly against extending Second

Amendment protection to high-capacity magazines.   The D.C. Circuit Court of Appeals, in a

case challenging Washington D.C.'s restriction on magazines with more than ten rounds,

recently struggled with this first stage of analysis and determined that the court did not have

before it sufficient evidence to decide whether the Second Amendment even *reached* large-

capacity magazines.[45]  However, the court went on to conclude that, even if it was proper to

extend coverage of the amendment to large-capacity magazines, the government's interest in

banning them was strong enough to do so without violating Second Amendment rights.[46]

Having now reviewed the best evidence and argumentation advanced by defenders of

high-capacity magazine possession, I doubt that the Supreme Court would find it necessary to

reach that second stage of review in dealing with a ban on high-capacity magazines and am quite

confident that, in any event, the Court would agree with the ultimate conclusion that, even if the

amendment applies, a ban on high-capacity magazines withstands Second Amendment scrutiny.

---

[45] *Heller*, 670 F.3d at 1261.
[46] *Id.* at 1263 – 64.

In explaining that conclusion, I emphasize that commonly advanced rejections of a legitimate government interest in banning high-capacity magazines are deeply misleading. Many opponents of reasonable firearms regulation insist that we tried banning large-capacity magazines in 1994: the results are in, they say, and we failed. One favorite trope is to cite to a 1997 Department of Justice study, which, according to the recent testimony of Wayne LaPierre, "proved that [the] ban had no impact on lowering crime."[47] But no one is even *arguing* that a ban on high-capacity magazines (or on assault weapons, for that matter) will necessarily decrease crime rates; highly lethal firearms will still be widely available on the market, and some criminals will use them, just as they do now.

What defenders of a ban on high-capacity magazines *do* argue is that such a ban will help prevent these criminals from killing or maiming as many people when they commit violent crimes. And that argument is solidly grounded. One study, for example, found that between 1984 and 1993, criminals using guns with high-capacity magazines  or assault weapons as defined by the 1994 Assault Weapons Ban killed or injured an average of 29 victims, compared to the average 13 victims shot by criminals unequipped with large-capacity magazines.[48] Another study suggests that, since the lapse of the ban in 2004, high-capacity magazines have once again

---

[47] *See, e.g., What Should America Do About Gun Violence?: Hearing Before the S. Judiciary Comm.,* 113th Cong. (2013) (prepared testimony of Wayne LaPierre, Executive Vice President and Chief Executive Officer of the National Rifle Association).

[48] This study considered all "mass shooting" incidents: those in which six or more were killed or twelve or more were wounded. For an explanation of this study, see Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, in* REDUCING GUN VIOLENCE IN AMERICA 167 (Daniel W. Webster & Jon S. Vernick, eds., 2013). The study is Christopher S. Koper & Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation,* 17 J. OF QUANTITATIVE CRIMINOLOGY 33 (2001).

become common in episodes of violent crime after the beginnings of a decline, which probably

took place because the black market for these magazines had begun to dry up.[49]


Even more misleading is the suggestion that in 1997 we could (or even today that we can)

draw meaningful conclusions from the absence of unmistakable evidence of a decrease in

violence following the 1994 ban.  That legislation grandfathered or exempted many thousands of

weapons already owned, and those could still be sold or transferred.[50]  In other words, the 1994

ban was crafted with long-term effects in mind; to measure its effects notwithstanding its

untimely end is to misunderstand fundamentally how the legislation was designed to work.  It is

therefore all the more telling that supporters of reasonable regulation can cite studies based upon

identifiable trends emerging during the latter years of the ban, as well as evidence from both

before and after the ban, showing that the legal availability of large-capacity magazines is indeed

correlated with increased deaths and injuries caused by gun violence.  Considered alongside the

dangerousness inherent in a large-capacity magazine as a design feature, this evidence provides

the government with a sufficient basis to satisfy the Second Amendment under any plausible

understanding of the Supreme Court's jurisprudence surrounding that amendment.

---

[49] *See* David S. Fallis and James V. Grimaldi, *Va. data show drop in criminal firepower during assault gun ban*, WASH. POST (Jan. 23, 2011), http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html (finding that in Richmond, Virginia, the percentage of guns with high-capacity magazines seized from criminals by police fell to a low of 10% by 2004, when the federal assault weapons ban expired, but has since rebounded to 22%).

