IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARIE S. FRIEDMAN, M.D. and The Illinois State Rifle Association, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) No. 13-cv-09073 ) |
| THE CITY OF HIGHLAND PARK, | ) Hon. John W. Darrah ) |
| Defendant. | ) |

**BRIEF OF AMICUS CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE
IN SUPPORT OF DEFENDANT'S RESPONSE TO
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

On June 24, 2013, the Highland Park City Council adopted Ordinance No. 68-13, which prohibits the manufacture, sale and possession of military-style assault weapons and large capacity ammunition magazines ("LCMs") within Highland Park, subject to certain specified exemptions (the "Highland Park Ordinance"). Like many other jurisdictions, Highland Park has appropriately sought to protect its residents from the dangers posed by the small subset of military-style semi-automatic weapons that are specifically designed for offensive use and that are most apt to injure innocent bystanders. These jurisdictions recognize that assault weapons enable the killings of large numbers of people in seconds, and they have been used with deadly efficiency in some of the most horrific mass killings in American history, including the killing of 26 children and educators at Sandy Hook Elementary School and 13 students and teachers at Columbine High School. The very attributes that make these military-style weapons so useful for mass killers, make them of little or no value for legitimate self-defense use, thereby removing them from the constitutional protection afforded by *Heller*. At the same time, Highland Park's law does not prevent law-abiding persons from possessing conventional firearms, including

countless makes and models of semi-automatic handguns, rifles and shotguns. Plaintiffs do not dispute this and, thereby, have not articulated a burden on their Second Amendment right.

The reality is that post *Heller* numerous courts have carefully evaluated similarly-drafted assault weapon laws and *not one* of those courts have declared them unconstitutional under the Second Amendment. *See e.g., Shew v. Malloy*, -- F.Supp.2d. --, 2014 WL 346859 (D.Conn. Jan. 30, 2014) (upholding constitutionality of Connecticut's assault weapon and LCM law); *New York State Rifle and Pistol Association, Inc. v. Cuomo*, --- F.Supp.2d ----, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013) ("*NYSRPA*") (same with regard to the New York law); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") (same for the District of Columbia). These courts recognize that the weapons covered by such laws, which are used in mass shootings and other crimes at rates far higher than other firearms, are not entitled to protection under the Second Amendment. As is clear from *Heller*, the Second Amendment does not protect arms that are not in common use for the lawful purpose of self-defense, or arms that are particularly dangerous. That includes the assault weapons at issue here, which were "designed for rapid fire, close quarter shooting at human beings." *See* U.S Dep't of Treasury, *Assault Weapons Profile* 19 (Apr. 1994) (quoted in *Heller II*, 2011 WL 4551558, at *15).

## INTEREST OF AMICUS CURIAE

The Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. The Brady Center has a substantial interest in ensuring that the Second Amendment is not interpreted to jeopardize the public's interest in protecting families and communities through strong government action to prevent gun violence. Through its Legal Action Project, the Brady Center has filed numerous *amicus curiae* briefs in cases involving firearms regulations, including

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010); *United States v. Hayes*, 555 U.S. 415 (2009) (citing Brady Center brief); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *NYSRPA*, 2013 WL 6909955 (citing Brady Center brief); *Heller II*, 670 F.3d 1244; and *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc).

## ARGUMENT

I. **UNDER THE PRINCIPLES ESTABLISHED BY *HELLER* AND ITS PROGENY, REASONABLY-TAILORED ASSAULT WEAPONS LAWS ARE CONSTITUTIONAL**

A. **The Principles Set Forth by *Heller* and its Progeny**

The Supreme Court defined the scope of protection under the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008). In striking down the District of Columbia's "complete prohibition" on operable firearms, the Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 629, 635. In *McDonald v. City of Chicago*, the Court held that "the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." 130 S.Ct. 3020, 350 (2010). Most notably, the Court never provided in those decisions that firearm regulations are subject to a strong presumption against constitutionality, or as the Plaintiffs claim, subject to "categorical protection." (Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction, "Br." at 3, 5, 11.) Instead, the Court was careful to limit the scope of the right protected by the Second Amendment, recognizing that many forms of regulation remain valid.

