**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and | ) | |
| the Illinois State Rifle Association | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No: 13-cv-9073 |
| v. | ) | |
| | ) | Ho. John W. Darrah |
| | ) | |
| CITY OF HIGHLAND PARK, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN REPLY TO CITY OF HIGHLAND PARK'S**
**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

The Second Amendment confers a categorical right to possess commonly owned firearms for self-defense in the home. There is substantial evidence before the Court demonstrating that (a) many of the firearms Defendant has banned are commonly owned by law-abiding persons for lawful purposes, including self-defense, and (b) possession of these firearms by law-abiding persons in their Highland Park homes does not pose a non-speculative threat to Highland Park residents. Thus, there is, at minimum, a reasonable likelihood Defendant will not meet its burden of demonstrating a close fit between infringement of Plaintiffs' core constitutional right to possess commonly owned firearms for self-defense and Defendant's interest in protecting the public from criminal firearms violence.

Protection of constitutional freedoms is always in the public interest. In any balancing of harms, the irreparable harm to the core constitutional right of law-abiding persons to defend themselves, their homes and their families with a commonly owned firearm outweighs the speculative harm envisioned by Defendant. Plaintiffs' motion for a preliminary injunction should be granted.

## LAW AND ARGUMENT

Plaintiffs have shown, as a threshold matter, that they have "better than a negligible chance" of succeeding on the merits of their claim that the Ordinance infringes their constitutional right to keep commonly owned firearms in their homes for self-defense. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc*., 549 F.3d 1079, 1096 (7th Cir. 2008) (citations omitted). This threshold is low. *Id*. (citing *Roland Machinery Co. v. Dresser Industries, Inc*., 749 F.2d 380, 387 (7th Cir. 1984)). Plaintiffs have more than met their burden through evidence that the Ordinance prohibits possession of firearms commonly owned for self-

defense and that the possession of these firearms by law-abiding residents of Highland Park does not pose a non-speculative threat to public safety.

The Court must therefore balance the irreparable harm caused by infringement of Plaintiffs' constitutional right with Defendant's claim of irreparable harm to the public should enforcement of the Ordinance be preliminarily enjoined. *See Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997). The competing harms are evaluated on a sliding scale. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). The more likely Plaintiffs will succeed on the merits of their claim, the less the balance of harms must weigh in their favor. *Id.* (citations omitted). Indeed, the balance of harms must weigh "much more" in Plaintiffs' favor only if it is "very unlikely" they will succeed on the merits. *Id.* (citations omitted).

### 1.  The Ordinance Plainly Implicates Plaintiffs' Second Amendment Rights.

Defendant largely ignores the evidence in arguing that the Ordinance "does not implicate Plaintiffs' Second Amendment rights." (Def. Resp. at p. 6).  From 2008 to 2012 alone, nearly 3 million AR-type rifles were manufactured and sold in the United States by 37 federally-licensed manufacturers. (Ex. 4, Curcuruto Aff. at Ex. B).  In 2012, more than one out of every five new firearms - of all types - sold in the United States was a rifle banned under the Ordinance. (*Id.* at ¶ 6).  Defendant does not dispute these numbers and, despite admitting there are 4.9 to 7 million "assault weapons" in the United States, nevertheless asserts the firearms are not in common use. (Def. Resp. at Ex. D, ¶ 36; Ex. H, p. 24).  Regardless of the numbers, any disinterested person with even passing familiarity with the marketplace in which firearms are manufactured and sold, and the community in which they are owned and used, would acknowledge the overwhelming presence of AR-type rifles in retail stores, on shooting ranges and in the possession of law-

abiding firearm owners. (Ex. 8, Lombardo Suppl. Aff. at ¶¶ 3-4).[1]

Defendant also ignores that two Federal District Courts have held laws banning largely the same firearms and ammunition magazines imposed substantial burdens on Second Amendment rights because they prohibited possession of "firearms in common use." *Shew v. Malloy*, 2014 WL 346859 (D.Conn. Jan. 30, 2014); *see also New York State Rifle & Pistol, Ass'n v. Cuomo*, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2103). In *Shew*, the court held that:

> [T]he firearms and magazines at issue are in "common use" within the meaning of *Heller* and, presumably, used for lawful purposes. The legislation here bans the purchase, sale, and possession of assault weapons and LCMs, subject to certain exceptions, which the court concludes more than minimally affect the plaintiffs' ability to acquire and use firearms, and therefore levies a substantial burden on the Plaintiffs' Second Amendment rights.

