**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and | ) | |
| the Illinois State Rifle Association | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No: 13-cv-9073 |
| v. | ) | |
| | ) | Hon. John W. Darrah |
| | ) | |
| CITY OF HIGHLAND PARK, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..........................................................................................................1

STANDARD OF REVIEW ..........................................................................................2

HIGHLAND PARK CITY CODE § 136.001 *et seq* ....................................................3

MATERIAL FACTS ....................................................................................................5

      I.      Highland Park Has Banned Commonly Owned, Categorically Protected Firearms and Ammunition Magazines ....................................................5

      II.     AR-Type Rifles and Other Firearms Banned in Highland Park Are Owned by Law Abiding Persons for Lawful Purposes, Including Home Defense .............7

      III.    The Semi-Automatic Rifle Features Banned in Highland Park Are Integral to the Rifle Design and Safe Handling and Do Not Make Them More Dangerous Than Other Rifles ..................................................................9

      IV.   There is No Evidence that the Semi-Automatic Rifles Banned in Highland Park Are Preferred by Criminals............................................................10

      V.    There Is No Evidence Demonstrating that a Ban on Possession of a Class of Firearms Rarely Used by Criminals Will Reduce Firearms Crimes ................11

      VI.   There is No Evidence that a Ban on Possession of a Class of Firearms in Highland Park Will Reduce the Risk of a Mass Shooting ....................................12

LAW AND ARGUMENT ..........................................................................................13

      I.      Highland Park Cannot Meet its Burden of Demonstrating that the Banned Firearms Are Not Typically Possessed by Law-Abiding Citizens for Lawful Purposes....................................................................................14

      II.     In a Means-End Analysis, Highland Park's Justification for Burdening the Second Amendment Rights of Residents to Defend Themselves in Their Homes Should Be Subjected to Strict Scrutiny ....................................19

      III.    Highland Park Cannot Meet Its Burden of Justifying the Substantial Burden Imposed on Second Amendment Rights of its Residents ........................21

CONCLUSION..........................................................................................................24

# TABLE OF AUTHORITIES

**CITED CASES:**

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................3

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................................... passim

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ....................................................14, 16, 20, 21

*Fyock v. City of Sunnyvale*,
2014 U.S. Dist. LEXIS 29722 (N.D. Cal. Mar. 5, 2014)...........................15, 19

*Heller v. District of Columbia (“Heller II”)*,
670 F.3d 1244 (D.C.Cir. 2011) .........................................................16, 17, 18

*Illinois Association of Firearms Retailers v. City of Chicago*,
961 F.Supp. 2d 928 (N.D. Ill. 2014) ...............................................3, 16, 20

*McDonald v. City of Chicago*,
130 S.Ct. 3020 (2010)....................................................................1, 2, 15, 16

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2013) ..................................................................... passim

*New York State Rifle & Pistol Association v. Cuomo (“NYSRPA”)*,
2013 U.S. Dist. LEXIS 182307 (W.D.N.Y. 2013) .....................................18, 19

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) ................................................................16

*People v. Sanders*,
182 Ill.2d 524 (Ill. 1998).........................................................................18

*Peruta v. County of San Diego*,
742 F.3d 1144 (9th Cir. 2014) ..............................................................19, 20

*Shew v. Malloy*,
2104 U.S. Dist. Lexis 11339 (D.C. Conn. Jan. 30, 2014)...........................18, 19

*United States v. Miller*,
307 U.S. 174 (1939).................................................................................14

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ............................................................................................21

**OTHER AUTHORITIES**

City Code § 134.001 *et seq.*............................................................................................4

City Code § 136.001 *et seq.*.............................................................................1, 3, 4, 7

City Code § 136.0005 ......................................................................................................3

Fed. R. Civ. P. 56............................................................................................................2

Fed. R. Evid. 201(a) ........................................................................................................3

18 U.S.C. § 921(30) (repealed) ......................................................................................11

Advisory Committee Note to Subdivision (a) of 1972 Proposed Rule 201...........................3

Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:*
*An Analytical Framework and Research Agenda*, 56 UCLA L. Rev. 1443 (2009)..........5, 9, 12

Plaintiffs Arie S. Friedman, M.D. and the Illinois State Rifle Association ("Plaintiffs") submit the following Memorandum of Law in support of their Motion for Summary Judgment.

## **INTRODUCTION**

The Second Amendment right of all law-abiding persons to possess commonly owned firearms in their homes to defend themselves, their families and their property has been violated in Highland Park, where it is now a crime to possess a class of firearms that are among the most commonly owned in the United States. By enacting City Code § 136.001 *et seq.* ("Ordinance") and prohibiting possession of these firearms, Highland Park has violated the constitutional rights of Plaintiffs and all other law-abiding residents in the community.

The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) made clear that an individual's right to keep and bear arms is a core constitutional right, and it provided an analytical framework – grounded in text and history – under which laws that effect Second Amendment rights are to be addressed. Under *Heller*, an analysis of laws prohibiting firearms ownership begins with the question: Does the law in question ban ownership of firearms commonly owned for lawful purposes, including home defense? If the answer is "yes," there is no further inquiry. The law prohibiting ownership of the commonly owned firearms is categorically unconstitutional.

Further inquiry into public policy justifications for banning possession of commonly owned firearms is foreclosed under *Heller* because the Second Amendment "elevates above all other interests the right of law-abiding responsible citizens to use arms in defense of their hearth and homes." *Heller*, 554 U.S. at 634-35 ("The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really* worth insisting upon."); *see also McDonald v. City of*

1

*Chicago*, 130 S.Ct. 3020, 3047 (2010) ("In *Heller* … we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing.")

Nevertheless, Highland Park cannot justify violating the constitutional rights of its residents in the interest of public safety. The firearms Highland Park has banned are no more dangerous than firearms it has not banned, and the banned firearms are rarely used by criminals. Under any level of heightened scrutiny, Highland Park cannot demonstrate public safety will be enhanced by making it a crime for law-abiding citizens to keep the prohibited firearms in their homes for lawful purposes. Speculation that the public *might* benefit from curtailment of the constitutional right of armed self-defense is not sufficient. *See Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2013).

