**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARIE S. FRIEDMAN, M.D. and the Illinois State Rifle Association       ) ) ) | |
|         Plaintiffs,       ) ) | No: 13-cv-9073 |
|   v.        ) ) ) | Hon. John W. Darrah |
| CITY OF HIGHLAND PARK,       ) ) | |
|         Defendant.       ) | |

## PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS

Plaintiffs Arie S. Friedman, M.D. and the Illinois State Rifle Association submit their Local Rule 56.1(a)(3) Statement of Material Facts as to which there are no genuine issues and entitles them to judgment as a matter of law.

## PARTIES

1.  Arie S. Friedman, M.D. ("Friedman") is an adult resident of Highland Park, Illinois. He is a law abiding citizen, who is lawfully entitled to own and possess firearms under all applicable Federal and State laws and regulations. (Verified Complaint, Doc. 1 -1, ¶ 1.)

2.  Prior to the effective date of Highland Park City Code § 136.001 *et seq*. (the "Ordinance"), Friedman owned and possessed firearms and ammunition magazines in his home for lawful purposes, including the defense of his home and his family. (Verified Complaint, Doc. 1 - 1, ¶¶ 1 and 4.) In order to comply with the Ordinance, Friedman removed firearms from his home in Highland Park. (*Id.*)

3.      The Illinois State Rifle Association ("ISRA") is non-profit educational foundation incorporated under the laws of Illinois, with its principal place of business in Chatsworth, Illinois. (Verified Complaint, Doc. 1-1, ¶ 2.) The ISRA has more than 30,000 members residing in Illinois, including many residing in Highland Park. (*Id*.) The purposes of the ISRA include the protection of the rights of citizens to keep and bear arms for the lawful defense of their families, persons and property, and to promote public safety and law and order. (*Id*.)

4.      The City of Highland Park ("Highland Park") is a municipal corporation located in Lake County, Illinois. (Verified Complaint, Doc. 1-1, ¶ 3). Highland Park is governed by a Mayor and an elected six-member City Council, which is empowered to enact ordinances under its home rule authority. (*Id*.)

## JURISDICTION AND VENUE

5.      Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief seeks redress for a violation of the Second Amendment to the United States Constitution.  This Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1343(a). Venue is proper under 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## MATERIAL FACTS

### I.      The Ordinance Bans Possession of Commonly Used Firearms.

#### A.      The Highland Park Assault Weapons Ordinance

6.      Highland Park City Code Section 136.001 *et seq*. (attached as Exhibit 1) prohibits law-abiding citizens from possessing in Highland Park a category of firearms defined as "assault weapons". City Code § 136.005.

7.      Among the firearms defined as "assault weapons" under the Ordinance are semi-automatic rifles that have the capacity to accept a "large capacity magazine" (detachable or otherwise) and have one or more of five features: (1) only a pistol grip without a stock attached; (2) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (3) a folding telescoping or thumbhole stock; (4) a shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or (5) a muzzle brake or muzzle compensator. City Code § 136.001(C)(1).

8.      A "large capacity magazine" is defined under the Ordinance as any ammunition feeding device with the capacity to accept more than ten rounds, excluding (1) a feeding device that has been permanently altered so that it cannot accommodate more than ten rounds; (2) a .22 caliber tube ammunition feeding device; and (3) a tubular magazine that is contained in a lever-action firearm. City Code § 136.001(G).

9.      Included within the definition of "assault weapons" under the Ordinance are specifically designated rifles (or copies or duplicates thereof), including all AR-type rifles, all AK-type rifles and certain carbine rifles, including the Hi-Point carbine and the Sturm, Ruger Mini-14 rifle. City Code § 136.001(C)(7).

9.      A "muzzle brake" is defined under the Ordinance as a device attached to the muzzle of a firearm that utilizes escaping gas to reduce recoil. City Code § 136.001(H).

10.     A "muzzle compensator" is defined under the Ordinance as a device attached to the muzzle of a firearm that utilizes escaping gas to control muzzle movement. City Code § 136.001(I).

### B.     The Functional Operation of Firearms Banned in Highland Park.

11.     The rifles banned under the Ordinance are semi-automatic firearms, not fully automatic firearms. (Exhibit 2 at ¶¶ 3-5 - Affidavit of James W. Supica, Jr.) Semi-automatic firearms fire only one round when the trigger is pulled, as is the case with most other types of firearms, including revolvers and bolt-action, lever action, pump or slide action, and single shot firearms. (*Id*.; and Exhibit 3 at ¶ 15 and Exhibit E thereto (video demonstration) - Affidavit of David A. Lombardo.)

