# Exhibit 4

**Page 1**

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )
IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION

MATTHEW D. WILSON, TORY EDHLUND )
and JOSEPH MESSINCO, )
    Plaintiffs, )
  vs. ) No. 07 CH 4848
COOK COUNTY, a public body )
and corporate, TONI PRECKWINKLE, )
Board President, in her official )
capacity and its Board of )
Commissioners in their official )
capacities; namely: EARLEAN )
COLLINS, ROBERT STEELE, JERRY )
BUTLER, WILLIAM M. BEAVERS, )
DEBORAH SIMS, JOAN PATRICIA )
MURPHY, BRIDGET GAINER, JESUS )
G. GARCIA, PETER N. SILVESTRI, )
JOHN P. DALEY, LARRY SUFFREDIN, )
GREGG GOSLIN, JOHN A. FRITCHEY, )
TIMOTHY O. SCHNEIDER, JEFFREY )
TOBOLSKI, EDWIN REYES, ELIZABETH )
ANN DOODY GORMAN and THOMAS DART,)
Sheriff of Cook County, in his )
official capacity, )
    Defendants. )

    The discovery deposition of MARK DOUGLAS JONES, taken in the above-entitled cause, before MARLENE L. KING, a notary public of Cook County, Illinois, on April 30, 2014 at 330 North Wabash Avenue, Suite 3300, Chicago, Illinois, pursuant to notice.
    START TIME: 9:32 a.m. END TIME: 4:57 p.m.

**Page 2**

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4  ARIE S. FRIEDMAN, M.D. )
5  and the Illinois State )
6  Rifle Association, )
7    Plaintiffs, )
8  vs. ) NO. 13-CV-9073
9  CITY OF HIGHLAND PARK, )
10    Defendant. )
11
12    The deposition of MARK DOUGLAS JONES,
13  called for examination pursuant to the Rules of
14  Civil Procedure for the United States District
15  Courts pertaining to the taking of depositions,
16  taken before MARLENE L. KING, a notary public
17  within and for the County of Cook and State of
18  Illinois, at 330 North Wabash Avenue, Suite
19  3300, Chicago, Illinois, on April 30, 2014,
20  at the hour of 9:32 a.m.
21
22
23    REPORTED BY: MARLENE L. KING, C.S.R.
24    LICENSE NO.: 084-003326.

**Page 3**

1  APPEARANCES:
2
3    SWANSON, MARTIN & BELL, LLP,
4  BY: MR. JAMES B. VOGTS,
5  330 North Wabash Avenue,
6  Suite 3300,
7  Chicago, Illinois 60611
8  (312) 321-9100
9  jvogts@smbtrials.com
10    and
11  MR. VICTOR D. QUILICI,
12  P.O. Box 428,
13  River Grove, Illinois 60171
14  (847) 298-2566
15    Representing the Plaintiffs;
16
17  PERKINS COIE, LLP,
18  BY: MR. CHRISTOPHER B. WILSON,
19  131 South Dearborn Street,
20  Suite 1700,
21  Chicago, Illinois 60603
22  (312) 324-8603
23  cwilson@perkinscoie.com
24    Representing City of Highland Park;

**Page 4**

1  APPEARANCES (Continued):
2
3  STATE'S ATTORNEY OF
4  COOK COUNTY, ILLINOIS,
5  BY: MR. JAMES C. PULLOS,
6    Assistant State's Attorney,
7    Supervisor,
8    Labor and Employment Section,
9    and
10  MS. MARILYN F. SCHLESINGER,
11    Assistant State's Attorney,
12    Civil Actions Bureau,
13  RICHARD J. DALEY CENTER,
14  50 West Washington Street,
15  Room 500,
16  Chicago, Illinois 60602
17  (312) 603-5105
18  (312) 603-2355
19  james.pullos@cookcountyil.gov
20  marilyn.schlesinger@cookcountyil.gov
21    Representing the Defendants.
22
23
24

**Page 53**

1  (WHEREUPON, the record was read
2  by the reporter as requested.)
3  BY MR. VOGTS:
4  Q. I'll repeat that question. What
5  firearms do you own, Mr. Jones?
6  MR. WILSON: And we're going to mark this as
7  confidential.
8  MR. VOGTS: We are. I think you were out
9  of the room. I told Marlene that what would be
10  easiest for her and all of us is to temporarily
11  mark the entire transcript as confidential, and
12  then once we receive the transcript, we can
13  agree to mark those pages and lines that the
14  witness would like to keep under wraps. By
15  "under wraps" I mean within the confines of the
16  attorneys' expert witnesses and the Court, the
17  typical parameters of a confidentiality order.
18  MR. WILSON: Understood.
19  THE WITNESS: May I ask a question about
20  that?
21  BY MR. VOGTS:
22  Q. Sure.
23  A. I'm only concerned about where -- will
24  this list come out in open court at any time?

