# Exhibit 7

```
STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K    )
   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
       COUNTY DEPARTMENT - CHANCERY DIVISION
MATTHEW D. WILSON, TORY   )
EDHLUND, and JOSEPH       )
MESSINCO,                 )
        Plaintiffs,       )
    vs.                   ) No. 07 CH 4848
COOK COUNTY, A PUBLIC     )
BODY AND CORPORATE, TONI  )
PRECKWINKLE, BOARD        )
PRESIDENT, IN HER         )
OFFICIAL CAPACITY AND     )
ITS BOARD OF              )
COMMISSIONERS IN THEIR    )
OFFICIAL CAPACITIES,      )
NAMELY: EARLEAN COLLINS,  )
ROBERT STEELE, JERRY      )
BUTLER, WILLIAM M.        )
BEAVERS, DEBORAH SIMS,    )
JOAN PATRICIA MURPHY,     )
BRIDGET GAINER, JESUS G.  )
GARCIA, PETER N.          )
SILVESTRI, JOHN P.        )
DALEY, LARRY SUFFREDIN,   )
GREGG GOSLIN, JOHN A.     )
FRITCHEY, TIMOTHY O.      )
SCHNEIDER, JEFFREY        )
TOBOLSKI, EDWIN REYES,    )
ELIZABETH ANN DOODY       )
GORMAN, and THOMAS DART,  )
SHERIFF OF COOK COUNTY,   )
IN HIS OFFICIAL           )
CAPACITY,                 )
        Defendants.       )
```

1

---

1  IN THE UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF ILLINOIS
3           EASTERN DIVISION
4  ARIE S. FRIEDMAN, M.D.    )
5  and The Illinois State    )
6  Rifle Association,        )
7         Plaintiffs,   )
8     vs.            ) No. 13-cv-9073
9  CITY OF HIGHLAND PARK,    )
10        Defendant.    )
11
12     The discovery deposition of
13  JAMES YURGEALITIS, taken in the above-entitled
14  causes, before Rebecca Feeman, an Illinois
15  Shorthand Reporter, on May 8, 2014 at 330 North
16  Wabash Avenue, Suite 3300, Chicago, Illinois,
17  pursuant to notice.
18
19
20
21
22
23  Rebecca Feeman, CSR, RPR
24  License No.: 084-004726

2

---

1  APPEARANCES:
2     SWANSON, MARTIN & BELL
3     BY: MR. JAMES VOGTS
4     330 North Wabash Avenue, Suite 3300
5     Chicago, Illinois  60611
6     (312) 321-9100
7     jvogts@smbtrials.com
8         and
9     VICTOR D. QUILICI, ATTORNEY AND
10    COUNSELOR AT LAW
11    BY: MR. VICTOR D. QUILICI
12    P/O Box 428
13    River Grove, Illinois  60171
14    (847) 298-2566
15        Representing the Plaintiffs;
16
17    PERKINS COIE, LLP
18    BY: MR. CHRISTOPHER B. WILSON
19    131 South Dearborn Street, 17th Floor
20    Chicago, Illinois  60603
21    (312) 324-8603
22    cwilson@perkinscoie.com
23        Representing City of Highland Park;
24

3

---

1  APPEARANCES (Continued):
2     STATE'S ATTORNEY OF
3     COOK COUNTY, ILLINOIS
4     BY: MR. JAMES C. PULLOS
5     50 West Washington Street, Room 500
6     Chicago, Illinois  60602
7     (312) 603-5105
8     james.pullos@cookcountyil.gov
9         Representing the Defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

4

**Page 25**

1  operations that were not regular ATF-issued
2  firearms.
3      I believe when I first came on to ATF,
4  there were some Walther PPKs in 380, and I
5  believe that was it, but for my purposes, there
6  were other specialized units that were issued
7  other firearms. However, in my classification,
8  those were the only firearms that were issued to
9  me.
10     Q. What magazines were available to you to
11 use with the Colt AR-15?
12     A. They were standard -- the standard
13 issue for the AR-15 type rifles were 30-round
14 magazines.
15     Q. Were you trained on the use of the Colt
16 AR-15 rifle?
17     A. Yes.
18     Q. When was that?
19     A. I would say the conversion -- we had to
20 take approximately at least a week's worth of
21 familiarization and conversion training, so I
22 would say that was probably -- that was not long
23 before I left the field to go to the laboratory
24 and that was probably 2001 I would say

**Page 26**

1  approximately. I don't recall exactly but --
2      Q. What did that training consist of?
3      A. Initially it was disassembling
4  component parts, how to properly maintain the
5  firearm, and then a considerable amount of
6  shooting with that that was static shooting and
7  then dynamic shooting or on the move or tactical
8  situational type of range time.
9      Q. Do you personally own any firearms?
10     A. Yes.
11     Q. What firearms do you personally own
12 today?
13     A. Let's see. I have -- well, initially I
14 have some issue with providing a list of which
15 firearms I currently own only because I'm not --
16 I would object to that only because my home
17 address is listed, and having a listing of which
18 firearms I have and where I might keep those is
19 something that I object to.
20     MR. WILSON: Can we mark it as confidential?
21     MR. VOGTS: Yeah, we can mark the pages of
22 this transcript that addresses your personal
23 ownership of firearms as confidential so it
24 would be kept in the confines of this case.

**Page 27**

1  BY MR. VOGTS:
2      Q. Subject to that stipulation, can you
3  identify to me the firearms that you personally
4  own?
5      A. Certainly.
6      MR. WILSON: Before we do, I want to make
7  sure. Are you comfortable with that?
8      THE WITNESS: My concern was that all of a
9  sudden the transcript of this shows up online
10 somewhere and there's my home address, and as
11 any firearm owner would not -- you know, would
12 not like to see that and that's my concerns, but
13 if there is some way that that can be
14 guaranteed, I have no objection to providing you
15 with a listing of that.
16 BY MR. VOGTS:
17     Q. Okay. Can you answer the question?
18     A. Certainly. I have handguns, a Colt
19 Delta Elite semiautomatic pistol chambered in 10
20 millimeter. I have a Browning Hi Power
21 semiautomatic pistol, which is initially
22 chambered in 9 millimeter Parabellum, but I also
23 have a second slide and barrel assembly for it
24 which is chambered in .40 Smith & Wesson.

**Page 28**

1      I have a World War II vintage Colt
2  1911A1 in .45 ACP. I have a Marlin bolt-action
3  rifle in 22 Long Rifle. I have a Colt -- I
4  believe it's a 6920 semiautomatic rifle in .223,
5  and I have a Springfield Armory M1 Garand
6  semiautomatic rifle in 30.06 caliber.
7      Q. Over the course of your lifetime, have
8  you owned other firearms?
9      A. Yes.
10     Q. Do you recall the makes and models of
11 those firearms?
12     A. I had a -- let's see. What else have I
13 had that I no longer have? I had an Inglis
14 Hi-Power pistol in 9 millimeter caliber. Oh, I
15 also have a Browning Citori shotgun, over and
16 under double-barreled shotgun in 12 gauge.
17     Previously I've had a Winchester Model
18 12 shotgun, pump-action shotgun in 12 gauge.
19     Q. Any others that you can remember?
20     A. A Remington 870 in 12 gauge. That I've
21 personally owned, I think that should be the
22 extent of it.
23     Q. Do you hunt?
24     A. No.

