# Exhibit 13



Congressional
Research
Service

# Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy

**Jerome P. Bjelopera, Coordinator**
Specialist in Organized Crime and Terrorism

**Erin Bagalman**
Analyst in Health Policy

**Sarah W. Caldwell**
Information Research Specialist

**Kristin M. Finklea**
Specialist in Domestic Security

**Gail McCallion**
Specialist in Social Policy

March 18, 2013

Congressional Research Service
7-5700
www.crs.gov
R43004

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Summary

This report focuses on mass shootings and selected implications they have for federal policy in the areas of public health and safety. While such crimes most directly impact particular citizens in very specific communities, addressing these violent episodes involves officials at all levels of government and professionals from numerous disciplines.

*This report does not discuss gun control and does not systematically address the broader issue of gun violence. Also, it is not intended as an exhaustive review of federal programs addressing the issue of mass shootings.*

**Defining Public Mass Shooting**

Policy makers may confront numerous questions about shootings such as the December 2012 incident at Sandy Hook Elementary School in Newtown, CT, that claimed 27 lives (not including the shooter). Foremost, what are the parameters of this threat? How should it be defined?

There is no broadly agreed-to, specific conceptualization of this issue, so this report uses its own definition for *public mass shootings*. These are incidents occurring in relatively public places, involving four or more deaths—not including the shooter(s)—and gunmen who select victims somewhat indiscriminately. The violence in these cases is not a means to an end—the gunmen do not pursue criminal profit or kill in the name of terrorist ideologies, for example.

***One Measure of the Death Toll Exacted by Public Mass Shootings.*** Applying this understanding of the issue, the Congressional Research Service (CRS) has identified 78 public mass shootings that have occurred in the United States since 1983. This suggests the scale of this threat and is intended as a thorough review of the phenomenon but should not be characterized as exhaustive or definitive. According to CRS estimates, over the last three decades public mass shootings have claimed 547 lives and led to an additional 476 injured victims. Significantly, while tragic and shocking, public mass shootings account for few of the murders or non-negligent homicides related to firearms that occur annually in the United States.

**Policymaking Challenges in Public Health and Safety**

Aside from trying to develop a sense of this phenomenon's scope, policy makers may face other challenges when addressing this topic. To help describe some of the health and safety issues public mass shootings pose, this report discusses selected policy in three areas: *law enforcement*, *public health*, and *education*. While mass shootings may occur in a number of settings, the education realm is one that has received particular attention from policy makers, officials, and the public alike—at least since the 1999 shooting at Columbine High School in Littleton, CO. The tragedy at Sandy Hook Elementary has renewed such concerns for many.

In the areas of law enforcement, public health, and education, this report discusses some key efforts to *prevent* mass shootings as well as efforts geared toward *preparedness* and *response*. Policy measures that deal with *recovery* are also discussed within the context of education and public health initiatives.

***Policy Effectiveness and Outlay of Resources.*** Many of the policymaking challenges regarding public mass shootings boil down to two interrelated matters: (1) a need to determine the effectiveness of existing programs and (2) figuring out where to disburse limited resources.

Finally, baseline metrics related to this problem are often unclear or unavailable. This lack of clarity starts with identifying the number of shootings themselves, since no broadly agreed-to definition exists. Several questions flow from this issue. How many people have such incidents victimized? How much does prevention of, preparedness for, and response to such incidents cost the federal government? What measurements can be used to determine the effectiveness of such programs?

# Contents

Roadmap for the Report ........................................................................................................... 3

Defining and Identifying Public Mass Shootings ................................................................... 3
    Arriving at a Definition ..................................................................................................... 4
    Identifying Incidents ......................................................................................................... 6

Describing Public Mass Shootings ......................................................................................... 7
    Placing Them within a Broader Context ........................................................................... 7
        A Subset of Multiple Murder ....................................................................................... 8

Law Enforcement Implications ............................................................................................. 12
    Prevention ...................................................................................................................... 14
        Community Policing .................................................................................................. 14
        Intelligence-Led Policing .......................................................................................... 15
        Offender Profiling for Public Mass Shootings: Not a Preventive Tool ............................ 16
    Preparedness and Prevention Combined—Threat Assessments ............................................ 17
    Response ........................................................................................................................ 18
        Federal Response to a Local Crime ............................................................................ 18
        Definitional Implications for Criminal Justice Process .................................................... 19

Public Health Implications ................................................................................................... 20
    Prevention ...................................................................................................................... 21
        Surveillance May Not Be Necessary to Identify Public Mass Shootings ......................... 22
        Difficulty in Identifying Risk and Protective Factors ...................................................... 22
        The Effectiveness of Preventive Interventions Is Unclear ............................................... 23
    Preparedness ................................................................................................................... 24
    Response ........................................................................................................................ 26
    Recovery ........................................................................................................................ 27

Education Implications ........................................................................................................ 27
    Prevention ...................................................................................................................... 29
        School Climate ......................................................................................................... 30
        School Resource Officers ........................................................................................... 31
    Preparedness and Emergency Planning ............................................................................. 32
    Response ........................................................................................................................ 34
    Recovery ........................................................................................................................ 34

Concluding Comments ......................................................................................................... 35

## Figures

Figure 1. Public Mass Shootings in the United States 1983-2012 ................................................... 8

Figure 2. Placing Public Mass Shootings into Context ................................................................... 9

Figure 3. Age of Perpetrators in Public Mass Shootings 1983-2012 ............................................. 12

## Contacts

Author Contact Information ................................................................................................... 37

Shooting incidents such as the one at Sandy Hook Elementary School in December 2012 and the one at an Aurora, CO, movie theater in July 2012 have focused attention on federal policy issues in the law enforcement, public health, and education arenas, among others. The Congressional Research Service (CRS) has identified 78 public mass shootings that have occurred in the United States since 1983. These shootings have claimed almost 550 lives according to CRS estimates.[2]

How does the death toll tied to public mass shootings compare with figures related to the preeminent threat that federal law enforcement has confronted in the last decade? CRS estimates that since the terrible events of September 11, 2001 (9/11), Al-Qaeda-inspired homegrown terrorists have killed 14 people in two incidents in the United States.[3] Since 9/11, according to CRS estimates, 281 people have died in 38 public mass shootings.[4] Arguably, the comparatively low death toll associated with Al Qaeda-inspired incidents at least partly results from a large-scale federal focus on homeland security and counterterrorism efforts.

### Violence

On January 16, 2012, President Obama announced a slate of proposals aimed at reducing gun violence—not just public mass shootings, the topic of this report—in the United States.[1] The proposals focus on four areas:

- Closing background check loopholes,

- Banning military-style assault weapons and high-capacity magazines,

- Making schools safer, and

- Increasing access to mental health services.

Some of the President's proposals, such as encouraging better information sharing among and between states and federal agencies and providing incentives for police departments to use existing grants to hire school resource officers, can be addressed through executive actions. Other proposals, such as reinstating the assault weapons ban and providing funding for a range of mental health programs and services, require action by Congress. The President's proposals touch on a number of issues that public mass shootings raise for federal safety and public health policy.

It is important to caution the reader that, while tragic and shocking, public mass shootings account for few of the murders[5] related to firearms that occur annually in the United States. According to the Federal Bureau of Investigation (FBI, the Bureau), in 2011, firearms were used to murder 8,583 people.[6] To provide further context, over the last two decades, the nation has

---

[1] The White House, *Now Is the Time: The President's Plan to Protect Our Children and Our Communities by Reducing Gun Violence*, January 16, 2013, http://www.whitehouse.gov/sites/default/files/docs/wh_now_is_the_time_full.pdf. Hereafter: *The President's Plan*.

[2] For more information on this report's approach regarding the concept of "public mass shooting," please see the section titled "Defining and Identifying Public Mass Shootings."

[3] Incidentally, these deaths stemmed from two shooting incidents in which the gunmen were likely motivated by ideology tied to Al Qaeda. For more information, please see CRS Report R41416, *American Jihadist Terrorism: Combating a Complex Threat*, by Jerome P. Bjelopera.

[4] This count does not include shooters killed in these incidents.

[5] For this report, murder implies the willful killing of one human being by another.

[6] Federal Bureau of Investigation, *Uniform Crime Reports, Crime in the United States, 2011*, Table 8, "Expanded Homicide Data," http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/expanded-homicide-data-table-8. The Federal Bureau of Investigation (FBI, the Bureau) counts what it describes as "murder and nonnegligent manslaughter" for these statistics. Preliminary figures for 2012 suggest "an increase of 1.9 percent in the number of violent crimes ... for the first 6 months of 2012 when compared with figures reported for the same time in 2011." See Federal Bureau of Investigation, *Uniform Crime Reports, Crime in the United States, 2012, January-June Preliminary Semiannual Uniform Crime Report*, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/preliminary-semiannual-uniform-crime-report-january-june-2012. It is unknown, however, whether this preliminary reported increase in violent crimes was coupled with an increase in firearm-related homicides.

---

experienced a general *decline* in violent crime. In 1992, 1.9 million violent crimes were reported, while 2011 saw 1.2 million.[7] In the same period, the national murder rate dropped from 9.3 to 4.7 per 100,000 inhabitants.[8]

# Roadmap for the Report

As a starting point, this report delves into public mass shootings over the last three decades, exploring the nature of this threat. *Of note, this report does not focus on gun violence, writ large, nor does it discuss gun control.*[9]

In its broader discussion of related federal public health and safety issues, the report covers selected policy implications in three areas: *law enforcement*, *public health*, and *education*. While mass shootings may occur in a number of public settings, the education realm is one which has generated concern from policy makers, officials, and the public alike—at least since the 1999 shooting at Columbine High School in Littleton, CO. The tragedy at Sandy Hook Elementary has renewed such concerns for many.

In this report, discussion of each of these is further broken down into efforts geared toward

- *prevention*—actions intended to reduce the likelihood of shootings.[10]
- *preparedness*—planning how to cope with potential shootings.
- *response*—structured efforts employed to react to an actual shooting.

Policy measures that deal with recovery are also discussed within the context of education and public health initiatives. Recovery entails helping institutions, communities, and individuals cope with the aftermath of a shooting.[11] This report is not intended as an exhaustive review of specific federal programs in these areas.

# Defining and Identifying Public Mass Shootings

This report attempts to refine the relatively broad concept of *mass shooting* (which could potentially involve a wide variety of actors targeting victims for any number of reasons) into a narrower formulation: *public mass shootings*. This has been done to focus discussion around a number of violent incidents that lie outside of specific crime issues such as terrorism, drug

---

[7] Federal Bureau of Investigation, *Uniform Crime Reports, Crime in the United States, 2011*, Table 1, "Crime in the United States by Volume and Rate per 100,000 Inhabitants, 1992–2011," http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/table-1.

[8] According to the FBI these figures include "murder and nonnegligent manslaughter." See ibid.

[9] For more information on this see CRS Report RL32842, *Gun Control Legislation*, by William J. Krouse.

[10] Some policies and programs discussed in this report may also help *mitigate* the impact of actual shootings. For example, while the presence of school resource officers may help prevent a school shooting, such an officer could feasibly mitigate the impact of a shooting by intervening after a gunman began his assault.

[11] To some degree these concepts—prevention, preparedness, response, and recovery—correspond with ideas that guide federal emergency management. In this report, these concepts are used only to help describe issues involved in devising policy related to public mass shootings. For more on federal emergency management, see CRS Report R42845, *Federal Emergency Management: A Brief Introduction*, coordinated by Bruce R. Lindsay.

---

trafficking, gang activity, and domestic violence that have federal policies, law enforcement structures, and laws tailored in many instances to specifically address them.

## Arriving at a Definition

In order to delineate a workable understanding of *public mass shooting* for this report, CRS examined scholarly journal articles, monographs, and government reports.[12] These sources discussed a variety of terms such as mass murder, mass shooting, mass killings, massacres, and multiple homicide. Definitions of these terms varied with regard to establishing the number of victims or fatalities involved, the weapons used, the motives of the perpetrator, and the timeframes within which the casualties or injuries occurred.

This report defines public mass shootings as *incidents occurring in relatively public places, involving four or more deaths—not including the shooter(s)—and gunmen who select victims somewhat indiscriminately. The violence in these cases is not a means to an end such as robbery or terrorism.*[13]

**Relatively public places.** For this report, public mass shootings happen in *relatively* public circumstances. Such settings can include schools, workplaces, restaurants, parking lots, public transit, even private parties that include at least some guests who are not family members of the shooter.[14]

**Tallying Fatalities.** Any definition of mass shootings requires a somewhat arbitrary threshold demarcating the number of victims killed per incident. This report's threshold is based on a definition of mass murder offered by the FBI.[15]An important caveat deserves mentioning. A compilation of incidents based on any such arbitrary threshold may fail to adequately describe the

---

[12] James Alan Fox and Jack Levin, *Extreme Killing: Understanding Serial and Mass Murder,* 2nd ed. (Los Angeles: Sage, 2012), p. 19. Hereafter: Fox and Levin, *Extreme Killing.* James L. Knoll, IV, "The 'Pseudocommando' Mass Murderer: Part I, The Psychology of Revenge and Obliteration," *Journal of the American Academy of Psychiatry and the Law,* vol. 38, no. 1 (2010) pp. 87-89; Federal Bureau of Investigation, *Serial Murder: Multi-Disciplinary Perspectives for Investigators,* 2008, p. 8; John E. Douglas, Ann W. Burgess, and Robert K. Ressler, *Crime Classification Manual: A Standard System for Investigating and Classifying Violent Crimes,* 2nd ed. (San Francisco: Jossey-Bass, 2006) p. 96; Grant Duwe, "A Circle of Distortion: The Social Construction of Mass Murder in the United States," *Western Criminology Review,* vol. 6, no. 1 (2005) p. 59. Paul E. Mullen, "The Autogenic (Self-Generated) Massacre," *Behavioral Sciences and the Law,* vol. 22, no. 3 (2004) pp. 311-314. Hereafter: Mullen, "The Autogenic." Grant Duwe, Tomislav Kovandzic, and Carlisle E. Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies,* vol. 6, no. 4 (2002) p. 273; Michael D. Kelleher, *Flash Point: The American Mass Murderer,* (Westport, CT: Praeger, 1997) p. 2. Hereafter: Kelleher, *Flash Point.*

[13] This report only includes incidents that occurred in the 50 states, Puerto Rico, and the District of Columbia.

