# Exhibit 14

# Mass Shootings in America: Moving Beyond Newtown

Homicide Studies
2014, Vol. 18(1) 125–145
© 2013 SAGE Publications
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/1088767913510297
hsx.sagepub.com



## James Alan Fox[1] and Monica J. DeLateur[1]

## Abstract
Mass shootings at a Connecticut elementary school, a Colorado movie theater, and other venues have prompted a fair number of proposals for change. Advocates for tighter gun restrictions, for expanding mental health services, for upgrading security in public places, and, even, for controlling violent entertainment have made certain assumptions about the nature of mass murder that are not necessarily valid. This article examines a variety of myths and misconceptions about multiple homicide and mass shooters, pointing out some of the difficult realities in trying to avert these murderous rampages. While many of the policy proposals are worthwhile in general, their prospects for reducing the risk of mass murder are limited.

## Keywords
mass murder, subtypes, school shootings, trends, public policy, correlates

Calendar year 2012 offered a rich variety of hot topics for media coverage and public debate. The political campaign season featured an unprecedented number of presidential hopefuls and televised candidate debates, while the year's hurricane season resulted in wide-ranging destruction, primarily from Superstorm Sandy. In addition, the debate over universal health care culminated in the most highly anticipated U.S. Supreme Court ruling in decades.

Nothing, however, surpassed the amount and intensity of interest, at least from a news perspective, than the scourge of mass murder, specifically, a movie theater rampage in Aurora, Colorado, in July and then a public school massacre in Newtown, Connecticut, in mid-December. As one measure of media attention, the Associated Press's year-end poll of news editors placed mass shootings as the leading news story of 2012 (Associated Press, 2012).

[1]Northeastern University, Boston, MA, USA

**Corresponding Author:**
James Alan Fox, School of Criminology and Criminal Justice, Northeastern University, 360 Huntington Avenue, Boston, MA 02115, USA.
Email: J.fox@neu.edu

Downloaded from hsx.sagepub.com by guest on January 29, 2014

Even before the final death toll from the shooting spree at Newtown's Sandy Hook Elementary School was determined, politicians, pundits, and professors of various disciplines were all over the media, pushing their proposals for change. Some talked about the role of guns, others about access to mental health services, and still more about the need for enhanced security in schools and other public places. Whatever their agenda or the passion behind it, these advocates made certain assumptions concerning patterns in mass murder and the profile of mass killers. Unfortunately, these assumptions were not always consistent with the facts.

Until fairly recently, criminologists had all but ignored the topic of mass murder, and mass shootings in particular (see Bowers, Holmes, & Rhom, 2010; DeLisi & Scherer, 2006; Liwerant, 2007). Some scholars may have regarded mass killing, the murder of four or more victims in a single episode, as merely a special case of criminal homicide, explainable by the same criminological theories applied to single-victim incidents and, therefore, not deserving of special treatment. Other criminologists may have considered mass murder as primarily a matter of psychopathology—a crime perpetrated by individuals who suffer from profound mental disorders (e.g., psychosis) and, therefore, best analyzed through the lens of psychiatry. Finally, some may have assumed that such incidents are not only rare but also aberrational and, therefore, unworthy of significant research attention. More importantly, opportunities for examining mass murder in a systematic fashion have been hindered by limited availability of primary data: Mass murderers are typically deceased, inaccessible for legal reasons, or unwilling or unable to cooperate with research investigators (see Bowers et al., 2010; Fox & Levin, 2003).

Perhaps because of the limited body of systematic research on mass murder, much of the public discourse is grounded in myth and misunderstanding about the nature of the offense and those who perpetrate it. In this article, we attempt to identify and assess a number of these misconceptions that seem to have encouraged policy responses with a slim probability of achieving their desired outcome—eliminating the risk of mass murder.

## Myth: Mass Murderers Snap and Kill Indiscriminately

One of the earliest systematic examinations of mass murder incidents challenged the widespread view in the popular press and professional literature that mass murderers are crazed lunatics who suddenly snap, go berserk, and kill indiscriminately (Levin & Fox, 1985). Over the past few decades, moreover, this notion has persisted, at least in the public's mind, in large part because of the selective attention to the most extreme and unusual cases.

However, mass murder rarely involves a sudden explosion of rage. To the contrary, mass killers typically plan their assaults for days, weeks, or months (see, for example, Fox & Levin, 2012; Walkup & Rubin, 2013). These preparations include where, when, and who to kill, as well as with what weapons they will strike. These assailants are deliberate, determined to kill, with little regard for what obstacles are placed in their path.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

For example, Dylan Klebold and Eric Harris, the two adolescents responsible for the 1999 Columbine High School massacre, purposely chose Hitler's birthday for their attack (out of admiration for the dictator's power) and spent long hours in the woods fine-tuning their marksmanship skills. They even conceived a grand follow-up plan should they survive the school shooting: to hijack an airplane and fly it into the skyline of New York City (and this was 2 years before the September 11, 2001, acts of terrorism).

The level of detailed planning may help to explain the calm demeanor exhibited by mass murderers, even in the midst of chaos. Witnesses to a mass shooting often report, for example, that the gunman appeared relaxed, even smiling, while killing or injuring dozens of innocent victims (see Aitken, Oosthuizen, Emsley, & Seedat, 2008). Mass murderers have been known to develop and follow a mental script, one that is rehearsed over and over again, to the point where they become comfortable with the mission.

Whatever the style of killing, the motives for mass murder are organized around five primary themes that can occur singly or in combination (Fox & Levin, 1998). Specifically,

1. Revenge (e.g., a deeply disgruntled individual seeks payback for a host of failures in career, school, or personal life);
2. Power (e.g., a "pseudo-commando" style massacre perpetrated by some marginalized individual attempting to wage a personal war against society);
3. Loyalty (e.g., a devoted husband/father kills his entire family and then himself to spare them all from a miserable existence on earth and to reunite them in the hereafter);
4. Terror (e.g., a political dissident destroys government property, with several victims killed as "collateral damage," to send a strong message to those in power); and
5. Profit (e.g., a gunman executes the customers and employees at a retail store to eliminate all witnesses to a robbery).

Among these types, revenge motivation is, by far, the most commonplace (see Knoll, 2010; Leyton, 1986). Mass murderers often see themselves as victims—victims of injustice (Bowers et al., 2010; Palermo, 1997). They seek payback for what they perceive to be unfair treatment by targeting those they hold responsible for their misfortunes. Most often, the ones to be punished are family members (e.g., an unfaithful wife and all her children) or coworkers (e.g., an overbearing boss and all his employees). In such cases, there may be a primary target (which itself can be a place, such as a company, a school, or an agency) while others are killed as surrogates, in what has been termed "murder by proxy" (see Frazier, 1975).

