# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARIE S. FRIEDMAN, M.D. and The )
Illinois State Rifle Association, )
                                    )
                Plaintiffs, )
                                    )
v. )  No. 13-cv-09073
                                    )
THE CITY OF HIGHLAND PARK, )
                                    )
                Defendant. )

## DECLARATION OF MARK D. JONES

Pursuant to 28 U.S.C. § 1746, I, Mark D. Jones, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2. I was retained by the City of Highland Park to provide my opinions in this matter. The views I state herein are drawn from my professional experience and training.

3. I am currently employed by the University of Chicago Crime Lab in the capacity of Law Enforcement Advisor and have been so employed since August 2012. Prior to that I spent the majority of my career (from September 8, 1991 until November 30, 2011) with the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), where I worked on a range of issues involving firearms. My *curriculum vita* is attached hereto. I retired from ATF as the U.S. Department of Justice's Regional Firearms Advisor to the governments of Central America; prior to that position, I served as a program manager in ATF headquarters (HQ) assigned to

the FBI Counter Terrorism and Criminal Investigations Divisions; supervisor of the Arson and Explosives Intelligence group in ATF HQ; supervisor of Washington Group II investigating firearms trafficking in the Washington, D.C. field division; Deputy Division Chief of the ATF HQ Arson and Explosives Division; the Division Operations Officer in the Chicago Field Division; supervisor of Chicago Group I investigating street gangs in the Chicago Field Division, and as a special agent in the Kansas City Field Division conducting criminal investigations. During my career with ATF, I was assigned to the District of Columbia for more than 7 years in several of the positions set forth above. I have participated in over 100 federal, state and/or local law enforcement arrests involving unlawful firearms possession, illegal firearms trafficking, misuse of firearms, and firearms-related violence. I conducted, supervised, or participated in investigations in the District of Columbia, and the states of California, Florida, Georgia, Illinois, Iowa, Kansas, Nebraska, North Carolina, Maryland, Missouri, New Jersey, New York, Ohio, South Dakota, Texas, and Virginia in the United States as well as in the countries of Barbados, Belize, Bolivia, Costa Rica, Egypt, El Salvador, Guatemala, Honduras, Lebanon, Nigeria, and Panama.

4. During my final assignment with ATF, I was responsible for developing and implementing the United States government's strategy to aid the governments of Central America in reducing firearms violence. While based in El Salvador, I led a team of experts who conducted detailed assessments of the regulatory and enforcement environments in six of the seven countries of Central America (Belize,

2

Costa Rica, El Salvador, Guatemala, Honduras and Panama). Through those assessments I was able to formulate a training plan to help the public security agencies in each of those countries to better focus and use their resources to deter illegal small-arms trafficking.

5. In my career at ATF I worked with numerous domestic and international law-enforcement and intelligence agencies to train their personnel to conduct investigations of illicit small-arms trafficking, investigations of explosives-related crimes, and investigation of violent gangs. I was selected as a ATF representative during national-level explosives policy meetings at the White House. I also negotiated the first interagency agreement to bring the ATF's small-arms expertise to FBI-sponsored Joint Terrorism Task Forces nationwide, and drafted ATF's national policy to implement that agreement.

6. Prior to ATF, I worked for the U.S. Department of State, Diplomatic Security Service (DSS) where I conducted internal-affairs investigations and protective security operations. I also served as the Supervisory Special Agent in charge of security for the U.S. Ambassador to Lebanon; and served as supervisor of a specially trained team of agents conducting high-risk dignitary protection operations and training missions, both within the United States and abroad. During my employment with DSS, I travelled extensively, both domestically and in foreign countries, to conduct sensitive criminal and national security investigations, several involving criminal misuse of firearms.

3

7. I have provided training to law enforcement and public security officials and agencies throughout the United States, Europe, Central and South America, Africa, Asia and the Middle East, on how to recognize and interdict illicit small-arms trafficking and conduct explosives-related investigations. During my law-enforcement career, I received extensive training involving firearms, use of force, evidence collection, explosives, and many additional subjects. In 1988, I was trained as a firearms instructor by DSS and subsequently trained many public security and law enforcement personnel both in the United States and in foreign countries in the safe use, care and storage of firearms. Following my appointment by ATF, I received additional training as a firearms instructor, this time at the Federal Law Enforcement Training Center, and subsequently trained numerous federal, state and local law enforcement officers in the proper use, handling, and maintenance of firearms, and did so until I retired in 2011. I was certified as a use-of-force instructor-trainer, and conducted training for federal, state and local law enforcement officers from numerous agencies until I retired. I have read many studies on firearms possession, lawful use and criminal or negligent misuse of firearms. I make an effort to review new studies on those subjects as they are published. I have a Master of Science Degree in Management from Johns Hopkins University.

