# EXHIBIT K

# REDUCING GUN VIOLENCE IN AMERICA

## Informing Policy with Evidence and Analysis

Edited by
**DANIEL W. WEBSTER**
and **JON S. VERNICK**

Foreword by
**MICHAEL R. BLOOMBERG**



# America's Experience with the Federal Assault Weapons Ban, 1994–2004

Key Findings and Implications

Christopher S. Koper

In 1994, the federal government imposed a ten-year ban on military-style semi-automatic firearms and ammunition-feeding devices holding more than ten rounds of ammunition. This legislation, commonly known as the federal assault weapons ban, was intended in the broadest sense to reduce gunshot victimizations by limiting the national stock of semi-automatic firearms with large ammunition capacities and other features conducive to criminal uses. Reflecting America's general political divisions over the issue of gun control, the debate over the law was highly contentious. Ten years later, Congress allowed the ban to expire.

More recently, there have been growing calls for a reexamination of the assault weapons issue. This debate has been fueled by a series of mass shooting incidents involving previously banned firearms or magazines. Since 2007, for example, there have been at least 11 incidents in which offenders using

Christopher S. Koper, PhD, is an associate professor in the Department of Criminology, Law and Society at George Mason University and a senior fellow and co-director of the Research Program on Evidence-Based Policing at George Mason's Center for Evidence-Based Crime Policy.

assault weapons or other semi-automatics with magazines larger than 10 rounds have wounded or killed eight or more people (Violence Policy Center 2012). Some of the most notorious of these incidents have been a 2007 shooting on the college campus of Virginia Tech that left 33 dead and 17 wounded; a 2011 shooting in an Arizona parking lot that killed 6 and wounded 13, including Congresswoman Gabrielle Giffords; a 2012 shooting in an Aurora, Colorado, movie theatre that left 12 dead and 58 wounded; and, most recently, a shooting in a Newtown, Connecticut, elementary school that left 26 victims dead, 20 of whom were children (an additional victim was killed elsewhere).

To help inform the new dialogue on this issue, this essay examines America's experience with the 1994 assault weapons law. During the course of the ban, the National Institute of Justice (NIJ) funded a series of studies on the law's impacts for the U.S. Department of Justice and the U.S. Congress (Koper 2004; Koper and Roth 2001, 2002; Roth and Koper 1997, 1999). I present highlights from those studies, with an emphasis on findings from the final evaluation reported in 2004 (Koper 2004). These studies sought to assess the law's impacts on (1) the availability of assault weapons (AWs) and large-capacity magazines (LCMs) as measured by price and production (or importation) indices in legal markets; (2) trends in criminal uses of AWs and LCMs; and (3) trends in the types of gun crimes that seemed most likely to be affected by changes in the use of AWs and LCMs. (The latter two issues are emphasized in this summary.) Finally, the research team examined studies of gun attacks more generally in order to estimate the ban's potential to produce longer-term reductions in shootings.

In summary, the ban had mixed effects in reducing crimes with the banned weaponry because of various exemptions and loopholes in the legislation. The ban did not appear to affect gun crime during the time it was in effect, but some evidence suggests it may have modestly reduced gunshot victimizations had it remained in place for a longer period. The ban's most important provision was arguably its prohibition on ammunition magazines holding more than 10 rounds. Policymakers considering a new version of the ban might particularly focus on this aspect of the previous legislation and reconsider the exemptions and loopholes that undermined the effectiveness of the original ban.

## Provisions of the Assault Weapons Ban

Enacted on September 13, 1994, Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 imposed a ten-year ban on the "manufacture, transfer, and possession" of certain semi-automatic firearms designated as assault weapons. The AW ban did not prohibit all semi-automatics; rather, it was directed at semi-automatics having features that appear to be useful in military and criminal applications but unnecessary in shooting sports or self-defense. Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept ammunition magazines holding large numbers of bullets. The law specifically prohibited 18 models and variations by name (e.g., the Intratec TEC-9 pistol and the Colt AR-15 rifle), as well as revolving cylinder shotguns (see Koper 2004, 5). This list included a number of foreign rifles that the federal government had banned from importation into the country beginning in 1989 (e.g., Avtomat Kalashnikov models). In addition, the ban contained a generic "features test" provision that generally prohibited other semi-automatic firearms having two or more military-style features, as described in Table 12.1. In total, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) identified 118 model and caliber variations that met the AW criteria established by the ban.

