# EXHIBIT L

*A Dramatic New Plan for Ending America's Epidemic of Gun Violence*

# PRIVATE GUNS

# PUBLIC HEALTH

## David Hemenway

# CHAPTER 4   SELF-DEFENSE USE OF GUNS

> There is little or no need for a gun for self-protection [for most Americans] because there's so little risk of crime. People don't believe it, but it's true. You just can't convince most Americans they're not at serious risk.
>
> —Gary Kleck

The previous chapters highlighted some of the costs guns impose on society. But guns also provide some safety benefits. Guns may be used to thwart criminal acts, and awareness of their presence may deter individuals from attempting to commit crimes. But how common is self-defense gun use, and how much benefit do guns really provide for our society? This chapter describes the scientific evidence available on the role of firearms in deterring crime and thwarting criminals, discusses the frequency of self-defense gun use and whether such incidents are usually socially beneficial, and considers the evidence concerning whether armed resistance against attackers makes good sense.

## THE MYTH AND REALITY OF DETERRENCE

Given the claims of the gun lobby, it is perhaps surprising that there is in fact little credible evidence that guns deter crime. Criminologist Gary Kleck (1988) claims that publicized police programs to train citizens in gun use in Orlando (to prevent rape) and in Kansas City (to prevent robbery) led to reductions in crime by changing prospective criminals' awareness of gun ownership among potential victims. However, a careful analysis of the data found no evidence that crime rates changed in either location after the training (McDowall, Lizotte, and Wiersema 1991). The deterrent effects of civilian gun ownership

on burglary rates were also supposedly shown by the experiences of Morton Grove, Illinois (after it banned handguns), and Kennesaw, Georgia (after it required that firearms be kept in all homes) (Kleck 1988). Again, a careful analysis of the data did not show that guns reduced crime (McDowall, Wiersema, and Loftin 1989). Instead, in Morton Grove, the banning of handguns was followed by a large and statistically significant decrease in burglary reports (McDowall, Lizotte, and Wiersema 1991).

The fact that rural areas in the United States have more guns and less crime than urban areas has sometimes been claimed as evidence of the deterrent that firearms represent (e.g., Polsby and Kates 1998). The comparison, of course, is inappropriate. Cities in high-income countries generally experience more crime than rural areas, whatever the levels of gun ownership. A more valid comparison is between cities, between states, or between regions.

One study found a negative association between rates of gun ownership and crime rates (more guns, less crime) (Lott 1998a). However, in that study, gun ownership data came from election exit polls conducted in 1988 and 1996. These data on gun ownership levels are unreliable. According to the polling source, Voter News Service, the data cannot be used as the author uses them—to determine either state-level gun ownership levels or changes in gun ownership rates—for three reasons: (1) the survey sampled only actual voters, a minority of the adult population; (2) the gun ownership question changed between the two periods; and (3) the sample size was far too small for reliable estimates. In only fourteen states were there more than one hundred respondents to the 1996 poll, and for one such state, Illinois, the polls indicated, nonsensically, that personal gun ownership more than doubled between 1988 and 1996, from 17 to 36 percent of the adult population. Overall, the data from these exit polls indicate that gun ownership rates in the United States increased an incredible 50 percent during those eight years. Yet all other surveys of the general population show either no change or a decrease in the percentage of Americans who personally own firearms (Kleck 1997b). Analyses of guns and crime using the Voter News Service data are meaningless.

No other study finds that crime is lower in cities, states, or regions where there are more guns. Instead, the evidence indicates that where there are more guns, while there are no more robberies, there are more gun robberies and more robbery homicides (Cook 1987). Most studies find that where there are more guns, there are significantly more gun homicides and total homicides (Ohsfeldt and Morrisey 1992; Hepburn and Hemenway 2003).

A widely cited proponent of the supposed deterrent effect of guns has

claimed that when gun prevalence is high, burglars seek out unoccupied dwellings to avoid being shot (Kleck 1988, 1997b). Yet the evidence comes not from a scientific study but from a flawed comparison using different victimization surveys in different time periods for four areas—the United States, Britain, the Netherlands, and Toronto. In the United States, compared to the other three areas, a higher percentage of burglaries are committed when no one is at home. Kleck's analysis does not take into account relevant factors that might explain the association (e.g., the percentage of time in which dwellings are occupied). The areas are compared to the United States but not to each other, and only four nations/cities are examined. One could just as well argue that since cigarette consumption is higher in Japan and Stockholm than in the United States, and the Japanese and Swedish live longer than Americans, cigarettes are good for longevity.

