# Exhibit 16

## Page 1

```
STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K    )
   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
       COUNTY DEPARTMENT - CHANCERY DIVISION
MATTHEW D. WILSON, TORY    )
EDHLUND, and JOSEPH        )
MESSINCO,                  )
       Plaintiffs,         )
  vs.                      ) No. 07 CH 4848
COOK COUNTY, A PUBLIC      )
BODY AND CORPORATE, TONI   )
PRECKWINKLE, BOARD         )
PRESIDENT, IN HER          )
OFFICIAL CAPACITY AND      )
ITS BOARD OF               )
COMMISSIONERS IN THEIR     )
OFFICIAL CAPACITIES,       )
NAMELY: EARLEAN COLLINS,   )
ROBERT STEELE, JERRY       )
BUTLER, WILLIAM M.         )
BEAVERS, DEBORAH SIMS,     )
JOAN PATRICIA MURPHY,      )
BRIDGET GAINER, JESUS G.   )
GARCIA, PETER N.           )
SILVESTRI, JOHN P.         )
DALEY, LARRY SUFFREDIN,    )
GREGG GOSLIN, JOHN A.      )
FRITCHEY, TIMOTHY O.       )
SCHNEIDER, JEFFREY         )
TOBOLSKI, EDWIN REYES,     )
ELIZABETH ANN DOODY        )
GORMAN, and THOMAS DART,   )
SHERIFF OF COOK COUNTY,    )
IN HIS OFFICIAL            )
CAPACITY,                  )
       Defendants.         )
```

## Page 2

```
        IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION
ARIE S. FRIEDMAN, M.D.   )
and The Illinois State   )
Rifle Association,       )
      Plaintiffs,        )
  vs.                    ) No. 13-cv-9073
CITY OF HIGHLAND PARK,   )
      Defendant.         )
```

The discovery deposition of JAMES YURGEALITIS, taken in the above-entitled causes, before Rebecca Feeman, an Illinois Shorthand Reporter, on May 8, 2014 at 330 North Wabash Avenue, Suite 3300, Chicago, Illinois, pursuant to notice.

Rebecca Feeman, CSR, RPR
License No.: 084-004726

## Page 3

APPEARANCES:
SWANSON, MARTIN & BELL
BY: MR. JAMES VOGTS
330 North Wabash Avenue, Suite 3300
Chicago, Illinois 60611
(312) 321-9100
jvogts@smbtrials.com
   and
VICTOR D. QUILICI, ATTORNEY AND COUNSELOR AT LAW
BY: MR. VICTOR D. QUILICI
P/O Box 428
River Grove, Illinois 60171
(847) 298-2566
   Representing the Plaintiffs;

PERKINS COIE, LLP
BY: MR. CHRISTOPHER B. WILSON
131 South Dearborn Street, 17th Floor
Chicago, Illinois 60603
(312) 324-8603
cwilson@perkinscoie.com
   Representing City of Highland Park;

