# Exhibit 17

---

STATE OF ILLINOIS  )
                   )  SS:
COUNTY OF C O O K  )
   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
       COUNTY DEPARTMENT - CHANCERY DIVISION
MATTHEW D. WILSON, TORY EDHLUND )
and JOSEPH MESSINCO,            )
         Plaintiffs,            )
     vs.                        ) No. 07 CH 4848
COOK COUNTY, a public body      )
and corporate, TONI PRECKWINKLE,)
Board President, in her official)
capacity and its Board of       )
Commissioners in their official )
capacities; namely: EARLEAN     )
COLLINS, ROBERT STEELE, JERRY   )
BUTLER, WILLIAM M. BEAVERS,     )
DEBORAH SIMS, JOAN PATRICIA     )
MURPHY, BRIDGET GAINER, JESUS   )
G. GARCIA, PETER N. SILVESTRI,  )
JOHN P. DALEY, LARRY SUFFREDIN, )
GREGG GOSLIN, JOHN A. FRITCHEY, )
TIMOTHY O. SCHNEIDER, JEFFREY   )
TOBOLSKI, EDWIN REYES, ELIZABETH)
ANN DOODY GORMAN and THOMAS DART,)
Sheriff of Cook County, in his  )
official capacity,              )
         Defendants.            )

    The discovery deposition of MARK DOUGLAS JONES, taken in the above-entitled cause, before MARLENE L. KING, a notary public of Cook County, Illinois, on April 30, 2014 at 330 North Wabash Avenue, Suite 3300, Chicago, Illinois, pursuant to notice.
    START TIME: 9:32 a.m. END TIME: 4:57 p.m.

1

---

    IN THE UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
              EASTERN DIVISION
ARIE S. FRIEDMAN, M.D.   )
and the Illinois State   )
Rifle Association,       )
       Plaintiffs,       )
   vs.                   ) NO. 13-CV-9073
CITY OF HIGHLAND PARK,   )
       Defendant.        )

    The deposition of MARK DOUGLAS JONES, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARLENE L. KING, a notary public within and for the County of Cook and State of Illinois, at 330 North Wabash Avenue, Suite 3300, Chicago, Illinois, on April 30, 2014, at the hour of 9:32 a.m.

       REPORTED BY: MARLENE L. KING, C.S.R.
       LICENSE NO.: 084-003326.

2

---

APPEARANCES:

  SWANSON, MARTIN & BELL, LLP,
  BY:  MR. JAMES B. VOGTS,
  330 North Wabash Avenue,
  Suite 3300,
  Chicago, Illinois 60611
  (312) 321-9100
  jvogts@smbtrials.com
      and
  MR. VICTOR D. QUILICI,
  P.O. Box 428,
  River Grove, Illinois 60171
  (847) 298-2566
      Representing the Plaintiffs;

  PERKINS COIE, LLP,
  BY:  MR. CHRISTOPHER B. WILSON,
  131 South Dearborn Street,
  Suite 1700,
  Chicago, Illinois 60603
  (312) 324-8603
  cwilson@perkinscoie.com
      Representing City of Highland Park;

3

---

APPEARANCES (Continued):

  STATE'S ATTORNEY OF
  COOK COUNTY, ILLINOIS,
  BY:  MR. JAMES C. PULLOS,
     Assistant State's Attorney,
     Supervisor,
     Labor and Employment Section,
     and
     MS. MARILYN F. SCHLESINGER,
     Assistant State's Attorney,
     Civil Actions Bureau,
  RICHARD J. DALEY CENTER,
  50 West Washington Street,
  Room 500,
  Chicago, Illinois 60602
  (312) 603-5105
  (312) 603-2355
  james.pullos@cookcountyil.gov
  marilyn.schlesinger@cookcountyil.gov
      Representing the Defendants.

