# Exhibit 19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARIE S. FRIEDMAN, M.D. and<br>the Illinois State Rifle Association<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF HIGHLAND PARK,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) No: 13-cv-9073<br>)<br>) Hon. John W. Darrah<br>)<br>)<br>)<br>)<br>) |

### SUPPLEMENTAL AFFIDAVIT OF GARY KLECK

If sworn as a witness, I could competently testify to the following:

1. Highland Park has asserted that "[a]ssault weapons are used in a disproportionately high number of shootings of law enforcement officers. For example, although assault weapons represented somewhere between 1 and 8% of guns used in crime in 1994, they accounted for 16% of gun murders of police officers."

2. Highland Park relies on extremely unrepresentative statistics to support this point. It relies on a report by Roth and Koper (1997), which presented annual figures on officers killed for the period 1992-1996. It should first be noted that this period as a whole was unrepresentative of U.S. history, or recent U.S. history, in that killings of police officers were extraordinarily frequent, averaging 62.4 firearm killings of police officers per year (FBI 1997, p. 14), compared to an annual average for the most recent 10-year period for which data are available, 2003-2012, of 49.3 (FBI 2013). Even within this period, Highland Park chose to cite data pertaining to the most extreme year for gun killings of police officers, 1994, in which an unprecedented 76 officers

1

were killed with guns (Roth and Koper 1997, p. 98). By comparison, in the most recent year for which data are available, 2012, there were just 44 gun killings of officers.

3. More specifically relevant to Highland Park's claim, 1994 was also unrepresentative of the 1992-1996 period with regard to the share of gun murders involving so-called "assault weapons" (AWs). In 1994, 12% of killings of police officers were (according to Roth and Koper) known to have involved these weapons, compared to just 5.5% of those occurring in the rest of the period studied by Koper and Roth (1997, p. 95). By citing this data from this unique and unrepresentative year, Highland Park more than doubled the apparent AW share of police killings.

4. The AW share that Highland Park cites, however, is not 12% but an even higher 16%. The 16% figure is based on a possibly unrepresentative subsample of just 58 police gun killings rather than the total of 76 such murders. Roth and Koper classified nine of these killings as AW killings, and nine out of 58 is indeed 16%. The problem with this computation is that it assumes that homicides in which the details of the firearms used by assailants were recorded by police are representative of all gun killings of officers. This only makes sense if one assumes that in 1994, a year of intense public attention to the use of AWs, police were no more likely to record details identifying a murder weapon as an AW than they were to record details about other types of firearms, types subject to much less public and media scrutiny. If, as is more plausible, police made sure to record details identifying a murder weapon as an AW in every, or nearly every incident in which one was used, it is quite possible that there were in fact only nine AW-involved killings of police officers, and that all of the remaining 67 gun killings of officers involved non-AW weapons. Under this assumption, the correct AW share, even for the unrepresentative year of

2

1994, was 12%, i.e. nine out of 76 gun killings of officers, not 16% (nine of 58). For the rest of the 1992-1996 period, this share was 5.5%.

5.  Alternatively, we could accept, for argument's sake, the dubious assumption underlying the Roth and Koper computations, and assume that incidents in which details of the homicide guns were sufficient to determine whether they were AWs were indeed representative of all incidents in which guns were used to kill police officers. This assumption justifies computing the AW share based only on the incidents for which police recorded sufficient detail on the guns. For the period 1993-1996, excluding the deviant year of 1994, there were 146 killings with such detail, of which 11 were classified by Roth and Koper as AW-involved, or 7.5% (computed from Koper and Roth 1997, p. 98).

6.  If 5.5% is the more meaningful and representative estimate of the AW share of firearm killings of law enforcement officers, this contradicts Highland Park's claim that "assault weapons are used in a disproportionately high number of shootings of law enforcement officers," since they claim that 1-8% of all gun crimes involve AWs. Given that 5.5% falls squarely within this range, the data do not support the claim – the AW share of gun killings of police officers appears to be no greater than the AW share of gun crime in general. Alternatively, even if we use the more dubious 7.5% figure, the still does not support its claim, since 7.5% also falls in the 1-8% range applying to gun crime in general. In sum, the only reason the data appear to support Highland Park's claim is because it relied on data pertaining to the unique, and uniquely unrepresentative, year of 1994. Without that one deviant year, its case collapses.

7.  It is worth noting what more recent data would imply regarding the risk of police officers being killed with an AW. The most recent year for which the relevant data are available is 2012, a year in which a total of 44 law enforcement officers were killed with firearms in the

3

U.S. (FBI 2013). Applying the 5.5% estimate of the AW share, we can estimate that in the entire U.S. there were probably about *two* felonious killings of law enforcement officers with AWs in 2012. While even a single murder of a police officer is one too many, it is scarcely credible to imply that AWs are a significant threat to the safety of American law enforcement personnel.

