**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and | ) | |
| the Illinois State Rifle Association | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No: 13-cv-9073 |
| v. | ) | |
| | ) | Hon. John W. Darrah |
| | ) | |
| CITY OF HIGHLAND PARK, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Plaintiffs Arie S. Friedman, M.D. and the Illinois State Rifle Association ("Plaintiffs")

respond to Defendant's Statement of Material Facts (Doc. 45) as follows:


1.      On June 24, 2013, the City Council adopted City Ordinance No. 68-13,

prohibiting the manufacture, sale and possession of assault weapons and large capacity

magazines within the City ("Ordinance"). (Ex. A, Declaration of Nancy Rotering, ¶5.) (A true

and correct copy of the Ordinance, which bears the Mayor's signature, is attached to the Rotering

Declaration as Exhibit 1.)

**RESPONSE:** Admitted that on June 24, 2014, the City Council adopted City Ordinance

No. 60-13, prohibiting the manufacture, sale and possession within the City of certain

firearms it defined as "assault weapons" and ammunition magazines it defined as "large

capacity magazines".

1

2.      The City modeled its Ordinance after Cook County's assault weapon ban with only minor non-substantive exceptions, the City's Ordinance is identical to the County's. (Rotering Declaration, ¶6.)

   **RESPONSE:** Admitted that the City modeled its Ordinance after Cook County's Blair Holt Assault Weapons. Denied that differences between the laws are minor non-substantive exceptions. (Pls.' Rule 56.1 Statement of Material Facts [Doc. 42] ("SMF"), Ex. 1, § 134.010 (A)(1)(a)(iv).)

3.      The City deliberately chose Cook County's ordinance as a model because it had recently survived equal protection and vagueness challenges before the Illinois Supreme Court. Rotering Declaration, ¶7.)

   **RESPONSE:** Admitted.

4.      As set forth in the Ordinance, the City Council believes that assault weapons pose an undue threat to public safety for the residents, property owners and visitors to the City. (Rotering Declaration, ¶8.)

   **RESPONSE:** Admitted.

5.      In its Ordinance, the City Council also expressed its concern that the recent mass shooting tragedies in Aurora, Colorado Newtown, Connecticut, Tucson, Arizona and Santa Monica, California, could occur in Highland Park, unless proper public safety measures were taken. (Rotering Declaration, ¶9.)

**RESPONSE:** Denied. (Def.'s Statement of Undisputed Material Facts [Doc. 45] ("SOF") Ex. A, Ex. 1).

6.      Mayor Rotering noted that, as a mother of four, she was particularly concerned about preventing a school shooting similar to the massacre at Sandy Hook Elementary School in Newtown. ("That is what was on my mind throughout our consideration of the Ordinance: how unlikely an assault weapon massacre was in Newtown and how similar our communities are. I could not shake the thought that we could just as easily be those panicked and grief-stricken parents.") (Rotering Declaration, ¶9.)

**RESPONSE:**  Admitted that Mayor Rotering made these statements in her Declaration.

7.      Mayor Rotering also wrote a letter to the Mayor of Aurora, Colorado, in the wake of their gun-related tragedy, empathizing with the agony his community was experiencing. Rotering Declaration, ¶9.)

**RESPONSE:**  Admitted that Mayor Rotering made these statements in her Declaration.

8.      The City Council recognized that Highland Park was not immune to gun violence, particularly gun violence involving assault weapons, and that such weapons posed a dangerous threat in the City and other suburban areas. (Rotering Declaration, ¶10.)

**RESPONSE**:  Admitted that Mayor Rotering made these statements in her Declaration.

9.      The City of Highland Park enacted Ordinance to address the potential threat of mass shootings involving a semi-automatic assault weapon. Such events are demonstrably more

catastrophic when the assailant uses a semi-automatic assault weapon than when other firearms are used. (Ex. D, Declaration of Mark D. Jones, ¶11)

> **RESPONSE:** Plaintiffs object to the term "semi-automatic assault weapon" on the ground that it is not defined and, without definition, is argumentative. Plaintiffs further object on the basis that there is no indication that the witness has personal knowledge of any mass shooting or undertaken any research into the occurrence of mass shootings. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

> Subject to these objections, Plaintiffs admit that the purpose of the Ordinance was to address a perceived threat of a mass shooting in Highland Park. Plaintiffs deny that involvement of certain firearms (defined in the Ordinance as "assault weapons") in mass shootings have historically resulted in a more "catastrophic" events than when other firearms are used. (SMF at ¶¶ 22–28 and 114–118.)

10.     Under the Ordinance, "Large Capacity Magazine" refers to any magazine with a capacity exceeding ten (10) rounds for both Semiautomatic Rifles and Pistols. For semiautomatic shotguns the Ordinance limits internal capacity to five (5) rounds. (Ex. C, Declaration of James Yurgealitis Declaration, ¶33(5))

> **RESPONSE:** Denied that the Ordinance defines a "Large Capacity Magazine" to be any magazine with a capacity exceeding ten rounds. (SMF Ex. 1, § 134.010 (A)(3).) Admitted that the Ordinance limits semi-automatic shotgun magazine capacity to rive rounds.

