**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARIE S. FRIEDMAN, M.D. and ) <br> the Illinois State Rifle Association ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ) <br> CITY OF HIGHLAND PARK, ) <br> ) <br> Defendant. ) | No: 13-cv-9073 <br><br> Hon. John W. Darrah |

**PLAINTIFFS' MOTION TO STRIKE CERTAIN STATEMENTS
OF MATERIAL FACTS SUBMITTED BY DEFENDANT**

Plaintiffs Arie S. Friedman, M.D. and the Illinois State Rifle Association ("Plaintiffs") move to strike Statement Nos. 9, 24, 25, 26, 27, 28, 29, 30, 31, 34, 51, 54, 55, 56, 57, 58, 59, 60, 61, 62 and 63 submitted by Defendant in its Statement of Material Facts ("SOF") (Doc. 45), and in support state as follows:

**I.    The Term "Assault Weapon" is Not Defined and Thus Statements of Fact 9, 25, 26, 28, 29, 30, 31, 34, 51, 54, 56, 60 and 62 Are Argumentative and Misleading.**

There is a fundamental disagreement in this case over whether the firearms Highland Park has chosen to ban are properly characterized as "assault weapons." Plaintiffs contend that "[a]pplication of the "assault weapon" label to civilian semi-automatic firearms … [is] a political device for those seeking to restrict firearms ownership." (Pls.' Rule 56.1 Statement of Material Facts [Doc. 42] ("SMF"), Ex. 2 at ¶ 9; *see also Stenberg v. Carhart*, 530 U.S. 915, 1001 n.12 (2000) (Thomas, J., dissenting) ("Prior to 1989, the term 'assault weapon' did not exist in the

1

lexicon of firearms. It is a political term, developed by anti-gun publicists …").) The "assault weapon" characterization should be given to only selective fire firearms, *i.e.*, firearms that "continue to fire with a single pull of the trigger as long as the trigger is held back, or fire a burst of multiple rounds with each pull of the trigger". (SMF Ex. 2 at ¶ 8.) The Highland Park Ordinance defines "assault weapon" differently. However, Highland Park has not adopted either definition of the term as it is used in its statements of fact. Thus, Highland Park's use of the term is non-factual, misleading and argumentative.

Plaintiffs' objection to Highland Park's use of the undefined term is not simply a dispute over semantics. There is a major functional difference between true selective fire firearms and the semi-automatic firearms banned under the Ordinance, and the difference has important implications for this case. For example, Plaintiffs would admit that fully-automatic firearms "are not appropriate for hunting." (*See* Def.'s Statement of Material Facts [Doc. 45] ("SOF") at ¶ 26.) However, Plaintiffs cannot admit that each of the semi-automatic firearms, characterized under the Ordinance as "assault weapons," are not appropriate for hunting. The other statements of fact using the undefined, argumentative term fall into the same pattern.

Highland Park's use of "assault weapon" is misleading and confusing for an additional reason. The Ordinance categorizes countless firearms as "assault weapons," including various models of pistols, shotguns and rifles, and many other firearms based on their features alone, having nothing to do with their basic functional operation. But even these banned firearms are not all alike. As a result, even if the definition Highland Park *would apply* to the term "assault weapon" is "firearms designated as assault weapons under the Ordinance," confusion still reigns. For example, a Streetsweeper shotgun (banned under the Ordinance as an "assault weapon") may not be appropriate for hunting, while an AR-15 rifle (also banned under the Ordinance as an

"assault weapon") is perfectly appropriate for hunting and is widely used for that purpose. By not defining "assault weapons" or otherwise distinguishing among the numerous firearms banned under the Ordinance, Highland Park has not presented proper statements of fact.

Highland Park presumably enacted the Ordinance after careful analysis of the firearms it banned. It should not now be permitted to defend the Ordinance in such an imprecise, misleading way. Highland Park's Statements of Fact 9, 25, 26, 28, 29, 30, 31, 34, 51, 54, 56, 60 and 62 should be stricken.

