# Exhibit C

**CONFIDENTIAL**

## Page 1

```
STATE OF ILLINOIS    )
                     ) SS:
COUNTY OF C O O K    )
    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
        COUNTY DEPARTMENT - CHANCERY DIVISION
MATTHEW D. WILSON, TORY EDHLUND )
and JOSEPH MESSINCO,            )
        Plaintiffs,             )
    vs.                         ) No. 07 CH 4848
COOK COUNTY, a public body      )
and corporate, TONI PRECKWINKLE,)
Board President, in her official)
capacity and its Board of       )
Commissioners in their official )
capacities; namely: EARLEAN     )
COLLINS, ROBERT STEELE, JERRY   )
BUTLER, WILLIAM M. BEAVERS,     )
DEBORAH SIMS, JOAN PATRICIA     )
MURPHY, BRIDGET GAINER, JESUS   )
G. GARCIA, PETER N. SILVESTRI,  )
JOHN P. DALEY, LARRY SUFFREDIN, )
GREGG GOSLIN, JOHN A. FRITCHEY, )
TIMOTHY O. SCHNEIDER, JEFFREY   )
TOBOLSKI, EDWIN REYES, ELIZABETH)
ANN DOODY GORMAN and THOMAS DART,)
Sheriff of Cook County, in his  )
official capacity,              )
        Defendants.             )
```

The discovery deposition of MARK DOUGLAS JONES, taken in the above-entitled cause, before MARLENE L. KING, a notary public of Cook County, Illinois, on April 30, 2014 at 330 North Wabash Avenue, Suite 3300, Chicago, Illinois, pursuant to notice.
START TIME: 9:32 a.m. END TIME: 4:57 p.m.

## Page 2

```
    IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
            EASTERN DIVISION
ARIE S. FRIEDMAN, M.D.    )
and the Illinois State    )
Rifle Association,        )
        Plaintiffs,       )
    vs.                   ) NO. 13-CV-9073
CITY OF HIGHLAND PARK,    )
        Defendant.        )
```

The deposition of MARK DOUGLAS JONES, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARLENE L. KING, a notary public within and for the County of Cook and State of Illinois, at 330 North Wabash Avenue, Suite 3300, Chicago, Illinois, on April 30, 2014, at the hour of 9:32 a.m.

REPORTED BY: MARLENE L. KING, C.S.R.
LICENSE NO.: 084-003326.

## Page 3

APPEARANCES:

SWANSON, MARTIN & BELL, LLP,
BY: MR. JAMES B. VOGTS,
330 North Wabash Avenue,
Suite 3300,
Chicago, Illinois 60611
(312) 321-9100
jvogts@smbtrials.com
    and
MR. VICTOR D. QUILICI,
P.O. Box 428,
River Grove, Illinois 60171
(847) 298-2566
    Representing the Plaintiffs;

PERKINS COIE, LLP,
BY: MR. CHRISTOPHER B. WILSON,
131 South Dearborn Street,
Suite 1700,
Chicago, Illinois 60603
(312) 324-8603
cwilson@perkinscoie.com
    Representing City of Highland Park;

## Page 4

APPEARANCES (Continued):

STATE'S ATTORNEY OF
COOK COUNTY, ILLINOIS,
BY: MR. JAMES C. PULLOS,
    Assistant State's Attorney,
    Supervisor,
    Labor and Employment Section,
    and
    MS. MARILYN F. SCHLESINGER,
    Assistant State's Attorney,
    Civil Actions Bureau,
RICHARD J. DALEY CENTER,
50 West Washington Street,
Room 500,
Chicago, Illinois 60602
(312) 603-5105
(312) 603-2355
james.pullos@cookcountyil.gov
marilyn.schlesinger@cookcountyil.gov
    Representing the Defendants.

