IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARIE S. FRIEDMAN, M.D. and the Illinois State Rifle Association ) ) ) Plaintiffs, ) ) v. ) ) ) CITY OF HIGHLAND PARK, ) ) Defendant. ) | No: 13-cv-9073<br><br>Hon. John W. Darrah |

**PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Arie S. Friedman, M.D. and the Illinois State Rifle Association ("Plaintiffs") respond to Defendant's Motion for Summary Judgment [Doc. 43] and Memorandum of Law in Support ("Def.'s Memo") [Doc. 44] as follows:

**INTRODUCTION**

Highland Park misreads the Supreme Court's decision in *Heller* and wishes away the Court's central holding. By asserting that "nothing in *Heller* can be read to guarantee 'self-defense' as a right in and of itself" (Def.'s Memo at 8), Highland Park ignores that the Court found the right to self-defense "inherent" and "central to the Second Amendment right" to keep and bear arms. 554 U.S. 579, 628 (2008). Two years later in *McDonald*, the Court affirmed that fundamental guarantee: "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller* we held that individual self-defense is 'the *central component*' of the Second Amendment right." 130 S.Ct. 3020, 3036 (2010) (emphasis in original).

Highland Park cannot impose a burden on the constitutional right of law-abiding persons

1

to defend themselves and their families in their homes by prohibiting possession of firearms commonly owned for that purpose. And it does not matter under *Heller* whether there may be other firearms available for Highland Park residents to keep in their homes. Highland Park is not free to decide for its residents what types of commonly owned firearms are legal and illegal to possess in their homes, regardless of its reason for enacting the Ordinance.

The firearms banned by Highland Park are not just a "narrow sliver" of firearms currently in common use. (Def.'s Memo at 2.) To the contrary, they are among the most commonly produced, acquired and owned firearms today. The banned firearms are typically possessed by law-abiding persons for lawful purposes, including hunting, target shooting and self-defense. Because Highland Park has not presented evidence to the contrary, it has failed to meet its burden of establishing that the firearms it has banned are not protected by the Second Amendment. The Ordinance is therefore categorically unconstitutional under *Heller*. The inquiry should end there.

Instead, Highland Park asks the Court to go further, engage in a means-end analysis and consider its reasons for enacting the Ordinance. The invitation should be rejected because it requires the Court to ignore the majority's opinion in *Heller* and instead follow Justice Breyer's dissenting opinion, in which he pushed for an analytical framework in which the protected right is balanced with governmental interests. The majority in *Heller*, however, plainly rejected such an approach as the kind of "freestanding interest balancing" to which core constitutional rights are not subjected. 554 U.S. 579 at 634.

The *Heller* majority answered the question squarely before this Court: Does a law prohibiting a law abiding person from possessing a commonly owned firearm in his or her home for self-defense violate the Second Amendment? *Heller* answered this question affirmatively,

and struck down the District of Columbia's ban on a class of commonly owned firearms. This Court, bound by *Heller*, should strike down the Highland Park Ordinance as well.

## LAW AND ARGUMENT

**I.   Highland Park Has Failed to Show that the Banned Firearms and Magazines Fall Outside the Scope of Second Amendment Protection.**

There is no dispute that Highland Park has the burden to demonstrate that the banned firearms and magazines are not commonly owned by law abiding persons for lawful purposes, including self-defense, and are thus outside the scope of Second Amendment protection. *See Illinois Association of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 936 (N.D. Ill. 2014) ("City bears the burden of first establishing that the ordinance regulates activity generally understood in 1791 to be *un*protected by the Second Amendment") (emphasis in original). The evidence presented by Highland Park on its threshold burden falls substantially short. [1]

The only evidence presented by Highland Park addressing "common ownership" of the banned firearms is a back-of-the-envelope estimate by one of its witnesses that there were approximately 4.9 million "assault weapons" in the United States in 2004, and his personal opinion that "[w]hile this number is not insignificant, … it does not support the claim that assault weapons are in 'common use'". (Def.'s Statement of Material Fact ("SOF") at ¶¶ 55-56). [2]

---

[1] At the February 27, 2014 hearing on Plaintiffs' Motion for Preliminary Injunction, Highland Park acknowledged its burden of proving that the banned firearms and magazines are not commonly owned for lawful purposes, including self-defense, and that if its proof is insufficient, it loses on the issue. *See* Transcript of Proceedings at pp. 51-52, attached as Exhibit A.

