IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Arie S. Friedman, M.D. and the Illinois State Rifle Association,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>City Of Highland Park,<br><br>　　　　　　　Defendant. | Case No.　13-cv-9073<br><br>Hon. John W. Darrah |

**<u>DEFENDANT CITY OF HIGHLAND PARK'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE CERTAIN STATEMENTS OF MATERIAL FACTS SUBMITTED BY DEFENDANTS</u>**

In their Motion to Strike, Plaintiffs challenge 21 of the 74 Statements of Fact that Highland Park has submitted.  Plaintiffs challenge some of these facts on multiple grounds.  As set forth in more detail below, however, none of these challenges have merit.  Plaintiffs' Motion to Strike should be denied in its entirety.  First, the term "assault weapons" is defined in detail by the Highland Park Ordinance and is nearly identical to the definition used by Cook County, as well as the United States Congress under the federal Assault Weapons Ban.  Second, Mayor Rotering's discussion of the tragic incident involving Laurie Dann is highly relevant to both Highland Park's decision to restrict assault weapons and Plaintiffs' constitutional challenge to that decision.  Finally, the expert affidavits of Paul Shafer, Chief of Police for the City of Highland Park, and James Yurgealitis and Mark Jones, both long-time veterans of the federal Bureau of Alcohol, Tobacco, Firearms & Explosives are competent and well-supported statements of expertise that meet all of the requirements of Rules 702 and 703 of the Federal Rules of Evidence.

I.      **The Term "Assault Weapon" is Defined Extensively by the Ordinance**.

Plaintiffs' contention that the term "assault weapon" is not defined is confusing as a threshold matter. Highland Park's Ordinance No. 68-13 is titled "An Ordinance Amending Chapter 134 of "The Highland Park Code of 1968," as Amended, Regarding **Assault Weapons."** (emphasis added). The five-page Ordinance then consists of nearly three full pages of definitions of the term "assault weapon" as well as a list of many examples of specific weapons which fall under those definitions. Highland Park's Ordinance is also nearly identical to the Blair Holt Assault Weapons Ban adopted by Cook County on November 14, 2006. (A copy of the Highland Park Ordinance was attached to Defendant's Statement of Undisputed Material Facts. For convenience, Defendants have attached another copy of the Highland Park Ordinance as Exhibit A herein.)

The Highland Park and Cook County Ordinances modeled their definitions upon similar sections of the federal Assault Weapons Ban, which restricted the sale and manufacture of these weapons nationally from 1994 through 2004. In *Wilson v. County of Cook*, 968 N.E.2d 641, 649-653, 2012 WL 112026 (Ill. S. Ct. April 5, 2012), the Illinois Supreme Court described the federal Assault Weapons Ban in more detail:

> [I]n 1994, after a series of hearings on the subject of semiautomatic assault weapons over a five-year period, Congress enacted the Violent Crime Control and Law Enforcement Act, Pub.L. 103–322, 108 Stat. 1796 (codified at 18 U.S.C. §§ 921, 922 (1994)), including a ban on the possession of "semiautomatic assault weapons" and "large capacity ammunition feeding devices" not lawfully possessed as of the date of the enactment. 18 U.S.C. §§ 921(a)(30), (a)(31), 922(v), (w) (1994). **The law defined a "semiautomatic assault weapon" in several different ways, including a specific list of banned firearms or "copies or duplicates" of those firearms. In addition to banning weapons by name, the law banned other semiautomatic rifles, pistols and shotguns that possessed two or more specific characteristics that the legislature found were designed for military applications and that distinguished the firearms from traditional sporting weapons or those useful for self-defense.** 18 U.S.C. § 921(a)(30)(A)–(D) (1994).