[50] Koper, REDUCING GUN VIOLENCE IN AMERICA, *supra* note 49, at 165 – 66.

**Assault Weapons Ban**

By many accounts, the most important component of the newly proposed assault weapons ban is its prohibition on high-capacity magazines.[51]  But that does not mean that the remaining features of the proposal stand on weaker constitutional ground.   Far from it. Application of *Heller*'s three threshold factors – dangerousness, commonness of use, and connection to core self-defense interests – demonstrates that the Second Amendment does not provide legal shelter to the features that trigger a firearm's prohibition under the ban.

Opponents of the legislation as well as some proponents of new firearms regulation have observed that some of the "military characteristics" that can lead to prohibition under the legislation[52] (and, by some accounts, under assault weapons bans in general[53]) are mostly cosmetic traits designed to make a gun *appear* dangerous and are not, in fact, intrinsically hazardous.  But Congress would surely be acting within its constitutional authority if it were to reject this characterization as self-serving or otherwise unreliable. For example, the Brady Campaign to Prevent Gun Violence insists that "[p]istol grips . . . help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position [and that] [b]arrel

---

[51] Tom Diaz, a researcher for the Violence Policy Center, has repeatedly called on lawmakers to focus their attention on a high-capacity magazine ban. *E.g.*, Tom Diaz, *Ten Ways to Spot a Sell-Out on Gun Control*, FAIRLY CIVIL (Jan. 14, 2013, 2:26 PM), http://tomdiazgunsandgangs.com/2013/01/14/ten-ways-to-spot-a-sell-out-on-gun-control/ ("An effective law will focus on one prime feature—the ability to accept a high-capacity magazine.").
[52] *See, e.g.*, *What Should America Do About Gun Violence?: Hearing Before the S. Judiciary Comm.*, 113th Cong. (2013) (statement by Sen. Ted Cruz) ("Now, what the assault weapons ban instead targets are cosmetic features.").
[53] See, e.g., Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1295 (2009).

shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession."[54]  Moreover, even if the characterization of these features as cosmetic were accurate, it would make little difference as a constitutional matter.  In a recent televised interview, Justice Scalia explained the basis in history for exempting certain types of regulations from Second Amendment review.  Certain limitations on gun ownership are constitutionally permissible, he contended, "because there were some [regulations] that were acknowledged at the time [of the Founding]. For example, there was a tort called affrighting . . . if you carried around a really horrible weapon just to scare people, like a head ax or something. . . ."[55]  What the Justice evidently meant was that regulating weapons because they are chosen specifically for their intimidating appearance is constitutionally unproblematic because the very use of intimidation is unnecessarily disruptive to organized society.[56]

Even more important to the constitutionality of the assault weapons ban is the absence of any connection to the core Second Amendment right to defend oneself with a firearm.  At this committee's hearing on January 30, several witnesses criticized the assault weapons ban on policy grounds, but in my role as a constitutional lawyer listening intently for arguments relevant to the proposal's Second Amendment propriety, I was struck by the failure of anyone's

---

[54] Brady Campaign to Prevent Gun Violence, The Top 10 NRA Myths About Assault Weapons, http:// www.bradycampaign.org/issues/assaultweapons/nramyths/.

[55] Interview with Justice Antonin Scalia by Chris Wallace, FOX NEWS SUNDAY (July 29, 2012), *transcript available at* http://www.foxnews.com/on-air/fox-news-sunday/2012/07/29/justice-antonin-scalia-issues-facing-scotus-and-country#p//v/1760654457001.

[56] Justice Scalia's point about the tort of affrighting surfaces in the *Heller* decision itself: the majority opinion cited three illustrative examples of state courts entertaining such actions in the nineteenth century. *See* Dist. of Columbia v. Heller, 554 U.S. 570, 627 (2008) (citing, e.g., State v. Lanier, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same. . . .")).

testimony to support these features as essential to self-defense.   In fact, I have searched in vain for any reasoned arguments that pistol grips, forward grips, telescoping stocks, grenade or rocket launchers, and barrel shrouds are indispensable or even contribute to self-defense.