First, *Heller* made it clear that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and does not amount to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. In furtherance of this limited protection, the Court proclaimed that an individual right to keep and bear arms for self-defense is subject to certain regulation by the legislature. It recognized

that legislatures retain "a variety of tools for combating" the "problem of handgun violence" short of a total ban on all handgun possession. *Id.* at 636. The Court was extremely cautious that its decision not be used to choke off efforts to design valid firearms regulations. For this reason, it set forth a non-exclusive illustrative list of "presumptively lawful" regulations. *Id.* at 626-7.

Second, *Heller* held that the historical tradition of this nation justifies prohibitions on the carrying of "dangerous and unusual weapons." *Id.* at 627. The Supreme Court cited, for example, Blackstone, who stated that "[t]he offence of *riding or going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land . . . ." 4 Blackstone 148 (1769). It also cited *English v. State*, 35 Tex. 473 (1871), which held that the Second Amendment did not protect certain types of weapons that are used for criminal purposes. According to *English*:

> To refer the deadly devices and instruments called in the statute 'deadly weapons' to the proper and necessary arms of a 'well-regulated militia,' is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.

35 Tex. 473, at *3.

Third, the Supreme Court in *Heller* set parameters on the type of scrutiny to apply to firearms regulation, though it declined to articulate a specific level of scrutiny. 554 U.S. at 634. *Heller* implicitly rejected strict scrutiny, as it set forth certain laws that are "presumptively lawful," without any showing of need or fit that would satisfy a strict scrutiny analysis. *Id.* at 626-27. And although the Court held that rational basis review was inappropriate in the context of the handgun ban at issue, *Heller* repeatedly identified that the primary reason for its holding was that the severity of the ban amounted to a "destruction of the right." *Id.* at 629. The Seventh

Circuit has recognized that, under *Heller*, firearm regulations that amount to less than "blanket prohibitions" on the right of armed self-defense will not require the government "to prove so strong a need" for its regulation. *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012).

Pursuant to the guidelines set forth by *Heller*, courts have established a clear framework through which to analyze the rights guaranteed by the Second Amendment. First, a court "determines if the provision in question impinges upon a Second Amendment right." *Shew*, 2014 WL 346859, at *4. This analysis requires a court to determine "whether the regulated firearms or magazines are commonly used for lawful purposes and, if they are, whether the legislation substantially burdens a Second Amendment right." *Id.* If the law in question does not implicate an activity falling inside the scope of the Second Amendment, then the analysis stops and "the regulated activity is categorically unprotected." *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011). However, if the evidence is inconclusive or suggests that a regulated activity is not categorically unprotected, then there must be a second inquiry into the strength of the government's justification for regulating the exercise of Second Amendment rights. *Id.*[1] Some courts have chosen to *assume* that the disputed legislation impinges on a Second Amendment right and move directly to the second portion of the analysis. *See NYSPRA*, at *11.

---

[1] Plaintiffs argue that Highland Park cannot possibly be justified in passing an assault weapons law because it "has a very low incidence of crime of any kind, particularly violent crime." (Br. at 11.) But *Heller* does not impose a requirement that a community suffer through a mass shooting or develop a violent crime problem before implementing firearms regulations. The court in *Shew* recognized that the Connecticut assault weapons law was not passed due to a high incidence of violent crime, but rather, was inspired by the Sandy Hook Elementary School shooting. *Shew*, 2014 WL 346859, at *8 ("Connecticut's General Assembly made its legislative judgment concerning assault weapons and LCM possession after the mass-shooting at Sandy Hook Elementary School."); *see also NYSRPA*, 2013 WL 6909955, at *2 (recognizing that New York passed its law "[i]n response to the tragic and incomprehensible shooting at Sandy Hook Elementary School."). Indeed, *English v. State*, which the *Heller* majority cited as supporting the historical tradition for bans on "dangerous and unusual" weapons, recognized that "[i]t is one of the undisputed functions of government, to take precautions against crime before it has been committed . . ." 35 Tex. 473, at *3 (Tex. 1871) (quoting John Stewart Mill).