2014 WL 346859, at * 26-27.

Similarly, the court in *New York State Rifle* held that "there can be little dispute that tens of thousands of Americans own these guns and use them exclusively for lawful purposes such as hunting, target shooting, and even self-defense." 2013 WL 6909955, at * 36 (citing Christopher S. Koper *et al.*, U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* at 1 (2004)). The court therefore held:

> The restrictions at issue more than "minimally affect" Plaintiffs' ability to acquire and use the firearms, and they therefore impose a substantial burden on Plaintiffs' Second Amendment rights.

2013 WL 6909955, at * 36; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1287-88 (D.C.Cir. 2011) (Kavanagh J., dissenting) (A "brief perusal of the website of a popular American

---

[1] Defendant and its witnesses consistently conflate the "assault weapons" and the "large capacity magazines" banned under the Ordinance, and misleadingly suggest the banned firearms are all "high capacity guns" with "overwhelming fire power."(*See, e.g.*, Def. Resp. at pp. 1 & 11). In truth, a great many of the firearms defined as "assault weapons" under the Ordinance are not sold with "large capacity magazines" but with 5 and 10 round magazines. (Ex. 8, Lombardo Suppl. Aff. at ¶ 9).

gun seller" underscores that "[s]emi-automatic rifles are commonly used for self-defense in the home, hunting, target shooting, and competitions").

Defendant alternatively argues that even if a firearm is in "common use" for lawful purposes it may still fall outside Second Amendment protections if it is "dangerous and unusual." However, a "commonly used" firearm is, by definition, a firearm that is not "dangerous and unusual" under *Heller*:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those in "common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting "dangerous and unusual weapons."

554 U.S. 570 at 627. A firearm cannot be both "common" and "unusual." And Defendant's interpretation of *Heller* as imposing both "common use" and not "dangerous and unusual" requirements on Second Amendment-protected firearms is wrong and should be rejected.[2]

Nevertheless, arguments that the presence of one of five features on semi-automatic rifle makes the firearm "unusually dangerous" are misleading and specious. For example, while Defendant maintains that folding stocks are present for the purpose of concealment, a folding

---

[2]      Defendant's argument that the *Heller* Court articulated a "dangerous and unusual" limitation on the "in common use" test comes from Professor Laurence Tribe's testimony before the Senate Judiciary Committee on February 12, 2013. (*See* Def. Resp. at Ex. H, p. 11). However, Professor Tribe, like many who have advocated a narrow reading of *Heller*, is guilty of changing the Court's words to fit his argument. The Court did not recognize, as Professor Tribe states, that "dangerous *or* unusual" firearms fall outside Second Amendment protections. Rather, the Court used the conjunctive "dangerous *and* unusual" and did so only as historical support for protection of firearms "in common use at the time." 554 U.S. at 627 (emphasis added). The distinction between these phrases is significant. All firearms, including handguns, are dangerous. If the *Heller* Court intended that Second Amendment protections would be lost on a mere showing that a firearm presented potential danger, it would not have struck down the Washington D.C. handgun ban as unconstitutional. The Brady Center in its *amicus* brief is guilty of the same tactic by wrongly stating that under *Heller* a firearm, although commonly owned by law-abiding persons, may be banned on a showing that it is "particularly dangerous" or "unusually dangerous." (*Amicus* Br. at pp. 2, 6 & 8).