Under *Heller*, elected officials cannot impose their values in derogation of the constitutional right possessed by all law-abiding citizens to arm themselves with commonly owned firearms in defense of their homes and families. It does not matter that Highland Park believes public safety requires law-abiding residents, like Dr. Friedman, to remove commonly owned firearms from his home. *Heller* unequivocally established that a person's Second Amendment right to possess commonly owned firearms for self-defense in his or her home cannot be bargained away in legislatures or diminished by the courts.

## **STANDARD OF REVIEW**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The constitutionality of the Ordinance does not present factual questions for determination at trial. *Moore*, 702 F.3d at 942 (case remanded for entry of declaration of unconstitutionality following appeal from order dismissing complaint); *Illinois Association of Firearms Retailers v. City of Chicago*, 961 F.Supp. 2d 928, 932 (N.D. Ill. 2014) (resolution of constitutional challenge to law prohibiting retail firearm sales at "summary judgment stage instead of proceeding to trial is the proper course of action."). "Only adjudicative facts are determined at trials, and only legislative facts are relevant to the constitutionality" of the Ordinance. *Moore*, 702 F.3d at 942. Legislative facts "bear on the justification for the legislation, as distinct from facts concerning the conduct of the parties in a particular case," which are adjudicative facts. *Id.*; *see* Fed. R. Evid. 201(a); Advisory Committee Note to Subdivision (a) of 1972 Proposed Rule 201 ("Legislative facts … are those which have relevance to legal reasoning and the law making process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."). Here, the Court has sufficient legislative facts on which to address the constitutionality of the Ordinance.

## HIGHLAND PARK CITY CODE §136.001 *et seq*.

The Ordinance provides that "[n]o person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity Magazine" in Highland Park. City Code § 136.0005 (Ex. 1 to Statement of Material Facts ("SMF")). Highland Park defines a "Large Capacity Magazine" as any ammunition feeding device with the capacity to accept more than ten rounds" of ammunition. City Code § 136.001(G). Highland Park defines an "Assault Weapon" in a variety of ways, including:

(1) A semi-automatic rifle with the capacity to accept a detachable magazine capable of accepting more than ten rounds of ammunition, and has one of the

following features:

(a) A pistol grip without a stock attached;

(b) A feature capable of functioning as a protruding grip for the non-trigger hand;

(c) A folding, telescoping or thumbhole stock;

(d) A shroud attached to the barrel that partially or completely encircles the barrel; or

(e) A muzzle brake or muzzle compensator.

(2) A semi-automatic pistol or a semi-automatic rifle with a fixed magazine capable of accepting more than ten rounds of ammunition.

(3) A semi-automatic pistol with the capacity to accept a detachable magazine, and has one of five specified features.

(4) A semi-automatic shotgun with one of five specified features.

(5) A shotgun with a revolving cylinder.

(6) A conversion kit from which an "Assault Weapon" can be assembled.

(7) Sixty-four rifles, pistols and shotguns (along with copies thereof) specified by manufacturer, model or type, including AR-type and AK-type semi-automatic rifles.

City Code § 136.001(C). [1]

Highland Park's definition of "assault weapons" has no basis in firearms history, design or development. According to the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), it is a "misnomer" to refer to semi-automatic rifles as "assault weapons" because true assault weapons are selective fire weapons that can be fired in a fully automatic mode, meaning they continue to fire with a single pull of the trigger as long as the trigger is held back. (SMF ¶¶ 18 & 21.) The rifles banned under the Ordinance are not fully automatic firearms, but semi-automatic firearms. (SMF ¶ 11.) Semi-automatic firearms fire only one round with each pull of

---

[1]     The City Council apparently gave no consideration to the less restrictive alternative of regulating possession of these firearms in the manner it regulates possession of handguns, whose owners must register their firearms annually, pay an annual fee, provide fingerprints and attend gun safety training once every three years. City Code § 134.001 *et seq.*

the trigger, as is the case with most other firearms, including revolvers and bolt-action, lever action, pump action or single shot firearms. (*Id*.) There is no such thing as a *semi-automatic* assault weapon. (SMF ¶ 20.); *see* Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and Research Agenda*, 56 UCLA L. Rev. 1443, 1484 (2009) (Assault weapon ban "laws generally define assault weapons to be a set of semiautomatic weapons … that are little different from semiautomatic pistols and rifles that are commonly owned by tens of millions of law abiding citizens. 'Assault weapons' are no more 'high power' than many other pistols and rifles that are not covered by the bans.").[2]

## MATERIAL FACTS

### I.  Highland Park Has Banned Commonly Owned, Categorically Protected Firearms and Ammunition Magazines.

Among the firearms banned by Highland Park is the immensely popular and commonly owned AR-type rifle. Their popularity among shooters is based, in part, on their modular design. (SMF ¶ 34.) AR-type rifles have an upper receiver into which the barrel is mounted and a lower receiver that holds the firing assembly onto which the stock and lower grip are mounted. (*Id*.) The two receivers allow for use of different barrels and different ammunition cartridges to suit different purposes. (*Id*.) Thus, because of their adaptability, AR-type rifles can be used for target shooting, home defense, and small and large game hunting. (*Id*.)

AR-type rifles are also accurate, functionally reliable and easy to reload. (SMF ¶ 32.) They are also generally lighter in weight, shorter in length and have less recoil than traditionally-styled wooden stock rifles. (SMF ¶ 33.) A survey of 21,942 owners of modern sporting rifles

---

[2]    Plaintiffs have filed a Video Demonstration in support of their Motion for Summary Judgment, in which the clear difference between semi-automatic and fully automatic fire are shown. (*See* SMF Ex. 3 at Ex. E.) The video also demonstrates use of a variety of commonly owned firearms, including revolvers, pistols, shotguns and rifles.