12.     Semi-automatic firearms use some of the energy of the fired cartridge to move a fresh cartridge into firing position. (Exhibit 2 at ¶ 6.) The semi-automatic nature of semi-automatic firearms is in reference to their self-loading capability and not the manner in which they are fired. (*Id*.).

13.     Semi-automatic firearms have been manufactured and commonly used for lawful civilian purposes for well over a century. (Exhibit 2 at ¶ 4.)

14.     Semi-automatic rifles are sold by their manufacturers with magazines of various capacities, typically 5, 10, 20 or 30 rounds. (Exhibit 3 at ¶ 6.)

15.      Examples of semi-automatic rifles sold with magazines having a capacity of 10 rounds or less include models of the Smith & Wesson M & P 10 (an AR-type rifle sold with 5 and 10 round magazines); the Remington Model R-15 Predator and Varmint (AR-type rifles sold with 5 round magazines); and the Bushmaster Hunter, Predator and Varminter rifles (AR-type rifles sold with 5 round magazines).  (Exhibit 3 at ¶ 5.)

### C.     The Firearms Banned in Highland Park Are Not Military Weapons.

16.     Historically, firearm development goals have largely been the same for civilian, military and law enforcement firearms, from the earliest period of firearms design until today – to

4

safely, accurately and reliably discharge rounds. (Exhibit 2 at ¶ 7.) Improvements made in military firearms have been routinely adopted for civilian firearms. (*Id*.; and Exhibit 4 at p. 199 – Deposition of Mark D. Jones (Highland Park expert witness).)

17.     The wood-stocked bolt-action rifle, used by hunters for generations, gained popularity among civilians following World War I, where it was the battlefield rifle. (Exhibit 2 at ¶ 7.) After the U.S. military began using the semi-automatic rifle during World War II, a wide range of semi-automatic rifles gained popularity among civilians. (*Id*.)  Semi-automatic rifles built on the AR-platform for civilian use were developed in the early 1960's based on the M-16 rifle used by U.S. forces in Viet Nam. (*Id*.; Exhibit 4 at pp. 199-200.)

18.     Military forces around the world since the end of World War II have primarily used selective-fire rifles as standard service rifles. (Exhibit 2 at ¶ 8.) A selective-fire rifle has the ability to fire both fully automatic, meaning it continues to fire with a single trigger pull as long as the trigger is held back, or a burst of multiple rounds with each pull of the trigger, as well as semi-automatic, meaning a separate pull of the trigger is required for each shot. (*Id*.)

19.     The semi-automatic rifles banned under the Ordinance are not military firearms. (Exhibit 2 at ¶ 8.)

20.     Historically, there is no such thing as a "semi-automatic assault weapon." (Exhibit 2 at ¶ 9.)

21.     In its July 6, 1989 Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles, the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") stated with regard to semi-automatic rifles that "it is somewhat of a misnomer to refer to these weapons as assault rifles. True assault rifles are selective fire weapons that will

fire in a fully automatic mode". (Exhibit 5 at pp. 5-6 – Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles.)

**D.** **The Firearms Banned in Highland Park Are Owned by Millions of Persons in The United States.**

22.     The National Shooting Sports Foundation ("NSSF") is the trade association for the firearms industry. Its mission is to promote, protect and preserve hunting and the shooting sports. The NSSF has a membership of more than 10,000 manufacturers, distributors, firearm retailers, shooting ranges, sportsmen's organizations and publishers. (Exhibit 6 at ¶ 1 – Affidavit of James Curcuruto.)

23.     The NSSF has estimated that from 1990 to 2012, approximately 5,128,000 AR-type rifles were manufactured for domestic sale in the United States by 50 manufacturers.  (Exhibit 6 at ¶ 4.)

24.      The NSSF has estimated that from 1990 to 2012, approximately 3,415,000 AR-type and AK-type rifles have been imported into the United States. (Exhibit 6 at ¶ 4.)

25.      The NSSF has estimated that more than 4.8 million persons in the United States own at least one AR-type or AK-type semi-automatic rifle. (Exhibit 6 at ¶ 4.)

26.     The NSSF has estimated that approximately 3,457,230 AR-type rifles were manufactured for domestic sale in the United States from 2008 to 2012. (Exhibit 6 at ¶ 5.)

27.     According to ATF Annual Firearms Manufacturing and Export Reports ("AFMER Reports"), 30,433,751 firearms of all types were manufactured in the United States for domestic sale from 2008 to 2012. (Exhibit 6 at ¶ 5.)

28.     Based on the NSSF's estimate of the number of AR-type rifles that were manufactured in the United States for domestic sale from 2008 to 2012 (3,457,230) and AFMER Reports setting forth the number of firearms of all types manufactured in the United States for

domestic sale from 2008 to 2012 (30,433,751), 11.4 percent of all firearms manufactured in the United States for domestic sale from 2008 to 2012 were AR-type rifles. (Exhibit 6 at ¶ 5.)