**Page 54**

1  Q. It's distinctly possible, but I can't
2  say that it will.
3  A. Okay. Well, I don't have any standing
4  to do this, but I'm going to object to answering
5  that question because I have security concerns
6  for myself.
7  Based on my long career there are quite
8  a number of people I think that would like
9  to see me dead, so I have a threat concern.
10  But beyond that I'll answer your question.
11  So I own a Glock Model 26 nine
12  millimeter semi-automatic pistol, a Glock 19
13  nine millimeter semi-automatic pistol, a
14  Smith & Wesson Model 13 .357-caliber revolver,
15  a Smith & Wesson Model 48 22 magnum revolver,
16  a Remington Model 848 Automaster 12-gauge
17  shotgun, a Savage-Stevens Model I think it's
18  301 12-gauge double barrel shotgun, a Winchester
19  Model 94 lever action rifle in 44 magnum,
20  and a Norinco Model -- Model 56, Type 56,
21  semi-automatic rifle.
22  Q. Is the Norinco Type 56 in the AK
23  platform?
24  A. Yes. I have forgotten one. I'm sorry.

**Page 55**

1  Ruger 10/22, .22-caliber semi-automatic rifle.
2  Q. What magazine capacity does your I
3  believe two Glock semi-automatic pistols have?
4  A. The Model 26 is a 10 round capacity.
5  Model 19 is a 15 round capacity.
6  Q. Do you own magazines for the Norinco
7  Type 56 rifle?
8  A. I do.
9  Q. What magazines do you own?
10  A. I own 30 round capacity magazines.
11  Q. The Ruger 10/22 semi-automatic rifle
12  is equipped with a 10 round rotary magazine,
13  is that correct?
14  A. That's correct.
15  Q. Is that the only magazine you own for
16  that gun?
17  A. Yes.
18  Q. Do you hunt?
19  A. Yes.
20  Q. What type of hunting do you do?
21  A. I hunt pheasants and quail
22  occasionally.
23  Q. You use shotguns for that purpose?
24  A. I use my Remington 848 for that

**Page 56**

1  purpose, yes, and I have in the past hunted
2  prairie dogs.
3  Q. What firearm did you use for that type
4  of hunting?
5  A. I used an AR-15 very custom with a
6  heavy barrel and custom trigger and four and a
7  half by 14 optics.
8  Q. Was that a firearm that you at one time
9  owned?
10  A. Yes.
11  Q. Who manufactured that AR-15?
12  A. It's a Colt lower and I think it's
13  i-Gun upper.
14  Q. Is it chambered at .223?
15  A. Yes.
16  Q. Did you find that AR-15 appropriate for
17  prairie dog hunting?
18  A. Yes.
19  Q. Suitable for prairie dog hunting?
20  A. Yes, I did.
21  Q. Did you prairie dog hunt with others
22  or -- typically or by yourself?
23  A. Others.
24  Q. Kind of a group activity, isn't it,

1 prairie dog hunting?
2   A. Yes.
3   Q. Flushing them out of their holes?
4   A. It's a group activity for us, yes.
5   Q. Okay. Were others in your group
6 equipped with AR type rifles as well for that
7 purpose?
8   A. Some, some not. Some used a bolt
9 action rifle. And I initially started doing
10 that with a Remington Sendero in .223, bolt
11 action rifle.
12   Q. When you prairie dog hunted with the
13 AR-15, what magazine capacity were you equipped
14 with?
15   A. 10 and 20.
16   Q. Why 20?
17   A. I shoot prone a lot. The 30 round
18 magazine tends to interfere with the prone
19 position, so I shoot from a 10 or 20 round
20 magazine.
21   Q. Well, why would you choose a 20 instead
22 of a 10 for that purpose?
23   A. The volume of prairie dogs is such
24 that sometimes it's just more convenient not to

57

1 change magazines quite so often.
2   Q. Do you keep a firearm available in
3 your home if it's needed for self-defense?
4   A. Yes.
5   Q. What firearm do you keep available for
6 that purpose?
7   A. The Smith & Wesson Model 13 and the
8 Glock Model 19.
9   Q. And the Glock Model 19 is a firearm
10 that's equipped with a 15 round magazine, is
11 that right?
12   A. That's right.
13   Q. Do you keep that Glock Model 19 under
14 lock and key?
15   A. Yes.
16   Q. Okay. Is it a safe that's readily
17 accessible?
18   A. Yes.
19   Q. Combination or a biometric device?
20   A. Combination. I actually have several.
21 The one that it's in now is a combination with
22 sort of a Simplex lock arrangement, if you
23 understand what I'm talking about. Couple of
24 buttons, and it opens with a flywheel.