| | |
|---|---|
| 1  Q. Have you hunted?<br>2  A. No.<br>3  Q. Why do you own the firearms that you<br>4  currently own?<br>5  A. My daughter and I and my father and I<br>6  have done a lot of target shooting. I also have<br>7  firearms for home defense.<br>8  Q. What firearm or firearms do you keep<br>9  available to you for home defense purposes?<br>10 A. Any one of the semiautomatic pistols<br>11 that I listed as being currently owned.<br>12 Q. Which would include the Colt, Delta,<br>13 the Browning Hi-Power, the Colt 1911; is that<br>14 right?<br>15 A. Correct. I would not -- you know,<br>16 unless it was, you know, some sort of exigent<br>17 circumstance, I probably would not avail myself<br>18 of the World War II vintage pistol for a home<br>19 defense situation.<br>20 Q. Why not?<br>21 A. Just it's older. I don't shoot it as<br>22 much and don't really care to potentially<br>23 diminish the value of it.<br>24 Q. What's the magazine capacity for the<br>29 | 1  has been at other people's ranges or out on<br>2  their property.<br>3  Q. Okay. Throughout your reports and your<br>4  declaration in this case, you referred to the<br>5  military configuration rifles. Does your<br>6  Colt 6920 have a military configuration?<br>7  A. Well, it has the -- if those -- it has<br>8  the features on it that are referred to in my<br>9  report. It's as it came from the factory.<br>10 Q. And what features are those?<br>11 A. Gas operated, semiautomatic, flash<br>12 hider, a barrel shroud. I'm trying to think if<br>13 it has -- if it comes from the factory with a<br>14 bayonet lug. I think it does.<br>15 Q. Still grip?<br>16 A. Yes, detachable magazine, and it also<br>17 has -- I have it configured exactly as our ATF<br>18 issued M4s were configured.<br>19 Q. Does it have a protruding grip forward<br>20 of the trigger guard?<br>21 A. Yes.<br>22 Q. Do you have a rail system on that gun?<br>23 A. Yes.<br>24 Q. And what do you have on the rail<br>31 |
| 1  Colt Delta Elite pistol?<br>2  A. Seven rounds.<br>3  Q. And what is the magazine capacity for<br>4  the Browning Hi-Power pistol?<br>5  A. I believe when it's in .40 caliber it's<br>6  only 10, and it's 13 in 9 millimeter.<br>7  Q. You currently own -- I believe you<br>8  listed seven firearms that you currently own.<br>9  Do you -- or strike that.<br>10     Have you used all seven of those<br>11 firearms in the past three years?<br>12 A. Not all of them, no.<br>13 Q. How many of the seven have you used<br>14 over the past three years for any purpose?<br>15 A. I would say primarily four.<br>16 Q. Which four of those?<br>17 A. The Marlin, the Browning Hi-Power, the<br>18 Delta Elite, the Colt 6920, and the M1 Garand.<br>19 Q. What did you use the Colt 6920 for?<br>20 A. Target shooting.<br>21 Q. Do you belong to a range or -- do you<br>22 belong to a range?<br>23 A. I did. Actually my membership recently<br>24 expired. So when I have gone out shooting, it<br>30 | 1  system?<br>2  A. The only thing I -- well, the foregrip<br>3  is a SureFire Foregrip with an integrated<br>4  SureFire flashlight on it.<br>5  Q. Why do you have a flashlight on that?<br>6  A. I have it configured the exact same way<br>7  that we had it configured on the firearms that<br>8  were available to us at ATF.<br>9  Q. Why have you chosen to configure your<br>10 personally owned firearm in the same manner as<br>11 which the ATF-issued firearm was configured?<br>12 A. That was my familiarization with that<br>13 weapon system, so I had it configured exactly --<br>14 or I configured it exactly as the issued weapons<br>15 that we had at ATF.<br>16    We qualify four times a year with that<br>17 firearm. That was the most comfortable<br>18 configuration due to the amount of time I spent<br>19 with that over the years. So I said if this is<br>20 what I'm familiar with and I've been trained on<br>21 it extensively, this is the way I would like to<br>22 configure my own.<br>23 Q. Why did ATF have a flashlight mounted<br>24 on the rail system?<br>32 |

## Page 33

1  MR. WILSON: Objection. Lack of foundation.
2  MR. VOGTS: You can answer if you know.
3  THE WITNESS: I mean, other than for
4  illumination, I don't know.
5  BY MR. VOGTS:
6  Q. That's the obvious answer, right?
7  A. (Nonverbal response).
8  Q. For use in darkened environments?
9  A. Certainly.
10  Q. In a close combat quarter situation
11  perhaps?
12  A. Well, either close combat quarter or
13  distances.
14  Q. The flashlight is capable of
15  illuminating a distant situation?
16  A. Well, define distance.
17  Q. Sure, it's a relative concept. I'll
18  move on. It's not probably worth our time.
19  A. Okay.
20  Q. What is the magazine capacity you have
21  with your Colt 6920?
22  A. I have a number of 30-round magazines
23  and a number of 20-round magazines.
24  Q. Do you have any 10-round magazines?

## Page 34

1  A. Yes.
2  Q. Do you have any 5-round magazines for
3  that rifle?
4  A. No.
5  Q. Do you know if there are 5-round
6  magazines available for that rifle?
7  A. I know that there are smaller capacity
8  magazines manufactured for competition matches.
9  However, I'm not exactly sure what those are. I
10  don't know if there's a 5 round manufactured for
11  that.
12  Q. Under what circumstances do you use a
13  30-round magazine in your Colt rifle as opposed
14  to a 10-round magazine?
15  A. Whatever I take to the range is usually
16  what I bring.
17  Q. What do you typically take to the
18  range?
19  A. Well, it would all depend because my
20  daughter likes to shoot the Colt with a bipod on
21  the front of it, and she can't do that from a
22  bench situation with a 30-round magazine. It's
23  too long, so I have shorter magazines for that.
24  Q. Because the longer magazine gets in the

## Page 35

1  way of the bench?
2  A. Uh-huh, yes.
3  Q. How old is your daughter?
4  A. 21.
5  Q. Has she shot most of her adult life?
6  She hasn't been an adult long, but did she shoot
7  as a child?
8  A. Yes, she did.
9  Q. And you taught her to shoot?
10  A. Yes.
11  Q. How long has she been shooting a
12  Colt 6920 rifle?
13  A. As long as I owned it, approximately
14  eight or nine -- I've probably had it seven or
15  eight years would be my guess.
16  Q. So she's been shooting since roughly
17  age 13?
18  A. 13 to 15, somewhere in there.
19  Q. Do you enjoy shooting that rifle?
20  A. Yes.
21  Q. What do you enjoy about that rifle?
22  A. I like the ease of operation and the
23  reliability, and the way that I have it
24  configured, it's somewhat sentimental I suppose

## Page 36

1  because it's configured the exact same way that
2  it was -- that the issued ones were for us at
3  ATF.
4  Q. When you say ease of operation, what do
5  you mean?
6  A. Well, I think once you learn a firearm
7  system and you've had as much time on it as I've
8  had, it's natural for me because, again,
9  qualifying on it four times a year over numerous
10  years, for me it's easy to operate because I was
11  constantly revisiting or refreshing my training
12  on it.
13  Q. Do you believe that that rifle was easy
14  for your daughter to operate at age 13 after she
15  got instruction from you?
16  A. Initially, no, but the more -- again,
17  the more time she spent training and -- well,
18  not training but shooting it and the more
19  proficient she became with it.
20  Q. How would you compare the, I guess,
21  ease of operation of the Colt rifle with, say,
22  your Colt Delta Elite pistol? Are they similar?
23  A. I don't know if -- that's sort of hard
24  to quantify, and I don't really know what ease

**Page 37**

1  of operation would mean in that regard. Comfort
2  level perhaps? I'm comfortable with either one.
3  Q. They're both semiautomatic firearms,
4  correct?
5  A. Yes.
6  Q. They both accept detachable magazines,
7  correct?
8  A. Yes.
9  Q. They both have external manual
10 safeties?
11 A. Yes.
12 Q. One has a charging handle in order to
13 load around from the magazine into the chamber,
14 correct?
15 A. Correct.
16 Q. That would be the Colt rifle?
17 A. Yes.
18 Q. The Colt pistol has a slide that you
19 retract in order to load a round for the
20 magazine into the chamber, correct?
21 A. Correct.
22 Q. Those are all similarities that those
23 guns have, correct?
24 A. Correct.

**Page 38**

1  Q. Based upon those features of those two
2  guns, can you say that one is any more easy to
3  operate than the other, or are they largely the
4  same?
5  A. Well, I think if you break it down in
6  terms of those systems, they're probably both
7  similar in the learning curve once you learn
8  them, but the first time -- you know, the first
9  time I ever picked up an AR without any
10 familiarization, I wasn't comfortable with it as
11 I was with any other firearm that had a
12 dissimilar operating system than what I was used
13 to.
14     There are similarities between them,
15 correct, but I don't know that one is
16 necessarily easier than the other or that you
17 can relatively say that the ease of operation is
18 the same. I suppose the learning curve on those
19 and the comfort level is somewhat subjective.
20 Q. To the person?
21 A. Yes.
22 Q. All right. You indicated that you feel
23 the Colt 6911 rifle is reliable. What did you
24 mean by reliable?