[14] For a general discussion of violence in the workplace, see Federal Bureau of Investigation, *Workplace Violence: Issues in Response,* (2004). Hereafter: Federal Bureau of Investigation, *Workplace Violence.*

[15] The FBI has defined mass murder as "[a] number of murders (four or more) occurring during the same incident, with no distinctive time period between the murders. These events typically involved a single location, where the killer murdered a number of victims in an ongoing incident." This report allows for instances of mass murder to involve more than one specific location. For the FBI definition, see Federal Bureau of Investigation, *Serial Murder,* p. 8. For a different definition, see Fox and Levin, *Extreme Killing,* p. 19. While this report focuses a great deal on the timing involved in serial and mass murder to differentiate the two categories, Fox and Levin emphasize motivation. The 112th Congress passed legislation (P.L. 112-265) that formally authorizes the Attorney General to provide investigative assistance to states in instances of violent crimes in public venues, including attempted and actual mass killings. For the purposes of P.L. 112-265, the term "mass killings" means three or more killings in a single incident and relies on the definition of "place of public use" from 18 U.S.C. 2332f(e)(6).

---

universe of incidents to which educators, public health professionals, and law enforcement have to react and for which they have to prepare.[16] One author has stated that gunmen "injure far more victims than they kill; however, they must certainly be considered mass murderers by obvious intentions of their actions."[17] In the critical early moments of a shooting, police, teachers, and rescue personnel do not necessarily know how many people are injured versus dead. Personnel and resources are initially mobilized in response to a shooting, regardless of the number of fatalities.

**Indiscriminate Selection of Victims.** For this report's definition, a killer's relationship to his or her victims is important. Driven by a desire for revenge and/or power, some killers may target family members or intimate friends.[18] In the incidents described as public mass shootings for this report, the gunmen cannot solely kill such individuals. This particularly rules out cases of domestic violence—instances only involving family members either inside or outside the home—from consideration as public mass shootings. Thus, for this report, the gunmen in public mass shootings somewhat indiscriminately select their victims. For example, a student assailant involved in a public mass shooting plans on killing particular teachers, while simultaneously staging a wider assault on his school.

**Violence Not a Means to an End.** For this report, a public mass shooter's agenda certainly may stem from his specific personal experiences and psychological conditions. However, as implied in the above definition, the shooters who perpetrated the incidents counted in this report did not have broad socio-political objectives, such as using violence to advocate the fall of a regime.[19] Thus, gunmen acting in the name of a terrorist organization or a clearly framed philosophy of hate typically were not considered public mass shooters. Also, shootings largely motivated by criminal profit were not counted. Based on the purpose undergirding the assailant's violence, the following examples do not fit the definition of public mass shooting used for this report.

- In December 2012, Dwayne Moore was convicted of *home invasion, armed robbery,* and four counts of first-degree murder in Massachusetts. He reportedly gunned down four victims, including a child, in a September 2010 drug-related incident in Boston, MA.[20]

- A mass murder that has been widely reported as a *hate-motivated* incident occurred on the morning of August 5, 2012, when Wade Michael Page shot to death six people at the Sikh Temple of Wisconsin in Oak Creek—near Milwaukee, WI.[21] According to the FBI, police responding to the scene returned fire, wounding Page. He then took his own life by shooting himself.[22]

---

[16] One expert has written: "A common definition of mass murder requires the intentional death of at least four individuals in a single incident. Another interpretation of the term reduces the number of slain victims to three for the crime to be considered mass murder. Both of these definitions are obviously arbitrary and focus exclusively on the number of victims killed." Kelleher, *Flash Point,* p. 2.

[17] Ibid.

[18] See Fox and Levin, *Extreme Killing,* pp. 23-25 for a discussion.

[19] For more on terrorism-related incidents in the United States see CRS Report R41416, *American Jihadist Terrorism: Combating a Complex Threat,* by Jerome P. Bjelopera and CRS Report R42536, *The Domestic Terrorist Threat: Background and Issues for Congress,* by Jerome P. Bjelopera.

[20] Brian Ballou et al., "Dwayne Moore Convicted of Four Counts of First-Degree Murder in Mattapan Slaying Trial," *Boston Globe,* December 17, 2012, http://www.boston.com/metrodesk/2012/12/17/dwayne-moore-found-guilty-mattapan-massacre/ETijeAnjXDGR98symtVy1K/story.html.

[21] John Diedrich et al., "FBI: Seeking Second 'Person of Interest' in Oak Creek Sikh Temple Shooting," *Milwaukee* (continued...)

---

- U.S. Army Major Nidal Hasan was charged in a shooting at Fort Hood, TX, on November 5, 2009. The mass murder, which has been described as a *terrorist incident*, killed 13 and injured more than 40 others.[23]

## Identifying Incidents

To identify incidents of public mass shootings, CRS reviewed descriptions of mass shooting events found in scholarly journal articles, monographs, lists created by government entities and advocacy organizations, and news accounts.[24] It is important to note that while every effort was made to be thorough in reviewing the sources used, the incidents identified by CRS should not be considered as constituting an exhaustive list of public mass shootings.[25]

Readers are also cautioned against tying this report's definition of public mass shootings directly to specific federal policy responses. In other words, the policy responses discussed below are not restricted to preventing or reacting to public mass shootings as defined in this report. For instance, many of the policy measures discussed herein respond to shooting events or threats that

---

(...continued)

*Journal Sentinel,* August 6, 2012, http://www.jsonline.com/news/crime/shooter-wade-page-was-army-vet-white-supremacist-856cn28-165123946.html. Dinesh Ramde and Todd Richmond, "Motive Sought for Mass Shooting at Wis. Sikh Temple," *Associated Press,* August 6, 2012, http://news.yahoo.com/motive-sought-6-slain-wis-sikh-temple-083039570.html. A Sikh temple is also called a gurdwara.

[22] William Branigin and Michael Laris, "Wade Michael Page Committed Suicide, FBI Says," *Washington Post,* August 8, 2012, http://www.washingtonpost.com/politics/wade-michael-pages-ex-girlfriend-arrested/2012/08/08/00c99f72-e10a-11e1-a19c-fcfa365396c8_story.html.

[23] See U.S. Congress, Senate Committee on Homeland Security and Governmental Affairs, *A Ticking Time Bomb: Counterterrorism Lessons from the U.S. Government's Failure to Prevent the Fort Hood Attack,* 112th Cong., 1st sess., February 2011, p. 53, http://hsgac.senate.gov/public/_files/Fort_Hood/FortHoodReport.pdf. "Fort Hood Shooting Suspect to Remain Confined," *Associated Press State and Local Wire,* in *msnbc.com,* November 21, 2009, http://www.msnbc.msn.com/id/34084622; "Fort Hood Shooting Suspect Out of Intensive Care," *CNN.com,* December16, 2009, http://www.cnn.com/2009/CRIME/12/16/texas.fort.hood.hasan/index.html?iref=allsearch.

[24] Connecticut Office of Legislative Research, "Weapons Used in Mass Shootings," January 18, 2013, http://www.cga.ct.gov/2013/rpt/2013-R-0057.htm; Counterterrorism Bureau of the New York City Police Department, "Active Shooter: Recommendations and Analysis for Risk Mitigation," 2012 edition, http://www.nyc.gov/html/nypd/downloads/pdf/counterterrorism/ActiveShooter2012Edition.pdf; James Alan Fox and Jack Levin, "Table 19.1: Deadliest Mass Murders in the United States Since 1900," in *Extreme Killing,* p. 230; Citizens Crime Commission of New York City, "Mass Shooting Incidents in America (1984-2012)," http://www.nycrimecommission.org/initiative1-shootings.php; Brady Campaign to Prevent Gun Violence, "Mass Shootings in the United States Since 2005," December, 14, 2012, http://www.bradycampaign.org/xshare/pdf/major-shootings.pdf; Mark Follman, Gavin Aronsen, and Deanna Pan, "US Mass Shootings, 1982-2012: Data from Mother Jones' Investigation," *Mother Jones,* December 28, 2012, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data. Mayors Against Illegal Guns, "Mass Shootings Since January 20, 2009," http://libcloud.s3.amazonaws.com/9/f8/9/1098/1/mass_shootings_2009-13_-_jan_29_12pm.pdf; Michael Kelleher, "Chapter 11: A Survey of Mass Murderers" in *Flash Point,* pp. 173-181. Searches of U.S. newspapers and wire services using LexisNexis were conducted in many instances in order to confirm information or gather more details about incidents listed in the sources consulted.

[25] While other sources and methods (relying on the FBI's Supplementary Homicide Reports, for example) can be applied in defining this issue and counting the number of incidents, the approach used for this report was selected based on a careful evaluation of this report's objectives and CRS resources. Our definition encompasses a count of fatalities along with information about motivation for a shooting and where it occurs spatially. While it would be possible to use FBI data to generate counts of incidents involving the requisite number of fatalities for inclusion in an estimate of mass shootings, the additional research needed to assess the motivational and spatial criteria that must be met for inclusion would require a very large undertaking. We expect our estimates provide a good approximation of the frequency and scale of mass shootings, but note that more comprehensive approaches could be taken to improve the precision of the estimates.

---

could include fewer than four deaths or shooters with specific ideologies and targets. The shooting definition offered in this report is meant to help illustrate the nature and breadth of a threat that lacks an agreed-upon conceptualization among experts, capturing some of the most extreme shooting cases over the last three decades.

# Describing Public Mass Shootings

For many years, mass shootings have been of interest and concern to a variety of experts—including psychologists, sociologists, criminologists, public health experts, policy makers, and students of popular culture—who have written much on the topic. Journalists have tracked such killings for a long time as well. For example, a case involving gunman Howard B. Unruh in September 1949 received national attention.[26] There were over 50 news articles in more than a dozen major newspapers in the United States in the month after the shooting occurred.

- In what was reported at the time as the biggest mass murder in U.S. history, Unruh killed 13 people in a 20-minute-long incident in Camden, NJ. He shot people he knew as well as strangers. His victims included three children.[27]

All of this interest in such shootings has produced a wide variety of terms and concepts that address an assortment of issues. Categorizing types of murder—and mass shootings, more narrowly—can be tricky. In many cases, individual incidents involving assailants who kill one, two, or three people are described as single, double, or triple murder. However, when the number of victims rises or the case involves complicating circumstances such as the killer assailing individuals in different locations or a string of murders committed over a period of days, months, or years, efforts to define and understand murder can grow much more difficult.

## Placing Them within a Broader Context

Most scholarly and expert sources suggest that mass shootings are rare violent crimes. One study has described them as "very low-frequency and high intensity event[s]."[28] The 78 public mass shootings between 1983 and 2012 that CRS has identified claimed 547 lives (see **Figure 1**).[29]

---

[26] Richard Goldstein, "Howard Unruh, 88, Dies; Killed 13 of His Neighbors in Camden 1949," *New York Times,* October 29, 2009. Unruh, who reportedly suffered from paranoid schizophrenia, never stood trial for the murders. He died after being confined for six decades in the Trenton Psychiatric Hospital. In 1950, reporter Meyer Berger received a Pulitzer Prize for his coverage of Unruh's mass shooting.

[27] Ibid. See also "N.J. Vet Killed 13 in 1949 in Biggest U.S. Mass Murder," *Boston Globe,* April 16, 1953. Meyer Berger, "Veteran Kills 12 in mad Rampage on Camden Street," *New York Times,* September 8, 1949.

[28] J. Reid Meloy, et. al., "A Comparative Analysis of North American Adolescent and Adult Mass Murderers," *Behavioral Sciences and the Law,* vol. 22, no. 3 (2004) p. 307.

[29] Not including shooters who died in the course of a shooting.

---

### Figure 1. Public Mass Shootings in the United States 1983-2012
Deaths and Total Casualties



**Source:** CRS, based on analysis of mass shooting incidents identified by CRS.

**Notes:** * "Deaths" do not include shooters. "Total Casualties" include deaths and victims who suffered non-lethal injuries from gunshots.

## A Subset of Multiple Murder

Public mass shootings, as defined by this report, can be viewed as part of the larger issue of "multiple murder." A lexicon has emerged since the 1980s to describe instances of multiple murder.[30] Qualitatively broader than cases of single, double, or triple murder, instances of multiple murder can be divided into a number of categories including serial or mass killings.[31] **Figure 2** lays out how this report frames the issue of public mass shootings. Starting at the top of **Figure 2**, *serial murders* involve multiple victims killed by the same offender or offenders in separate events over a period of days, months, or years.[32] For this report, *mass murders* involve four or more people killed—not including the shooter(s)—in less than one day by the same

---

[30] There is no universally agreed to or legally codified number of victims per incident that distinguishes multiple murder from other types of murder.

[31] "Qualitatively broader" is intended to suggest that there are qualitative factors surrounding incidents of multiple murder that help to distinguish them from single, double, or triple murders. This conceptualization of multiple murder does not necessarily require multiple murders to include four or more deaths. Characterizing multiple murders involves examining some of the circumstances surrounding a killer's actions.