Sometimes, mass murderers target an entire category of people (e.g., women, Jews, immigrants, Whites, Blacks, etc.), constituting a hate crime in the extreme. The victims may be chosen randomly, but the type of victim or the place to find them may not be. In such cases, strangers are punished just because of their class membership or group association.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

The rarest form of mass murder is the completely random attack (often in a public place) committed by someone who in his or her paranoid thinking suspects that the whole world is corrupt and unfair (Petee, Padgett, & York, 1997). The level of paranoia may be truly psychotic (e.g., God, the President, or some other powerful entity is behind a wide-ranging conspiracy) or involve a lesser form of paranoid personality disorder in which the perpetrator consistently misconstrues innocent acts or gestures by others as purposely malicious.

Even though most mass murderers deliberately target specific people or places, it is, of course, the seemingly senseless random massacres that are the most frightening to people. After all, they can happen at any place, at any time, and to anyone—usually without warning—and, for this reason, random acts of mass murder, although the least frequent form, receive the most attention by the mass media and the public alike.

## Myth: Mass Shootings Are on the Rise

The recent carnages in Newtown, Connecticut; Aurora, Colorado; and elsewhere have compelled many observers to examine the possible reasons behind the rise in mass murder. The New York Times columnist David Brooks noted the number of schizophrenics going untreated (Brooks, 2012). Former President Bill Clinton and other gun-control advocates have pointed to the expiration of the 1994 Federal Assault Weapons Ban as the culprit, while gun-rights proponents have argued that the body counts would be lower were more Americans armed and ready to overtake an active shooter. There is, however, one not-so-tiny flaw in all the various theories and speculations for the presumed increase in mass shootings: Mass shootings have not increased in number or in overall death toll, at least not over the past several decades.

The moral panic and sense of urgency surrounding mass murder have been fueled by various claims that mass murders, and mass shootings in particular, are reaching epidemic proportions. For example, the Mother Jones news organization, having assembled a database of public mass shootings from 1982 through 2012, has reported a recent surge in incidents and fatalities, including a spike and record number of casualties in the year 2012 (Follman, Pan, & Aronsen, 2013).

It is critical to note that Mother Jones did not include all mass shootings in their analysis but instead attempted to delineate those that were senseless, random, or at least public in nature. Mother Jones settled on several criteria for inclusion in its mass shootings database, specifically the following:

- The shooter took the lives of at least four people;
- The killings were carried out by a lone shooter;
- The shootings happened during a single incident and in a public place; and
- The murders were not related to armed robbery or gang activity.

By virtue of these selection rules, mass shootings involving family members were excluded, even though they too can involve large body counts. Other massive shootings were ignored because of their relation to gang activity or some criminal enterprise.

Downloaded from hsx.sagepub.com by guest on January 29, 2014



**Figure 1.** Mass shootings in the United States, 1976-2011.

Not only is Mother Jones's decision to disqualify cases based on certain criteria that are hard to defend but also the criteria themselves were not necessarily applied consistently (see Fox, 2013). The Columbine mass murder and the Westside Middle School massacre, for example, were included despite the fact that both were carried out by pairs of armed assailants. In response to criticism concerning the definitional concerns, Mother Jones emphasized two main themes: the need to focus more narrowly on "senseless" public shootings and the importance of investigating mass shootings beyond just the incident counts (Follman et al., 2013). Obviously, public shootings are worthy of discussion, but then so are mass killings in families or those that are designed to further some criminal enterprise. Widening the net by including mass shootings in all forms can only add to our understanding of extreme killing.

As it happens, Mother Jones's claim concerning a rise in mass shootings doesn't stand when considering the full range of cases. Figure 1 displays the number of mass shooting incidents and victims from 1976 through 2011, based on data from the FBI's Supplementary Homicide Reporting (SHR) program (along with the missing Florida data for 1996-2011 drawn directly from the state's homicide report records). These reflect all 672 mass shootings with at least four fatalities reported to local law enforcement authorities as part of the routine collection of crime statistics. Unlike the Mother Jones approach, these data do not exclude cases based on motive, location, or victim–offender relationship. They only exclude incidents in which fewer than four victims (other than the assailant) were killed, murders committed with a weapon other than a firearm, or isolated cases that may have occurred in jurisdictions that did not report homicide data to the FBI. In addition, only because of the usual time lag in crime reporting, the figures for 2012 were not yet available.

According to these expanded data, over the past few decades, there have been, on average, nearly 20 mass shootings a year in the United States. Most, of course, were

Downloaded from hsx.sagepub.com by guest on January 29, 2014

nowhere as deadly as the recent massacres in Aurora and Newtown that have countless Americans believing that a new epidemic is on them and that have encouraged healthy and often heated debate concerning causes and solutions.

Without minimizing the pain and suffering of the hundreds of those who have been victimized in recent attacks, the facts clearly say that there has been no increase in mass shootings and certainly no epidemic (see Duwe, 2004). What is abundantly clear from the full array of mass shootings is the largely random variability in the annual counts (Best, 2013). There have been several points in time when journalists and others have speculated about a possible epidemic in response to a flurry of high-profile shootings. Yet, these speculations have always proven to be incorrect when subsequent years reveal more moderate levels.

The year 1991, for example, saw a 35-year-old gunman kill 23 people at a cafeteria in Killeen, Texas, and a disgruntled graduate student murder 5 at the University of Iowa, along with other sensationalized incidents. The surge in mass killings was so frightening that a rumor spread throughout the nation that there would be a mass murder at a college in the Northeast on Halloween (Farrish, 1991). Fortunately, October 31 came and went without anything close to a massacre taking place.

And as of this writing, more than one third of the way into 2013, Mother Jones has identified but one incident that fits its definition of a senseless mass shooting. If this is any indication, the tendency for bad years to be followed by better ones will hold true once again.

## Myth: Recent Mass Murders Involve Record-Setting Body Counts

If anything has increased with regard to mass murder, it is the public's fear, anxiety, and widely held belief that the problem is getting worse (see Baldassare, Bonner, Petek, & Shrestha, 2013). Unquestionably, this perception is linked to the style and pervasiveness of news-media coverage, owing in large part to advances in technology (Heath & Gilbert, 1996). In 1966, when Charles Whitman opened fire from atop the 307-foot tower at the University of Texas in Austin, there were no 24-hr news stations or fleets of satellite trucks to relay images of tragedy as they unfolded. CNN wasn't born until the 1980s, and the other major cable news outlets not until much later. Today, of course, the American public can watch chilling live coverage of some far-away mass shooting by turning on their high-definition television screens, making it feel as if the event is happening just down the street.