8. In preparing to present my opinions here, I reviewed the following materials:

    a. Plaintiffs' Complaint; Case Number 13-cv-9073
    b. Highland Park City Code of 1968, as amended, Chapter 136: Assault Weapons (the "Highland Park Ordinance")

c. Illinois Compiled Statutes, Chapter 430. Public Safety Act, Firearms Owners Identification Card Act

d. Abrams, Daniel, 1992. Ending The Arms Race, An Argument for a Ban On Assault Weapons, Yale Law Review

e. Ayoob, Massad, 1980. In the Gravest Extreme, Police Bookshelf

f. Bureau of Justice Statistics, 2010. Victimization During Household Burglary, National Crime Victimization Survey

g. Bureau of Alcohol, Tobacco and Firearms, 1989 Report and Recommendation on the Importability of Certain Semiautomatic Rifles

h. Bureau of Alcohol, Tobacco and Firearms, 1998. A Study on the Sporting Suitability of Modified Semi-Automatic Assault Rifles

i. Chivers, C.J., 2011 The Gun. Simon and Schuster

j. Cooper, Jeff, 1989. Principals of Personal Defense. Paladin Press

k. Firearm & Injury Center at University of Pennsylvania, 2011. Firearm Injury in the U.S.

l. Grossman, David A., 1996. On Killing. Little, Brown & Co.

m. Hemenway, David, 2010. Private Guns, Public Health. University of Michigan Press

n. Hemenway, David, 2011. Risks and Benefits of a Gun in the Home; American Journal of Lifestyle Medicine

o. Krouse, William J., 2012. Gun Control Legislation, Congressional Research Service

p. Lizotte, Alan J; David J. Bordua and Carolyn S. White, 1981. Firearms Ownership for Sport and Protection: Two Not So Divergent Models. American Sociological Review, 46(4), 499-503.

q. Lott, John R. Jr., 1998. More Guns, Less Crime. Understanding Crime and Gun Control Laws; University of Chicago Press

r. Lott, John R. Jr., 2003. The Bias Against Guns. Regnery Publishing, Inc.

s. Diaz, Tom, 2013. The Last Gun. New Press, New York

t. Ludwig, Jens; Philip J. Cook and Tom W. Smith, 1998. The Gender Gap in Reporting Household Gun Ownership. American Journal of Public Health, 88(11), 1715-18.

u. McDougal, Topher; David A. Shirk; Rogert Muggah and John H. Patterson, 2013. The Way of the Gun: Estimating Firearms Traffic across the U.S.-Mexico Border. University of San Diego Trans-Border Institute and the Igarape Institute

v. Planty, Michael and Jennifer L Truman, 2013. Firearm Violence, 1993-2011 Bureau of Justice Statistics, U.S. Department of Justice

w. Richardson, Erin, Hemenway, David. 2011. Homicide, Suicide, and Unintentional Firearm Fatality: comparing the United States with other high-income countries. Journal of Trauma and Acute Care Surgery.

5

x. Christopher Koper, AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE (Jerry Lee Center of Criminology, University of Pennsylvania 2004).

y. Shefey, Joseph F. and James D. Wright. 1995. In the Line of Fire: Youth. Guns, and Violence in Urban America Hawthorne, NY: Aldine de Gruyter

z. Siddle, Bruce K. Sharpening the Warrior's Edge. 1995. PPCT Research Library

aa. Spitzer, Robert J. 2012. The Politics of Gun Control. Boulder, CO: Paradigm.

bb. Violence Policy Center, 2004. Illinois, Land of Post-Ban Assault Weapons

cc. Blair, Martaindale & Nichols, *Active Shooter Events from 2000 to 2012,* Jan. 2014 (available at http://leb.fbi.gov/2014/january/active-shooter-events-from-2000-to-2012?utm_campaign=email-Immediate&utm_content=286210)

dd. Office of the State's Attorney Judicial District of Danbury, *Report of the State's Attorney for the Judicial District of Danbury*, Nov. 25, 2013.

ee. Anything otherwise referenced in this declaration.