The law also banned "copies or duplicates" of the named gun makes and models, but federal authorities emphasized exact copies. Relatively cosmetic changes, such as removing a flash hider or bayonet mount, were thus sufficient to transform a banned weapon into a legal substitute. In this sense, the law is perhaps best understood not as a gun ban but as a law that restricted weapon accessories. A number of gun manufacturers began producing modified, legal versions of some of the banned guns, though not all of these substitute weapons proved as popular as the banned versions.[1] In other respects (e.g., type of firing mechanism, ammunition fired, and the ability to accept a detachable magazine), the banned AWs did not differ from other legal semi-automatic weapons.

The other major component of the assault weapons legislation was a ban on most ammunition-feeding devices holding more than 10 rounds of ammunition (referred to as large-capacity magazines).[2] The LCM ban was arguably the most important part of the assault weapons law for two reasons. First, an LCM is the most functionally important feature of an AW-type firearm. As noted by the U.S. House of Representatives, most prohibited AWs came equipped with magazines holding 30 rounds and could accept magazines holding as

Table 12.1   Features test of the federal assault weapons ban

| Weapon category | Military-style features (2 or more qualified a firearm as an assault weapon) |
|---|---|
| Semi-automatic pistols accepting detachable magazines | 1) ammunition magazine that attaches outside the pistol grip<br>2) threaded barrel capable of accepting a barrel extender, flash hider, forward handgrip, or silencer<br>3) heat shroud attached to or encircling the barrel<br>4) weight of more than 50 ounces unloaded<br>5) semiautomatic version of a fully automatic weapon |
| Semi-automatic rifles accepting detachable magazines | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) bayonet mount<br>4) flash hider or a threaded barrel designed to accommodate one<br>5) grenade launcher |
| Semi-automatic shotguns | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) fixed magazine capacity over 5 rounds<br>4) ability to accept a detachable ammunition magazine |

many as 50 or 100 rounds (United States Department of the Treasury 1998, 14). Removing LCMs from these weapons thus greatly limits their firepower.

Second, the reach of the LCM ban was much broader than that of the AW ban because many semi-automatics that were not banned by the AW provision could accept LCMs. Approximately 40 percent of the semi-automatic handgun models and a majority of the semi-automatic rifle models that were being manufactured and advertised prior to the ban were sold with LCMs or had a variation that was sold with an LCM (calculated from Murtz and the Editors of Gun Digest 1994). Still others could accept LCMs made for other firearms and/or by other manufacturers. A national survey of gun owners in 1994 found that 18% of all civilian-owned firearms and 21% of civilian-owned handguns were equipped with magazines having 10 or more rounds (Cook and Ludwig 1996, 17). The AW provision did not affect most LCM-compatible guns, but the LCM provision limited the capacities of their magazines to 10 rounds.

The AW ban also contained important exemptions. AWs and LCMs manufactured before the effective date of the ban were "grandfathered" and thus legal to own and transfer. Though not precise, estimates suggest there were

upward of 1.5 million privately owned AWs in the United States when the ban took effect (American Medical Association Council on Scientific Affairs 1992; Cox Newspapers 1989, 1; Koper 2004, 10). Gun owners in America possessed an estimated 25 million guns that were equipped with LCMs or 10-round magazines in 1994 (Cook and Ludwig 1996, 17). and gun industry sources estimated that, including aftermarket items for repairing and extending magazines, there were at least 25 million LCMs available in the United States as of 1995 (Gun Tests 1995, 30). Moreover, an additional 4.8 million pre-ban LCMs were imported into the country from 1994 through 2000 under the grandfathering exemption, with the largest number arriving in 1999. During this same period, importers were also authorized to import another 42 million pre-ban LCMs that may have arrived after 2000.