A more reliable study used data from the Uniform Crime Reports for all fifty U.S. states for 1977–98 and data from the U.S. National Crime Victimization Survey (NCVS) for 330,000 households for 1994–98. The findings from both analyses were that U.S. counties and states with more guns have higher rates of burglary and higher per capita rates of "hot burglary" (burglary when someone is at home) (Cook and Ludwig 2003). Homes with firearm collections are considered prime targets for burglars.

Surveys of burglars in the United States do indicate that most would prefer that no one is at home—and presumably that no one is armed—when they enter the premises (Rengert and Wasilchick 1985; Wright and Rossi 1986). There is little question that professional burglars, who are among the least violent of serious criminals, want merchandise and do not want to get arrested, bludgeoned, or shot. But there is currently no credible evidence that a high prevalence of gun ownership reduces burglary or any other crime or in any way reduces potential violent confrontations.

## HOW COMMON IS SELF-DEFENSE GUN USE?

Much discussion about the protective benefits of guns has focused on the incidence of self-defense gun use. Proponents of such putative benefits often claim that 2.5 million Americans use guns in self-defense against criminal attackers each year (Kleck and Gertz 1995). This estimate is not plausible and has been nominated as the "most outrageous number mentioned in a policy discussion by an elected official" (Cook, Ludwig, and Hemenway 1997, 463).

The estimate comes from a national telephone survey in which respon-

urglars seek out unoccupied
b). Yet the evidence comes not
parison using different victim-
our areas—the United States,
Jnited States, compared to the
laries are committed when no
 into account relevant factors
 percentage of time in which
ed to the United States but not
 examined. One could just as
igher in Japan and Stockholm
and Swedish live longer than

Iniform Crime Reports for all
I.S. National Crime Victimiza-
or 1994–98. The findings from
s with more guns have higher
'hot burglary" (burglary when
). Homes with firearm collec-

idicate that most would prefer
 no one is armed—when they
.985; Wright and Rossi 1986).
lars, who are among the least
lise and do not want to get
ently no credible evidence that
rglary or any other crime or in
ns.

ENSE GUN USE?

s of guns has focused on the
of such putative benefits often
 self-defense against criminal
s estimate is not plausible and
umber mentioned in a policy
g, and Hemenway 1997, 463).
 one survey in which respon-

dents reported their own behavior. All attempts at external validation reveal it to be a huge overestimate (Hemenway 1997b). For example, in 34 percent of the cases in which respondents stated that they used guns for self-defense, they said they used guns to protect themselves during burglaries. If true, this would translate into guns being used in self-defense in approximately 845,000 burglaries each year. From sophisticated victimization surveys (the NCVS), however, we know that there were fewer than 6,000,000 burglaries in the year of the survey, and in only 1,300,000 of those cases was someone certainly at home. Since only 41 percent of U.S. households owned firearms, and since the victims in two-thirds of the occupied dwellings remained asleep, the 2.5 million figure requires us to believe that burglary victims used their guns in self-defense more than 100 percent of the time.

A more reasonable estimate of self-defense gun use during burglary comes from a retrospective analysis of Atlanta police department reports. Examining home invasion crimes during a four-month period, researchers identified 198 cases of unwanted entry into single-family dwellings when someone was at home (Kellermann et al. 1995). In only three cases (less than 2 percent) did a victim use a firearm in self-defense. If this figure were extrapolated nationally for the year the survey covers, it would suggest approximately twenty thousand gun uses against burglary.

If it were true, the estimate of 2.5 million self-defense gun uses per year would lead to many other absurd conclusions. There just aren't enough serious crimes for victims to use guns so many times. For example, the number of respondents who claim to have used a gun against rape and robbery attempts suggests that victims of these attempted crimes are more likely to use a gun against the offender than the attackers are to use a gun against the victim—even though the criminal chooses the time and place for the attack, most citizens do not own guns, and very few people carry guns. Similarly, the number of people who claim to use guns in self-defense and report the incident to police (64 percent in the Kleck survey) often exceeds the total number of such crimes reported to police, including all the crimes when the victim did not have a gun (Ludwig 2000).

Other results coming from this telephone survey are also grossly exaggerated. Respondents claim to have shot more than two hundred thousand criminals. Yet each year, only about one hundred thousand people total (typically victims of assaults, suicide attempts, or accidents) are treated in emergency departments for gunshot wounds (Annest et al. 1995). Kleck (1997b) makes the strange claim that most gunshot victims are criminals, and when

criminals are shot they do not seek professional medical care. But surveys of jail detainees find that even among criminals, almost all go to hospital emergency rooms for treatment of their wounds. Of more than 380 surveyed criminals in jails in California, Ohio, Nevada, Georgia, Maryland, and Washington, D.C., who had been wounded in incidents, few of which were related to their incarceration, more than 90 percent went to the hospital for treatment (May et al. 2000a; May, Hemenway, and Hall 2002).