## Page 4

APPEARANCES (Continued):
STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
BY: MR. JAMES C. PULLOS
50 West Washington Street, Room 500
Chicago, Illinois 60602
(312) 603-5105
james.pullos@cookcountyil.gov
   Representing the Defendants.

```
 1              I N D E X
 2   WITNESS                    EXAMINATION
 3   JAMES YURGEALITIS
 4     By Mr. Vogts                  6
 5
 6            E X H I B I T S
 7   NUMBER                    MARKED FOR ID
 8   Yurgealitis Deposition Exhibit
 9         Nos. 1-2............................9
           No. 3..............................12
10         No. 4..............................43
           No. 5..............................43
11         No. 6..............................44
           No. 7..............................45
12         No. 8..............................47
           No. 9..............................47
13         No. 10.............................50
           No. 11.............................50
14         No. 12.............................61
           No. 13.............................80
15         No. 14.............................85
           No. 15.............................90
16         No. 16............................109
           No. 17............................131
17         Nos. 18-19........................148
           No. 20............................171
18         No. 21............................178
           No. 22............................179
19         No. 23............................185
           No. 24............................188
20         No. 25............................192
21
22
23
24
                                                5
```

```
 1         (Whereupon, the witness was duly
 2         sworn.)
 3         MR. VOGTS: This is the discovery deposition
 4   taken of James Yurgealitis in the Wilson versus
 5   Cook County case and the deposition of
 6   Mr. Yurgealitis taken in the Friedman versus
 7   City of Highland Park case.
 8              JAMES YURGEALITIS,
 9   called as a witness herein, was examined and
10   testified as follows:
11              EXAMINATION
12   BY MR. VOGTS:
13      Q.  Mr. Yurgealitis, have you ever given a
14   deposition before?
15      A.  Yes.
16      Q.  You know the general ground rules?
17      A.  Yes.
18      Q.  Okay. The most important ground rule
19   that I sometimes forget, and you may as well, is
20   let's do our best to not talk over the top of
21   one another. Wait until I finish my question
22   before you begin to answer. Even if you know
23   exactly where I'm going, wait until I finish so
24   the court reporter can get everything down
                                                6
```

```
 1   accurately and doesn't strangle us before the
 2   day is over; all right?
 3      A.  Sure.
 4      Q.  How many times have you given a
 5   deposition before today?
 6      A.  Two prior occasions.
 7      Q.  And were those matters in litigation?
 8      A.  Yes.
 9      Q.  What kind of cases were those?
10      A.  They were both divorce related.
11      Q.  Not firearms related?
12      A.  No.
13      Q.  And I see from résumés that I have here
14   in my stack of exhibits that you testified
15   multiple times before grand juries, is that
16   right?
17      A.  Correct.
18      Q.  And that was in your capacity as an
19   employee of the ATF?
20      A.  Both ATF and the department --
21      Q.  Have you ever testified at the trial of
22   a case?
23      A.  Yes.
24      Q.  Approximately how many times?
                                                7
```

```
 1      A.  I would approximate it as more than 20
 2   and less than 50.
 3      Q.  And on each of those occasions were you
 4   testifying in your capacity as an employee of
 5   either the ATF or the Diplomatic Security
 6   Service?
 7      A.  Yes.
 8      Q.  Generally when you've testified in
 9   trials of cases, did it have to do with forensic
10   firearms matters?
11      A.  Not so much forensic firearms matters
12   but classification of firearms or as a fact
13   witness in a criminal case where I may have been
14   the affiant on a search warrant or have filled
15   out the return on a search warrant and it was in
16   relation to where those items were found in
17   terms of the evidence that was taken from a
18   particular location pursuant to a search
19   warrant.
20      Q.  On those occasions where you testified
21   on the classification of firearms, can you
22   describe just generally what you mean by
23   classification firearms?
24      A.  In general whether or not it was
                                                8
```

**Page 141**

1  stated in the report, any .38 caliber revolver,
2  the standard ammunition, say, maybe just lead
3  ball ammunition, is going to have power capable
4  of stopping an individual. Double ought buck
5  will stop an individual.
6      Q. And then some?
7      A. Yeah.
8      MR. VOGTS: Let's go off the record for a
9  second.
10         (Whereupon, a discussion was had
11         off the record.)
12 BY MR. VOGTS:
13     Q. Mr. Yurgealitis, when you use the word
14 over penetration, what exactly do you mean?
15     A. When I use the term over penetration,
16 it means that projectile that enters the target
17 and exits the target. Over penetration, meaning
18 it doesn't stay within the intended targets in
19 terms of an intruder or a deadly force
20 situation, and it also may mean that it will --
21 if you don't hit that individual, that it would
22 over penetrate in a sense of it would penetrate
23 through another wall or structural part of the
24 building.