4

---

## Page 5

```
            I N D E X
WITNESS                    EXAMINATION
MARK DOUGLAS JONES
   By Mr. Vogts                 8
         E X H I B I T S
NUMBER                     REFERRED TO
Deposition Exhibit
   No. 1                        7
   No. 2                        7
   No. 3                       14
   No. 4                       61
   No. 5                       61
   No. 6                       68
   No. 7                       68
   No. 8                       66
   No. 9                      119
   No. 10                     124
   No. 11                     130
   No. 12                     136
   No. 13                     144
   No. 14                     159
   No. 15                     171
   No. 16                     175
   No. 17                     178
```

## Page 6

```
         E X H I B I T S
NUMBER                     REFERRED TO
Deposition Exhibit
   No. 18                     209
   No. 19                     216
   No. 20                     225
   No. 21                     228
   No. 22                     237
   No. 23                     243
   No. 24                     246
   No. 25                     250
   No. 26                     271
```

## Page 7

MR. VOGTS: Would you swear in the witness, please.

(WHEREUPON, the witness was duly sworn.)

MR. VOGTS: This is the discovery deposition of Mark D. Jones taken in the case of Wilson versus Cook County and also the deposition of Mark D. Jones taken in the case of Friedman versus the City of Highland Park.

Good morning, Mr. Jones.

THE WITNESS: Good morning.

MR. VOGTS: I'm going to show you, make as part of the record here, Exhibit 1 and Exhibit 2, which are the notices for the deposition in the two cases.

And for the record in each of those deposition notice a request was made pursuant to Federal Rule of Civil Procedure 34 or Illinois Supreme Court Rule 214 that the witness bring to the deposition today all reports, studies, data, articles, treatises and other documents that support the opinions stated in his February 7, 2014 declaration and his November 25, 2013 report. It's my understanding the witness has

## Page 8

not brought those materials with him today.

MARK DOUGLAS JONES, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. VOGTS:

Q. Is that a correct statement, Mr. Jones?

A. That's correct. I do not have those materials with me at the moment.

MR. VOGTS: The plaintiffs in both cases will reserve their right to reconvene this deposition at a later date should that be necessary.

BY MR. VOGTS:

Q. Will you please state your name for the record?

A. My name is Mark Douglas Jones.

Q. What is your age?

A. I'm 56.

Q. Where do you live?

A. Chicago, Illinois.

Q. What is your residence address?

A. 7622 North Rogers Avenue, R-o-g-e-r-s, Chicago.

1  they do not.
2      Q.  Would you agree that the difference
3  between a fully automatic rifle and a
4  semi-automatic rifle is a major functional
5  difference between those two firearms?
6      A.  Certainly a major legal difference
7  between the two.  Possession of one is a felony
8  without proper registration.  Possession of the
9  other in this case is a violation of the assault
10  weapons ban.
11      Q.  Would you agree that the ability to
12  fire fully automatic is a major functional
13  difference from a rifle that can only fire
14  semi-automatic?
15      A.  Yes.
16      Q.  At Page 8 of your Declaration in
17  the Friedman case did you write that, "The
18  functional differences between AR rifles
19  used for military purposes and civilian
20  semi-automatic rifles are minimal"?
21      A.  Yes, they are minimal.
22      Q.  Okay.  Explain that to me, please.
23      A.  They function exactly -- in exactly the
24  same fashion with the exception that selected

73

1  fire has a selector switch that can be moved
2  from semi-automatic to fully automatic and
3  allows for them to fire fully automatic.
4          Other than that, the rifles fire
5  exactly the same, civilian AR-15 or military
6  M-4.  The controls are the same.  The stocks are
7  the same.  The ammunition magazines are the
8  same.  If you can function one, you can function
9  the other.
10      Q.  Okay. Except for the major functional
11  difference that one can fire in fully automatic
12  mode, and the other can only fire in a
13  semi-automatic mode, correct?
14      A.  Yes.
15      Q.  At Page 9 of your Declaration -- refer
16  to mine.
17      A.  Try to smooth things up.
18      Q.  Paragraph 16 --
19      A.  Yep.
20      Q.  -- you wrote that, "The AR-15 family
21  of rifles may be fired at virtually the same
22  cyclical rate of fire as a fully automatic
23  machine gun by installing a commercially
24  manufactured so-called "bump fire" trigger