8. Highland Park has asserted that "[i]n police involved shootings the number of shots fired is statistically very low - less than four rounds expended so the ammunition capacity of a standard revolver (6 cartridges) would satisfy one's self defense needs most of the time and a semi-automatic pistol with a 10 round capacity magazine even more so."

9. It is commendable that Highland Park has conceded that incidents of gun violence rarely involve large numbers of rounds being fired, as this confirms the Plaintiffs' position that limits on magazine capacity are unlikely to prevent deaths or injuries because it is so unusual that large numbers of rounds are fired in shooting incidents. However, Highland Park's mistake in this connection is in limiting this claim to shootings by police officers. It is true about shooting incidents in general regardless of who is doing the shooting.

10. Highland Park, however, draws a *non sequitur* conclusion from this fact. They describe only the *average* number of rounds, without acknowledging the occurrence of police shootings in which the number of rounds fired exceeds, sometimes by a considerable margin, this average. If a police officer, or civilian for that matter, found himself in a situation that required more than 10 rounds to be fired in order to preserve his bodily safety or that of others, it would scarcely be reassuring for him to be told that his situation was out of the statistical norm and thus of no consequence.

11. It is clear that police shootings with large numbers of rounds fired, while fairly unusual, *have* occurred in the past – a fact that Highland Park does not deny. Of course, it is an

4

arithmetic axiom that if the average number of rounds fired in police shootings were four, some incidents involved more than four, just as others involved fewer than four. In any case, actual shootings have involved officers firing far more than ten rounds. For example, following a bank robbery in North Hollywood, CA on February 28, 1997, police officers fired 650 rounds at the heavily armed suspects, who themselves had fired 1,101 rounds (Clinton, 2011). Likewise, a stakeout of robbery suspects by FBI agents on April 11, 1986 in Miami resulted in seven agents firing approximately 96 rounds – an average of about 14 rounds per agent (Federal Bureau of Investigation 1986). Previously, a famous shooting involving members of the Symbionese Liberation Army in the Los Angeles area on May 16, 1974 resulted in "several thousand" rounds being fired by police (Wikipedia, "Symbionese Liberation Army" article, accessed July 8, 2014).

12. These spectacular cases are admittedly extreme, but there is also evidence of more frequent shooting incidents in which more than 10 rounds were fired. Data on shootings by officers of the New York Police Department during 2012 (the most recent year available), indicate that 13% of shootings involved more than 10 rounds being fired per officer (New York City Police Department 2014). Thus, defensive uses of firearms by police officers quite commonly involve more rounds being fired than can be held by magazines permitted under the Highland Park ordinance.

13. If the marksmanship of civilians who defend themselves with firearms is less than that of police officers, one would expect that civilians would, on average, need a larger number of rounds to effectively defend themselves than police officers. Consequently, one would expect that the share of incidents of civilian self-defense with a gun in which over 10 rounds were fired would be even higher than the share of police defensive uses that involved over 10 rounds being fired. That is, one would expect that *over* 13% of civilian defensive gun uses would involve that many

rounds fired, if the NYPD experience is typical with regard to the number of times police fire when they discharge their firearms.

I declare under the penalty of perjury that the foregoing is true and correct.

July _18___, 2014.

*Gary Kleck*
Gary Kleck

**References**

Clinton, Paul. 2011. 5 Gunfights That Changed Law Enforcement. Police: The Law Enforcement Magazine, May 4, 2011.
Federal Bureau of Investigation. 1986. Shooting Incident 4/11/86 Miami, FL. Available online at http://www.webcitation.org/5gcuig4Jd. Accessed July 8, 2014.
Federal Bureau of Investigation. 1997. Law Enforcement Officers Killed and Assaulted 1996. Available online at http://www.fbi.gov/about-us/cjis/ucr/leoka/1996/leoka96.pdf. Accessed July 8, 2014.
Federal Bureau of Investigation. 2013. Law Enforcement Officers Killed and Assaulted 2012. Available online at http://www.fbi.gov/about-us/cjis/ucr/leoka/2012. Accessed July 8, 2014.
New York City Police Department. 2014. 2012 Annual Firearms Discharge Report. Available online at http://www.nyc.gov/html/nypd/html/analysis_and_planning/reports.shtml, accessed July 9, 2014.
Roth, Jeffrey A., and Christopher S. Koper. 1997. Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: *Final Report*. Washington, D.C.: Urban Institute.