11.     There are hundreds if not thousands of different types and models of firearms available in the United States for self-defense or sporting. The Ordinance prohibits only a few of

4

these weapons. In fact, because the Ordinance defines "Assault: Weapons" by whether or not the weapon contains one or more of specified characteristics, the Ordinance does not even prohibit all semi-automatic firearms. (Yurgealitis Declaration, ¶34) (Ex. F, the Declaration of Michael Kupka sets forth pictures of each of the guns prohibited under the Ordinance.)

> **RESPONSE:** Denied that there are hundreds if not thousands of different types of firearms available in the United States for self-defense or sporting use. (Pls.' Statement of Additional Material Facts ("SAMF"), ¶ 1.) Admitted that there are hundreds if not thousands of different models of firearms available in the United States for self-defense or sporting use. Denied that the Ordinance prohibits possession of only a few types and models of firearms. (SMF Ex. 1, § 134.010 (A)(1).) Admit that the Ordinance does not prohibit possession of all semi-automatic firearms.

12. As the legislative body for the City, the City Council is responsible for making policy and enacting laws that protect and preserve the public health, safety, and welfare of City residents, businesses, and visitors. Specifically, the City Council has the duty to prevent, to the greatest extent practicable, the commission of violent crimes within the City. (Rotering Declaration, ¶4.)

> **RESPONSE:** Admitted.

13. According to the 2010 Census, there are 29,763 residents of the City. 25.9% of City residents are under age 18, and 5.3% of City residents are under age five. (Ex. B, Declaration of Paul Shafer, ¶4)

> **RESPONSE**: Admitted.

5

14.     The City currently employs 57 sworn police officers, which equates to a ratio of 1.92 sworn officers per 1,000 residents. (Shafer Declaration, ¶ 5)

**RESPONSE**:  Admitted.

15.     According to City Police Department ("Department") records, the City has issued 2,930 alarm user permits for burglar alarms at private properties in the City. The Department does not track how many properties have implemented gates, guards, or other security features. (Shafer Declaration, ¶6)

**RESPONSE**:  Admitted.

16.     In the six-year period from 2008 to 2013, there were 293 residential and commercial burglaries in the City that were reported to the Department. (Shafer Declaration, ¶8)

**RESPONSE**:  Admitted.

17.     Since 2008, there have been two reported home invasions during which the residents of the home were present. In one of those invasions, there were multiple intruders. (Shafer Declaration, ¶9)

**RESPONSE**:  Admitted.

18.     Since 2008, there have been 16 arrests for crimes in the City involving firearms and/or ammunition. (Shafer Declaration, ¶10)

**RESPONSE**:  Admitted.

19.     There has not been a homicide in the City since June 2003. However, there were four homicides in the City between October 1996 and June 2003. (Shafer Declaration, ¶11)

**RESPONSE**:  Admitted.

20.     In 2013, the average Police Department response time for high-priority 911 calls, which include alleged shootings and incidents involving firearms, is four minutes and 20 seconds. (Shafer Declaration, ¶21)

**RESPONSE:**  Admitted.

21.     There are 15 schools located within the City, including the Highland Park High School and numerous elementary schools. (Shafer Declaration, ¶13)

**RESPONSE:**  Admitted.

22.     There are four community centers and three nursing homes located within the City. (Shafer Declaration, ¶14)

**RESPONSE:**  Admitted.

23.     There are multiple places in the City at which large numbers of people frequently congregate. Among the more notable of these places are: the Ravinia Festival; the Port Clinton retail and office development in downtown Highland Park; the Renaissance Place retail and residential development in downtown Highland Park; the Crossroads Shopping Center along Skokie Valley Road; the Courtyard Marriott hotel along Lake Cook Road; and four commuter rail stations. (Shafer Declaration, ¶15)

**RESPONSE:** Admitted.

24.     During the morning of May 20, 1988, Laurie Dann entered the Ravinia Elementary School in the City, and attempted to detonate a bomb in the school's hallway. Nobody was injured by Dann at the Ravinia School. However, later that day, Dann would shoot six students at an elementary school in the adjacent Village of Winnetka, killing one eight-year-old boy. (Shafer Declaration, ¶12)

> **RESPONSE:** Plaintiffs object to these statements on the grounds that the events described in these statements are irrelevant and that the witness cited in support of these statements does not have personal knowledge of the events described. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

> Subject to these objections, admitted.

25.     Assault weapons are not designed for self-defense, but are instead designed for combat situations which include rapid fire, the possibility of multiple targets, and a need for increased magazine capacity to engage multiple targets. These factors are not typically present when a firearm is required for defense of a home. (Shafer Declaration, ¶16)

> **RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. Plaintiffs further object to the opinions set forth in these statements on the grounds that the witness has not been shown to be qualified to offer opinions regarding firearms design and the "factors" typically present in

a home defense situation. *See* Plaintiffs' Motion to Strike Certain Statements of Material
Fact Submitted by Defendant.

Subject to these objections, Plaintiffs deny that firearms designated as "assault weapons"
in the Ordinance are not designed for self-defense use. (SMF at ¶¶ 40, 41, 45, 46, 47, 52,
53; SMF Ex. 2 at ¶ 3.) Plaintiffs further deny that the semi-automatic firearms designated
as assault weapons in the Ordinance are designed for combat situations. (SMF at ¶ 19;
SMF Ex. 2 at ¶ 8.) Plaintiffs further deny that sufficient ammunition and the potential
need to fire at multiple targets are not required in a home defense situation. (SMF Ex. 2 at
¶ 12; SAMF at ¶ 2.).