> II. **Statement of Fact No. 24 Regarding the Laurie Dann Incident is Wholly Irrelevant to the Constitutionality of the Ordinance.**

The Mayor of Highland Park indicated that a 1988 incident in which Laurie Dann entered a Winnetka school and shot six students was on her mind while considering the Ordinance. (SOF Ex. 1 at ¶ 9.) While her concern for school children is understandable, the Laurie Dann incident has no factual connection to so-called "assault weapon" or "large capacity magazine" possession in Highland Park or elsewhere. Laurie Dann used a six shot .32 caliber Smith & Wesson revolver and .22 caliber Beretta pistol with a 7 round magazine to commit her crimes, both of which are lawful to own and possess in Highland Park and everywhere else in the United States. (*See* www.en.wikipedia.org/wiki/Laurie_Dann (last visited on July 7, 2014).) The Mayor's 25-year old memory of the Dann incident may have been part of the emotional backdrop for her decision to vote for the Ordinance, but it is not evidence on which the constitutionality of the Ordinance should be decided. Highland Park's Statement of Fact 24 should be stricken as irrelevant.

**III.     Highland Park Chief of Police Shafer Is Not Qualified to Express Opinions on Firearms Design, Typical Home Defense Scenarios, Hunting Firearms or Hunting Strategies and Whether "Assault Weapons" Would Increase Incidents Involving Multiple Victims.**

Highland Park's Statements of Fact Nos. 25, 26, 27, 28, 30 and 31 are supported by Chief of Police Shafer' Declaration in which he expresses personal opinions on a variety of topics. What is missing in Chief Shafer's declaration, however, is any mention of what qualifications he has to testify that (1) "[a]ssault weapons are not designed for self-defense," (2) "the need to engage multiple targets … [is not] required of a home defense firearm," (3) "assault weapons are not appropriate for hunting" and (4) "assault weapons … increase the probability … of multiple victims." (*See* Shafer Decl. [Doc. 45-2] at ¶¶ 16-20.)   As a result, Chief Shafer's Declaration is not admissible, probative evidence.  Fed. R. Civ. P. 56 (c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out the facts that would be admissible in evidence, and show that the *affiant or declarant is competent to testify on the matters stated*.") (emphasis added).

Nor do Chief Shafer's opinions survive *Daubert* / Fed. R. Evid. 702 scrutiny.  Under Rule 702, trial judges are to screen opinion testimony and determine whether it rests on a reliable foundation offered by an expert with requisite knowledge in the subject matter. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 597 (1993). Insistence on reliability helps ensure the integrity of the judicial process, *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989), and is of such importance that judges can act *sua sponte* to exclude testimony that does not pass muster under *Daubert*. *See O'Conner  v. Commonwealth Edison Co.*, 13 F.3d 1090, 1094 (7th Cir. 1994).   Indeed, the proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Daubert*,

509 U.S. at 592 n. 10. Highland Park has not and cannot make the requisite showing with respect to Chief Shafer.

Chief Shafer's Declaration fails to mention any experience, let alone study, research or knowledge, with respect to firearms design, function, purpose or use. Nor does the Declaration mention Chief Shafer's knowledge of or experience with hunting and what types of firearms are appropriate and used for hunting. And there is no mention of whether he has studied, researched or in any way acquired knowledge of a connection between "assault weapon" ownership and the occurrence of shooting incidents involving multiple victims. Without establishing that Chief Shafer has "scientific, technical or other specialized knowledge" on these subjects, his opinions are inadmissible. *See* Fed. R. Evid. 702.

### IV. Statements of Fact Nos. 55 and 56 Lack Foundation and Are Based on Inadmissible Hearsay.

Highland Park's Statements of Fact Nos. 55 and 56 are supported by expert witness James Yurgealitis' calculation of the approximate number of "assault weapons" owned in the United States. His calculation is based, in part, on information he claims to have found on an NRA-affiliated website: www.gunbanfacts.com/FAQ.aspx. (*See* SOF Ex. C at ¶ 36.) According to Yurgealitis, the website indicated that "depending on the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S." (*Id*.) Based on these percentages and a study concluding that under one measure there were 218 million privately owned firearms in the United States in 2004, Yurgealitis concludes "there are 4,905,000 assault weapons in the U.S." (*Id*.) [1]

---

[1] The study relied on by Yurgealitis, *The U.S. gun stock: results from the 2004 national firearms survey*, (attached as Exhibit A) found that by a different measure there were between

There are at least two evidentiary problems with Yurgealitis' calculation. First, he fails to indicate what definition of "assault weapon" was used on the NRA-affiliated website to arrive at the 15% estimate. Yurgealitis also fails to reveal how the 15% estimate was calculated or what time period the estimate covered. Without this information, the Court cannot conclude that the estimates are the "kinds of facts" experts in his field "would reasonably rely." *See* Fed. R. Evid. 703. *See Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719 (E.D. Wis. 2008) (excluding unreliable expert testimony where the expert did not independently verify the source and accuracy of plaintiff's sales data).