**\*\*C O N F I D E N T I A L\*\***

Page 5:

```
              I N D E X
WITNESS                    EXAMINATION
MARK DOUGLAS JONES
   By Mr. Vogts                  8
         E X H I B I T S
NUMBER                    REFERRED TO
Deposition Exhibit
   No. 1                         7
   No. 2                         7
   No. 3                        14
   No. 4                        61
   No. 5                        61
   No. 6                        68
   No. 7                        68
   No. 8                        66
   No. 9                       119
   No. 10                      124
   No. 11                      130
   No. 12                      136
   No. 13                      144
   No. 14                      159
   No. 15                      171
   No. 16                      175
   No. 17                      178
```

Page 6:

```
         E X H I B I T S
NUMBER                    REFERRED TO
Deposition Exhibit
   No. 18                      209
   No. 19                      216
   No. 20                      225
   No. 21                      228
   No. 22                      237
   No. 23                      243
   No. 24                      246
   No. 25                      250
   No. 26                      271
```

Page 7:

  1  MR. VOGTS: Would you swear in the witness,
  2  please.
  3       (WHEREUPON, the witness was
  4        duly sworn.)
  5  MR. VOGTS: This is the discovery deposition
  6  of Mark D. Jones taken in the case of Wilson
  7  versus Cook County and also the deposition of
  8  Mark D. Jones taken in the case of Friedman
  9  versus the City of Highland Park.
 10       Good morning, Mr. Jones.
 11  THE WITNESS: Good morning.
 12  MR. VOGTS: I'm going to show you, make as
 13  part of the record here, Exhibit 1 and Exhibit
 14  2, which are the notices for the deposition in
 15  the two cases.
 16       And for the record in each of those
 17  deposition notice a request was made pursuant to
 18  Federal Rule of Civil Procedure 34 or Illinois
 19  Supreme Court Rule 214 that the witness bring
 20  to the deposition today all reports, studies,
 21  data, articles, treatises and other documents
 22  that support the opinions stated in his February
 23  7, 2014 declaration and his November 25, 2013
 24  report. It's my understanding the witness has

Page 8:

  1  not brought those materials with him today.
  2       MARK DOUGLAS JONES,
  3  called as a witness herein, having been first
  4  duly sworn, was examined and testified as
  5  follows:
  6            EXAMINATION
  7  BY MR. VOGTS:
  8     Q. Is that a correct statement, Mr. Jones?
  9     A. That's correct. I do not have those
 10  materials with me at the moment.
 11     MR. VOGTS: The plaintiffs in both cases will
 12  reserve their right to reconvene this deposition
 13  at a later date should that be necessary.
 14  BY MR. VOGTS:
 15     Q. Will you please state your name for the
 16  record?
 17     A. My name is Mark Douglas Jones.
 18     Q. What is your age?
 19     A. I'm 56.
 20     Q. Where do you live?
 21     A. Chicago, Illinois.
 22     Q. What is your residence address?
 23     A. 7622 North Rogers Avenue, R-o-g-e-r-s,
 24  Chicago.

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

**Page 25**

Q. -- from 1980 to 1985?
A. That's correct.
Q. Where did you grow up?
A. Rogers Park in Chicago.
Q. Okay. And that's where you presently live?
A. Yes.
Q. Are you a trained statistician?
A. No.
Q. Do you claim any expertise in statistics?
A. I have some education, but I can't claim that I have any special expertise.
Q. Your resume indicates you received an Associate of Arts degree from Wilbur Wright College, is that correct?
A. Yes.
Q. Did you ever obtain a bachelor's degree?
A. Yes.
Q. Where did you obtain a bachelor's degree?
A. University of Illinois, Chicago.
Q. Is that on your resume?