[2] Plaintiffs have moved to strike this opinion and the estimate on which it is based on the grounds that they lack foundation and are based on unreliable hearsay. *See* Plaintiffs' Motion to Strike Certain Statements of Material Fact Submitted by Defendant, dated July 21, 2014.

Highland Park's witness has not been shown to be qualified to offer an opinion on the extent to which the banned firearms are in "common use".[3] Nevertheless, the estimate cannot be probative of firearms in "common use" today, because it is based on data from 2004. Since then, approximately 5.63 million more "assault weapons" have been produced for sale in the United States. (Pls.' Statement of Material Facts ("SMF") Ex. 6 at Ex. C) (AR and AK-type rifles only). Regardless, using the overall civilian stock of firearms to arrive at the number of banned firearms in "common use" is inappropriate because there is no evidence that every currently owned firearm is actually "in use". Indeed, there is substantial reason to believe that a great many firearms are not "in use" at all. The study relied on by Highland Park's witness estimated that each of the 57 million persons who own firearms in the United States own an average of 6.6 firearms. Approximately, 3% of firearm owners (1.7 million persons) own more than 25 firearms on average. (*See* Pls.' Statement of Additional Material Facts ("SAMF") at ¶ 14.) It is logical to assume that tens of millions of firearms, perhaps more, are part of collections or have been replaced by newer more modern firearms.

A better measure, although still imprecise, is an estimate of the percentage of firearms owners who own firearms banned under the Ordinance. Thus, assuming Highland Park's "not insignificant" estimate of 4.9 million owners is accurate, nearly 1 in 10 firearm owners in the United States owns a firearm that is banned in Highland Park. This estimate is consistent with evidence that from 2008 to 2012, AR-type rifles alone (just one of the banned firearms, albeit the most popular) comprised 11.4% of all firearms produced for domestic sale. AR-type rifle production far exceeded the number of revolvers produced during the same years. (*Id.*) This estimate is also consistent with survey evidence that in 2012, more than 1 out of 5 new firearms

---

[3] Highland Park has not presented the qualifications of the witness, James Yurgealitis, to the Court.

sold by retail dealers was a rifle banned under the Ordinance. (SMF at ¶ 31.) This evidence is corroborated by Highland Park's own witness, who volunteered that the banned rifles are "very popular" and "sell very quickly". (SMF at ¶ 36.) Indeed, the witness owns a banned rifle and uses it for a lawful purpose – target shooting. (SMF at ¶ 65.)

While Highland Park's has presented evidence that the banned firearms are not in "common use" that has little if any probative value, the evidence that the firearms are not owned for lawful purposes simply does not exist. Firearms banned under the Ordinance are undeniably used commonly for hunting. One of Highland Park's own witnesses has hunted prairie dogs with an AR-15 rifle equipped with a 20 round magazine. (SMF at ¶ 68; *see also* SMF at ¶ 67.) Nor is there a dispute that firearms banned under the Ordinance are used for target shooting. Again, Highland Park's own witness owns a banned firearm for that purpose. (SMF at ¶ 65.) And a survey of randomly selected adults revealed that nearly 12 million persons used a banned firearm for target shooting in 2012. (SMF at ¶¶ 63-64.)

With regard to whether the banned firearms are commonly used for self-defense, Highland Park argues that the firearms are not appropriate for self-defense and that other types of firearms are more suitable for that purpose. Plaintiffs disagree, but whether one type of firearm is better than another for self-defense in the home is ultimately irrelevant under *Heller*. The relevant inquiry is whether persons commonly own the banned firearms for self-defense use, and Highland Park has presented no evidence at all on the subject. The only evidence from which that question can be answered has been presented by Plaintiffs. (SMF at ¶¶ 48-54.) As a result, Highland Park has failed to meet its burden.