968 N.E.2d at 645 (emphasis added).  In *Wilson*, the Illinois Supreme Court also went on to note specifically:

> Congress found these features [of assault weapons] were combat-designed features that enabled shooters to discharge high numbers of bullets rapidly in a "spray fire" fashion while maintaining control of the firearm, creating enhanced lethality. H.R.Rep. No. 103–489, at 18–20 (1994), reprinted in 1994 U.S.C.C.A.N. 1820, 1826–27. The law also specifically exempted a list of 661 firearms by make and model that the legislature found were most commonly used in hunting and recreational sports. 18 U.S.C. § 921, app. A (1994).

968 N.E.2d at 645.  Thus, the definition of an assault weapon is defined at length in the Highland Park Ordinance.  In addition, this definition of a semi-automatic weapon including a detachable magazine and other characteristics "designed for military applications" has been part of the general legislative vocabulary for more than 20 years.  Plaintiffs' challenge defies logic let alone the law.[1]

One possible explanation for the Plaintiffs' illogical attack on the definition of "assault weapons" is the Illinois Supreme Court's ruling in *Wilson*.  There, the Court denied a challenge to Cook County's Assault Weapon Ordinance which asserted that the term "assault weapon" was unconstitutionally vague.  968 N.E.2d at 649-653.  Given the Illinois Supreme Court's ruling, Plaintiffs here do not and cannot challenge the identical definition in the Highland Park Ordinance on similar constitutional grounds.  Instead, Plaintiffs are attempting to challenge in a

---

[1] Plaintiffs' reliance on Justice Thomas' dissent in *Stenberg v. Carhart*, 530 U.S. 915 (2000) is particularly baffling. That case had nothing to do with assault weapons or Second Amendment rights whatsoever.  In *Stenberg*, the Supreme Court struck down restrictions on certain *abortion* procedures which the Court held interfered with the right to privacy.  In his dissent, Justice Thomas noted in a footnote that the majority referred to the medical procedure "dilation and evacuation" rather than the Plaintiffs' preferred but more politically-charged term "partial birth abortion."  *Id.* at 1001 n. 16.  He then cited a Stanford Law Review article which contains the language quoted by Plaintiffs about assault weapons.  (The language was from the article, not Justice Thomas.)  Justice Thomas was asserting, however, the opposite of Plaintiffs' contention.  The fact that someone objects to a particular term does not mean it does not have a given meaning.  Since 1994, assault weapons have developed a very clear meaning.  As Justice Thomas asserted, the fact that Plaintiffs object to the term "assault weapon" is not a basis for not using that term.

Motion to Strike what they could not challenge on vagueness grounds. This court should reject that procedural gambit.

The term "assault weapons" is extensively defined in the Highland Park Ordinance. Highland Park's Undisputed Material Facts referencing that term are neither argumentative nor misleading. Facts 9, 25, 26, 28, 29, 30, 31, 34, 51, 54, 56, 60 and 62 should all be deemed admitted as a matter of law.

**II.    The Tragic School Attack by Laurie Dann is Highly Relevant to Highland
        Park Decision to Ban Assault Weapons.**

In her sworn declaration, Highland Park Mayor Nancy Rotering described some of the deliberations of the Highland Park City Council during its consideration of a ban on assault weapons.

> The City Council also expressed its concern that the recent mass shooting tragedies in Aurora, Colorado, Newton, Connecticut, Tucson, Arizona and Santa Monica, California, could occur in Highland Park, unless proper public safety measures are taken. As Mayor, and as a mother of four, I am particularly concerned about preventing a school shooting similar to the massacre at Sandy Hook Elementary School in Newtown. That is what was on my mind throughout our consideration of the Ordinance: how unlikely an assault weapon massacre was in Newtown and how similar our communities are. I could not shake the thought that we could just as easily be those panicked and grief-stricken parents. In a similar vein, I wrote a letter to the Mayor of Aurora, Colorado, in the wake of their gun-related tragedy, empathizing with the agony his community was experiencing.

Rotering Declaration at 9, (attached as Exhibit A to Statement of Undisputed Material Facts.)