Finally, it is relevant to ask how many assault weapons Americans currently own.  Data is hard to come by in large part because firearms manufacturers refuse to release data tracking their sales.[57]  What we do know is that the number of weapons that would qualify under either the proposed ban's so-called "characteristics test" or its explicit list of banned models is smaller than the number of guns with standard-issue high-capacity magazines.[58]  One reporter's painstaking analysis estimated that there are 3.75 million AR-15-style rifles owned in the U.S. today, and AR-15s are the most popular although not the exclusive type of qualifying assault weapon.[59]  The NRA's lobbying arm estimates that, depending upon the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S.[60]  Given that the Congressional Research Service recently found that, as of 2009, Americans own about 310 million guns,[61] the NRA's estimate would translate into approximately 7 million assault weapons owned today. Although 7 million is hardly a negligible figure, it still corresponds to quite a small portion of the

---

[57] Justin Peters, *How Many Assault Weapons Are There in America? How Much Would It Cost the Government To Buy Them Back?*, SLATE (Dec. 20, 2012), http://www.slate.com/blogs/crime/2012/12/20/assault_rifle_stats_how_many_assault_rifles_are_there_in_america.html.

[58] *See* Koper, REDUCING GUN VIOLENCE IN AMERICA, *supra* note 49, at 161 (explaining that the universe of large-capacity magazine equipped firearms is broader than the universe of weapons satisfying the criteria for categorization as an assault weapon).

[59] Peters, *supra* note 58.

[60] *Top Ten Frequently Asked Questions*, NRA-ILA, http://www.gunbanfacts.com/FAQ.aspx (last visited February 2, 2013).

[61] WILLIAM J. KROUSE, CONG. RES. SERV., RL32842, GUN CONTROL LEGISLATION 8 (2012).

overall gun market – hardly enough to justify calling such weapons "common" within the meaning of *Heller*.

But for the purposes of constitutional analysis, debating how to characterize the significance of assault weapons' market presence would be a waste of time. To make a difference to *Heller*'s threshold inquiry, which must take notice of the complete lack of any connection of assault-weapon features to self-defense as well as these features' dangerousness in both fact and appearance, the market presence of assault weapons would have to be overwhelmingly large (and even then, I doubt seriously the bottom line would change as a constitutional matter). And overwhelmingly large it assuredly is not.

## Universal Registration and Background Checks

All responsible participants in the gun safety debate agree that some groups of people simply should not be allowed to own, keep, or carry guns. Those groups include children, dangerous felons, and those with serious mental illnesses that preclude safe gun ownership. When some observers casually compare the Second Amendment to the First, they forget this essential difference: Although freedom of speech sometimes comes at a price, and although speech can at times pose dangers, our constitutional system addresses those dangers by permitting government to impose carefully crafted limits on speech, not by limiting or licensing eligible speakers. The Constitution's strategy with respect to guns is entirely different. It addresses the dangers of guns in the wrong hands by permitting government to keep them out of

those hands in the first place, and, of course, by permitting government to regulate where and under what conditions people can bear those weapons in possible confrontation with others.

Accordingly, this Congress might be called upon to consider measures designed to minimize the risk that guns fall into the hands of such prohibited purchasers and owners. Measures dealing with straw purchases and trafficking are obviously important in that effort and are clearly constitutional. Rather than spending the committee's time on those measures, I will focus here on provisions that mandate universal registration requirements or a universal background check, closing the many notorious loopholes that characterize current laws on the subject. There is no serious doubt that requiring universal registration or a universal background check would comply with the Second Amendment.

It is important to recognize, at the outset, that prohibiting particular groups of people from owning or possessing guns is fully compatible with the Second Amendment. In the first place, such prohibitions are consistent with the original and traditional understanding of the Second Amendment. It was widely accepted at the time of the framing that not every person had a right to keep and bear arms; instead, the right was closely tied to the notion of responsible citizenship, and it has long been denied to criminals and others whose possession of guns would pose a severe danger to the public.[62] On this point, precedent aligns closely with history. The Supreme Court said in *District of Columbia v. Heller*: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the

---

[62] *See United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009).