B.   **Courts Applying *Heller* Have Overwhelmingly Held that Laws Similar to the Highland Park Ordinance are Constitutional**

Courts are overwhelmingly in agreement that laws restricting the possession of assault weapons, such as the Highland Park Ordinance, are constitutional. *See e.g., Shew*, 2014 WL 346859 at *1 (Connecticut Public Act 13-3, which prohibits the ownership of certain assault weapons and large capacity magazines, is constitutional); *NYSRPA*, 2013 WL 6909955, at *1 (same with regard to analogous provisions of the New York Secure Ammunition and Firearms Enforcement Act of 2013); *Heller II*, 670 F.3d 1244 (same for the District of Columbia equivalent). In fact, post-*Heller*, no court has found an assault weapons ban similar to that of Highland Park to be unconstitutional.[2]

The common thread running through these post-*Heller* assault weapon decisions is the recognition that: (1) *Heller* allows firearms prohibitions which apply to a small subset of particularly dangerous weapons and leave the public with numerous firearms options for self-defense; and (2) that legislatures enacting such laws are entitled to due deference, so long as the laws are based on reasonable inferences drawn from substantial evidence.

First, post-*Heller* assault weapon cases are in agreement that the statutes at issue are not blanket firearms bans akin to the Washington, D.C. ban in dispute in *Heller*. "Unlike the law held unconstitutional in *Heller*, the laws at issue here do not prohibit the possession of "the quintessential self-defense weapon," to wit, the handgun." *Heller II*, 670 F.3d at 1261-62; *see also Shew*, 2014 WL 346859 at *7. The laws contain prohibitions on a small subset of particularly dangerous weapons, which leave a host of options available for gun owners to use

---

[2] The Supreme Court of Illinois in *Wilson v. County of Cook* declined to rule on the constitutionality of the Cook County assault weapons law, preferring to send it back to trial court for an empirical inquiry into the nature of weapons covered by the law. 2012 IL 112026 at *656-57 (Ill. 2012).

for self-defense. *See e.g., Shew*, 2014 WL 346859, at *7 ("The challenged legislation provides alternate access to similar firearms and does not categorically ban a universally recognized class of firearms."); *Wilson*, 2012 IL 112026, at *655 (noting that the ordinance at issue is not "a complete ban on all semiautomatic firearms. Instead, it covers a particular subset of these weapons with particular characteristics, that the County has determined make them capable of firing rapidly, delivering a large number of shots without reloading and creating a high risk of collateral damage."). Indeed, the District of Columbia, whose assault weapon law was found to pass constitutional muster in *Heller II*, compiled a list of hundreds of firearms that are not subject to the ban.[3] These alternatives provide more than adequate means of self-defense.[4]

Every court to consider the constitutionality of assault weapons law has recognized the unique dangers posed by this small subset of firearms. For example, in *Heller II*, the D.C. Circuit properly deferred to the D.C. Council's judgment that "assault weapons ... creat[e] 'mass produced mayhem'"; their "military features ... are designed to enhance their capacity to shoot multiple targets very rapidly"; they "place law enforcement officers 'at particular risk ... because of their high firepower'"; and they "'account for a larger share of guns used in mass murders and murders of police.'" 2011 WL 4551558, at *15 (citations omitted).[5]

---

[3] *See* MPDC, Firearms Eligible for Registration in the District of Columbia, at 4-15, *available at* http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/firearms_eligible_registration.pdf.

[4] Nor does the Highland Park Ordinance burden the ability of law-abiding Highland Park residents to hunt. The State Department of Natural Resources imposes limitations on the firearms that can be used to hunt that are far more restrictive than the Highland Park Assault Weapons Ban. *See* http://www.dnr.illinois.gov/hunting/Pages/HuntingDevicesandAmmunition.aspx.