stock's true purpose is portability.[3] A telescoping stock simply permits small adjustments in length to fit different shooters' physical statures. (Ex. 6, Supica Aff. at ¶ 10). A pistol grip is a function of an AR-type rifle's straight line design, which "dictates a grip of this type so that the shooter can hold and fire the weapon."[4] While muzzle brakes and compensators help reduce redirect and recoil, this performance attribute is not only useful when firing multiple rounds rapidly, as Defendant argues. They have a recognized "sporting use by allowing the shooter to reacquire the target for a second shot" and are especially helpful to small statured persons.[5] And nearly all rifles have a fore end that encases or shrouds the barrel and allows the shooter to have a secure grasp of the firearm and to protect the shooter from heat generated by successive shots, fired either rapidly or slowly.[6]

Defendant's argument that firearms with one or more of these features "are not generally used for lawful purposes" is not supported, and it is actually contradicted by its own witnesses. (Def. Resp. at Ex. C, ¶ 18 ("Semi-automatic assault weapons and civilian sporting firearms, e.g., hunting rifles and shotguns, make up a very small percentage of firearms used in armed assaults, homicides and suicides in Illinois and nationwide.")). Criminals overwhelmingly prefer and use concealable handguns. (Ex. 7, Kleck Aff. at ¶ 9). Preference for handguns among criminals is amply demonstrated in Chicago Police Department homicide statistics, which show that 96.8%

---

[3]    *See* Ex. 9, *Department of Treasury Study on the Sporting Suitability of Modified Semi-Automatic Assault Rifles*, Ex. 5 ("With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking.").

[4]    *Id*; *see also* Ex. 6, Supica Aff. at ¶ 10.

[5]    *Id*; *see also* Ex. 6, Supica Aff. at ¶ 10.

[6]    Defendant cites to a statement made by Brian J. Siebel, an attorney formerly employed by the Brady Center to Prevent Gun Violence (*amicus curiae* in support of Defendant in this case), before the Washington D.C. Committee on Public Safety to support its argument that these features make a firearm "unusually dangerous". (Def. Resp. at p. 10). The testimony Siebel gave was not based on personal knowledge of firearms design, function or use, and there is no basis on which to consider his testimony as that of an expert witness under Rule of Evidence 702. Mr. Siebel appeared before the Committee in the role of an advocate, his testimony is not evidence and it should not be considered.

of firearm homicides from 2006 to 2011 were committed with handguns. Less than 1% of firearm homicides were committed with a rifle of any type. (Ex. 10, Chicago Murder Analyses 2006–2011). [7]

There is, however, substantial evidence that AR-type rifles are optimal for self-defense use and are commonly owned for that purpose. They are light weight, easy to handle, reliable, have minimal recoil and are more accurate than handguns. (Ex. 3 at ¶ 4).[8] Perhaps most importantly, the majority of AR-type rifles are chambered in .223/5.56 ammunition, a round that combines sufficient stopping power with the greatest measure of safety to innocent persons in a home defense encounter. Defendant's witnesses ignore or do not understand this important factor in selection of a home defense firearm. (Ex. 11, Roberts Suppl. Aff. at ¶¶ 3-8).[9]

 While Defendant disagrees that persons commonly own these rifles for personal defense, it has not presented evidence to the contrary. In fact, Defendant's witnesses add inferential support that persons commonly keep these firearms available for self-defense by recognizing the "widely known axiom amongst defensive tactics trainers [that] the 'best self-defense gun is the gun at hand'" (Def. Resp. at Ex. C, ¶ 46) and that the "best choice" of a firearm for home defense should be based on the person's "personal experience and comfort level with firearms." (Def. Resp. at Ex. D, ¶ 38). Because one out of every five new firearms purchased today is an AR-type

---

[7]     A rifle is obviously more difficult for a criminal to conceal. Another reason criminals prefer handguns to rifles is that rifles are generally more expensive. The average price paid for an AR-type rifle in 2013 was $1,058. (Ex. 4, Curcuruto Aff. at ¶ 5).