(defined as AR-type and AK-type firearms) revealed that survey respondents ranked accuracy and reliability as their most important reasons for purchasing their rifles. (SMF ¶ 51.) Survey respondents also cited modern sporting rifle ergonomics, low recoil and light weight as reasons for their purchases. (*Id.*)

Firearms industry analysts have estimated that from 1990 to 2012 approximately 5,128,000 AR-type rifles were produced in the United States for domestic sale. (SMF ¶ 23.) From 2008 to 2012 alone, approximately 3,457,230 AR-type rifles were produced. (SMF ¶ 26.) In fact, AR-type rifles comprised 11.4% of all firearms produced in the United States for domestic sale from 2008 to 2012. (SMF ¶ 28.) During these same years, a substantially greater number of AR-type rifles were produced than commonly owned revolvers. (SMF ¶ 29.) Shotguns and AR-type rifles were produced in nearly equal numbers. (SMF ¶ 30.) [3]

AR-type rifles are sold with magazines of various capacities, including 5, 10, 15, 20 and 30 rounds. (SMF ¶ 53; SMF Ex. 3 at ¶6.) Magazines holding more than 10 rounds of ammunition are most commonly used in AR-type rifles. (SMF ¶ 53.) Industry research shows that of the approximately 158 million detachable magazines possessed by consumers in the United States, approximately 75 million are capable of holding more than 10 rounds. (*Id.*)

The popularity of AR-type rifles is evident to persons who regularly interact with or observe the community of persons who sell, own and use firearms. (SMF ¶ 35.) A survey of retail firearm dealers revealed that 92.5% of those responding reported that they stocked AR-type rifles. (SMF ¶ 31). The same retail firearm dealers reported that more than 1 out of every 5 new

---

[3]     These figures are based primarily on ATF Annual Firearm Manufacturing and Export Reports ("AFMER") available online at www.atf.gov. In 2012 alone (the most recent year AFMER data is available), an estimated 1,267,800 AR-type rifles were produced for domestic sale. Given the trend in AR-type rifle popularity and production, it is reasonable to assume that production numbers in 2013 and the first half of 2014 were similar or greater. (*See* SMF Ex. 6 at Ex. B & Ex. C.)

firearms sold in 2012 was an AR-type rifle, and they sell out their inventories of AR-type rifles quickly. (SMF ¶¶ 31 & 36.)

AR-type rifles are regularly used on firearms ranges throughout Illinois. (SMF ¶ 35.) A survey of 8,335 randomly selected adult United States residents found that approximately 12 million persons participated in target shooting with an AR-type rifle in 2012. (SMF ¶¶ 62–64.) AR-type rifles also have a substantial presence at industry trade shows, where new and popular products are displayed. (SMF ¶ 35.) There is little question that the market for AR-type rifles has been the fastest growing market segment in the firearms industry for a number of years. (SMF ¶ 36.) [4] There can be little question that AR-type rifles are a commonly owned firearm. [5]

## II. AR-Type Rifles and Other Firearms Banned in Highland Park Are Owned by Law Abiding Persons for Lawful Purposes, Including Home Defense.

The popularity of AR-type rifles is based, in part, on their adaptability for nearly all lawful uses, including self-defense in the home. An appropriate home defense firearm is one that will reliably incapacitate a hostile person in a life threatening situation and stop him from continuing his actions. (SMF ¶ 37.) An appropriate home defense firearm is also one that minimizes danger to innocent persons in the home. (SMF ¶ 39.) AR-type rifles meet both criteria – effectiveness and safety. (SMF ¶ 40.)

---

[4] Two of Highland Park's expert witnesses, former ATF agents, support Highland Park's firearms ban, but own rifles banned under the Ordinance. One owns an AR-type rifle and several large capacity magazines for target shooting with family members. (SMF ¶ 65.) The other previously owned an AR-15 rifle and a large capacity magazine for hunting, and he presently owns an SKS rifle, which is one of the specifically listed rifles banned in Highland Park. (SMF ¶ 68; City Code § 136.001(7) (a)(xiii).)

[5] Any suggestion that the popularity of AR-type rifles among law-abiding citizens extends to the criminal market for firearms has no empirical support. Both sides in this case agree that criminals overwhelming prefer and use handguns to commit their crimes. And crime data from numerous sources demonstrates that AR-type rifles and long guns in general are rarely used by criminals. *See* § IV, below.

Most AR-type rifles are chambered for .223 caliber ammunition, a relatively inexpensive rifle cartridge that has sufficient power to stop a home intruder but because of its relatively small mass, loses velocity quickly after passing through walls and other objects, thus decreasing the risk of an errant shot injuring an innocent family member. (SMF ¶ 41.)  Heavier ammunition, such as most large caliber handgun ammunition, retains greater momentum after penetrating walls and other structures, thus placing unintended targets at greater risk. (SMF ¶ 42.)  Those with expertise in terminal ballistics (the study of projectile behavior from the time a first object is hit until the projectile stops), including the Federal Bureau of Investigation, have concluded that .223 ammunition is the ideal close quarters self-defense cartridge. (SMF ¶ 45.)

The Chicago Police Department makes AR-type rifles chambered for .223 ammunition available to police officers "to enhance officer safety in high threat situations." (SMF ¶ 47.)  And in 2012, the Department of Homeland Security issued specifications for purchase of 7,000 AR-type rifles chambered for .223 ammunition for agents' use as "personal defense weapons" in close quarters. (SMF ¶ 46.)

The choice of a firearm and ammunition by a civilian for use in a potential self-defense encounter should be based on the same criteria relied on by law enforcement agencies: reliable incapacitation while minimizing risk to innocent bystanders. (SMF ¶ 44.)  In a survey of 21,942 owners of modern sporting rifles conducted in 2013, survey respondents were asked to rank their reasons for owning their rifles. (SMF ¶ 52.)  "Home defense" was ranked second by survey respondents, closely behind "recreational target shooting." (SMF ¶ 52.) [6]  Similar information was obtained from an informal survey of 779 persons enrolled in firearms training and safety

---

[6]     Other reasons given for owning a modern sporting rifle included big game hunting, varmint hunting, competition target shooting, and collecting. (SMF ¶ 52.)

classes in 2013 and 2014. (SMF ¶ 53.)  More than half of those surveyed (58.7%) keep a semi-automatic rifle with a detachable magazine available for personal protection. (SMF ¶ 53.) [7]

### III.  The Semi-Automatic Rifle Features Banned in Highland Park Are Integral to the Rifle Design and Safe Handling and Do Not Make Them More Dangerous Than Other Rifles.