29.     The NSSF's estimate of the number of AR-type rifles manufactured in the United States for domestic sale from 2008 to 2012 (3,457,230) exceeds the number of revolvers manufactured in the United States for domestic sale during the same years (2,637,348). (Exhibit 6 at ¶ 5.)

30.     The NSSF's estimate of the number of AR-type rifles manufactured in the United States for domestic sale (3,457,230) nearly equals the number of shotguns manufactured in the United States for domestic sale during the same years (3,719,444). (Exhibit 6 at ¶ 5.)

31.     An on-line survey conducted by the NSSF of retail firearm dealers revealed that 92.5 percent of those responding stocked AR-type rifles for sale in 2012. (Exhibit 6 at ¶ 8.) In The NSSF retail firearms dealer survey indicated that 20.3 percent of all new firearms sold by survey respondents in 2012 was an AR-type rifle. (*Id.*)

32.     AR-type rifles are accurate, reliable and easy to reload. (Exhibit 3 at ¶ 4.)

33.     AR-type rifles are generally lighter in weight, shorter in length and have less recoil than traditionally-styled wooden stock rifles. (Exhibit 3 at ¶ 4.)

34.     The popularity of AR-type rifles is also based their modular design. (Exhibit 3 at ¶ 3.) They have an upper receiver into which the barrel is mounted and a lower receiver that holds the firing assembly and onto which the butt stock and lower grip are mounted. (*Id.*) The two receivers can be dismounted allowing for mounting of a different barrel and use of different rifle cartridges to suit different purposes, including target matches, home defense and small and large game hunting. (*Id.*)

35.     The popularity and common ownership of AR-type rifles in the civilian marketplace is evident to persons who are involved in or regularly observe the community of persons who own and use firearms. (Exhibit 3 at ¶ 5.) AR-type rifles are regularly observed on firearms ranges in Illinois and are the most commonly used rifle over the past five to ten years. (*Id*.). Based on their substantial presence at industry trade shows where products are displayed, the market for AR-type rifles appears to be a growing firearms market segment. (*Id*.; Exhibit 7 at p. 58-59 & 64 – Deposition of James C. Yurgealitis (Highland Park expert witness).)

36.     In recent years there has been an increase in the popularity and availability of semiautomatic firearms patterned after those initially designed for military purposes. (Exhibit 7 at pp. 63-64.)  Gun stores cannot get enough AR-type rifles and they sell very quickly. (*Id*. at pp. 64-65.) They are popular because of reliability and functionality. (*Id*. at p. 65.)

**II.      The Ordinance Bans Possession of Firearms That Are Commonly Owned and Suitably Used for Lawful Purposes, Including Home Defense, Target Shooting and Hunting.**

**A.  Ownership for Home Defense Purposes.**

37.     An effective home defense firearm is one that will reliably incapacitate a hostile person in a life threatening situation and stop him from continuing his actions.  (Exhibit 8 at ¶ 3 – Affidavit of Dr. Gary Roberts.)

38.     The perfect home defense firearm is a firearm which the operator is familiar with and can operate easily. (Exhibit 7 at pp. 153-154.)

39.     A safe home defense firearm is one that minimizes danger to innocent persons in the home. (Exhibit 8 at ¶ 3.)

40.     An AR-type rifle is a firearm appropriately chosen for home defense purposes from the standpoint of both effectiveness and safety.  (Exhibit 3 at ¶ 4; Exhibit 8 at ¶ 8.)

41.     Most AR-type rifles are chambered for .223 ammunition, a relatively inexpensive rifle cartridge that has sufficient power to stop a home intruder but loses velocity and momentum relatively quickly after passing through walls and other objects, thus decreasing the risk that an errant shot inadvertently strikes a family member in a home defense situation.  (Exhibit 3 at ¶ 4; Exhibit 8 at ¶¶ 4-8.)

42.     Ammunition heavier than .223 ammunition, such as most large caliber ammunition used in pistols and revolvers, retains greater momentum after penetrating walls and other structures than .223 ammunition despite having slower velocities. (Exhibit 8 at ¶ 4.)

43.     Twelve gauge 00 Buckshot fired from a shotgun will penetrate an interior wall and put innocent bystanders at risk to virtually the same extent as large caliber handgun ammunition. (Exhibit 8 at  ¶ 4.) Both 00 Buckshot and large caliber handgun ammunition will penetrate after passing through an interior wall more than twice as far as a .223 round. (*Id.*)

44.     The correct choice of ammunition by a civilian for use in a potential self-defense encounter should be based on the same criteria relied on by law enforcement: reliable incapacitation while minimizing danger to innocent bystanders. (Exhibit 8 at ¶ 3.)