58

1   Q. Have you ever had occasion to access
2 that firearm because of a perceived threat?
3   A. No.
4   Q. Is your wife trained in the use of
5 any firearm you keep in your home?
6   A. Yes.
7   Q. Please describe the extent of her
8 training.
9   A. I have -- we actually met on a range,
10 on an ATF range. And I had trained her myself
11 to some extent that she's able to function the
12 revolver reliably under what I would consider
13 to be adverse circumstances. Or at least that's
14 the hope. You never know until you get there.
15   Q. Have you trained her on the use of a
16 Glock Model 19 as well?
17   A. She's shot it, but I wouldn't be as
18 confident with her using that gun as I would
19 using the revolver, so that's why I keep the
20 revolver in the house.
21   Q. Do you keep the Glock Model 19 loaded
22 in the safe?
23   A. I keep it with the magazine in the gun
24 but no rounds in the chamber.

59

1   Q. Is the magazine fully loaded with
2 15 rounds?
3   A. Yes.
4   Q. Okay. Does the Glock Model 19 have an
5 external manual safety?
6   A. Yes.
7   Q. Do you have any sort of -- strike that.
8     Do you have an opinion as to whether
9 it's appropriate or inappropriate for a civilian
10 without any law enforcement background to keep
11 a firearm available in his or her home for
12 possible self-defense use?
13   A. Yes.
14   Q. What is your opinion?
15   A. My opinion is that if an individual
16 wants to have a firearm, they should be able
17 to have a firearm in their home for defense.
18   Q. Can we agree -- I guess going forward,
19 I should have done this earlier, but that as to
20 some basic nomenclature, would you agree that in
21 the most fundamental way there are two types of
22 handguns, there are revolvers with cylinders,
23 and there are pistols with magazines? Would you
24 agree with that description of handguns?

60

**Page 157**

1  section at the bottom called Highlights, right
2  column, first bullet pointed paragraph --
3      A.  Yes.
4      Q.  -- "About 12 percent of all households
5  violently burglarized while someone was at home
6  faced an offender armed with a firearm," is that
7  correct?
8      A.  Yes.  That's what it says.
9      Q.  And that's 12 percent of the
10 one million figure, is that correct?
11     A.  I think so.  If I read this correctly,
12 I think that's right.
13     Q.  Referring you back to Exhibit 5,
14 Page 6, you have a brief discussion of United
15 States Supreme Court's decision in the Heller
16 versus District of Columbia case, is that
17 correct?
18     A.  Yes.
19     Q.  Did you write that paragraph?
20     A.  Yes, I did.
21     Q.  Okay.  Did you write that paragraph
22 based upon your reading, personal reading,
23 of the Heller decision?
24     A.  Yes.

**Page 158**

1      Q.  And based on your reading of the Heller
2  decision, you believe the Court concluded the
3  Second Amendment right to keep and bear arms
4  does not include the right to possess
5  unusually dangerous firearms.
6      A.  That's correct.
7      Q.  Isn't it true that in fact the Supreme
8  Court referred to the historical tradition of
9  prohibiting the carrying of dangerous and
10 unusual weapons, that it used language different
11 from what you wrote in your report?
12     MR. WILSON:  Objection.  Calls for a legal
13 conclusion.
14     THE WITNESS:  That's what it says in the
15 Heller decision.
16 BY MR. VOGTS:
17     Q.  And I just handed you a copy of the
18 Heller decision.
19     A.  Yes.  I am reading the Heller decision
20 you just gave me, and it says dangerous and
21 unusual weapons.
22     Q.  Grammatically speaking, is there a
23 difference between a firearm that is unusually
24 dangerous and a firearm that is unusual and

**Page 159**

1  dangerous?
2      A.  Yes.
3      Q.  What is that difference?
4      A.  Well, I think all firearms are
5  dangerous.  They are all inherently dangerous,
6  much like any other tool is -- has an inherent
7  danger and needs to be used correctly.
8          Unusually dangerous to me says
9  something like short barrel shotgun or hand
10 grenade or assault weapon.  And unusual and
11 dangerous says to me something like cigarette
12 lighter gun or cell phone gun or a cane gun,
13 something that isn't --
14     Q.  That you don't see very often.
15     A.  That you don't see very often except
16 in the NRA museum or occasional gun show.
17     Q.  But like all guns, it's nevertheless
18 dangerous in the wrong hands.
19     A.  Even in the right hands it's dangerous.
20     Q.  I'm going to show you what has been
21 marked as Exhibit 14.  Is this the Declaration
22 that you signed under oath in the Heller versus
23 District of Columbia case on September 22, 2013?
24     A.  Certainly looks like it to me, yes.