**Page 39**

1  A. Well, the 6920 --
2  Q. I'm sorry.
3  A. No, when it's properly maintained it
4  is. If it's not properly cleaned, there's
5  always some issues with it, and we had that with
6  guns in the field and I haven't really
7  experienced that with my personally owned one
8  because after we go out shooting, we clean it
9  immediately afterwards.
10     But ease of operation for me is, again,
11 not just a general principle, but it's relevant
12 to the comfort level and the amount of
13 experience I've had with a particular firearm.
14 So for me there's an ease of operation because
15 my familiarity with it.
16 Q. But when you say reliable, I guess
17 what, mechanically speaking, are you referring
18 to when you say a firearm is reliable?
19 A. Oh, in general reliability means if you
20 load it and you pull the trigger, it's going to
21 function as it's designed to be. I have not had
22 an issue with an AR rifle unless it wasn't
23 properly maintained or properly cleaned. That
24 to me would be the definition of reliability.

**Page 40**

1  When you need to use it, it works.
2  Q. And you would refer to your Colt Model
3  6920 rifle as an AR type rifle, correct?
4  A. Yes.
5  Q. Do you find your Colt rifle to be
6  accurate?
7  A. Yes.
8  Q. Do you find your Colt rifle has
9  relatively minimal recoil compared to, say, your
10 Springfield M1 Garand or any of the shotguns you
11 own?
12 A. It's significantly less recoil than the
13 Garand, yes.
14 Q. Did your daughter when she was a young
15 teenager ever shoot the Springfield M1 Garand?
16 A. Yes.
17 Q. Does she prefer the Colt 6920?
18 A. She likes shooting the Garand actually
19 more. She likes the kick.
20 Q. But the Colt rifle has significantly
21 less kick?
22 A. It has significantly less felt recoil.
23 Q. Is the Colt 6920 rifle easy to reload?
24 A. Yes.

## Page 57

1 where it might have some application to forensic
2 firearm and tool mark examiners, like, for
3 instance, the way a bolt face was machined so
4 that it left a certain type of marking that
5 might have been unique to that firearm where it
6 would leave it on the base of an expended
7 cartridge case.
8     Q. Okay. Did you attend the SHOT Show in
9 2012, which was your last year of employment?
10    A. No.
11    Q. 2011?
12    A. 2011 or 2010 may have been the last
13 time that I went. I believe it was 2011.
14    Q. And did you attend your first SHOT Show
15 in 2003 or 2004?
16    A. Approximately.
17    Q. And you said one of the purposes you
18 had in attending the SHOT Show was to see
19 basically new products being offered?
20    A. Correct.
21    Q. What, if any, assessment did you make
22 in terms of new products being offered between
23 2003 or '4 and 2010? Are there any notable
24 differences in those shows?

## Page 58

1     A. Well, there's always unique and
2 individual things that are released every year.
3 I mean, it's a marketing -- it's an exposition
4 of new products and -- well, and past products
5 as well.
6        Notable in what sense I guess is --
7     Q. Well, let me ask you this: If I were
8 to use the phrase black guns, do you know what
9 I'm speaking of?
10    A. Yes.
11    Q. And what do you know a black gun to be,
12 euphemistically I guess?
13    A. An AR type semiautomatic rifle.
14    Q. Some people might call them tactical
15 rifles?
16    A. There's a number of interchangeable
17 terms. Tactical rifles, assault rifles.
18    Q. Modern sporting rifles, have you heard
19 that?
20    A. I have but not until fairly recently.
21    Q. Okay. Did you notice between 2003 and
22 2010 at the SHOT Show that there was a
23 substantially greater presentation of AR type
24 rifles from product manufacturers?

## Page 59

1     A. Yes, I think every time I went there
2 there was another manufacturer stepping into
3 that market.
4     Q. Exhibit 8, paragraph 14, in that
5 paragraph you indicate that you relied on the
6 Merriam-Webster Dictionary to define the term
7 assault rifle; correct?
8     A. In that paragraph, yes, I did.
9     Q. Why did you resort to the
10 Merriam-Webster Dictionary for the definition of
11 assault rifle rather than any of the number of
12 firearms books you personally owned for a
13 definition?
14    A. Well, why did I quote that one
15 specifically?
16    Q. Uh-huh.
17    A. Only because it's a generally
18 acceptable reference for laypeople, so to speak,
19 or people unfamiliar with firearms. There were
20 numerous other definitions that were similar in
21 the reference books that I utilized in
22 preparation for the report.
23    Q. So a layperson or a person not familiar
24 with firearms would understand an assault rifle

## Page 60

1 to be as any of the various automatic or
2 semiautomatic rifles with large capacity
3 magazines designed for military use, is that
4 correct?
5     A. Well, I think that they would
6 understand that although it's not a
7 firearm-specific publication, that the
8 Merriam-Webster Dictionary is a generally
9 accepted reference for the definition of an
10 item, whether it's an assault rifle or some
11 other item.
12    Q. Do persons knowledgeable on the subject
13 of firearms to your knowledge define assault
14 rifles in the same manner?
15    A. I'm sorry. Could you repeat that?
16    Q. I'll restate it. To your knowledge do
17 persons knowledgeable on the subject of firearms
18 define assault rifles as it's found in
19 Merriam-Webster's Dictionary?
20    A. I believe to one degree or another, not
21 verbatim perhaps. However, I'm sure there are
22 variations on a theme, but they may all contain
23 certain similarities.
24    Q. Is that how you would define an assault

## Page 61

1  rifle?
2    A.  In general, yes.
3    Q.  Is that how the ATF defines an assault
4  rifle?
5    A.  I do not know.
6              (Whereupon, Yurgealitis
7              Deposition Exhibit No. 12 was
8              marked for identification.)
9  BY MR. VOGTS:
10   Q.  I'll show you a copy of a document I've
11 marked as Exhibit 12 titled Report and
12 Recommendation of the ATF Working Group on the
13 Importability of Certain Semiautomatic Rifles.
14 Have you seen this document before,
15 Mr. Yurgealitis?
16   A.  I have seen it. I don't recall when,
17 but it is quite dated so I may have seen it
18 years ago. However, I'm not -- if you're asking
19 me -- if you're going to ask me to recall the
20 content of it, I don't. I wouldn't be able to
21 do that without rereading it.
22   Q.  But you do believe you've seen it
23 before and you recognize it as an ATF document,
24 correct?

## Page 62

1    A.  Yes, but back from -- what's it dated,
2  July of 1989?
3    Q.  Yes, that's correct. I refer you to
4  page 5 of Exhibit 12. At the very bottom of the
5  page, isn't it correct that the ATF in this
6  document wrote true assault rifles are selective
7  fire weapons that will fire in a fully automatic
8  mode?
9    A.  Well, let me just read it out loud
10 because I'm a little bit confused by your
11 question and perhaps if --
12   Q.  Well, my question is, is that what the
13 ATF wrote in this document? Did I read that
14 correctly?
15       MR. WILSON: I'll object to selecting a
16 single sentence out of this whole paragraph.
17       THE WITNESS: If the reporter could please
18 read back your question because I'm not certain
19 as to what exact part of that you quoted.
20       MR. VOGTS: I'll restate it.
21       THE WITNESS: Well, if she could --
22       MR. VOGTS: I'll restate it to make it
23 easier.
24

## Page 63

1  BY MR. VOGTS:
2    Q.  Did the ATF write in this document that
3  true assault rifles are selected fire weapons
4  that will fire in a fully automatic mode?
5    A.  That's what the document says, yes.
6    Q.  Did ATF also state in Exhibit 12 that
7  it is somewhat of a misnomer to refer to
8  semiautomatic rifles as assault rifles?
9    A.  Where on the page is that?
10   Q.  (Indicating).
11   A.  Thank you. That's what the document
12 says, correct.
13   Q.  Do you agree or disagree that it's
14 somewhat of a misnomer to refer to a
15 semiautomatic rifle as an assault rifle?
16   A.  Personally I don't agree with that
17 assessment, with the ATF's assessment, no.
18   Q.  Okay. Referring back --
19   A.  I'm getting a little filled up here
20 with exhibits.
21   Q.  We'll just keep stacking them up here
22 and we will manage.
23       Referring you back to Exhibit 8, your
24 declaration, paragraph 13, you wrote that in

## Page 64

1  recent years, there has been an increase in the
2  popularity and availability of semiautomatic
3  rifles, pistols, and shotguns with features
4  initially designed, paren, or patterned after
5  those designed, close paren, for a military
6  purpose; is that correct?
7    A.  Correct.
8    Q.  What is your basis for saying that in
9  recent years there has been an increase in the
10 popularity of those firearms?
11   A.  Well, based on as we had stated before
12 at the SHOT Show, every year I went there it
13 seemed as though there was another major
14 manufacturer who had decided to produce a model
15 or a line of AR type rifles where they had
16 really no history of doing it before then.
17      The number of available options and
18 aftermarket accessories for AR type rifles, I
19 believe Brownells might even have their own
20 catalog that's fully devoted to AR accessories
21 that's a few hundred pages. That and if you
22 walk into a local gun store and see what they
23 stock or ask them what they sell or they sell a
24 large quantity of or a large number of and