[32] The FBI has offered what can be seen as a broad definition of serial murder: "The unlawful killing of two or more victims by the same offender(s), in separate events." The Bureau also dismisses the key distinction between serial and spree killing. Spree killing can be defined as: "two or more murders committed by an offender or offenders, without a cooling-off period." The lack of a "cooling off period" theoretically distinguishes spree killing from serial murder. However, a majority of experts convened by the FBI in 2005 to discuss serial killing determined that the concept of a cooling off period was too vague to be useful, thus minimizing spree killing as a distinct type of murder. For this report, crimes that some may consider spree killings also can fall under the category of "public mass shooting," if the shootings occur during one day or less. See Federal Bureau of Investigation, *Serial Murder: Multi-Disciplinary Perspectives for Investigators*, 2008, p. 9. Hereafter: Federal Bureau of Investigation, *Serial Murder.* Serial killing is defined in federal law as: "a series of three or more killings, not less than one of which was committed within the United States, having common characteristics such as to suggest the reasonable possibility that the crimes were committed by the same actor or actors." See 28 U.S.C. § 540B.

offender or offenders. Mass murder can then be divided into subcategories—that may or may not involve gunmen—such as massacres perpetrated by people interested in genocide, cult killings, terrorist plots, the slaying of people during the course of drug trafficking, and, as conceptualized in this report, public mass shootings.[33]

### Figure 2. Placing Public Mass Shootings into Context



**Sources:** Graphic constructed by CRS, adapted from concepts highlighted in: James Alan Fox and Jack Levin, *Extreme Killing: Understanding Serial and Mass Murder,* 2nd ed. (Los Angeles: Sage, 2012), p. 19; James L. Knoll, IV, "The 'Pseudocommando' Mass Murderer: Part I, The Psychology of Revenge and Obliteration," *Journal of the American Academy of Psychiatry and the Law,* vol. 38, no. 1 (2010) pp. 87-89; Federal Bureau of Investigation, *Serial Murder: Multi-Disciplinary Perspectives for Investigators,* 2008, p. 8; John E. Douglas, Ann W. Burgess, and Robert K. Ressler, *Crime Classification Manual: A Standard System for Investigating and Classifying Violent Crimes,* 2nd ed. (San Francisco: Jossey-Bass, 2006) p. 96; Grant Duwe, "A Circle of Distortion: The Social Construction of Mass Murder in the United States," *Western Criminology Review,* vol. 6, no. 1 (2005) p. 59. Paul E. Mullen, "The Autogenic (Self-Generated) Massacre," *Behavioral Sciences and the Law,* vol. 22, no. 3 (2004) pp. 311-314; Grant Duwe, Tomislav Kovandzic, and Carlisle E. Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies,* vol. 6, no. 4 (2002) p. 273; Michael D. Kelleher, *Flash Point: The American Mass Murderer,* (Westport, CT: Praeger, 1997) p. 2.

**Notes:** For this graphic, "public mass shootings" involve four or more deaths from gunshot wounds, not including the perpetrator of the violence. "Murder" implies the willful killing of one human being by another.

---

[33] For a discussion of the variety of mass killings see Mullen, "The Autogenic" p. 313.

## *Public Mass Shootings — Settings*

Among the 78 public mass shootings since 1983 that CRS has identified, 26 occurred at workplaces where the shooter was employed either at the time of the incident or prior to it. The next largest number of public mass shootings occurred at places of education (12).[34]

- In 2000 in Wakefield, MA, Michael McDermott took three guns to Edgewater Technology Inc., where he was employed, and shot seven coworkers.[35]

- In 2006 Charles Roberts entered a one-room Amish schoolhouse in Lancaster County, PA, where he shot and killed five students and injured five others.[36]

As the above implies, the public mass shootings identified by CRS involve a high level of localization. A mass shooter usually targets individuals in one location or, as the examples below demonstrate, in a small handful of closely clustered geographic sites.

- In 1988 Michael Hayes shot at people randomly as he roamed his neighborhood in Winston Salem, NC, killing four and injuring five.[37]

- In 2009 Michael McLendon shot his mother before driving to the nearby town of Samson, GA, where he shot five more people. He then drove to another neighboring town, Geneva, where he shot several more people before killing himself. In total McLendon killed 10 people and injured six.[38]

## *Public Mass Shootings — Perpetrators*

Many experts agree that a workable, detailed profile of mass shooters does not exist.[39] However, there are some observations that can be made regarding public mass shooters. For instance, among the public mass shooting incidents reviewed by CRS, the gunmen generally acted alone, were usually white and male, and often died during the shooting incident. The average age of the shooters in the incidents identified by CRS was 33.5 years.

Only on rare occasions was more than one perpetrator involved in a public mass shooting. CRS has identified three such incidents since 1983.

---

[34] Not all of the incidents CRS identified took place exclusively at one location. The numbers given here reflect incidents that occurred in part or in full at the type of location described.

[35] Brian MacQuarrie and Rick Klein, "Slaughter at the Office: Man Held in Deaths of 7 Colleagues in Wakefield," *Boston Globe*, December 27, 2000.

[36] Cindy Stauffer et al., "Horror in Schoolhouse: 5 Amish Girls Killed, 5 Critically Wounded in Shocking Massacre," *Lancaster New Era*, October 3, 2006.

[37] Paul Nowell, "Four Killed, Five Injured in Shooting Spree," Associated Press, July 18, 1988.

[38] Shaila Dewan, "Gunman Kills 10 in Alabama, Then Takes His Life," *New York Times*, March 10, 2009.

[39] In this instance, "workable" is intended to convey a profile with the discerning ability to proactively identify individuals planning to engage in a shooting. In the case of school shootings, the FBI has stated that, an effective profile or checklist that can predict who will become an assailant does not exist. See Mary Ellen O'Toole, *The School Shooter: A Threat Assessment Perspective,* (Federal Bureau of Investigation, 2000) p. 1. See also Federal Bureau of Investigation, *Workplace Violence,* pp. 21, 25, 26; Mullen, "The Autogenic," p. 322; Robert A. Fein et al., *Threat Assessment in Schools: A Guide to Managing Threatening Situations and to Creating Safe School Climates,* (Secret Service, Department of Education, May 2002) p. 17.

- In 1993, Juan Luna and James Degorski killed seven employees at a restaurant in Palatine, IL.[40]

- In 1998, Andrew Golden and Mitchell Johnson killed five people and injured 10 at their middle school in Jonesboro, AR.[41]

- In 1999 Dylan Klebold and Eric Harris killed 13 and injured 23 at their high school in Littleton, CO, and then killed themselves.[42]

Of the public mass shooting incidents identified by CRS for which information on the race of the perpetrator(s) was available, over half of the shooters were reportedly white.[43]

Almost always, the shooters were male. Of the incidents compiled by CRS, only one involved a female assailant. In January 2006, Jennifer Sanmarco shot to death seven individuals—six were fatally wounded in a U.S. postal facility in Goleta, CA. One death occurred near Sanmarco's condominium, also in Goleta. She killed herself as well.[44]

It was common for the gunmen involved in the shootings identified by CRS to kill themselves during their assaults. Forty-one of 81 shooters killed themselves. In 10 instances, law enforcement officers killed the gunmen involved.[45]

The shooters identified by CRS ranged in age from 11 to 66 years old. All but 10 were age 20 or older. Most of them were in their 20s, 30s, or 40s (see **Figure 3**).

---

[40] Jeff Coen, Eric Ferkenhoff, and Flynn McRoberts, "Brown's Suspects Charged: 'They Are People without a Soul,' Police Chief Says," *Chicago Tribune*, May 19, 2002.

[41] John Kifner et al., "From Wild Talk and Friendship to Five Deaths in a Schoolyard," *New York Times*, March 29, 1998.

[42] Patricia Callahan, "Dream Turns to Nightmare," *Denver Post*, April 22, 1999, p. A1.

[43] While a range of demographic information on the perpetrators (including shooter gender and age) was noted in multiple sources reviewed by CRS, perpetrator race was often noted by just a single source, if at all. As such, CRS is not confident in presenting more nuanced data on the race of the shooters involved in public mass shootings identified for this report.

[44] Steve Chawkins and Jill Leovy, "7 Victims of Goleta Rampage," *Los Angeles Times,* February 2, 2006.

[45] Whether these gunmen intended to die at the hands of law enforcement (an act commonly described as "suicide by cop") is unclear. For more on this issue see Anthony J. Pinizzotto, Edward F. Davis, and Charles E. Miller III, "Suicide by Cop" *FBI Law Enforcement Bulletin,* vol. 74, no. 2 (February 2005), pp. 8-20.

---

**Figure 3. Age of Perpetrators in Public Mass Shootings 1983-2012**

Grouped in 10-Year Intervals



**Source:** CRS, based on analysis of mass shooting incidents identified by CRS.

# Law Enforcement Implications

When considering law enforcement's role in coping with public mass shootings, policy makers and the public likely are most aware of how police forces react when they learn of an incident. Public mass shootings typically trigger a rapid police response, followed by an investigation and, potentially, prosecutions and sentencing. Also, while a shooting incident may spur an immediate law enforcement response, the *potential* for such a scenario impacts law enforcement prevention and preparedness measures. Police are not typically involved in recovery efforts.

From a law enforcement perspective, mass shootings tend to be single-jurisdiction issues involving a particular community. As such, while the federal government may not play a direct role in formulating specific state and local practices, it may influence these practices through the availability of grants. For example, the Department of Homeland Security (DHS) offers funding via its Homeland Security Grant Program to "fund a range of preparedness activities, including planning, organization, equipment purchase, training, exercises, and management and administration."[46] Although Department of Justice (DOJ) grants are not necessarily framed in terms of prevention, preparedness, or response, they can certainly address these issues regarding mass shootings.[47]

---

[46] The State Homeland Security Program (part of the Homeland Security Grant Program) "supports the implementation of state Homeland Security Strategies to address the identified planning, organization, equipment, training, and exercise needs to prevent, protect against, mitigate, respond to, and recover from acts of terrorism and other catastrophic events." See http://www.fema.gov/fy-2012-homeland-security-grant-program#0.

[47] A number of existing grant programs may be used as vehicles to incentivize state and local law enforcement. For more information on the history and purpose areas of the Edward Byrne Memorial Justice Assistance Grant (JAG) Program, see CRS Report RS22416, *Edward Byrne Memorial Justice Assistance Grant (JAG) Program*, by Nathan James. For information on the Community Oriented Policing Services (COPS) program, see CRS Report RL33308, (continued...)

---

One foundational question is what, if anything, does the federal government want to influence in the states via grant funding related to law enforcement? Should the federal government enhance interagency information sharing and coordination on procedures to evaluate and deal with shooting threats?[50] Should it increase law-enforcement-related grant funding to bolster school resource officer training or the number of metal detectors in academic settings? In this area, the Obama Administration's January 16, 2013 report, *Now Is the Time: The President's Plan to Protect Our Children and Our Communities by Reducing Gun Violence (The President's Plan)*, included a commitment to using the Community Oriented Policing Services (COPS) program to incentivize police departments to hire more school resource officers. The plan also indicates that DOJ will develop a model—including best practices—for using school resource officers.[51]

> ## Federal Framework for Emergency Management
>
> U.S. emergency management is largely decentralized, potentially involving public, private, and nongovernmental agencies. Nonetheless, there exists a federal framework for managing domestic incidents. Within this framework, the National Incident Management System (NIMS) is an all-hazards, national approach to incident management.[48] It is built on
>
> - continuous preparedness,
> - flexible communications and information systems,
> - standardized resource management,
> - incident management and coordination (built, in part, on the Incident Command System), and
> - ongoing updating of NIMS concepts and principles.
>
> All federal departments and agencies are required to adopt NIMS.[49] In addition, state, local, and tribal organizations must adopt NIMS in order to be eligible for federal preparedness grants.

Of course, such issues potentially involve a variety of specialists—not only police officials but also public health experts and educators,

---

(...continued)

*Community Oriented Policing Services (COPS): Background and Funding,* by Nathan James. For information on the various juvenile justice grant programs, see CRS Report RL33947, *Juvenile Justice: Legislative History and Current Legislative Issues,* by Kristin M. Finklea.

[48] NIMS enables relevant entities to "prevent, protect against, respond to, recover from, and mitigate the effects of incidents, regardless of cause, size, location, or complexity, in order to reduce the loss of life and property and harm to the environment." It is a flexible system, adaptable to the spectrum of potential incidents, and one that provides standardized framework to foster coordination and cohesion between relevant agencies. Federal Emergency Management Agency, "National Incident Management System," December 2008, http://www.fema.gov/pdf/emergency/nims/NIMS_brochure.pdf. NIMS is administered by the Department of Homeland Security (DHS), and through the National Integration Center, the Secretary of DHS "publishes the standards, guidelines, and compliance protocols for determining whether a Federal, State, tribal, or local government has implemented NIMS." See Federal Emergency Management Agency, "About National Incident Management System," July 20, 2012, http://www.fema.gov/about-national-incident-management-system.

[49] This is required by Homeland Security Presidential Directive 5 (HSPD-5), issued by former President George W. Bush on February 28, 2003.

[50] Many such questions involve law enforcement as well as other experts with key roles to play in this area. As a case in point, policy makers may debate whether the federal government should encourage states to provide preventative mental health services to individuals at risk of committing violent crimes. Determining who could benefit from such services potentially involves police officers as well as medical professionals and teachers. Several juvenile justice grant programs have purpose areas that could be used to provide mental health services to at-risk youth. Congress may also consider incentivizing law enforcement training that includes a focus on mental health offender issues. The JAG program, for one, provides grant money for a variety of purpose areas, including law enforcement training broadly. Within programs such as this, funds could be utilized for specialized training.

[51] See *The President's Plan.* While resource officers may be described as a preventive law enforcement measure, this report covers them as part of prevention efforts in the realm of education. See the discussion under the heading "School Resource Officers" in this report.

---

among others. Grants impacting preparedness may shape first responder training, and grants influencing response could affect the development of law enforcement protocols for responding to mass shootings. Some policy makers may wish to incentivize the establishment and training of tactical emergency medical services (EMS) teams to support law enforcement during instances of mass shootings or related events. These teams could provide medical threat assessments, deliver medical care, and promote law enforcement safety, among other things. Little research has evaluated the effectiveness of such tactical EMS teams in the civilian domain, and policy makers may wish to request additional research in this arena.[52] Congress may debate which elements of law enforcement prevention, preparedness, and response—if any—the federal government could try to influence in the states and localities.[53]

In addition to providing financial assistance and incentives for certain law enforcement activities, the federal government may provide assistance in the form of manpower. Policy makers may debate whether federal law enforcement has sufficient authority and resources to assist state and local entities—if requested and if appropriate—in preparing for and responding to mass shootings and related incidents. For example, *The President's Plan* calls for additional funding for the federal government to train law enforcement, school officials, and others to respond to scenarios involving shooters.