The emotional impact of the Sandy Hook slaughter was intensified by the immediacy of news reports. Young children, their eyes fresh with tears and their faces filled with terror from just having fled their embattled school building, were swarmed by reporters holding microphones and cameras. The news coverage of Sandy Hook had Americans glued to their TV sets. According to a USA Today/Gallup poll of more than 1,000 adults, half the respondents watched the news reporting "very closely," while 90% indicated watching at least "somewhat closely" (Saad, 2012).

Downloaded from hsx.sagepub.com by guest on January 29, 2014

The extensive news focus on school shootings certainly had an impact on perception and fear. The same USA Today/Gallup poll found that nearly one quarter of those surveyed believed that a shooting spree such as Sandy Hook was "very likely" to occur in their own community and more than half thought that it was at least "somewhat likely" (Saad, 2012).

Meanwhile, as news of the Sandy Hook shooting was still unfolding and before any perpetrator or motive was identified, scores of journalists were asking whether this was the worst school shooting in history. It didn't matter that deadlier episodes had occurred overseas (the 2004 school siege in Russia), at a college setting (Virginia Tech in 2007) or involving means other than gunfire (the 1927 school explosion in Bath, Michigan), reporters were eager to declare the Sandy Hook massacre as some type of new record (see Best, 2013).

When it comes to news reporting, the penchant for some journalists to characterize tragedy as some kind of record is mystifying. Whether the latest massacre is in any sense the worst doesn't change the associated pain and suffering of the victims, their families, and the community at large.

At the same time, there is a definite downside to media overexposure and obsession with records, and that is the possibility that some like-minded and obscure individual will see an opportunity for recognition and perhaps a chance to break a record for bloodshed (Dietz, 1986). Of course, the overwhelming majority of Americans who watch the news about a mass shooting identify with the pain and suffering of the victims and their families. However, a few individuals instead identify with the power of the perpetrator, empathize with his or her frustrations, and maybe even admire his or her instant but undeserved celebrity.

The dynamics of imitation and reinforced learning suggest that people are far more likely to model the behavior of others if they perceive the act as reaping some reward (see Bandura, 1978). Many rational adults would question how compelling Columbine shooters Dylan Klebold and Eric Harris could be as role models when, at the end of the school day, they were found lying dead from self-inflicted gunshot wounds. However, teenagers can often interpret outcomes very differently from their parents. To an unhappy, alienated adolescent, the two gunmen could be seen as heroes: Not only had they avenged the bullying, intimidation, and acts of ostracism that are commonplace in sprawling high schools such as Columbine but also they were famous for it. When TIME magazine placed the gunmen on its May 3, 1999, cover with the headline "The Monsters Next Door," most readers saw the "cover boys" as just that—monsters. A few like-minded teenagers would have considered them celebrities who had the courage to get even, to claim a victory for bullying victims everywhere (see Paton, 2012).

There are many curious examples of copycat offending, and not just among children and adolescents. The U.S. Postal Service suffered a series of shootings, beginning with the 1986 massacre of 14 postal employees in Edmond, Oklahoma, from which came the well-known phrase, "going postal." Some of these perpetrators spoke openly about other postal rampages that had preceded their own. Adam Lanza, the Sandy Hook school shooter, was reportedly obsessed with Anders Breivik, a Norwegian mass

Downloaded from hsx.sagepub.com by guest on January 29, 2014

murderer responsible for killing 77 people, and he, in turn, was fascinated with the notorious Unabomber, Theodore Kaczynski.

This so-called "copycat effect," while widely embraced in the popular press, has received only limited attention in scholarly research, and mostly in the area of suicide (see Coleman, 2004). Sociologist David Phillips (1982) gave the imitation hypothesis more than a modicum of credibility with a series of studies related to the publicity surrounding suicides and subsequent increases in attempted or completed suicides. Phillips similarly observed, based on quasi-experimental time series data, a lagged impact of executions and major prize fights on rates of homicide (Phillips, 1983). Phillips's findings, however, have been seriously criticized for violation of model assumptions and for capitalizing on chance results (Baron & Reiss, 1985).

Given the paucity of hard evidence about the exact magnitude of copycatting, particularly with regard to multiple murders, we are left with but an array of anecdotes suggesting how mass murderers were drawn to those who perpetrated similar crimes. Even then, there is no certainty that the murders would not have occurred regardless of modeling. At best, copycatting might influence the form, and not necessarily the inspiration, for mass murder.

Whatever the extent of imitation, it is important that media coverage not obsess over large and especially record-setting body counts and avoid the tendency to sensationalize already sensational events (see Duwe, 2000). Indeed, there is a critical distinction between shedding light on a crime and a spotlight on the criminal.

## Myth: Violent Entertainment, Especially Video Games, Are Causally Linked to Mass Murder

Besides the imitation of notorious crimes and criminals, fictional portrayals of violence can provide a source for modeling behavior. Certainly, concern over the negative impact of violent entertainment extends back generations. Yet, the realism offered by today's entertainment options has intensified the debate.

It can be tempting to try to implicate entertainment media—especially video games— for various stunning episodes of extreme violence. A Gallup poll taken in the wake of the April, 1999, Columbine massacre found that 62% of the more than 1,000 adults surveyed nationwide felt that entertainment media was a major cause of school violence (Newport, 1999), and 83% supported restrictions on sales of violent media to children (see Carlson, 2002). Furthermore, a Gallup poll of approximately 1,000 adults nationwide taken immediately following the December 2012, Sandy Hook shooting found that 78% of respondents believed that reducing the depiction of gun violence in entertainment media would be effective in decreasing the risk of mass shootings (Newport, 2012).

It is not surprising that most schoolyard shooters and many adult mass murderers played violent video games in their spare time. To be sure, violent people are often attracted to violent entertainment, on TV, in film, or through game consoles. However, the ability to document a direct causal link indicating that consuming violent entertainment leads to violent behavior has eluded social science researchers for years (Brief of Social Scientists et al., 2010; Ferguson, 2011; Grimes, Anderson, & Bergen, 2008).

Downloaded from hsx.sagepub.com by guest on January 29, 2014

Much was written in the popular press about the fact that Sandy Hook shooter Adam Lanza spent long hours alone in the basement of his Newtown home playing violent video games (see, for example, Edelman, 2013). However, his gaming may be more a symptom of his personality and temperament than the cause. As a socially awkward youngster, reportedly with Asperger's syndrome, his social isolation may be the key to his preoccupation with gaming as well as his rampage against an unwelcoming society.

The entertainment industry has, at times, been used as a convenient scapegoat, and censorship as an easy solution. Lawsuits directed against various media organizations have occasionally been launched, albeit unsuccessfully, when it was discovered that some mass murderer had been obsessed with violent entertainment. Such concerns also led to the passage of a 2005 California ban on the sale of violent video games to minors, although the U.S. Supreme Court ultimately judged the prohibition to be unconstitutional in a 7-2 decision (*Brown, Governor of California, et al., v. Entertainment Media Association et al.*, 2011). It has long been easy to point fingers at this profitable industry, while ignoring some of the root causes of violence that are much more difficult to resolve.