9. In summary, based on my experience in law enforcement and my review of all the materials cited herein, I believe that assault weapons, as defined by the Highland Park Ordinance, are unusual and dangerous and are not appropriate for self-defense. Additionally, Highland Park's Ordinance serves the goals of enhancing public safety and reducing firearm-related crime.

## I. Topic Background

10. The U.S. Supreme Court ruling in *Heller v District of Columbia* held that the Second Amendment of the Constitution guarantees an individual's right to possess a firearm unconnected with militia service, for traditionally lawful purposes such as hunting and self-defense within the home. The court specifically stated that the right to keep and bear arms is not unlimited, does not permit an individual to possess any weapon whatsoever and specifically excludes unusually dangerous

6

firearms. Legislatures and bureaucracies have, respectively, the responsibility to pass laws and promulgate regulations that offer equal protection under the law to all parts of society, not just a vocal minority advocating for something that serves only their particular interests.

11. The City of Highland Park enacted Ordinance to address the potential threat of mass shootings involving a semi-automatic assault weapon. Such events are demonstrably more catastrophic when the assailant uses a semi-automatic assault weapon than when other firearms are used[i]. The recent study by Mayors Against Illegal Guns (MAIG) shows that of the 93 examples occurring between January 2009 and September 2013 at least 14 semi-automatic or fully automatic assault weapons were recovered from the suspects; in those incidents, 151% more casualties resulted and 63% more deaths occurred that in incidents involving other types of guns[ii]. The MAIG report cited does not include the September 20, 2013 mass shooting at Cornell Park in Chicago wherein a subject wielding a Kalashnikov style semi-automatic assault rifle wounded 13 victims in just a few seconds[iii].

12. For example, Adam Lanza used an assault weapon legally purchased by his mother to shoot his way into a locked elementary school building in Newtown, Connecticut in 2012. In ten minutes, he killed 26 people and wounded two others. He discharged his weapon at least 130 times in less than eight minutes. Newtown Police responding to the first 911 call were on the scene in less than four minutes. One minute later, the shooter killed himself.[iv]

7

13. According to the Federal Bureau of Investigation, the frequency of active shooter events has doubled between 2009 and 2013, as compared to the period 2000 to 2008[v]. The FBI defines an "active shooter event" as "an individual actively engaged in killing or attempting to kill people in a confined and populated area, typically through use of a firearm."[vi] The events considered in the FBI's study were limited to those where the shooter attempted to kill multiple people in an area occupied by multiple unrelated individuals where at least one victim was unrelated to the shooter[vii].

14. Moreover, assault weapons are used in a disproportionately high number of shootings of law enforcement officers. For example, although assault weapons represented somewhere between 1 and 8% of guns used in crime in 1994, they accounted for 16% of gun murders of police officers[viii].

15. The AR15 family of rifles and the various civilian versions of Kalashnikov style firearms available on the U.S. gun market are based entirely on the original selective fire versions of the same guns[ix]. The functional differences are minimal, mainly in the lack of fully automatic fire capability missing on the semi-automatic civilian versions. Conversion of semi-automatic rifles to fully automatic machineguns is possible with machine tools available in any automotive repair shop and requires a certain amount of skill and knowledge to be reliable, but many of the U.S. sourced rifles recovered from Mexican drug cartels were found to have been converted from their original, semi-automatic configuration to allow fully automatic fire[x]. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

recovers hundreds of illegal machine guns annually in the United States and many of those are either AR15 or Kalashnikov style firearms originally manufactured as semi-automatic firearms.

16. When comparing the rate of fire (cyclic rate) of a Federally regulated, fully automatic machine gun and an semi-automatic AR15-type rifle, the difference is minimal. The AR15 family of rifles may be fired at virtually the same cyclic rate of fire as a fully automatic machine gun, by installing a commercially manufactured so-called "bump fire" trigger activator or by merely firing from the hip holding the barrel shroud with one hand, and pressing the trigger with the other. By using this after market device or adopting the described technique, the AR15's recoil will naturally fire the weapon at a cyclic rate equal to a fully automatic machine gun.