## Criminal Use of Assault Weapons and Large-Capacity Magazines Prior to the Ban

During the 1980s and early 1990s, AWs and other semi-automatic firearms equipped with LCMs were involved in a number of highly publicized mass shootings that raised public concern about the accessibility of high-powered, military-style weaponry and other guns capable of rapidly discharging high numbers of bullets (Cox Newspapers 1989; Kleck 1997, 124–126, 144; Lenett 1995; Violence Policy Center 2012). Perhaps most notably, AWs or other semi-automatics with LCMs were used in 6, or 40%, of 15 particularly severe mass shooting incidents between 1984 and 1993 that resulted in at least 6 deaths or at least 12 killed or wounded (Kleck, 1997, 124–126, 144). Early studies of AWs, though sometimes based on limited and potentially unrepresentative data, also suggested that AWs recovered by police were often associated with drug trafficking and organized crime (Cox Newspapers 1989, 4; also see Roth and Koper 1997, chap. 5), fueling a perception that AWs were guns of choice among drug dealers and other particularly violent groups. These events intensified concern over AWs and other semi-automatics with LCMs and helped spur the 1989 federal import ban on selected semi-automatic rifles (implemented by executive order) and the passage of the 1994 federal AW ban (the states of California, New Jersey, Connecticut, Hawaii, and Maryland also passed AW legislation between 1989 and 1994).

Looking at the nation's gun crime problem more broadly, numerous studies of AW-type weapons conducted prior to the federal ban found that AWs

typically accounted for up to 8% of guns used in crime, depending on the specific AW definition and data source used (e.g., see Beck et al. 1993; Hargarten et al. 1996; Hutson, Anglin, and Pratts 1994; Hutson et al. 1995; McGonigal et al. 1993; New York State Division of Criminal Justice Services 1994; Roth and Koper 1997, chap. 2; Zawitz 1995). A compilation of 38 sources indicated that AWs accounted for about 2% of crime guns on average (Kleck 1997, 112, 141–143). Similarly, the most common AWs prohibited by the 1994 federal ban accounted for between 1% and 6% of guns used in crime according to most of several national and local data sources examined for the NIJ-funded studies summarized here (Koper 2004, 15).

As with crime guns in general, the majority of AWs used in crime were assault pistols rather than assault rifles. Among AWs reported by police to ATF during 1992 and 1993, for example, assault pistols outnumbered assault rifles by a ratio of three to one.

The relative rarity of AW use in crime can be attributed to a number of factors. Many of these models are long guns, which are used in crime much less often than handguns. Also, as noted, a number of the rifles named in the 1994 law were banned from importation into the United States in 1989. Further, AWs in general are more expensive and more difficult to conceal than the types of handguns that are used most frequently in crime.

Criminal use of guns equipped with LCMs had not been studied as extensively as criminal use of AWs at the time of the ban. However, the overall use of guns with LCMs, which is based on the combined use of AWs and non-banned guns with LCMs, is much greater than the use of AWs alone. Based on data examined for this and a few prior studies, guns with LCMs were used in roughly 13% to 26% of most gun crimes prior to the ban, though they appeared to be used in 31% to 41% of gun murders of police (see summary in Koper 2004, 18; also see Adler et al. 1995; Fallis 2011; New York Division of Criminal Justice Services 1994).

### The Ban's Effects on Crimes with Assault Weapons and Large-Capacity Magazines

Although there was a surge in production of AW-type weapons as Congress debated the ban in 1994, the law's restriction of the new AW supply and the interest of collectors and speculators in these weapons helped to drive prices higher for many AWs (notably assault pistols) through the end of the 1990s