While the survey respondents claimed to be shooting more than 200,000 criminals, FBI's Uniform Crime Reports (UCR) for that year reported only 350 justifiable homicides by private citizens, and not all of these were with firearms (U.S. Department of Justice 1993). Per week, that would mean about 3,850 shootings of bad guys—but fewer than 7 died? Even if the UCR figure may be somewhat of an underestimate (discussed later in this chapter) the wounding/death rates just don't make sense.

Respondents from this telephone survey also report being victims of more than four times the number of robberies as is estimated by the NCVS, whose purpose is to determine rates of victimization. But none of these additional robberies seem to show up in police records or in hospital admissions of injured patients.

Survey respondents in the self-defense telephone survey also claim to have used their guns to save more than four hundred thousand people a year from death. Yet only twenty-seven thousand homicides occurred in the year of the survey. In other words, for every person actually murdered, gun owners claimed to be saving fifteen (usually themselves and their families) from certain death. One might then expect that non–gun owners, of whom few are saved by guns, would have much higher rates of homicide victimization than gun owners. Yet the evidence shows that non–gun owners are less likely to be murdered than are gun owners.

It is clear that the claim of 2.5 million annual self-defense gun uses is a vast overestimate. But what can account for it? The main causes are telescoping and the false-positive problem—a matter of misclassification that is well known to medical epidemiologists. (See appendix A for a discussion of self-defense gun use and the false-positive problem.) Fortunately, the NCVS, which includes information on self-defense, drastically reduces these problems.

Housing units in the NCVS remain in the sample for three years, and residents are interviewed every six months. To eliminate telescoping—the reporting of events that occurred outside the time frame in question—inci-

l medical care. But surveys of
lmost all go to hospital emer-
more than 380 surveyed crim-
gia, Maryland, and Washing-
, few of which were related to
to the hospital for treatment
)02).

shooting more than 200,000
() for that year reported only
id not all of these were with
week, that would mean about
died? Even if the UCR figure
sed later in this chapter) the

report being victims of more
timated by the NCVS, whose
But none of these additional
or in hospital admissions of

one survey also claim to have
thousand people a year from
les occurred in the year of the
ially murdered, gun owners
and their families) from cer-
un owners, of whom few are
homicide victimization than
un owners are less likely to be

self-defense gun uses is a vast
: main causes are telescoping
misclassification that is well
iix A for a discussion of self-
m.) Fortunately, the NCVS,
astically reduces these prob-

nple for three years, and resi-
eliminate telescoping—the
me frame in question—inci-

dents reported in the first interview are excluded. Residents are asked in subsequent interviews only about events that occurred since the most recent interview. In surveys of criminal victimization, telescoping can increase estimates "by between 40% and 50% depending on the type of crime; the inflation rate is greatest for violent crimes" (Skogan 1990, 262; see also Cantor 1989).

More important, the NCVS properly restricts claims of self-defense gun use to those who report a threatened, attempted, or completed victimization; it cannot be a genuine self-defense gun use unless there is an actual threat. Limiting the defensive gun use issue to this group eliminates most of the false-positive problem. The resulting estimate for annual defensive gun uses is between 55,000 and 120,000 per year, less than one-twentieth of the 2.5 million figure (Cook 1991; McDowall and Wiersema 1994; National Archive 1998).

The NCVS estimate has some limitations. It does not ask about all crimes (e.g., trespassing or vandalism), but only about six serious ones—rape and sexual assault, robbery, assault, burglary, nonbusiness larceny, and motor vehicle theft. However, no one claims that instances of self-defense gun use for the minor crimes that are omitted would dramatically swell the total. We also might expect the NCVS to give an underestimate of self-defense gun use since it prompts respondents not by asking directly whether they used a gun in self-defense but only by asking, "What did you do?" and "Anything else?" However, there is little reason to expect that respondents might forget or might be unwilling to report using a gun to protect themselves against a crime that occurred within the past six months. (See appendix A on self-defense gun use.)

Whatever its limitations, it seems clear that the NCVS estimates of self-defense gun use are more valid than the private telephone survey estimates of millions of self-defense gun uses each year.

## IS MORE BETTER?

A presumption exists that the higher the number of reported self-defense gun uses, the greater the benefit of guns, both to the user and to society generally. This assumption may be incorrect.

An increased likelihood of self-defense gun use may change the behavior of criminals in a perverse direction. Rather than being deterred from committing crimes, criminals may instead increasingly arm themselves in the belief