**Page 142**

1      Q. And potentially wound somebody on the
2  other side of that wall or structure?
3      A. Correct.
4      Q. In your declaration you indicate that
5  if an individual had a preference for a shoulder
6  weapon as a home defense firearm, you have
7  recommended a 12 gauge pump-action shotgun; is
8  that correct?
9      A. Yes.
10     Q. And that shotgun would be loaded with
11 double ought buckshot, is that correct?
12     A. That would be my recommendation, yes.
13     Q. And you recommended that that shotgun
14 be stored with the hammer dropped and an empty
15 chamber and the safety off, is that correct?
16     A. Correct.
17     Q. Why the safety off?
18     A. Because in a stress situation, the
19 firearm would be unloaded. It's easy to -- it
20 would be unloaded -- I should say there would
21 not be a round chambered in it. The firearm is
22 easily quickly loaded. There's no manipulation
23 of a safety necessary, and again, you know,
24 there's a very distinctive sound when you

**Page 143**

1  chamber a pump-action shotgun and if you put
2  some -- you put some moxie into it.
3      Q. So the only action required of the
4  operator with a shotgun in that condition is to
5  work the pump. The gun would then be loaded,
6  aim, and fire?
7      A. Correct.
8      Q. There's no safety to manipulate because
9  you already have it off?
10     A. Correct.
11     Q. Yes or no?
12     A. Correct.
13     Q. Let's talk about double ought buckshot.
14 Depending on the size of the shell itself, how
15 many pellets are in a double ought buckshot
16 shot?
17     A. Approximately 32, thereabouts. I'm
18 sorry. I'm thinking of the caliber. You know,
19 I'm drawing a blank.
20     Q. Anywhere from 9 to 12, does that sound
21 right?
22     A. Approximately, yes.
23     Q. And I think you already mentioned that
24 the caliber or the diameter of each of those

**Page 144**

1  individual pellets is 32 --
2      A. Approximately.
3      Q. Which is roughly the equivalent of the
4  diameter of a 9 millimeter bullet, a little bit
5  less?
6      A. Little bit less.
7      Q. So when you fire a double ought
8  buckshot shell, let's say, down the hallway of
9  the home, you're releasing 9 to 12 3,200th of an
10 inch diameter pellets down that hallway?
11     A. Correct.
12     Q. At a distance of, let's say, 15 feet or
13 so, what is the approximate diameter of that
14 shell?
15     A. Close to what you were holding out your
16 hands.
17     Q. About a softball size?
18     A. Maybe a little bit larger. Like a
19 softball to --
20     MR. WILSON: Chicago style softball.
21 BY MR. VOGTS:
22     Q. Smaller?
23     A. Smaller than a pie plate but larger
24 than a softball I would say.

**Page 145**

Q. What is the penetrative ability of double ought buckshot compared to, let's say, large caliber pistol rounds? Greater, less, equal, or don't you know?

A. I would say I don't know because I haven't done any comparative studies.

Q. Okay. Now, what are the advantages of a shoulder weapon as a home defense firearm, if any?

A. Stability. Obviously in the case of a shotgun, a larger -- well, you can't really say caliber obviously. A larger bore weapon that may have advantages over firing a single projectile.

Q. What advantage is that?

A. Well, being able to fire buckshot as we just discussed as opposed to firing one single projectile out of either a rifle or a handgun.

Q. So you might have a greater ability with that shotgun to incapacitate your target than you might with a pistol or rifle caliber?

A. You may.

Q. Okay. What other advantages does a long gun bring to a home defense encounter over

**Page 146**

a handgun?

A. Other than those stated in my opinion, not much.

Q. Generally speaking, is a long gun more accurate than a handgun, or can it be shot more accurately than a handgun?

MR. WILSON: Objection. Vague.

BY MR. VOGTS:

Q. Strike that. Generally speaking, can a long gun be shot more accurately than a handgun?

MR. WILSON: Objection. Vague.