74

1  activator."
2      A.  Yes.
3      Q.  Did I read that correctly?
4      A.  Yes, you did.
5      Q.  Okay.  Have you ever used a
6  commercially available "bump fire" trigger
7  activator?
8      A.  Yes.
9      Q.  Why is that?
10      A.  To test it to see how it functioned.
11      Q.  Test it in an official capacity or just
12  more private curiosity?
13      A.  No, in official capacity.
14      Q.  And what did you experience?
15      A.  I experienced a firearm that fired
16  at a very high cyclic rate.  AR-15 emptied the
17  magazine very, very quickly.
18      Q.  When using that "bump fire" trigger
19  activator, did you fire from the shoulder,
20  from your hip?  Where did you fire from?
21      A.  Many of them you have to fire from the
22  hip.  There is another one on the market now
23  that is a stock activator that functions the
24  same way, and you can fire it from the shoulder.

75

1      Q.  When you yourself fired that fire, what
2  kind of firearm did you fire from the hip with
3  that "bump fire" activator?
4      A.  It was some sort of an AR-15 copy.
5  I don't recall the exact model or make.
6      Q.  How did that activator work?
7      A.  I can't tell you the science on it
8  other than the recoil causes the sear not to
9  fully engage and allows the weapon to fire fully
10  automatic.  Beyond that, it was attached to the
11  trigger.  You pull the trigger.  It fired.
12  Fired fully automatic.
13      Q.  Is that device legal under Federal law?
14      A.  Yes.
15      Q.  ATF has looked at it and decided that
16  it was a legal device.
17      A.  Yes.  That's correct.
18      Q.  Do you know what the basis of ATF's
19  determination was that that was a legal device?
20      A.  No.
21      Q.  It's generally, however, not legal to
22  convert a semi-automatic firearm into a fully
23  automatic firearm, is it?
24      A.  That's correct.  It's illegal.

76

**Page 77**

1  Q. You have received what I'll
2  characterize as extensive firearms training in
3  your career?
4  A. That's correct.
5  Q. Have you ever been taught in any of
6  those training sessions to fire a firearm from
7  your hip?
8  A. Yes. Actually, I have been.
9  Q. Under what circumstance would you fire
10 a firearm from your hip?
11 A. I myself would not fire a firearm from
12 my hip.
13 Q. Why not?
14 A. It's not as accurate as firing from the
15 shoulder. If you're holding a long gun, it's
16 meant to be mounted to the shoulder and fired,
17 and that's how I would fire it.
18    Except for really extreme emergency
19 where you needed to deploy the firearm
20 immediately and the target was close enough that
21 I felt that I was capable of hitting it from the
22 hip like that, I would normally not do that.
23 Q. You've also spent a considerable amount
24 of time instructing others on firearms use and

**Page 78**

1  safety?
2  A. Yes.
3  Q. Have you ever instructed any of your
4  agents, officers, pupils, whatever you call
5  them, to fire a firearm from the hip?
6  A. No, have not.
7  Q. For the same reasons?
8  A. Yes. Let me say that we have
9  demonstrated it and demonstrated the differences
10 in accuracy between firing from the hip. I
11 think at the Federal Law Enforcement Training
12 Center there is still a curriculum where they
13 train you to fire from the hip position, and
14 they trained all Federal agencies to go through
15 the basic criminal investigator course, how to
16 fire a firearm from the hip, but I have not
17 trained anyone to fire.
18 Q. Would that technique if in fact it
19 was trained as you have described be limited
20 to situations in which there was a need to lay
21 suppressive fire down to protect a colleague
22 in the field?
23 A. The short answer is no. I was taught
24 that technique and have only been shown it in

**Page 79**

1  the context of using a shotgun, which typically
2  doesn't contain enough ammunition to put
3  suppressive fire down in the context that I
4  understand suppressive firearm. So no.
5  Q. What circumstance was it that
6  contemplated where you might need to fire from
7  the hip?
8  A. Mr. Vogts, I don't know the policy, why
9  they were trying to teach that. They taught it,
10 I learned it, I took the test I was supposed to
11 take and passed it and moved on and have never
12 fired a firearm from the hip.
13 Q. Are you aware of any circumstance in
14 which a criminal has used a "bump fire" trigger
15 activator in the commission of a firearms crime?
16 A. I am not aware of one of those
17 circumstances, although there are many,
18 many circumstances that I'm not aware of.
19 Q. But you're not aware of one.
20 A. No, I am not personally aware of one of
21 those, no.
22 Q. You also wrote at Paragraph 16 of
23 Exhibit 5 that, "The AR-15 family of rifles may
24 be fired at virtually the same cyclical rate of