26.     Assault weapons are not appropriate for hunting. Hunting strategy requires a
weapon to accurately kill an animal humanely, preferably with one shot. Accordingly, the
magazine capacity is generally much smaller. Large magazines and rapid-fire capability of
assault weapons exceed these hunting requirements. (Shafer Declaration, ¶ 117).

**RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not
defined and, without definition, is argumentative. Plaintiffs further object to the opinions
set forth in these statements on the grounds that the witness has not been qualified to
offer opinions regarding "hunting strategy" and what firearms are "appropriate for
hunting." *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted
by Defendant.

Subject to these objections, Plaintiffs deny that firearms designated as "assault weapons" under the Ordinance are not appropriate for hunting. (SMF at ¶¶ 67-68; SMF Ex. 2 at ¶ 3; and SMF Ex. 3 at ¶ 3 and ¶ 8 (Exs. 3, 4, and 5).) Plaintiffs further deny that magazines with a capacity of more than 10 rounds and multiple shot capability exceeds "hunting requirements." (SMF at ¶¶ 67 and 68.)

27.     By way of example, the AR-15 assault weapon (the civilian version of the military M-16) was not designed as a hunting weapon; it was designed for use by the military in combat situations. (Shafer Declaration, ¶18)

**RESPONSE:** Plaintiffs object to the opinions set forth in these statements on the grounds that the witness has not been qualified to offer opinions regarding firearms design. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, Plaintiffs deny that the civilian version of the AR-15 rifle is not designed for use as a hunting rifle. (SMF Ex. 2 at ¶ 3; SMF Ex. 6 at Ex. A; SMF at ¶ 52, 67 and 68; SOF Ex. C at ¶ 33, p. 19). Plaintiffs further deny that the civilian version of the AR-15 rifle is designed for use by the military in combat situations. (SMF at ¶¶ 18 – 20.)

28.     The Highland Park Chief of Police determined that residents did not need assault weapons to adequately protect themselves, their families, or their properties. If required, there were numerous other types of firearms available and legal for possession by City residents that would serve the intended self-defense purposes. (Shafer Declaration, ¶19)

**RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. Plaintiffs further object to this statement on the grounds that it misstates the witness's declaration, and that the personal beliefs of the Highland Park Chief of Police as to what type of firearms residents "need" to protect themselves, their families, or their properties or would serve the "self-defense purpose" and the adequacy of "other types of firearms" for self-defense purposes are irrelevant. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to these objections, Plaintiffs admit the witness expressed these "beliefs" in his declaration.

29.     The City Council also determined that the presence of assault weapons in the City would increase the risk to residents and visitors. Every firearm, when used aggressively against a person, presents a risk of great bodily harm or death. (Shafer Declaration, ¶19)

**RESPONSE**: Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. Plaintiffs further object on the basis that this statement misstates the witness's declaration.

Subject to these objections, Plaintiffs deny that the "presence" of firearms defined in the Ordinance as "assault weapons" would "increase the risk to residents and visitors." (SMF at ¶¶ 40-47, 70, 92-109). Plaintiffs admit that "[e]very firearm, when used aggressively against a person, presents a risk of great bodily harm or death."

30. Assault weapons typically have many features that are specifically designed to allow the user to shoot multiple targets in a shorter time period than conventional firearms that are designed for self-defense. (Shafer Declaration, ¶19)

> **RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. Plaintiffs further object to the opinions set forth in these statements on the grounds that the witness has not been shown to be qualified to offer opinions regarding firearms design. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

> Subject to these objections, Plaintiffs deny that the firearms defined as "assault weapons" in the Ordinance have "features that are specifically designed to allow the user to shoot multiple targets in a shorter period of time" that do not exist on other firearms suitable for self-defense use. (SMF at ¶¶ 11, 70; SMF Ex. 3 at ¶¶ 9-14 and Ex. E (Video Demonstration, 05:46–15:22; SAMF at ¶ 3.) Plaintiffs further deny that semi-automatic rifles, shotguns and pistols are not "conventional firearms". (SAMF at ¶ 3.)

31. The presence of assault weapons in the City would increase the probability that shooting incidents could involve multiple victims. (Shafer Declaration, ¶20)

> **RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, Plaintiffs deny that the "presence" of firearms defined as "assault weapons" in the Ordinance "would increase the probability that shooting incidents could involve multiple victims." (SMF Ex. 3 at ¶ 6; SMF at ¶¶ 95 – 98, 100 – 103, 111 – 118.)

32.     Assault weapons, rifles or pistols, fully or semi-automatic, are designed to be used in an offensive role. (Jones Declaration, ¶44)

**RESPONSE:** Admitted that fully automatic assault weapons are designed for use offensively. Denied that the semi-automatic firearms defined as "assault weapons" in the Ordinance are designed "to be used in an offensive role". (Doc. 26-5 (Supplemental Aff. of Dr. Gary Roberts) at ¶ 7.)

33.     There are countless accessories available to add to firearms traditionally considered "sporting firearms" (i.e. those initially designed and manufactured for target shooting or hunting) which brings their functionality more towards the military side of the spectrum and away from the sporting side. (Yurgealitis Declaration, ¶32)

**RESPONSE:** Denied that "accessories" on "sporting firearms … bring[] their functionality more toward the military side of the spectrum". (SMF at ¶ 7; SMF Ex. 2 at ¶¶ 8 and 10; SMF Ex. 3 at Ex. E (Video Demonstration, 05:46-15:22).)