Second, the website estimates are inadmissible hearsay. *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) and *In re James Wilson Associates*, 965 F.2d 160, 173 (7th Cir. 1992), illustrate the point. Although under Rule 703 an expert may rely on hearsay in formulating his opinion if it is of the type reasonably relied on by experts in the field, the evidence is not admissible for the truth of the matters asserted.

Further undercutting admissibility, Yurgealitis did not produce print-outs from the website at his deposition verifying the information.[2] (Indeed, the information Yurgealitis claims to have found on www.gunbanfacts.com/FAQ.aspx is not presently on the website.) As a result, neither Plaintiffs nor the Court can independently verify Yurgealitis' claims. For these reasons, Statements of Fact Nos. 55 and 56 should be stricken.

---

260 million and 305 million privately owned firearms in the United States in 2004. (*Id*. at p. 4.) Applying the same percentages to these estimates results in a finding that there were between 5.85 million and 6.86 million "assault weapons" in the United States in 2004. However, from 2004 to 2012, at least 5.63 million more firearms defined by the Ordinance as "assault weapons" have been added to the civilian stock in the United States. (SMF Ex. 6 at Ex. C.) Thus, if Yurgealitis' analysis is accepted, there were 11.48 to 12.25 million "assault weapons" in the United States in 2102.

[2] Plaintiffs' notice for Yurgealitis' deposition requested that he produce at the time of his deposition "all reports, studies, articles, treatises and other documents that support" his opinions. (*See* Notice of Deposition, attached as Exhibit B.)

**V.     Statement of Fact Nos. 57, 58, 59, 60, 61, 62 and 63 Should Be Stricken Because the Witness Is Not Qualified to Offer Expert Opinions on the Matters.**

Highland Park's Statements of Fact Nos. 57, 58, 59, 60, 61, and 63 address the "Use of Assault Weapons in Mass Shootings."  Each of these Statements is supported by the Declaration of Mark E. Jones, a retired ATF agent, who had a 20-year career with ATF working in a variety of positions.  Jones, however, has no experience or expertise on the occurrence of mass shootings, the circumstances under which they have occurred or their causes. He has not done any research, surveys or analyses of mass shootings. (Jones Deposition at p. 222, attached as Exhibit C.)  Instead, he relied on one report for his statements about mass shootings:  a September 2013 report prepared by Mayors Against Illegal Guns ("MAIG") titled "Analysis of Recent Mass Shootings." (Exhibit C at p. 222-23.) [3]

Although Jones describes conclusions reached in the MAIG report, he did not review any of the data on which MAIG relied in arriving at those conclusions. (Exhibit C at p. 233.) He also did not assess the methodology used by MAIG or how it collected data. (*Id*.)  All Jones did to assess the accuracy of any conclusion drawn by MAIG was to ask certain persons at the University of Chicago Crime Lab, "What do you think of the Mayors Against Illegal Guns studies, things they publish"? (Exhibit C at pp. 227-28.) They reportedly responded that they "had seen one or more of the Mayors Against Illegal Guns publications that had been put out, and they generally agreed that they're accurate and fair and not biased in a way that would skew

---

[3]     When asked what expertise he brings to this case, Jones testified that he was "a 30-year plus practitioner as a police officer and Federal Agent, and that gives me I think insight" into whether "assault weapons are appropriate" in Highland Park. (Exhibit C at p. 29.)

my opinion…" (*Id.*)  Under Fed. R. Evid. 703, Jones' testimony should be stricken because his reliance on the MAIG report cannot be shown to be reasonable.  *Cf. TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (the rationale of Rule 703 "is certainly not satisfied in this case where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.").