**Page 26**

A. It is.
Q. I missed that. And what was your bachelor's degree in?
A. Criminal justice.
Q. And later you obtained a master's degree from Johns Hopkins in management?
A. Yes, law enforcement management.
Q. Was that a multi-year program or a shortened, concentrated program? What exactly was that?
A. It was a multi-year cohort program. Virtually everyone in my cohort with the exception of one person was a sworn police officer from -- generally from around the East Coast, the Atlantic Seaport. And we met every other Friday and Saturday for eight hours a day for two years.
Q. You said you had some education in statistics. Where did you receive that education?
A. In my undergraduate studies I had two statistics classes, research methods classes, at University of Illinois. And then in the master's program I had another research methods

**Page 27**

class.
Q. Okay. In the master's program what was the I guess subject matter of that research methods class?
A. Essentially what they -- I apologize if I'm jumping too fast. Essentially what the professor wanted us to learn was how to look at randomized control trials, how to do a literature review, and how to understand why in general a study that I was reading would be valid or invalid, the long and short of it.
I mean, it was a one semester class and so thus not -- it didn't provide me with expertise to be a statistician, but it gave me some understanding of how some of these -- how these studies work and how to understand whether they were good, bad or indifferent.
Q. Are you a criminologist?
A. No.
Q. Have you ever studied criminology?
A. I have had criminology classes, but I'm not a criminologist, no.
Q. So you don't claim any expertise in criminology as you sit here today.

**Page 28**

A. No.
Q. Have you received any training in the science of either wound ballistics or terminal ballistics?
A. I have never had a class, a specific class that talks about that. I have had a career of inculcation into things like stopping power, firearms efficacy, firearms reliability, what firearms might be better suited to a particular task than another, but I have not ever had any -- like a formal class in wound ballistics or terminal ballistics.
Q. As you sit here today, do you claim any expertise in the science of either terminal ballistics or wound ballistics?
A. No.
Q. Have you published any books, articles or studies on the effects of firearms laws on crime rates?
A. No.
Q. Have you published any books, articles or study on the effects of firearm laws on other subjects?
A. No, haven't published.

**Page 29**

1  Q. Have you published any books, articles
2  or studies on the effects of firearms laws on --
3  strike that.
4      Have you published any books, studies
5  or articles on the effects of firearm bans of
6  any kind on firearm violence?
7  A. No.
8  Q. What is the expertise that you bring to
9  this case?
10 A. I am a 30-year plus practitioner as a
11 police officer and Federal agent, and that gives
12 me I think insight into the entire subject
13 matter.
14 Q. What do you believe that subject matter
15 to be?
16 A. Well, in this case it's whether assault
17 weapons are appropriate in Cook County.
18 Q. And Highland Park?
19 A. This is a dual deposition?
20 Q. Yes.
21 A. Yes, and in the community of Highland
22 Park.
23 Q. And when you say whether assault
24 weapons are "appropriate" in those communities,

**Page 30**

1  what do you mean by that?
2  A. I mean that the community has enacted
3  a law that essentially says they don't believe
4  that those weapons are appropriate to be
5  possessed by their citizens.
6  Q. And what is it about your training,
7  experience or background that you believe gives
8  you insight into whether those communities acted
9  appropriately in making that determination?
10 MR. WILSON: I'm going to object. He can
11 answer, but we are presenting Mr. Jones as an
12 expert on a variety. I don't want him to -- a
13 variety of issues.
14     You have asked him a general question
15 on what he thinks he is offering in this case,
16 but I think it's an improper line of questioning
17 of an expert to ask him all the areas he's an
18 expert on.
19 BY MR. VOGTS:
20 Q. Would you like the question read back?
21 A. Yes, please.
22     (WHEREUPON, the record was read
23      by the reporter as requested.)
24 MR. WILSON: Renew my objection.

**Page 31**

1  THE WITNESS: I don't think it's for me
2  to say whether I think the communities acted
3  appropriately or not.
4  BY MR. VOGTS:
5  Q. But it's correct that you do have
6  an opinion that the community did act
7  appropriately, isn't that correct?
8  A. Yes.
9  Q. But you have just said it's not for
10 you to say --
11 MR. WILSON: Objection.
12 BY MR. VOGTS:
13 Q. -- isn't that right?
14 A. It seems to me this is a bit off topic,
15 but the community elects the people that make
16 the law. They pass the law. They're supported
17 by their citizenry. They therefore acted
18 appropriately. I'm supporting these communities
19 in the law that they have enacted.
20 Q. When you worked as a police officer
21 for the Glencoe Police Department from 1980
22 to 1985, were you issued a sidearm?
23 A. Yes.
24 Q. What sidearm were you issued?