Plaintiff Friedman owns a banned firearm that, until the effective date of the Ordinance, he *kept* in his home to defend himself and his family. (Verified Complaint, Doc.1-1 at ¶¶ 1 & 4.)

5

Dr. Friedman is not alone in his choice of a home defense firearm. Evidence gathered from a survey of 21,942 owners of banned firearms, conducted for non-litigation purposes, demonstrates that behind recreational target shooting, home defense was ranked as the second most important reason for owning firearms banned in Highland Park. Although Highland Park complains that this survey was not conducted in ways to ensure a representative sample of all owners of banned firearms was gathered, the survey results are nevertheless evidence that should be considered. Criticisms of the survey methodology go to the weight of the evidence, not its admissibility. *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1172 (7th Cir. 1987) (district court improperly disregarded survey results because survey flaws go the weight of the evidence.); *see also AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, … such situations will be rare …") (internal citation omitted); *Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd*. Partnership, 34 F.3d 410, 416 (7th Cir. 1994) (not error to consider shopping mall survey although some questions were "a bit slanted").

Notably, while Highland Park questions the survey methodology, it offers no evidence of how the survey results are biased or why any theoretical bias would be in the direction of overstating ownership of banned firearms for home defense use. Highland Park has a burden to present evidence, and it cannot meet its burden by merely diminishing the weight to be given to Plaintiffs' proof.

## II. The Court Is Bound to Follow the Majority's Opinion in *Heller*.

Based on the evidentiary record before the Court, application of means-end scrutiny to Highland Park's ban on possession of commonly owned firearms in the home would constitute

nullification of the majority opinion in *Heller* and adoption of the interest balancing analysis advanced by Justice Breyer in his dissenting opinion. But that is what Highland Park asks the Court to do – disavow *Heller* and defer to the City Council's judgment that some commonly owned firearms are good and others are bad.

Although *Heller* recognized that the rights secured by the Second Amendment have limits, the only limitation it recognized on the type of firearm that can be possessed by a law abiding person in the home for self-defense use is that the firearm be one that is "in common use at the time." 554 U.S.570 at 627. Long-standing restrictions on *who* may possess firearms and *where* they can be possessed, such as prohibitions on possession by felons and the mentally ill, and laws forbidding firearms in schools or government buildings, may survive *Heller*'s text and historical tradition analysis, but a complete ban on possession of a commonly owned type firearm cannot survive. *Id*. at 626.[4]

While *Heller* identified examples of "presumptively lawful measures" that may survive a text and historical tradition analysis, the Court did not open the door to restrictions on the inherent right of law abiding persons to keep commonly owned firearms in their homes for possible self-defense use. *Id*. at 627 n. 26. Highland Park's suggestion that the Ordinance is simply a regulatory measure consonant with *Heller* and the inherent Second Amendment right of self-defense in the home misses the mark by a wide margin.

---

[4] *Heller* did not hold that a firearm "in common use" can nevertheless be banned if the firearm is found "abnormally dangerous and unusual", as Highland Park contends. (Def.'s Memo at 9.) In the passage cited by Highland Park for this contention, the Court simply found support for the "common use" limitation in the "historical tradition of prohibiting 'dangerous and unusual'" firearms. 534 U.S. at 627. *Heller* did not in any way create a second "not dangerous and unusual" hurdle for commonly owned firearms to overcome in order to be protected under the Second Amendment.

### III. Laws Imposing Restrictions on the Exercise of Core Second Amendment Right of Law Abiding Persons to Possess Firearms in Their Homes Are Subject to Strict Scrutiny.