Mayor Rotering then went on to recall the devastating events caused by Laurie Dann in 1988.

As Highland Park Chief of Police, Paul Shafer described these events in his declaration:

> During the morning of May 20, 1988, Laurie Dann entered the Ravinia Elementary School in the City, and attempted to detonate a bomb in the school's hallway. Nobody was injured by Dann at the Ravinia School. However, later that day, Dann would shoot six students at an elementary school in the adjacent Village of Winnetka, killing one eight-year-old boy.

(Shafer Declaration at 12, attached as Exhibit B to Statement of Undisputed Material Facts.)

In her declaration, Mayor Rotering also recalled those events and their impact on her decision to support the ban on assault weapons:

> Lastly, the tragedy that occurred when Laurie Dann attempted to ignite an incendiary device at one of our Highland Park elementary schools, then went on a shooting rampage at another school in nearby Winnetka was also on my mind. My concern for how vulnerable our schools and schoolchildren are played into our need to pass the Ordinance.

Rotering Decl. at 9. Mayor Rotering was noting that the mass shooting in the Sandy Hook elementary school in Newtown, Connecticut was not a remote tragedy, but unfortunately similar to events which had occurred in Highland Park and its neighboring community in 1988. Plaintiffs' contention that Laurie Dann was not armed with an assault weapon misses this point entirely. If Laurie Dann had obtained an assault weapon, the tragic events in Winnetka could have been far, far worse. Beyond this, Highland Park did not have an abstract connection to school violence, but a real and painful one based on actual experience.

The events involving Laurie Dann are potentially relevant to this Court's decision as both a legal and factual matter. Under the two-prong standard established by the Seventh Circuit in *Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir.2011), if the court determines that Plaintiffs' Second Amendment rights are implicated by the Highland Park Ordinance, "then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* at 703. *See also Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*). Mayor Rotering and the City Council's consideration of the Laurie Dann incident and its connection to a possible ban on assault weapons would be directly relevant to this consideration of Highland Park's justification for its decision under this second prong of the analysis.

Accordingly, there is no basis for Plaintiffs' Motion to Strike Defendants' Statement of Fact Number 24.

**III.    Defendants' Experts in Law Enforcement Have Properly Supported Their Conclusions on Factual Issues.**

Highland Park has submitted three experts in law enforcement to support its ban on assault weapons:  Paul Shafer, the Highland Park Chief of Police, James Yurgealitis, a 26-year veterant of the federal Bureau of Alcohol, Tobacco, Firearms & Explosives ("BATF"), and Mark Jones, also a career agent of the BATF, who also served as an officer in the Glencoe Police Department, and is currently a member of the University of Chicago Crime Lab.  For their part, Plaintiffs have not offered a single member of law enforcement to challenge Highland Park's Ordinance.[2]  Because Plaintiffs' challenge to Highland Park's experts misunderstands both the Rules of Evidence and the factual support for their conclusions, Plaintiffs' Motion to Strike portions of their factual assertions should be dismissed as a matter of law.

**A.    Federal Rules of Evidence 702 and 703 Do Not Bar Statements of Fact**

Plaintiffs assert that the Court's 'gatekeeper authority" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702 along with Fed. R. Evid. 703 should act as a bar to more than a dozen Statements of Fact supported by the declarations of Highland Park's experts.  Not surprisingly, though, Plaintiffs do not cite to single case in which the Federal Rules of Evidence have been used to strike statements of fact in this manner.  The case law establishes the opposite:  Highland Park's experts have provided highly relevant and admissible information to the Court.

---

[2] Plaintiffs five experts are:  James Supica, the Director of Museums for the National Rifle Association; David Lombardo, a firearms trainer; James Cucuruto, the Director of Research for a firearms industry trade association; Gary Kleck, a Professor of Criminology at Florida State University; and Gary Roberts, a dentist in private practice in California.