26

mentally ill …"[63] The Court fortified this conclusion in *McDonald v. City of Chicago*, when it added: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' … We repeat those assurances here."[64]

Once the constitutionality of prohibiting gun possession by some people is accepted, the constitutionality of a reasonable system of registration or background checks follows automatically. The most powerful argument for this inference is not a technical legal point; it is, instead, common sense. And, although it shouldn't be necessary to cite authority for the point, it's worth noting that as eminent an authority as Alexander Hamilton wrote in *The Federalist* that "[t]he rules of legal interpretation are rules of *common sense*," and that the "true test" of a "just application" of these rules is whether the resulting interpretation is "consistent with reason and common sense."[65]

Consider, then, whether the Constitution would be "consistent with reason and common sense" if it allowed prohibitions on firearms purchases by felons but disallowed background checks to determine whether a felon was the would-be purchaser of a firearm. As a matter of common sense, we all know that guns do not of their own accord stay out of the hands of prohibited purchasers. Nor are prohibited purchasers likely to confess their legal inability to buy guns when talking to gun dealers. The prohibitions, in short, do not enforce themselves. In order to be effective, in order to be meaningful, in order to be anything more than rules on paper, they

---

[63] 554 U.S. 570, 626 (2008).
[64] 130 S. Ct. 3020, 3047 (2010) (plurality opinion).
[65] *The Federalist* No. 83, at 495 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

27

must be comprehensive and must be carried into operation by the government. It contradicts common sense—it ignores the fact that "the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men"[66]—to say on the one hand that prohibiting felons from owning guns is constitutional, but to insist on the other hand that the background checks that seek to make those prohibitions effective are unconstitutional.

The Supreme Court's decisions in *District of Columbia v. Heller* and *McDonald v. City of Chicago* confirm the constitutionality of reasonable background check requirements. *Heller* expressly affirms that the Court was not calling into doubt "laws imposing conditions and qualifications on the commercial sale of arms."[67] The *McDonald* Court "repeat[ed] those assurances," observing that its holding "does not imperil every law regulating firearms."[68] The universal registration requirement or background check is simply a "condition[]" on the transfer of arms; it is therefore expressly within the zone of permissible regulation identified by *Heller* and *McDonald*.

Analogous Supreme Court doctrine points in the same direction. The right to vote, like the right to keep and bear arms, is a fundamental right of Americans.[69] But no serious legal scholar doubts that before letting a citizen cast his ballot, the government may require the citizen to register and may take steps to check whether he or she really is an eligible voter. And the

---

[66] *NFIB v. Sebelius*, 132 S. Ct. 2566, 2589 (2012) (opinion of Roberts, C.J.) (quoting *South Carolina v. United States*, 199 U.S. 437, 449 (1905)).

[67] 554 U.S. at 626–27.

[68] 130 S. Ct. at 3047 (plurality opinion).

[69] *Compare Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) (holding that the right to vote is fundamental), *with McDonald v. City of Chicago*, 130 S. Ct. 2020 (2010) (holding that the right to keep and bear arms is fundamental).

Supreme Court agrees; in *Crawford v. Marion County Election Board*, for example, it concluded that Indiana's voter ID law was a permissible means of ensuring that only eligible voters participate in an election.[70] Checking whether a voter is eligible before giving that voter a ballot is comparable to checking whether a purchaser is eligible before letting her acquire a gun. Just as the former is constitutional, so is the latter. And the argument is of course even stronger in the instance of firearms. For, unlike a ballot in the hands of an ineligible voter, which might in the end prove to make no difference to who wins or loses the election at issue, a gun in the hands of even one ineligible owner poses a deadly danger all by itself.

History reinforces common sense and case law in this regard. The Supreme Court in *Heller* and *McDonald* stressed the role of history in interpreting the scope of the Second Amendment; "longstanding" prohibitions upon gun ownership, the Court indicated, are presumptively exempt from Second Amendment scrutiny.[71] Lower courts have likewise noted that history plays an important, though not exclusive, role in determining the scope of permissible regulation under the Second Amendment.[72] Measures to keep guns out of the hands of prohibited owners – owners who could not safely be entrusted with control of a lethal weapon – have a strong historical pedigree. For example, many states have longstanding laws— sometimes, laws dating back a century or more—requiring sellers to keep registers of all firearm purchasers; the registers had to be open to peace officers.[73] The government could use thus use

---

[70] 553 U.S. 181 (2008) (plurality opinion).