[5] Court decisions pre-dating *Heller II* similarly noted the extraordinary dangerousness of assault weapons. *See e.g., Springfield, Inc. v. Buckles*, 292 F.3d 813, 818 (D.C. Cir. 2002) (crediting ATF's decision that certain assault weapons "had increasingly been used in the commission of violent crimes"); *Navegar, Inc. v. United States*, 192 F.3d 1050, 1061 (D.C. Cir. 1999) (upholding federal assault weapon ban because Congress acted "[b]ased on the grave dangers posed by [semi-automatic assault weapons] before prior federal and state laws could be enforced").

Second, post-*Heller* courts evaluating assault weapons law have recognized that legislatures are entitled to due deference in furthering the important government objective of crime prevention and public safety, so long as the legislatures draw "reasonable inferences from substantial evidence." As the federal court in Connecticut noted recently:

> The legislature is far better equipped than the judiciary to make delicate political decisions and policy choices concerning the dangers in carrying firearms and the manner to combat those risks. Accordingly, the court must only assure that, in formulating its judgments, Connecticut has drawn reasonable inferences based on substantial evidence.

*Shew*, 2014 WL 346859, at *8 (internal citations omitted); *see also e.g., NYSPRA*, 2013 WL 6909955, at *18 ("This Court's role is to assure that, in formulating its judgments, New York has drawn reasonable inferences based on substantial evidence.") (internal citations omitted). Further, to pass constitutional challenge, the fit between the firearm regulation and the stated objective "need only be reasonable not perfect." *See e.g., Shew*, 2014 WL 346859, at *8 (internal citations omitted).

## II. THE WEAPONS REGULATED BY THE ORDINANCE FALL OUTSIDE THE PROTECTION OF THE SECOND AMENDMENT BECAUSE THEY ARE EXTRAORDINARILY DANGEROUS AND NOT APPROPRIATE FOR LEGITIMATE SELF-DEFENSE PURPOSES

Highland Park's assault weapons law is consistent with the scope of the Second Amendment right recognized in *Heller*, for it covers only a small subset of unusually dangerous weapons that are not commonly used for lawful self-defense. *See People v. James,* 94 Cal. Rptr. 3d 576, 585-586 (Ct. App. 2009) ("*Heller* does not extend Second Amendment protection to assault weapons[.]"). Plaintiffs' flimsy empirical evidence simply does not demonstrate that the weapons banned by the Highland Park Ordinance are commonly used by civilians *for lawful purposes*. In fact, the opposite is true – the banned assault weapons are extraordinarily dangerous and, while useful for mass shootings and other offensive assaults, they are not

appropriate – and certainly not necessary – for the legitimate self-defense purposes outlined in *Heller*.

### A. The Banned Weapons are Not in Common Use for Lawful Purposes

Although Plaintiffs attempt to blur the scope of the law, the Highland Park Ordinance does *not* cover all semi-automatic weapons or even a significant portion of them. Instead, the law is narrowly tailored to allow the continued possession of vast numbers of semi-automatic weapons that can be purchased for self-defense. The ban applies only to a limited class of nonconventional firearms, that is, those semi-automatic weapons that accept a detachable magazine *and* have at least one enumerated military-style feature. *See* Highland Park City Code § 136.001(C). These features greatly increase the assaultive capacity and thus the dangerousness of the weapons; they also significantly narrow the scope of the ban. In fact, the weapons banned by Highland Park comprise only a tiny fraction of firearms in circulation. *See e.g.*, Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban* 10 (Report to National Institute of Justice, U.S. Dep't of Justice, June 2004) ("Koper, *An Updated Assessment*") ("Around 1990, there were an estimated 1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock)[.]").[6]

Plaintiffs' attempts to demonstrate that these weapons are used for *lawful* purposes are based on highly questionable statistics. Plaintiffs cite to a "nationwide survey" in which gun owners identified "recreational target shooting" and "home defense" as the primary reasons for the purchase of their rifles. (Br. at 8.) But the survey *only* provides *lawful* purposes as possible reasons for owning a weapon. (Br., Ex. 4, Curcuruto Aff. at Ex. C, 34.) In any case, it is unlikely that gun owners responding to a survey would list an *unlawful* purpose as the primary