[8]     Federal and local law enforcement agencies across the country recognize the attributes of AR-type rifles, which make them optimal personal defense firearms. For example, the U.S. Department of Homeland Security recently issued contract specifications to purchase 7,000 AR-type rifles as "personal defense weapons." (*See* Ex. 11, Roberts Suppl. Aff. at ¶ 6).

[9]     The City of Highland Park apparently recognizes these attributes of .223/5.56 ammunition. It has budgeted funds to replace pistol caliber carbine rifles with rifle caliber rifles in 2014. (Ex. 11, Roberts Suppl. Aff. at ¶ 6).

rifle, it follows that they are likely "at hand" and their owners have familiarized themselves with their handling characteristics. (Ex. 4, Curcuruto Aff. at ¶ 6).

Although Defendant has not offered any evidence (other than *ipse dixit* conclusions from witnesses) that banned firearms are not commonly kept for self-defense purposes, it has criticized firearm owner survey evidence presented by Plaintiffs. The NSSF Modern Sporting Rifle (MSR) Comprehensive Consumer Reports ("MSR Report') shows that self-defense was the second most frequently given reason for owning a modern sporting rifle by 21,942 persons responding to an on-line survey. (Ex. 4, Curcuruto Aff. at ¶ 5). Defendant's witness criticizes the survey because it did not use sampling methodology to capture a representative sample of all MSR owners, and she speculates that only the "most engaged MSR owners" likely responded to the survey. (Def. Resp. at Ex. E, ¶ 13). She further speculates that "[i]t could be there are other groups of MSR owners who might respond differently to the questions," but she offers no insight on why or how the "other group" would respond differently. And while Defendant dismisses the MSR Report as "self-serving" it bears noting that the survey was not prepared by the NSSF for use in litigation but to gather market information that would be useful to NSSF members, which include manufacturers, distributors and retail sellers of modern sporting rifles, who rely on the accuracy of this data in making business decisions. (Ex. 4, Curcuruto Aff. at ¶¶ 2-3).

Defendant's criticism of the survey of students enrolled in firearm training and safety classes also misses the mark. The ongoing survey currently includes responses from 671 students, 57.7% of whom reported that they keep a semi-automatic rifle with a detachable magazine available for personal protection. (Ex. 8, Lombardo Suppl. Aff. at ¶ 5). Defendant's witness finds fault with the survey because she believes that those who do not own firearms for self-defense would decline to complete the survey because "it purports not to apply to them" and

therefore the results would "vastly exaggerate the proportion of people who own rifles for personal protection." (Def. Resp. at Ex. E, ¶ 9). The survey, however, permitted students who did not keep firearms available for personal protection to respond with "none of the above." (Ex. 8, Lombardo Suppl. Aff. at ¶ 6). Of those surveyed, 24.7% provided that response. (*Id*.). Thus, the survey does not "vastly exaggerate" the number of persons who choose to keep a semi-automatic rifle available for personal protection.[10]

Similarly, Defendant's criticism that neither survey asked whether the firearms are owned for unlawful purposes makes little sense. First of all, the issue is whether law-abiding persons commonly own the banned firearms for lawful purposes, not the extent to which non-law-abiding persons may own them. If evidence reflecting the extent to which criminals own certain types of firearms were relevant under *Heller*, prohibitions on handgun ownership (criminals' preferred firearm by an overwhelming margin) would be constitutional. Second, the idea that the survey results are untrustworthy because criminals are not represented in the results incorrectly presumes there are a sizeable number of criminals who own and use the banned firearms. However, there is consensus among all who have studied criminal firearms ownership, including Defendant's own witnesses, that the number of criminals who own these firearms is "very small." (*See, e.g.*, Def. Resp. at Ex. C, ¶ 18; *see also* Ex. 10, Chicago Murder Analyses, and Ex.12, Kleck Supp. Aff. at ¶ 18).