Highland Park bans possession of semi-automatic rifles with one of five design features - pistol grips; folding, telescoping and thumbhole stocks; barrel shrouds; protruding grips; muzzle breaks; and muzzle compensators. Each of these features is integral to the design and safe handling of the rifle. (SMF ¶ 69.) Moreover, the presence of one or more of these features does not make the rifle more dangerous than a rifle without them. (SMF ¶ 70; *see generally* SMF ¶¶ 71-91; *see also* Volokh, *supra* at 1484 ("Assault weapon" bans "often focus on features that have little to do with dangerousness.").) [8]

For example, a telescoping stock simply permits the shooter to adjust the overall length of the rifle a few inches to fit his or her stature. (SMF ¶ 72.) An improperly fitted rifle will lead to errant shots. (SMF ¶ 73.)  The pistol grip on an AR-type rifle is no different than a grip made part of the butt-stock of a traditionally-styled rifle. Because of the rifle's straight line design, a pistol grip just sits below rather than as part of the stock. (SMF ¶ 79–81.) A pistol grip, like the grip on any firearm, helps the shooter control the firearm while aiming and during recoil. (SMF ¶

---

[7]     Whether to keep a firearm available in the home for possible self-defense use is obviously a personal decision. However, the U.S. Department of Justice has reported that an average of 114,620 persons are confronted by armed intruders in their homes each year. (SMF ¶ 58.) Approximately 48,269 times each year these confrontations result in aggravated assaults and 22,278 times sexual assaults occur. (SMF ¶¶ 59-60.) And FBI Supplementary Homicide Reports show that an average of 430 burglary-related homicides occur each year. (SMF ¶ 55.) An estimated 2.2 to 2.5 million times each year persons use or display a firearm for self-protection or protection of property. (SMF ¶ 61.)

[8]     The Video Demonstration filed in support of Plaintiffs' Motion for Summary Judgment shows the banned design features and demonstrates the purposes they serve in the overall design of AR-type rifles. (*See* SMF Ex. 3 at Ex. E.)

82.)  Barrel shrouds of one kind or another are present on all long guns. They serve as a place for the shooter to place his or her non-trigger hand, and protect it from heat build-up in the barrel. Barrels shrouds also protect the gas tube that carries gases back to work an AR-type rifle's action. (SMF ¶ 83-85.)

The presence of one or more of the banned design features does not affect a semi-automatic rifle's basic function, shared by all non-fully automatic firearms:  to discharge one round with each pull of the trigger. (SMF ¶ 69-70.) The presence of these features make the firearm easier to aim and control and therefore more safe to use. (*Id.*)

## IV.    There is No Evidence that the Semi-Automatic Rifles Banned in Highland Park Are Preferred by Criminals.

Highland Park admits that semi-automatic "assault rifles" make up a very small percentage of firearms used in armed assaults and homicides and are rarely used by criminals in Illinois and nationwide. (SMF ¶¶ 93-94.) Highland Park also admits that criminals overwhelmingly prefer and use concealable handguns in commission of crimes. (SMF ¶ 92.) Highland Park's admissions are consistent with research and data on firearms crime, including Chicago Police Department homicide data, which reveals that just 22 out of 2,215 firearm homicides (0.99%) that occurred from 2006 to 2012 were committed with *a rifle of any type*. In contrast, 2,146 of the firearm homicides (97%) were committed with handguns. (SMF ¶ 94.) [9]

A compilation of 38 studies by various researchers on the criminal use of "assault weapons" of all types (pistols, shotguns and rifles) demonstrates that they were used in less than 2% of firearms crimes. (SMF ¶ 97.) Nine of the 38 studies addressed the criminal use of "assault

---

[9]     A substantial amount of research and commentary on the criminal use of "assault weapons" does not distinguish between the types of firearms given the "assault weapons" label, thus conflating "assault" rifles, pistols and shotguns into one broad category of firearms. However, research has shown that among "assault weapons" recovered by law enforcement, "assault pistols" outnumbered "assault rifles" by a ratio of approximately 3 to 1. (SMF ¶ 99.)

rifles" only, and they revealed that "assault rifles" accounted for just 0.38% of crime guns on average. (SMF ¶ 98.) None of these studies addressed the important question of whether a criminal's use of an "assault weapon" played any role in the outcome of the crime. [10]

Research has also shown that "assault weapons" are almost never used to kill police officers. (SMF ¶ 119.) For the period 1980 to 1989, just 33 of 810 (4%) police officers feloniously killed in the U.S. were killed with "assault weapons" of some type (pistol, rifle or shotgun). (SMF ¶ 120.) Another study revealed that of the 276 police killings from January 1992 through May 1996, just three were committed with an AR-type rifle. (SMF ¶ 121.) And even in the rare instances in which police officers or others were killed or victimized by a criminal using an "assault weapon," it is erroneous to conclude that but for the use of an "assault weapon" the crime would not have occurred. (SMF ¶¶ 108-109.) Other firearms would have been easily substituted for the "assault weapon", which would have been just as lethal. (SMF ¶ 108.) [11]

## V. There Is No Evidence Demonstrating that a Ban on Possession of a Class of Firearms Rarely Used by Criminals Will Reduce Firearms Crimes.

From 1994 to 2004, federal law prohibited possession of a class of firearms defined as "semi-automatic assault weapons." 18 U.S.C. § 921(30) (repealed). The federal law prohibited ownership of many of the same firearms now banned by Highland Park, including AR-type rifles. *Id.* Empirical analyses of the expired federal law demonstrate that it had no effect on crime rates, homicide rates, the number of gunshot wounds per victim or the number of wounded

---

[10]    Because semi-automatic "assault weapons" do not differ in function from other semi-automatic firearms, their use in crime would almost never dictate a different outcome in terms of the number of persons injured.