45.     The Federal Bureau of Investigation and others with expertise in wound and terminal ballistics believe that well designed .223 ammunition offers ideal penetration characteristics with less risk of over penetration than typical handgun and shotgun ammunition. (Exhibit 8 at ¶ 7.)

46.     In 2012, the Department of Homeland Security issued specifications to purchase 7,000 AR-type rifles chambered for .223 ammunition for use as personal defense weapons "suitable for use in close quarters". (Exhibit 8 at ¶ 6.)

47.     The Chicago Police Department makes AR-type rifles chambered for .223 ammunition available for police officer use "to enhance officer safety in high threat situations" and when an officer "reasonably believes that he or she may soon confront a threat that may require use of deadly force". (Exhibit 8 at ¶ 6.)

48.     The NSSF published a Modern Sporting Rifle (MSR) Comprehensive Consumer Report ("MSR Survey") in 2103. (Exhibit 6 at ¶ 6.) The purpose of the MSR Survey was to gather information for use by NSSF members in their businesses, including demographic information on persons owning AR-type and AK-type rifles (collectively "modern sporting rifles") and information related to consumer purchasing decisions and product use. (*Id.*)

49.     Because there is no database of modern sporting rifle owners, the NSSF solicited consumer participation in the MSR Survey through banner advertisements on various websites, blogs and e-newsletters geared toward firearms ownership and hunting. (Exhibit 6 at ¶ 6.)

50.     Online responses to the MSR Survey were received from 21,942 owners of modern sporting rifles. (Exhibit 6 at ¶ 6.) The typical person responding to the MSR Survey was 35+ years old, married and had some college education. (*Id.*) Three out of every four modern sporting rifles recently purchased by MSR Survey respondents were chambered for .223 ammunition. (*Id.*) The average price paid by MSR Survey respondents for their modern sporting rifles was $1,058. (*Id.*)

51.     Persons responding to the MSR Survey ranked accuracy and reliability as the most important reasons for purchasing their modern sporting rifles. (Exhibit 6 at ¶ 7.) Other reasons cited by survey respondents for their purchase of modern sporting rifles included ergonomics, low recoil, ease with which they can be shot and their light weight. (*Id.*)

52.     MSR Survey respondents ranked recreational target shooting highest among seven reasons for owning a modern sporting rifle. (Exhibit 6 at ¶ 7.) Use of a modern sporting rifle for

home defense was ranked by survey respondents as the second highest reason for owning a modern sporting rifle. (*Id*.) Varmint hunting ranked fourth. (*Id*.) Other reasons for owning a modern sporting rifle included collecting, competition shooting, big game hunting and professional use/job related. (*Id*.)

53. Of those responding to the MSR Survey, 56% indicated that they use a 30 round magazine in their most recently purchased modern sporting rifle. (Exhibit 6 at ¶ 6.) Magazines capable of holding more than 10 rounds of ammunition were used by 83% of those responding to the survey. (*Id*.) Research demonstrates that of the approximately 158 million magazines in consumers' possession in the United States, approximately 75 million or 46% are capable of holding more than 10 rounds of ammunition. (*Id*. at ¶ 10.)

54. From January 2013 through May 5, 2014, 779 persons enrolled in Home Protection and Concealed Carry Seminars and NRA Basic Pistol classes in northern Illinois were surveyed by the instructor and asked to identify the type of firearm they owned for personal protection. (Exhibit 3 at ¶ 7). Of those completing the survey, 58.2% indicated that they keep a semi-automatic rifle with a detachable magazine available for personal protection. (*Id*.)

55. According to the FBI's Supplementary Homicide Reports, an average of 430 burglary-related homicides occurred each year from 2003 and 2007. (Exhibit 9 at p. 10 – U.S. Department of Justice, Bureau of Justice Statistics, *Victimization During Household Burglary*.)

56. The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 1,025,520 household burglaries were committed each year from 2003 and 2007 when a household member was present. (Exhibit 9 at p. 9, Table 16.) On average, approximately 2,809 burglaries were committed each day from 2003 to 2007 when a household member was present. (*Id*.)

57.     The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 266,560 household members became victims of violent crime each year from 2003 to 2007 during the commission of a burglary. (Exhibit 9 at p. 9, Table 17.) On average, approximately 730 burglaries were committed each day from 2003 to 2007 in which a household member became a victim of a violent crime. (*Id*.)