**Page 160**

1      Q.  Referring you to Paragraph 13.
2      A.  Page?
3      Q.  5.
4      A.  Page 5.  Okay.  Paragraph 13.
5      Q.  In the second sentence you express the
6  following opinion, and I'm going to ask you
7  whether that's an opinion you still have, quote,
8  "All firearms, be they rifles, shotguns or
9  handguns, pose a similar threat to public safety
10 in the wrong hands, and, in my opinion, should
11 be regulated similarly."
12     A.  Yes.  I stand by that statement.
13     Q.  Exhibit 5, Page 9, Paragraph 18 --
14     A.  Okay.
15     Q.  -- one of the opinions you have
16 expressed in this case is that, "Semi-automatic
17 assault weapons and civilian sporting arms,
18 firearms, e.g., hunting rifles and shotguns,
19 make up a very small percentage of firearms used
20 in armed assaults, homicides and suicides in
21 Illinois and nationwide," is that correct?
22     A.  Yes.
23     Q.  That is your opinion?
24     A.  Yes.

** C O N F I D E N T I A L **

Page 161:

1 Q. And it is backed up by data?
2 A. Yes.
3 Q. And I believe you referred to the
4 Uniform Crime Reports that are published by the
5 FBI on an annual basis?
6 A. Yes.
7 Q. There's some lag time in those reports;
8 you don't get them for a year or so after the
9 period that's reported on them?
10 A. That's my understanding, yes.
11 Q. Exhibit 4, Page 20 you essentially
12 express the same opinion at the top when you
13 wrote, "Statistically rifles and shotguns known
14 collectively in the vernacular as, quote, long
15 guns, closed quote, are less likely to be used
16 in homicides or recovered by law enforcement
17 authorities than other crimes," is that correct?
18 A. That's correct.
19 Q. And in support of that statement you
20 cited a Bureau of Justice Statistics report,
21 did you not?
22 A. Look what I cited. I'll tell you.
23 Bureau of Justice Statistics, Firearms and
24 Violence 1993 through 2011.

Page 162:

1 Q. You agree that criminals by an
2 overwhelming majority prefer handguns, is that
3 correct?
4 A. Yes.
5 Q. And data from just about every source
6 and Federal organization looks at these kinds
7 of things has drawn that conclusion, correct?
8 A. That's right.
9 Q. Elsewhere in Exhibit 5, specifically
10 Paragraph -- or Page 6 you indicate in Paragraph
11 9 that the ordinance serves -- strike that.
12 You indicate in Paragraph 9 that one
13 of the goals the ordinance serves is reducing
14 firearms related crime, is that correct?
15 A. Yes.
16 Q. How do you square that opinion with the
17 fact that the data shows that long guns, rifles
18 and shotguns are rarely if ever used by
19 criminals in committing their crimes?
20 A. Rarely, but sometimes. And as a former
21 public safety officer in Glencoe and having
22 worked with the Highland Park Police Department
23 and all of the departments along that North
24 Shore area, I recognize that household burglary

Page 163:

1 is in fact one of the largest problems that
2 those communities face.
3 Less long guns mean less guns stolen
4 in burglaries for -- to be then put under the
5 secondary market and potentially used by
6 criminals, first.
7 Q. So by banning a subclass of long guns,
8 in this instance those guns classified as
9 assault rifles or assault shotguns, firearms
10 related crime will reduce because fewer of those
11 guns will be stolen in related burglaries.
12 A. Well, that's certainly one aspect. And
13 another and I think even more important is when
14 they are banned and not available to be used
15 by people who shouldn't be using them for the
16 purpose that they want, people like the kid in
17 Colorado at the movie theater or any of the
18 other -- or the guy at the Fed Ex facility in
19 Kennesaw, Georgia yesterday where they have a
20 law that says everyone has to have a gun, he
21 used a long gun.
22 If they're not available, they can't be
23 used. They're not appropriate for self-defense
24 in the home. They are just not -- they're not

Page 164:

1 the best weapon for home defense. If they're
2 not there, you can't use them in a mass
3 shooting, you can't use them in a suicide,
4 you can't use them for any bad purpose.
5 And in my opinion the City of Highland
6 Park has made the decision that they don't want
7 those firearms in their political subdivision.
8 The town of Highland Park doesn't want assault
9 weapons.
10 I think their rationale is good. They
11 don't want them there so they can't be used, and
12 they're doing it prophylactically so they're not
13 available to be used, stolen in burglaries or
14 used in a mass shooting at the big temple that's
15 just across Lake Cook Road from Highland Park
16 or at the shopping mall or in any of the places
17 that people come to gather.
18 Q. Let's put mass shootings for the moment
19 off, off to the side here, and just address,
20 you know, the more commonly occurring firearms
21 related crimes that occur in the United States.
22 Do you believe that reducing the
23 availability of these subclasses of rifles and
24 shotguns will reduce the occurrence of firearms