### Page 65

1  that's what I would base that opinion on.
2     Q.  So if you walk into a local gun store
3  and ask them, what response do you believe you
4  receive?
5     A.  Well, they're very popular.  AR type
6  rifles are very popular.  They either can't get
7  enough of them or they sell very quickly.
8     Q.  Why do you believe AR type rifles are
9  very popular?
10    A.  I would say for some of the reasons
11 that I spoke earlier of when I was describing
12 what it is on my own personal AR type rifle that
13 I find attractive, or, you know, functionality
14 or reliability.  I think a lot of people enjoy
15 the fact these days that you can accessorize
16 them with almost anything.  With the
17 introduction of rail attachment systems, there's
18 a multitude of accessories you can mount on
19 them.
20    Q.  Any other reasons for their popularity?
21    A.  I mean, in general speaking from a
22 professional perspective, that would encompass a
23 lot.
24    Q.  In paragraph 13 you note that these

### Page 66

1  firearms and their features were initially
2  designed or patterned after those designed for a
3  military purpose.  When you say initially
4  designed, are you referring to -- I think it's
5  perhaps obvious -- the origin of those features
6  and the design historically?
7     A.  Yes.
8     Q.  Would you agree that historically a
9  great many civilian firearms and their features
10 had their origin in military and military use?
11    A.  A great number?  I mean, there are
12 other firearms other than AR types that have
13 features that are -- were originally designed
14 for a military purpose.
15    Q.  And that are now or at some point were
16 used commonly by law abiding civilians?
17    A.  Yes.
18    Q.  Can you give me an example of a firearm
19 or a feature that fits that description other
20 than the AR type rifle?
21    A.  A Colt 1911 model or a variant thereof
22 is obviously a military design or a firearm
23 designed for a military purpose that is very --
24 immensely popular.

### Page 67

1     Q.  Even going back farther, isn't it true
2  that the basic concept of a revolver was
3  designed for military use?
4     A.  I don't know that Colt invented the
5  revolver precisely for military applications,
6  but it found widespread popularity.  Without
7  looking back at some of my reference material, I
8  don't know that it was designed by Colt in
9  direct response to a military --
10    Q.  Need or desire?
11    A.  Need or request for -- you know,
12 request for production.
13    Q.  Are you familiar with the Colt Walker
14 model revolver?
15    A.  Yes.
16    Q.  Do you know whether or not that
17 revolver was designed for use in the war with
18 Mexico in the 1840s?
19    A.  I believe it was.  Although, I can't --
20 I don't have that memorized.  However, what I
21 was referring to is that Samuel Colt's initial
22 idea to invent the revolver was not, to my
23 knowledge, the direct response to a request by
24 the military to produce that.

### Page 68

1     Q.  Okay.  How about the double action
2  revolver?  What historical origin did the double
3  action revolver have?
4     A.  That's a good question.  Off the top of
5  my head, I do not know.
6     Q.  If I were to suggest to you that its
7  origin may have lied in Britain's military use
8  of the Webley revolver, does that refresh your
9  recollection at all?
10    A.  I would not be surprised if that were
11 the derivation.  I have no reason to doubt that
12 that's what it is, but I don't have it off the
13 top of my head.
14    Q.  Bolt-action rifles are and have been
15 immensely popular in the United States for
16 civilian use, is that correct?
17    A.  Correct.
18    Q.  Did the bolt-action rifle have its
19 origin in military use?
20    A.  Yes.
21    Q.  When was that?
22    A.  Late 1860s, if I'm not mistaken, early
23 1870s.
24    Q.  And the single -- the bolt-action rifle

| | | | |
|---|---|---|---|
1 | receiver or the mechanism and the -- as opposed
2 | to a Monte -- where there may be more
3 | considerable offset between the shooter's
4 | shoulder and his eye level and the barrel?
5 |     Q.  Well, I'll get to my understanding of
6 | what straight-line design means, I guess, in a
7 | second, but as you sit here today, do you have
8 | any understanding as to what is meant by the
9 | straight-line design of an AR type rifle?
10 |    A.  I believe I do.  However, I don't know
11 | exactly what your definition of that may be.
12 |    Q.  Well, let's see if we can get on the
13 | same page here.  I'm showing you --
14 |    A.  Here, I'll hand you back the Ruger
15 | catalog.
16 |        MR. WILSON:  Just put it in the pile.
17 |            (Whereupon, Yurgealitis
18 |             Deposition Exhibit No. 14 was
19 |             marked for identification.)
20 | BY MR. VOGTS:
21 |    Q.  Showing you the Remington 2012 product
22 | catalog that I'll mark as Exhibit 14,
23 | specifically pages 40 and 41 that depict the
24 | Remington Model R-15 AR type rifle; is that

85

1 | correct?
2 |    A.  That's what it shows, yes.
3 |    Q.  Now, tell me if you understand
4 | straight-line design to be the following:  That
5 | the rifle itself from its muzzle to its
6 | buttstock is designed on a straight line through
7 | the action as opposed to a more traditionally
8 | styled firearm in which from the muzzle to the
9 | buttstock there is an absence of that straight
10 | line?
11 |    A.  Yes, yeah, and I believe that when I
12 | had a moment to think about it while you were
13 | retrieving the catalog I presumed what you were
14 | going to refer to.
15 |    Q.  And you had the same challenge
16 | articulating that as I did, correct?
17 |    A.  Correct.
18 |    Q.  Do you know what benefit or advantage
19 | comes from there being a straight-line design to
20 | an AR type rifle?
21 |    A.  I would say from my perspective, less
22 | rise to the muzzle after firing.
23 |    Q.  Is it also served to direct recoil
24 | directly back into the shoulder of the shooter?

86

1 |    A.  It will, yes.
2 |    Q.  As opposed to a more traditionally
3 | style rifle?
4 |    A.  Yes.
5 |    Q.  So the straight-line design has that
6 | functional purpose, correct?
7 |    A.  It has that functional difference, yes.
8 |    Q.  A number of -- strike that.
9 |        In the ordinance there are features,
10 | specific features that are banned, may not be
11 | present in a semiautomatic rifle capable of
12 | accepting a detachable -- large capacity
13 | detachable magazine; is that right?
14 |        MR. WILSON:  I'll object, but it's really
15 | just clarification.  You're referring to the
16 | ordinance and I think we're probably better off
17 | picking one or the other --
18 |        MR. VOGTS:  Well, subject to the proviso --
19 | off the record here for a second.
20 |            (Whereupon, a discussion was had
21 |             off the record.)
22 | BY MR. VOGTS:
23 |    Q.  You discuss those features on page 16,
24 | paragraph 33 of Exhibit 8; is that right?

87

1 |    A.  Yes.
2 |    Q.  Among those banned features are only a
3 | pistol grip without a stock attached?
4 |    A.  Yes.
5 |    Q.  Referring you back to the Remington
6 | catalog and the page that depicts the Remington
7 | R-15 and its pistol grip configuration, is your
8 | interpretation of a pistol grip under the
9 | ordinance the pistol grip we see on this
10 | Remington R-15?
11 |    A.  In a general sense of the design, yes,
12 | not perhaps completely identical to the one in
13 | the picture.
14 |    Q.  So the language only a pistol grip
15 | without a stock attached does not necessarily
16 | mean a rifle without a stock in your
17 | interpretation, is that right?
18 |    A.  I'm sorry.  Can you repeat that?
19 |    Q.  The language of the ordinance, only a
20 | pistol grip without a stock attached --
21 |    A.  Which section are you referring to
22 | there?  Oh, so you're looking at my report right
23 | now?
24 |    Q.  Right.

88

Page 93

1  guess in answer to your -- in response to your
2  question, what I'm saying is you're equating the
3  second sentence that you just read with the
4  Remington R 5, and I'm just saying that you're
5  making that jump. I'm not making that jump.
6  It's not specifically cited in there.
7      Q. Can't you make that jump though?
8      A. Well, I can say that the Remington R 5
9  is a straight-line design as most AR type rifles
10 are. However, I'm just trying to qualify my
11 answer a little bit by saying that, yes, the
12 Remington R 5 has pistol grip and they mentioned
13 use or the purpose of a pistol grip in a
14 straight-line design rifle.
15     Q. And that type of pistol grip is
16 necessitated because the rifle has a
17 straight-line design, correct?
18     A. It says in most cases, the
19 straight-line design of the military weapon
20 dictates a grip of this type.
21     Q. And you cannot incorporate a pistol
22 grip into the wrist of a firearm stock as they
23 are in more typical traditionally styled rifles,
24 can you?