## Prevention

While law enforcement's role in crime control traditionally has been viewed as largely *reactive*, there has been a trend toward enhancing *proactive* law enforcement efforts. Thus, in the past three decades, much of the policing world has incorporated investigative strategies bent on preventing crimes in addition to solving crimes that have already occurred.[54] However, the effectiveness of proactive law enforcement techniques in preventing public mass shootings is unclear. As modern policing has evolved, several prominent philosophies and techniques—including community policing and intelligence-led policing—have focused on law enforcement preventing rather than solely responding to crime.

### Community Policing

As laid out by DOJ, "[c]ommunity policing is a philosophy that promotes organizational strategies, which support the systematic use of partnerships and problem-solving techniques, to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime."[55] Community policing can employ a range of techniques to

---

[52] See Nelson Tang and Gabor D. Kelen, "Invited Commentary: Role of Tactical EMS in Support of Public Safety and the Public Health Response to a Hostile Mass Casualty Incident," *Disaster Medicine and Public Health Preparedness*, vol. 1, suppl. 1, (2007), pp. s55-s56. See Michael J. Feldman, Brian Schwartz, and Laurie J. Morrison, "Effectiveness of Tactical Emergency Medical Support: A Systematic Review," June 6, 2006.

[53] Beyond guiding or shaping local policing, federal grant programs can also reinforce existing state and local practices or subsidize actions that state and local governments had planned to pursue on their own, among other things.

[54] These investigative strategies include community policing, problem-oriented policing, intelligence-led policing, and predictive policing. See Lois M. Davis et al., *Long-Term Effects of Law Enforcement's Post-9/11 Focus on Counterterrorism and Homeland Security*, RAND, 2010, pp. 2-4, http://www.rand.org/pubs/monographs/2010/RAND_MG1031.pdf.

[55] Department of Justice, *Community Policing Defined*, http://www.cops.usdoj.gov/default.asp?item=36. See also Bureau of Justice Assistance, "Understanding Community Policing: A Framework for Action," August 1994, https://www.ncjrs.gov/pdffiles/commp.pdf.

---

control crime, and these techniques can be tailored to the specific needs of individual communities. The federal government has incentivized community policing efforts through DOJ's COPS office.[56]

Research on community policing generally speaks to its impact on overall crime rates, and CRS has not identified any comprehensive research on how community policing may be used to specifically address mass shootings. Policy makers may question whether community policing efforts are useful in targeting a specific type of crime (mass shootings) in a specific setting (public places).

## Intelligence-Led Policing

Based in part on community policing and problem solving efforts, intelligence-led policing initiatives, originally developed in Great Britain, have emerged throughout the nation.[59] After 9/11, intelligence operations were transformed at the federal level as well as at the state and local levels. More and more, intelligence-led policing is not a single methodology, but a framework that encompasses much of modern operational police activity.[60] Similar to community policing, intelligence-led policing relies upon information input (as the basis for intelligence analysis), two-way communications with the public, scientific data analysis (using the basic formula that information plus analysis equals intelligence), and problem solving.[61]

The impact of intelligence-led policing cannot yet be fully evaluated because "long term studies of police forces that have fully implemented and adopted intelligence-led policing have yet to be conducted."[62] Further, like research on community policing efforts,

> ### Intelligence-Led Policing and Fusion Centers
>
> Gunmen involved in public mass shootings may not be targets easily preempted from wrongdoing by intelligence-led policing. However, there still may be roles that fusion centers[57] can play in countering this threat. (Such centers have been highlighted as tools to enhance intelligence-led policing.) Fusion centers may be able to help contextualize this issue. For instance, the Commonwealth Fusion Center based in Massachusetts launched the "Targeting Violent Crime Initiative," sponsored by DOJ, to examine firearms offenses in Massachusetts. This effort has focused on issues such as determining the source of firearms used in gun crimes in Massachusetts; understanding potential links between the illegal gun markets; and delving into gun crime trends throughout the state.[58] As such, policy makers may be interested in whether fusion centers have anything to offer in the way of intelligence-led policing to address mass shootings.

---

[56] For more information on the Community Oriented Policing Services (COPS) program within DOJ, see CRS Report R40709, *Community Oriented Policing Services (COPS): Current Legislative Issues*, by Nathan James and CRS Report RL33308, *Community Oriented Policing Services (COPS): Background and Funding*, by Nathan James.

[57] Fusion centers are a "collaborative effort of two or more Federal, state, local, or tribal government agencies that combines resources, expertise, or information with the goal of maximizing the ability of such agencies to detect, prevent, investigate, apprehend, and respond to criminal or terrorist activity." See P.L. 110-53, Aug. 3, 2007, §511, 121 STAT. 322. Amends Homeland Security Act of 2002 by adding §210A(j).

[58] David Lambert, Federal Bureau of Investigation, "Intelligence-Led Policing in a Fusion Center," *FBI Law Enforcement Bulletin*, vol. 79, no. 12 (December 2010), pp. 1-6.

[59] Bureau of Justice Assistance, "Intelligence-Led Policing: The New Intelligence Architecture," September 2005, https://www.ncjrs.gov/pdffiles1/bja/210681.pdf.

[60] Jerry H. Ratcliffe, *Intelligence-Led Policing*, (Portland, OR: Willan Publishing, 2008), p. 6.

[61] Department of Justice, "Intelligence-Led Policing: The Integration of Community Policing and Law Enforcement Intelligence," *Law Enforcement Intelligence: A Guide for State, Local, and Tribal Law Enforcement Agencies*, http://www.cops.usdoj.gov/pdf/e09042536_Chapter_04.pdf.

[62] Jerry Ratcliffe, "What is Intelligence-Led Policing," http://jratcliffe.net/research/ilp.htm.

---

available information on intelligence-led policing does not address whether intelligence-led policing may be an effective approach to use in addressing mass shootings.

Using intelligence-led policing to thwart mass shooters may be especially challenging for a number of reasons.

- Mass shooters most often act alone and share few of their plans with others.[63] Typically, they do not engage in ongoing conspiracies that can be infiltrated by undercover police officers or monitored by informants.[64]

- There may be too few public mass shooting incidents to establish detailed geographic patterns (hot spots) for law enforcement to exploit.[65]

## Offender Profiling for Public Mass Shootings: Not a Preventive Tool

Researchers and policy makers have questioned whether law enforcement can develop a profile of a mass shooter to help identify at-risk individuals before a shooting incident occurs. No effective mass shooter profile exists for law enforcement to use to proactively identify potential suspects. One researcher has succinctly noted that "the predictors [for mass murder] are invariably far more common than the event we hope to predict, and mass murder is very rare. Although mass murderers often do exhibit bizarre behavior, most people who exhibit bizarre behavior do not commit mass murder."[66] Aside from usually but not always being male, there are few other characteristics across mass murderers that would be reliable or valid for creating a general profile for individuals most likely to engage in a public mass shooting. This also holds true when examining individuals who carry out mass shootings in specific settings; for instance, "[t]here is no accurate or useful profile of 'the school shooter.'"[67]

---

[63] This is not meant to suggest that mass shooters are always silent regarding their plans. Rather, they may not typically involve others in orchestrating their schemes.

[64] Whereas criminal groups may engage in activities that could produce intelligence information for law enforcement to exploit, such as communicating to one another via email regarding their schemes, lone gunmen or mass shooters often do not. Minus any ideological underpinnings for their actions, public mass shooters may in some ways be likened to terrorist suspects who act alone, often described as "lone wolves." One FBI official has said, "The lone wolf is arguably one of the biggest challenges to American law enforcement. How do you get into the mind of a terrorist? The FBI does not have the capability to know when a person gets up in middle America and decides: 'I'm taking my protest poster to Washington or I'm taking my gun.'" See Gary Fields and Evan Perez, "FBI Seeks to Target Lone Extremists," *Wall Street Journal*, June 15, 2009, http://online.wsj.com/article/SB124501849215613523.html. For more on lone wolves, see CRS Report R42536, *The Domestic Terrorist Threat: Background and Issues for Congress*, by Jerome P. Bjelopera.

[65] Hot spot analysis is one technique that may be involved in intelligence-led policing. For more information about mapping crime, see National Institute of Justice, "Mapping Crime: Understanding Hot Spots," August 2005.

[66] Richard J. McNally, "Why Psychiatrists Can't Predict Mass Murderers," *Salon.com*, January 12, 2011.

[67] National Institute of Justice, "Preventing School Shootings: A Summary of a U.S. Secret Service Safe School Initiative Report," *NIJ Journal*, 2002. The notion of profiling "may be an effective strategy for limiting the field of suspects after a crime has occurred," but it is generally not considered effective for *proactively* identifying an individual who may be a greater risk for committing a targeted act of violence, including a public mass shooting. See Randy Borum, Robert Fein, Bryan Vossekuil, et al., "Threat Assessment: Defining an Approach for Evaluating Risk of Targeted Violence," *Behavioral Sciences and the Law*, vol. 17 (1999), p. 328. Hereafter: Borum et al., "Threat Assessment."

---

Also of note, criminal profiling is generally utilized *after* a crime has been committed, and not usually as a preventive tool.[68] In the course of investigating serial crimes by a repeat offender such as a serial murderer, it could be utilized as a proactive tool to narrow the pool of potential offenders before a subsequent crime is committed. However, because mass shooters generally do not have the opportunity to commit a second crime—they are most typically either killed or captured after the mass shooting—investigative analysis would be most commonly employed after the mass shooting to understand how it happened rather than as a tool to identify potential shooters before an incident occurs.

All of this does not mean that preventing public mass shootings is wholly beyond the scope of federal law enforcement. For instance, to enhance law enforcement efforts in the violent crime domain, DHS, DOJ, and the FBI have been working to "identify measures that could be taken to reduce the risk of mass casualty shootings."[69]

## Preparedness and Prevention Combined—Threat Assessments

Alternatively, what has come to be known as "threat assessment" may be more appropriately suited to prepare for the threat of potential shooters and to prevent them from harming others. Federal law enforcement has been involved in providing threat assessment approaches to front-line professionals, such as educators, who may encounter potential shooters. Threat assessments are used after a potentially harmful individual has come to the attention of authorities. The assessment process evaluates the threat he or she poses. Certainly, threat assessments may be used to prevent a mass shooting. Law enforcement efforts to train front-line professionals in the assessment process can be seen as an effort geared toward preparing these individuals to cope with threats.

The National Threat Assessment Center (NTAC), which is part of the U.S. Secret Service, provides research on threat assessment as well as on targeted violence.[70] The threat assessment approach used by the U.S. Secret Service was developed as part of its broader intelligence activities designed to protect the President and other officials. Nonetheless, it "can be applied with some modification to evaluating risk for other forms of targeted violence."[71] It does not rely upon "profiles" of potential malicious actors (as profiles have not proven to be reliable predictors

---

[68] The FBI and its behavioral analysts in the Behavioral Science Unit developed what is often referred to as criminal "profiling," or criminal investigative analysis. It was advanced as an investigative technique to narrow the field of potential offenders based on analyses of the crimes committed. Today, much of the criminal investigative analysis at the FBI is conducted by agents and analysts in the Behavioral Analysis Units at the National Center for the Analysis of Violent Crime. Federal Bureau of Investigation, "Criminal Profiling Part 1 of 7," http://vault.fbi.gov/Criminal%20Profiling/Criminal%20Profiling%20Part%201%20of%207/view. The National Center for the Analysis of Violent Crime is a component of the Critical Incident Response Group at the FBI. For more information, see http://www.fbi.gov/about-us/cirg/investigations-and-operations-support/investigations-operations-support#cirg_ncavc.

[69] Components of such risk reduction involve prevention, protection, response, education, and research/evaluation. Department of Homeland Security, "Statement by Secretary Napolitano on President Obama's Proposal to Combat Gun Violence," press release, January 16, 2013, http://www.dhs.gov/news/2013/01/16/statement-secretary-napolitano-president-obama%E2%80%99s-proposal-combat-gun-violence.

[70] See Secret Service, "National Threat Assessment Center," http://www.secretservice.gov/ntac.shtml.

[71] Borum et al., "Threat Assessment," p. 327. In 1992, the Secret Service, along with the Federal Bureau of Prisons and National Institute of Justice, undertook a 5-year Exceptional Case Study Project (ECSP) to study individuals who have attacked or attempted to attack public officials and figures in the United States. For specific ECSP findings, see Robert A. Fein and Bryan Vossekuil, "Threat Assessment Investigations: A Guide for State and Local Law Enforcement Officials," July 1998.

---

for actual threat), nor does it depend on stated threats as a starting point for evaluating risk (because not every person who makes a threat poses a true risk, and not all persons who pose risks make threats).[72] Within this threat assessment framework, it has been suggested that information be collected relating to: (1) facts that bring the subject to the attention of authorities, (2) the subject of interest, (3) attack-related behaviors, (4) possible motives, and (5) potential targets.[73] Of note, law enforcement may not be the only authorities involved in evaluating information and conducting such a threat assessment, but the assessment framework may be one of several tools that law enforcement relies upon in an attempt to prevent targeted violence, including mass shootings. Policy makers may wonder whether threat assessment has proved to be a viable tool for law enforcement to use in preventing incidents of mass shootings. Further, they may question if the threat assessment framework could be modified to better serve law enforcement and other professionals who collaborate on efforts to prevent targeted violence.

If threat assessments can effectively identify potential mass shooters, policy makers may debate how law enforcement could use this information. One potential option could be to create a criminal watchlist, similar to the Terrorist Screening Database,[74] or terrorist watchlist, to be used in background checks for firearms, among other things.[75] Similar to questions regarding the threshold for placing a suspected individual on the terrorist watchlist, one of the relevant issues would involve establishing criteria for the addition of potential mass shooters to a violent criminal watchlist. There may also be questions about if or how law enforcement may engage with others such as mental health professionals and community leaders in decisions to place someone on such a watchlist. (For a discussion of how the federal government coordinates preparedness efforts for incidents involving mass casualties see "Preparedness" under the "Public Health Implications" section of this report).