To the extent that youngsters spend endless hours being entertained by violence says more about the lack of parental supervision and control. It isn't that the entertainment media are so powerful; it is that our other institutions—family, school, religion, and neighborhood—have grown weaker with respect to socializing children (see Flannery, Modzeleski, & Kretschmar, 2013; Paton, 2012). Banning violent entertainment may be an easy fix, especially when policymakers are unwilling or unable to deal with the more fundamental causes of violence.

## Myth: Greater Attention and Response to the Telltale Warning Signs Will Allow Us to Identify Would-Be Mass Killers Before They Act

In the aftermath of an extremely violent episode, survivors typically question why certain warning signs were ignored. The warning sign can even come in the form of overt or veiled threats articulated by the soon-to-become mass murderer—a process that has been termed "leakage" (O'Toole, 2008). If anything, these indicators are yellow flags that only turn red once the blood has spilled and are identified in the aftermath of tragedy with crystal-clear hindsight.

There certainly exist a number of common features in the profile of a mass shooter. As shown in Table 1, they are overwhelmingly male (more than 95% are male), more often Caucasian (nearly two thirds are White), and older than murderers in general (half are more than 30 years of age). Beyond just these demographics, mass killers tend to share a number of psychological and behavioral characteristics, including depression, resentment, social isolation, the tendency to externalize blame, fascination with graphically violent entertainment, and a keen interest in weaponry (see Fox & Levin, 2003). However, these characteristics, even in combination, are fairly prevalent in the general population.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

**Table 1.** Demographic Characteristics of Mass Shooters, 1976-2011.

| Demographic characteristic | n | % |
|---|---|---|
| Offender sex | | |
| Male | 506 | 95.8 |
| Female | 22 | 4.2 |
| Total | 528 | 100.0 |
| Offender race | | |
| White | 321 | 62.0 |
| Black | 171 | 33.0 |
| Other | 26 | 5.0 |
| Total | 518 | 100.0 |
| Offender age | | |
| Under 20 | 63 | 12.2 |
| 20-29 | 196 | 38.1 |
| 30-39 | 127 | 24.7 |
| 40-49 | 95 | 18.4 |
| 50 and above | 34 | 6.6 |
| Total | 515 | 100.0 |

*Note.* The total count of 692 was reduced because of unknown offender characteristics.

Profiles and checklists designed to predict rare events—such as mass shootings—tend to over-predict, producing a large number of "false positives" (see Chaiken et al., 1994; Norko & Baranoski, 2008). Many people may closely match the profile—angry, frustrated folks who are reclusive, quick to blame others for their shortcomings and make threatening remarks—but very few will in fact commit murder, much less mass murder (see Bjelopera, Bagalman, Caldwell, Finklea, & McCallion, 2013; Ferguson, Coulson, & Barnett, 2011; Mulvey & Cauffman, 2001).

In addition, aggressive attempts to single out potential troublemakers before they make trouble can potentially do more harm than good by stigmatizing, marginalizing, and traumatizing already troubled individuals. If they already feel mistreated, then focused interventions, even if benevolent, can easily be misinterpreted as further evidence of persecution, thereby encouraging a violent outburst rather than discouraging it (see Fox & Levin, 1994, 2012; Lakeman, 1997).

## Myth: Widening the Availability of Mental Health Services Will Allow Unstable Individuals to Get the Treatment They Need and Avert Mass Murders

Recent mass shootings at the hands of seemingly disturbed individuals have prompted mental health advocates to push for increased access to treatment. Unfortunately, countless Americans suffer from depression and loneliness. Many go without the psychiatric treatment that they desperately need but perhaps cannot afford.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

It would certainly be a fitting legacy to the tragedy in Newtown if mental health services were expanded and improved. However, greater access to treatment options may not necessarily reach the few individuals on the fringe who would seek to turn a school, a shopping mall, or a movie theater into their own personal war zone. With their tendency to externalize blame and consider themselves as victims of mistreatment, mass murderers see the problem to reside in others, not themselves (Knoll, 2012). If urged or even coerced to seek counseling, the would-be mass murderer would likely resist angrily to the suggestion that something is wrong with him or her. He or she desires fair treatment, not psychological treatment (see, for example, Fox & Levin, 1994).

In the aftermath of high-profile mass shootings, political leaders often rally to address the needs of the mentally ill. Unfortunately, this timing tends to stigmatize the vast majority of people who suffer from mental illness as if they too are mass murderers in waiting (see Barry, McGinty, Vernick, & Webster, 2013). However, no clear relationship between psychiatric diagnosis and mass murder has been established (see Busch & Cavanaugh, 1986; Dietz, 1986; Taylor & Gunn, 1999).

In addition, the sudden initiative to aid the psychologically impaired may be the right thing to do but for the wrong reason. For example, during an April 8, 2013, speech in Hartford, Connecticut, delivered months after the Sandy Hook school shooting, President Barack Obama (2013) urged Congress to respond: "We need to help people struggling with mental health problems get the treatment they need *before it is too late*" [italics added]. We should endeavor to help the mentally ill out of concern for their well-being, not just because we are worried about the well-being of those they might kill (Swanson, 2008).

## Myth: Enhanced Background Checks Will Keep Dangerous Weapons Out of the Hands of These Madmen

If one thing is predictable about mass shootings, it is that they will spark heated debate over gun control. Many public officials and private citizens alike insist that we must find a way to keep guns away from our most dangerous element (see Barry et al., 2013; Best, 2013). However, they are often blinded by passion and anger from confronting the practical limitations to achieving that desirable objective.

Most mass murderers do not have criminal records or a history of psychiatric hospitalization (Dietz, 1986). They would not be disqualified from purchasing their weapons legally. A recent examination of 93 mass shootings from January 2009 through September 2013, conducted by Mayors Against Illegal Guns (2013), found no indication that any of the assailants were prohibited by federal law from possessing firearms because they had been adjudicated mentally ill or had been involuntarily committed for treatment. And in just 10 of the 93 cases, there was evidence that concerns about the mental health of the shooter had been brought to the attention of a medical practitioner or legal authority prior to the shooting spree.

People cannot be denied their Second Amendment rights just because they look strange or act in an odd manner. Moreover, would-be mass killers can usually find an alternative

Downloaded from hsx.sagepub.com by guest on January 29, 2014

**Table 2.** Mass Shootings and the Federal Assault Weapon Ban.

| Time period | Incidents | | Victims | |
|---|---|---|---|---|
| | Total | Average | Total | Average |
| 1976-1994 | 335 | 17.6 | 1,536 | 80.8 |
| 1995-2004 | 193 | 19.3 | 876 | 87.6 |
| 2005-2011 | 144 | 20.6 | 699 | 99.9 |

*Source.* Supplementary Homicide Reports, 1976-2011.