17. Moreover, the parts and plans for conversion of a semi-automatic firearm into a machinegun are widely available on the internet, in classified advertisements in various trade publications or at gun shows and are, in and of themselves, legal to possess under federal law as long they are not stored in proximity to a firearm that could be converted by their installation[xi].

18. Semi-automatic assault weapons and civilian sporting firearms, e.g., hunting rifles and shotguns, make up a very small percentage of firearms used in armed assaults, homicides and suicides in Illinois and nationwide[xii].

19. Many randomized, controlled case studies have demonstrated that merely bringing a firearm into the home significantly increases the residents' risk of death by gunshot,[xiii] exactly the opposite result sought by many who acquire a firearm for

9

self-defense. Alarmists cite an increase in residential burglary as the main reason to keep a firearm in the home for self-defense,[xiv] when in fact home invasion burglaries (and related murders) make up a tiny percentage of all residential burglaries in the United States[xv].

20. Two of the main rationales for acquiring a military style semi-automatic assault rifle cited in firearms industry articles and advertisements are defense of the home in the event of a natural disaster and ensuing civil insurrection and/or to fight the tyranny of an out-of-control federal government often supported by the words of the one of founding fathers of the republic, Thomas Jefferson; "The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants."[xvi]

21. Addressing these two concepts in reverse order: The ideation of armed resistance against a tyrannical government is part of the American legend and, while it is certainly true that colonial militia took up arms in revolt against the British during the 18th century, the concept of doing so in 2014, or for that matter of a dictatorial takeover of the United States government is laughable, as is the idea that a civilian militia armed with semi-automatic assault weapons could mount an effective campaign against the United States armed forces, even if the U.S. military were inclined to support an aspiring tyrant.

22. Natural and man-made disasters can and do occur; floods, fires, earthquakes, tornados, failures of the power grid, riots and looting have all come to pass in the United States. Taken in context, however, the most serious incidents

10

have lasted no longer than a few days before civilian authorities restored order. During such events civilians were required to shelter in place for short periods of time, some possibly resorting to the use of force. However the idea that untrained civilians should acquire assault weapons, as a hedge against a horde of suddenly feral neighbors is firearms industry fear mongering at its most vile[xvii] that results in more unnecessary firearms in general circulation, vulnerable to theft and misuse.

## II. Human Factors Considerations

23. Firearms are clearly effective lethal tools for self-defense, both for law enforcement and civilian use. The paradox however is that many poorly or entirely untrained individuals would not be able to use a firearm to defend themselves. In his book <u>On Killing,</u> author David Grossman makes a compelling case that one person taking another's life is much more difficult in practice than is portrayed in popular culture, particularly for individuals who have not benefited from operant conditioning training methodologies employed by the military and civilian police agencies[xviii]. In my own experience as a law enforcement use-of-force instructor, countless civilians, relatives, and friends have sought my advice about acquiring a firearm for self-defense. In most of those instances, when I inquired about their intentions I was told that they intended to deter would-be criminals by merely displaying a gun hoping that the demonstration would cause the criminal to flee. When questioned about their feelings about potentially killing another human being, I was invariably met with a statement to the effect that he or she had not really considered that possibility.

11

24. It is axiomatic among firearms enthusiasts that "Guns don't kill people, people kill people," and it is also well known within the law enforcement training community that intention and combat mind set are critical to success in lethal force encounters.[xix]   As a trainer I spent countless hours helping police officers and federal agents hone the physical skills required to manipulate their firearms and less-lethal weapons, e.g. handcuffs, pepper spray, batons, and conducted energy devices (Taser), trying to ingrain the skills so that little conscious thought would be necessary to employ them.  Civilians without training are clearly capable of killing one another with whatever is at hand as is borne out by the homicide statistics recorded annually by the FBI and other agencies. The question here is whether the average citizen, statistically unlikely to encounter violence in his or her lifetime, and with little or no training in self-defense disciplines, could become a killer by the mere possession of a firearm. Based on my training and experience, I believe the answer to be no.

25. Setting aside the concept of combat mindset and the ability of one person to kill another, the idea of a use-of-force continuum must be considered. In discussions about use of force, lethal force is but one option and always the least desirable even when required.