Table 12.2    Assault weapons as a percentage of guns recovered by police

| City | Pre-ban | Post-ban | % change |
|---|---|---|---|
| Baltimore, MD | 1.88% (1992–1993) | 1.25% (1995–2000) | –34% |
| Boston, MA | 2.16% (1991–1993) | 0.6% (2000–2002) | –72% |
| Miami, FL | 2.53% (1990–1993) | 1.71% (1995–2000) | –32% |
| St. Louis, MO | 1.33% (1992–1993) | 0.91% (1995–2003) | –32% |
| Anchorage, AK | 3.57% (1987–1993) | 2.13% (1995–2000) | –40% |
| Milwaukee, WI | 5.91% (1991–1993) | 4.91% (1995–1998) | –17% |

Note: Figures for Baltimore, Boston, Miami, and St. Louis are based on all recovered guns. Figures for Anchorage and Milwaukee are based on, respectively, guns tested for evidence and guns recovered in murder cases. Changes in Baltimore, Boston, Miami, and St. Louis were statistically significant at $p<.05$. See Koper (2004) for further details about the data and analyses.

and appeared to make them less accessible and/or affordable to criminal users.[3] Analyses of several national and local databases on guns recovered by police indicated that crimes with AWs declined following the ban.

To illustrate, the share of gun crimes involving the most commonly used AWs declined by 17% to 72% across six major cities examined for this study (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), based on data covering all or portions of the 1995–2003 post-ban period (Table 12.2). (The number of AW recoveries also declined by 28% to 82% across these locations and time periods; the discussion here focuses on changes in AWs as a share of crime guns in order to control for general trends in gun crime and gun seizures.) Similar patterns were found in a national analysis of recovered guns reported by law enforcement agencies around the country to ATF for investigative gun tracing.[4] The percentage of gun traces that were for AWs fell 70% between 1992–1993 and 2001–2002 (from 5.4% to 1.6%), though the interpretation of these data was complicated by changes that occurred during this time in gun tracing practices (see Koper 2004 for further discussion).

The decline in crimes with AWs was due primarily to a reduction in the use of assault rifles. Assessment of trends in the use of assault rifles was complicated by the rarity of crimes with such rifles and by the substitution in some cases of post-ban rifles that were very similar to the banned models. In general, however, the decline in AW use was only partially offset by substitution of post-ban AW-type models. Even counting the post-ban models as AWs, the share of crime guns that were AWs fell 24% to 60% across most of the local

jurisdictions studied. Patterns in the local data sources also suggested that crimes with AWs were becoming increasingly rare as the years passed.

The decline in crimes with AWs appeared to have been offset throughout at least the late 1990s by steady or rising use of other semi-automatics equipped with LCMs. Assessing trends in LCM use was difficult because there is no national data source on crimes with LCMs and few contacted jurisdictions maintained such information. It was possible, nonetheless, to examine trends in the use of guns with LCMs in four jurisdictions: Baltimore, Milwaukee, Anchorage, and Louisville (KY). Across the different samples analyzed from these cities (some databases included all recovered guns and some included only guns associated with particular crimes), the share of guns with an LCM generally varied from 14% to 26% prior to the ban. In all four jurisdictions, the share of crime guns equipped with LCMs rose or remained steady through the late 1990s (Table 12.3). These trends were driven primarily by handguns with LCMs, which were used in crime roughly three times as often as rifles with LCMs (though crimes with rifles having LCMs also showed no general decline). Generalizing from such a small number of jurisdictions must be done very cautiously, but the consistency of the findings across these geographically diverse locations strengthens the inference that they reflected a national pattern.

Failure to reduce LCM use for at least several years after the ban was likely because of the immense stock of exempted pre-ban magazines, which, as noted, was enhanced by post-ban imports. The trend in crimes with LCMs may have been changing by the early 2000s, but the available data were too limited and inconsistent to draw clear inferences (post-2000 data were available for only two of the four study sites).

Table 12.3  Guns with large-capacity magazines as a percentage of guns recovered by police (selected years)

| City | Pre-ban | Late 1990s | Early 2000s |
|---|---|---|---|
| Baltimore, MD | 14.0% (1993) | 15.5% (1998) | 15.7% (2003) |
| Anchorage, AK | 26.2% (1992–1993) | 30.0% (1999–2000) | 19.2% (2001–2002) |
| Milwaukee, WI | 22.4% (1993) | 36.4% (1998) | N/A |
| Louisville, KY | N/A | 20.9 (1996) | 19.0% (2000) |

Note: Figures for Baltimore and Milwaukee are based on, respectively, guns associated with violent crimes and with murders. Figures for Anchorage and Louisville are based on guns submitted for evidentiary testing. The Anchorage figures are based on handguns only. See Koper (2004) for further details about the data and analyses.