THE WITNESS: Since we're -- if we're going to switch scenarios here because we've been talking about this up until -- up until this question in terms of kind of in a box here at home defense scenario or a break-in type situation, unless I have the wrong read on kind of the perspective or the boundaries of what this part of the deposition has been about, I don't necessarily believe that long range accuracy is applicable in a home defense situation.

BY MR. VOGTS:

Q. Fair enough, but even in relatively

**Page 147**

short- or medium-range situations, say 15 to 25 feet, again generally speaking, is a long gun capable of being fired more accurately at those ranges than a handgun?

A. I could not -- I can't give you an absolute on that. I know to me shot placement is everything in a home defense situation. You may have somebody who is -- again, we're talking relative training or experience boundaries or qualifiers for a statement like that because somebody may be an incredibly good shot with a handgun better than the other family member is with a long gun. So that's kind of difficult for me to answer.

Q. Okay. What disadvantages are there to a long gun in a home defense encounter with an intruder?

A. In a general sense, I think that it actually -- although a shorter -- as we discussed before, telescoping stock allows you to maneuver a rifle in a confined area better or more easily than it would if it were extended. I don't necessarily believe that a long gun is the right call in a home defense situation

**Page 148**

because it is difficult to maneuver. It is to a certain extent in my opinion more easily taken away from a homeowner than a handgun is.

Q. If that homeowner, in fact, encounters up close that intruder?

A. Well, if they go downstairs and try to confront them, there's a good chance that anybody could have their firearm taken from them. If they sat up there and called the police, they wouldn't have to worry about it.

Q. What if the intruder comes upstairs and encounters the homeowner?

A. Well, you shoot him when he's coming up the stairs if deadly force is called for.

Q. But in your declaration, you do state that if a person has a preference for a shoulder weapon, you would recommend the 12 gauge shotgun?

A. Yeah, if they had a preference for it, yes.

(Whereupon, Yurgealitis Deposition Exhibit Nos. 18-19 were marked for identification.)

**Page 149**

1  BY MR. VOGTS:
2     Q.  And specifically you recommended either
3  the Mossberg --
4     A.  Mossberg Model 500.
5     Q.  -- Model 500, which I marked an
6  Internet page from Exhibit 19 for the Remington
7  Model 870, Exhibit 18; is that correct?
8     A.  Correct.
9     Q.  Both of those firearms have an overall
10 length of 48 and a half inches, is that right?
11    A.  I guess it all depends on which barrel
12 you have on it.
13    Q.  Well, specifications there provide for
14 those models 48 and a half inches; am I right?
15    A.  Well, no, because there are a number of
16 different barrel lengths that these firearms are
17 available in because if you see right here, it
18 says features.  On Exhibit 19 on the right-hand
19 side, it shows on the third bullet point -- the
20 fourth bullet point down, excuse me,
21 20/22/24/26/28-inch barrels.
22       So it is available in different -- it's
23 available in multiple different barrel lengths,
24 and I believe you can -- there are aftermarket

**Page 150**

1  barrels that you can purchase that are still
2  legal under the National Firearms Act but are
3  shorter than that.
4     Q.  And a shorter barrel in a shotgun of
5  this type would be more maneuverable obviously,
6  correct?
7     A.  Correct.
8     Q.  Now, in paragraph 4 of your
9  declaration, you indicate that the advantages of
10 one of these two shotguns is its unmatched
11 stopping power; correct?
12    A.  Certainly.
13    Q.  Its low probability of over penetration
14 as compared to rifle caliber and velocity
15 projectiles, is that correct?
16    A.  Correct.
17    Q.  What is the basis for your statement
18 that there is a low probability of over
19 penetration with double ought buckshot as
20 compared to rifle caliber and velocity
21 projectiles?
22    A.  Well, if you're talking 3,000 -- well,
23 let's take a look at the AR because that's been
24 the focus of the majority of this deposition.