**Page 80**

1  fire as a fully automatic machine gun," and I'm
2  going to skip some language, "by merely firing
3  from the hip holding the barrel shroud with one
4  hand and pressing the trigger with the other."
5  A. Um-um.
6  Q. Could you explain that to me, please?
7  I don't understand how merely firing from the
8  hip and holding the barrel shroud with one hand
9  and pressing the trigger can achieve fully
10 automatic fire?
11 A. With a bump fire activator.
12 Q. Okay. So I just misunderstand your
13 syntax there.
14 A. Could very well be, sir, yes.
15 Q. So what you're saying in that sentence
16 is with a "bump fire" trigger activator you can
17 achieve a cyclical rate of fire similar to that
18 of a fully automatic gun.
19 A. That's correct.
20 Q. Page 9 of Exhibit 5, Paragraph 17,
21 you discuss there that, "parts and plans for
22 conversion of semi-automatic firearms into
23 a machine gun are widely available on the
24 Internet," is that correct?

**Page 173**

1 understatement given these numbers, is that
2 correct?
3    A. Vastly overrepresented.
4    Q. Two pages later for year 2009 of the
5 378 firearms related murders in that year, just
6 six were committed with a rifle of some type,
7 correct?
8    A. Yes.
9    Q. And again, we don't know whether that
10 rifle was of the type banned under the ordinance
11 or not.
12    A. That's correct.
13    Q. We could go on with additional pages,
14 but essentially these numbers confirm that
15 rifles, whether they be banned under the
16 ordinance or not, are rarely used by criminals
17 to commit firearms related crimes, correct?
18    MR. PULLOS: I'll object to the form.
19       You could answer.
20    THE WITNESS: And I would answer by saying
21 they're rarely used in these statistics to
22 commit firearms related murder. I am aware of
23 at least one incident last year where 13 people
24 were shot with a Kalashnikov copy outside a park

**Page 174**

1 here in Chicago.
2 BY MR. VOGTS:
3    Q. Let's talk about that since you bring
4 it up. I guess that's kind of the shorthand way
5 to refer to as the Cornell Square Park shooting?
6    A. I think that's right.
7    Q. And how many shooters were involved in
8 that event?
9    A. My recollection is two, but I'm not
10 100 percent sure of that.
11    Q. How many guns were fired in that event?
12    A. I don't know.
13    Q. Would it surprise you to learn there
14 were two guns fired in that event?
15    A. If you say so, I agree with you. If
16 you have that knowledge, I'll defer.
17    Q. Rifle was one of them?
18    A. Yes.
19    Q. Handgun was the other.
20    A. Um-um.
21    Q. You don't know that, though, do you?
22    A. I guess I do remember hearing that,
23 yes, on the news. I don't have any specific
24 special like insider knowledge of that

**Page 175**

1 particular event. I know what you do about it
2 from the news.
3    Q. You did refer to it in your
4 Declaration, did you not, on the Friedman case?
5    A. Yes.
6    Q. And where did you gather the
7 information?
8    A. From public media sources.
9    Q. But you didn't acquire a greater depth
10 of knowledge about that incident other than what
11 you provided in the Declaration.
12    A. No, sir.
13    Q. Who is Christopher Koper?
14    A. He is a researcher.
15    Q. You cited to one of Mr. Koper's
16 reports, have you not?
17    A. I believe I did, yes.
18    MR. VOGTS: K-o-p-e-r.
19 BY MR. VOGTS:
20    Q. And the report I've cited to you I've
21 marked as Exhibit 16, which is titled Updated
22 Assessment of the Federal Assault Weapons Ban:
23 Impacts on Gun Markets and Gun Violence, 1994 to
24 2003. Is that correct?