34.     Numerous assault weapons available for purchase by the public are, save the lack of select fire capability, identical copies of military firearms. As such they retain a number of features originally designed to maximize their effectiveness in battle. (Yurgealitis Declaration, ¶32)

13

**RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, Plaintiff admit there are numerous firearms defined as "assault weapons" in the Ordinance that are available to the public and, except for the "lack of select fire capability," are copies of firearms used by the military. Plaintiffs admit that certain features present on select fire military firearms were designed to make them effective in battle.

35.    Other firearms available to the public, which were not initially intended for sale to government or military customers, incorporate features which mimic those found on military firearms. (Yurgealitis Declaration, ¶32)

**RESPONSE:** Admitted.

36.    A semiautomatic rifle which includes only a pistol grip (or does not include a shoulder stock) increases the ability of the operator to conceal the firearm, maneuver the firearm in confined space and facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator). Rifles traditionally considered sporting firearms are generally not designed and produced as such. (Yurgealitis Declaration, ¶ 33(1)a)

**RESPONSE:** Admitted that a semi-automatic rifle with a pistol grip but without a shoulder stock of any kind, may increase the ability of the operator to conceal the firearm

14

and maneuver the firearm in confined space. Denied that the type of grip on any rifle makes it "easier" to fire "from the hip or a position directly in front of the operator." (Doc. 10-6 (Affidavit of James W. Supica, Jr.) at ¶ 10; SMF Ex. 3 at Ex. E (Video Demonstration, 12:58-13:56)). Admitted that rifles designed without a shoulder stock of any kind have not been "traditionally considered sporting firearms".

37.     Protruding foregrips allow increased stability of the firearm by the operator. They allow the operator to better control recoil and muzzle climb thus increasing the hit probability of successive shots. This is not a feature found on traditional sporting firearms. (Yurgealitis Declaration, ¶ 33(1)b))

**RESPONSE:** Plaintiffs object to the term "traditional sporting firearms" on the ground that it is not defined and is vague. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, Plaintiffs admit that "[p]rotruding foregrips allow increased stability of the firearm by the operator. They allow the operator to better control recoil and muzzle climb thus increasing the hit probability of successive shots". Plaintiffs deny that protruding foregrips are not found on firearms used for "sporting" purposes, including hunting and target shooting. (SMF at ¶¶ 65, 87 – 89.)

38.     Protruding foregrips appeared on some versions of AK based rifles however it was not until the advent of Rail Attachment Systems (RAS) and acceptance by the US Military

of same that foregrips for semi-automatic rifles have grown in popularity. (Yurgealitis Declaration, ¶ 33(1)b))

**RESPONSE:** Admitted.

39.     Folding and/or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space. It also facilitates easier or more comfortable firing from positions other than the shoulder (as with pistol grip only rifles). (Yurgealitis Declaration, 1(33(1)b))

> **RESPONSE:** Admitted that a "folding" stock on a rifle may make it easier to conceal
> the rifle or maneuver the rifle in a confined space. Denied that a "telescoping" stock on a
> rifle may make it easier to conceal the rifle or maneuver the rifle in a confined space.
> (SMF at ¶¶ 71-76; SMF Ex. 2 at ¶ 10; SMF Ex. 3 at Ex. E (Video Demonstration, 07:16-
> 09:13).) Denied that the type of stock on any rifle makes it "easier or more comfortable"
> to fire "from positions other than the shoulder."   (Doc. 10-6 (Affidavit of James W.
> Supica, Jr.) at ¶ 10; SMF Ex. 3 at Ex. E (Video Demonstration, 12:58-13:56).)

40.     U.S. Military origins for this type of stock can be found on the Ml carbine in WWII when modified for paratrooper use. (Yurgealitis Declaration, ¶33(1)b))

> **RESPONSE:** Plaintiffs object to the phrase "this type of stock" on the ground that it is
> not defined and is vague. *See* Plaintiffs' Motion to Strike Certain Statements of Material
> Fact Submitted by Defendant.

Subject to this objection, Plaintiffs admit that folding stocks were found on "the Ml carbine in WWII when modified for paratrooper use".

41.     Thumbhole stocks have traditionally been utilized on firearms for sport and target shooting, however during the Federal Assault Weapons Ban a number of AK style firearms (amongst others) were so equipped in order to meet the requirements during the time that the law was in effect. (Yurgealitis Declaration, ¶ 33(1)c))

**RESPONSE:** Admitted.

42.     Military semi-automatic and select fire rifles have featured a shroud or hand guard that encircles the barrel since before the onset of WWII. The MI "Garand" Rifle utilized by the US Military during that conflict incorporated a traditional wooden stock similar to most hunting and sporting rifles of the period however it also featured a wooden handguard which covered the top 2/3rds of the barrel. (Yurgealitis Declaration, ¶33(1)d))

**RESPONSE:** Admitted.

43.     This design feature is not a recent development. Enclosing the barrel in a shroud serves multiple purposes. In a modern gas operated semi-automatic Military rifle it serves to protect the gas tube/piston mechanism from inadvertent damage.