Jones draws on one conclusion formed by MAIG – "of the 93 examples occurring between January 2009 and September 2013 at least 14 semi-automatic or fully automatic assault weapons were recovered from the suspects; in those incidents, 151% more casualties resulted and 63% more deaths occurred that in incidents involving other types of guns".  (SOF ¶ 58.)  But even his interpretation of the MAIG conclusion is wrong. MAIG reported 11 incidents involving "assault weapons" not 14 incidents. (SMF Ex. 10 at ¶ 26.) The 14 incidents referred to by MAIG were crimes involving an "assault weapon" or a pistol with "high capacity magazine." (*Id.*) And although Jones correctly read the MAIG report to say that in those 14 incidents more persons were shot on average than were shot on average in the other 79 incidents, Jones does not have the qualifications to testify to the statistical reliability of MAIG's conclusion.[4]   While a source of an expert opinion need not be admissible in evidence, it must be reliable, *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904-905 (7th Cir.2007); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987), because an "'opinion has a significance proportioned to the sources that sustain it.'" *Huey v. United Parcel Service, Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999).

---

[4] Jones is not a criminologist or a statistician. (Exhibit C at pp. 25-27.)

If Jones had expertise in statistics or critical interpretation of criminological data, he would have confirmed that the MAIG conclusion is not robust enough to draw a conclusion about the effect of "assault weapon" use in mass shootings. (SMF Ex. 10 at ¶¶ 26-28.) When small samples are used, conclusions drawn from the sample can be sensitive to inclusion or exclusion of just a few cases. (SMF Ex. 10 at ¶ 26.) A careful analyst will test for sample sensitivity by removing a few outliers to see if results are substantially affected by just a modest change in the sample composition. (*Id.*) As it turns out, the small sample of 14 incidents is highly sensitive to slight changes in sample composition. (SMF Ex. 10 at ¶ 27.) When just three shootings are excluded from the sample, the average number of deaths that occurred in the remaining sample (5.1) falls to nearly the same average number of deaths that occurred in the other 79 incidents (4.8). (*Id.*)

At bottom, to "help the trier of fact" an expert witness has to do more than read another's work into evidence. "[Rule 703] was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *See Lyman*, 580 F. Supp. 2d at 726.

The Seventh Circuit's decision in *In re James Wilson Associates*, further illustrates the point. There, an architect attempted to testify to the value of a building based upon a report provided to him by a consulting engineer who had examined the building. The trial judge "was entitled to exclude the architect's evidence as hearsay." 965 F.2d at 172. The issue in the case was the state of the building, and the expert who had evaluated that building (*i.e.*, the consulting engineer) was the one who should have testified. The architect "could not testify for the purpose of vouching for the truth of what the engineer had told him--of becoming in short the engineer's

9

spokesman." *Id*. at 173. Moreover, it "is improper to use an expert witness as a screen against cross-examination. . . ." *Id*.

Here, Highland Park hired Jones to read into evidence a report prepared by another on a subject on which he has no demonstrated knowledge or expertise. Statements of Fact Nos. 57, 58, 59, 60, and 63 should be stricken.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' request the Court strike Defendant's Statements of Material Fact Nos. 9, 24, 25, 26, 27, 28, 29, 30, 31, 34, 51, 54, 55, 56, 57, 58, 59, 60, 61, 62 and 63.

Respectfully submitted,

/s/ James B. Vogts
James B. Vogts
Andrew A. Lothson
Brett M. Henne
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com
bhenne@smbtrials.com
alothson@smbtrials.com

**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I, James B. Vogts, hereby certify that on the 21st day of July, 2014, I caused to be served a copy of the foregoing document on all counsel of record listed below, via the Court's ECF system and/or by U.S. Mail.

1. Christopher B. Wilson
   Perkins & Coie LLP

10

        131 S. Dearborn Street
        Suite 1700
        Chicago, IL 60603
        (312) 324- 8400
        Email: cwilson@perkinscoie.com

2.     Christopher J. Murdoch
        Holland & Knight, LLP
        131 South Dearborn Street
        30th Floor
        Chicago, IL 60603
        (312) 263-3600
        Email: chris.murdoch@hklaw.com

3.     Hart M. Passman
        Holland and Knight, LLP
        131 South Dearborn
        30th Floor
        Chicago, IL 60603
        (312) 578-6634
        Email: hart.passman@hklaw.com

4.     Steven M. Elrod
        Holland & Knight, LLP
        131 South Dearborn Street
        30th Floor
        Chicago, IL 60603
        (312) 263-3600
        Email: steven.elrod@hklaw.com

                                  */s/ James B. Vogts*
                                     James V. Vogts