**Page 32**

1  A. A Model 19 -- Smith & Wesson Model 19
2  .357-caliber revolver.
3  Q. And was that the sidearm you carried
4  throughout your tenure with the Glencoe Police
5  Department?
6  A. Yes.
7  Q. Okay. Did that revolver hold six
8  rounds in its cylinder?
9  A. Yes.
10 Q. Did you have available to you as a
11 police officer in the Village of Glencoe a
12 long gun for use when needed?
13 A. Yes.
14 Q. What long gun did you have available to
15 you?
16 A. There was an Ithaca Model 37 Deerslayer
17 12-gauge shotgun that was mounted in each squad
18 car.
19 Q. When you worked for the Diplomatic
20 Security Service, were you issued a sidearm?
21 A. Yes.
22 Q. What sidearm were you issued in that
23 job?
24 A. I was issued a Smith & Wesson Model

---

**Page 221**

1  removing that particular tool from the tool
2  box of those who would misuse it and keeping
3  it -- keeping them out of the hands of people
4  that are not going to behave the way they're
5  supposed to in society.
6      Q. The authors of Exhibit 19 did not
7  differentiate between events that involved the
8  use of firearms classified as assault weapons
9  and those that did not, correct?
10     A. I think that's right, yes.
11     Q. So can you say that any perceived
12  increase in these active shooting events in
13  recent years is attributable to the possession
14  of firearms classified as assault weapons under
15  the ordinance?
16     A. No. I can say, though, that those
17  that do occur with assault weapons are more
18  catastrophic and result in greater loss of life
19  I think and way more -- far more catastrophic
20  injuries to the victims that don't die than
21  would have if you used a handgun.
22        Interestingly, on Page 9 of the -- and
23  I will quote the third paragraph. "Because
24  shooters often carry rifles and frequently shoot

**Page 222**

1  at officers in these events, law enforcement
2  personnel should wear body armor to protect them
3  from rifle fire." So even the FBI in their
4  study is saying it's a concern.
5      Q. You brought up the occurrence of mass
6  shootings many times today. Have you yourself
7  done any independent research on the subject of
8  mass shootings?
9      A. No.
10     Q. Have you yourself conducted any surveys
11  or analyses of mass shootings yourself?
12     A. No.
13     Q. Have you yourself conducted any
14  independent research on the frequency with which
15  mass shootings occur?
16     A. No. I'm relying entirely on materials
17  prepared by others.
18     Q. And specifically a report prepared by
19  the Mayors Against Illegal Guns?
20     A. Among others, that's right.
21     Q. I didn't see reference to any other
22  reports of mass shootings in either your
23  Declaration or Report, is that correct?
24     A. I'm relying on the Mayors Against

**Page 223**

1  Illegal Guns report.
2      Q. Do you have an empirical basis --
3  strike that.
4        Going back to the Active Shooter Event
5  study performed by the FBI, their definition of
6  an active shooting event was not predicated on
7  any persons actually being shot or any persons
8  actually being killed, correct?
9      A. I think that the definition of an
10  active shooter doesn't necessarily mean that
11  they're shooting. It means someone with a gun
12  in a location that they've described here.
13     Q. But the Mayor Against Illegal Guns
14  report on mass shootings, they defined a mass
15  shooting as an event in which four or more
16  people are killed, correct?
17     A. Yes. I believe that comports with the
18  FBI's definition of what a mass shooting is as
19  well. If there is a difference, I believe it's
20  in the fact that the FBI's definition does not
21  include the shooter, and Mayors Against Illegal
22  Guns probably does in the total number of deaths
23  and injuries.
24     Q. You have an empirical basis on which to