Highland Park not only asks the Court to reject *Heller*, and the text and historical tradition approach, it incorrectly asserts that "the Seventh Circuit joined a number of other circuits in holding that an intermediate level of scrutiny should be applied" to laws restricting Second Amendment rights. (Def.'s Memo at 12.) Highland Park cites to *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) in support of its position, but in *Ezell* the court rejected intermediate scrutiny and instead applied a higher standard - "not quite strict scrutiny" - to a firing range ban that made it more difficult for law abiding persons to exercise their Second Amendment right to possess firearms. *See also Illinois Association of Firearms Retailers*, 961 F. Supp. 2d at 936 (strict scrutiny applied to law prohibiting retail firearm sales). The Seventh Circuit has only applied intermediate scrutiny to laws restricting the Second Amendment rights of *non-law abiding* citizens. *See United States v. Skoien*, 614 F.3d 638 (7th Circuit 2010) (persons convicted of domestic violence). In contrast, where the plaintiffs are "law abiding, responsible citizens" their Second Amendment rights are "entitled to full solicitude under *Heller*[.]" *Ezell*, 651 F.3d at 708.

The firing range ban in *Ezell* did not lie at the margin of Second Amendment protections, and neither does the Highland Park Ordinance. In fact, the Ordinance arguably lies closer to the core guarantee of armed self-defense in the home than the ordinance challenged in *Ezell*. The Ordinance does not just make it inconvenient to possess firearms (because local retail sales are prohibited) or more difficult to qualify to possess firearms (because local qualifying ranges are banned). The Ordinance does not merely prohibit possession at certain times or in certain places but not others. The Ordinance is a complete prohibition on possession of constitutionally-

protected firearms in the home. Outright bans on possession of commonly owned firearms by law abiding persons in their homes, if not categorically unconstitutional under *Heller*, are unconstitutional under a strict scrutiny analysis. *See Gowder v. City of Chicago*, 923 F.Supp.2d 1110, 1124 (N.D. Ill 2012) ("a regulation restricting the core Second Amendment right to keep arms for self-defense in the home … must be reviewed under a text, history, or tradition approach, or at least under strict scrutiny …."). [5]

Any attempt by Highland Park to characterize the Ordinance as similar to a content neutral time, place and manner restriction on speech should be rejected. The Ordinance is more akin to a content-based restriction under the First Amendment because it prohibits Highland Park residents from possessing constitutionally-protected firearms in their homes to defend themselves and their families. *See United v. Grace*, 461 U.S. 171, 177 (1983) (absolute prohibitions on a particular type of expression are subject to strict scrutiny). In the First Amendment context, "[t]he principal inquiry in determining content neutrality … is whether the government has adopted a regulation of speech because of disagreement with the message it conveys". *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, the inquiry is whether Highland Park enacted the Ordinance because of disagreement with choices made by law abiding persons to possess certain firearms in their homes for self-defense use. Highland Park fails this test. There is nothing neutral about Highland Park's view that the banned firearms are abnormally dangerous and "designed to kill human beings as quickly as possible[.]" (Def.'s

---

[5] The D.C. Circuit is the only federal appellate court to address the constitutionality of an "assault weapon" ban under *Heller*, and it did so on an incomplete record. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1262 (D.C. Cir. 2011). There, the court chose "intermediate rather than strict scrutiny [as] the appropriate standard of review" because, unlike in this case, the plaintiffs presented "hardly any evidence that semi-automatic rifles and magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport". *Id*. Had evidence of a burden on the core Second Amendment right been presented, the court seemed to leave open application of strict scrutiny.

Memo at 1.)

The Third, Fourth and Fifth Circuits have also recognized that strict scrutiny is appropriately applied to laws prohibiting possession of a class of firearms in the home by law abiding citizens. This view is not surprising because intermediate scrutiny is interest balancing, and *Heller* forbids interest balancing in cases involving prohibitions on possession of classes of commonly owned firearms. In *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010), the court applied intermediate scrutiny to a law criminalizing possession of a firearm with an obliterated serial number because the law "was neither designed to nor had the effect of prohibiting the possession of any class of firearms". In *United States v. Masciandaro*, 638 F. 3d 458, 470 (4th Cir. 2010), the court applied intermediate scrutiny to a law criminalizing possession of a firearm in a motor vehicle in a national park but noted that "any law that would burden the 'fundamental' core right of self-defense in the home by a law abiding citizen would be subject to strict scrutiny".