As the Court is well aware, Rule 703 provides in full:

**Bases of an Expert's Opinion Testimony**

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. **If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.** But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate  the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis added).  By its express terms, Rule 703 applies only to matters to be submitted to a jury.  As the Seventh Circuit has noted:  "Rule 703 effectively recognizes that distinction in limiting the admissibility of such evidence only as to juries." *Ambrose v. Roeckman,* 749 F.3d 615, 621 (7th Cir. 2014).  Where the court is the trier of fact, "it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose." *Id.* Even when expert information is presented to a jury, an expert may rely upon hearsay or the conclusions of other experts.  *U.S. v. Rollins*, 862 F.2d 1282 (7th Cir. 1988); *Nachtscheim v. Beech Aircraft Corp.*, 847 F.2d 1261 (7th Cir. 1988).  Thus, Plaintiffs challenges to the expert conclusions of Paul Shafer, James Yurgealities and Mark Jones are all misplaced to the extent Plaintiffs complain of reliance on hearsay, particularly given that the case is before the court rather than a jury.

Plaintiff reliance on *Daubert* and Rule 702 is similarly misplaced.  As Rule 702 provides:

**Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

      (b)     the testimony is based on sufficient facts or data;

      (c)     the testimony is the product of reliable principles and methods; and

      (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. But Plaintiffs have not established that any of the facts submitted are flawed in any way. At most, Plaintiffs contend that their experts would have asserted conflicting information. Yet, this is grounds for cross-examination, not a basis for striking material facts. *See e.g. Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796 (7th Cir. 2013)(reversing trial court's decision to bar statistical evidence as an abuse of discretion where court challenged conclusions reached by experts rather than the underlying data supporting those conclusions).

None of the facts supported by Chief Shafer, Mr. Yurgealitis nor Mr. Jones are proper subjects of a motion to strike. As described in more detail below, each of Plaintiffs' contentions as to these experts should be denied as a matter of law.

**B.    Highland Park's Chief of Police is Competent to Testify about Assault Weapons**

Paul S. Shafer has been the Chief of Police for the City of Highland Park since July 2003. He has more than 35 years in law enforcement in the Chicago area, beginning as a patrol officer in Bellwood in 1979, and then serving as a Commander and Captain in the Naperville Police Department for more than twenty years. In addition to his extensive law enforcement experience, Chief Shafer also described his own decision to request that Highland Park purchase assault weapons for use by its police officers in special situations. As set forth in his Declaration:

In 2013, due to the nationwide increase in active shooter incidents, I requested that the City Council approve the use of .223 rifles by members of the Department. I believe that these rifles, **which are assault weapons,** are necessary for law enforcement, because (a) the rifles are more accurate at longer distances; and (b) the ammunition for these rifles can penetrate a suspect's body armor. To my knowledge, every municipal police department in the vicinity of the City deploys .223 rifles for its officers.

Shafer Decl. at 22 (emphasis added). Despite Chief Shafer's extensive law enforcement

background and his particular experience with assault weapons, Plaintiff have challenged the

following six facts set forth in his declaration:

> 25. Assault weapons are not designed for self-defense, but are instead designed for combat situations which include rapid fire, the possibility of multiple targets, and a need for increased magazine capacity to engage multiple targets. These factors are not typically present when a firearm is required for defense of a home. (Shafer Declaration, ¶16)

> 26. Assault weapons are not appropriate for hunting. Hunting strategy requires a weapon to accurately kill an animal humanely, preferably with one shot. Accordingly, the magazine capacity is generally much smaller. Large magazines and rapid-fire capability of assault weapons exceed these hunting requirements. (Shafer Declaration, ¶17)

> 27. By way of example, the AR-15 assault weapon (the civilian version of the military M-16) was not designed as a hunting weapon; it was designed for use by the military in combat situations. (Shafer Declaration, ¶18)