[71] *See* 554 U.S. at 626–27; 130 S. Ct. at 3047 (plurality opinion).

[72] *See, e.g., Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010).

[73] *See Heller*, 670 F.3d at 1253–54.

these registers to determine whether any of the purchasers had obtained weapons in violation of the law.

To be sure, modern computerized background checks differ from the more cumbersome historical enforcement measures known to hisory. But "a constitution [is] intended to endure for ages to come."[74] Just as the Second Amendment covers modern weapons, like handguns, that did not exist when the Bill of Rights was ratified in 1791, so too does it cover modern enforcement measures, like mandatory computerized background checks, that could not have been anticipated in 1791. Reasonable background checks fit into the long historical tradition to which registration requirements belong, and that is enough to sustain them without further ado under the tests established by the Supreme Court in *Heller* and *McDonald*.

In short, all relevant legal considerations—logic and common sense, directly applicable precedent, analogies to surrounding legal doctrines, and history and tradition—point to the same conclusion. The Second Amendment does not prohibit Congress from passing laws to carry into effect concededly constitutional prohibitions on firearm purchases. The universal background check, in particular, easily passes constitutional muster as a permissible regulation of the transfer of firearms.

This is not to say that all conceivable background check systems would comport with the Constitution. Suppose, for example, that Congress were to pass a law requiring handgun purchasers to undergo an extensive check on the purchasers themselves and all their family

---

[74] *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819).

30

members and housemates, a check that took years to complete. Such a scheme would plainly impose a very severe burden on the right to keep and bear arms for self-defense. The burden would be entirely disproportionate to the objective the government is seeking to pursue. Where a background check is taken to such lengths that it effectively destroys the right to keep and bear arms, rather than ensuring that the right is enjoyed only by those constitutionally entitled to it, the government has overstepped the lawful boundaries of its power.

Such concerns are entirely out of place here, however. Whether a particular background check scheme that Congress adopts would go too far obviously depends on the specific details of that scheme. But none of the proposals seriously under consideration at the present come remotely close to overstepping constitutional boundaries. The proposed background check frameworks, especially those that rely on checks conducted instantaneously through the National Instant Background Check System, impose a constitutionally insignificant burden upon law-abiding citizens. Indeed, an instant background check is much *less* onerous than the Voter ID law that the Supreme Court upheld in *Crawford v. Marion County Election Board*; it is also much less cumbersome than longstanding registration requirements and other conditions on sale[75] that are concededly constitutional. Ultimately, therefore, I see no merit to the constitutional objections to the background check proposals presently being seriously considered by Congress.

### III. The Consistency of the President's Measures with the Separation of Powers

---

[75] *See Heller*, 670 F.3d at 1253.

This January, President Obama announced twenty-three steps that his Administration would take to prevent gun violence.[76] The President has begun to implement these steps by using the executive powers vested in him by the Constitution and laws of the United States. Because the President adopted these measures by executive action, without specific congressional involvement, some have concluded that the President violated the separation of powers established by the Constitution. This claim is legally untenable; the President is acting well within his powers as head of the executive branch.

Some of the President's measures involve nothing beyond communicating with members of the public. Measure 23, for example, is to "[l]aunch a national dialogue ... on mental health." There is plainly no constitutional problem with executive steps of this sort. The President obviously does not need congressional permission every time he decides to give a speech or publish a press release.

Another category of measures—and this covers the great majority of the actions that the President has committed to take—includes steps that will improve the enforcement of federal laws already on the books. Thus, the President has agreed to "[m]aximize enforcement efforts to prevent gun violence and prosecute gun crime."[77] He has likewise decided "to require federal law enforcement to trace guns recovered in criminal investigations."[78] These improvements to

---

[76] *See, e.g.*, Colleen Curtis, *President Obama Announces New Measures to Prevent Gun Violence*, Jan. 16, 2013, available at http://www.whitehouse.gov/blog/2013/01/16/president-obama-announces-new-measures-prevent-gun-violence.

[77] Measure 13.