---

[6] Available at http://www.ncjrs.gov/pdffiles1/nij/grants/ 204431.pdf.

reason for owning a weapon. Plaintiffs' other "survey" of gun owners is neither scientific nor representative. While Plaintiffs assert that "nearly 60% of those surveyed indicated that they own a semi-automatic rifle with a detachable magazine for home protection," (Br. at 8), Plaintiffs' affiant David A. Lombardo, an NRA Law Enforcement Instructor and Training Counselor, merely "personally surveyed students in the firearm classes [he] taught in 2013 to determine what type of firearm they keep in their home for self-defense purposes." (Br., Ex. 3, Lombardo Aff. ¶ 5.) No additional information on the Lombardo "survey" is provided.

Plaintiffs also point to sales and manufacturing statistics to show that the banned weapons are in common use. (Br. at 7.) But as the court in *NYSPRA* explained, "ownership statistics alone are not enough. The firearms must also be possessed for lawful purposes, like self-defense." 2013 WL 6909955, at *11. Plaintiffs' reliance on a National Shooting Sports Foundation report for the assertion that a large number of AR-type rifles were produced and sold in, and imported into, the United States from 1998-2012 does not demonstrate that these weapons were used by *civilians*, rather than law enforcement or military, and does not indicate that they were used for lawful purposes. (Br. Ex. 4 at Ex. B.)[7]

In fact, many dangerous weapons manufactured and sold in the United States are diverted to criminal use. Every year tens of thousands of U.S.-made weapons are purchased by "straw" purchasers in the United States and smuggled to Mexico for use by drug cartels. *See* Colby Goodman, *Update on U.S. Firearms Trafficking to Mexico Report* 5 (Apr. 2011).[8] The mere fact

---

[7] Plaintiffs' motion incorrectly cites to Exhibit 3, the Lombardo affidavit, for these statistics. (Br. at 7.)

[8] *Available at* http://www.wilsoncenter.org/sites/default/files/Update%20on%20U.S.%20Firearms%20Trafficking%20to%20Mexico%20Report.pdf (between 2007 and 2009, more than 69,808 firearms were recovered in Mexico, with a majority having a nexus to the United States).

that a certain number of weapons may be manufactured or sold does not demonstrate that Americans commonly own these guns for lawful use.

B. **The Weapons Banned by the Ordinance are Unusually Dangerous**

The very features that bring assault weapons within the scope of Highland Park's Ordinance render these firearms uniquely dangerous, and useful for offensive assaults, rather than lawful self-defense. As noted above, Highland Park classifies as "assault weapons" only a narrow subset of semi-automatic firearms that *also* possess specific functional features such as protruding grips, folding or telescopic stocks, barrel shrouds, or muzzle brakes. "'[These] military features ... are designed to enhance [these firearms'] capacity to shoot multiple human targets very rapidly." *Heller II*, 2011 WL 4551558, at *15 (quoting Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence (Oct. 1, 2008) ("Siebel Testimony")).

Protruding grips. Protruding pistol grips "were designed to assist in controlling machineguns during automatic fire" and allow the shooter to spray-fire from the hip position. ATF & Dep't of the Treasury, *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* ("ATF Report"), Ex. 5 (Apr. 1998); *see also Heller II*, 2011 WL 4551558, at *15 ("Pistol grips on assault rifles ... help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position." (quoting Siebel Testimony)). Further, protruding pistol grips can "be an aid in one-handed firing of the weapon in a combat situation." *ATF Report* Ex. 5. By contrast, there is no reason to believe that such grips improve a firearm's performance in the overwhelming majority of self-defense encounters. Nor are such grips of any value for sporting purposes, since spray-firing and "one-handed shooting [are] not usually employed in hunting or organized competitive target competitions." *Id.* [9]

---

[9] Likewise, the "predominant advantage [of folding and telescoping stocks] is for military purposes." *ATF Report* Ex. 5. These stocks' "main advantage ... is portability, especially for airborne troops[.]"