---

[10]    "No survey is beyond criticism, especially in the context of litigation." *Simon Property Group L.P. v. mySimon, Inc*., 104 F.Supp.2d 1033, 1039 (S.D.Ind. 2000). Survey evidence need not be perfect to be admissible. *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club*, 34 F.3d 410, 416 (7th Cir.1994). Only in "rare" occasions will a survey be so flawed to be completely unhelpful to the trier of fact and therefore inadmissible." *Id*. Defendant's criticisms of the survey evidence in this case ring particularly hollow as they have provided no contrary evidence.

The evidence demonstrates substantially more than a "negligible chance" Plaintiffs will succeed on the merits of their claim that the Ordinance substantially implicates their Second Amendment rights.

> ### 2. The Seventh Circuit Applies "Not Quite Strict Scrutiny" to Laws Infringing on Important Corollaries to Meaningful Exercise of Second Amendment Rights.

Laws imposing a burden on the core Second Amendment right of armed self-defense require "an extremely strong public-interest justification and a close fit between the government's means and its end." *Ezell v. City of Chicago*, 651 F.3d 684, 708-09 (7th Cir. 2011) (City bears burden to establish close fit between firing range ban and strong public interest justification). The required "rigorous showing" is "not quite strict scrutiny" but is greater than intermediate scrutiny. *Id.* at 708; *accord Moore v. Madigan*, 702 F.3d 933, 939-40 (7th Cir. 2012); *Illinois Association of Firearms Retailers v. City of Chicago*, No. 10-C-04184, 2014 U.S. Dist. LEXIS 782 (N.D. Ill. Jan. 6, 2014) (City ban on retail firearm sales a serious encroachment on important corollary to meaningful exercise of core right to possess firearms for self-defense); *see also Peruta v. County of San Diego*, No. 10-56971, 2014 U.S. App LEXIS 2786, at * 91-92 (9th Cir. Feb. 13, 2014) (criticizing Second, Third and Fourth Circuit application of intermediate scrutiny as the "interest balancing inquiry" explicitly rejected in *Heller*).

Defendant wrongly contends that a complete prohibition on firearms owned by millions of law-abiding persons and particularly well-suited for self-defense, does not "strike anywhere near the core of the Second Amendment" and therefore intermediate scrutiny should be applied. (Def. Resp. at p. 12). Defendant relies on *U.S. v. Skoien*, 614 F.3d 638 (7th Cir. 2010), but the Seventh Circuit subsequently explained that in *Skoien* it required a lesser showing by the government (intermediate scrutiny) because the law at issue curtailed gun rights of persons

convicted of domestic violence "who present a higher than average risk of misusing a gun", not law-abiding persons. *Moore*, 702 F.3d at 940. *Ezell* furthered explained the use of intermediate scrutiny in *Skoien* because the case did not involve the "central self-defense component of the right." *Ezell*, 651 F.3d at 708. Even then, the intermediate scrutiny in *Skoien* required a "strong showing" that the law was vital to public safety. *Id*. (citing *Skoien*, 614 F.3d at 641).[11]

The extent to which a constitutional right can be exercised with other firearms is irrelevant to whether a law is a serous encroachment of the Second Amendment right. *Cf. Ezell*, 651 F.3d at 697 (it is a "profoundly mistaken assumption" that harm to a constitutional right is measured by the extent it can be exercised in another jurisdiction). Just as it was no answer in *Ezell* that firing ranges existed just outside Chicago, it is no answer here that law-abiding citizens can defend themselves with other firearms. Under Defendant's logic, the handgun ban in *Heller* would have survived because Washington D.C. residents could lawfully own rifles and shotguns for self-defense in their homes. *Heller* 554 U.S. at 630 ("it is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as possession of other firearms (*i.e.* long guns) is allowed."); s*ee also Illinois Association of Firearms Retailers*, 2014 U.S. Dist. LEXIS at * 27 (rejecting argument that ban on firearm sales was not serious encroachment on the