[11]    Research has further shown that criminals are strongly disinclined to carry an "assault weapon" even when they own one. (SMF ¶ 101.) This is attributable to the fact that they are difficult to conceal and are considerably more expensive than handguns. (SMF ¶ 102.) In a survey of AR-type rifle owners, survey respondents reported that the average price they paid for their rifles was $1,058. (SMF ¶ 50.)

victims per incident. (SMF ¶ 103.) Empirical studies of state-level "assault weapon" bans reached similar conclusions. (SMF ¶ 104.)

Highland Park's localized ban on "assault weapons" is even less likely to have any impact on criminal firearms violence than federal and state bans because of the ease with which banned firearms can be acquired nearby to Highland Park. (SMF ¶ 105.) Highland Park and North Chicago are the only municipalities in Lake County that prohibit the sale and ownership of "assault weapons." (SMF ¶ 106.) The population of Highland Park and North Chicago comprises just 8.8% of the total population of Lake County, and just 1.6% of Lake County's geographical area. (*Id*.) Thus, a Highland Park resident intent on committing a crime with an "assault weapon" would have little difficulty acquiring one by driving only a short distance to a firearm retailer or a private seller outside Highland Park. (*Id*.) Nevertheless, whether "assault weapons" are readily available to residents of Highland Park makes little difference. Non-banned firearms, which are just as lethal as the banned firearms, can be easily substituted. (*Id*.); *see* Volokh, *supra* at pp. 184-85 ("It's therefore hard to see how assault weapons bans would do much to decrease crime, since even a criminal who complies with the ban could easily find an unbanned gun that is as criminally useful as the banned gun, and is as dangerous to victims as is the banned gun.").

**VI.    There is No Evidence that a Ban on Possession of a Class of Firearms in Highland Park Will Reduce the Risk of a Mass Shooting.**

Mass shootings are rare in absolute terms. (SMF ¶ 110.) And while tragic and shocking, mass shootings account for few of the murders that occur annually in the U.S. (SMF ¶ 111.) Over the past several decades, the annual counts of mass shootings have been randomly variable, and have not increased in number or in overall homicides. (SMF ¶ 112–113.) Moreover, firearms of all types have been used by mass shooters: pistols, revolvers, shotguns and rifles.

(SMF Ex. 10 at Appendix pp. 23-57.). In fact, the firearms used in many of the most recent, highly publicized mass shootings are not banned in Highland Park (*e.g.*, Virginia Tech, Northern Illinois University, Fort Hood, Tucson, Washington D.C. Navy Yard and Oak Creek (Sikh Temple)). (*Id.*) Any perception that mass shooters typically use "assault weapons" to commit their crimes is inaccurate.

In shootings in which large numbers of rounds are fired, it is extraordinarily rare that the presence of a "large capacity magazine" had an impact on the number of victims injured or killed. (SMF ¶ 114.) A study of the 81 mass shootings that occurred between 1994 and 2013 (defined as incidents in which more than six persons were shot, fatally or non-fatally) demonstrated that mass shooters have not required "large capacity magazines" to fire large numbers of rounds because (a) they were equipped with multiple firearms, (b) they came equipped with multiple magazines, or (c) they were able to reload their firearms without interference from others. (SMF ¶ 115.) Of the 81 mass shootings examined, the shooters were known to have used magazines with capacities in excess of 10 rounds in just 21 incidents. (SMF ¶ 116.) However, in each of those 21 incidents the shooter was equipped with multiple firearms and multiple magazines. (*Id.*) Thus, if those shooters had chosen to obey a local law limiting magazines to 10 rounds or less, they would have been able to injure the same number of persons by loading new magazines or firing their other firearms. (*Id.*)

## LAW AND ARGUMENT

The "central component" of the Second Amendment right to keep and bear arms is the personal right of armed self-defense, most notably in the home. *Heller*, 554 U.S. at 595. The District of Columbia's ban on handgun possession was found unconstitutional in *Heller* because the ban "extend[ed] … to the home, where the need for defense of self, family and property is

most acute." *Id.* at 628-29. The constitutional right to possess firearms in the home for self-defense is "central to the Second Amendment" and extends to firearms that are in "common use" for lawful purposes. *Id.* at 627 ("The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense.") (citing *United States v. Miller*, 307 U.S. 174 (1939) (firearms not typically possessed by law-abiding persons for lawful purposes, such as short-barreled shotguns, not protected)). The evidence before the Court establishes that the Highland Park Ordinance bans a complete class of firearms commonly owned for self-defense, target shooting and hunting throughout the United States. The Ordinance is, therefore, categorically unconstitutional.

I.    **Highland Park Cannot Meet its Burden of Demonstrating that the Banned Firearms Are Not Typically Possessed by Law-Abiding Citizens for Lawful Purposes.**

Highland Park has the burden of establishing that the banned firearms and magazines fall outside the scope of Second Amendment protection because they are not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see also Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011) ("[I]f the government can establish that a challenged firearms law regulates activity outside the scope of the Second Amendment right … the regulated activity is categorically unprotected."). Highland Park cannot meet its burden.

Whether the banned firearms and magazines are typically possessed by law-abiding citizens for lawful purposes focuses on the choices made by contemporary citizens. *Heller*, 554 U.S. at 582 (rejecting as "bordering on the frivolous" the argument that only firearms in existence in the 18th century are protected). The choices commonly made by the people matter in deciding what firearms have Second Amendment protection under *Heller*, not the choices made by legislative bodies. The Court in *McDonald* underscored this point by rejecting the

argument made by Justice Breyer in his dissent that "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make," such as "[w]hat sort of guns are necessary for self-defense? Handguns? Rifles? Semi-automatic weapons?" *McDonald*, 130 S.Ct. at 3126 (Breyer, J., dissenting):

> Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion. [citation omitted] "The very enumeration of the right takes out of the hands of government – even the Third Branch of government – the power to decide in a case-by-case basis whether the right is really worth insisting upon.