58.     The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 114,620 household members were confronted by an armed intruder each year from 2003 to 2007 during the commission of a household burglary. (Exhibit 9 at p. 10, Table 18.) On average, approximately 314 burglaries were committed each day from 2003 to 2007 in which a household member was confronted by an intruder with a weapon. (*Id*.)

59.     The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 22,278 persons were sexually assaulted each year from 2003 to 2007 during the commission of a household burglary. (Exhibit 9 at p. 9, Table 15.) On average, approximately 61 burglaries were committed each day from 2003 to 2007 in which a household member became a victim of a sexual assault. (*Id*.)

60.     The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 48,269 persons were victims of aggravated assault each year from 2003 to 2007 during the commission of a household burglary. (Exhibit 9 at p. 9, Table 15.) On average, approximately 132 burglaries were committed each day from 2003 to 2007 in which a household member became a victim of an aggravated assault. (*Id*.)

61.     A national survey of adults residing on the lower 48 states in 1993 determined that there are approximately 2.2 to 2.5 million defensive gun uses by civilians annually. (Exhibit 10 at ¶ 10 – Affidavit of Gary Kleck.)

**B.** **Target Shooting.**

62.     The NSSF published a Sports Shooting Participation in the United States report in 2012 ("Shooting Participation Report") (Exhibit 6 at ¶ 9.)

63.     The purpose of the Shooting Participation Report was to communicate the results of a telephone survey of 8,335 randomly selected adults, which was designed to determine regional and national participation rates in target shooting and sport shooting. (Exhibit 6 at ¶ 9.)

64.     The Shooting Participation Report indicated that approximately 11,977,000 persons participated in target shooting with a modern sporting rifle in 2012. (Exhibit 6 at ¶ 9.)

65.     Defendant's expert witness, James C. Yurgealitis, owns a Colt Model 60-29 AR-type rifle. (Exhibit 7 at p. 27-28.) Yurgealitis taught his teenage daughter to fire the rifle, and they both use the rifle for target shooting. (*Id*. at pp. 34-35.) Yurgealitis' AR-type rifle is equipped with a telescoping stock, a pistol grip, a barrel shroud and a protruding grip. (*Id*. at pp. 31 & 106.) He owns a number of 20 and 30 round magazines for the rifle. (*Id*. at p. 33.) Yurgealitis finds his AR-type rifle accurate, reliable and easy to operate. (*Id*. at pp. 35-36, 40.)

66.     AR-type rifles are also used in the very popular "3 Gun" shooting competitions, the fastest growing shooting sport in the country, in which shooters use a pistol, a shotgun and an AR-type rifle to move through different stages and engage different targets from a variety of positions. (Exhibit 3 at ¶ 8.)

**C.** **Hunting.**

67.     AR-type rifles are also commonly used for small game hunting because they are accurate, reliable and easy to handle. (Exhibit 3 at ¶ 8.) In Illinois, it is legal to use "any type of legal rifle including large capacity semi-automatic rifles" to hunt coyotes

(www.dnr.illinois.gov/hunting/documents/hunttrapdigest.pdf). In many other states, they are used for hunting varmints and small game of various kinds, as well as wild boar. (Exhibit 3 at ¶ 7.)

68. Defendant's expert witness, Mark D. Jones, owned an AR-15 rifle chambered for .223 ammunition and equipped with a 20 round magazine, which he used to hunt prairie dogs. (Exhibit 4 at p. 56.) Others with whom Jones hunted prairie dogs also used AR-type rifles. (*Id*. at p. 57.) Jones currently owns a Norinco SKS Type 56 (AK-type) rifle, which is banned under the Ordinance. (*Id*. at p. 54.)

### III. The "Assault Rifle" Features Banned in Highland Park Do Not Affect a Rifle's Functional Operation and Do Not Make a Rifle More Dangerous than Other Firearms.

69. The rifle features that Highland Park has banned – pistol grips; folding; telescoping and thumbhole stocks; barrel shrouds; protruding grips; muzzle breaks; and muzzle compensators – are each integral to the safe handling of an AR-type rifle. (Exhibit 3 at ¶ 9.)

70. The presence of one of the individual rifle features that Highland Park has banned – pistol grips; folding, telescoping and thumbhole stocks; barrel shrouds; protruding grips; muzzle breaks; and muzzle compensators – does not make a rifle more dangerous than a rifle without them. (Exhibit 3 at ¶ 9; Exhibit 7 at pp. 120-121.)

### A. Folding, Telescoping and Thumbhole Stocks.

71. Telescoping stocks on AR-type rifles are fairly common. (Exhibit 7 at p. 104.)

72. Telescoping or adjustable stocks are present on AR-type rifles to enable the shooter to adjust the rifle's length to fit his or her physical stature. (Exhibit 3 at ¶ 10.)