**Page 169**

1  with an AR-15.
2  Q. Setting aside mass shootings for the
3  purposes of this question, isn't it true that
4  AR-15 type rifles are rarely if ever used by
5  criminals committing firearms related crimes?
6  A. Yes. It's an unusual weapon in the
7  hands of criminals.
8  Q. And why is that?
9  A. I don't know. No one knows. We're
10 still struggling with that research, and we just
11 don't know. We don't know why they don't choose
12 assault rifles instead of handguns.
13 Q. Isn't it true that research has shown,
14 as we have already discussed, that criminals
15 prefer handguns because they're concealable?
16 A. That's true. That's my belief. I
17 believe they generally prefer them because
18 they're easier to conceal and easier to move
19 around and shoot from a car and things like
20 that.
21 Q. And an AR-15 type rifle, given the fact
22 that it's a rifle and a long gun, cannot be as
23 easily concealed as a handgun.
24 A. That's true.

**Page 170**

1  Q. AR-15 type rifles are generally more
2  expensive than the average handgun, is that
3  correct?
4  A. That's true.
5  Q. Could that be another reason why
6  criminals rarely if ever use AR-15 type rifles
7  in firearms related crimes?
8  MR. WILSON: Objection. Calls for
9  speculation.
10 THE WITNESS: I suppose that -- as I said,
11 trying to get into a criminal's head, not so
12 easy.
13 BY MR. VOGTS:
14 Q. But you have spent 30 years doing that,
15 didn't you?
16 A. I've spent a lot of time with
17 criminals, and I've spent a lot of time talking
18 to them. Understanding their motivation is
19 something that really eludes me to this day.
20    It's possible that price point makes
21 a difference in what they choose to use in their
22 crimes. It's possible.
23 Q. You cited in your work -- strike that.
24 Let me go back a second.

**Page 171**

1  Are you familiar with Chicago Police
2  Department Chicago Murder Analyses? Have you
3  seen those before?
4  A. I may have seen them online. I've not
5  seen any of those documents.
6  Q. I will show you one in its complete
7  form here for the year 2010. Just quickly look
8  it over, and then I'll ask you some questions.
9  MR. PULLOS: Do you have a copy?
10 MR. VOGTS: I'm going to ask questions off
11 of that. Exhibit 15.
12    I have some specific pages that I'll
13 refer you to once you're done.
14    (WHEREUPON, there was a short
15    pause.)
16 THE WITNESS: Okay. We can start.
17 BY MR. VOGTS:
18 Q. Marked as Exhibit 15, some selected
19 pages from the separate Chicago Police
20 Department Murder Analyses prepared for the
21 years 2006 through 2011.
22    Referring to the second page of Exhibit
23 15, based on Chicago Police Department data,
24 there were a total of 362 firearms related