Page 94

1      A. I don't see how you could, but I mean,
2  there are other variations. Just to make note
3  that there were thumbhole stocks, which I
4  believe are not allowed either, but I'm just
5  saying that that's not the only -- that's not
6  the only way to skin that cat, but I understand
7  that that's -- the design of the rifle
8  necessitates a pistol grip. I agree, but I
9  wasn't -- I'm trying to give you a technical --
10 a technically sound answer to something without
11 making an assumption.
12     Q. I appreciate that. What function does
13 the pistol grip serve on a rifle?
14     A. According to me or according to the ATF
15 report?
16     Q. According to you. You can put that
17 aside. I'm done with that.
18        According to you, what function does a
19 pistol grip -- whether it be in the wrist of a
20 traditionally styled firearm or protruding
21 beneath the stock?
22     A. Well, to aid in controlling -- for the
23 operator to control the firearm or operate the
24 firearm.

Page 95

1      Q. Why is that important?
2      A. Why is controlling the firearm
3  important?
4      Q. Yes.
5      A. To aid in aiming or to control it
6  during recoil.
7      Q. And is the control in aiming in part a
8  safety consideration?
9      A. Well, certainly, yes.
10     Q. Is a rifle with a pistol grip
11 configuration as we see it on typical AR type
12 rifles any more dangerous in the hand of a
13 criminal than a rifle with a more traditional
14 pistol grip configuration in the wrist of the
15 stock?
16        MR. WILSON: Can you read that question back?
17           (Whereupon, the record was read
18           as requested.)
19        MR. WILSON: Object to the term dangerous in
20 that question. It's vague.
21        MR. PULLOS: I object to form.
22        THE WITNESS: I wouldn't -- the way that you
23 stated with a more traditional pistol grip
24 incorporated into the wrist of the stock I

Page 96

1  believe is what you just said?
2      MR. VOGTS: I did.
3      THE WITNESS: I don't consider a traditional
4  rifle stock to incorporate a pistol grip in the
5  stock. If we look -- do we have the Ruger
6  catalog?
7      MR. VOGTS: Yeah, or the Remington might
8  be --
9      THE WITNESS: The Ruger.
10     MR. VOGTS: Both would work.
11     THE WITNESS: This is fine. In Exhibit 13 as
12 we looked at before on page 87 and 88, the
13 Mini-14 Ranch Rifle and the Mini-14 Ranch Rifle
14 with black stainless finish have traditional
15 rifle stocks, but the way that you asked that
16 question was is a rifle with a pistol grip or a
17 protruding pistol grip any more dangerous than
18 in the hand of a criminal -- and I'm summarizing
19 here -- than a rifle with a pistol grip
20 incorporated into the stock. That's not a
21 pistol grip.
22 BY MR. VOGTS:
23     Q. Fair enough. Let me restate the
24 question. Is a rifle with a pistol grip as we

24 (Pages 93 to 96)

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

###### Page 97

1  see it in a typical AR configuration any more
2  dangerous in the hands of a criminal than a
3  rifle with a more traditional grip for the
4  trigger hand as we see it on the Mini-14?
5      A.  Well, dangerous is a relative term.  Is
6  it more easily fired from a position other than
7  the shoulder?  Yes.  I don't know if that
8  equates to dangerousness necessarily directly.
9  Is it easier to -- I find that I would not shoot
10 my Marlin 22 bolt-action rifle from the hip.
11     Q.  But you could?
12     A.  In an exigent circumstance and with the
13 result in degradation in aiming, but you could
14 if you had to, certainly.
15     Q.  And you could fire the Ruger Mini-14
16 from the hip with the grip it has in the wrist
17 of the stock, correct?
18     A.  Certainly, but I believe it's easier
19 for me to fire an AR type rifle from the hip
20 than it would be for a more traditionally
21 stocked firearm.  Let's put it that way.
22     MR. WILSON:  Off the record.
23         (Whereupon, a discussion was had
24          off the record.)

###### Page 98

1  BY MR. VOGTS:
2      Q.  Mr. Yurgealitis, have you ever fired
3  your Colt 6920 rifle from the hip?
4      A.  I don't know if I've fired mine, but I
5  have fired an AR-15 type rifle from the hip.
6      Q.  And you talk about degradation and
7  accuracy.  What did you mean by that?
8      A.  Well, you're not sighting down the
9  barrel and utilizing the sights on the firearm
10 to adjust your aim point or to, you know, aim
11 the rifle incorrectly.
12     Q.  So if your goal was to actually hit a
13 target, shooting from the hip is not the
14 technique to use; would you agree with that?
15     A.  Not if you want to deliver accurate
16 fire.
17     Q.  Have you ever in the course of your
18 training on the use of an AR type rifle been
19 trained to shoot from the hip?
20     A.  I don't believe that part of our
21 conversion training covered firing from the hip.
22 However, I've fired numerous firearms from the
23 hip at the ATF Laboratory.  We had quite an
24 extensive reference collection that I was in

###### Page 99

1  charge of so I had the opportunity to shoot a
2  number of different firearms from the hip.
3      Q.  A Thompson Submachine Gun perhaps?
4      A.  Thompsons, STEN submachine guns, a
5  number of different types of military firearms
6  with vertical foregrips that were intended to be
7  utilized in that way.
8      Q.  Okay.  Let's move to the vertical
9  foregrip or as the ordinance refers to them as
10 the protruding grip.  Your Colt Model 6920 rifle
11 has a protruding grip, is that correct?
12     A.  Yes, it has a vertical foregrip
13 attached to the rail -- the rail system over the
14 barrel.
15     Q.  And that's a grip that you hold with
16 your non-trigger hand, is that right?
17     A.  Correct.
18     Q.  In your report or in your declaration I
19 should say, Exhibit 8, you state that the
20 protruding grip allows increased stability of
21 the firearm by the operator; is that right?
22     A.  That is my thought, but I just wanted
23 to get to exactly what page we're on here.
24     Q.  (Indicating).

###### Page 100

1      A.  Thank you.
2      Q.  Why is increased stability an important
3  concept in shooting?
4      A.  Well, as it says in the next sentence,
5  it says they, referencing protruding foregrips,
6  allow the operator to better control recoil and
7  muzzle climb, thus increasing the hit
8  probability of successive shots.
9      Q.  So it has a functional relation to
10 accuracy, correct?
11     A.  Yes.
12     Q.  And accuracy has a relationship to
13 safety, is that right?
14     A.  Amongst other factors, yes.
15     Q.  You also note that it's a feature seen
16 on a great many firearms that have rail
17 attachment systems?
18     A.  Yes.
19     Q.  Why does a gun that has a rail
20 attachment system also sometimes have a
21 protruding grip?  What is the relationship
22 between the two?
23     A.  Well, there are many manufactured rail
24 attachment systems and many manufactured

Page 101:

    1  vertical foregrips that are available and that
    2  will meet up with each other or mate. In other
    3  words, amongst a number of -- hundreds of
    4  accessories that you can put on a rail
    5  attachment system, whether it's on an AR type
    6  rifle or other type of firearm, are vertical
    7  foregrips.
    8      Q.  Does a light sometimes necessitate the
    9  presence of a protruding grip?
    10     A.  If it's of certain types, yes.
    11     Q.  Why is that?
    12     A.  Well, because the rail design is -- has
    13 sharp -- a Picatinny rail has --
    14     THE WITNESS:  If you would like me to spell
    15 it, P-i-c-a-t-i-n-n-y.  It has sharp edges or
    16 sharply-machined edges, and to utilize, say, a
    17 bear hand as a non-trigger or hand aiming or
    18 support for the rifle, it's not a comfortable
    19 fit.
    20 BY MR. VOGTS:
    21     Q.  So in the presence of a Picatinny rail,
    22 at times you cannot use your non-trigger hand to
    23 support the rifle at the forend as you otherwise
    24 would?