As another means of preparing for mass shootings, some law enforcement agencies have participated in tailored trainings. DHS, for instance, sponsors preparedness courses for shootings as well as webinars, and workshops.[76] The California Highway Patrol has taken advantage of these opportunities and, between August 2012 and January 2013, "has led 18 active shooter trainings on campuses across Northern California."[77] In these two-day classes, officers participate in simulated scenarios; they are trained to respond to a reported incident, bring a shooter under control, and ensure the safety of building occupants.

# Response

## Federal Response to a Local Crime

From a law enforcement perspective, public mass shootings are often highly localized incidents involving lone gunmen acting near where they live. Thus, these cases largely do not involve

---

[72] Borum et al., "Threat Assessment," p. 372.

[73] Ibid., p. 330.

[74] For more information on the Terrorist Screening Database, see http://www.fbi.gov/about-us/nsb/tsc.

[75] For more information on terrorist watchlist screenings and background checks for firearms, see CRS Report R42336, *Terrorist Watch List Screening and Brady Background Checks for Firearms*, by William J. Krouse.

[76] See Department of Homeland Security, "Active Shooter Preparedness," http://www.dhs.gov/activeshooter.

[77] Kaci Poor, "Active Shooter Training Prepares Local Law Enforcement for Sandy Hook Situation," *The Times-Standard*, January 25, 2013.

conspiracies or the extensive crossing of jurisdictions. As such, mass shootings generally may be considered a local concern. Nonetheless, federal law enforcement—most notably the FBI—has historically provided assistance, when requested, to state and local law enforcement in the investigation of crimes that do not automatically fall under the jurisdiction of federal law enforcement.[78]

Some have expressed concerns that without official authority to respond to such incidents that fall primarily under a single state's jurisdiction, the federal response to these incidents could be slowed from questions of jurisdiction.[79] However, in practice, federal law enforcement has routinely assisted state and local law enforcement in a variety of capacities. The FBI's Office of Law Enforcement Coordination (OLEC), for one, is the liaison between the FBI and the greater law enforcement community. FBI assistance includes a variety of criminal justice information and research, background checks and security clearances, and disaster and hazardous material response teams. Of note, the 112th Congress passed legislation (P.L. 112-265) that formally authorizes the Attorney General to provide investigative assistance to states in instances of violent crimes in public venues, including attempted and actual mass killings. Some may question whether this authority will change federal law enforcement involvement in responding to and investigating instances of public mass shootings or whether it will simply formalize an already well-established practice.

## Definitional Implications for Criminal Justice Process

As noted, the definition of a mass shooting is not always consistent across the scholarly, policy, and law enforcement realms. Within the law enforcement realm, a clear definition of mass shootings may be more critical during certain phases of the criminal justice process than others. Take, for instance, the question of who counts as a "victim" of a mass shooting. Is a victim

- Only someone who was killed at the scene of the crime?

- Someone who was shot and hospitalized in critical condition for an extended period of time?

- Someone who was caught in the cross-fire but not critically injured by bullets?

- Someone who died or was injured in attempting to escape the situation, but who did not die from a gunshot wound?

The individual circumstances involving victims are quite varied, but in certain steps of the criminal justice process, the need for a concrete definition may be more pressing.

The fact that law enforcement will respond to a public mass shooting may not depend on the ability to pinpoint the exact number of dead or injured victims. However, the details regarding victimization may more greatly impact how the incident is investigated and prosecuted after the conclusion of the mass shooting. Once an investigation begins, information about individuals considered "victims" may be of special interest to investigators and prosecutors. If the shooter

---

[78] One of the FBI's top ten priorities is to "support federal, state, local and international partners." See http://www.fbi.gov/about-us/quick-facts. Of course, other federal law enforcement agencies, such as the Bureau of Alcohol Tobacco, Firearms, and Explosives, can help local police with mass shooting investigations.

[79] Jerry Seper, "FBI Agents Back Bill Allowing Feds to Help Probe Mass Killings," *The Washington Times*, January 2, 2013.

survives the incident and is prosecuted, whether or not a victim dies as a result of the mass shooting will influence the charges brought against the shooter. These charges may include actual and attempted homicide, manslaughter, and assault, among others.[80] The charges can, in turn, influence the length of sentence a shooter may receive if convicted of the charges brought against him.

A gunman's motives influence how police investigate shootings. A shooter's motives may also drive the charges ultimately brought against him, if he survives the incident. While some cases may be instances of relatively indiscriminate killing, others involve assailants driven by particular hatreds that lead to the targeting of specific groups and can be considered hate crimes and investigated and prosecuted accordingly. Still others can involve ideologically-motivated killing, leading to terrorism-related investigations and charges.

In considering a shooter's motives and intentions, law enforcement may question whether it is the shooter's resolve to die along with his victims, either in an act of self-inflicted suicide or through "suicide-by-cop," what some have termed "suicide by mass murder."[81] When law enforcement officers respond to a report of a shooter, they are faced with multiple concerns in attempting to disarm and arrest the shooter. Will they have to use lethal force on the suspect? Will the suspect take his own life? Will the suspect try to prolong his life and his rampage through the use of body armor and other defensive tactics?

# Public Health Implications[82]

From a public health policy perspective, public mass shootings are mass casualty incidents (MCI) that cause both injury and death.[83] Although public mass shootings are infrequent, the health sector[84] has considerable related experience to bring to bear on preparing for and responding to these events.

---

[80] Federal crimes of attempted and actual homicide and manslaughter are codified at 18 U.S.C. § 1111-1113.

[81] Rachel Kalish and Michael Kimmel, "Suicide by Mass Murder: Masculinity, Aggrieved Entitlement, and Rampage School Shootings," *Health Sociology Review*, vol. 19, no. 4 (2010).

[82] This section includes contributions from Sarah A. Lister, Specialist in Public Health and Epidemiology (public health, prevention, preparedness and response), and Elayne J. Heisler, Analyst in Health Services (emergency departments, trauma care).

[83] Casualties can include victims or responders who die from their injuries; victims or responders who survive with physical injuries (not limited to gunshot wounds); and victims, responders, bystanders, and community members who experience psychological repercussions. The most severe injuries are less common than minor injuries such as sprains and strains. See Department of Health and Human Services (HHS), Centers for Disease Control and Prevention (CDC), *Emergency Preparedness and Response: Injuries and Mass Casualty Events*, http://www.bt.cdc.gov/masscasualties/ injuriespro.asp Traumatic events can have both short- and long-term consequences. See Centers for Disease Control and Prevention, *Emergency Preparedness and Response: Coping with a Traumatic Event*, http://www.bt.cdc.gov/ masscasualties/copingpro.asp.

[84] According to DHS, in the context of critical national infrastructure, the health care and public health sector (referred to as "the health sector" in this report) consists of a variety of health care facilities and transportation services, products manufacture and distribution, financing and data management systems, governmental public health agencies, and non-governmental organizations. Department of Homeland Security, *Healthcare and Public Health Sector-Specific Plan: An Annex to the National Infrastructure Protection Plan*, 2010, Executive Summary, p. 1, http://www.dhs.gov/xlibrary/ assets/nipp-ssp-healthcare-and-public-health-2010.pdf.

---

The health sector addresses mass shootings as it does any other health threat, through (1) prevention, (2) preparedness, (3) response, and (4) recovery over the long term. Prevention focuses on the perpetrators of mass shooting. The other three components of the health sector approach concentrate on the victims of such incidents.

Public health options to thwart mass shootings are likely limited. Of these four components, the effectiveness of preventive efforts may be most unclear. Fundamentally, this area likely lacks strong evidence regarding what might successfully stop potential shooters from becoming actual shooters. This evidence could come from evaluation of new or existing policies. Such efforts could help fill a gap in knowledge about what is effective.

In terms of preparedness, response, and recovery, proven approaches exist. However, policy makers may wish to consider how existing capacities (or policies to increase capacity) vary across geographic areas and populations. Also, the ability to rapidly evaluate the effectiveness of existing programs and/or deploy resources may hinge on the flexibility of funding structures.

## Prevention

Public health interventions are often based on research with large-scale datasets and rigorous information collection regimens.[85] The effectiveness of this approach may be limited largely because public mass shootings are rare, *potential* perpetrators cannot be identified accurately, and no systematic means of intervening are known to be effective. Regardless, a public health-oriented discussion of prevention of mass shootings should consider the field's traditional approach to stemming any cause of injury or death, highlighting some of the ways that this approach may or may not address public mass shootings.

Public health professionals address prevention of injury and death via a three-step process focused on understanding and stemming health-related problems:

- First, systematic collection of data (*surveillance*)[86] may help define the scope of the problem, identify an outbreak of the problem, and detect trends related to the problem.

- Second, research may identify characteristics associated with higher rates of injury or death attributed to the problem (called *risk factors* and *protective factors*, respectively). Such research may be based on surveillance or other sources of information.

- Third, efforts to reduce risk factors and enhance protective factors may be developed to stem the problem. These are founded on research pursued in the previous step of this process. Called *preventive interventions* within the context of public health, such undertakings traditionally focus on victims. However, as mentioned above, in the case of public mass shootings, the focus of prevention is generally on the gunmen involved.[87]

---

[85] For examples of public health surveillance systems, see Centers for Disease Control and Prevention, National Center for Health Statistics, *Surveys and Data Collection Systems*, http://www.cdc.gov/nchs/surveys.htm.

[86] This does not include what may be considered surveillance within law enforcement contexts, i.e., covertly gathered information about suspects.

[87] Centers for Disease Control and Prevention, Injury Center, *Violence Prevention, The Public Health Approach to* (continued...)

## Surveillance May Not Be Necessary to Identify Public Mass Shootings

Mass shootings are rare, high-profile events, rather than broad trends that require systematic data collection to understand. The public health system does not conduct surveillance specifically for public mass shootings as defined in this report. Some broader information about shootings is collected (e.g., from death certificates[88]); however, this information is largely about victims rather than assailants, limiting its usefulness for research into the prevention of mass shootings. For example, the Centers for Disease Control and Prevention's (CDC's) National Violent Death Reporting System (NVDRS) enables participating states to supplement death certificates with information from law enforcement agencies, crime laboratories, coroner or medical examiner reports, health providers, and other state and local agencies. The NVDRS is currently in operation in fewer than half the states.[89] *The President's Plan* proposes expanding the NVDRS to all 50 states at a cost of $20 million.[90]

## Difficulty in Identifying Risk and Protective Factors

According to the parameters of this CRS analysis, the victims of public mass shootings are essentially random. Thus, health research into risk and protective factors tied to these incidents would likely focus on things that would either boost or lower the chances that one might become a gunman. One obstacle in identifying such factors is the relatively small data pool available for research (several dozen tragedies over the last thirty years in the United States).

Gun violence broadly, rather than public mass shootings, accounts for many more instances of death and injury per year and yields a far larger pot of observable information. This information may be used in research to identify risk and protective factors. Therefore, potential risk and protective factors may have more utility when public health professionals confront the much

---

(...continued)
*Violence Prevention*, http://www.cdc.gov/ViolencePrevention/overview/publichealthapproach.html. The approach is discussed in the context of school violence in U.S. Congress, House Committee on Education and the Workforce, Subcommittee on Early Childhood, Youth and Families, *School Violence: Protecting Our Children*, 106th Cong., 1st sess., March 1, 1999, H.Hrg.106-9 (Washington: GPO, 1999), pp. 44-58. The CDC describes a four-step process; this CRS report combines the last two steps (intervention evaluation and implementation) into one step, resulting in the three-step process described in the text.

[88] Both the legal authority for maintaining registries of deaths and the responsibility for issuing death certificates reside with individual states, territories, and two cities (Washington, DC, and New York, NY). Information collected in death certificates is aggregated at the federal level by the National Center for Health Statistics (NCHS, within CDC) in the National Vital Statistics System (NVSS); see http://www.cdc.gov/nchs/nvss.htm. NCHS extracts information from NVSS to create the National Death Index (NDI), a data set that can be combined with other data sets for research purposes; see http://www.cdc.gov/nchs/data_access/ndi/about_ndi.htm. Information about non-fatal shootings is included in the CDC's National Electronic Injury Surveillance System – All Injury Program (NEISS-AIP), which collects data from a sample of U.S. hospital emergency departments; NEISS-AIP data can be used to generate national estimates of nonfatal injuries. See Centers for Disease Control and Prevention, *Injury Prevention & Control: Data & Statistics*, http://www.cdc.gov/injury/wisqars/index.html. Additionally, the National Conference of State Legislatures reports that 40 states have statutes establishing statewide trauma registries that collect data about trauma, including both fatal and non-fatal gunshot wounds; the data collected and the source of the data (e.g., emergency medical service or trauma centers) vary by state. See Hollie Hendrikson, *The Right Patient, the Right Place, the Right Time: A Look at Trauma and Emergency Medical Services Policy in the States*, National Conference of State Legislatures, Washington, DC, September 2012, http://www.ncsl.org/documents/health/NCSLTraumaReport812.pdf.

[89] Centers for Disease Control and Prevention, *National Violent Death Reporting System*, http://www.cdc.gov/violenceprevention/nvdrs.

[90] *The President's Plan*.

---

broader phenomenon of gun violence, not just public mass shootings. Consequently, potential risk factors such as mental illness, substance abuse, exposure to violence, and easy access to guns are all addressed to some extent in *The President's Plan,* which covers the wider issue of gun violence.[91] *The President's Plan* also responds to the suggestion by some that health research related to gun violence has been hampered by a statutory prohibition on the use of certain funding to "advocate or promote gun control."[92] *The President's Plan* states that research into gun violence is not advocacy,[93] and a Presidential Memorandum directs the Health and Human Services (HHS) Secretary to "conduct or sponsor research into the causes of gun violence."[94]

## The Effectiveness of Preventive Interventions Is Unclear

Prevention of public mass shootings in a public health context would in theory involve interventions targeted at potential perpetrators, not potential victims. These interventions would be founded on well-tested risk and protective factors, which—as noted above—do not currently exist. If relatively unproven factors were to be used in the development of preventive interventions, this would likely yield many misidentifications.