**Table 3.** Weapons Used in Public Mass Shootings.

| Type of firearm | n | % |
|---|---|---|
| Assault weapons | 35 | 24.6 |
| Semiautomatic handguns | 68 | 47.9 |
| Revolvers | 20 | 14.1 |
| Shotguns | 19 | 13.4 |
| Total | 142 | 100.0 |

*Source.* Mother Jones database of mass shootings, 1982-2012.

way of securing the needed weaponry. Several mass shooters have used firearms purchased, borrowed, or stolen from a family member or friend (see Follman et al., 2013).

## Myth: Restoring the Federal Ban on Assault Weapons Will Prevent These Horrible Crimes

In the aftermath of the Newtown shooting, many media pundits and political leaders alike decried the expiration of the 1994 federal ban on certain military-style assault weapons. However, a comparison of the incidence of mass shootings during the 10-year window when the assault weapon ban was in force against the time periods before implementation and after expiration shows that the legislation had virtually no effect, at least in terms of murder in an extreme form. As shown in Table 2, based on SHR data from 1976 to 2011, the average incidence and victimization level during the federal prohibition was not especially different than in the years before or after the law was operative.

The overwhelming majority of mass murderers use firearms that would not be restricted by an assault weapons ban (see Duwe, 2007). Moreover, the Mother Jones data, notwithstanding the questions surrounding inclusions/exclusions, suggest that assault weapons are not as commonplace in mass shootings as some gun-control advocates believe. As shown in Table 3, semiautomatic handguns are far more prevalent in random massacres than firearms that would typically be classified as assault weapons (Follman et al., 2013). In fact, only one quarter of these mass murderers killed with an assault weapon; they easily could have identified an alternate means of mass casualty if that were necessary.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

In an analysis of mass shootings from January 2009 through September 2013, Mayors Against Illegal Guns (2013) confirmed the limited role of military-style assault weapons. Only 14 of the 93 incidents examined by this gun-control group involved assault weapons or high-capacity magazines. Of course, limiting the size of ammunition clips would at least compel a gunman to pause to reload or switch weapons, potentially giving others a brief window of opportunity to escape or even intervene (see Barry et al., 2013; Best, 2013). However, such an initiative would likely affect only newly produced accessories. Unfortunately, there is an ample supply of large-capacity magazines already in circulation for anyone determined enough to locate one.

## Myth: Expanding "Right to Carry" Provisions Will Deter Mass Killers or at Least Stop Them in Their Tracks and Reduce the Body Counts

The potential for citizens to counterattack while an assailant stops to reload is but one reason why many gun-rights advocates argue against gun restrictions, at least for law-abiding, licensed gun owners. Specifically, many argue that the establishment of gun-free zones (e.g., schools, churches, courthouses, and other government buildings) makes citizens vulnerable to attacks by armed assailants.

Proponents for expanding concealed carry rights contend that having more people armed in public spaces would not only serve as a deterrent but also permit citizens to overpower an armed assailant. Whatever the deterrent or intervention effects, detractors have voiced concern that a sudden shootout between an assailant and citizens armed with concealed weapons could potentially catch countless innocent victims in the crossfire. As mentioned, mass killers are often described by surviving witnesses as being relaxed and calm during their rampages, owing to their level of planning. In contrast, the rest of us are taken by surprise and typically respond frantically.

Whether or not permitting concealed carry impacts the risk of mass murder is, of course, an empirical question, and not just a debate involving hypotheticals. Using a Poisson regression approach, Lott and Landes (2000) analyzed the effect of right-to-carry laws in 23 states on the incidence and magnitude of multiple-victim homicide over the time frame of 1977-1995, concluding that such legislation works to suppress the risk and extent of mass violence. However, Duwe, Kovandzic, and Moody (2002), applying the more flexible and appropriate negative binomial model to a time frame expanded through 1999, concluded that the effect of right-to-carry laws was negligible, neither encouraging nor discouraging mass shootings.

The debate over an armed citizenry has focused specifically on schools and the need to protect vulnerable populations of students from armed assailants. Since the Newtown shooting, lawmakers in as many as six states have promoted legislation to arm schoolteachers and train them to shoot. And, based on a nationwide poll by the Gallup organization, nearly two thirds of Americans see merit in this idea (Newport, 2012).

Supporters of firearms-for-faculty laws argue that ever since the early 1990s, when the U.S. Congress established schools as gun-free zones, an armed assailant, be it a student-insider or a stranger-intruder, could be assured to face little opposition. The belief

Downloaded from hsx.sagepub.com by guest on January 29, 2014

is that arming teachers and administrators might serve as a powerful deterrent to anyone contemplating a Columbine-style school shooting. It is hard to imagine, however, that a vengeful student, who is willing to die by police gunfire or by his or her own hand, would be dissuaded by knowing that the faculty were armed. He may even welcome the chance to shoot it out with the principal at high noon in the school cafeteria.

The debate over guns on campus has been particularly contentious with regard to institutions of higher education. The national grassroots organization Students for Concealed Carry has had some success in convincing legislators that the body count in episodes such as the Virginia Tech massacre, in which 32 people were slain, would be reduced were properly licensed and trained students allowed to carry guns to class. However, in light of the low rate of serious violence on campus and the high prevalence of substance abuse and depression among college students, it would seem ill-advised to encourage gun carrying by anyone other than duly sworn public safety personnel.

## Myth: Increasing Physical Security in Schools and Other Places Will Prevent Mass Murder

The immediate response to deadly shootings in schools and other buildings is typically a call for enhanced physical security (see Lassiter & Perry, 2009; Trump, 2011). In the short term, access control and close surveillance may calm the fears of an anxious public. In the long run, it is equally important to avoid transforming our public spaces into fortresses.

Out of concern for the safety of the most vulnerable members of society, schools at all levels have seen the need to invest significant resources in physical security measures. As shown in Table 4, public schools have particularly embraced access control strategies as well as surveillance technology. Despite the tremendous suffering that would come from a school shooting, the exceptionally low probability of such an event would argue against excessive levels of security (Fox & Burstein, 2010). Children should not be constantly reminded of their vulnerability, suggesting that they have a target on their backs. It hardly serves the primary mission of educating students.

Although generally effective in protecting a student population, most security measures serve only as a minor inconvenience for those who are determined to cause mayhem (see Fox & Burstein, 2010; Rocque, 2012; Trump, 2000). Two middle school students in Arkansas, for example, didn't bother trying to bring guns into school. They only had to pull the fire alarm and wait outside in the schoolyard for their human targets to emerge from the building.