26. Police officers learn that their use of force begins with their mere presence -- their uniform, badge and other symbols of authority constitute a recognizable institution in American society and in general, citizens understand they are required to obey lawful commands from a police official or face arrest.[xx]   Police

officers all over the United States receive empty-hand defensive tactics training, usually mandated by a state training council or a similar governing body.

27. The amount of defensive tactics training for law enforcement officers varies from state to state, but is invariably focused on overcoming low to medium levels of resistance, e.g. verbal non-compliance to police commands, passive resistance characterized by letting one's body go limp, or active resistance like pulling or running away from an officer's attempts to restrain. That training begins in the police academy for recruits and continues throughout one's career. Police officers are issued handcuffs - the most ubiquitous use-of-force device - and other tools such as batons to ensure compliance or overcome resistance to their authority. They are trained in how to properly use these tools, and after just a few years most officers become quite adept at employing them.

28. Research into human factors conducted by PPCT, Inc. has documented the physiological effects that come into play during a lethal force encounter and affect the outcome. The human nervous system, more specifically the sympathetic and parasympathetic nervous systems (SNS), have evolved to improve a human being's chances of surviving deadly threats.[xxi] The SNS offers tremendous support for gross motor skills like pushing, throwing and running, also known as fight or flight[xxii]. However, fine motor skills like manipulating the tiny selector lever (safety) or retracting the charging handle on a semi-automatic assault weapon often suffer during deadly force encounters.

13

29. When a person experiences an SNS activation his or her heart rate soars almost immediately, sometimes to well over 200 beats per minute;[xxiii] blood is shunted away from the extremities leading to loss of touch sensitivity; sensory input is largely restricted to vision, normally constituting about 70% of an individual's input under normal circumstances, during a SNS activation it becomes the dominant sense. Importantly, a phenomenon known as "tunnel vision" also sets in, limiting peripheral and low light vision and thus further reducing information available to mitigate the lethal force threat perception.[xxiv]

30. One reason military and police trainers spend so much time on basic firearms drills is to instill so-called "muscle memory" in recruits whereby activities like deactivating a safety become automatic requiring no conscious thought. When suddenly confronted by a deadly force threat the automatic response ensues and the weapon may be brought into play using the gross motor skills that are complimented by the body's own evolutionary reaction. Police recruits typically fire thousands of rounds in basic training and manipulate all of their issued equipment, including their firearms, countless times.

31. ATF special agent candidates spend a full week drawing their firearms, developing a proper shooting stance, and "dry firing" with laser practice equipment before they ever actually discharge a live round.[xxv] The fact that so many police involved shootings result in a documented nationwide hit-to-rounds fired ratio of less than 50% is evidence that even well trained law enforcement personnel subject to the forces of evolution and only able to overcome their natural programming with

14

difficulty. How much less so will untrained, unskilled, and unresolved citizens be able to effectively employ a complex, notoriously finicky rifle like the AR15?

32. It is also widely understood that physical skills deteriorate without regular practice - hence the in-service training common to all law enforcement and military agencies and elements. Regular requalification is required and many agencies require monthly practice. Even the best trained police officers and soldiers skills will degrade over time if not deliberately and regularly honed.

33. Like pilots in training, much time in law enforcement recruit and in-service firearms training is given over to handling emergencies, specifically, fixing a (semi-automatic) gun that has malfunctioned during a deadly force encounter. This type of training is known as the "immediate action drill" and is designed to instill muscle memory in a shooter so that the physical actions become rote, requiring very little conscious thought. An individual is taught to perform a series of activities in a specific sequence that will rectify the most common semiautomatic firearm malfunctions.

34. In my own experience, these drills were performed at least twice annually for untold repetitions until my colleagues and I could perform them "in our sleep." Regrettably, most civilian firearms training ignores this topic altogether leaving the novice shooter with no knowledge, skills, or abilities to overcome a malfunction at a crucial moment. For that reason when I am asked to recommend a firearm for personal defense I usually suggest the revolver, a tried and true weapon design that is widely recognized by experts as the most reliable mechanism on the market. With

15

no external safety or bolt carrier release to manipulate, if deadly force is necessary a home defender is only required to aim the gun and press the trigger. Jeff Cooper, the well-known firearms trainer, author of innumerable articles and books and founder of the original Gun Sight Ranch firearms training facility opined that a heavy-duty handgun is the "optimum defensive arm..."[xxvi] and I am in complete agreement.