A later media investigation of LCM use in Richmond, Virginia, suggests that the ban may have had a more substantial impact on the supply of LCMs to criminal users by the time it expired in 2004. In that city, the share of recovered guns with LCMs generally varied between 18% and 20% from 1994 through 2000 but fell to 10% by 2004 (Fallis 2011). It is not clear whether the Richmond results represented a wider national or even regional trend. (The data from this study also show that after the ban was lifted, the share of Richmond crime guns with an LCM rose to 22% by 2008.)

### The Ban's Impacts on Gun Violence

Because offenders could substitute non-banned guns and small magazines for banned AWs and LCMs, there was not a clear rationale for expecting the ban to reduce assaults and robberies with guns. But by forcing this weapon substitution, it was conceivable that the ban would reduce the number and severity of shooting deaths and injuries by reducing the number of shots fired in gun attacks (thus reducing the number of victims per gunfire incident and the share of gunshot victims sustaining multiple wounds). Based on this logic, the research team examined several indicators of trends in the lethality and injuriousness of gun violence for different portions of the 1995–2002 post-ban period. These included national-level analyses of gun murders, the percentage of violent gun crimes resulting in death, the share of gunfire cases resulting in wounded victims, the percentage of gunshot victimizations resulting in death, and the average number of victims per gun homicide incident. For selected localities, the team also examined trends in wounds per gunshot victim or the percentage of gunshot victims sustaining multiple wounds.

On balance, these analyses showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years (see Koper 2004, Koper and Roth 2001, and Roth and Koper 1997). Nationally, for example, the percentage of violent gun crimes resulting in death (based on gun homicides, gun assaults, and gun robberies reported to the Uniform Crime Reports) was the same for the period 2001–2002 (2.9%) as it was for the immediate pre-ban period 1992–1993 (Koper 2004, 82, 92). Accordingly, it was difficult to credit the ban with contributing to the general decline in gun crime and gun homicide that occurred during the 1990s.

However, the ban's exemption of millions of pre-ban AWs and LCMs meant that the effects of the law would occur only gradually. Those effects were still

unfolding when the ban was lifted and may not have been fully realized until several years beyond that, particularly if importation of foreign, pre-ban LCMs had continued in large numbers. In light of this, it was impossible to make definitive assessments of the ban's impact on gun violence.

It was also difficult to judge the ban's effects on the more specific problem of mass shootings. The research team attempted to assess changes in mass shootings during the first few years of the ban, but this effort was hampered by the difficulty of counting these incidents (results can be sensitive to the definitions and data sources used) and identifying the specific types of guns and magazines used in them (Roth and Koper 1997, app. A). There is no national data source that provides detailed information on the types of guns and magazines used in shooting incidents or that provides full counts of victims killed and wounded in these attacks. Studying mass shootings in particular poses a number of challenges with regard to defining these events, establishing the validity and reliability of methods for measuring their frequency and characteristics (particularly if done through media searches, as is often necessary), and modeling their trends, as they are particularly rare events (e.g., see Duwe 2000; Roth and Koper 1997, app. A).

Nonetheless, the issue of mass shootings continues to be a catalyst to the debate surrounding AW legislation. A recent media compilation of 62 mass shooting incidents that involved the death of four or more people over the period 1982–2012, for instance, suggests that 25% of the guns used in these attacks were AW-type weapons (these were not precisely defined) and another 48% were other types of semi-automatic handguns (Follman, Aronsen, and Pan 2012). Continuing improvements in media search tools and greater attention to the types of guns and magazines used in multiple-victim attacks may improve prospects for examining this issue more rigorously in future studies.