**Page 151**

1  Standard muzzle velocity out of a .223
2  Remington, give or take, is 2,300 feet per
3  second.  I'm sorry.  More than that.
4       So I mean, I can't quote you off the
5  top of my head what the muzzle velocity is of a
6  double ought buck pellet coming out of a
7  Remington 870, but I can almost guarantee you
8  that it is significantly less than that of a
9  .223 round.
10    Q.  Is the probability of over penetration
11 dependent on muzzle velocity alone?
12    A.  No.
13    Q.  What else is it dependent upon?
14    A.  Well, it depends on the type of
15 material that it encounters, the angle of the
16 shot, the orientation of the shooter.
17    Q.  Do you know whether or not the
18 probability of over penetration is partly
19 dependent upon bullet mass?
20    A.  Well, bullet mass and/or bullet tip
21 design as well.
22    Q.  So it's not just velocity?
23    A.  No, I didn't say that it was just, but
24 those are some of the considerations.

**Page 152**

1     Q.  But going back to your statement that
2  double ought buckshot has a low probability of
3  over penetration as compared to rifle caliber
4  and velocity projectiles, you conducted no
5  testing to support that statement; have you?
6     A.  No, I have not.  Just based on my
7  training and experience.
8     Q.  Now, a shotgun of the type you've
9  identified, the Mossberg 500 or the Remington
10 870, has fairly substantial recoil; would you
11 agree with that?
12    A.  Yes.
13    Q.  And when fired in an inside
14 environment, it's pretty darn loud; isn't it?
15    A.  There are a lot of firearms that are
16 loud in confined spaces.  It's as loud as some,
17 if not louder than others.  I mean, again,
18 that's a subjective -- without a decibel meter,
19 that's a subjective presumption.
20    Q.  The .357 revolver that your daughter
21 enjoys shooting is also a very loud firearm,
22 isn't it?
23    A.  Yes.
24    Q.  And that's because of the .357 round

38 (Pages 149 to 152)

1  the chamber, it's one movement.  That's if --
2  it's a great audible deterrent.  It's just my
3  opinion that that's my -- you know, that's the
4  reason to go to it over an AR.  I like my AR.  I
5  know how to work my AR, but that wouldn't be the
6  go-to gun in that situation for me.
7       Q.  Now, if you stored that AR, and
8  specifically the Smith & Wesson M&P15, in my
9  hypothetical with the safety off and the chamber
10 empty, you would have to make one movement to
11 load that chamber just as you would have to make
12 one movement with the pump-action shotgun;
13 correct?
14      A.  True.
15      Q.  So you could store them in the same
16 condition and limit the number of movements in
17 both guns that are needed in order to arm and
18 load that gun for use?
19      A.  Yeah, but for me the movement required
20 to work a pump-action shotgun is more natural
21 and more fluid than reaching up or reaching down
22 to pull a charging handle, and that's just
23 personal preference.
24      Q.  Okay.  Now, in terms of the handgun

157

1  that you recommend, you indicated that your
2  first inclination is to recommend an eight-shot
3  revolver in either .38 caliber +P ammunition or
4  .357 ammunition; is that correct?
5       A.  Yes.
6       Q.  Why an eight-shot revolver as opposed
7  to a five- or six-shot revolver?
8       A.  Because it's really the -- in a
9  revolver which is pointed and pull the trigger
10 to have it fire in that caliber, that's about
11 the largest capacity that you can purchase.
12      Q.  Again, why do you feel you need a
13 larger capacity beyond five or six for a home
14 defense encounter?
15      A.  Only because if there's an eight-shot
16 revolver that's available, then I would suggest
17 that if it's legal and it's available and an
18 individual can find that in a revolver, then
19 that would be a good choice for a purchase.
20      Q.  And those eight-shot revolvers are
21 available.  I believe you referenced a Smith &
22 Wesson Model 627 and a Taurus Model 608, is that
23 correct?
24      A.  I think that's two of them, yes.