**Page 176**

1    A. Yes. That's correct.
2    Q. And specifically your citation to
3 Mr. Koper's report shows up in Paragraph 14
4 to Exhibit 5, the Friedman Declaration, correct?
5    A. Page 14?
6    Q. Page 8, Paragraph 14.
7    A. Gotcha. Yes.
8    Q. And you write in that paragraph,
9 "Although assault weapons represented between
10 one and eight percent of guns used in crime in
11 1994, they accounted for 16 percent of gun
12 murders of police officers."
13    A. That's what I wrote.
14    Q. Referring you to Page 15 of the Koper
15 report. Is this the page of the Koper report
16 from which you pulled the statistics cited by
17 you in Paragraph 14 of Exhibit 5? Footnote
18 refers to Pages 14 through 15, Footnote 12.
19    A. Well, it's certainly what I referred
20 to for the eight percent of guns used in crime.
21 I don't find the 16 percent --
22    Q. Look to Footnote 12, please.
23    A. Okay. Thank you. As many as 16
24 percent of gun owners are police officers in

\*\*CONFIDENTIAL\*\*

```
 1   STATE OF ILLINOIS    )
 2                        ) SS:
 3   COUNTY OF C O O K    )
 4        I, MARLENE L. KING, a notary public
 5   within and for the County of Cook County and
 6   State of Illinois, do hereby certify that
 7   heretofore, to-wit, on April 30, 2014,
 8   personally appeared before me, at 330 North
 9   Wabash Avenue, Suite 3300, Chicago, Illinois,
10   MARK DOUGLAS JONES, in a cause now pending and
11   undetermined in the Circuit Court of Cook
12   County, Illinois, wherein MATTHEW D. WILSON,
13   et al., are the Plaintiffs, and COOK COUNTY,
14   a public body and corporate, et al., are the
15   Defendants.
16        I further certify that the said MARK
17   DOUGLAS JONES was first duly sworn to testify
18   the truth, the whole truth and nothing but the
19   truth in the cause aforesaid; that the testimony
20   then given by said witness was reported
21   stenographically by me in the presence of the
22   said witness, and afterwards reduced to
23   typewriting by Computer-Aided Transcription, and
24   the foregoing is a true and correct transcript
                                                 281
```

```
 1   McCORKLE LITIGATION SERVICES, INC.
         200 N. LaSalle Street Suite 2900
 2          Chicago, Illinois 60601-1014
 3
     DATE: May 11, 2014
 4
     MR. CHRISTOPHER B. WILSON,
 5   PERKINS COIE, LLP,
     131 South Dearborn Street,
 6   Suite 1700,
     Chicago, Illinois  60603
 7
     IN RE:  Wilson vs. Cook County
 8   COURT NUMBER:  07 CH 4848
     DATE TAKEN: April 30, 2014
 9   DEPONENT:  Mark Douglas Jones
10   Dear Mr. Wilson:
11   Enclosed is the deposition transcript for the
     aforementioned deponent in the above-entitled
12   cause.  Also enclosed are additional signature
     pages, if applicable, and errata sheets.
13
     Per your agreement to secure signature, please
14   submit the transcript to the deponent for review
     and signature.  All changes or corrections must
15   be made on the errata sheets, not on the
     transcript itself.  All errata sheets should be
16   signed and all signature pages need to be signed
     and notarized.
17
     After the deponent has completed the above,
18   please return all signature pages and errata
     sheets to me at the above address, and I will
19   handle distribution to the respective parties.
20   If you have any questions, please call me at the
     phone number below.
21
     Sincerely,
22
     Margaret Setina     Court Reporter Present:
23   Signature Department     MARLENE L. KING
24   cc:  Mr. Vogts, Mr. Pullos, Ms. Schlesinger.
                                                 283
```

```
 1   of the testimony so given by said witness as
 2   aforesaid.
 3        I further certify that the signature to
 4   the foregoing deposition was reserved by counsel
 5   for the respective parties and that there were
 6   present at the deposition the attorneys
 7   hereinbefore mentioned.
 8        I further certify that I am not counsel
 9   for nor in any way related to the parties to
10   this suit, nor am I in any way interested in the
11   outcome thereof.
12        IN TESTIMONY WHEREOF: I have hereunto
13   set my hand and affixed my notarial seal this
14   11th day of May, 2014.
15
16
17
18        Marlene L. King
19
20        NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21
22
23
24
                                                 282
```

71 (Pages 281 to 283)