**RESPONSE:** Admitted.

44.     A barrel shroud also provides additional grip space for the operator to steady and control the rifle during rapid, repeat firing without getting burned by the hot barrel. For example the handguard fitted to the M-I 6A1 as originally adopted by the US featured a rounded

triangular cross section forward of the receiver. This shape was a natural fit for the non trigger (supporting) hand. (Yurgealitis Declaration, ¶33(1)d))

**RESPONSE:** Admitted.

45.     A muzzle brake in a semiautomatic rifle can serve a number of purposes depending on its design and placement. Escaping gases can be vented upwards at the end of the barrel to reduce "muzzle flip" and allow the operator to control the rifle during rapid, repeat firing without taking time to reacquire the target. (Yurgealitis Declaration, 133(1)e))

**RESPONSE:** Admitted.

46.     As stated earlier in the case of AK style rifles, a muzzle brake serves to vent gases directionally to counter the tendency of this rifle to move up and to the right after firing. The net advantage of less time required to recover control of the rifle after firing is that it allows the operator to more rapidly fire accurate additional shots if required. (Yurgealitis Declaration, ¶33(1)e))

**RESPONSE:** Admitted.

47.     The AR 15 family of rifles and the various civilian versions of Kalashnikov style firearms available on the U.S. gun market are based entirely on the original selective fire versions of the same guns. The functional differences are minimal, mainly in the lack of fully automatic fire capability missing on the semi-automatic civilian versions. (Jones Declaration, ¶15)

**RESPONSE:** Admitted that **t**he AR-15 family of rifles and the various civilian versions of Kalashnikov style firearms available on the U.S. gun market are based on the original selective fire versions of the same guns. Denied that the functional difference between the civilian semi-automatic versions of the selective fire rifles – the lack of fully automatic fire capability – is a minimal difference. (SAMF at ¶ 4; SMF at ¶¶ 11, 18.)

48.     The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) recovers hundreds of illegal machine guns annually in the United States and many of those are either AR15 or Kalashnikov style firearms originally manufactured as semi-automatic firearms. (Jones Declaration, ¶15)

**RESPONSE:** Plaintiffs object to this statement on the ground that there is no foundational testimony revealing the source of the witness's knowledge on the subject. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, admitted.

49.     When comparing the rate of fire (cyclic rate) of a Federally regulated, fully automatic machine gun and an semi-automatic AR 15-type rifle, the difference is minimal. (Jones Declaration, ¶16)

**RESPONSE:** Denied. (SAMF at ¶ 5; SMF Ex. 3 at Ex. E (Video Demonstration, 00:00-00:42); Doc. 26-2 (Supplemental Aff. of David A. Lombardo) at ¶ 10; SMF at ¶¶ 11, 18.)

19

50. The modern revolver will fire under virtually any circumstances, is ergonomically ideal for the human body under stress, and available in a variety of calibers, ammunition capacities, and price points to meet virtually any personal defense need. (Jones Declaration, ¶35)

> **RESPONSE:** Admitted that modern revolvers will fire under virtually any circumstance and is ergonomically suited for the human body under stress. Admitted that revolvers come in a variety of calibers, ammunition and price points. Denied that modern revolvers meet virtually any personal defense need. (SMF at ¶¶ 42-47; SMF Ex. 8 at ¶ 8; SMF Ex. 3 at ¶ 4.)

51. While there are many firearms available that are suitable for both sporting and defensive purposes, the semiautomatic assault weapon is typically a "civilianized" version of a firearm originally manufactured for military use. (Jones Declaration, ¶36)

> **RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

> Subject to this objection, Plaintiffs admit that some firearms defined as "assault weapons" in the Ordinance are semi-automatic civilian versions of firearms first manufactured for military use.

52. The principal difference between an AR15 semi-automatic rifle and its military sibling, the M4/M16, is the latter's selective fire capability, that is the ability to use the weapon as a fully automatic machine gun (wherein a single trigger pull can empty the magazine) and for

semi-automatic fire (wherein each trigger pull results in only one cartridge being fired). (Jones Declaration, ¶37)

> **RESPONSE:** Admitted.

53.    Ultimately, the purpose of military assault rifles and submachine guns (the analog for a civilian assault pistol) is offensive - to facilitate the assault and capture of a military objective. (Jones Declaration, ¶39)

> **RESPONSE:** Admitted that a purpose of military assault rifles and military submachine
> guns is offensive use – to facilitate the assault and capture of a military objective.  Denied
> that a military "submachine gun" is "the analog for a civilian assault pistol". (SOF Ex. D
> at ¶¶ 37, 39; SMF Ex. 1 (§ 136.001(c)(3).)

54.    It is difficult to determine how many assault weapons Americans currently own, in large part because most firearm manufacturers refuse to release data tracking their sales. The declarations filed in support of the plaintiffs' complaint in this matter focus on the number of semi-automatic rifles manufactured in the United States, but we know that a great many of these end up in Mexico. (Yurgealitis Declaration, ¶35)

> **RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not
> defined and, without definition, is argumentative. Plaintiffs further object to the statement
> that "we know a great many [semi-automatic rifles manufactured in the United States]
> end up in Mexico" on the ground that the statement is not supported by the cited source.
> *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by
> Defendant.