**Page 224**

1  say that the occurrence of mass shooting events
2  has increased in recent years.
3      A. Would you define -- sorry to be obtuse.
4  Would you define "empirical" for me in this
5  case?
6      Q. A data driven basis.
7      A. I have reviewed the documents in
8  my bibliography, and some of them contain
9  statistical information that talk about the
10  incidence of mass shootings, and in there it
11  talks about -- in those documents it talks about
12  increase, decrease and frequency. So that's
13  what I'm basing my opinion on.
14     Q. Well, based on your review of those
15  documents is there a basis on which you have
16  concluded that the occurrence of mass shooting
17  events have increased in recent years?
18     A. Yes.
19     Q. Which sources, upon which sources do
20  you base that conclusion?
21     A. The Mayors Against Illegal Guns, study
22  that I cite, and the FBI study which talks about
23  Active Shooter Events, not necessarily -- you're
24  right. An active shooter event doesn't

\*\*CONFIDENTIAL\*\*

**Page 225**

1 necessarily mean that there's a shooter. Just
2 means there is someone in the building with a
3 gun.
4   Q.  Show you what's been marked as Exhibit
5 20, which was an article published in a journal
6 called Homicide Studies, Volume 18, 2014 titled
7 Mass Shootings in America: Moving Beyond
8 Newtown, principal author of which was James
9 Alan Fox. Do you know who James Alan Fox is?
10   A.  I recognize the name, but I don't know
11 his professional bona fides.
12   Q.  At Page 129 Mr. Fox and his co-author,
13 Figure 1, created a table depicting the
14 occurrence of mass shootings, occurrence of mass
15 shootings as events and the values of victims of
16 those mass shootings by year from 1976 to 2011.
17   A.  Yes. 2010 it says here.
18   Q.  Would you agree with the
19 characterization of the solid black line, which
20 is incidents per year, that those numbers show
21 a fairly stable pattern from 1976 through 2011?
22   A.  This table reflects that it's
23 relatively stable, I guess.
24   Q.  There have in fact -- as early as 1977

**Page 226**

1 and 1978 there were as many as 25 mass
2 shootings, is that correct?
3   A.  Yes.
4   Q.  And again in 1993?
5   A.  Yes.
6   Q.  In 2003 there appear to be 26 or 27?
7   A.  Yes.
8   Q.  2008, 2009, 25 again?
9   A.  Yes.
10   Q.  And in all the interceding years up and
11 down some but not substantially so, correct?
12   A.  Looks to me like '85 to '94 was a
13 very distinct increase, then a drop in '94. An
14 increase from '94 to '98. A drop. An increase
15 from 2000 to 2003 and then a drop. And then
16 it stays relatively stable to 2010 or 2011,
17 according to this table.
18   Q.  Has any study or report that you have
19 seen and reviewed in this case come to the
20 conclusion that the pattern of mass shooting
21 events, incidents by year, has been dictated
22 by the availability of firearms classified as
23 assault weapons?
24   A.  No.

**Page 227**

1   Q.  Have you done anything to verify the
2 accuracy of any conclusion drawn in the Mayors
3 Against Illegal Mass Shooting report?
4   A.  Yes.
5   Q.  What have you done?
6   A.  I have spoken to my colleagues at the
7 University of Chicago Crime Lab, many of whom
8 are in fact economists and statisticians, and
9 they agree with the general accuracy of the
10 reports.
11   Q.  For what purpose did you speak to those
12 colleagues?
13   A.  For purposes of figuring out what I
14 could rely on as far as information to undergird
15 my findings and my opinions.
16   Q.  Could you elaborate on that? I don't
17 quite understand what you mean by that.
18   A.  I asked them, "What do you think of the
19 Mayors Against Illegal Guns studies, things they
20 publish?"
21   Q.  Nothing more specific than that?
22   A.  No, not really. No. "Did you look at
23 their, you know, methodology?" I asked them
24 what they thought. Most of them had seen one or