In *National Rifle Association of America v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 205 (5th Cir. 2012), the court held that federal law prohibiting sale of handguns to persons under the age of 21 was "consistent with a long standing, historical tradition" and fell outside Second Amendment protection. However, the court nevertheless conducted a mean-end analysis and recognized that "[a] law that burdens the core of the Second Amendment guarantee – for example, 'the right of law-abiding citizens to use arms in defense of hearth and home,' *Heller*, 554 U.S. at 635, would trigger strict scrutiny". [6]

---

[6] The decisions of other district courts addressing the constitutionality of "assault weapon" bans are not binding on this Court, and they are also unpersuasive. (*See* Def.'s Memo at 13.) In each case, the courts applied intermediate scrutiny, in part, because under the reasoning that other firearms remained available for self-defense in the home, and the bans did not "disarm individuals". *See, e.g.*, *Heller II*, 670 F.3d at 1262. This reasoning ignores the Supreme Court's

### IV. The Ordinance Does Not Survive Strict Scrutiny.

Laws that seriously encroach on the core Second Amendment right of law abiding citizens to arm themselves in their homes require the "an extremely strong public interest justification and a close fit between the government's means and its end." *Ezell*, 651 F.3d at 708-09. Again, Highland Park has not met its burden. There is no evidence establishing a "close fit" between possession of banned firearms in the homes of law-abiding persons and "public safety" in Highland Park.[7]

Highland Park's argument that the banned firearms are "disproportionately represented in criminal activity" is contradicted by its own witnesses. (Def.'s Memo at 10; *see also* SMF at ¶¶ 92, 93, 95 & 96.) And Highland Park's claim that statistical evidence shows "disproportionate" use of "assault weapons" in crime collapses when the source of the data is examined. The study relied on by Highland Park, a compilation and analysis of 38 studies addressing the use of "assault weapons" by criminals, was performed by Plaintiffs' expert witness, noted criminologist Gary Kleck. (SMF at ¶¶ 97-98; *see also* SAMF at ¶ 15 (KLECK, GARY, TARGETING GUNS (1997) pp. 110–128 and corresponding Table 4.1).)

The median percentage of crimes in which "assault weapons" of some type were used was found to be just 1.8 % across the 38 studies. (SMF Ex. 10 at ¶ 38.) Only two of the studies estimated that "assault weapons" were used in more than 4.3 % of crimes. The 8 % estimate on which Highland Park focuses was an outlier, and found unreliable because it did not examine a

---

admonition in *Heller* that "[i]t is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.* long guns) is allowed". 554 U.S. at 629. It is also "no answer to say" under *Heller* that commonly owned AR-15 rifles can be banned because Plaintiffs can possess commonly owned handguns.

[7]   "Not quite strict scrutiny" is indistinguishable from strict scrutiny, under which a law must be narrowly tailored to serve a compelling governmental interest. *See Siefert v. Alexander*, 608 F.3d 974, 981 (7th Cir. 2010).

representative sample of firearms used in crime. (*Id.*) Thus, the evidence is that Highland Park has banned firearms that are rarely used by criminals, who overwhelmingly prefer and use easily concealed and inexpensive handguns to commit their crimes. (SMF at ¶¶ 92, 96, 100-103.) It is grossly misleading for Highland Park to cite to Dr. Kleck's work and argue without elaboration that "as much 8 % of guns used in crime" are "assault weapons".