> 28. The Highland Park Chief of Police determined that residents did not need assault weapons to adequately protect themselves, their families, or their properties. If required, there were numerous other types of firearms available and legal for possession by City residents that would serve the intended self-defense purposes. (Shafer Declaration, ¶19)

> 30. Assault weapons typically have many features that are specifically designed to allow the user to shoot multiple targets in a shorter time period than conventional firearms that are designed for self-defense. (Shafer Declaration, ¶19)

> 31. The presence of assault weapons in the City would increase the probability that shooting incidents could involve multiple victims. (Shafer Declaration, ¶20)

Each of these facts, however, is clearly based on Chief Shafer's extensive law enforcement

experience and personal knowledge of the capabilities of assault weapons. Plaintiffs have not

established that he would not be a credible and reliable witness on these issues. Notably,

Plaintiffs chose not to depose Mr. Shafer during expert discovery and therefore do not have any

basis for challenging his expertise. Plaintiffs should not be allowed, though, to waive discovery

and then use their lack of knowledge to assert a lack of expertise. Accordingly, Plaintiffs Motion

to Strike Facts 25, 26, 27, 28, 30, and 31 should be denied.

### C. A 26-Year Law Enforcement Agent is a Reliable Expert on Firearms and Assault Weapons.

Plaintiffs attack two relatively straightforward statistics offered by one of Highland

Park's other expert witnesses, James Yurgealitis. In his sworn declaration, Mr . Yurgealitis

describes his credentials as follows:

> I am currently Self Employed as a Legal and Forensic Consultant providing
> Criminal Case Reviews, Forensic Case Reviews and Technical Firearms
> Consulting, Testing and Training Services to Corporations, Legal Counsel and the
> Public Sector. During my previous 26 year career as a Federal Law Enforcement
> Officer I have been recognized, and testified as, an expert witness in numerous
> local, state and federal courts. I have toured numerous firearms and ammunition
> manufacturer's facilities both in the United States and overseas. I maintain a
> personal library of firearms and ammunition related books and periodicals and
> maintain contact with other recognized experts in the field. My final assignment
> in government service was as Senior Special Agent/Program Manager for
> Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives
> (ATF), U.S. Department of Justice, a position I held for nine (9) years. During
> that time I was responsible for all Bureau firearms and forensic firearms related
> training and research at the ATF National Laboratory Center in Ammendale,
> Maryland.

Yurgealitis Decl. at 1. Mr. Yurgealitis supported a series of material facts, including the

following facts addressing the number of assault weapons in the United States:

### Prevalence of Assault Weapons

54. It is difficult to determine how many assault weapons Americans currently
own, in large part because most firearm manufacturers refuse to release data
tracking their sales. The declarations filed in support of the plaintiffs' complaint
in this matter focus on the number of semi-automatic rifles manufactured in the
United States, but we know that a great many of these end up in Mexico.
(Yurgealitis Declaration, ¶35)

55. The NRA's lobbying arm estimates that, depending upon the definition of
assault weapon, assault weapons represent 15% of all semi-automatic guns owned
in the U.S., which in turn represent about 15% of all firearms owned in the U.S.
(Yurgealitis Declaration, ¶35)

> 56. According to 2004 national firearms survey conducted by Hepburn, Miller, Azreal and Hemenway, there are approximately 218 million privately owned firearms in the U.S. Based on the NRA's statistics, therefore, there are approximately 4,905,000 assault weapons in the U.S. While this number is not insignificant, in my opinion it does not support the claim that assault weapons are 'in common use'. (Yurgealitis Declaration, ¶36)

Plaintiffs have moved to strike Fact Nos. 55 and 56 on the basis that they are hearsay. Yet, as Plaintiffs are forced to admit Rule 703 specifically provides: "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Thus, the Seventh Circuit has recognized that hearsay is an improper objection to an expert's testimony under Rule 703. *See U.S. v. Rollins*, 862 F.2d 1282 (7th Cir. 1988).