[78] Measure 9.

federal law enforcement efforts plainly fall within the President's constitutional power—and constitutional responsibility—to "take Care that the Laws be faithfully executed."[79]

A third group of measures involves the making of rules and regulations under preexisting congressionally granted authority. For instance, step 21—"[f]inalize regulations clarifying essential health benefits and parity requirements within ACA exchanges"—simply carries into effect authority granted by the Patient Protection and Affordable Care Act.[80]

Step 11, "[n]ominate an ATF director," is equally clearly within the President's constitutional powers; the Constitution expressly states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Officers of the United States."[81] Likewise, the Constitution plainly authorizes the President's requests for information from executive branch officials, such as step 15, "direct[ing] the Attorney General to issue a report on the availability and most effective use of new gun safety technologies and challenge the private sector to develop innovative technologies"; Article II provides that the President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."[82]

Finally, and perhaps most controversially, some of the President's measures entail the issuance of interpretations of existing laws. To this class belongs, for instance, step 16, "[c]larify[ing] that the Affordable Care Act does not prohibit doctors asking their patients about

---

[79] U.S. Const. art. II, § 3.
[80] Patient Protection and Affordable Care Act of 2010, Pub. L. 111-148, § 1321(a).
[81] U.S. Const. art. II, § 2, cl. 2.
[82] U.S. Const. art. II, § 2, cl. 1.

guns in their homes." To be sure, the Article III judiciary must ultimately interpret laws when applying those laws in the context of concrete cases or controversies. But it is well established that the President also has the authority to interpret the law—and especially the power to announce legal interpretations concerning issues that have not yet been settled by the courts. In fact, the tradition of presidential clarifications of the law goes back to President George Washington's Neutrality Proclamation. The tradition also has a solid grounding in the text of the Constitution; it is based on the Constitution's vesting in the President of "the executive Power," and in its imposition on the President of the power and duty to "take Care that the Laws be faithfully executed."[83]

In sum, although some opponents of gun regulation might disagree with some of the President's executive actions as a matter of policy, those disagreements cannot plausibly be translated into constitutional objections. From a separation-of-powers perspective, the President has acted well within the bounds of his constitutionally assigned authority.

*****************

In closing, I note that I share the beliefs of many that the prevalence of guns in our country is by no means the only significant contributor to the tragedy at Newtown and to the many other gun-related massacres we have seen in recent months and recent years, or to the deaths of an average of over 30 Americans, nearly 5 of them children, *each and every day* as a result of gunfire homicides in less visible, and often virtually unnoticed, tragic incidents. [84]

---

[83] U.S. Const. art. II, §§ 1, 3.

[84] The Center for Disease Control reports that in 2010, 11,078 individuals in the U.S. died from firearm-related homicides.  1,773 of them were between the ages of 0 and 19. *See* CENTER FOR DISEASE CONTROL, NATIONAL CENTER FOR INJURY PREVENTION & CONTROL, *WISQARS*

Violence has many causes. Violent video games, for example, some of them simulating mass shootings, may well play a significant role in the inculcation of violent attitudes among children.[85] And mental illness plainly played a significant part in bringing about the massacre at Newtown. If our country is to reduce the incidence of similar unspeakable violence in the future, the widespread availability of high-powered guns to people who should not possess them and who have no constitutional right to do so is by no means the only phenomenon that our government, our society, and our families need to address.

But it is simply not true that the presence of other causes of gun violence means that we neither can nor should do anything significant about the prevalence, too often in the wrong hands, of high-powered guns and high-capacity magazines that turn those guns from means of self-defense into weapons of mass destruction. It is not true constitutionally, it is not true politically, and it is not true morally. We must do our best to address in a serious way *every* source of avoidable death by firearms that we can, and if we always point to other problems still waiting to be solved we will never get started.

The time to get started on sensible gun regulation is not now—it was weeks, months, years, even decades ago. The Second Amendment is not a barrier. We have already delayed too long, and our society has paid a terrible price. We should delay no longer.

---

*Fatal Injury Reports, National and Regional, 1999 – 2010,*
http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html (last visited Feb. 4, 2013).
[85] *See Brown v. Entertainment Merchants Ass'n,* 131 S. Ct. 2729, 2767–71 (2011) (Breyer, J., dissenting).