Barrel Shrouds. Barrel shrouds serve the purpose of protecting the shooter's hand from the heat generated by firing many rounds in rapid succession, an attribute useful for mass assaults but hardly needed to defend oneself in the home. The City specifically incorporated this functional consideration in its statutory definition of "assault weapon." *See* Highland Park City Code § 136.001(C)(3)(c) ("A shroud attached to the barrel, or that partially or completely encircles the barrel, *allowing the bearer to hold the Firearm with the non-trigger hand without being burned*[.]" (emphasis added)).

Muzzle Brakes and Compensators. Muzzle brakes and compensators are devices designed "to reduce recoil" and "to control muzzle movements." *See* Highland Park City Code § 136.001(H),(I). In other words, their purpose is to control "muzzle climb"—*i.e.*, the tendency of the weapon's recoil to force the barrel up, and off target, after each round is fired. Muzzle climb, however, only occurs when shooters fire their weapons so rapidly that they cannot reacquire the target between shots. *See ATF Report* Ex. 5. As in the case of protruding grips, then, the utility of muzzle brakes and compensators is largely confined to offensive, rapid-fire uses. Indeed, the assaultive purpose of these devices is confirmed by their own manufacturers, which market them as a means of "enhanc[ing] control and accuracy *during full auto and rapid fire*." Troy Industries, Medieval Muzzle Brake 5.56 mm, https://troyind.com/products/medieval-muzzle-brake-556 (last visited February 6, 2014) (emphasis added).

In sum, semi-automatic assault weapons presenting the features enumerated in the Highland Park Ordinance have "a military configuration that was designed for killing and disabling the enemy." *ATF Report*, at 1. In 1994, the ATF concluded that "[y]ou will not find

---

*Id.* Moreover, firearms equipped with telescoping or folding stocks are uniquely dangerous to bystanders: while "[t]hese stocks allow the firearm to be fired from the folded position, ... it cannot be fired nearly as accurately as with an open stock." *Id.*

these weapons in a duck blind or at the Olympics," but rather these weapons were "designed for rapid fire, close quarter shooting at human beings." *See* U.S Dep't of Treasury, *Assault Weapons Profile* 19. As such, they create "mass produced mayhem" without materially improving a shooter's self-defense capabilities. *Id.* (quoted in *Heller II*, 2011 WL 4551558, at *15).

Plaintiffs attempt to characterize the prohibited assault weapons as "simply reflect[ing] technological advancement in firearm design" (Br. at 9.), but a gun industry trade magazine, *Shooting Sports Retailer*, demonstrates the disingenuousness of this claim:

> Hunters, quite frequently will not be impressed by the 'tactical coolness factor' that has drawn many new shooters into the shop looking for a gun. In fact, some of them will likely be put off by the military-esque attitude and marketing …**The tactical coolness factor does, on the other hand, attract a lot of first time gun buyers** …Unlike many of the hunting demographic, these potential buyers will likely be interested only in tactical guns, and **the military-ish looks and features will be a big selling point** with them…Many of the news shooters attracted to tactical guns for their first firearms purchase will think that they know guns because they've played a lot of first-person shooter video games….

Violence Policy Center, *Freedom Group's Militarized Marketing* (January 2014) (citing Shooting Sports Retailer, *Selling Tactical* (July/August 2013) (emphasis added), available at http://www.vpc.org/studies/freedomgroup.pdf.

In reality, the extraordinary dangerousness of assault weapons is confirmed by the fact that they are often indistinguishable from military-grade firearms, other than firing semi-automatically rather than fully automatically. Notably, Plaintiffs admit that "rifles built on the AR-platform, were…based on the M-16 rifle used by U.S. forces in Viet Nam." (Br. At 10.) This admission is critical, as the Supreme Court has already indicated that "M-16 rifles *and the like*" may be banned as "'dangerous and unusual.'" *Heller*, 554 U.S. at 627 (emphasis added). As the D.C. Circuit held in *Heller II*, "[S]emi-automatics still fire almost as rapidly as automatics." 2011 WL 4551558, at *15 (citing Siebel Testimony ("30-round magazine" of Uzi

"was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic")). Furthermore, the "AR-15 and other [formerly] federally banned assault weapons ... 'accept ammunition magazines made for ... military weapons.'" *Id.* (quoting Koper, *An Updated Assessment* 4)).