---

[11]     *Amicus* Brady Center completely misreads *Moore* and the Seventh Circuit's level of scrutiny analyses by suggesting that anything less than a "'blanket prohibition' on the right of armed self-defense" will not require the government to prove a strong need for its regulation. (*Amicus* Br. at p. 5). However, the firing range ban subjected to "not quite strict scrutiny" in *Ezell* was certainly not a blanket prohibition on self-defense, nor was the retail sales ban struck down in *Illinois Association of Firearms Retailers*. The Brady Center essentially advocates rational basis review in which laws are upheld "so long as the legislatures draw 'reasonable inferences' from substantial evidence." (*Amicus* Br. at p. 5). However, this sort of legislative deference ignores that *Heller* rejected rational basis review. *Heller*, 554 U.S. at 628 n.27. *Heller* also admonished that "the very enumeration of the right takes out of the hands of the government ... the power to decide on a case-by-case basis whether the right is really *worth* insisting upon." *Heller*, 554 U.S. at 634; *see also Peruta*, 2014 U.S. App LEXIS 2786, at * 91-92 (criticizing deference shown to legislative assessments of the fit between firearms regulations and asserted government interests by Second, Third and Fourth Circuits).

right because it merely regulated where acquisitions may occur, but did not prohibit them elsewhere).[12]

In the Seventh Circuit, "serious encroachments" on "important corollar[ies] to the meaningful exercise of the core right to possess firearms for self-defense" are substantial burdens that deserve more stringent scrutiny than intermediate scrutiny. *Ezell*, 651 F.3d at 708. The Highland Park Ordinance does exactly that, and Defendant should be held to the burden of demonstrating a close fit between its fear of a mass shooting and its decision to prohibit law-abiding citizens in Highland Park from possesing firearms commonly owned for self-defense.

### 3. Defendant Cannot Meet Its Burden of Demonstrating a Close Fit Between the Ordinance and Public Safety.

Defendant makes clear that the Ordinance was passed out of concern that a mass shooting could occur in Highland Park. (Def. Resp. at p. 4). Although mass shootings are horrific events, there is no empirical or logical basis to conclude that a prohibition on possession of "assault weapons" and large capacity magazines by law-abiding persons will make such an event less likely or catastrophic. The connection between the Ordinance and prevention of mass shootings or any criminal firearms violence in Highland Park is not supported by reliable evidence and is entirely speculative.

Noted criminologist James Alan Fox observed that "[t]he moral panic and sense of urgency surrounding mass murder have been fueled by various claims that mass murders, and mass shootings in particular, are reaching epidemic proportions." Fox, J.A. & DeLateur, M.J., *Mass Shootings in America: Moving Beyond Newtown*, Homicide Studies, Vol. 18 (2014). However, "[m]ass shootings have not increased in number or in the overall death toll, at least not

---

[12]    While Defendant argues that other firearms are available for self-defense, it does not reveal that handguns are not legally possessed in Highland Park absent approval of the Chief of Police, payment of an annual fee, fingerprinting, completion of training every three years and registration of the handgun by make, model and serial number. *See* Highland Park City Code §§ 134.0003 & 134.0004.

in the last several decades." *Id*. "If anything has increased with regard to mass murder, it's the public's fear, anxiety, and widely held belief that the problem is getting worse." *Id*.

Careful evaluation of the evidence surrounding mass shootings confirms these observations. Mass shootings account for only a tiny share of all homicides in the United States. (Ex. 12, Kleck Supp. Aff. at ¶9). And mass shooters have virtually never needed a large capacity magazine to injure or kill in large numbers because they either (a) possessed multiple guns, (b) possessed multiple magazines, or (c) had ample opportunity to reload, using smaller magazines. (*Id*. at ¶ 10). The hypothetical potential for reducing harm by limiting magazine capacity is limited to a very small subset of already very rare events. (*Id*.)

Thirty years of historical evidence demonstrates that a prohibition on possession of any type of firearm or magazine will not decrease the already remote likelihood of a mass shooting or impact the number of victims. In the 72 mass shootings that involved six or more victims from 1984 to July 2013, the use of a large capacity magazine only affected the number of persons injured or killed in just one or, possibly, two shootings. (Ex.12, Kleck, Suppl. Aff. at ¶¶ 11- 17). Thus, even if large capacity magazines were unavailable, virtually every mass shooter had the ability to fire large numbers of rounds because he had multiple guns or multiple smaller magazines. (*Id*. at ¶ 14). The claimed association between the use of assault weapons or large capacity magazines and the number of victims is therefore non-causal and spurious. (*Id*.)