130 S.Ct. at 3050 (citing *Heller*, 554 U.S. at 634-35).

In *Heller*, the Court identified handguns as the "most popular" firearm chosen by Americans for self-defense in the home, and gave several reasons why a citizen might prefer handgun for self-defense. *Heller*, 554 U.S. at 629. Importantly, however, the Court concluded that *"[w]hatever the reason"* for the choice of firearms, the choice was made by the American people, and a "complete prohibition" on the firearms that the people have chosen to keep in their homes "is invalid." *Id*. (emphasis added.)

Whether banned firearms and magazines are commonly owned is measured nationally, not by evaluating the local community in which they are banned. As one district court recently stated:

> The Supreme Court did not define the common use test as a local test, but rather evaluated common use as a national test in its historical discussion. *Heller*, 554 U.S. at 621-28. Moreover, it cannot be that common use is measured on anything but a national scale—otherwise, the scope of individuals' Second Amendment rights as enshrined in the federal Constitution would vary based on location. This result would be wrong: the Second Amendment safeguards individual rights equally throughout the United States.

*Fyock v. City of Sunnyvale*, 2014 U.S. Dist. LEXIS 29722, *14 (N.D.Cal. Mar. 5, 2014). Thus, any attempt to justify the Ordinance based on a perceived "community standard" in Highland Park should be rejected. *See McDonald*, 130 S.Ct. at 3046 (rejecting argument that local governments should be permitted to enact gun control laws they deem reasonable because "conditions and problems differ from locality to locality and that citizens have divergent views on the issue of gun control.").

Highland Park also cannot justify its ban because its citizens can lawfully possess other commonly owned firearms. *Heller* specifically rejected this argument. 554 U.S. at 630 ("[I]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as possession of other firearms (*i.e.* long guns) is allowed."); *see also Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (argument that a ban of one type of firearm does not implicate the Second Amendment because "residents still have access to hundreds more" is "frivolous."). Banning one type of commonly owned firearms and not others,

> [Is] a bit like saying books can be banned because people can always read newspapers. That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right. Indeed, *Heller* itself specifically rejected this mode of reasoning.

*Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1289 (D.C.Cir.2011) (Kavanagh J., dissenting).

The Seventh Circuit has held it is a "profoundly mistaken assumption" that harm to a constitutional right is measured by the extent the right can be exercised elsewhere or in a different way. *See Ezell v. City of Chicago*, 651 F.2d 684, 697 (7th Cir. 2011) (existence of firing ranges outside Chicago did not justify firing range ban in Chicago); *see also Illinois Association of Firearms Retailers*, 961 F.Supp. 2d at 938-39 (rejecting argument that ban on firearm sales within city limits was not an encroachment on Second Amendment rights because

sales could occur elsewhere). Indeed, if local governments are allowed to demonize and ban commonly owned firearms one subset at a time, no subset will be left, and right as described in *Heller* will simply disappear. [12]

Just because a Highland Park resident may not *require* an AR-type rifle to defend himself and his family (or a 12 gauge shotgun or semi-automatic pistol) does not mean the government is free to ban them. The Second Amendment provides categorical protection for all types of firearms that are commonly owned for lawful purposes, not just those the government deems worthy of protection. *See Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."). The clear implication of *Heller* is that categorical protection of firearms ownership is not limited to handguns but extends to whatever types of firearms are commonly chosen by law-abiding persons for lawful uses. *See Moore*, 702 F.3d at 935 (Nor can we "ignore the implication of the [*Heller*] analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one's home.").

Highland Park cannot meet its burden of proving the banned firearms and magazines fall outside Second Amendment protection because evidence demonstrates the overwhelming popularity and common ownership of AR-type rifles among law-abiding citizens. *See Heller II*, 670 F.3d 1244, 1261 (D.C.Cir.2011) (Kavanagh J., dissenting) (A "brief perusal of the website of a popular American gun seller underscores the point that semi-automatic rifles are quite common in the United States" and "are commonly used for self-defense in the home, hunting and target shooting."). From 2008 to 2012, more than one out of every nine firearms produced *of all*

---

[12]     Under the notion that a ban on a subset of commonly owned firearms is permissible under the Second Amendment provided law abiding citizens are not completely disarmed, a prohibition on possession of commonly owned shotguns, semi-automatic pistols or revolvers would be sustainable.  They are used in crime, including mass shootings, and are dangerous when in the wrong hands. (SMF Ex. 10 at Appendix).

*types* was an AR-type rifle. (SMF ¶ 28.) In 2012, retail firearms dealers reported that more than one out of every five new firearms sold was an AR-type rifle. (SMF ¶ 31.) Highland Park's own witness acknowledges that retail dealer inventories of AR-type rifles sell very quickly. (SMF ¶ 36.) And although there are different views on what type of firearm is best suited for home defense use, there is substantial evidence that AR-type rifles are commonly kept for home defense, and that they have attributes making them particularly suitable for that purpose.

Thus, the question is not whether a pistol, revolver, shotgun or rifle is the right choice of a home defense firearm. The question is whether the American people have made the choice to keep AR-type rifles in their homes for self-defense use. If the answer is "yes" the government is not free to override the peoples' decision without violating the Second Amendment.[13]

Other district courts have readily found that "assault weapon" and "large capacity magazine" ownership falls within the scope of Second Amendment protections. *Heller II*, 670 F.3d 1244, 1261 (D.C.Cir.2011) ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use' …"); *Shew v. Malloy*, 2104 U.S. Dist. Lexis 11339, *27-28 (D.C. Conn. Jan. 30, 2014) (the firearms and magazines at issue are in "common use" within the meaning of *Heller*); *New York State Rifle & Pistol Association v. Cuomo ("NYSRPA")*, 2013 U.S. Dist. LEXIS 182307, *36 (W.D.N.Y. 20130 ("[T]here can be little dispute that tens of thousands of Americans own these guns for lawful purposes, such as hunting, target shooting and even self-defense."); *Fyock v. City of*

---

[13]    Although Highland Park bears the burden of demonstrating that the banned firearms and magazines fall outside the scope of Second Amendment protection, Plaintiffs have presented evidence that AR-type rifles and "large capacity magazines" are commonly owned, and that the prohibited design features do not make the rifles more dangerous than rifles without them. Under the severability doctrine, courts may "excise the offending portion" of an act and "preserve the remainder" provided that "the remainder is complete in and of itself, and is capable of being executed wholly independently of the severed portion." *People v. Sanders*, 182 Ill.2d 524, 696 (Ill. 1998).