73. If a rifle's stock is too short for the shooter, a right handed person will tend to pull shots to the left, and if the stock is too long, shots will go low and to the left. (Exhibit 3 at ¶ 10.)

74.     The typical difference in the overall length of an AR-type rifle with a telescoping stock fully extended as opposed to fully collapsed is just a few inches. (Exhibit 3 at ¶ 10 and Exhibit E thereto (Video Demonstration).)

75.     The telescoping stock on a Smith & Wesson M & P 15 rifle can change the overall length of the rifle from 35 to 32 inches. (Exhibit 3 at ¶ 10.)

76.     The change in overall length of a rifle from 35 to 32 inches does turn an otherwise non-concealable firearm into a concealable firearm for criminal purposes. (Exhibit 3, ¶ 10.)

77.     Thumbhole stocks are widely used by Olympic and other slow precision target shooting competitors. (Exhibit 3 at ¶ 10.)

78.     Thumbhole stocks generally enhance accuracy and do not have an effect the basic function of a semi-automatic rifle. (Exhibit 3 at ¶ 10.)

**B.     Pistol Grips.**

79.     AR-type rifles are designed on a straight line, which serves to reduce "muzzle rise" during recoil. (Exhibit 2 at ¶ 10; Exhibit 7 at pp. 86-87.)

80.     A pistol-style grip for the trigger hand is necessary on an AR-type rifle because of the rifle's raised butt-stock in the straight line design. (Exhibit 2 at ¶ 10; Exhibit 7 at pp. 93-94.)

81.     If the trigger-hand grip on an AR-type rifle was made part of the butt-stock, as on a traditionally-styled rifle, the trigger hand would be in an unnatural position. (Exhibit 2 at ¶ 10; Exhibit 3 at ¶ 12-13 and Exhibit E thereto (Video Demonstration).)

82.     A pistol grip aids in controlling a rifle during aiming and recoil. (Exhibit 7 at pp. 94-95.)

### C.  Barrel Shrouds.

83**.**  Nearly all rifles have some sort of fore end that "shrouds" or encases the barrel, fully or partially, and serves as a place to support the rifle with the non-trigger hand and to protect the shooter's hand from barrel heat build-up. (Exhibit 2 at ¶ 10; Exhibit 3 at ¶ 11 and Exhibit E thereto (Video Demonstration); Exhibit 7 at p. 126.)

84.  A barrel shroud on an AR-style rifle also serves as the place to incorporate a rail system on which accessories can be mounted, such as a telescopic sight, an optical sight or a flashlight. (Exhibit 3 at ¶ 10.)

85.  A barrel shroud on an AR-style rifle also protects the aluminum gas tube, which carries powder gasses back to work the rifle's action. (Exhibit 2 at ¶ 10; Exhibit 7 at pp. 125-126.)

86.  The presence of a barrel shroud on an AR-type rifle does not in and of itself make the rifle more dangerous; it allows for control by the operator. (Exhibit 7 at pp. 126-127.)

### D.  Protruding Grips.

87.  A "protruding grip" forward of the trigger guard is sometimes present on AR-type rifles to give the shooter a more secure grip on the firearm, particularly rifles with rail-mounted accessories that the make the barrel shroud more difficult to grasp firmly. (Exhibit 3 at ¶ 11 and Exhibit E thereto (Video Demonstration).)

88.  The presence of a protruding grip on an AR-type rifle provides the shooter with better stability, which aids in accuracy, and better control during recoil and safety. (Exhibit 7 at pp. 99-100.)

89.  A vertical protruding fore grip potentially increases safety by allowing more accurate fire from a firearm. (Exhibit 7 at pp. 102-103)

### E. Muzzle Brakes and Muzzle Compensators.

90.     Both "muzzle brakes" and "muzzle compensators" serve to re-channel the gases expelled from the muzzle of a firearm. (Exhibit 3 at ¶ 14.) A muzzle brake will reduce the amount of recoil felt by the operator. (*Id.*) A muzzle compensator will redirect muzzle gases and keep the muzzle down for better acquisition of a target in the event a second shot is taken. (*Id.*) Muzzle brakes and compensators are found on a wide variety of firearms. (*Id.*)

91.     The presence of a muzzle brake or a muzzle compensator on an AR-type rifle does not in and of itself make the rifle more or less dangerous. (Exhibit 7 at p. 129.)

### IV.     Highland Park's Ban on Possession of "Assault Rifles" by Law-Abiding Citizens Will Not Have an Impact on Firearms Related Crime.