**Page 172**

1  murders in the city that year, correct?
2  A. That's what it says, yes.
3  Q. And just one was committed with a
4  rifle.
5  A. Yes.
6  Q. And the type of rifle that one murder
7  was committed with is not described, is that
8  right?
9  A. That's correct.
10 Q. So it could be a rifle of the type
11 banned under the ordinance or it could be of
12 a rifle not banned under the ordinance.
13 A. Correct.
14 Q. Two pages later in 2010 of the 353
15 firearms murders committed in that year, just
16 four were committed with a rifle, is that
17 correct?
18 A. Yes.
19 Q. And the numbers there confirm that
20 at least in a murder scenario criminals
21 overwhelmingly use handguns in the City of
22 Chicago.
23 A. That's correct.
24 Q. And "overwhelming" might be an

```
1    Q.  Muzzle brakes and muzzle compensators.
2    A.  Yes.
3    Q.  How does the presence of a muzzle brake
4  or a muzzle compensator make the firearm more
5  dangerous than one without them?
6    A.  Both of those devices' primary purpose
7  is to reduce felt recoil and control muzzle
8  climb, those two things.  In an AK -- or I'm
9  sorry, a Kalashnikov design, for instance,
10 the early ones, the muzzle brake was designed
11 in such a way as to use gases venting from the
12 bullets that you fire to keep the gun from
13 climbing up into the right as much as it would
14 under rapid firing conditions, in other words,
15 allowing you to put second and subsequent
16 followup shots more accurately on the targets
17 you have selected.  Just makes it easier to
18 control it in rapid firing.
19   Q.  It makes it easier to control it in
20 just nonrapid subsequent firing, too, correct?
21   A.  Sure.
22   Q.  So if you were to target range with
23 a rifle with a muzzle compensator on it, and
24 you were seeking to reacquire the target more
                                            197
```

```
1  readily for your second shot, the muzzle
2  compensator would help you do that.
3    A.  Yes.  Although I would say, frankly,
4  that when you're talking about target shooting,
5  you're typically talking about a firearm with
6  a scope.
7       Very few competitive shooting sports
8  have time components that require you to have
9  that sort of quick, rapid followup acquisition
10 of a target.
11      The final analysis, the reason that
12 Kalashnikov designed that rifle with a
13 compensator the way he did was so that it could
14 be used to deliver really accurate -- more
15 accurate fire in volume on military targets.
16   Q.  Do any of the firearms you personally
17 own have muzzle brakes or muzzle compensators on
18 them?
19   A.  The type 56 rifle has one.  It's a
20 Kalashnikov design.
21   Q.  Muzzle brakes and muzzle compensators
22 are also available on semi-automatic pistols,
23 correct?
24   A.  Some, yes.  They are typically
                                            198
```

```
1  aftermarket, but yes, they do exist.
2       MR. VOGTS:  Why don't we take a short break
3  here.  Maybe we'll come back and talk more
4  slowly.
5           (WHEREUPON, a short recess
6            was taken.)
7  BY MR. VOGTS:
8    Q.  Mr. Jones, earlier you mentioned in
9  discussing the five features that are banned
10 under the ordinance if present on a semi-
11 automatic rifle capable of accepting a large
12 capacity magazine developed out of military uses
13 of those firearms, correct?
14   A.  Yes.  That's right.
15   Q.  Isn't it generally true that most
16 developments in firearm technology over
17 the years have come out of the military?
18   A.  That's my belief, yes.
19   Q.  Bolt action rifles, for example, in
20 World War II, correct?
21   A.  Yes.  That's right.
22   Q.  Grand style rifles coming out of --
23 bolt action coming out of World War I?
24   A.  Yes.
                                            199
```

```
1    Q.  Grand rifles coming out of World War
2  II?
3    A.  Yes, both things.
4    Q.  AR-15 type rifles for civilian use
5  evolving out of the use of similar fully
6  automatic rifles in the Viet Nam War?
7    A.  Yes.
8    Q.  Isn't it also true that developments of
9  other forms of technology have frequently come
10 out of the military over the years?
11   A.  Yes.
12   Q.  Referring you back to the Koper report,
13 Exhibit 16, Page 3, based on Mr. Koper's
14 analysis of the impact of the Federal Assault
15 Weapons Ban, he determined that should the ban
16 be renewed, the ban's effects on gun violence
17 are likely to be small at best and perhaps too
18 small for reliable measurement, is that correct?
19   A.  That's what Mr. Koper opines.  That's
20 correct.
21   Q.  Do you have any reason to dispute
22 Mr. Koper's opinion on that subject?
23   A.  No.
24   Q.  Mr. Koper went on to say that assault
                                            200
```

**Page 233**

1  stricter. I would characterize it as filling
2  gaps that are in our current firearms laws.
3    Q. Have they publicly taken positions to
4  your knowledge on any other firearms law related
5  issues?
6    A. Well, they've taken a position against
7  assault weapons. They've taken a position
8  against high capacity magazines or large
9  capacity magazines, yes.
10    Q. Any others?
11    A. May have. I don't know.
12    Q. Have you personally reviewed any of
13  the data on which MAIG relied at arriving on
14  percentages or numbers or values in its report?
15    A. No.
16    Q. So you have not seen data in any
17  form, whether it be on a spreadsheet or
18  otherwise.
19    A. If it were on their website, I have
20  seen it, but I don't recall specifically. I
21  certainly have not looked at anything that
22  relates to their methodology and how they
23  collect numbers and what they include and what
24  they do not include in any of their studies.

**Page 234**

1    Q. At the end of their report they have
2  a summary or synopsis of each of the 93 mass
3  shooting events that have occurred during the
4  years, what is it, 2009 through 2013.
5    A. Yes. I think that's right.
6    Q. Have you read those?
7    A. Yes, many of them, and it's been some
8  time. But yes, I have.
9    Q. Have you in any instance or with regard
10  to any of those 93 incidents gone beyond what's
11  reported by MAIG in the report in order to
12  develop greater knowledge about what transpired
13  in any of those incidents?
14    A. Only the more recent ones that have
15  publicly available sources.
16    Q. Newtown being one?
17    A. Newtown. I looked at some news
18  reporting on Aurora. I looked at some news
19  reporting on the Navy Yard shooting, some things
20  like that.
21        But to get to the heart of your
22  question, no, I don't think I have based on what
23  you have asked. I don't think I have done what
24  you asked.