Page 102:

    1      A.  You could.  I mean, you can, but it's
    2  not designed to be held with a bear hand.  In
    3  that case, you would be better off leaving, say
    4  for instance, a factory AR style shroud or
    5  foregrip on the weapon if you weren't going to
    6  use a vertical foregrip with a Picatinny rail.
    7      Q.  And if you had a Picatinny rail with a
    8  protruding grip forward of the trigger guard,
    9  you would arguably have better control over that
    10 firearm; is that correct?
    11     A.  Yes.
    12     Q.  And better control means better
    13 accuracy, correct?
    14     A.  Yes.
    15     Q.  Better accuracy means better safety,
    16 correct?
    17     A.  Well, better accuracy means a number of
    18 things.  Amongst those, more safe operation of a
    19 firearm.
    20     Q.  And by more safe operation of a
    21 firearm, that inaccurate shots will not hit
    22 targets not intended to be hit?
    23     A.  I'm sorry.  Can you --
    24     Q.  Strike that then.  In terms of safety,

Page 103:

    1  a protruding grip allows for more accuracy
    2  because inaccuracy can lead to targets being hit
    3  that are not intended; correct?
    4      MR. WILSON:  I'll object as vague.  It's
    5  unclear in the question whether you're talking
    6  about AR type weapons or all weapons.
    7      THE WITNESS:  I think it's almost as if you
    8  just asked a question based on a separate
    9  sentence.  Amongst safety considerations with
    10 any firearm is a concern about hitting
    11 unintended targets, period.  A vertical foregrip
    12 potentially increases safety by allowing more
    13 accurate fire from a firearm, period.  I think
    14 it's just trying to -- the way it was
    15 structured, I was having a hard time following.
    16     MR. VOGTS:  That's fine.  That's fine.
    17     THE WITNESS:  But that's amongst -- vertical
    18 foregrip allows that, but it also allows other
    19 things.
    20 BY MR. VOGTS:
    21     Q.  Okay.  Moving on to folding telescoping
    22 and thumbhole stocks, what is a folding stock?
    23     A.  A folding stock is a portion of the
    24 firearm stock that can be folded or it's hinged

Page 104:

    1  or constructed that it can be shortened or moved
    2  out of the way to reduce the overall length of
    3  the firearm.
    4      Q.  In your trips to the SHOT Show and to
    5  local gun stores, you don't see many, if any,
    6  firearms on the shelves with the folding stock
    7  you've just described; do you?
    8      A.  As originally manufactured?
    9      Q.  New firearms.
    10     A.  They're not -- they're not common.  I
    11 would say that.
    12     Q.  Right.  However, telescoping stocks on
    13 AR type rifles are fairly common; is that
    14 correct?
    15     A.  Yes.
    16     Q.  What is the purpose of a telescoping
    17 stock on an AR rifle?
    18     A.  The same as with a folding stock, to
    19 reduce the overall length of the firearm to
    20 allow for -- well, to reduce or increase the
    21 overall length of the firearm for it to --
    22 individuals of different physical stature, to
    23 utilize the firearm, also to conceal it and, you
    24 know, reduce the overall length and make it more

## Page 105

1  maneuverable in a more confined area, or
2  more -- I don't know if maneuverable is the
3  correct term. Make it -- I'll put it in
4  layman's terms. Less big in a small place.
5  Q. What is length of pull?
6  A. Length of pull is the distance
7  between -- well, it's the -- it's relative to
8  the length of the stock and the distance from
9  the butt end of the stock to a certain point on
10 the stock.
11 Q. Why is length of pull, proper length of
12 pull important in shooting?
13 MR. WILSON: Objection. Lack of foundation.
14 THE WITNESS: Why is proper length of pull
15 important -- again, if you could repeat that.
16 I'm sorry.
17 BY MR. VOGTS:
18 Q. Why is a proper length of pull an
19 important consideration in rifle shooting?
20 A. It has an impact on the -- or it's a --
21 I would say it impacts the accuracy and the
22 ability to aim or recover from a fired shot, et
23 cetera. Basically the stock -- a properly
24 fitted firearm is easier to or more comfortable

## Page 106

1  to operate. Let's put it that way.
2  Q. And to shoot accurately, correct?
3  A. Yes.
4  MR. WILSON: Are you almost done with this
5  line of questioning?
6  MR. VOGTS: Let me finish this feature and
7  we'll break. Just five more minutes or so.
8  BY MR. VOGTS:
9  Q. Does a telescoping stock on an AR type
10 rifle allow the operator to achieve a proper
11 length of pull?
12 A. Yes, it does. Amongst other functions,
13 yes. The adjustability allows you to -- I don't
14 know if you ask the average shooter if they
15 would know what the term length of pull meant.
16 It allows it to be adjusted so that, you know,
17 an individual can find a more comfortable length
18 or length of pull actually.
19 Q. Does your Colt Model 6920 have a
20 telescoping stock?
21 A. Yes.
22 Q. And I imagine when you shoot that
23 firearm, you adjust the stock from the position
24 it's in after your daughter has shot the

## Page 107

1  firearm?
2  A. Yes, usually, yes.
3  Q. You're about six two or so, six three?
4  A. Six four.
5  Q. And how tall is she?
6  A. Five six.
7  Q. Without that adjustable telescoping
8  stock, would one of you have a more difficult
9  time firing that gun accurately because it
10 didn't fit you well?
11 A. I would have to ask my daughter because
12 there is times where she has actually taken it
13 after I've shot it and not adjusted it and shot
14 it. Whether she's that sensitive to it or not,
15 I don't know.
16 At least as far as my training went
17 with the M4s from ATF, we would -- I would not
18 necessarily have that stock adjusted at the same
19 length when I was in a tactical situation that I
20 would have when I was shooting it at the range
21 due to body armor, et cetera that we wore on
22 tactical operations.
23 So it did -- it does allow for
24 adjustability, but I think you could shoot it

## Page 108

1  either way and not have a substantial
2  degradation in accuracy.
3  Q. But you don't disagree with the general
4  concept that a properly fitted rifle to a
5  person's stature is a desired feature of that
6  rifle, correct?
7  MR. WILSON: Objection to the term properly
8  fitted.
9  THE WITNESS: And the double negative, don't
10 disagree.
11 BY MR. VOGTS:
12 Q. Do you disagree with the proposition
13 that a properly fitted rifle to a person's
14 stature is an important consideration in
15 selecting the rifle?
16 MR. WILSON: Again, same objection.
17 THE WITNESS: I would say that it would be a
18 consideration in selecting a rifle.
19 BY MR. VOGTS:
20 Q. I believe you testified that
21 telescoping stock permits the rifle to be
22 concealed more readily?
23 A. Yes, amongst other capabilities that
24 that provides to a firearm.

**Page 117**

immediately because there's a burglar, and I don't think that the same types of firearms or the same tactics or the same mentality should be applied when you're talking about a homeowner addressing a home burglary as you would with law enforcement.

Additionally, there's a vast difference in training. I wouldn't -- you know, if I was as a police officer or a law enforcement officer responding to a home of an accountant, I would know more do my own accounting than he should do his own law enforcement.

Unless it's a life or death situation, there's no cause for somebody to go down the stairs and try to confront that individual, and that's when you start talking about, you know, assault weapons or AR-15 type weapons or semiautomatic rifles for home defense and maneuverability, and there are many other firearms that are more maneuverable than an AR-15.

Q. And many firearms less maneuverable?
A. Exactly, exactly, but what I'm saying is to start equating those two -- and I'm not

**Page 118**

trying to qualify my answers other than to say okay, there's a difference -- people carry different things for different reasons because they have different missions, and a homeowner doesn't necessarily need to fend off a squad of enemy soldiers on a frontal assault and worry about a flanking maneuver by another squad. He may need to worry about one individual.

The military mission is going to differ from a civilian mission. The law enforcement mission is going to differ from the civilian situation. So that's where I was just trying to say, hey, let's step back for a second and look at this, and I wanted to interject that.

But to get back to your original question, yes, a telescoping stock for a civilian would make it more maneuverable in tight quarters.

Q. Okay. You made reference in your answer to a vast difference in training. Were you referring to training in tactical situations or training on how to use and operate a firearm or both?
A. Both. I think that I have seen people

**Page 119**

that are civilians that are extremely well trained and extremely well versed and shoot on a regular basis and are incredibly proficient with firearms, and I have seen people at a range where I felt like I couldn't get my head to the ground low enough because they're turning around with a firearm.

You know, there's different levels of capability based on how much time and effort either an agency or an organization or an individual is willing to expend on somebody to train them to use it safely and properly.