Because the number of public mass shootings in the United States may be too small to offer substantive analysis that could produce effective interventions, it may be most feasible to address gunmen involved in such incidents as a subset of violent offenders. Preventive interventions directed at potential violent offenders may target populations, at-risk subgroups, or high-risk individuals. These approaches may or may not prove effective within the broader context of gun violence, and what effect (if any) they would have on mass shootings is unclear as well. *The President's Plan* provides examples of each approach:

- Population-wide interventions include finalizing regulations for mental health parity in private health insurance and ensuring that Medicaid plans are in compliance with parity requirements.[95]

- Interventions targeting at-risk subgroups include a clarification that doctors are permitted to talk about gun safety with patients who have access to guns and efforts to make mental health and conflict resolution services available specifically for students who have been exposed to violence.[96]

---

[91] *The President's Plan.*

[92] CDC appropriations from FY1997 through FY2011 included a prohibition on the use of funds "to advocate or promote gun control." This prohibition has been extended to all HHS agencies for FY2012 and FY2013. See CRS Report WSLG375, *Is Gun Violence Research Advocacy? Appropriations Restrictions on Using HHS Funds to "Advocate or Promote Gun Control,"* by Kathleen S. Swendiman, January 23, 2013. See also Jay Dickey and Mark Rosenberg, "'Senseless' is not studying gun violence," *The Washington Post,* July 29, 2012, and Michael Luo, "Sway of N.R.A. Blocks Studies, Scientists Say," *The New York Times,* January 25, 2011.

[93] *The President's Plan.*

[94] U.S. President (Obama), "Engaging in Public Health Research on the Causes and Prevention of Gun Violence," *Public Papers of the Presidents of the United States* (Washington: GPO, 2013).

[95] *The President's Plan.* See CRS Report R41768, *Mental Health Parity and Mandated Coverage of Mental Health and Substance Use Disorder Services After the ACA,* by Amanda K. Sarata. Mental health parity generally refers to the concept that health insurance coverage for mental health services should be offered on par with covered medical and surgical benefits.

[96] *The President's Plan.*

---

- Interventions targeting high-risk individuals include a clarification that health professionals are permitted to report to law enforcement violent threats that patients may make.[97] Also, on January 15, 2013, the HHS Office of Civil Rights issued a letter to health care providers to clarify that federal health privacy laws do not prohibit them from disclosing "necessary information about a patient to law enforcement, family members of the patient, or other persons, when [they] believe the patient presents a serious danger to himself or other people."[98] Interventions focused on high-risk individuals can also involve training law enforcement officers to work with mental health professionals to intervene with students in crisis.

## Preparedness

The federal government has supported coordinated mass casualty incident (MCI) preparedness efforts in large cities since 1997[99] and in all 50 states, territories, and the District of Columbia since 2002,[100] through federal grants and contracts to public health agencies. These agencies are required to develop plans to integrate responding entities—including federal, state, and local law enforcement; emergency medical services (EMS); private sector health care facilities; and others. These federal grants and contracts support the rapid establishment of interdisciplinary communications (e.g., emergency operations centers) and periodic exercises that bring key responders together to practice before an actual incident, among other things. Although these federal grants and contracts were established in response to concerns about terrorism, they may also help local agencies prepare for MCIs such as public mass shootings. Some are concerned about whether these programs are sufficiently dispersed to enable rural areas to prepare for an MCI.[101]

Certain aspects of the health care delivery system, such as the capacity and proximity of critical facilities to a mass shooting, can affect survival from a public mass shooting. Three components of the health care delivery system contribute to MCI readiness: (1) emergency medical services (EMS), (2) hospital-based emergency departments (EDs), and (3) trauma care.

---

[97] *The President's Plan.*

[98] Letter from Leon Rodriguez, Director, Health and Human Services, Office of Civil Rights, "Message to Our National Health Care Providers," January 15, 2013, http://www.hhs.gov/ocr. The letter clarifies requirements of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, 45 CFR § 164.512(j).

[99] Metropolitan Medical Response System contracts required more than 120 cities to establish and exercise mass casualty management plans. National Research Council, *Preparing for Terrorism: Tools for Evaluating the Metropolitan Medical Response System Program*, Washington, D.C., The National Academies Press, 2002, http://www.nap.edu/catalog.php?record_id=10412. The program, originally managed by HHS, is now a component of the Federal Emergency Management Agency (FEMA) Homeland Security Grant Program (HSGP). It received dedicated appropriations from FY1997 through FY2011. For FY2012, its purposes are allowable, but no longer required, of grantees receiving HSGP funds. Federal Emergency Management Agency, FY2012 Homeland Security Grant Program, http://www.fema.gov/fy-2012-homeland-security-grant-program.

[100] Department of Health and Human Services, Public Health Emergency, "Hospital Preparedness Program," http://www.phe.gov/preparedness/planning/hpp/pages/default.aspx.

[101] Kristin Viswanathan, Theresa Wizemann, and Bruce M. Altevogt, "Improving Rural Mass Casualty Response in the United States," in *Preparedness and Response to a Rural Mass Casualty Incident* (Washington, DC: National Academies Press, 2011), pp. 77-86.

---

*Emergency medical services (EMS)* include 911 call centers, medical care that occurs at the scene of an emergency, the transportation of victims to hospitals, and any treatment that occurs on the way. EMS systems vary by locality—some are operated by municipal or county governments, others by fire departments, and still others by private for-profit companies. This may mean that response times, quality, availability, and preparedness vary by locality. Federal responsibility for EMS is shared across the Department of Transportation, DHS, and HHS,[102] which raises potential concerns about coordination and sustainability.[103] Also, an HHS grant program administered by the Health Resources and Services Administration (HRSA) supports an effort to ensure that emergency medical services are appropriate for children.[104]

*Hospital-based emergency departments (ED)* vary by locality, and not all hospitals have an ED. Rural areas in particular may have both fewer hospitals overall and fewer hospitals that offer emergency care. In both urban and rural areas, some EDs may not function optimally on a day-to-day basis, which would affect their ability to respond to an MCI. EDs may be overcrowded, may "board" patients when inpatient beds are unavailable, and may divert ambulances because they are operating at capacity.[105] The federal government supports EDs through a variety of mechanisms including hospital preparedness grants, interagency coordination, and training of emergency health providers.[106] Through the Medicare and Medicaid programs, the federal government provides payments to hospitals that deliver care to uninsured patients in hospital EDs.[107] These payments (called disproportionate share payments) are an important source of a financial support for EDs.

*Trauma centers* are specialized hospitals with the resources and equipment needed to treat severely injured patients.[108] They provide specialized care that is beyond the capability of the typical ED. Trauma centers are classified into four levels, with lower numbers (I, II) providing

---

[102] Institute of Medicine, *Future of Emergency Care: Emergency Medical Services at the Crossroads* (Washington, DC: The National Academies Press, 2007).

[103] The National Conference of State Legislatures suggests that state-level organization of EMS services also impedes coordination. See Hollie Hendrikson, *The Right Patient, the Right Place, the Right Time: A Look at Trauma and Emergency Medical Services Policy in the States*, National Conference of State Legislatures, Washington, DC, September 2012, p. 9, http://www.ncsl.org/documents/health/NCSLTraumaReport812.pdf.

[104] This program is described in CRS Report R41278, *Public Health, Workforce, Quality, and Related Provisions in PPACA: Summary and Timeline*, coordinated by C. Stephen Redhead and Erin D. Williams. The funding for this program is described in CRS Report R41390, *Discretionary Spending in the Patient Protection and Affordable Care Act (ACA)*, coordinated by C. Stephen Redhead.

[105] U.S. Government Accountability Office, *Hospital Emergency Departments: Crowding Continues to Occur, and Some Patients Wait Longer than Recommended Time Frames*, 09-347, April 30, 2009, http://www.gao.gov/products/GAO-09-347; Institute of Medicine, *Emergency Medical Services at the Crossroads* (Washington, DC: The National Academies Press, 2007); and Institute of Medicine, *Hospital-Based Emergency Care: At the Breaking Point* (2007).

[106] For more information about HHS programs to train emergency providers, see CRS Report R41278, *Public Health, Workforce, Quality, and Related Provisions in PPACA: Summary and Timeline*, coordinated by C. Stephen Redhead and Erin D. Williams. For more about the Hospital Preparedness Program see Department of Health and Human Services, Public Health Emergency, "Hospital Preparedness Program," http://www.phe.gov/preparedness/planning/hpp/pages/default.aspx; and Department of Health and Human Services, Assistant Secretary for Preparedness and Response, *Healthcare Preparedness Capabilities: National Guidance for Healthcare System Preparedness*, January 2012, p. 24, http://www.phe.gov/Preparedness/planning/hpp/reports/Documents/capabilities.pdf.

[107] CRS Report R42865, *Medicaid Disproportionate Share Hospital Payments*; and CRS Report R41196, *Medicare Provisions in the Patient Protection and Affordable Care Act (PPACA): Summary and Timeline*, by Alison Mitchell.

[108] Centers for Disease Control and Prevention, "Access to Trauma Care: Getting the Right Care, at the Right Place, at the Right Time," August 24, 2010, http://www.cdc.gov/traumacare/access_trauma.html. Hereafter: Centers for Disease Control and Prevention," "Access to Trauma Care."

---

more specialized care. Trauma centers may play a role in responding to MCIs, but not all areas have the patient volume to support a trauma center. Distance to the nearest trauma center may be an issue in some MCIs. The federal government provides some funding for trauma centers through grants authorized under HHS, but not of all these programs have received funding.[109] In addition, the CDC is working to raise awareness of trauma centers and has produced research showing the importance of access to trauma care in surviving a severe injury.[110]

# Response

The medical response to an MCI involves triage[111] and limited treatment of victims on-site, as well as the transfer of victims to appropriate health care facilities for definitive treatment. As described above, federal preparedness funding aims to ensure: (1) that the medical components of MCI response work as well as possible when needed, (2) that individual components are as capable as they can be in response, and (3) that medical responders can coordinate and communicate well with each other and with other response sectors such as law enforcement and public education. However, when an incident occurs, local authorities and health systems are largely on their own during the initial phases of a response. The federal government, through HHS (and, when needed, the Department of Defense), can support local efforts to respond to MCIs, making available mobile medical teams, mobile field hospitals, medical supply and pharmaceutical caches, and medical evacuation and transport.[112] In general, however, mass shootings resolve quickly, often before federal operational assistance can be delivered.

In the event of a public mass shooting or other MCI, as with any emergency medical situation, delaying treatment while determining a patient's insurance status or ability to pay for health care services may prove fatal. The Emergency Medical Treatment and Active Labor Act (EMTALA) protects against such a delay.[113] EMTALA requires a hospital that receives Medicare payments (as the vast majority of hospitals do) to screen a patient for emergency medical conditions without regard for the patient's ability to pay. If the screening identifies an emergency medical condition, EMTALA requires the hospital to stabilize the patient. In instances where a patient's injuries are too severe to be treated at an ED, a patient may be sent to a trauma center. EMS or local EDs may determine whether a transfer to a trauma center is needed. Trauma centers are also subject to EMTALA (if the hospitals receive Medicare payments) and are required to accept transfers when an ED has determined that the trauma center possesses the specialized services that the patient needs but the ED lacks.

---

[109] For information about regional trauma programs, see CRS Report R41278, *Public Health, Workforce, Quality, and Related Provisions in PPACA: Summary and Timeline*, coordinated by C. Stephen Redhead and Erin D. Williams. For information about funding of regional trauma programs, see CRS Report R41390, *Discretionary Spending in the Patient Protection and Affordable Care Act (ACA)*, coordinated by C. Stephen Redhead.

[110] Centers for Disease Control and Prevention, "Access to Trauma Care."

[111] This involves identifying "the severity and type of injury and determin[ing] which hospital or other facility would be the most appropriate to meet the needs of the patient." See Centers for Disease Control and Prevention, "Field Triage," http://www.cdc.gov/fieldtriage/.

[112] For information, see Department of Health and Human Services, Assistant Secretary for Preparedness and Response. "Medical Assistance," http://www.phe.gov/Preparedness/support/medicalassistance/Pages/default.aspx; and Archived CRS Report RL33095, *Hurricane Katrina: DOD Disaster Response*, by Steve Bowman, Amy Belasco, and Lawrence Kapp.

[113] The Emergency Medical Treatment and Active Labor Act (EMTALA) was enacted as part of the Consolidated Omnibus Budget Reconciliation Act of 1985 (P.L. 99-272). For more information on EMTALA, see CRS Report RS22738, *EMTALA: Access to Emergency Medical Care*, by Edward C. Liu.

---

## Recovery

Recovery of affected individuals and communities over the long term may require ongoing services to meet the physical and mental health care needs of both victims and responders. Ongoing services may involve inpatient and outpatient medical care; psychosocial interventions such as pastoral or peer counseling; and population-level interventions such as public announcements about common reactions to traumatic events (which can help normalize people's experiences and reduce anxiety around symptoms that are likely to be transient) or information about how to discuss an incident with children.[114] The availability of such services in a timely and accessible manner may also be important for reducing long-term consequences such as posttraumatic stress disorder.[115] Although federal resources generally focus on the immediate aftermath of an MCI, the federal government may fund public health interventions as well as programs that support the physician and behavioral health workforce and other infrastructure. The federal government also has a role in providing and financing health services that victims and responders may access.[116]

For an individual's long-term recovery from a public mass shooting, lack of insurance or inability to pay for health care services may limit the treatment options available (e.g., physical rehabilitation or counseling). Thus, financial support may play a key role in long-term recovery.[117]

# Education Implications

Schools are unique institutions. They have a mission of great importance to our nation—they are responsible for keeping our children safe while educating them and helping prepare them to be

---

[114] Centers for Disease Control and Prevention, *Emergency Preparedness and Response: Mass Casualty Event Preparedness and Response,* http://www.bt.cdc.gov/masscasualties.