## Myth: Having Armed Guards at Every School Will Serve to Protect Students From an Active Shooter and Provide a Deterrent as Well

In the wake of the Sandy Hook massacre, Wayne LaPierre, Executive Director of the National Rifle Association (NRA), suggested that we equip every school in America—schools of every size, level, and type—with an armed guard. Central to the set of

Downloaded from hsx.sagepub.com by guest on January 29, 2014

**Table 4.** Percentage of Public Schools With Various Safety and Security Measures.

| School safety and security measure | School year | | | | |
|---|---|---|---|---|---|
| | 1999-2000 | 2003-2004 | 2005-2006 | 2007-2008 | 2009-2010 |
| Controlled access during school hours | | | | | |
| Buildings (e.g., locked or monitored doors) | 74.6 | 83.0 | 84.9 | 89.5 | 91.7 |
| Grounds (e.g., locked or monitored gates) | 33.7 | 36.2 | 41.1 | 42.6 | 46.0 |
| Closed the campus for most students | 64.6 | 66.0 | 66.1 | 65.0 | 66.9 |
| Required to wear badges or picture IDs | | | | | |
| Students | 3.9 | 6.4 | 6.1 | 7.6 | 6.9 |
| Faculty and staff | 25.4 | 48.0 | 47.8 | 58.3 | 62.9 |
| Metal detector checks on students | | | | | |
| Random checks | 7.2 | 5.6 | 4.9 | 5.3 | 5.2 |
| Required to pass through daily | 0.9 | 1.1 | 1.1 | 1.3 | 1.4 |
| Sweeps and technology | | | | | |
| Random sweeps for contraband | 11.8 | 12.8 | 13.1 | 11.4 | 12.1 |
| Provided telephones in most classrooms | 44.6 | 60.8 | 66.8 | 71.6 | 74.0 |
| Notification system for school-wide emergency | NA | NA | NA | 43.2 | 63.1 |
| Anonymous threat reporting system | NA | NA | NA | 31.2 | 35.9 |
| Used security cameras to monitor the school | 19.4 | 36.0 | 42.8 | 55.0 | 61.1 |
| Visitor requirements | | | | | |
| Sign in or check in | 96.6 | 98.3 | 97.6 | 98.7 | 99.3 |
| Dress code | | | | | |
| Required students to wear uniforms | 11.8 | 13.8 | 13.8 | 17.5 | 18.9 |
| Enforced a strict dress code | 47.4 | 55.1 | 55.3 | 54.8 | 56.9 |
| School supplies and equipment | | | | | |
| No book bags or clear-only ones | 5.9 | 6.2 | 6.4 | 6.0 | 5.5 |
| Provided school lockers to students | 46.5 | 49.5 | 50.6 | 48.9 | 52.1 |

*Source.* U.S. Department of Education, National Center for Education Statistics, School Survey on Crime and Safety 2000, 2004, 2006, 2008, and 2010.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

**Table 5.** Percentage of Public Schools With Security Personnel.

| School characteristics | %t of schools with security guards or sworn police officers | | | % of schools with regularly armed security personnel | | |
|---|---|---|---|---|---|---|
| | 2005-2006 | 2007-2008 | 2009-2010 | 2005-2006 | 2007-2008 | 2009-2010 |
| All public schools | 41.7 | 46.3 | 42.8 | 30.7 | 34.1 | 28.0 |
| Grade level | | | | | | |
| Primary school | 26.2 | 33.1 | 27.7 | 15.7 | 20.1 | 12.5 |
| Middle school | 63.7 | 65.5 | 66.4 | 51.8 | 54.2 | 51.0 |
| High school | 75.2 | 79.6 | 76.4 | 64.0 | 67.5 | 63.3 |
| Combined school | 43.5 | 39.9 | 36.6 | 32.4 | 32.1 | 24.6 |
| Enrollment size | | | | | | |
| Less than 300 | 22.7 | 27.6 | 25.6 | 16.2 | 16.1 | 13.5 |
| 300-499 | 29.8 | 36.1 | 33.5 | 20.5 | 26.7 | 19.8 |
| 500-999 | 50.5 | 52.7 | 47.3 | 36.9 | 39.5 | 30.3 |
| 1,000 or more | 86.9 | 90.6 | 90.0 | 70.3 | 73.5 | 74.6 |
| Locale | | | | | | |
| City | 49.1 | 57.3 | 50.9 | 30.5 | 33.1 | 27.6 |
| Suburb | 42.7 | 45.4 | 45.4 | 32.2 | 33.7 | 29.6 |
| Town | 44.4 | 51.1 | 39.0 | 38.1 | 45.0 | 31.6 |
| Rural | 33.8 | 36.0 | 35.2 | 27.1 | 30.5 | 25.3 |
| Percent minority enrollment | | | | | | |
| Below 5% | 28.3 | 35.6 | 30.4 | 22.9 | 27.1 | 21.9 |
| 5% up to 20% | 38.9 | 42.9 | 36.5 | 30.2 | 37.7 | 27.6 |
| 20% up to 50% | 41.6 | 44.7 | 41.9 | 35.3 | 38.4 | 30.5 |
| 50% and above | 51.3 | 55.4 | 52.5 | 31.3 | 31.8 | 29.1 |

*Source.* U.S. Department of Education, National Center for Education Statistics, 2005-2006, 2007-2008, and 2009-2010 School Survey on Crime and Safety (SSOCS), 2006, 2008, and 2010.

recommendations advanced by an NRA-sponsored task force is for schools to be sufficiently prepared to ward off any dangerous intruder (see Hutchinson, 2013).

Actually, as shown in Table 5, many schools, especially high schools and those in urban areas, already use security personnel, often equipped with firearms. Notwithstanding the many benefits to employing well-trained school resource officers (Rich-Shea, 2010) as a deterrent to mass shootings, this too is limited. Columbine High School, in fact, had school resource officers on duty the day in 1999 when two alienated adolescents turned their school into a war zone. Columbine was a fairly large campus with nearly 2,000 students enrolled, and the officers couldn't be everywhere at once.

If armed guards and armed teachers are indeed worthy strategies for protecting children, then what should schools do to protect the students before and after school? Expanding this approach would dictate providing weapons to coaches, athletic directors, and even bus drivers.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

## Conclusion

The fact that gun control, expanded psychiatric services, and increased security measures are limited in their ability to prevent dreadful mass shootings doesn't mean that we shouldn't try. In the immediate aftermath of the Newtown shooting, there was momentum in Washington, D.C., and in various state legislatures to establish policies and procedures designed to make us all safer.