35. The modern revolver will fire under virtually any circumstances, is ergonomically ideal for the human body under stress, and available in a variety of calibers, ammunition capacities, and price points to meet virtually any personal defense need.

### III. General Suitability

36. The genre of firearm at the center of the instant case is the semi-automatic assault weapon defined under the Highland Park Ordinance[xxvii] - the essential characteristic of which is a magazine capacity well in excess of what would typically be used in for target shooting or hunting. While there are many firearms available that are suitable for both sporting and defensive purposes, the semiautomatic assault weapon is typically a "civilianized" version of a firearm originally manufactured for military use.

37. The principal difference between an AR15 semi-automatic rifle and its military sibling, the M4/M16, is the latter's selective fire capability, that is the ability to use the weapon as a fully automatic machine gun (wherein a single trigger pull can empty the magazine) and for semi-automatic fire (wherein each trigger pull

results in only one cartridge being fired). The federal government tightly regulates possession of machine guns, whereas the possession of semiautomatic firearms is not regulated very much at all. There have been very few crimes committed with legally registered machine guns and other firearms of the types under strict federal control and there have been many, many crimes including mass casualty shootings carried out with semi-automatic assault weapons, rifles and pistols. The mass· shootings alone resulted in at least 519 deaths and scores of injuries between 2009 and 2013.[xxviii]

38. Statistically, rifles and shotguns, known collectively in the vernacular as "long guns", are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes.[xxix] Yet when they are used the carnage that results is stunning, the two most recent examples being 29 casualties in Newtown, Connecticut (December 2012) and 70 in Aurora, Colorado (July 2012) for a total of 99 dead and wounded in just those two 2012 Incidents.[xxx]

39. Military assault weapons were developed to allow soldiers the ability to direct high volumes of "suppressive" fire at their enemies thus permitting their compatriots to more readily maneuver on the battlefield. The 20-30 round magazine capacity found in virtually every modern military long gun, coupled with the 7 magazine "basic load" carried by American military riflemen, gives an infantry squad the ability to maintain a sustained rate and volume of fire sufficient to dominate an enemy. Ultimately, the purpose of military assault rifles and submachine guns (the analog for a civilian assault pistol) is offensive - to facilitate

17

the assault and capture of a military objective. In terms of contemporary sporting purposes for a semi-automatic assault rifle, the only conceivable use for a high capacity magazine is during a 3-gun match. In these events participants use a pistol, rifle, and shotgun to overcome fantasy challenges presented by the match organizers. Said another way, there are a variety of human silhouette "aggressor" targets arranged to challenge a shooter who's score is based on the number of accurate hits coupled with the time it takes him or her to complete the course of fire. Each of the three firearms is used during specific phases or segments of the match and then set aside, so in most cases a 30 round magazine is superfluous - the match stage requiring a rifle might only require 5 or 10 rounds to negotiate successfully. A shooter using all 30 rounds would be considered by his or her peers as either very unskilled or profligate.

40. In police involved shootings the number of shots fired is statistically very low - less than four rounds expended[xxxi] so the ammunition capacity of a standard revolver (6 cartridges) would satisfy one's self defense needs most of the time and a semi-automatic pistol with a 10 round capacity magazine even more so.

41. To offer a high capacity magazine as the answer to lack of training or familiarity with reloading the weapon when necessary is dangerous and irresponsible. A favorite old chestnut of police firearms trainers is, "You cannot miss fast enough," meaning that in time of need one should remain calm and rely on his or her training to make accurate, incapacitating shots against an assailant, not "spray and pray." To suggest that a novice gun owner without sufficient training

and experience to reload a semi-automatic handgun under stress should equip themselves with more ammunition in high capacity magazines is ludicrous. That theory places everyone in a household, even a neighborhood, in jeopardy of being killed by stray rounds.

42. In my opinion, firearms owners should be required to attend professional training, conduct regular practice sessions, and become expert in manipulating his or her chosen weapon under a variety of circumstances and lighting conditions to gain and maintain proficiency.

43. A would-be firearms owner who cannot, or will not, train and practice should consider other security options. If that person ignores common sense and insists on buying a gun, then he or she would be best served by a revolver, for reasons previously articulated in this report.