### Assessing the Potential Long-Term Effects of Banning Assault Weapons and Large-Capacity Magazines

Although available evidence is too limited to make firm projections, it suggests that the ban may have reduced shootings slightly had it remained in place long enough to substantially reduce crimes with both LCMs and AWs. A small number of studies suggest that gun attacks with semi-automatics—including AWs and other guns equipped with LCMs—tend to result in more shots fired, more persons wounded, and more wounds inflicted per victim

than do attacks with other firearms (see reviews in Koper 2004; Koper and Roth 2001; also see McGonigal et al. 1993; Richmond et al. 2003; Reedy and Koper 2003; Roth and Koper 1997). For example, in mass shooting incidents that resulted in at least 6 deaths or at least 12 total gunshot victims from 1984 through 1993, offenders who clearly possessed AWs or other semi-automatics with LCMs (sometimes in addition to other guns) wounded or killed an average of 29 victims in comparison to an average of 13 victims wounded or killed by other offenders (see Koper and Roth's [2001] analysis of data compiled by Kleck [1997, 144]).

Similarly, a study of handgun attacks in Jersey City, New Jersey, during the 1990s found that the average number of victims wounded in gunfire incidents involving semi-automatic pistols was in general 15% higher than in those involving revolvers (Reedy and Koper 2003). The study also found that attackers using semi-automatics to fire more than 10 shots were responsible for nearly 5% of the gunshot victims in the sample. Used as a tentative guide, this implies that the LCM ban could have eventually produced a small reduction in shootings overall, perhaps up to 5%, even if some gun attackers had the foresight to carry more than one small magazine (or more than one firearm) and the time and poise to reload during an attack.

Effects of this magnitude might be difficult to measure reliably, but they could nonetheless yield significant societal benefits. Consider that in 2010 there were 11,078 gun homicides in the United States and another 53,738 nonfatal assault-related shootings according to the federal Centers for Disease Control and Prevention (see the CDC's web-based injury statistics query and reporting system at http://www.cdc.gov/injury/wisqars/index.html). At these levels, reducing shootings by just 1% (arguably a reasonable ballpark estimate for the long-term impact of substantially reducing AW and LCM use) would amount to preventing about 650 shootings annually. The lifetime medical costs of assault-related gunshot injuries (fatal and nonfatal) were estimated to be about $18,600 per injury in 1994 (Cook et al. 1999). Adjusting for inflation, this amounts to $28,894 in today's dollars. Moreover, some estimates suggest that the full societal costs of gun violence—including medical, criminal justice, and other government and private costs (both tangible and intangible)—could be as high as $1 million per shooting (Cook and Ludwig 2000). Hence, reducing shootings by even a very small margin could produce substantial long-term savings for society, especially as the shootings prevented accrue over many years.

## Lessons and Implications from the 1994 Ban

Studies of America's previous assault weapons ban provide a number of lessons that can inform future policymaking. A new law similar to the old ban will have little impact on most gun crimes, but it may prevent some shootings, particularly those involving high numbers of shots and victims. It may thus help to reduce the number and severity of mass shooting incidents as well as produce a small reduction in shootings overall.

The most important feature of the previous ban was the prohibition on large-capacity ammunition magazines. A large magazine is arguably the most critical feature of an assault weapon, and restrictions on magazines have the potential to affect many more gun crimes than do those on military-style weapons. Restrictions focused on magazine capacity may also have a greater chance of gaining sufficient public and political support for passage than would new restrictions on assault weapons, though current polling suggests that both measures are supported by three-quarters of non-gun owners and nearly half of gun owners (Barry et al., in this volume). To enhance the potential impact of magazine restrictions, policymakers might also consider limiting magazine capacity to fewer than 10 rounds for all or selected weapons (for example, lower limits might be set for magazines made for semi-automatic rifles).[5] It is unknown whether further restrictions on the outward features of semi-automatic weapons, such as banning weapons having any military-style features, will produce measurable benefits beyond those of restricting magazine capacity.