158

1       Q.  You also reference in your report a
2  recommendation to have a speedloader handy.
3  What is a speedloader?
4       A.  A speedloader is a mechanism that holds
5  additional cartridges and makes reloading a
6  revolver -- makes it able for the operator to
7  reload a revolver faster than placing the
8  bullets in the cylinder one at a time.
9       Q.  And your recommendation of having a
10 speedloader available is in the event that more
11 than eight shots are required, correct?
12      A.  Yes.
13      Q.  So in that scenario, this person to
14 whom you recommended an eight-shot revolver
15 would have 16 rounds available to him or her in
16 that home defense situation?
17      A.  Yes.
18      Q.  Now, you indicate in paragraph 41 of
19 Exhibit 8 that the .38 +P caliber round and the
20 .357 magnum round have a low probability of over
21 penetration?
22      A.  Well, I think if you have to qualify
23 that, I stated with hollow points, not
24 necessarily just standard .357 or .38 plus --

159

1       Q.  Fair enough, but you believe that those
2  ammunition rounds with hollow points have a low
3  probability of over penetration, is that
4  correct?
5       A.  Well, that's dependent on the factors
6  that we discussed earlier.
7       Q.  Refresh my recollection.
8       A.  Well, bullet type, powder charge,
9  muzzle velocity, bullet weight.
10      Q.  But we're talking about fire from these
11 revolvers --
12      A.  Uh-huh.
13      Q.  -- in those calibers.  It's your
14 opinion that those calibers and these revolvers
15 have low probability of over penetration,
16 correct?
17      A.  That's what it states, correct.
18      Q.  Compared to what other ammunition?
19      A.  Well, I think compared to most high
20 velocity rifle rounds.
21      MR. WILSON:  It's 2:15.  Is it a good time
22 for a break?
23      MR. VOGTS:  Sure, if you like.
24

160

40 (Pages 157 to 160)

## Page 197

1  am going to keep in my possession a number of
2  exhibits marked today including Exhibit 13, the
3  Ruger Firearms catalog, Exhibit 14, the
4  Remington Firearms Catalog, and I think that's
5  it.
6      MR. WILSON:  I think that's all.
7      MR. VOGTS:  Those two.  The rest will go with
8  the court reporter.
9      MR. WILSON:  Jim, could we ask that you copy
10 and circulate the cover and the pages
11 referenced?
12     MR. VOGTS:  Yes, yes.  Signature?
13     MR. WILSON:  We will reserve signature.
14         (FURTHER DEPONENT SAITH NOT.)
15         (Whereupon, proceedings
16          concluded at 3:20 p.m.)

## Page 198

```
STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K    )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
    COUNTY DEPARTMENT - CHANCERY DIVISION
MATTHEW D. WILSON, et  )
al,                    )
      Plaintiffs,      ) No. 07 CH 4848
  vs.                  )
COOK COUNTY, a public  )
body and corporate, et )
al.,                   )
      Defendants.      )
```

I, JAMES YURGEALITIS, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken on May 8, 2014; that I have read the foregoing transcript of my deposition, and affix my signature to same.

            JAMES YURGEALITIS

Subscribed and sworn to
before me this       day
of           , 2014


NOTARY PUBLIC

## Page 199

```
STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K    )
```

I, Rebecca Feeman, an Illinois Shorthand Reporter, do hereby certify that heretofore, to-wit, on May 8, 2014, personally appeared before me, at 330 North Wabash Avenue, Suite 3300, Chicago, Illinois, JAMES YURGEALITIS, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein MATTHEW D. WILSON, et al., are the Plaintiffs, and COOK COUNTY, a public body and corporate, et al., are the Defendants.

I further certify that the said JAMES YURGEALITIS was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as

## Page 200

aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my hand this 16th of May, 2014.


            *Rebecca Dalton*
            ILLINOIS SHORTHAND REPORTER
            COOK COUNTY, ILLINOIS

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052