21

Subject to this objection, Plaintiffs deny that it is "difficult to determine how many firearms defined as 'assault weapons' in the Ordinance Americans currently own". (SMF at ¶¶ 23- 28.)  Plaintiffs further deny that "most firearm manufacturers refuse to release data tracking their sales". (SMF at ¶ 5 and www.atf.gov/content/About/statistics.) Plaintiffs further deny that "a great many [semi-automatic rifles manufactured in the United States] end up in Mexico". (SAMF at ¶ 6.)

55.      The NRA's lobbying arm estimates that, depending upon the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S. (Yurgealitis Declaration, ¶36)

RESPONSE: Plaintiffs object to this statement as irrelevant in the absence of information reflecting the time frame of the estimates and as hearsay. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, Plaintiffs deny that these estimates reflect current ownership percentages. (SMF at ¶ 28.)

56.      According to 2004 national firearms survey conducted by Hepburn, Miller, Azreal and Hemmenway, there are approximately 218 million privately owned firearms in the U.S. Based on the NRA's statistics, therefore, there are approximately 4,905,000 assault weapons in the U.S. While this number is not insignificant, in my opinion it does not support the claim that assault weapons are 'in common use'. (Yurgealitis Declaration, ¶36)

22

**RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. Plaintiffs further object to the statement that "there are approximately 218 million privately owned firearms in the U.S." on the ground that the source for the figure is not accurately interpreted and cited. Plaintiffs further object on the basis that the source for the figure is hearsay, and there is no testimony under Federal Rule of Evidence 703 that the survey is of the type that an expert in the field would reasonably rely. Plaintiffs further object to the witness's opinion as to whether the number is or is not "significant" and whether the number "support[s] the claim that assault weapons are in common use" as a legal conclusion. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to these objections, Plaintiffs admit that the authors concluded under one measure there were 218 million firearms owned in the United States in 2004. Plaintiffs admit that ownership of 4,905,000 firearms defined as "assault weapons" is "not insignificant". Plaintiffs deny the conclusion that the figure does not support the claim that "assault weapons" are in common use. (SMF at ¶¶ 23-31.)

57.    Mass shootings alone resulted in at least 519 deaths and scores of injuries between 2009 and 2013. (Jones Declaration, ¶37)

**RESPONSE:** Plaintiffs object to this statement on the grounds that the witness does not have personal knowledge of any mass shooting nor has he undertaken any research into the occurrence of mass shootings. Plaintiffs further object on the ground that there is no foundational testimony revealing the source of the witness's knowledge on the subject.

*See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to these objections, denied. (SMF Ex. 10 at ¶ 29 and Appendix, pp. 40 – 56.)

58.     The recent study by Mayors Against Illegal Guns (MAIG) shows that of the 93 examples occurring between January 2009 and September 2013 at least 14 semi-automatic or fully automatic assault weapons were recovered from the suspects; in those incidents, 151% more casualties resulted and 63% more deaths occurred that in incidents involving other types of guns. (Jones Declaration, ¶11)

> **RESPONSE:** Plaintiffs object to this statement on the grounds that the witness does not have personal knowledge of any mass shooting nor has he undertaken any research into the occurrence of mass shootings. Plaintiffs further object on the ground that the source for the figures is hearsay, and there is no testimony under Federal Rule of Evidence 703 that the survey is of the type that an expert in the field would reasonably rely. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

> Subject to these objections, Plaintiffs deny that at least 14 semi-automatic or fully automatic assault weapons were recovered from the suspects. (SOF Ex. G at p. 3; SMF at ¶ 26.) Plaintiffs further deny that the report indicated that 151% more casualties resulted and 63% more deaths occurred [in incidents involving semi-automatic or fully automatic assault weapons] than in incidents involving other types of guns. (SOF Ex. G at p. 3; SMF at ¶ 26.)

59.     The MAIG Report cited does not include the September 20, 2013 mass shooting at Cornell Park in Chicago wherein a subject wielding a Kalashnikov style semi-automatic assault rifle wounded 13 victims in just a few seconds. (Jones Declaration, ¶11) (A copy of the MAIG Report is attached as Ex. G.)

**RESPONSE:** Plaintiffs object to the term "assault rifle" on the ground that it is argumentative.

Subject to this objection, Plaintiffs admit that the MAIG Report does not include reference to the September 20, 2013 mass shooting in Cornell Park in Chicago. Plaintiffs deny that a single "subject" wielding a semi-automatic rifle wounded 13 persons in just a few seconds. (SAMF at ¶ 7.)

60.     For example, Adam Lanza used an assault weapon legally purchased by his mother to shoot his way into a locked elementary school building in Newtown, Connecticut in 2012. In ten minutes, he killed 26 people and wounded two others. He discharged his weapon at least 130 times in less than eight minutes. Newtown Police responding to the first 911 call were on the scene in less than four minutes. (Jones Declaration, ¶12)

**RESPONSE:** Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, Plaintiffs admit that Adam Lanza used a firearm defined as an "assault weapon" under the Ordinance, which was legally purchased by his mother, to shoot his way into a locked elementary school building in Newtown, Connecticut in 2012. Plaintiffs further admit that in ten minutes, he killed 26 people and wounded two others, he discharged his firearm at least 130 times in less than eight minutes, and that Newtown Police responding to the first 911 call were on the scene in less than four minutes.