**Page 228**

1 more of the Mayors Against Illegal Guns
2 publications that had been put out, and they
3 generally agree that they're accurate and fair
4 and not biased in a way to -- that would skew my
5 opinion by relying in part in forming my opinion
6 for this case and Highland Park case, on using
7 them in partial basis to underpin what I think.
8   Q.  Did you go to those persons at the
9 Chicago -- University of Chicago Crime Lab with
10 any specific questions about certain aspects of
11 the report?
12   A.  No.
13   Q.  And for purposes of simplification,
14 I'll refer to the Mayors Against Illegal Guns as
15 MAIG, M-A-I-G, just so I don't have to try to
16 say it. Is that fine?
17   A.  That's fine with me, yes.
18   Q.  Do you have a different way to say it?
19   A.  No, MAIG is good.
20 MR. VOGTS: All right. 22?
21 MR. PULLOS: 21.
22 BY MR. VOGTS:
23   Q.  Is Exhibit 21 a copy of the MAIG
24 Analysis of Recent Mass Shootings?

**C O N F I D E N T I A L**

---

**Page 233**

1  stricter. I would characterize it as filling
2  gaps that are in our current firearms laws.
3    Q. Have they publicly taken positions to
4  your knowledge on any other firearms law related
5  issues?
6    A. Well, they've taken a position against
7  assault weapons. They've taken a position
8  against high capacity magazines or large
9  capacity magazines, yes.
10   Q. Any others?
11   A. May have. I don't know.
12   Q. Have you personally reviewed any of
13  the data on which MAIG relied at arriving on
14  percentages or numbers or values in its report?
15   A. No.
16   Q. So you have not seen data in any
17  form, whether it be on a spreadsheet or
18  otherwise.
19   A. If it were on their website, I have
20  seen it, but I don't recall specifically. I
21  certainly have not looked at anything that
22  relates to their methodology and how they
23  collect numbers and what they include and what
24  they do not include in any of their studies.

**Page 234**

1    Q. At the end of their report they have
2  a summary or synopsis of each of the 93 mass
3  shooting events that have occurred during the
4  years, what is it, 2009 through 2013.
5    A. Yes. I think that's right.
6    Q. Have you read those?
7    A. Yes, many of them, and it's been some
8  time. But yes, I have.
9    Q. Have you in any instance or with regard
10  to any of those 93 incidents gone beyond what's
11  reported by MAIG in the report in order to
12  develop greater knowledge about what transpired
13  in any of those incidents?
14   A. Only the more recent ones that have
15  publicly available sources.
16   Q. Newtown being one?
17   A. Newtown. I looked at some news
18  reporting on Aurora. I looked at some news
19  reporting on the Navy Yard shooting, some things
20  like that.
21      But to get to the heart of your
22  question, no, I don't think I have based on what
23  you have asked. I don't think I have done what
24  you asked.

**Page 235**

1    Q. I believe you earlier stated that in
2  14 of the 93 incidents described in the MAIG
3  report assault weapons were used, is that
4  correct?
5    A. Yes.
6    Q. If you look at that report, isn't it
7  correct that the 14 number reflects the number
8  of incidents in which assault weapons for large
9  capacity magazines were used?
10   A. I don't think that's correct. I think
11  it's 14 incidents of assault weapons or 14
12  incidents where an assault weapon was
13  identified. There could be more. They weren't
14  able to identify it.
15   Q. In Page 3 of the report there is a bar
16  graph at the bottom of the page titled Assault
17  Weapons or High-Capacity Magazines. Do you see
18  that?
19   A. I do. I see that, yes.
20   Q. That's actually at the beginning of the
21  sentence that reads, "Assault Weapons or High-
22  Capacity Magazines were used in at least 14
23  incidents."
24   A. Yes.