Highland Park's argument that "assault weapons" account for 16 percent of guns used to murder police officers is also misleading and not supported by the evidence. Highland Park's argument is based on a 1997 study by Roth and Koper of police shootings that occurred between 1992 and 1996. (SAMF at ¶¶ 10–11.) The study revealed that the percentage of police shootings known to have involved an "assault weapon" of some type in this five-year period was 5.5 %. (*Id.*) However, in 1994, there were an unusually high number of police shootings (76) and of the shootings in which the type of firearm was known (58), nine (12%) were found to have involved an "assault weapon" of some type. (*Id.*) The 16 % figure cited by Highland Park is not the percentage of all police shootings or even all police shootings in 1994 but only the percentage of the 1994 shootings in which the type of firearm had been identified, a subset of all police shootings that has not be verified as representative of all shootings that occurred that year. (*Id.*) Notably, of the 276 police shootings that occurred between 1992 and 1996, just three were known to have involved use of an AR-type rifle. (SMF at ¶ 39.)

Highland Park's central argument – fewer criminal shootings will occur if "assault weapons" are not available – is also not supported by evidence. Bans on possession of one type of firearm have not decreased crime rates for the simple reason that criminals easily substitute banned firearms for unbanned firearms. (SMF at ¶¶ 18 & 21.) And unbanned firearms in the hands of criminals are not only capable of inflicting the same number of injuries as banned

12

firearms, empirical evidence demonstrates that they have done so. (*Id*.)

Nowhere is Highland Park's argument more strained than its contention that a mass shooting is less likely to occur and will involve fewer injuries if law abiding persons are prohibited from possessing "assault weapons". Highland Park relies on a single study in support of its argument, *Analysis of Recent Mass Shootings* prepared by Mayors Against Illegal Guns ("MAIG Report"). However, the study reveals that in 88% of the shootings analyzed (82 of 93), mass shooters did not use an "assault weapon" to inflict mass casualties, they used other types of firearms, overwhelmingly handguns like other criminals. (*See* Doc. 26-11.) And even in the shootings in which an "assault weapon" was present or used, other types of firearms were almost always also present and used. (*Id*.)

Thus, Highland Park's argument that the firearms it has banned "have led … to tragedy… in incident and incident" is simply not supported by evidence. (Def.'s Memo at 2.) Mass shooting tragedies are caused by criminals who plan their crimes with the intention to shoot as many persons as they can, and they equip themselves with sufficient firearms and ammunition with which to do so. Any alleged causal connection between "assault weapons" and the occurrence of mass shootings or the number of persons injured is entirely spurious. (SMF Ex. 10 at ¶¶ 22-28.) [8]

---

[8] If a firearm's involvement in mass shootings were a justifiable basis on which to ban possession of the firearm in the homes of law abiding persons, a ban on handgun possession would arguably pass constitutional muster. Among the 78 incidents examined in the MAIG Report where the type of firearm used was known, 63 involved the use of a handgun. A ban on shotgun possession in the home would be justifiable, too. Shotguns were used in 12 incidents, more frequently than "assault weapons", which were used in just 11 incidents. In the 12 shotgun killings (Washington D.C.; Manchester; Herkimer; Aurora; Gilbert; Wagener; Oak Harbor; Jackson; Chicago; Bellville; Carthage; and Geneva County) an average of 12.3 persons were shot and 6.5 persons were killed. (*See* SOF Ex. G; Doc. 26-11.) Regardless of the numbers, a claim that there is a "close fit" between a ban on possession of any particular type of firearm in the home and the risk of a mass shooting is not supported by evidence or common sense.

The MAIG Report defined a "mass shooting" broadly as an incident in which at least four persons were killed, thus not limiting the crimes it examined to what most perceive a mass shooting to be – indiscriminate killings in a public place by a lone shooter. Included among the 11 shooting incidents in which "assault weapons" were present or used are seven incidents that do not fit the common perception: two gang retaliation shootings involving multiple gunmen (Boston and Washington, D.C.); three spree killings involving multiple locations and multiple firearms (Santa Monica, Geneva County and East Oakland); and two domestic killings of family members. (Osage and Albuquerque). (*See* SOF Ex. G.) The differences among the 11 shootings do not to diminish their tragic nature, but they do temper the inaccurate impression that every "mass shooting" referenced in the MAIG Report was the kind of random public shooting Highland Park fears, and is only possible with an "assault weapon" or large capacity magazines.