Plaintiffs Motion to Strike Fact Nos. 55 and 56 also fails for two additional reasons. First, as the stated facts make clear, Mr. Yurgealitis relied upon data from the National Rifle Association in reaching his conclusions. Since one of Plaintiffs' stable of industry experts was the Director of Museums for the NRA, it is at least highly likely that Plaintiffs had access to this data or should have found a way to do so.[3] Second, Plaintiffs can hardly be heard to complain of data from the National Rifle Association as unreasonable or unreliable.

At most, Plaintiffs have offered grounds on which to challenge the facts asserted by Mr. Yurgealitis. This does not constitute, however, a basis for striking those facts altogether. Accordingly, Plaintiffs Motion to Strike Facts No. 55 and 56 should be denied.

---

[3] Plaintiffs' contention that Mr. Yurgealitis did not bring a printout of the NRA webpage on which he relied to his deposition is similarly misplaced. Mr. Yurgealitis provided extensive footnotes to all the material referenced in his Declaration and Plaintiffs' counsel had copies of all relevant reports, studies and other references. Plaintiffs have cited no rule nor case law requiring experts to maintain copies of every website upon which they may rely.

**D.      Highland Park's Evidence on Mass Shootings is Admissible and Reliable.**

Finally, Plaintiffs move to strike a series of facts supported by Highland Park's expert

Mark Jones, a career agent of the BATF and a Law Enforcement Advisor to the University of

Chicago Crime Lab.  Specifically, Plaintiffs move to strike the following six facts concerning

mass shooting events in the United States.

<u>**Use of Assault Weapons in Mass Shootings**</u>

57.  Mass shootings alone resulted in at least 519 deaths and scores of injuries
between 2009 and 2013.  (Jones Declaration, ¶37)

58.  The recent study by Mayors Against Illegal Guns (MAIG) shows that of the
93 examples occurring between January 2009 and September 2013 at least 14
semi-automatic or fully automatic assault weapons were recovered from the
suspects; in those incidents, 151% more casualties resulted and 63% more deaths
occurred that in incidents involving other types of guns.   (Jones Declaration, ¶11)

59.  The MAIG Report cited does not include the September 20, 2013 mass
shooting at Cornell Park in Chicago wherein a subject wielding a Kalashnikov
style semi-automatic assault rifle wounded 13 victims in just a few seconds.
(Jones Declaration, ¶11)  (A copy of the MAIG Report is attached as Ex. G.)

60.  For example, Adam Lanza used an assault weapon legally purchased by his
mother to shoot his way into a locked elementary school building in Newtown,
Connecticut in 2012. In ten minutes, he killed 26 people and wounded two others.
He discharged his weapon at least 130 times in less than eight minutes. Newtown
Police responding to the first 911 call were on the scene in less than four minutes.
(Jones Declaration, ¶12)

61.  According to the Federal Bureau of Investigation, the frequency of active
shooter events has doubled between 2009 and 2013, as compared to the period
2000 to 2008. The FBI defines an "active shooter event" as "an individual
actively engaged in killing or attempting to kill people in a confined and
populated area, typically through use of a firearm." The events considered in the
FBI's study were limited to those where the shooter attempted to kill multiple
people in an area occupied by multiple unrelated individuals where at least one
victim was unrelated to the shooter.  (Jones Declaration, ¶13)

62.  Moreover, assault weapons are used in a disproportionately high number of
shootings of law enforcement officers. For example, although assault weapons

represented somewhere between 1 and 8% of guns used in crime in 1994, they accounted for 16% of gun murders of police officers.  (Jones Declaration, ¶14)[4]

63.  Statistically, rifles and shotguns, known collectively in the vernacular as "long guns", are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes.  Yet when they are used the carnage that results is stunning, the two most recent examples being 29 casualties in Newtown, Connecticut (December 2012) and 70 in Aurora, Colorado (July 2012) for a total of 99 dead and wounded in just those two 2012 incidents.  (Jones Declaration, ¶38)

To support these conclusions, Mr. Jones relied in part on a Report by Mayors Against Illegal Guns from September 2013.  (A copy of this Report was attached as Exhibit G to Highland Park's Statement of Undisputed Material Facts.  For convenience, a copy is attached to this Response as Exhibit B.)