A long history of mass shootings confirms that assault weapons are disproportionately chosen by those who intend to inflict mass mayhem. A 2004 study supported by the Department of Justice concluded that assault weapons "account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful." Koper, *An Updated Assessment* 51, 87. Similarly, a 2013 study utilizing data collected by the FBI indicates that assault weapons or high-capacity magazines were used in 28% of mass shootings between January 2009 and January 2013. Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (February 22, 2013).[10] Consistent with these findings, the available evidence suggests that attacks carried out with assault weapons tend to be particularly lethal. The Mayors Against Illegal Guns study demonstrates that in mass shootings using assault weapons, high-capacity magazines, or both, over twice as many people were shot and 57% more people were killed than in shootings using other weapons. *Id.* Relatedly, a recent study on violence in Mexico concluded that the 2004 expiration of the U.S. Federal Assault Weapons Ban led to a 38% increase in homicides in Mexican municipalities along the Arizona, New Mexico and Texas border, as compared to municipalities along the California border (as California had retained its state-level ban on assault weapons). Dube et al., *Cross-Border Spillover: U.S. Gun Law and Violence in Mexico*, American Political Science Review, Vol. 107, No. 3, 407 (August 2013).[11]

---

[10] *Available at* http://www.washingtonpost.com/blogs/wonkblog/files/2013/02/mass_shootings_2009-13_-_jan_29_12pm1.pdf.

[11] *Available at* https://files.nyu.edu/od9/public/papers/Cross_border_spillover.pdf.

These troubling statistics are confirmed by abundant demonstrative evidence. For example, John Allen Muhammad and Lee Boyd Malvo, known as the Beltway snipers, terrorized the Washington, D.C. metropolitan area for weeks and killed ten people using a Bushmaster XM-15—a firearm specifically identified as an assault weapon under the City's Ordinance. *See* Highland Park City Code § 136.001(c)(7)(a)(iii). Adam Lanza used the same weapon to kill 26 children and educators at Sandy Hook Elementary School. Just a few of the other mass killings perpetrated with assault weapons include those at Columbine High School, the 1993 law office shooting at 101 California Street in San Francisco (8 were killed and 6 wounded), and the December 2007 mall shooting in Omaha in which 9 people were killed. As these tragedies show, assault weapons are particularly well suited for those who desire to impose maximum destruction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Respectfully submitted,

/s/ Alexander D. Marks

| | |
|---|---|
| Jonathan E. Lowy<br>Elizabeth M. Burke<br>Alla Lefkowitz<br>Brady Center to Prevent Gun Violence<br>Legal Action Project<br>840 First Street, NE Suite 400<br>Washington, DC 20002<br>Telephone: (202) 370-8104<br>Facsimile: (202) 370-8102<br>E-Mail: jlowy@bradymail.org | Alexander D. Marks<br>   *Counsel of Record*<br>Burke, Warren, MacKay & Serritella, P.C.<br>330 N. Wabash Ave., 22nd Floor<br>Chicago, IL 60611<br>Telephone: (312) 840-7022<br>Facsimile: (312) 840-7900<br>E-mail: amarks@burkelaw.com |

Dated: February 12, 2014

- 16 -

## CERTIFICATE OF SERVICE

The undersigned attorney states that on February 12, 2014, he caused a copy of the foregoing Brief of Amicus Curiae Brady Center to Prevent Gun Violence in Support of Defendant's Response to Plaintiffs' Motion for Preliminary Injunction to be filed electronically with the Clerk of the Northern District of Illinois by filing through the CM/ECF system, and to be served upon all counsel of record.

/s Alexander D. Marks