Defendant cites to a report published by Mayors Against Illegal Guns (MAIG), which superficially suggests a causal connection between the use of assault weapons or large capacity magazines in mass shootings and the number of persons injured and killed. (Def. Resp. at p. 10).[13] The MAIG report, however, was based on a very small sample, and small samples are

---

[13]     MAIG defined mass shootings as events in which there were four or more victims. A total of 14 mass shootings were identified in which an assault weapon or a large capacity magazine was used, and 79

generally sensitive to inclusion or exclusion of extreme outliers. In the MAIG data there are three such outlier shootings, which resulted in 27, 14 and 12 deaths. Exclusion of these outliers from the sample lowers the average number of deaths in mass shootings involving assault weapons or large capacity magazines to a number statistically identical to average number of deaths in non-assault weapon/large capacity magazine shootings.[14] Thus, MAIG's data is not robust enough to draw conclusions about the effect of assault weapons or large capacity magazines in mass shootings. (Ex. 12, Kleck, Suppl. Aff. at ¶¶ 6-8; Ex. 13, MAIG Data, accessed at www.demandaction.org/blog/2013-02-update-comprehensive-study-of-mass-shootings-by-mayo (last visited Feb. 20, 2014)).[15]

The District of Connecticut's finding in *Shew*, 2014 WL 346859 (D.Conn. Jan. 30, 2014) that such a connection exists should not be followed. Under the guise of intermediate scrutiny, the court only required "reasonable inferences from substantial evidence" to uphold the constitutionality of the Connecticut assault weapons and large capacity magazine ban. *Id*. at * 40. The court in *New York State Rifle*, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013) required only the same minimal showing from the State in upholding the New York ban. The deference given to legislative findings by the courts in *Shew* and *New York State Rifle* is not countenanced under

---

mass shootings were identified in which they were not used. MAIG reported that 63% more persons were killed in the mass shootings involving assault weapons or large capacity magazines (average of 7.8 compared to 4.8 deaths).

[14] 5.1 deaths compared to 4.8 deaths.

[15] On a purely anecdotal level, mass shootings resulting in some of the highest death and injury counts did not involve "assault rifles" but handguns. For example, the Blacksburg, Virginia Shooting at Virginia Tech (33 killed and 17 wounded). (Def. Resp. at p. 5). The Fort Hood, Texas shooting (13 killed and 30 wounded), the Binghamton, New York shooting (14 killed and 4 wounded) and the Tucson, Arizona shooting (6 killed and 20 wounded) were each committed with handguns. *See* Ex. 13, MAIG Data. And according to witnesses, the shooter in the Aurora, Colorado shooting (12 killed and 58 injured) first used a shotgun before using a semi-automatic rifle, which jammed, and then a pistol. (Ex. 12, Kleck Suppl. Aff., Appx. at pp. 30-31).

*Heller*, and has no place in the Seventh Circuit's application of heightened scrutiny (either intermediate scrutiny or "nearly strict scrutiny") to laws implicating Second Amendment rights.[16]

### 4. The Balance of Harms Favors Protection of Plaintiffs' Constitutional Rights.

The evidence demonstrates substantially more than a reasonable likelihood Plaintiffs will succeed on the merits of their claim, and the balance of harms tips in Plaintiffs' favor. First of all, injunctions protecting constitutional freedoms "are always in the public interest." *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *see also Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (there can be no harm to a municipality when it is prevented from enforcing an unconstitutional statute); *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (no need "to weigh the injunction equities" because "injunctions protecting First Amendment freedoms are always in the public interest."). Secondly, the empirical evidence shows that the harm Defendant seeks to guard against – "a tragedy similar to Newtown" – is statistically remote and not made less likely or tragic by prohibiting possession of the banned firearms by law-abiding persons. Unfortunately, criminals can and have perpetrated tragic events like Newtown with all types of firearms, and even other weapons. Government's answer, however, should not be to take commonly owned firearms away from law-abiding persons.