*Sunnyvale*, 2014 U.S. Dist. LEXIS 29722, *13 (N.D. Cal. Mar. 5, 2014) (magazines having a capacity to accept more than ten rounds are in common use, and therefore not dangerous and unusual).

In sum, Highland Park's categorical ban on possession of commonly owned rifles and magazines by law-abiding citizens, like the District of Columbia's categorical ban on possession of commonly owned handguns in *Heller*, is unconstitutional. No further inquiry into Highland Park's reason for making it a crime for a law-abiding resident to keep one of these rifles or magazines in his or her home for self-defense purposes is required under the *Heller* analytical framework. *See Moore*, 702 F.3d at 940 (level of scrutiny analysis not required to strike down statute placing restrictions on carrying firearms outside the home); *Peruta v. County of San Diego*, 742 F.3d 1144, 1168-70 (9th Cir. 2014) (level of scrutiny analysis not required to strike down statutory restrictions on concealed carry outside the home). Whatever Highland Park's reason for the Ordinance, *Heller* does not permit a balancing of Highland Park's interest with the Second Amendment right of each and every resident to decide whether to keep a commonly owned firearm in his or her home for self-defense use, or what commonly owned firearm to keep. [14]

> **II.     In a Means-End Analysis, Highland Park's Justification for Burdening the Second Amendment Rights of Residents to Defend Themselves in Their Homes Should Be Subjected to Strict Scrutiny.**

---

[14]     The district courts in *Shew* and *NYSRPA* inaccurately distinguished the "assault weapon" bans they addressed from the District of Columbia handgun ban found unconstitutional in *Heller* on the basis that the handgun ban "amount[ed] to a complete prohibition on firearms for self-defense in the home." *Shew*, 2104 U.S. Dist. Lexis 11339 at *31; *see also NYSRPA*, 2013 U.S. Dist. LEXIS 182307 at * 43 (Unlike the handgun ban in *Heller*, the SAFE act "does not totally disarm New York citizens."). But the District of Columbia handgun ban was not a "complete prohibition" on armed defense in the home because residents could keep rifles and shotguns for that purpose. Thus, the District of Columbia ban and the bans in *Shew* and *NYSRPA* were actually alike in their effect – they each prohibited possession of a class of firearms commonly kept in the home for self-defense.

Highland Park has prohibited possession of "assault weapons" and "large capacity magazines" by law-abiding persons in their homes in the interest of "public safety." It has dictated to its residents how they may defend themselves, their families and their property, and has excluded the option of keeping an AR-type rifle available for that purpose, a firearm that is not only the most commonly owned rifle in America today, but a firearm that many believe to be the most effective and safe firearm for home defense use. Highland Park's prohibition strikes at the core of the Second Amendment right to armed self-defense, as articulated in *Heller*. As argued above, Highland Park's firearm ban is flatly unconstitutional without further inquiry into the reasons Highland Park had for enacting the Ordinance.

Nevertheless, should this Court employ a means-end analysis of Highland Park's justification for violating the Second Amendment rights of its residents, the justification should be subjected to strict scrutiny. Laws imposing a burden on the core Second Amendment right of armed self-defense require "an extremely strong public interest justification and a close fit between the government's means and its end." *Ezell*, 651 F.3d at 708-09 (holding that city bears burden to establish close fit between firing range ban and strong public interest justification). The required "rigorous showing" is "not quite strict scrutiny" but is greater than intermediate scrutiny. *Id.* at 708; *accord Moore*, 702 F.3d 933, 939-40 (A "substantial curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from the curtailment, though there is no proof it would."); *Illinois Association of Firearms Retailers*, 961 F.Supp. 2d at 938 (holding that city ban on retail firearm sales was a serious encroachment on an important corollary to the core right of armed self-defense and deserves more stringent scrutiny than intermediate scrutiny); *see also Peruta*, 742 F.3d at 1175-77 (criticizing Second, Third and Fourth Circuit application of intermediate

scrutiny in Second Amendment cases as "interest balancing" expressly rejected in *Heller*). [15]

At bottom, Highland Park's ban on possession of commonly owned firearms in the homes of law abiding residents is a "serious encroachment" on the right to armed self-defense. *Ezell*, 651 F.3d at 708. In any means-end analysis, Highland Park must make a "rigorous showing" of a "close fit" between "an extremely strong public interest justification" and the substantial burden imposed it has imposed on the rights of its law abiding residents. *Id.* [16]

### III. Highland Park Cannot Meet Its Burden of Justifying the Substantial Burden Imposed on Second Amendment Rights of its Residents.

Highland Park has made clear that it enacted the Ordinance out of concern that a "mass shooting … could occur in Highland Park, unless proper public safety measures are taken." (Declaration of Nancy Rotering, Doc. 22-1 at ¶ 9.) Although concern about mass shootings is understandable, there is no empirical or logical basis to conclude that a mass shooting is less likely to occur in Highland Park because law abiding residents are prohibited from keeping certain types of firearms and magazines in their homes for lawful purposes. Any alleged connection between the Ordinance and the prevention of mass shootings or any criminal violence

---

[15] *Heller* explicitly rejected rational basis review of legislative judgments restricting Second Amendment rights. 554 U.S. at 628 n. 27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Thus, there is no room for deference to legislative judgment when a burden on the core right to armed self-defense is at stake, as it was in *Heller* and is here.