#### A. Assault Weapons and Specifically Assault Rifles Are Rarely Used to Commit Crimes.

92**.**     Criminals overwhelmingly prefer and use concealable handguns in commission of crimes. (Exhibit 10 at ¶ 9 – Affidavit of Gary Kleck; Exhibit 4 at p. 162.)

93.      Rifles and shotguns, known in the vernacular as long guns, are statistically less likely to be used in homicides than handguns. (Exhibit 4 at p. 161.)

94.     According to Chicago Police Department data, just 22 of 2,215 firearm homicides (0.99%) that occurred in Chicago from 2006 to 2012 were committed with a rifle of some type. 2,146 of the firearm homicides were committed with handguns. (Exhibit 11 – Excerpts from Chicago Police Department, Chicago Murder Analysis Reports 2006 – 2102.)

95.     Semi-automatic "assault weapons" make up a very small percentage of firearms used in armed assaults and homicides in Illinois and nationwide. (Exhibit 4 at p. 160.)

96.     AR-type rifles are rarely used by criminals committing firearms related crimes. (Exhibit 4 at p. 169.)

97.     A compilation of 38 studies on the use of "assault weapons" in crime indicated that less than 2% of crime guns are "assault weapons" of all types. (Exhibit 10 at ¶ 38.)

98.     Nine of the 38 studies addressed the use of "assault rifles" only (as opposed to "assault pistols" and "assault shotguns"). The nine studies revealed that "assault rifles" accounted for .038% of crime guns on average. (Exhibit 10 at ¶ 38.)

99.     Among "assault weapons" reported by the police to the ATF in 1992 and 1993, "assault pistols" outnumbered "assault rifles" by a ratio of 3 to 1. (Exhibit 12 – Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1993 – 2003*, pp. 16 & 43.)

100.     Compared to their availability, "assault weapons" are underrepresented among the guns that felons actually used to commit crimes. (Exhibit 10 at ¶ 9.)

101.     Criminals are strongly disinclined to carry an "assault weapon" during commission of their crimes, even when they owned one. (Exhibit 10, ¶ 9).

102.     The rarity with which "assault rifles" are used in crime is attributable to a number of factors, including that they are more difficult to conceal and are more expensive than handguns. (Exhibit 10 at p. 16.)

### B.  A Ban on Possession of a Class of Firearms Rarely Used by Criminals Will Not Reduce the Number or Lethality of Firearms Related Crimes.

103.     Empirical analyses of the expired federal "assault weapon" ban indicate that it had no effect on crime rates, homicide rates, the number of gunshot wounds per victim or the number of wounded victims per incident. (Exhibit 10 at ¶ 18.)

104.     Empirical studies on the effect of state-level "assault weapon" bans suggest that they have not reduced crime. (Exhibit 12 at p. 81 n. 95; Exhibit 10 at ¶ 18.)  The impact of state-

level bans are likely undermined by the influx of legal "assault weapons" from other states. (Exhibit 12 at p. 81 n. 95; Exhibit 10 at ¶ 19.)

105.    Highland Park's local ban on "assault weapons" is even less likely to have an impact on firearms violence than federal and state bans because of the ease with which banned firearms can be acquired nearby to Highland Park. (Exhibit 10 at ¶ 19.)

106.    Highland Park and North Chicago are the only municipalities in Lake County, Illinois that prohibit possession of "assault weapons" within their city limits. (Exhibit 10 at ¶ 20.) The combined population of these two municipalities according to the 2010 census was 65,335, which was just 8.8% of Lake County's total population of 703,462. (*Id*.) "Assault weapons" may be legally sold and owned in all other Lake County communities.  (*Id*.) Approximately 91.2% of persons residing in Lake County are free to own "assault weapons." (*Id*.) "Assault weapons" are banned in just 1.6 % of Lake County's geographical area. (*Id*.)

107.    A person prohibited from possessing an "assault weapon" only by virtue of the Highland Park ban would have little difficulty acquiring one by driving only a short distance to a gun store or a private seller outside Highland Park.  (Exhibit 10 at ¶ 20.)

108.    It makes little difference whether or not "assault weapons" are readily available to Highland Park residents because other non-banned firearms can be substituted for them, which fire just as fast and are just as lethal as the banned firearms. (Exhibit 10 at ¶ 21.)

109.    Because a Highland Park resident who has the intent to commit a firearm crime has the ability to substitute a non-banned firearm in place of a banned firearm, there is no logical reason to expect that the ban will decrease the number or lethality of gun crimes. (Exhibit 10 at ¶ 21.)

### C.  A Ban on Possession of "Assault Weapons" Will Not Reduce the Number of Mass Shootings or the Number of Persons Shot in Mass Shootings.