**Page 235**

1    Q. I believe you earlier stated that in
2  14 of the 93 incidents described in the MAIG
3  report assault weapons were used, is that
4  correct?
5    A. Yes.
6    Q. If you look at that report, isn't it
7  correct that the 14 number reflects the number
8  of incidents in which assault weapons for large
9  capacity magazines were used?
10    A. I don't think that's correct. I think
11  it's 14 incidents of assault weapons or 14
12  incidents where an assault weapon was
13  identified. There could be more. They weren't
14  able to identify it.
15    Q. In Page 3 of the report there is a bar
16  graph at the bottom of the page titled Assault
17  Weapons or High-Capacity Magazines. Do you see
18  that?
19    A. I do. I see that, yes.
20    Q. That's actually at the beginning of the
21  sentence that reads, "Assault Weapons or High-
22  Capacity Magazines were used in at least 14
23  incidents."
24    A. Yes.

**Page 236**

1    Q. So that's a combination of assault
2  weapons and large capacity magazines, not just
3  assault weapons.
4    A. That's what it says here.
5    Q. For example, the shooting of people in
6  Tucson, including Gabrielle Giffords, was used
7  in -- the shooter used a large capacity magazine
8  but did not use an assault pistol or an assault
9  rifle, correct?
10    A. That's correct.
11    Q. All right. So of the 93 mass shooting
12  events described by MAIG in its report, 79
13  involved the use of firearms that were neither
14  assault weapons or that had large capacity
15  magazines, correct?
16    A. Yes. I think that's a good
17  characterization.
18    Q. And in those 79 events the shooters
19  were able to inflict mass casualties without
20  assault weapons and without large capacity
21  magazines, correct?
22    A. Yes.
23    Q. I think I know the answer to this
24  question, but I'm going ask it, anyway, for

**Page 245**

1 four of them the shooter possessed a handgun,
2 an assault weapon, and another type of firearm.
3     A.  Yes.
4     Q.  Okay.
5     A.  And just for whatever it's worth to
6 you, I think the Fort Hood shooting should be --
7 while it was a handgun, it should be classified
8 as an assault weapon based on the fact that it
9 was manufactured to be the companion to the I
10 think it's the FN-90, personal defense weapon.
11 That's a military weapon.
12         I don't know what kind of ammo he was
13 using, but you are only supposed to be able to
14 use the practice ammunition in this country.
15 They were never supposed to be able to sell
16 the actual military ammo.
17         But the entire firearm was developed
18 specifically as a military weapon.  It was never
19 meant for civilian -- to be in civilian hands.
20     Q.  But you don't know what type of
21 ammunition he used in his gun.
22     A.  I don't.  He may have used the military
23 practice ammo or he used the military -- the
24 real, the business ammo, if you will.

**Page 246**

1     Q.  But the FN-57 is a typically -- typical
2 operating semi-automatic pistol like the Glock.
3     A.  That's true.
4     Q.  It's just capable of handling more
5 high powered, high velocity ammunition.
6     A.  It shoots a rifle cartridge, small
7 rifle cartridge, yes.  Anyway, just for what
8 it's worth, dancing on the head of a pin here.
9     Q.  Exhibit 24 is MAIG data sorted by
10 column title Killed, k-i-l-l-e-d.  Do you see
11 that?
12     A.  Okay.
13     Q.  And we see among the top ten mass
14 shooting events as defined by the number of
15 people killed, it goes down to number of
16 eight --
17     A.  Yes.
18     Q.  -- in three of those incidents assault
19 weapons were used, correct?
20     A.  Yes.
21     Q.  And in seven of those instances the
22 criminal was able to inflict the casualties on
23 his victims without an assault weapon, correct?
24     A.  Yes.

**Page 247**

1     Q.  And if we look at the next ten highest
2 mass event shootings defined by the number of
3 persons killed, in none of them was an assault
4 weapon used by the shooter, correct?
5     A.  That's correct.
6     Q.  And if we look at the next ten, only
7 one of those incidents was an event in which an
8 assault weapon was used.
9     A.  Yes.
10     Q.  So if you look at these mass shooting
11 events described in the MAIG report of the
12 30 events defined by number of persons killed,
13 just four of the top 30 involve the use of
14 assault weapons, correct?
15     A.  Yes, qualified by when you go through
16 the incidents, many of them say unknown as
17 to the type of weapon used.  So this is all
18 speculative.  We know what they reported, but
19 there were many that were unknown.  So you can't
20 I think draw too strong of a conclusion on that.
21     Q.  Well, if the MAIG data is correct as
22 reflected on Exhibit 24, isn't it true that
23 there is only one of the 30 incidents as defined
24 by number of persons killed in which the type of