Q. But you do allow for the fact that there are a great number of civilians who are well trained to use and operate firearms?
A. Oh, there are well trained civilians. There are poorly trained civilians.
Q. And there's well trained police officers and poorly trained police officers?
A. Yes.
Q. Moving on, a thumbhole stock. I don't believe in Exhibit 8 -- oh, yes, you do. You write thumbhole stocks have traditionally been utilized on firearms for sport and target

**Page 120**

shooting, correct?
A. Yes.
Q. What value does a thumbhole stock bring to sport and target shooting?
A. Well, traditionally you didn't see a lot of manufacturers -- a large number of manufacturers utilize those until the Federal Assault Weapons Ban, but I mean, in general, they're for stability just as any other -- just as a pistol grip would be in other type of stock.
Q. And we see such a thumbhole stock in the Ruger catalog, Exhibit 13 at page 90; do we not?
A. Yes.
Q. And I believe Ruger promotes the thumbhole stock as assisting in what? Will you read that please?
A. Easy holding or resting at the bench.
Q. For target shooting, competitive or otherwise?
A. (Nonverbal response).
Q. Does the presence of a thumbhole stock in a semiautomatic rifle make that rifle more

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

```
 1  dangerous?
 2      A.  I don't think -- again, I'm going to
 3  step back just a little bit and say I don't
 4  think any one of these individual features that
 5  are banned by either one of these ordinances if
 6  taken by themselves makes something more
 7  dangerous or less dangerous.  I believe that
 8  once you have a combination of the features,
 9  then that's -- the potential for that increases.
10      It's almost like, you know, you go out
11  on the water.  Well, high waves aren't
12  necessarily bad until you combine them with high
13  winds and what have you.  Either one of those
14  two things might not be intrinsically dangerous
15  or make a situation more dangerous or more
16  deadly.  However, if you -- once you start
17  combining and looking things in the totality of
18  it, I think that's what the intent of the
19  ordinance was, not --
20      Q.  Hold that thought.  I'll be right back
21  or think about other things if you like.
22          (Whereupon, a discussion was had
23            off the record.)
24
                                                121
```

```
 1  BY MR. VOGTS:
 2      Q.  In Exhibit 8, page 11 -- or 17, I'm
 3  sorry, you talk about barrel shrouds, and there
 4  we have a difference between the two ordinances.
 5  If you pull out 4 and 5 from the stack in front
 6  of you, the Cook County ordinance, Exhibit 5,
 7  has a definition of barrel shroud at page 4.  Do
 8  you see that?
 9      MR. WILSON:  Page 4 of Cook County?
10      MR. VOGTS:  Yes.
11      THE WITNESS:  Yes.
12  BY MR. VOGTS:
13      Q.  I'm interested in your interpretation
14  of the difference between the barrel shroud
15  provisions in these two ordinances, and I'd like
16  you to tell me if you agree with my
17  interpretation under the Cook County ordinance.
18          An extension of the stock along the
19  bottom of the barrel which does not completely
20  or substantially encircle the barrel is not a
21  barrel shroud, is that correct?
22      A.  According to the verbiage in the
23  ordinance, yes.
24      Q.  So that kind of describes what would
                                                122
```

```
 1  typically be a forend on a traditionally styled
 2  rifle onto which the barrel sits.  Do you agree
 3  with that?
 4      A.  Yeah, in a general sense, yes.
 5      Q.  However, in Highland Park, a barrel
 6  shroud is one that partially or completely
 7  encircles the barrel; is that right?
 8      MR. WILSON:  Sorry.  So we're clear, are you
 9  talking about A1, A4?
10      MR. VOGTS:  Correct, yes.
11      THE WITNESS:  Well, I think the difference is
12  it says that the -- in the Highland Park
13  ordinance, it states that the shroud is attached
14  to the barrel as opposed to in Highland Park, it
15  is attached to or partially or completely
16  encircles the barrel.
17  BY MR. VOGTS:
18      Q.  Actually I think that language is
19  identical?
20      A.  No, you're right.  It is.  I'm sorry.
21  So basically this does not mention -- this does
22  not differentiate, say for instance, a
23  traditional stock with the groove cut in it for
24  the barrel to be seated in or embedded in.
                                                123
```

```
 1      Q.  Right.  In Highland Park under the
 2  language of its ordinance, that type of shroud
 3  or forend that doesn't completely encircle the
 4  barrel but partially encircles the barrel is a
 5  band feature; correct?
 6      A.  I mean, that's the way that it reads,
 7  but it would have to be -- it would have to be
 8  attached to the barrel, and that doesn't
 9  disqualify a standard -- I mean, that wouldn't
10  necessarily disqualify a standard rifle stock if
11  it's not -- if there's no barrel attachment
12  point if it attaches to the receiver or --
13      Q.  Well, it says attached to the barrel or
14  partially or completely encircles.  So it
15  needn't be attached to the barrel in Highland
16  Park, correct?
17      A.  Apparently by the verbiage under that
18  section, yeah.
19      Q.  Well, a barrel shroud under either
20  definition serves numerous purposes.  Would you
21  agree with that?
22      A.  Numerous purposes but primarily
23  protecting the operator from a hot barrel.
24      Q.  So in a sense, a handguard?
                                                124
```

Page 125:

1  A. (Nonverbal response).
2  Q. And wouldn't a forend on a
3  traditionally styled rifle serve that same
4  purpose, correct?
5  A. Well, yeah, a grip point, if you will,
6  or a hand hold or --
7  Q. In your report, Exhibit 8, you make
8  reference to the fact that in a modern
9  gas-operated semiautomatic military rifle, it
10  serves to protect the gas tube/piston
11  mechanism --
12  MR. WILSON: Sorry, Jim. If I could, I think
13  he's looking at his declaration. Are you
14  reading from the report?
15  MR. VOGTS: I'm sorry. I meant to say the
16  declaration. If I said report, I'm sorry, yeah.
17  MR. WILSON: Okay.
18  BY MR. VOGTS:
19  Q. In your declaration on page 17, you
20  state that in a modern gas-operated
21  semiautomatic military rifle, it serves to
22  protect the gas tube/piston mechanism from
23  inadvertent damage. I read that correctly,
24  correct?

Page 126:

1  A. Sure. I mean for like an AR, for, say,
2  an AR platform.
3  Q. Military or otherwise, the same gas
4  tube mechanism is present; correct?
5  A. Yes.
6  Q. And it serves to protect that
7  mechanism?
8  A. That's one of its design intents.
9  Q. It also provides additional grip space
10  for the operator to steady and control the rifle
11  during rapid repeat firing without getting
12  burned by the hot barrel, correct?
13  A. Correct.
14  Q. You also mention that -- strike that.
15  Does it also serve as a place to mount
16  rail attachment systems for scopes and optical
17  sites?
18  A. Yes.
19  Q. Does the presence of a barrel shroud on
20  a firearm under either ordinances's definition
21  make that firearm more dangerous?
22  A. Well, I will qualify my answer by
23  saying the same thing I did before. In and of
24  itself as a stand-alone object, if that were the

Page 127:

1  only banned feature, I would see how it would
2  not make that more dangerous or have it even
3  banned in the first place, but again, I believe
4  the intent of the ordinance is the combination
5  of these features, but I don't believe that a
6  handguard in and of itself makes a firearm more
7  dangerous. It allows more control by the
8  operator.
9  Q. Okay. However, both ordinances ban
10  civilian possession of semiautomatic rifles
11  capable of accepting detachable magazines that
12  have the presence of just one of these features;
13  isn't that right?
14  A. Yes, one or more of the following. I
15  just wanted to make sure I wasn't --
16  Q. So such a rifle with just a barrel
17  shroud is banned under the ordinance?
18  A. Yes, theoretically.
19  Q. Okay. Muzzle brakes and muzzle
20  compensators. What is a muzzle brake?
21  A. A muzzle brake is a device at the end
22  of a barrel that directs escaping gases from
23  firing to either reduce recoil or prevent a --
24  or to help control the muzzle of the firearm.