[115] See James Hawdon et al., "Social Solidarity and Wellbeing after Critical Incidents: Three Cases of Mass Shootings," *Journal of Critical Incident Analysis,* vol. 3, no. 1 (Fall 2012), pp. 2-25.

[116] For example, the Substance Abuse and Mental Health Services Administration (SAMHSA) has programs that may provide access to mental health services for victims (see http://www.samhsa.gov/), and the Health Resources and Services Administration trains mental health providers and has programs to place providers in rural and other underserved areas (see http://nhsc.hrsa.gov/ and http://bhpr.hrsa.gov/grants/mentalbehavioral/index.html). Under certain circumstances (e.g., if the infrastructure damage approached $1 million), the Governor might request that the President declare a major disaster area under the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1974 (the Stafford Act). Under a Stafford declaration, FEMA would be authorized to fund (among other things) a Crisis Counseling Assistance and Training Program (CCP); see 42 U.S.C. §5183. Alternatively, the President might consider a mass shooting event to be a "uniquely federal responsibility" and declare an emergency on that basis. Programs such as the CCP could be an adjustment made to the declaration under the President's authority, providing supplemental resources to state, local, and/or private mental health organizations. Such a declaration could also arguably provide assistance to safety forces (e.g., overtime pay) and provide other essential assistance requested by the state. See CRS Report RL33579, *The Public Health and Medical Response to Disasters: Federal Authority and Funding,* by Sarah A. Lister; Archived CRS Report RL33738, *Gulf Coast Hurricanes: Addressing Survivors' Mental Health and Substance Abuse Treatment Needs,* by Ramya Sundararaman, Sarah A. Lister, Erin D. Williams; and CRS Report RL33053, *Federal Stafford Act Disaster Assistance: Presidential Declarations, Eligible Activities, and Funding,* by Francis X. McCarthy.

[117] The coverage of mental health services under private health insurance plans, Medicare, and Medicaid may be particularly relevant for the long-term recovery of victims of an MCI. For more information about mental health coverage under private health insurance and Medicaid, see CRS Report R41249, *Mental Health Parity and the Patient Protection and Affordable Care Act of 2010,* by Amanda K. Sarata.

---

responsible and productive citizens. All levels of government are involved to some extent in this mission.[118] As mentioned earlier in this report, twelve of the 78 public mass shootings identified by CRS occurred in academic settings. Eight of these happened at primary or secondary education facilities. One incident, the December 14, 2012, shooting deaths of 20 children and 6 adults[119] at Sandy Hook Elementary School in Newtown, CT, has heightened congressional interest in school security.[120] Policy makers are examining whether school security can be further enhanced, and if so, how best to accomplish that goal.[121]

Four of the 12 public mass shootings in education settings involved high school or middle school students as assailants.[122] The federal government has supported efforts to preempt students from engaging in gun violence at school. More broadly, it has promoted policies to curb violence in schools, such as anti-bullying programs, which may or may not stem public mass shootings by student perpetrators. This section of the report focuses on those federal programs and initiatives administered by the Department of Education that may be relevant in the event of a public mass shooting in a school setting.

*The President's Plan* was released following the Newtown tragedy—it includes several provisions specifically related to schools.[123] However, funding for these provisions may not be sufficient to provide meaningful assistance to all schools that could potentially benefit. Difficult decisions confront policy makers. They must consider how to make the greatest possible improvements in student safety while likely being faced with limited federal resources to devote to safety initiatives. Policy makers may have to decide whether funds should be spread across many activities so that each activity gets some additional funding, or whether funding should be concentrated in fewer programs believed to be most cost effective. This decision is made even more difficult because research on effectiveness is limited for many school security programs.

---

[118] States and school districts have primary responsibility for the provision of elementary and secondary education in the United States. The vast majority of funding for schools is also provided by states and localities; the federal government contributes approximately 9% to the overall funding of elementary and secondary education. Nevertheless, the United States Department of Education (Department of Education) performs numerous functions, including promoting educational standards and accountability; gathering education data; disseminating research on important education issues; and administering federal education programs and policies. One of the most important priorities for the Department of Education in elementary and secondary education is improving academic outcomes for all students; particularly disadvantaged students, students with disabilities, English language learners, Indians, Native Hawaiians, and Alaska Natives.

[119] The gunman also killed himself and his mother. She was not shot at the school.

[120] For public health resources specifically addressing the Newtown tragedy see http://www.phe.gov/emergency/events/ newtown/Pages/default.aspx.

[121] In December, 2012, a group of 9 violence prevention researchers and practitioners developed a position statement on the Newtown shootings that has been endorsed by a wide variety of organizations and individuals. See http://www.ccbd.net/sites/default/files/OFFICIAL%20FOR%20DISSEMINATION- Connecticut%20School%20Shooting%20Position%20Statement%2012-19-2012-2%20pm%20ET.pdf.

[122] Of the eight remaining shootings: a) three involved non-students targeting elementary schools, b) one involved a gunman targeting people at the high school he formerly attended, c) four occurred on college campuses and involved either active or former students. CRS did not identify a public mass shooting involving a student attending elementary school who acted as an assailant in an incident at his or her own school.

[123] Schools continue to be among the safest places for children. Out of 1,579 homicides of youth ages 5-18 in the 2008-2009 year (most recent data available), approximately 1% (17), were school associated homicides. This percentage has remained consistently at less than 2% since the survey began in school year 1992-1993. These data do not indicate the weapon used. National Center for Education Statistics, Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, Department of Justice, *Indicators of School Crime and Safety: 2011*, Washington, D.C. February, 2012.

---

This may lead to consideration of whether more funding should be provided for research into program effectiveness, and if so, whether it would restrict funding for existing school security programs.

Policy makers must also consider the importance of continuity of funds for local program success. It can be difficult for local school districts to plan, develop and implement programs if they cannot be certain of a reliable funding stream. In recent years much of the dedicated funding for school safety programs provided by the Department of Education has been cut.[124] Some programs were cut because they were perceived as too small to make a difference. Others were cut because they failed to demonstrate their effectiveness. For example, funding for the Safe and Drug Free Schools and Communities Act (SDFSCA) program, the federal government's primary program aimed at preventing drug abuse and violence in and around public schools, has declined from $435 million in FY2009 to $65 million in FY2012.[125]

Department of Education guidance has divided the crisis management process for schools into four phases. Those four phases, in sequential order are: prevention, preparedness, response, and recovery.[126] Because emergency planning at institutions of higher education occurs in a significantly different environment and context, this report focuses on emergency planning at the elementary and secondary school level.[127]

## Prevention

Prevention (and mitigation) involves broadly structured efforts to help schools reduce the need to respond to crises including mass shootings. This stage of crisis management is critical for educators. If students do not feel safe at school, they will not be able to focus their energy on the most important task before them—learning. According to the Department of Education, this first stage of crisis management should include the following activities:

- connecting with community responders to identify potential hazards,

---

[124] One of the Safe and Drug Free Schools and Communities Act programs (SDFSCA) that is continuing to receive funding is the Safe Schools/Healthy Students (SS/HS) grant program. It is funded jointly by the Department of Education and SAMHSA. The program is administered by the Department of Education, SAMHSA, and DOJ. The SS/HS initiative is a discretionary grant program that provides schools and communities with federal funding to implement an enhanced, coordinated, comprehensive plan of activities, programs, and services that focus on healthy childhood development and the prevention of violence and alcohol and drug abuse. Grantees are required to establish partnerships with local law enforcement, public mental health, and juvenile justice agencies/entities. The program received $17 million in Department of Education funding for FY2012. These grants are awarded to state education agencies (SEAs), high-need local educational agencies (LEAs) and their partners.

[125] As authorized, the SDFSCA is divided into two major programs: State Formula Grants and National Programs. The majority of State Formula Grant funding was distributed first by formula to states and then also by formula to LEAs. However, FY2009 is the last year that funding was provided for State Formula Grants. Presently, funding is only provided for National Programs. Funding for the State Grant Formula program was eliminated in part because it was believed that the amount of money reaching LEAs was too small to implement effective programing. For more information on the SDFSCA program see CRS Report RL34496, *Safe and Drug-Free Schools and Communities Act: Program Overview and Reauthorization Issues*, by Gail McCallion.

[126] The Department of Education has a variety of resources to help schools and communities develop an emergency management plan. See http://www2.ed.gov/admins/lead/safety/emergencyplan/crisisplanning.pdf. See also http://rems.ed.gov/CreatingAndUpdatingSchoolEmergencyManagementPlans.aspx.

[127] For a discussion of school safety issues at Institutions of Higher Education, see CRS Report RL33980, *School and Campus Safety Programs and Requirements in the Elementary and Secondary Education Act and Higher Education Act*, by Gail McCallion and Rebecca R. Skinner.

---

- reviewing the most recent school safety audit,

- determining who is responsible for overseeing violence prevention at the school,

- soliciting staff input on the crisis plan,

- reviewing school incident data,

- determining major crime and violence problems at the school and assessing how effectively they are currently being addressed, and

- conducting an assessment to determine how existing threats may impact the school's vulnerability to particular crises.[128]

## School Climate

Improving school climate is one strategy for mitigating and preventing a variety of crises, including mass shootings (if the perpetrators involved in these incidents are students). A CDC report states that a positive school climate is "characterized by caring and supportive interpersonal relationships; opportunities to participate in school activities and decision-making; and shared positive norms, goals, and values."[129] Research has indicated that one of the most important elements in a positive school climate is for students to have a feeling of school connectedness. School connectedness is defined as "the belief by students that adults and peers in the school care about their learning as well as about them as individuals."[130]

The Department of Education's Office of Special Education Programs funds a Technical Assistance Center on Positive Behavioral Interventions and Supports. The Center provides capacity-building information and technical assistance to schools, districts, and states who are implementing a school climate protocol called *School-wide Positive Behavioral Interventions and Supports* (SWPBIS). SWPBIS is a three-tiered prevention-based approach to improving school-wide disciplinary practices. According to the Center, SWPBIS is used in more than 9,000 schools across 40 states.[131] SWPBIS has been linked to reductions in student suspensions and office discipline referrals.[132]

---

[128] A Secret Service study indicated that conducting threat assessments may help schools be better prepared to address potential problems. The study was based on information regarding 37 school shootings involving 41 attackers. It concluded that there is no accurate or useful 'profile' of a school shooter. In contrast, it indicated that threat assessment may be useful if it is: "a fact-based investigative and analytical approach that focuses on what a particular student is doing and saying, and not on whether the student 'looks like' those who have attacked schools in the past. Threat assessment emphasizes the importance of behavior and communications for identifying, evaluating and reducing the risk posed by a student who may be thinking about or planning for a school-based attack." Bryan Vossekuil et al., *The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States*. Department of Education and Secret Service, Washington D.C. 2004. p. 41. For more on threat assessments, see "Preparedness and Prevention Combined—Threat Assessments " in this report.

[129] Centers for Disease Control and Prevention, *School Connectedness: Strategies for Increasing Protection Factors Among Youth*. Atlanta, GA, Department of Health and Human Services, 2009, p. 7.

[130] Ibid., p. 3.

[131] *The President's Plan* requests $50 million to help 8,000 additional schools implement strategies to improve school climate. In addition to assistance provided through the Technical Assistance Center, the Department of Education is currently providing funding to 11 Safe and Supportive Schools grantees ($47.5 million in FY2012). SEAs, high-need LEAs and their partners can apply for this grant. Funding is used to develop and implement programs that measure and improve conditions for learning based on local needs.

[132] Catherine Bradshaw, et al., "Examining the Effects of Schoolwide Positive Behavioral Interventions and Supports (continued...)

---

Bullying prevention is also an important aspect of improving school climate. The Federal government recognizes the importance of this issue and has become increasingly involved in bullying prevention initiatives in recent years.[133]

Research indicates that both victims of bullying and those who engage in bullying behavior can experience both short and long-term effects resulting in psychological difficulties and social relationship problems. A GAO literature review of seven meta-analyses on the impact of bullying on victims found that bullying could result in psychological, physical, academic, and behavioral issues.[134] In addition, a Secret Service study on school safety and school attacks found that "Many attackers felt bullied, persecuted or injured by others prior to the attack."[135]

## School Resource Officers

The SDFSCA defines school resource officers as career law enforcement officers assigned by a local law enforcement agency to work with schools and community based organizations to:

> (A) educate students in crime and illegal drug use prevention and safety; (B) develop or expand community justice initiatives for students; and (C) train students in conflict resolution, restorative justice, and crime and illegal drug use awareness.[136]

*The President's Plan* would provide an incentive for DOJ's Community Oriented Policing Services (COPS) grants to be used to hire more school resource officers in the current year,[137] and would seek $150 million in funding for a new *Comprehensive Safety Grants* program. This new

---

(...continued)
on Student Outcomes," *Journal of Positive Behavior Interventions*, vol. 12, no. 3 (July 2010).

[133] Representatives from the U.S. Departments of Agriculture, Defense, Education, Health and Human Services, the Interior, Justice, the Federal Trade Commission and the White House Initiative on Asian Americans and Pacific Islanders have come together to form a Federal Partners in Bullying Prevention Steering Committee. The Federal Partners work to coordinate policy, research, and communications on bullying topics. The Federal Partners have created a website, http://www.stopbullying.gov, which provides extensive resources on bullying, including information on how schools can address bullying. In addition, with leadership the Department of Education, the Federal Partners have sponsored three antibullying summits attended by education practitioners, policy makers, researchers, and federal officials.

[134] Government Accountability Office, School Bullying: *Extent of Legal Protections for Vulnerable groups Needs to Be More Fully Assessed*, GA0-12-349, May 2012, pp. 8-10, http://www.gao.gov/assets/600/591202.pdf.

[135] Bryan Vossekuil, et al., *The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States*, Department of Education and Secret Service, Washington D.C. 2004, p. 12.