Gun restrictions and other initiatives may not stop the next mass murderer, wherever he or she may strike, but we can enhance the well-being of millions of Americans in the process. Besides, doing something is better than doing nothing. At least, it will reduce the debilitating feeling of helplessness.

Many of the well-intentioned proposals coming in response to the recent spike in mass shootings may do much to affect the level of violent crime that plagues our nation daily. We shouldn't, however, expect such efforts to take a big bite out of crime in its most extreme form. Of course, taking a nibble out of the risk of mass murder, however small, would still be a worthy goal for the nation. However, those who have suggested that their plan for change will ensure that a crime such as the Sandy Hook massacre will never reoccur will be bitterly disappointed.

Eliminating the risk of mass murder would involve extreme steps that we are unable or unwilling to take—abolishing the Second Amendment, achieving full employment, restoring our sense of community, and rounding up anyone who looks or acts at all suspicious. Mass murder just may be a price we must pay for living in a society where personal freedom is so highly valued.

### Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

### References

Aitken, L., Oosthuizen, P., Emsley, R., & Seedat, S. (2008). Mass murders: Implications for mental health professionals. *The International Journal of Psychiatry in Medicine, 38*, 261-269.

Associated Press. (2012, December 20). Poll ranks top 10 news stories of 2012. *USA Today*. Retrieved from http://www.usatoday.com/story/news/2012/12/20/year-top-news/1783303/

Baldassare, M., Bonner, D., Petek, S., & Shrestha, J. (2013, January). *PPIC Statewide Survey: Californians and their government*. San Francisco: Public Policy Institute of California.

Bandura, A. (1978). Social learning theory of aggression. *Journal of Communication, 28*, 12-29.

Baron, J. N., & Reiss, P. C. (1985). Same time, next year: Aggregate analyses of the mass media and violent behavior. *American Sociological Review, 50*, 347-363.

Barry, C. L., McGinty, E. E., Vernick, J. S., & Webster, D. W. (2013). After Newtown—Public opinion on gun policy and mental illness. *New England Journal of Medicine, 368*, 1077-1081.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

Best, J. (2013, June 16). *How should we classify the Sandy Hook killings?* Retrieved from http://reason.com/archives/2013/06/16/the-politics-of-gun-violence

Bjelopera, J. P., Bagalman, E., Caldwell, S. W., Finklea, K. M., & McCallion, G. (2013, March 18). *Public mass shootings in the United States: Selected implications for Federal public health and safety policy* (Congressional Report No. R43004). Washington, DC: Library of Congress Congressional Research Service.

Bowers, T. G., Holmes, E. S., & Rhom, A. (2010). The nature of mass murder and autogenic massacre. *Journal of Police and Criminal Psychology, 25*, 59-66.

Brief of Social Scientists and Media Effects Scholars as Amici Curiae Supporting Respondents, Schwarzenegger & Brown v. Entertainment Merchants Association & Entertainment Software Association, 537 U.S. 418 (2010)(no. 08-1448).

Brooks, D. (2012, July 23). More treatment programs. *New York Times*. Retrieved from http://www.nytimes.com/2012/07/24/opinion/brooks-more-treatment-programs.html

Brown, Governor of California, et al. v. Entertainment Merchants Association et al. 537 U.S. 418 (2010) (no. 08–1448).

Busch, K. A., & Cavanaugh, J. L. Jr. (1986). The study of multiple murder: Preliminary examination of the interface between epistemology and methodology. *Journal of Interpersonal Violence, 1*, 5-23.

Carlson, D. K. (2002, January 22). The blame game: Youth and media violence. *Gallup News Service*. Retrieved from http://www.gallup.com/poll/5626/Blame-Game-Youth-Media-Violence.aspx

Chaiken, J., Chaiken, M., & Rhodes, W. (1994). Predicting violent behavior and classifying violent offenders. In A. Reiss & J. Roth (Eds.), *Understanding and preventing violence* (Vol. 4, pp. 217-295). Washington, DC: National Academy Press.

Coleman, L. (2004). *The copycat effect: How the media and popular culture trigger the mayhem in tomorrow's headlines*. New York, NY: Pocket Books.

DeLisi, M., & Scherer, A. M. (2006). Multiple homicide offenders: Offense characteristics, social correlates, and criminal careers. *Criminal Justice and Behavior, 33*, 367-391.

Dietz, P. E. (1986). Mass, serial, and sensational homicides. *Bulletin of the New York Academy of Medicine, 62*, 477-491.

Duwe, G. (2000). Body-Count Journalism: The presentation of mass murder in the news media. *Homicide Studies, 4*, 364-399.

Duwe, G. (2004). The patterns and prevalence of mass murder in twentieth-century America. *Justice Quarterly, 21*, 729-761.

Duwe, G. (2007). *Mass murder in the United States: A history*. Jefferson, NC: McFarland and Company.

Duwe, G., Kovandzic, T., & Moody, C. E. (2002). The impact of right-to-carry concealed firearms laws on mass public shootings. *Homicide Studies, 6*, 271-296.

Edelman, A. (2013, February 17). Detectives investigating Newtown massacre find Adam Lanza's violent video games, ponder the 20-year-old mimicking a gory game scene. *New York Daily News*. Retrieved from http://www.nydailynews.com/news/national/violent-games-provide-motive-newtown-massacre-article-1.1266643

Farrish, K. (1991, October 30). Rumor of Halloween mass murder no threat. *Hartford Courant*. Retrieved from http://articles.courant.com/1991-10-30/news/0000210189_1_rumor-halloween-night-mass-murders

Ferguson, C. J. (2011). Video games and youth violence: A prospective analysis in adolescents. *Journal of Youth Adolescence, 40*, 377-391.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

Ferguson, C. J., Coulson, M., & Barnett, J. (2011). Psychological profiles of school shooters: Positive directions and one big wrong turn. *Journal of Police Crisis Negotiations, 11,* 141-158.

Flannery, D. J., Modzeleski, W., & Kretschmar, J. M. (2013). Violence and school shootings. *Current Psychiatry Reports, 15*(1), 1-7.

Follman, M., Pan, D., & Aronsen, G. (2013, February 27). A guide to mass shootings in America. *Mother Jones.* Retrieved from http://www.motherjones.com/special-reports/2012/12/guns-in-america-mass-shootings

Fox, J. A. (2013, January 31). *Responding to Mother Jones.* Retrieved from http://boston.com/community/blogs/crime_punishment/2013/01/responding_to_mother_jones.html

Fox, J. A., & Burstein, H. (2010). *Violence and security on campus: From preschool through college.* Santa Barbara, CA: Praeger.

Fox, J. A., & Levin, J. (1994). Firing back: The growing threat of workplace homicide. *Annals of the American Academy of Political and Social, 536,* 16-30.