44. Assault weapons, rifles or pistols, fully or semi-automatic, are designed to be used in an offensive role. Law enforcement agencies deploy these firearms in an auxiliary function, generally subordinate to the primary duty weapon which is for the majority of police officers a handgun. Generations of police agencies relied on revolvers as their primary duty weapon and shotguns as their auxiliary, the latter typically kept locked in patrol cars against the need for something more powerful than revolver.

45. Following a specific high profile incident in California,[xxxii] police agencies around the country began issuing semi-automatic pistols - the Illinois State Police was the first large agency to adopt the technology - which soon became ubiquitous.

19

A similar trend may be observed in the change from shotguns to patrol rifles, which began in earnest following a specific incident in Los Angeles in 1997[xxxiii] and led to many agencies either issuing semi-automatic assault rifles or approving the private purchase of such by their personnel, to avoid being "out gunned." Nationally, law enforcement leaders perceived a need for their officers to be able to overcome deadly force assaults at a greater distance with increased accuracy, tasks that semi-automatic assault rifles may easily accomplish and a shotgun generally cannot. The design characteristics of semi-automatic assault rifles allow them to excel at long distance accuracy and penetrate common ballistic vests worn by criminals, advantages that most police were lacked in 1997. It should be noted that virtually all police agencies require their personnel to undergo additional training and qualification before being authorized to carry and use a patrol rifle. Such training is typically lengthy (on the order of 40 hours) and is supplemented by regularly scheduled in-service training and requalification.

### IV. Suitability for Home Defense

46. The design characteristics outlined above are not an advantage in home defense settings, however, since the typical self defense distances involved in scenarios envisioned by firearms industry pundits average twenty feet[xxxiv] in homes with interiors constructed from gypsum drywall/sheetrock that will not prevent over penetration by any modern firearms cartridge, rifle, pistol or shotgun. To tout the semi-automatic assault weapon as the best or even second best tool for home

20

defense is specious and disingenuous. A widely known axiom amongst defensive tactics trainers is "the best self defense gun is the one at hand."

47. A responsible firearm owner will invariably keep his or her weapons under lock and key, most in a secure gun safe designed and sold for that purpose. Safes require time to unlock and open, obviating the rifle as the "...one at hand..." unless one anticipates an imminent home invasion, statistically very unlikely,[xxxv] or irresponsibly stores his/her long gun in a closet or under the bed, easily accessible to all members of a household including children and uninvited visitors like burglars. It is well known to law enforcement authorities that firearms present an attractive target for burglars, and a gun owner who secretes his or her unsecured firearm somewhere in the home is virtually delivering the weapon to the underground gun market and criminal misuse.

48. Long guns are also not optimal for home defense because they are challenging to manipulate in the close confines found in homes; the overall length of many rifles, even those with folding or collapsible shoulder stocks, renders them unwieldy and hard to maneuver. Additionally, rifles are far more powerful than necessary or desirable for most home defense uses - the velocity of widely available standard military surplus ammunition for AR15 rifles is more than 3000 feet per second and the projectile contains a steel penetrator that greatly increases the possibility of innocents being injured or killed by missed shots or ricochets.[xxxvi] Add to those factors the inevitable sympathetic nervous system activation coupled with a high capacity magazine and it becomes a recipe for disaster.

49. Many law enforcement and security experts consider the shotgun to be the acme of home defense tools, and I agree that a shotgun is more effective than most handguns and rifles but the shotgun suffers from the same disadvantages as any long gun - they are as a genre more complicated to store safely thus time consuming to obtain in an emergency, and are too long to be easily maneuverable indoors.

50. A far more likely scenario involves a handgun kept in a compact, secure yet easily accessible storage container - available in numerous configurations and locking mechanisms[xxxvii] - from which the weapon may be quickly obtained when needed but otherwise kept from unintended or unauthorized access.

51. Finally, most homeowners are not trained in close quarters combat so attempting to "clear" their house of a possible intruder would be imprudent. A safer, more conservative course would be to gather the family together in a pre-identified secure room, barricade the door and call the police. If an intruder cannot be warned off and forces entry into the safe haven before police arrive, the homeowner has the option to use deadly force if appropriate.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 7, 2014.

Executed on _Feb 7, 2014_

_____
MARK D. JONES

22