Policymakers must also consider the implications of any grandfathering provisions in new legislation. Assessing the political and practical difficulties of registering all assault weapons and large magazines or establishing turn-in or buyback programs for them is beyond the scope of this essay. Policymakers should note, however, that it may take many years to attain substantial reductions in crimes with banned weapons and/or magazines if a new law exempts the existing stock (which has likely grown considerably since the time of the original ban). Policies regarding exemptions must also explicitly address the status of imported guns and magazines.

Past experience further suggests that public debate on reinstating the ban or crafting a new one will raise prices and production of the guns and magazines likely to be affected. This could temporarily saturate the market for the guns and magazines in question (particularly if close substitutes emerge) and delay desired reductions in crimes with some categories of the banned weap-

onry (this appeared to happen with assault rifles that were banned by the 1994 law and may have contributed as well to the observed trends in use of large magazines).

A new ban on assault weapons and/or large-capacity magazines will certainly not be a panacea for America's gun violence problem nor will it stop all mass shootings. However, it is one modest measure that, like federal restrictions on fully automatic weapons and armor-piercing ammunition, can help to prevent the further spread of particularly dangerous weaponry.

### NOTES

1. In general, the AW ban did not apply to semi-automatics possessing no more than one military-style feature listed under the ban's features test provision. Note, however, that firearms imported into the country still had to meet the "sporting purposes test" established under the federal Gun Control Act of 1968. In 1989, ATF determined that foreign semi-automatic rifles having any one of a number of named military features (including those listed in the features test of the 1994 AW ban) fail the sporting purposes test and cannot be imported into the country. In 1998, the ability to accept an LCM made for a military rifle was added to the list of disqualifying features. Consequently, it was possible for foreign rifles to pass the features test of the federal AW ban but not meet the sporting purposes test for imports (U.S. Department of the Treasury 1998).

2. Technically, the ban prohibited any magazine, belt, drum, feed strip, or similar device that has the capacity to accept more than 10 rounds of ammunition or which can be readily converted or restored to accept more than 10 rounds of ammunition. The ban exempted attached tubular devices capable of operating only with .22 caliber rimfire (i.e., low velocity) ammunition.

3. See Koper (2004), Koper and Roth (2002), and Roth and Koper (1997) for more extensive discussions of the ban's impacts on prices and production of AWs, non-banned firearms, and LCMs.

4. A gun trace is an investigation into the sales history of a firearm (e.g., see ATF 2000).

5. To support the formulation and evaluation of policy in this area, there are also a number of research needs worth noting. For one, it is important to develop better data on crimes with guns having LCMs. Policymakers should thus encourage police agencies to record information about magazines recovered with crime guns. Likewise, ATF should consider integrating ammunition magazine data into its national gun tracing system and encourage reporting of magazine data by police agencies that trace firearms. Second, there is a need for more studies that contrast the outcomes of attacks with different types of guns and magazines. Such studies would help to refine predictions of the change in gun deaths and injuries that would follow reductions in attacks with firearms having large-capacity magazines.

REFERENCES

Adler, Wendy. C., Frederick M. Bielke, David J. Doi, and John F. Kennedy. (1995). *Cops under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns with High Capacity Magazines*. Washington, DC: Handgun Control, Inc.

American Medical Association Council on Scientific Affairs. 1992. "Assault Weapons as a Public Health Hazard in the United States." *JAMA* 267:3067–3070.

Beck, Allen, Darrell Gilliard, Lawrence Greenfeld, Caroline Harlow, Thomas Hester, Louis Jankowski, Tracy Snell, James Stephan, and Danielle Morton. 1993. *Survey of State Prison Inmates, 1991*. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Bureau of Alcohol, Tobacco, and Firearms (ATF). (2000). *Commerce in Firearms in the United States*. Washington, DC: United States Department of the Treasury.

Cook, Philip J., Bruce A. Lawrence, Jens Ludwig, and Ted R. Miller. 1999. "The Medical Costs of Gunshot Injuries in the United States." *JAMA* 282:447–454.

Cook, Philip J., and Jens Ludwig. 1996. *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*. Washington, DC: Police Foundation.