61.     According to the Federal Bureau of Investigation, the frequency of active shooter events has doubled between 2009 and 2013, as compared to the period 2000 to 2008. The FBI defines an "active shooter event" as "an individual actively engaged in killing or attempting to kill people in a confined and populated area, typically through use of a firearm." The events considered in the FBI's study were limited to those where the shooter attempted to kill multiple people in an area occupied by multiple unrelated individuals where at least one victim was unrelated to the shooter. (Jones Declaration, ¶13)

**RESPONSE:** Denied that the Federal Bureau of Investigation determined that the frequency of active shooter events has doubled between 2009 and 2013, as compared to the period 2000 to 2008. (SOF Ex. I.) Plaintiffs admit that the authors of the study concluded that "active shooter events" has approximately doubled between the period of 2000 – 2008 and 2009 – 2013.  Plaintiffs admit the federal government defines an "active shooter event" as "an individual actively engaged in killing or attempting to kill people in a confined and populated area, typically through use of a firearm." Plaintiffs admit the events considered in the study were limited to those where the shooter attempted to kill

26

multiple people in an area occupied by multiple unrelated individuals where at least one victim was unrelated to the shooter.

62.     Moreover, assault weapons are used in a disproportionately high number of shootings of law enforcement officers. For example, although assault weapons represented somewhere between 1 and 8% of guns used in crime in 1994, they accounted for 16% of gun murders of police officers. (Jones Declaration, ¶14)

> **RESPONSE:**  Plaintiffs object to the term "assault weapon" on the ground that it is not defined and, without definition, is argumentative. Plaintiffs further object on the ground that there is no foundational testimony revealing the source of the witness's knowledge on the subject. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.
>
> Subject to this objection, Plaintiffs deny that firearms defined in the Ordinance as "assault weapons" are used in a "disproportionately high number of shootings of law enforcement officers." (SMF at ¶¶ 119-121; SMF Ex. 10 at ¶ 39.)  Plaintiffs further deny that "assault weapons" represented somewhere between 1 and 8% of guns used in crime in 1994. (SMF at ¶ 38; SMF Ex. 10 at ¶ 38.) Plaintiffs further deny that "assault weapons" accounted for 16% of gun murders of police officers in 1994. (SAMF at ¶ 10.)

63.     Statistically, rifles and shotguns, known collectively in the vernacular as "long guns", are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes. Yet when they are used the carnage that results is stunning, the two most recent examples being 29 casualties in Newtown, Connecticut (December 2012) and 70 in Aurora,

Colorado (July 2012) for a total of 99 dead and wounded in just those two 2012 incidents. (Jones Declaration, ¶38)

> **RESPONSE:** Plaintiffs object to the statement "when they are used the carnage that results is stunning" is argumentative, not factual. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

> Subject to this objection, Plaintiffs admit that statistically, rifles and shotguns, known collectively in the vernacular as "long guns", are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes. Plaintiffs further admit that 29 casualties were sustained in Newtown, Connecticut and 70 casualties were sustained in Aurora, Colorado.

64. The typical self-defense distances involved in scenarios envisioned by firearms industry pundits average twenty feet in homes with interiors constructed from gypsum drywall/sheetrock that will not prevent over penetration by any modern firearms cartridge, rifle, pistol or shotgun. (Jones Declaration, ¶46)

> **RESPONSE:** Plaintiffs object to the statement that the "typical self-defense distances involved in scenarios envisioned by firearms industry pundits average twenty feet" is argumentative, not factual. It is also hearsay. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, Plaintiffs admit that homes with interiors constructed from gypsum drywall/sheetrock will not prevent over penetration by any modern firearm cartridge, rifle, pistol or shotgun.

65.     To tout the semi-automatic assault weapon as the best or even second best tool for home defense is specious and disingenuous. (Jones Declaration, ¶46)

**RESPONSE:** Plaintiffs object to this statement as argumentative, not factual.

Subject to this objection, Plaintiffs deny that "tout[ing] the semi-automatic assault weapon as the best or even second best tool for home defense" is either "specious nor disingenuous". (SMF at ¶¶ 37-47, 52, 54; SMF Ex. 8 at ¶¶ 7-8; SMF Ex. 3 at ¶ 4 and Ex. E (Video Demonstration, 15:23-22:47.)

66.     A responsible firearm owner will invariably keep his or her weapons under lock and key, most in a secure gun safe designed and sold for that purpose.

**RESPONSE:** Admitted.

67.     It is well known to law enforcement authorities that firearms present an attractive target for burglars, and a gun owner who secretes his or her unsecured firearm somewhere in the home is virtually delivering the weapon to the underground gun market and criminal misuse. (Jones Declaration, ¶47)

**RESPONSE:** Plaintiffs object to this statement as argumentative, not factual. It is also irrelevant.

68.     Long guns are also not optimal for home defense because they are challenging to manipulate in the close confines found in homes; the overall length of many rifles, even those with folding or collapsible shoulder stocks, renders them unwieldy and hard to maneuver.

**RESPONSE:** Plaintiffs object to this statement on the ground that there is no reference to the record as required by Local Rule 56.1.

Subject to this objection, Plaintiffs deny that some long guns are "not optimal for home defense because they are challenging to manipulate in the close confines found in homes and are "unwieldy and hard to maneuver". (SAMF at ¶ 3; SMF at ¶¶ 37-47, 52, 54; SMF Ex. 8 at ¶¶ 7-8; SMF Ex. 3 at ¶ 4.)