**Page 236**

1    Q. So that's a combination of assault
2  weapons and large capacity magazines, not just
3  assault weapons.
4    A. That's what it says here.
5    Q. For example, the shooting of people in
6  Tucson, including Gabrielle Giffords, was used
7  in -- the shooter used a large capacity magazine
8  but did not use an assault pistol or an assault
9  rifle, correct?
10   A. That's correct.
11   Q. All right. So of the 93 mass shooting
12  events described by MAIG in its report, 79
13  involved the use of firearms that were neither
14  assault weapons or that had large capacity
15  magazines, correct?
16   A. Yes. I think that's a good
17  characterization.
18   Q. And in those 79 events the shooters
19  were able to inflict mass casualties without
20  assault weapons and without large capacity
21  magazines, correct?
22   A. Yes.
23   Q. I think I know the answer to this
24  question, but I'm going ask it, anyway, for

* * C O N F I D E N T I A L * *

```
 1    STATE OF ILLINOIS    )
 2                         ) SS:
 3    COUNTY OF C O O K    )
 4        I, MARLENE L. KING, a notary public
 5    within and for the County of Cook County and
 6    State of Illinois, do hereby certify that
 7    heretofore, to-wit, on April 30, 2014,
 8    personally appeared before me, at 330 North
 9    Wabash Avenue, Suite 3300, Chicago, Illinois,
10    MARK DOUGLAS JONES, in a cause now pending and
11    undetermined in the Circuit Court of Cook
12    County, Illinois, wherein MATTHEW D. WILSON,
13    et al., are the Plaintiffs, and COOK COUNTY,
14    a public body and corporate, et al., are the
15    Defendants.
16        I further certify that the said MARK
17    DOUGLAS JONES was first duly sworn to testify
18    the truth, the whole truth and nothing but the
19    truth in the cause aforesaid; that the testimony
20    then given by said witness was reported
21    stenographically by me in the presence of the
22    said witness, and afterwards reduced to
23    typewriting by Computer-Aided Transcription, and
24    the foregoing is a true and correct transcript
                                                   281
```

```
 1    McCORKLE LITIGATION SERVICES, INC.
         200 N. LaSalle Street Suite 2900
 2          Chicago, Illinois 60601-1014
 3
      DATE: May 11, 2014
 4
      MR. CHRISTOPHER B. WILSON,
 5    PERKINS COIE, LLP,
      131 South Dearborn Street,
 6    Suite 1700,
      Chicago, Illinois  60603
 7
      IN RE:  Wilson vs. Cook County
 8    COURT NUMBER:  07 CH 4848
      DATE TAKEN:  April 30, 2014
 9    DEPONENT:  Mark Douglas Jones
10    Dear Mr. Wilson:
11    Enclosed is the deposition transcript for the
      aforementioned deponent in the above-entitled
12    cause.  Also enclosed are additional signature
      pages, if applicable, and errata sheets.
13
      Per your agreement to secure signature, please
14    submit the transcript to the deponent for review
      and signature.  All changes or corrections must
15    be made on the errata sheets, not on the
      transcript itself.  All errata sheets should be
16    signed and all signature pages need to be signed
      and notarized.
17
      After the deponent has completed the above,
18    please return all signature pages and errata
      sheets to me at the above address, and I will
19    handle distribution to the respective parties.
20    If you have any questions, please call me at the
      phone number below.
21
      Sincerely,
22
      Margaret Setina     Court Reporter Present:
23    Signature Department     MARLENE L. KING
24    cc:  Mr. Vogts, Mr. Pullos, Ms. Schlesinger.
                                                   283
```

```
 1    of the testimony so given by said witness as
 2    aforesaid.
 3        I further certify that the signature to
 4    the foregoing deposition was reserved by counsel
 5    for the respective parties and that there were
 6    present at the deposition the attorneys
 7    hereinbefore mentioned.
 8        I further certify that I am not counsel
 9    for nor in any way related to the parties to
10    this suit, nor am I in any way interested in the
11    outcome thereof.
12        IN TESTIMONY WHEREOF:  I have hereunto
13    set my hand and affixed my notarial seal this
14    11th day of May, 2014.
15
16
17
18          _Marlene L. King_  [seal]
19
20          NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21
22
23
24
                                                   282
```

71 (Pages 281 to 283)