Indiscriminate, inexplicable mass shootings in public places – like what occurred in Newtown, Connecticut – are extraordinarily rare events, and when they occur the types of firearms and ammunition magazines used rarely dictate the outcome in terms of the number of persons killed or injured. (SMF Ex. 10 at ¶¶ 29–37.) For example, even though the Newtown shooter inflicted all of the casualties with an "assault weapon", he entered the school with two loaded handguns, 11 loaded handgun magazines and 191 rounds of 9mm and 10mm handgun ammunition. [9] If the shooter did not have an "assault weapon" in the school that morning, tragically, he would have been able to kill the same number of persons in the same amount of time with a different firearm. His lethal intent was the reason so many lives were lost, not his

---

[9] *See* SAMF at ¶ 16 (State of Connecticut, Department of Public Safety Investigation Report, pp. 25 – 29 from the *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School*, Office of the State's Attorney for the Judicial District of Danbury, November 25, 2013 (available at www.ct.gov/csao/lib/csao/compressed-sandy-hook-report.pdf).

choice of one firearm over another.

Evidence of a "close fit" between prohibition on possession of "assault weapons" and large capacity magazines by law abiding residents of Highland Park and public safety requires substantially more evidence than Highland Park has presented. More narrowly tailored alternatives to a complete ban on possession of these commonly owned firearms were certainly available but apparently not even considered by the City Council. At bottom, the firearms Highland Park has singled out and banned pose no greater risk to the public when possessed by law abiding persons in their homes than any other lawfully owned firearm. The Ordinance does not survive strict scrutiny. [10]

## CONCLUSION

Highland Park has imposed an unconstitutional burden on residents who choose to keep a firearm in their homes to defend themselves and their families by dictating what type of commonly owned firearm they may possess. Dr. Friedman and other residents of Highland Park have the same constitutional right to possess firearms for self-defense use as persons living elsewhere, and Highland Park is no different from other communities, all of which have schools, parks, shopping centers, and police forces to keep order. Highland Park has not demonstrated that its interest in protecting the public from crime is furthered by prohibiting law-abiding residents from possessing firearms in their homes that are owned and used for lawful purposes by millions of persons throughout the United States. Plaintiffs' Second Amendment rights have been violated by Highland Park, and the Ordinance should be declared unconstitutional.

---

[10] Because of the lack of connection between possession of "assault weapons" by law abiding persons and the occurrence of firearms-related crimes of all types, Plaintiffs submit that the Ordinance would not survive any level of heightened scrutiny.

Respectfully submitted,

/s/ James B. Vogts
James B. Vogts
Andrew A. Lothson
Brett M. Henne
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com
bhenne@smbtrials.com
alothson@smbtrials.com

**Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE**

I, James B. Vogts, hereby certify that on the 21st day of July, 2014, I caused to be served a copy of the foregoing document on all counsel of record listed below, via the Court's ECF system and/or by U.S. Mail.

1. Christopher B. Wilson
   Perkins & Coie LLP
   131 S. Dearborn Street
   Suite 1700
   Chicago, IL 60603
   (312) 324- 8400
   Email:  cwilson@perkinscoie.com

2. Christopher J. Murdoch
   Holland & Knight, LLP
   131 South Dearborn Street
   30th Floor
   Chicago, IL 60603
   (312) 263-3600
   Email: chris.murdoch@hklaw.com

3. Hart M. Passman
   Holland and Knight, LLP
   131 South Dearborn
   30th Floor
   Chicago, IL 60603
   (312) 578-6634
   Email: hart.passman@hklaw.com

4. Steven M. Elrod
   Holland & Knight, LLP
   131 South Dearborn Street
   30th Floor
   Chicago, IL 60603
   (312) 263-3600
   Email: steven.elrod@hklaw.com

                                                /s/  James B. Vogts
                                                  James V. Vogts