Plaintiffs attack these facts on the ground that Mr. Jones has no "expertise in statistics or critical interpretation of criminological data."  Pl. Mot. to Strike at 9.  But the summary of the Mayors Against Illegal Guns Report did not require this level of statistical work.  As a review of the report makes clear, the facts are entirely supported.  The computation by Mr. Jones were simple arithmetic.  As Plaintiffs admit, there have indeed been 93 mass shooting events since 2009.  *Id.* at 8.  In those events, 14 involved weapons which would have been excluded by the Highland Park Ordinance.  In those 14 events, the deaths and casualties were extraordinarily higher than in the other 79 events.

Plaintiffs cannot challenge this simple math.  Even if they could, this hardly is grounds to strike the facts preferred by Mr. Jones, a career agent of the BATF and a Law Enforcement Advisor to the Chicago Crime Lab.  At most, it would grounds for cross-examination, impeachment, or testimony by a competing expert.  Plaintiffs have not identified any appropriate

---

[4] Although Plaintiffs assert in their Caption Heading that they are moving to strike Fact Nos. 61 and 62, they offer no basis for doing so, and do not refer again to these facts in their concluding sentence which only refers to the other five.  In an abundance of caution, Highland Park treats them as if they have all been part of the same argument, although there is no discussion of Facts 61 and 62 nor their alleged insufficiencies.

grounds for striking these facts as a matter of law. Accordingly, Plaintiffs Motion to Strike Facts Nos. 57, 58, 59, 60, 61, 62, and 63 should be denied.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Defendant, the City of Highland Park requests an order of this Court denying Plaintiffs' Motion to Strike Defendant's Statements of Material Fact Nos. 9. 24. 25. 26. 27. 28. 29, 30, 31, 34, 51, 54, 55, 56, 57, 58, 59, 60, 61, 62, and 63. Each of those facts is relevant, properly supported, and complies with Rules 702 and 703 of the Federal Rules of Evidence.


DATE:  August 6, 2014                         CITY OF HIGHLAND PARK


                                              By:  /s/ Christopher B. Wilson
                                                   One of Its Attorneys

Christopher B. Wilson, ARDC No. 06202139
Perkins Coie LLP
131 South Dearborn Street, Suite 1700
Chicago, IL  60603
Telephone:  (312) 324-8400
Fax:  (312) 324 - 9400
Cwilson@perkinscoie.com

Steven M. Elrod
Christopher James Murdoch
Hart M. Passman
Holland & Knight, LLP
131 South Dearborn Street
30th Floor
Chicago, Illinois 60603
(312) 263-3600
Steven.elrod@hklaw.com
Chris.murdoch@hklaw.com
Hart.passman@hklaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher B. Wilson, an attorney, certify that on August 6, 2014, I caused the

foregoing **DEFENDANT CITY OF HIGHLAND PARK'S RESPONSE IN OPPOSITION**

**TO PLAINTIFFS' MOTION TO STRIKE CERTAIN STATEMENTS OF MATERIAL**

**FACTS SUBMITTED BY DEFENDANTS**  to be  filed pursuant to the Court's CM/ECF

system and served via the Court's CM/ECF System on the following:


James B. Vogts
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com

Brett Michael Henne
Swanson, Martin & Bell, LLP
1860 West Winchester Road
Suite 201
Libertyville, IL  60048
(847) 949-0057
bhenne@smbtrials.com

Andrew Arthur Lothson
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
alothson@smbtrials.com

Alexander David Marks
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue
22nd Floor
Chicago, IL  60611
(312) 840-7000
amarks@burkelaw.com


 _/s/ Christopher B. Wilson_____