Defendant downplays the harm to Plaintiffs should the preliminary injunction be denied, and does not acknowledge that infringement of a core constitutional right is *per se* irreparable,

---

[16]    A further basis on which to reject both the *Shew* and *New York State Rifle* findings is that the courts in both cases relied extensively on the statement made by Brady Center attorney Brian Siebel before the Washington D.C. Committee on Public Safety as evidence of a connection between the bans and public safety. (*See* footnote 6, above). Siebel's statement also surfaced as "evidence" in *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1262-62 (D.C. Cir.2011). No court, however, has questioned the evidentiary basis for Siebel's statements, his qualifications to make them or whether they should be treated as evidence at all. Plaintiffs submit that Siebel's statement is, at most, just attorney argument and not evidence, and consideration of his personal views as evidence was an abuse of discretion.

which should be protected rather than infringed by the government. And Defendant's characterization of persons as "[a]larmists" who cite to national home invasion statistics to justify possessing a firearm for self-defense is curious at best. (Def. Resp. at Ex. C, p. 10). Each year from 2003 to 2007, there were an average of 266,560 violent crimes committed during household burglaries (approximately 757 per day). (Ex. 14, Bureau of Justice Statistics, Victimization During Household Burglary, Sept. 2010, at p. 2). An average of nearly 50 household burglaries occur in Highland Park each year. (Def. Resp. at Ex. B, p. 2). In 12% of violent home invasions nationally (31,987), the offender was armed with a firearm (approximately 91 per day). (Ex. 14 at p. 10). In 20% of these crimes (53,312), household members were victims of aggravated or simple assault (approximately 146 per day). (Ex. 14 at p. 10). In 3% of violent home invasions (7,996), a rape or sexual assault was committed (approximately 22 per day). (Ex. 14 at p. 9).

Prior to the effective date of the Ordinance, the banned firearms and magazines were freely possessed in Highland Park without harm to the public. Following the effective date, Plaintiffs' constitutional right to possess a class of firearms commonly owned for self-defense in the home has been infringed and harmed. Whether the banned firearms and magazines will ever actually be used in a mass shooting in Highland Park is theoretical, but the potential that a firearm may be needed to defend one's home has constitutional significance. That potential is the underpinning of the Second Amendment right. A preliminary injunction should be entered enjoining Defendant from enforcing the Ordinance until the merits of Plaintiff's case can be reached.

Respectfully submitted,

/s/ James B. Vogts
James B. Vogts
Brett M. Henne
Andrew A. Lothson
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com
bhenne@smbtrials.com
alothson@smbtrials.com


**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I, James B. Vogts, hereby certify that on the 20th day of February, 2014, I caused to be served a copy of the foregoing document on all counsel of record listed below, via the Court's ECF system and/or by U.S. Mail.

1.  Christopher James Murdoch
    Holland & Knight, LLP
    131 South Dearborn Street
    30th Floor
    Chicago, IL 60603
    (312) 263-3600
    Email: chris.murdoch@hklaw.com

2.  Hart M. Passman
    Holland and Knight, LLP
    131 South Dearborn
    30th Floor
    Chicago, IL 60603
    (312) 578-6634
    Email: hart.passman@hklaw.com

3.  Steven M. Elrod
    Holland & Knight, LLP
    131 South Dearborn Street
    30th Floor
    Chicago, IL 60603
    (312) 263-3600
    Email: steven.elrod@hklaw.com

4.  Alexander D. Marks
    Burke, Warren, MacKay & Serritella, P.C.
    330 N. Wabash Ave., 22nd Floor
    Chicago, Illinois 60611
    (312) 840-7022
    E-mail: amarks@burkelaw.com

                                        /s/ James B. Vogts
                                        James V. Vogts