[16] The Seventh Circuit applied intermediate scrutiny in *U.S. v. Skoien*, 614 F.3d 638 (7th Cir. 2010) to uphold a law curtailing the rights of persons convicted of domestic violence from possessing firearms. However, in *Ezell*, the court explained that a lesser showing was required in *Skoien* because the law at issue did not involve the "central self-defense component" of the Second Amendment right. *Ezell*, 651 F.3d at 708. And later in *Moore*, the court further distinguished *Skoien* on the basis that the law curtailed the rights of persons shown to present a risk of misusing firearms, not law abiding citizens. *Moore*, 702 F.3d at 940. Even then, intermediate scrutiny in *Skoien* required a "strong showing" that the law was vital to public safety. *Ezell*, 651 F.3d at 708 (citing *Skoien*, 614 F.3d at 641).

in Highland Park is entirely speculative. *See Moore,* 702 F.3d at 940 (speculation that the public *might* benefit from curtailment of the constitutional right of armed self-defense is not sufficient).

Mass shootings are rare in absolute terms, and while tragic, they account for very few of the firearm murders that occur annually in the United States. (SMF ¶¶ 110-111.) Moreover, mass shootings have not increased in number or overall death toll in the past several decades. (SMF ¶ 112.) Regardless, there is no evidence demonstrating that banning "assault weapons" will reduce the likelihood of a mass shooting occurring. Historically, mass shooters have used all types of firearms and magazines to commit their crimes. In fact, the most commonly used firearm in mass shootings is a firearm lawfully owned in Highland Park – a handgun. (*See* SMF Ex. 10 Appendix: Synopsis of Mass Shootings, 1994 – 2103.) [17]

In the three mass shootings singled-out by Highland Park as justification for the Ordinance – Aurora, Colorado; Newtown, Connecticut; and Santa Monica, California – the shooters possessed shotguns, pistols and rifles. Of the 30 top mass shootings ranked by number of persons killed (occurring between January 2009 and September 2013), just 4 involved an "assault weapon" while 28 involved one or more handguns. (SMF ¶ 118.) The notion that banning one type of firearm (particularly the type least frequently used) will deter mass shooters from committing their crimes is not supported by logic or common sense.

Historical evidence also demonstrates that mass shooters have not required "large capacity magazines" to fire large numbers or rounds because they were equipped with multiple firearms, possessed multiple ammunition magazines or were simply able to reload their firearms

---

[17]     Criminals overwhelmingly prefer handguns for use in any type of crime. (SMF ¶ 92); *see Heller*, 554 U.S. at 682 (Breyer J., dissenting) (handguns are "the overwhelming favorite weapon of armed criminals."). If banning handguns could not be justified in the interest of public safety in *Heller*, it follows that a ban on a class of rifles that are rarely used in crime also cannot be justified.

without interference from others. (SMF ¶ 115.) In a comprehensive study of 81 mass shootings, it was determined that "large capacity magazines" were used in just 21 of the incidents. (SMF ¶ 116.) But in each of the 21 incidents, the shooter possessed multiple guns and magazines. (*Id.*) Thus, even if the mass shooters in these incidents were limited by law to magazines holding 10 or fewer rounds of ammunition (on the very questionable assumption that criminals would obey such a law), there is no logical basis to believe they would not have been able to fire large numbers of rounds using multiple firearms and magazines.

The evidence simply does not establish a positive causal relationship between the types of firearms and magazines used in mass shootings and the number of persons injured. (SMF Ex. 10 at ¶¶ 24-25.) Tragically, persons who want to shoot more people are, on average, more likely to do so regardless of the firearms and magazines they choose to use. *(Id.)*

Highland Park's justification for the Ordinance is logically flawed and empirically unsupported, and it cannot meet its burden of establishing a "close fit" between its ban on firearms and magazines in the homes of law-abiding citizens and its desire to prevent a mass shooting and other firearm crimes in Highland Park. Highland Park's justification for violating the Second Amendment rights of its residents does not stand up to any level of scrutiny, particularly the "not quite strict scrutiny" applied by the Seventh Circuit to other laws burdening Second Amendment rights.

## CONCLUSION

The Second Amendment protects the rights of a law abiding persons in Highland Park to keep firearms in their homes to protect themselves, their families and their property. The only limitation on the exercise of that right is that the firearm they choose to keep must be a type of firearm that is commonly owned by other citizens for lawful purposes, including self-defense.

Under the central holding of *Heller*, legislatures and courts are not free to interfere with the exercise of this core constitutional right and decide which commonly owned firearms may be kept by law abiding persons in their homes. Highland Park, however, through its ban on possession of commonly owned firearms in the home, has taken the decision away from its residents and violated their constitutional rights. The provisions of Highland Park Ordinance that violate the Second Amendment should be declared unconstitutional.

Respectfully submitted,

/s/ James B. Vogts
James B. Vogts
Andrew A. Lothson
Brett M. Henne
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com
bhenne@smbtrials.com
alothson@smbtrials.com

24

**CERTIFICATE OF SERVICE**

I, James B. Vogts, hereby certify that on the 30th day of June, 2014, I caused to be served

a copy of the foregoing document on all counsel of record listed below, via the Court's ECF

system and/or by U.S. Mail.

1.      Christopher B. Wilson
        Perkins & Coie LLP
        131 S. Dearborn Street
        Suite 1700
        Chicago, IL 60603
        (312) 324- 8400
        Email:  cwilson@perkinscoie.com

2.      Christopher J. Murdoch
        Holland & Knight, LLP
        131 South Dearborn Street
        30th Floor
        Chicago, IL 60603
        (312) 263-3600
        Email: chris.murdoch@hklaw.com

3.      Hart M. Passman
        Holland and Knight, LLP
        131 South Dearborn
        30th Floor
        Chicago, IL 60603
        (312) 578-6634
        Email: hart.passman@hklaw.com

4.      Steven M. Elrod
        Holland & Knight, LLP
        131 South Dearborn Street
        30th Floor
        Chicago, IL 60603
        (312) 263-3600
        Email: steven.elrod@hklaw.com

        **Attorneys for Defendants**

                      */s/  James B. Vogts*
                       James V. Vogts

25