110.    Mass shootings are rare in absolute terms. (Exhibit 10 at ¶ 29.)

111.    While tragic and shocking, mass shootings (defined as incidents occurring in relatively public places, involving four or more deaths – not including the shooter – and a shooter who selects victims somewhat indiscriminately) account for few of the murders related to firearms that occur annually in the United States. (Exhibit 13 at pp. 1-11 – Congressional Research Service, *Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy*, Mar. 18, 2013.)

112.    Over the past several decades, mass shootings (defined as incidents in which 4 or more persons were killed, excluding the assailant) have not increased in number or in overall death toll. (Exhibit 14 at pp. 128-131 – Fox & DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, Vol. 18 Homicide Studies 125-145 (2014).)

113.    The annual counts of mass shootings (defined as incidents in which 4 or more persons were killed, excluding the assailant) have been randomly variable over the last several decades. (Exhibit 14 at pp. 128-129.)

114.    In mass shootings, where large numbers of rounds are fired, it is extraordinarily rare that the presence of a "large capacity magazine" had any impact on the number of victims injured or killed. (Exhibit 10 at ¶ 8.)

115.    A study of 81 mass shootings that occurred between 1994 and 2013 (defined as incidents in which more than six persons were shot, fatally or non-fatally) demonstrated that mass shooters have not needed "large capacity magazines" to fire large numbers of rounds because (a) they possessed multiple firearms, (b) they possessed multiple ammunition magazines, or (c) they were able to reload without interference from others.  (Exhibit 10 at ¶ 8.)

116.    A study of the 81 mass shootings that occurred between 1994 and 2013 (defined as incidents in which more six persons were shot, fatally or non-fatally) revealed that shooters were

known to have used magazines in excess of 10 rounds in 21 incidents. (Exhibit 10 at ¶ 8.) In each of these 21 incidents, the shooter possessed multiple guns and multiple magazines. (*Id.*) Thus, if the shooters were limited to magazines holding 10 or fewer rounds, they would have been able to continue to fire with an alternative gun or by loading new magazines. (*Id.*)

117.    In a study of mass shootings, 93 mass shootings were analyzed and it was determined that the shooter was able to inflict mass casualties without using "assault weapons" or "large capacity magazines" in 79 of the shootings. (Exhibit 4 at pp. 233-236.)

118.    In a study of mass shootings, in the 30 mass shootings ranked by number of persons killed, only 4 involved an "assault weapon" while in 28 of the shootings the killer possessed one or more handguns. (Exhibit 4 at pp. 246-249.)

### D.  A Ban on Possession of "Assault Weapons" Will Not Reduce the Number of Police Officers Killed.

119.    "Assault weapons" are almost never used to kill police officers. (Exhibit 10 at ¶ 39.)

120.    For the period 1980-1989, 33 (4%) of the 810 police officers feloniously killed in the U.S. and its territories were killed by "assault weapons" of some type (pistol, rifle or shotgun). For 1986-1990, 19 (5%) of the 350 officers killed were killed with "assault weapons" of some type. For the period 1992-1996, there were 4.5 "assault weapon" killings of police officers per year, and 7% of the total were committed with "assault weapons" of some type. (Exhibit 10 at ¶ 39.)

121.    Just 3 out of 276 killings of police officers in the period from January 1992 through May 1996 (approximately 1%) were committed with an AR-15 rifle or an AR-15 copy. (Exhibit 10 at ¶ 39.)

Respectfully submitted,

/s/ James B. Vogts
James B. Vogts
Andrew A. Lothson
Brett M. Henne
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com
bhenne@smbtrials.com
alothson@smbtrials.com

## CERTIFICATE OF SERVICE

I, James B. Vogts, hereby certify that on the 30th day of June, 2014, I caused to be served

a copy of the foregoing document on all counsel of record listed below, via the Court's ECF

system.

1.  Christopher James Murdoch
    Holland & Knight, LLP
    131 South Dearborn Street
    30th Floor
    Chicago, IL 60603
    (312) 263-3600
    Email: chris.murdoch@hklaw.com

2.  Hart M. Passman
    Holland and Knight, LLP
    131 South Dearborn
    30th Floor
    Chicago, IL 60603
    (312) 578-6634
    Email: hart.passman@hklaw.com

3.  Steven M. Elrod
    Holland & Knight, LLP
    131 South Dearborn Street
    30th Floor

Chicago, IL 60603
(312) 263-3600
Email: steven.elrod@hklaw.com

4.     Christopher B. Wilson
Perkins Coie LLC
131 S. Dearborn
Suite 1700
Chicago, IL 60603-5559
(312) 324-8603
Email: cwilson@perkinscoie.com

**Attorneys for Defendant**

*/s/ James B. Vogts*
    James V. Vogts