**Page 248**

1 firearm used was unknown, and that's the
2 Wilmington, California shooting, correct?
3     A.  Yes.
4     Q.  The type of firearm known was known in
5 each of the other 29 events on the first page of
6 Exhibit 24.
7     A.  That's correct.
8     Q.  Are you able to explain how the mass
9 shooter in any of those top 30 events in which
10 assault weapons were not used was able to
11 inflict the number of deaths that he did without
12 the use of assault weapon?
13     A.  No.  He had -- he had a firearm, in
14 many cases with a high-capacity magazine, and
15 he was able to inflict casualties.  I don't
16 really understand -- it's really self-evident,
17 Mr. Vogts.
18     Q.  Well, were there events among these
19 30 in which the shooter did not possess either
20 assault weapon or a high-capacity magazine?
21     A.  I'm sure that's true.  Yes.
22     Q.  Isn't it true there are circumstances
23 under which mass shooters have acted and killed
24 and shot many persons without the benefit of an

```
 1   assault weapon or high-capacity magazine?
 2      A.  Yes.
 3      Q.  And they do so by simply bringing
 4   sufficient guns or sufficient ammunition for
 5   those guns to the place of the shooting,
 6   correct?
 7      A.  Some of them have done that, yes,
 8   that's correct.
 9      Q.  And they're able to do that because
10   during the time they shoot, nobody has
11   effectively intervened to stop them from
12   shooting and reloading as necessary.
13      MR. WILSON:  Objection to speculation.
14      THE WITNESS:  I don't know the answer to
15   that.  I don't know why they were able to do
16   that.
17   BY MR. VOGTS:
18      Q.  Is it logical to you from a law
19   enforcement perspective that a person who is not
20   interfered with, whose intention is to kill as
21   many persons as possible in a mass shooting
22   event, will simply bring sufficient ammunition
23   with him to do so regardless of the gun he has
24   in his hand?
                                              249
```

```
 1      A.  You're asking me to ascribe logic and
 2   reason to crazy people.  I can't do that.
 3      Q.  You yourself has said that in your
 4   career as a law enforcement officer you have
 5   worked to get into the heads of criminals.
 6      A.  Criminals, not insane people.  There
 7   is a very big difference between someone who
 8   burglarized a house or does a gang shooting
 9   than any of these people who were distraught,
10   mentally ill or whatever their particular mental
11   issue was.
12      Q.  Exhibit 25 is MAIG data sorted by total
13   shot, last column on the right.
14      A.  Okay.  Total shot, not including
15   shooter.
16      Q.  The first incident on that list is
17   the Aurora, Colorado movie theater shooting,
18   correct?
19      A.  Yes, sir.
20      Q.  And the MAIG data reflects what we have
21   already discussed, that the shooter in that
22   incident had, according to this, two handguns,
23   one assault weapon and one other type of
24   firearm, correct?
                                              250
```

```
 1      A.  Yes.
 2      Q.  He inflicted 70 casualties in that
 3   shooting, correct?
 4      A.  That's correct.
 5      Q.  Next on the list with 43 casualties,
 6   is the Fort Hood shooting in which the shooter
 7   had a semi-automatic pistol, is that right?
 8      A.  Yes.
 9      Q.  And he was able to shoot 43 people with
10   that, right?
11      A.  Yes.
12      Q.  Newtown is next.  We'll get to Newtown
13   in greater detail.
14          The next four incidents, Tucson,
15   Binghamton, New York, Washington, DC and
16   Carthage, North Carolina all involved use of
17   handguns without involvement of assault weapons,
18   correct?
19      A.  Yes.
20      Q.  Going back to Exhibit 23, the data
21   sorted by assault weapon --
22      A.  Yes.
23      Q.  -- the incident at the top of that
24   list is Carson City, Nevada, an incident that
                                              251
```

```
 1   occurred on September 6, 2011, is that correct?
 2      A.  Yes.
 3      Q.  Do you have the MAIG report in front of
 4   you?
 5      A.  I will in a second.  Yes, I do.
 6      Q.  MAIG's summary of that incident appears
 7   on Page 20 of the report.  Refer you to that
 8   page.
 9      A.  I have it.
10      Q.  The shooter in that incident had a
11   handgun with him and two assault weapons,
12   correct?
13      A.  Yes.
14      Q.  He killed four people in that shooting,
15   didn't injure any -- I'm not saying death isn't
16   an injury, but he killed four people.  There
17   were no other people injured in that incident.
18      A.  Yes.
19      Q.  Do you have basis on which to state
20   that the shooter's use of an assault weapon in
21   that incident dictated the outcome, namely, that
22   four people were killed?
23      A.  I really don't understand your
24   question.
                                              252
```