Page 128:

1  Q. How does a muzzle brake differ from a
2  muzzle compensator?
3  A. Well, here's the fun part, is that a
4  lot of people use those terms interchangeably.
5  A muzzle brake may just direct gases in one
6  direction to control. Like, say for instance,
7  on some of the AK models, it was initially
8  placed on the firearm in order to control the
9  rifle's tendency to climb in one direction.
10  Q. During fully automatic fire?
11  A. Well, fully automatic fire or
12  semiautomatic fire.
13  Q. Is it a more valuable feature to have
14  on a rifle of this type, whether it be an AR
15  type or an AK type rifle, when that rifle is
16  used in fully automatic fire as opposed to
17  semiautomatic fire?
18  MR. PULLOS: Object to form.
19  THE WITNESS: I don't know that it -- from
20  personal experience, and that's what I'll speak
21  from, I have never felt that there was a major
22  difference in my ability to control, say, an AK
23  with a muzzle brake on it in fully automatic
24  fire versus an AK in fully automatic fire

32 (Pages 125 to 128)

| | | | |
|---|---|---|---|
| 1 | without one. | 1 | Q. Do you know whether or not it's an |
| 2 | BY MR. VOGTS: | 2 | allowable hunting caliber in your home state of |
| 3 | Q. Does your Colt rifle have a muzzle | 3 | Pennsylvania? |
| 4 | brake or a muzzle compensator on it? | 4 | A. I don't know. |
| 5 | A. It has a flash hider on it. | 5 | Q. Do you know in what states it is or is |
| 6 | Q. Which is a standard mechanism, correct? | 6 | not an allowable hunting caliber? |
| 7 | A. Correct. | 7 | A. I know in Illinois it is not. |
| 8 | Q. Does the presence of a muzzle brake or | 8 | Q. How did you come to learn that it is |
| 9 | muzzle compensator on a semiautomatic rifle make | 9 | not an allowable hunting caliber in Illinois? |
| 10 | that rifle more dangerous? | 10 | A. I believe it was on the Illinois State |
| 11 | A. Again -- and you'll get the same | 11 | Police website. |
| 12 | answer -- in and of itself, I don't believe that | 12 | (Whereupon, Yurgealitis |
| 13 | it makes it more or less dangerous. | 13 | Deposition Exhibit No. 17 was |
| 14 | Q. Do you agree that there are a number of | 14 | marked for identification.) |
| 15 | semiautomatic rifles capable of accepting | 15 | BY MR. VOGTS: |
| 16 | detachable magazines that are designed and sold | 16 | Q. I'm going to show you what I believe is |
| 17 | for hunting? | 17 | going to be marked as Exhibit 17 and ask you to |
| 18 | A. Yes. | 18 | turn to page 28, under box coyote hunting in |
| 19 | Q. You yourself have never hunted with | 19 | Illinois? |
| 20 | such a firearm, have you? | 20 | A. Yes, I see that. |
| 21 | A. No, I've never been a hunter. | 21 | Q. Within the Illinois Digest of Hunting |
| 22 | Q. Do you know people who hunt with those | 22 | and Trapping Regulations produced by the |
| 23 | types of firearms? | 23 | Illinois Department of Natural Resources, read |
| 24 | A. Give me a specific example and I'll | 24 | the third bullet point to yourself if you would. |
| | 129 | | 131 |
| 1 | tell you if I know anybody who hunts with one. | 1 | A. So this is specific to coyote hunting? |
| 2 | Q. With an AR type rifle. | 2 | Q. Right. Isn't it true based on what you |
| 3 | A. I know of people but I mean, close | 3 | read there that in Illinois, it's lawful to hunt |
| 4 | friends or people that are -- no. | 4 | coyote with any type of legal rifle including |
| 5 | Q. But you know of people who have? | 5 | large capacity semiautomatic rifles and shotguns |
| 6 | A. Certainly. | 6 | using any type of shell except for slugs? |
| 7 | Q. Do you agree that those types of rifles | 7 | A. Yes. |
| 8 | are suitably used for hunting? | 8 | Q. And although, as you write in your |
| 9 | MR. PULLOS: Object to the form. | 9 | report, these kinds of rifles were not |
| 10 | THE WITNESS: I couldn't speak because I | 10 | originally designed for hunting purposes, you |
| 11 | can't give you my personal opinion because I'm | 11 | are certainly aware they are frequently used |
| 12 | not a hunter. | 12 | today for hunting purposes; is that right? |
| 13 | BY MR. VOGTS: | 13 | MR. WILSON: Objection to frequently used. |
| 14 | Q. Okay. Turn to page 37 of exhibit -- | 14 | THE WITNESS: Well, I would say that I now |
| 15 | paragraph 37 of Exhibit 8. In paragraph 37 you | 15 | know they are legal for coyote hunting in |
| 16 | wrote it is worth noting that in Illinois, | 16 | Illinois. |
| 17 | amongst other states, .223/5.56 is too small a | 17 | BY MR. VOGTS: |
| 18 | caliber to be legal for hunting; is that | 18 | Q. And you know they're legal for hunting |
| 19 | correct? | 19 | elsewhere but you don't know specifically where |
| 20 | A. I know that it is in Illinois. I | 20 | by what state, correct? |
| 21 | cannot recall the other states that it is -- I | 21 | A. Correct. |
| 22 | mean, off the top of my head, I can't recall the | 22 | Q. Paragraph 38 of your declaration where |
| 23 | other states that it is not allowed -- an | 23 | you begin discussing in greater detail home |
| 24 | allowable hunting caliber. | 24 | defense and personal protection, do you |
| | 130 | | 132 |

## Page 153

1  primarily?
2  A. Sure, the powder charge and the barrel
3  length, et cetera.
4  Q. Do you believe that in selecting a
5  firearm and the ammunition for use in that
6  firearm for home defense purposes should in part
7  be dependent upon the amount of recoil that that
8  firearm and ammunition presents and the amount
9  of noise that that firearm and ammunition
10  presents to the homeowner?
11  A. I wouldn't say that the noise should
12  necessarily be a consideration. I think the
13  overall -- look at it more -- I have to look at
14  it more on a -- like the sum of its parts again.
15  The comfort level of the operator and their
16  level of training and their ability to
17  accurately place a shot is a combination of a
18  lot of -- a lot of criteria.
19  If it's a deadly force situation, your
20  hearing will come back. Noise, if it upsets you
21  or you're shocked by it, then perhaps you need
22  to look at a different type of firearm if it's
23  that much of a criteria, but it all comes down
24  to familiarity, ease of operation in a high

## Page 154

1  stress situation, for me at least, and the
2  ability to, you know, put that little piece of
3  metal that comes out of the end of the barrel in
4  the right spot on a bad person when they're
5  coming after you when you pull the curved piece
6  of metal underneath the receiver, and if you can
7  do that reliably and accurately and easily in a
8  high stress situation, that combination to me is
9  the perfect home defense weapon.
10  Q. If a person came to you and said I own
11  two guns, one is a Mossberg 12 gauge Model 500
12  shotgun for which I have double ought buckshot,
13  the other is a Smith & Wesson M&P15 AR type
14  rifle chambered in .223 ammunition, and he has a
15  ten-round magazine for that again, and he told
16  you that he was comfortable with both guns and
17  was familiar with both guns' operational
18  characteristics, and he wanted your
19  recommendation on which of those two guns you
20  felt was better suited for his use as a home
21  defense firearm in which a home in which he
22  lives with his wife and his two children. What
23  firearm would you recommend to him?
24  A. I would still recommend a Mossberg 500,

## Page 155

1  but that doesn't mean everybody takes my opinion
2  for gospel, but as I stated that in the report,
3  I would not -- I have an AR type rifle. That
4  wouldn't be the first thing I grabbed.
5  Q. Why not?
6  A. Because I don't particularly think
7  that -- I would feel too encumbered by utilizing
8  a shoulder weapon in a home defense situation.
9  The maneuverability and ease of operation is
10  more important to me. I'm not -- I mean, if I
11  take my Browning Hi-Power or if I take the Colt
12  Delta Elite that I have and have to manipulate
13  safety, I don't have a problem with that
14  personally because I'm comfortable with that.
15  My daughter doesn't have a problem with it
16  because she knows how to shoot it and doesn't
17  have an issue with shooting it either.
18  It's just I had a Remington 870. I
19  believe we went through that earlier. I have an
20  AR type rifle, and if somebody was breaking into
21  my residence, I just value the maneuverability.
22  I feel too -- I just can't move as easily.
23  Q. Yet you have recommended pump-action
24  shotguns to persons, correct?

## Page 156

1  A. If they had a preference for a shoulder
2  weapon, not as choice number one.
3  Q. Well, in the hypothetical I gave you,
4  this person owned two guns only and they were
5  both shoulder weapons, and in the hypothetical I
6  gave you, you would recommend the Mossberg
7  Model 500?
8  A. Yes, for the reasons I enumerated in
9  the report.
10  Q. Both guns are less maneuverable than
11  your Browning or your Colt Delta Elite, correct?
12  A. Certainly.
13  Q. What specific advantage does the
14  Mossberg Model 500 have over the Smith & Wesson
15  M&P15?
16  A. I would suggest that a shotgun is a
17  more effective home defense weapon than the
18  rifle would be because of really the incredible
19  stopping power of double ought buck.
20  Q. Anything else?
21  A. That's probably job number one.
22  Secondly, if it was set up in the quote/unquote
23  box condition that I mentioned in the report
24  where the safety was off, there was no round in

39 (Pages 153 to 156)

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052