[136] 20 USC 7161. Another version of the federal conceptualization of the role of a school resource officer is "a career law enforcement officer, with sworn authority, deployed in community-oriented policing, and assigned by the employing police department or agency to work in collaboration with schools and community-based organizations" for a variety of purpose areas. See 42 U.S.C. § 3796dd-8. Purpose areas are: "(A) to address crime and disorder problems, gangs, and drug activities affecting or occurring in or around an elementary or secondary school; (B) to develop or expand crime prevention efforts for students; (C) to educate likely school-age victims in crime prevention and safety; (D) to develop or expand community justice initiatives for students; (E) to train students in conflict resolution, restorative justice, and crime awareness; (F) to assist in the identification of physical changes in the environment that may reduce crime in or around the school; and (G) to assist in developing school policy that addresses crime and to recommend procedural changes." As such, the broad notion of a school resource officer may not be uniform across states and localities.

[137] This proposal can be implemented through executive action, it will not require congressional action. For more information on the COPS program see CRS Report R40709, *Community Oriented Policing Services (COPS): Current Legislative Issues*, by Nathan James.

---

grant program would provide school districts and law enforcement agencies with funding to hire new school resource officers and school psychologists. This new funding stream could also be used to purchase school safety equipment, develop or expand school safety proposals, and to train crisis intervention teams of law enforcement officers to respond and assist students in a crisis.

School resource officers are popular with the public. A recent Pew research study found that 64% of those surveyed supported having armed security guards or police in more schools.[138] However, some researchers and civil rights organizations have expressed concern about increasing the presence of school resource officers in schools, arguing that the presence of law enforcement can have a negative impact on the learning environment, and may lead to more school suspensions and referrals to the juvenile justice system.[139] On December 12, 2012, the Senate Judiciary Subcommittee on the Constitution, Civil Rights and Human Rights, held a hearing titled "Ending the School-to-Prison Pipeline." In his opening statement Chairman Richard Durbin stated that:

> For many young people, our schools are increasingly a gateway to the criminal justice system. This phenomenon is a consequence of a culture of zero tolerance that is widespread in our schools and is depriving many children of their fundamental right to an education.[140]

## Preparedness and Emergency Planning

Preparedness involves marshaling the necessary resources to ensure that they are available in the event of a crisis, including shooting incidents. This involves

- confirming that the school's current emergency plan is consistent with the National Incident Management System,

- acquiring the necessary equipment and first aid resources to address a potential crisis,

- establishing procedures to account for the location of all students,

- developing procedures to communicate with staff, families and the media,

- ensuring all school staff are familiar with the school's layout, safety features, utility shutoffs, etc., and

- conducting practice drills for students and staff.[141]

One of the proposals included in *The President's Plan* would provide $30 million in one-time grants to school districts to help them develop and implement Emergency Management plans. In addition, a current SDFSCA program—Readiness and Emergency Management for schools

---

[138] The Pew survey was based on phone interviews with a national sample of 1,502 adults during January 9-13, 2013. The Pew Research Center for the People and the Press, *Gun Rights Proponents More Politically Active: In Gun Control Debate, Several Options Draw Majority Support,* January 14, 2013.

[139] Data indicate that suspensions for all students have been increasing over time, however, there has been a disproportionate increase for non-Whites, particularly African American students. "The Black/White gap has grown from 3 percentage points in the 1970s to over 10 percentage points in the 2000s. Blacks are now over three times more likely than Whites to be suspended." Daniel Losen and Russell Skiba, *Suspended Education: Urban Middle Schools in Crisis,* The Civil Rights Project, Los Angeles, CA, September 13, 2010, p. 3.

[140] http://durbin.senate.gov/public/index.cfm/pressreleases?ID=7dcaee2b-b40e-4199-bf20-557b4b1bc650.

[141] http://www2.ed.gov/admins/lead/safety/emergencyplan/crisisplanning.pdf.

---

(REMS) provides competitive grants to LEAs to strengthen and improve their emergency response and crisis plans. No grants were awarded in FY2012.[142]

The Department of Education has developed resources and training materials that are available online to help schools develop emergency plans and respond to crises.[143] However, these resources are not limited to addressing a school shooting crisis; they are intended to be applicable to a range of potential crises that could impact a school (e.g., natural disaster, pandemics, terrorism).

Indicators of School Crime and Safety data show that many schools have been increasing measures intended to improve school safety. In school year 1999-2000, 54.1% of surveyed students (ages 12-18) reported that their school had security guards and/or assigned police officers; this percentage had increased to 68.1% by school year 2009-2010. Other school security measures that have increased between school year 1999-2000 and school year 2009-2010 include the use of security cameras (from 19.4% to 61.1%); locking or monitoring doors (from 74.6% to 91.7%); and requiring faculty and staff to wear badges or IDs (from 25.4% to 62.9%).[144] *The President's Plan* would set up an interagency group to release a model set of emergency management plans for schools, houses of worship, and institutions of higher education. It would also require the Department of Education to collect and disseminate best practices for addressing school discipline.

Maintaining crisis response capacity is required of schools by 92% of states.[145] Press accounts of school shootings have provided anecdotal evidence indicating that school emergency planning (lock-down procedures and practice drills, etc.) may have minimized deaths and injuries in incidents of mass shootings. However, federal legislation does not regulate the content or quality of these plans, and the comprehensiveness and implementation of these plans vary considerably across school districts.

---

[142] LEAs that receive a REMS grant are required to form partnerships and collaborate with community organizations, local law enforcement agencies, heads of local government, and offices of public safety, health, and mental health as they review and revise these plans. Plans are required to be coordinated with state or local homeland security plans and must support the implementation of NIMS (for more on NIMS please see the text box titled "Federal Framework for Emergency Management" at the beginning of the "Law Enforcement Implications" section of this report.) REMS grants may be used for training school safety teams and students, conducting facility audits, informing families about emergency response policies, implementing an Incident Command System, conducting drills and tabletop simulation exercises, preparing and distributing copies of crisis plans, and, to a limited extent, for purchasing school safety equipment. Grantees under this program may receive support in managing and implementing their projects and sustaining their efforts over time from the Readiness and Emergency Management for Schools Technical Assistance Center.

[143] The Department of Education's website includes information on all stages of crisis management: prevention/mitigation, preparedness, response, and recovery. See http://www2.ed.gov/admins/lead/safety/emergencyplan/index.html. The Department of Education emphasizes the importance of schools ensuring that their emergency plans and potential responses are coordinated and aligned with first responders and with NIMS.

[144] These data are based on responses from school principals or persons most knowledgeable about crime and safety issues at the school. National Center for Education Statistics, Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, Department of Justice, *Indicators of School Crime and Safety: 2011*, Washington, D.C. February, 2012.

[145] See "Executive Summary" *Journal of School Health*, vol. 78, no. 2 (February 2008), p. 110. The federal SDFSCA State Formula Grant program required LEAs receiving funding under the program to have a comprehensive plan, including *"a crisis management plan for responding to violent or traumatic incidents on school grounds ... "* However, FY2009 was the last year that funding was provided for State Formula Grants, and as a consequence this federal requirement has lapsed.

---

# Response

An organized and coordinated response to a crisis is based in large part on the prevention and preparedness activities that schools have adopted and implemented. According to the Department of Education, during a crisis (which can include mass shootings), schools should undertake the following activities:

- identifying the type of crisis that is occurring,

- activating the incident management system,

- identifying the appropriate response to the crisis (e.g., evacuation, shelter in place, lockdown, etc.),

- implementing the plans and procedures established in the preparation phase,

- ensuring that important information is being communicated to staff, students and parents, and

- ensuring that emergency first aid is being provided to the injured.[146]

Many school shootings last only minutes—as a consequence, teachers and school staff become the immediate responders out of necessity in many crises, sometimes heroically sacrificing their own lives to protect the children in their care. Community first responders, including law enforcement and emergency medical personnel, are also key to ending a crisis as quickly as possible. Among their many tasks, they must immediately subdue the shooter, if he is still alive; and they most coordinate all the emergency services that are required by survivors of the shooting.

# Recovery

Recovery efforts are focused on returning students to the learning environment as soon as possible. These efforts include

- restoring school facilities,

- identifying the supports and services needed by students, staff, and families to help them recover from the crisis,

- connecting individuals to services, including mental health and counseling services, and

- allowing sufficient time for recovery and deciding how to commemorate the event.[147]

The primary Department of Education program available to schools to assist recovery efforts following a crisis is Project SERV (School Emergency Response to Violence). This program provides education-related services to schools that have been disrupted by a violent or traumatic crisis. Local educational agencies and institutions of higher education (IHEs) are eligible to apply

---

[146] See http://www2.ed.gov/admins/lead/safety/crisisplanning.pdf.

[147] See http://www2.ed.gov/admins/lead/safety/emergencyplan/crisisplanning.pdf.

for these grants.[148] Project SERV funds may be used for a wide variety of activities, including mental health assessments, referrals, and services for victims and witnesses of violence; enhanced school security; technical assistance in developing a response to the crisis; and training for teachers and staff in implementing the response.[149]

School counselors can also play an important role in facilitating a school community's recovery following a crisis. School counselors can provide an avenue for students to be heard by a caring adult, and can provide needed services or make referrals for services to community providers.[150]

*The President's Plan* includes several provisions that would increase student access to mental health services. It seeks $150 million in funding for a new *Comprehensive Safety Grants* program. One of the authorized uses of this program would be to hire school counselors. In addition, the proposal seeks $50 million to train 5,000 additional mental health professionals to serve youth in schools and communities, and $25 million to provide mental health services for trauma, conflict resolution, and other school-based violence prevention strategies. The proposal would also provide $55 million for a new Project AWARE which would train teachers and other adults to recognize and help youth with mental illness and work with a variety of community agencies and organizations to ensure youth who need help are connected to service providers.

# Concluding Comments

When addressing public mass shootings, many of the policymaking challenges may boil down to two interrelated concerns: (1) a need to determine the effectiveness of existing programs—particularly preventive efforts—and (2) figuring out where to disburse limited resources.

---

[148] Project SERV provides grants of up $50,000 for short term needs (up to six months); and grants of up to $250,000 for extended services (for a period of up to 18 months). LEAs and IHEs may apply for both Immediate Services funding and Extended Services funding; however, a separate application must be submitted for each.

[149] Appropriations for this program are requested on a no-year basis, to remain available for obligation at the federal level until expended. Thus, funds can be carried over from year to year in the event that there are no school-related crises in a given year.

[150] The Elementary and Secondary School Counseling program received funding of $52 million in FY2012. It provides competitive grants to LEAs to establish or expand elementary and secondary school counseling programs. Grantees that receive funding under this program must meet several requirements, including having a program that is comprehensive in addressing the counseling and educational needs of all students; increases the range, availability, quality, and quantity of counseling services; expands services through qualified staff; involves public and private entities in collaborative efforts to enhance the program and promote integrated services; and provides appropriate staff training. The President did not request any FY2013 funding for this program, instead proposing to a fund a broader Successful, Safe, and Healthy Students program. In addition to the Elementary and Secondary School Counseling program there are two other mental health programs authorized by the Elementary and Secondary Education Act; however they are no longer receiving funding. The Grants for the Integration of Schools and Mental Health Systems program authorizes the Secretary to award competitive grants or enter into contracts or cooperative agreements with SEAs, LEAs, or Indian tribes for the purpose of increasing student access to quality mental health care by developing innovative programs to link local school systems with the local mental health system. The program last received funding of $6 million in FY2010. The second program is the Promotion of School Readiness through Early Childhood Emotional and Social Development (Foundations for Learning). The Secretary, in consultation with the Secretary of Health and Human Services, is permitted to award Foundations for Learning Grants to LEAs, local councils, community-based organizations, and other public or nonprofit private entities to assist eligible children with school readiness. The program last received funding of $1 million in FY2010.

---

The law enforcement and public health fields have lengthy histories of applying preventive approaches to their work. However, the utility of widely employed preventive measures in these areas to fight public mass shootings is far from clear. For example, it appears that intelligence-led policing fails to address this threat. Likewise, preventive public health approaches reliant on research drawn from large data sets, covering broad populations, and examining general trends may not adequately address relatively rare—though devastating—public mass shootings. Given this, policy makers may be interested in supporting the development of useful preventive schemes in the law enforcement and public health arenas.

In the area of education, preventive efforts may be more effective. Fostering a positive school climate can be seen as a key element in preventing shootings. Additionally, the use of school resource officers as a preventive measure is popular among Americans. Yet, there are those who question the impact of such officers on the learning environment.

Policy makers confront the task of disbursing resources among a wide assortment of programs to tackle public mass shootings. Which efforts are more important than others? For example, should prevention trump response in most cases? Should programs that have multiple uses be favored over others that may be seen as more focused (or vice versa)? For example, which should receive more support related to dealing with mass shootings: EMS or efforts to cultivate positive school climate? Which untested programs or approaches should be evaluated thoroughly? Who should evaluate them? How long should funding exist to tackle the threat of mass shootings?

All of this hints at an overarching difficulty confronting experts interested in crafting policy to address mass shootings. Essentially, baseline metrics gauging the effectiveness of policies to thwart public mass shootings are often unclear or unavailable. This lack of clarity starts with identifying the number of shootings, themselves, since no broadly agreed-to definition exists. Several questions flow from this issue. How many people have such incidents victimized? How much does prevention of, preparedness for, and response to such incidents cost the federal government? What measurements can be used to determine the effectiveness of such efforts? In other words, and most importantly, how will we measure our successes or determine our failures in fighting this problem?

# Author Contact Information

Jerome P. Bjelopera, Coordinator
Specialist in Organized Crime and Terrorism
jbjelopera@crs.loc.gov, 7-0622

Erin Bagalman
Analyst in Health Policy
ebagalman@crs.loc.gov, 7-5345

Sarah W. Caldwell
Information Research Specialist
scaldwell@crs.loc.gov, 7-9712

Kristin M. Finklea
Specialist in Domestic Security
kfinklea@crs.loc.gov, 7-6259

Gail McCallion
Specialist in Social Policy
gmccallion@crs.loc.gov, 7-7758