Fox, J. A., & Levin, J. (1998). Multiple homicide: Pattern of serial and mass murder. *Crime and Justice, 23,* 407-455.

Fox, J. A., & Levin, J. (2003). Mass murder: An analysis of extreme violence. *Journal of Applied Psychoanalytic Studies, 5,* 47-64.

Fox, J. A., & Levin, J. (2012). *Extreme killing: Understanding serial and mass murder.* Thousand Oaks, CA: Sage.

Frazier, S. H. (1975). Violence and social impact. In J. C. Schoolar & C. M. Gaitz (Eds.), *Research and the psychiatric patient.* New York, NY: Brunner/Mazel.

Grimes, T., Anderson, J. A., & Bergen, L. (2008). *Media violence and aggression: Science and ideology.* Thousand Oaks, CA: Sage.

Heath, L., & Gilbert, K. (1996). Mass media and fear of crime. *American Behavioral Scientist, 39,* 379-386.

Hutchinson, A. (2013, April). *Report of the national school shield task force.* The National School Shield. Retrieved from http://www.nraschoolshield.com/NSS_Final_FULL.pdf

Knoll, J. L. (2010). The "pseudocommando" mass murderer: Part I, the psychology of revenge and obliteration. *Journal of the American Academy of Psychiatry and the Law Online, 38,* 87-94.

Knoll, J. L. (2012). Mass murder: Causes, classification, and prevention. *Psychiatric Clinics of North America, 35,* 757-780.

Lakeman, R. (1997). Dangerousness and mental illness: The implications for nursing practice. *Vision, 3*(4), 10-14.

Lassiter, W. L., & Perry, D. C. (2009). *Preventing violence and crime in America's schools: From put-downs to lock-downs.* Santa Barbara, CA: Praeger.

Levin, J., & Fox, J. A. (1985). *Mass murder: America's growing menace.* New York, NY: Plenum.

Leyton, E. (1986). *Compulsive killers: The story of modern multiple murder.* New York: New York University Press.

Liwerant, O. S. (2007). Mass murder: Discussing criminological perspectives. *Journal of International Criminal Justice, 5,* 917-939.

Lott, J. R., & Landes, W. M. (2000). *Multiple victim public shootings* (Unpublished manuscript). Retrieved from http://ssrn.com/abstract=272929

Mayors Against Illegal Guns. (2013). Analysis of Recent Mass Shootings. Retrived from http://libcloud.s3.amazonaws.com/9/56/4/1242/1/analysis-of-recent-mass-shootings.pdf

Downloaded from hsx.sagepub.com by guest on January 29, 2014

Mulvey, E. P., & Cauffman, E. (2001). The inherent limits of predicting school violence. *American Psychologist, 56,* 797-802.

Newport, F. (1999, May 13). Public continues to believe a variety of factors caused Littleton: Parents and family issues top the list. *Gallup News Service.* Retrieved from http://www.gallup.com/poll/3856/Public-Continues-Believe-Variety-Factors-Caused-Littleton.aspx

Newport, F. (2012, December 19). *To stop shootings, Americans focus on police, mental health: Democrats substantially more likely to see assault gun ban as effective. Gallup News Service.* Retrieved from http://www.gallup.com/poll/159422/stop-shootings-americans-focus-police-mental-health.aspx

Norko, M. A., & Baranoski, M. V. (2008). The prediction of violence; detection of dangerousness. *Brief Treatment and Crisis Intervention, 8,* 73-91.

Obama, B. (2013, April 8). *Remarks by the president on reducing gun violence—Hartford, CT* [Video file]. Retrieved from http://www.whitehouse.gov/photos-and-video/video/2013/04/08/president-obama-speaks-reducing-gun-violence#transcript

O'Toole, M. E. (2008). The school shooter: A threat assessment perspective. *Quantico, VA: Federal Bureau of Investigation.* Retrieved from http://www.fbi.gov/stats-services/publications/school-shooter

Palermo, G. B. (1997). The Berserk syndrome: A review of mass murder. *Aggression and Violent Behavior, 2,* 1-8.

Paton, N. (2012). Media participation of school shooters and their fans: Navigating between self-distinction and imitation to achieve individuation. In G. W. Muschert & J. Sumiala (Eds.), *Studies in media and communications: Vol. 7. School shootings: Mediatized violence in a global age* (pp. 205-234). Bingley, UK: Emerald Group Publishing Limited.

Petee, T. A., Padgett, K. G., & York, T. S. (1997). Debunking the stereotype: An examination of mass murder in public places. *Homicide Studies, 1,* 317-337.

Phillips, D. P. (1982). The impact of fictional television stories on U.S. adult fatalities: New evidence on the effect of the mass media on violence. *The American Journal of Sociology, 87,* 1340-1359.

Phillips, D. P. (1983). The impact of mass media violence on U.S. homicides. *American Sociological Review, 48,* 560-568.

Rich-Shea, A. (2010). *Adolescent youth and social control: The changing role of public schools* (Unpublished dissertation) Northeastern University, Boston, MA. Retrieved from http://hdl.handle.net/2047/d20002800

Rocque, M. (2012). Exploring school rampage shootings: Research, theory, and policy. *The Social Science Journal, 49,* 304-313.

Saad, L. (2012, December 28). Parents' fear for children's safety at school rises slightly. *Gallup News Service.* Retrieved from http://www.gallup.com/poll/159584/parents-fear-children-safety-school-rises-slightly.aspx

Swanson, J. (2008). Preventing the unpredicted: Managing violence risk in mental health care. *Psychiatric Services, 59,* 191-193.

Taylor, P. J., & Gunn, J. (1999). Homicides by people with mental illness: Myth and reality. *The British Journal of Psychiatry, 174,* 9-14.

Trump, K. S. (2000). *Classroom killers? Hallway hostages? How schools can prevent and manage school crises.* Thousand Oaks, CA: Corwin.

Trump, K. S. (2011). *Proactive school security and emergency preparedness planning.* Thousand Oaks, CA: Corwin.

Walkup, J. T., & Rubin, D. H. (2013). Social withdrawal and violence—Newtown, Connecticut. *The New England Journal of Medicine, 368,* 399-401.

Downloaded from hsx.sagepub.com by guest on January 29, 2014

## Author Biographies

**James Alan Fox** is the Lipman Family Professor of Criminology, Law and Public Policy at Northeastern University. He has published 18 books, including Extreme Killing: Understanding Serial and Mass Murder (Sage 2012), co-authored with Jack Levin.

**Monica J. DeLateur** is a doctoral student in the School of Criminology and Criminal Justice at Northeastern University. Her current research explores sentencing outcomes and decisions to prosecute, particularly in human trafficking cases.

Downloaded from hsx.sagepub.com by guest on January 29, 2014