Cook, Philip J., and Jens Ludwig. 2000. *Gun Violence: The Real Costs*. New York: Oxford University Press.

Cox Newspapers. 1989. *Firepower: Assault Weapons in America*. Washington, DC: Cox Enterprises.

Duwe, Grant. 2000. "Body-Count Journalism: The Presentation of Mass Murder in the News Media." *Homicide Studies* 4:364–399.

Fallis, David. 2011. "VA Data Show Drop in Criminal Firepower During Assault Gun Ban." *Washington Post*, January 23.

Follman, Mark, Gavin Aronsen, and Deanna Pan. 2012. "A Guide to Mass Shootings in America." *Mother Jones*, Dec. 15. http://www.motherjones.com/politics/2012/07/mass-shootings-map.

Gun Tests. 1995. "Magazine Rule Change Unlikely." March.

Hargarten, Stephen W., Trudy A. Karlson, Mallory O'Brien, Jerry Hancock, and Edward Quebbeman. 1996. "Characteristics of Firearms Involved in Fatalities." *JAMA* 275:42–45.

Hutson, H. Range, Deirdre Anglin, Demetrios N. Kyriacou, Joel Hart, and Kelvin Spears. 1995. "The Epidemic of Gang-Related Homicides in Los Angeles County from 1979 through 1994." *JAMA* 274:1031–1036.

Hutson, H. Range, Deirdre Anglin, and Michael J. Pratts, Jr. 1994. "Adolescents and Children Injured or Killed in Drive-By Shootings in Los Angeles." *New England Journal of Medicine* 330:324–327.

Kleck, Gary. (1997). *Targeting Guns: Firearms and Their Control*. New York: Aldine de Gruyter.

Koper, Christopher S. 2004. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*. Report to the National Institute of Justice, U.S. Department of Justice. Jerry Lee Center of Criminology, University of Pennsylvania, Philadelphia, PA.

Koper, Christopher S., and Jeffrey A. Roth. 2001. "The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple

Outcome Measures and Some Lessons for Policy Evaluation." *Journal of Quantitative Criminology* 17:33–74.

Koper, Christopher S., and Jeffrey A. Roth. 2002. "The Impact of the 1994 Federal Assault Weapons Ban on Gun Markets: An Assessment of Short-Term Primary and Secondary Market Effects." *Journal of Quantitative Criminology* 18:239–266.

Lenett, Michael G. 1995. "Taking a Bite Out of Violent Crime." *University of Dayton Law Review* 20:573–617.

McGonigal, Michael D., John Cole, C. William Schwab, Donald R. Kauder, Michael F. Rotondo, and Peter B. Angood. 1993. "Urban Firearm Deaths: A Five-Year Perspective." *Journal of Trauma*: 35:532–537.

Murtz, H.A., and the Editors of Gun Digest. 1994. *Guns Illustrated 1994*. Northbrook, IL: DBI Books.

New York State Division of Criminal Justice Services. 1994. *Assault Weapons and Homicide in New York City*. Albany, NY.

Reedy, Darin C., and Christopher S. Koper. 2003. "Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers." *Injury Prevention* 9:151–155.

Richmond, Therese S., Charles C. Branas, Rose A. Cheney, and C. William Schwab. 2003. *The Case for Enhanced Data Collection of Handgun Type*. Firearm and Injury Center at Penn, University of Pennsylvania, Philadelphia, PA.

Roth, Jeffrey A., and Christopher S. Koper. 1997. *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*. Washington, DC: The Urban Institute.

Roth, Jeffrey A., and Christopher S. Koper. 1999. *Impacts of the 1994 Assault Weapons Ban: 1994–96*. Washington, DC: National Institute of Justice, U.S. Department of Justice.

United States Department of the Treasury. (1998). *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*. Washington, DC.

Violence Policy Center (2012). *Mass Shootings in the United States Involving High-Capacity Ammunition Magazines*. Washington, DC.

Zawitz, Marianne W. 1995. *Guns Used in Crime*. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.