69.     Rifles are far more powerful than necessary or desirable for most home defense uses - the velocity of widely available standard military surplus ammunition for AR15 rifles is more than 3000 feet per second and the projectile contains a steel penetrator that greatly increases the possibility of innocents being injured or killed by missed shots or ricochets. (Jones Declaration, ¶48)

**RESPONSE:** Denied that "rifles are far more powerful than necessary or desirable for most home defense uses". (SMF at ¶¶ 37-47, 52, 54; SMF Ex. 8 at ¶¶ 7- 8; SMF Ex. 3 at ¶ 4.)  Plaintiffs admit that .223 caliber ammunition typically used in AR-15 rifles has muzzle velocities in the area of 3000 feet per second. Plaintiffs deny that the use of .223 caliber ammunition "greatly increases the possibility of innocents being injured or killed by missed shots or ricochets". (SMF at ¶¶ 37-47; SMF Ex. 8 at ¶¶ 7-8.)

30

70.     In police involved shootings the number of shots fired is statistically very low - less than four rounds expended so the ammunition capacity of a standard revolver (6 cartridges) would satisfy one's self defense needs most of the time and a semi-automatic pistol with a 10 round capacity magazine even more so. (Jones Declaration, ¶40)

**RESPONSE:** Denied. (SAMF at ¶¶ 12-13.)

71.     The conclusions reached in the NSSF's MSR Comprehensive Consumer Report 2013, 2013 Firearms Retailer Survey Report, and Sports Shooting Participation in the United States in 2012 Report are based on a flawed research methodology and are therefore unreliable. (Ex. E, Declaration of Gretchen Cusick, ¶12)

**RESPONSE:**  Denied. (SMF at ¶¶ 48-53; SMF Ex. 6 at ¶¶ 6-7.)

72.     Defensive gun use is a rare occurrence. When such an event is so rare, inaccurate reporting by even a small number of respondents could lead to population projections that exaggerate the true number of incidents by orders of magnitude. As Daniel Webster and Jens Ludwig observe, if one-half of one percent of the survey respondents incorrectly reported that they had used a gun to defend themselves against criminal attack last year, the estimated number of gun uses would be twice as high as the true number. (Cusick Declaration, ¶20)

**RESPONSE:** Plaintiffs object to what "Daniel Webster and Jens Ludwig" observe as hearsay. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant.

Subject to this objection, Plaintiffs deny that defensive gun use is a rare occurrence. (SMF at ¶ 61; SMF Ex. 10 at ¶ 10; Doc. 27-1 (Supplemental Aff. of Gary Kleck) at ¶¶ 20-32.)

73.     Dr. Kleck's research is also undermined by the effect of psychological "telescoping." The phenomenon of "telescoping" and social desirability bias lead to an overstated incidence of reported defensive gun uses. Telescoping is the tendency of respondents to report events as happening more recently than they in fact happened. This tendency of telescoping is natural and can be minimized by reducing the time period in which respondents are asked to recall whether an event occurred. In this case, the respondents were asked to recall whether an event occurred in the past year, which is a relatively long period of time and would likely result in telescoping, If, on the other hand, the survey asked respondents to estimate the number of defensive uses of a firearm in the past month, the telescoping effect would be minimized. (Cusick Declaration, ¶21)

**RESPONSE:** Denied. (Doc. 27-1 (Supplemental Aff. of Gary Kleck) at ¶¶ 27-28.)

74.     Given the extremely low incidence of defensive gun use, one must also consider the small percentage of respondents whose mental illness caused them to report a defensive gun use that did not actually happen. Such incidents are rare, but when the overall incidence of defensive gun use is also extremely rare, such inaccurate reporting can have a profound effect on Dr. Fleck's subsequent estimates. (Cusick Declaration, ¶23)

**RESPONSE:** Denied. (Doc. 27-1 (Supplemental Aff. of Gary Kleck) at ¶ 30.)

Respectfully submitted,

/s/ James B. Vogts

James B. Vogts
Andrew A. Lothson
Brett M. Henne
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com
bhenne@smbtrials.com
alothson@smbtrials.com

**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I, James B. Vogts, hereby certify that on the 21st day of July, 2014, I caused to be served a copy of the foregoing document on all counsel of record listed below, via the Court's ECF system and/or by U.S. Mail.

1.  Christopher B. Wilson
    Perkins & Coie LLP

131 S. Dearborn Street
Suite 1700
Chicago, IL 60603
(312) 324- 8400
Email:  cwilson@perkinscoie.com

2.      Christopher J. Murdoch
        Holland & Knight, LLP
        131 South Dearborn Street
        30th Floor
        Chicago, IL 60603
        (312) 263-3600
        Email: chris.murdoch@hklaw.com

3.      Hart M. Passman
        Holland and Knight, LLP
        131 South Dearborn
        30th Floor
        Chicago, IL 60603
        (312) 578-6634
        Email: hart.passman@hklaw.com

4.      Steven M. Elrod
        Holland & Knight, LLP
        131 South Dearborn Street
        30th Floor
        Chicago, IL 60603
        (312) 263-3600
        Email: steven.elrod@hklaw.com

                                */s/  James B. Vogts*
                                James V. Vogts