# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Arie S. Friedman, M.D. and the Illinois State Rifle Association, | |
| Plaintiffs, | Case No. 13-cv-9073 |
| v. | Hon. John W. Darrah |
| City Of Highland Park, | |
| Defendant. | |

## **DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS**

Defendant, the City of Highland Park, responds to Plaintiffs Arie S. Friedman, M.D. and

the Illinois State Rifle Association Rule 56.1 Statement of Material Facts follows:

1.      Arie S. Friedman, M.D. ("Friedman is an adult resident of Highland Park, Illinois. He is a law abiding citizen, who is lawfully entitled to own and possess firearms under all applicable Federal and State laws and regulations. (Verified Complaint, Doc. 1 -1, ¶ 1.)

**RESPONSE:  Highland Park admits that Dr. Friedman is an adult resident of**

**Highland Park, Illinois.  Plaintiff has submitted no information, other than his Verified**

**Complaint, regarding which weapons or firearms he owns, the purpose of those weapons or**

**firearms, nor his lawful standing to own and possess such weapons or firearms.  Highland**

**Park, therefore, lacks information to admit or deny the remainder of the paragraph.**

2.      Prior to the effective date of Highland Park City Code § 136.001 *et seq*. (the "Ordinance"), Friedman owned and possessed firearms and ammunition magazines in his home for lawful purposes, including the defense of his home and his family.  (Verified Complaint, Doc. 1 - 1, ¶¶ 1 and 4.)  In order to comply with the Ordinance, Friedman removed firearms from his home in Highland Park.  (*Id.*)

**RESPONSE: Plaintiff has submitted no information, other than his Verified Complaint, regarding which weapons or firearms he owns, the purpose of those weapons or firearms or his lawful standing to own and possess such weapons or firearms. Plaintiff has also not submitted any information of any kind concerning his compliance with the Highland Park Ordinance. Highland Park, therefore, lacks information to admit or deny the remainder of the paragraph.**

3.      The Illinois State Rifle Association ("ISRA") is non-profit educational foundation incorporated under the laws of Illinois, with its principal place of business in Chatsworth, Illinois. (Verified Complaint, Doc. 1-1, ¶ 2.) The ISRA has more than 30,000 members residing in Illinois, including many residing in Highland Park. (*Id.*) The purposes of the ISRA include the protection of the rights of citizens to keep and bear arms for the lawful defense of their families, persons and property, and to promote public safety and law and order. (*Id.*)

**RESPONSE: Plaintiffs have not submitted any additional information concerning the Illinois State Rifle Association other than that provided in their Verified Complaint and Highland Park therefore lacks information sufficient to admit or deny this paragraph.**

4.      The City of Highland Park ("Highland Park") is a municipal corporation located in Lake County, Illinois. (Verified Complaint, Doc. 1-1, ¶ 3). Highland Park is governed by a Mayor and an elected six-member City Council, which is empowered to enact ordinances under its home rule authority. (*Id.*)

**RESPONSE: Admitted.**

5.      Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief seeks redress for a violation of the Second Amendment to the United States Constitution. This Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1343(a). Venue is proper under 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

**RESPONSE: Highland Park admits that Plaintiffs' Verified Complaint asserts claims for violations of the Second Amendment. The balance of this paragraph asserts legal arguments for which no response is required.**

6.      Highland Park City Code Section 136.001 *et seq.* (attached as Exhibit 1) prohibits law-abiding citizens from possessing in Highland Park a category of firearms defined as "assault weapons". City Code § 136.005.

**RESPONSE: Admitted.**

7.      Among the firearms defined as "assault weapons" under the Ordinance are semi-automatic rifles that have the capacity to accept a "large capacity magazine" (detachable or otherwise) and have one or more of five features: (1) only a pistol grip without a stock attached; (2) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (3) a folding telescoping or thumbhole stock; (4) a shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or (5) a muzzle brake or muzzle compensator. City Code § 136.001(C)(1).

**RESPONSE: Admitted.**

8.      A "large capacity magazine" is defined under the Ordinance as any ammunition feeding device with the capacity to accept more than ten rounds, excluding (1) a feeding device that has been permanently altered so that it cannot accommodate more than ten rounds; (2) a .22 caliber tube ammunition feeding device; and (3) a tubular magazine that is contained in a lever-action firearm. City Code § 136.001(G).

**RESPONSE: Admitted.**

9.      Included within the definition of "assault weapons" under the Ordinance are specifically designated rifles (or copies or duplicates thereof), including all AR-type rifles, all AK-type rifles and certain carbine rifles, including the Hi-Point carbine and the Sturm, Ruger Mini-14 rifle. City Code § 136.001(C)(7).

**RESPONSE: The Highland Park Ordinance includes an illustrative list of rifles covered by the Ordinance. The Ordinance further defines at § 136.001(C)(1) the design**

**elements of a rifle which would subject it to the Ordinance. The Ordinance does not, however, reference "all AR-type rifles."**

9. (*sic*) A "muzzle brake" is defined under the Ordinance as a device attached to the muzzle of a firearm that utilizes escaping gas to reduce recoil. City Code § 136.001(H).

**RESPONSE: Admitted.**

10. A "muzzle compensator" is defined under the Ordinance as a device attached to the muzzle of a firearm that utilizes escaping gas to control muzzle movement. City Code § 136.001(I).

**RESPONSE: Admitted.**

11. The rifles banned under the Ordinance are semi-automatic firearms, not fully automatic firearms. (Exhibit 2 at ¶¶ 3-5 - Affidavit of James W. Supica, Jr.) Semi-automatic firearms fire only one round when the trigger is pulled, as is the case with most other types of firearms, including revolvers and bolt-action, lever action, pump or slide action, and single shot firearms. (*Id.*; and Exhibit 3 at ¶ 15 and Exhibit E thereto (video demonstration) - Affidavit of David A. Lombardo.)

**RESPONSE: Highland Park admits that the Ordinance bans certain types of semi-automatic firearms. "When comparing the rate of fire (cyclic rate) of a "Federally regulated, fully automatic machine gun and a semi-automatic AR15-type rifle, the difference is minimal." (Declaration of Mark Jones, Defendant's Statement of Undisputed Material Facts, Exhibit D, at 16.) Highland Park denies that the functionality of the semi-automatic weapons banned under the Ordinance is similar to "revolvers and bolt action, lever action, pump or slide action and single shot firearms."**

12. Semi-automatic firearms use some of the energy of the fired cartridge to move a fresh cartridge into firing position. (Exhibit 2 at ¶ 6.) The semi-automatic nature of semi-automatic firearms is in reference to their self-loading capability and not the manner in which they are fired. (*Id.*).

**RESPONSE: Highland Park admits that semi-automatic weapons use energy to load additional cartridges for firing and, as a result, these weapons are capable of firing extremely rapidly. In the Newtown, Connecticut mass shooting, for example, Adam Lanza, armed with a Bushmaster XM 15 - EM25 semi-automatic rifle, discharged his weapon at least 130 times in less than 8 minutes. (Jones Decl. at `12.) Highland Park denies Plaintiffs self-serving and unsupported definition of "semi-automatic firearms.**

13. Semi-automatic firearms have been manufactured and commonly used for lawful civilian purposes for well over a century. (Exhibit 2 at ¶ 4.)

**RESPONSE: While certain semi-automatic firearms have been available for many years, the relative popularity of the type of assault weapons defined under the Highland Park Ordinance is a very recent event. Of the approximately 5 million AR and AK type rifles manufactured between 1990 and 2012, Plaintiffs estimate that approximately 3.5 million were manufactured in the five years from 2008 to 2012. (See Deposition of James Cucuruto, pp. 43-44 and Exhibit 2). In 1990, for example, only 43,000 rifles of this type were manufactured in the United States. *Id.***

14. Semi-automatic rifles are sold by their manufacturers with magazines of various capacities, typically 5, 10, 20 or 30 rounds. (Exhibit 3 at ¶ 6.)

**RESPONSE: Highland Park admits that semi-automatic rifles are sold with various magazine capacities.**

15. Examples of semi-automatic rifles sold with magazines having a capacity of 10 rounds or less include models of the Smith & Wesson M & P 10 (an AR-type rifle sold with 5 and 10 round magazines); the Remington Model R-15 Predator and Varmint (AR-type rifles sold with 5 round magazines); and the Bushmaster Hunter, Predator and Varminter rifles (AR-type rifles sold with 5 round magazines). (Exhibit 3 at ¶ 5.)

**RESPONSE: Highland Park admits that semi-automatic rifles are sold with various magazine capacities.**

16. Historically, firearm development goals have largely been the same for civilian, military and law enforcement firearms, from the earliest period of firearms design until today – to safely, accurately and reliably discharge rounds. (Exhibit 2 at ¶ 7.) Improvements made in military firearms have been routinely adopted for civilian firearms. (*Id*.; and Exhibit 4 at p. 199 – Deposition of Mark D. Jones (Highland Park expert witness).)

**RESPONSE: Improvements in many technologies, including firearms, have been developed from military applications. (Deposition of Mark D. Jones at p. 199). "Assault weapons, rifles or pistols, fully or semi-automatic, are designed to be used in an offensive role." (Jones Decl. at 44). "Numerous assault weapons available for purchase by the public are, save the lack of selective fire capability, identical copies of military firearms. As such they retain a number of features originally designed to maximize their effectiveness in battle." (Declaration of James Yurgealitis at 32).**

17. The wood-stocked bolt-action rifle, used by hunters for generations, gained popularity among civilians following World War I, where it was the battlefield rifle. (Exhibit 2 at ¶ 7.) After the U.S. military began using the semi-automatic rifle during World War II, a wide range of semi-automatic rifles gained popularity among civilians. (*Id*.) Semi-automatic rifles built on the AR-platform for civilian use were developed in the early 1960's based on the M-16 rifle used by U.S. forces in Viet Nam. (*Id*.; Exhibit 4 at pp. 199-200.)

**RESPONSE: See Response to No. 16, above.**

18. Military forces around the world since the end of World War II have primarily used selective-fire rifles as standard service rifles. (Exhibit 2 at ¶ 8.) A selective-fire rifle has the ability to fire both fully automatic, meaning it continues to fire with a single trigger pull as long as the trigger is held back, or a burst of multiple rounds with each pull of the trigger, as well as semiautomatic, meaning a separate pull of the trigger is required for each shot. (*Id*.)

**RESPONSE: Admitted.**

19.     The semi-automatic rifles banned under the Ordinance are not military firearms. (Exhibit 2 at ¶ 8.)

RESPONSE:  "Numerous assault weapons available for purchase by the public are, save the lack of selective fire capability, identical copies of military firearms.  As such they retain a number of features originally designed to maximize their effectiveness in battle." (Declaration of James Yurgealitis at 32).

20.     Historically, there is no such thing as a "semi-automatic assault weapon." (Exhibit 2 at ¶ 9.)

RESPONSE:  Semi-automatic firearms such as those defined in the Highland Park Ordinance have long been classified as assault weapons.  Most notably the Federal Assault Weapons Ban, 18 U.S.C. § 922(v)(i), established by Congress in 1994, which elapsed in September 2004, defined certain semi-automatic firearms as "assault weapons."

21.     In its July 6, 1989 Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles, the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") stated with regard to semi-automatic rifles that "it is somewhat of a misnomer to refer to these weapons as assault rifles.  True assault rifles are selective fire weapons that will fire in a fully automatic mode".  (Exhibit 5 at pp. 5-6 – Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles.)

RESPONSE:  The ATF Working Group discussion occurred prior to the 1994 Federal Assault Weapons Ban, 18 U.S.C. § 922 (v)(i), and is therefore irrelevant and immaterial.

22.     The National Shooting Sports Foundation ("NSSF") is the trade association for the firearms industry.  Its mission is to promote, protect and preserve hunting and the shooting sports.  The NSSF has a membership of more than 10,000 manufacturers, distributors, firearm retailers, shooting ranges, sportsmen's organizations and publishers.  (Exhibit 6 at ¶ 1 – Affidavit of James Curcuruto.)

**RESPONSE: Highland Park admits that the NSSF is a trade association that purports to represent the firearms industry.** **While it purports to have 10,000 members, less than 100 are voting members. (Deposition of James Cucuruto, pp. 18-20.)**

23. The NSSF has estimated that from 1990 to 2012, approximately 5,128,000 AR-type rifles were manufactured for domestic sale in the United States by 50 manufacturers. (Exhibit 6 at ¶ 4.)

**RESPONSE: Highland Park admits that NSSF has created such an estimate of domestically manufactured AR-type rifles for the period 1990 to 2012.** **That estimate is highly unreliable as a measure of domestic use of these firearms. (Yurgealitis Decl. at 35.)**

24. The NSSF has estimated that from 1990 to 2012, approximately 3,415,000 AR- type and AK-type rifles have been imported into the United States. (Exhibit 6 at ¶ 4.)

**RESPONSE: Highland Park admits that the NSSF has also created an estimate of imported rifles for the period 1990 to 2012.** **That estimate is also highly unreliable as a measure of domestic use of these firearms. (Yurgealitis Decl. at 35.)**

25. The NSSF has estimated that more than 4.8 million persons in the United States own at least one AR-type or AK-type semi-automatic rifle. (Exhibit 6 at ¶ 4.)

**RESPONSE:** **The NSSF estimate is based on a flawed methodology and unreliable survey data and its therefore improper. (Declaration of Gretchen Cusick at 12).**

26. The NSSF has estimated that approximately 3,457,230 AR-type rifles were manufactured for domestic sale in the United States from 2008 to 2012. (Exhibit 6 at ¶ 5.)

**RESPONSE: Highland Park admits that the NSSF has also created an estimate of domestically manufactured rifles for the period 2008 to 2012.** **That estimate is also highly unreliable as a measure of domestic use of these firearms. (Yurgealitis Decl. at 35.)**

8

27. According to ATF Annual Firearms Manufacturing and Export Reports ("AFMER Reports"), 30,433,751 firearms of all types were manufactured in the United States for domestic sale from 2008 to 2012. (Exhibit 6 at ¶ 5.)

**RESPONSE: Admitted.**

28. Based on the NSSF's estimate of the number of AR-type rifles that were manufactured in the United States for domestic sale from 2008 to 2012 (3,457,230) and AFMER Reports setting forth the number of firearms of all types manufactured in the United States for domestic sale from 2008 to 2012 (30,433,751), 11.4 percent of all firearms manufactured in the United States for domestic sale from 2008 to 2012 were AR-type rifles. (Exhibit 6 at ¶ 5.)

**Response:** The NSSF estimate is based on a flawed methodology and unreliable survey data and its therefore improper. (Declaration of Gretchen Cusick at 12).

29. The NSSF's estimate of the number of AR-type rifles manufactured in the United States for domestic sale from 2008 to 2012 (3,457,230) exceeds the number of revolvers manufactured in the United States for domestic sale during the same years (2,637,348). (Exhibit 6 at ¶ 5.)

**RESPONSE:** The NSSF estimate is based on a flawed methodology and unreliable survey data and its therefore improper. (Declaration of Gretchen Cusick at 12).

30. The NSSF's estimate of the number of AR-type rifles manufactured in the United States for domestic sale (3,457,230) nearly equals the number of shotguns manufactured in the United States for domestic sale during the same years (3,719,444). (Exhibit 6 at ¶ 5.)

**RESPONSE:** The NSSF estimate is based on a flawed methodology and unreliable survey data and its therefore improper. (Declaration of Gretchen Cusick at 12).

31. An on-line survey conducted by the NSSF of retail firearm dealers revealed that 92.5 percent of those responding stocked AR-type rifles for sale in 2012. (Exhibit 6 at ¶ 8.) In The NSSF retail firearms dealer survey indicated that 20.3 percent of all new firearms sold by survey respondents in 2012 was an AR-type rifle. (*Id*.)

**RESPONSE:** The NSSF estimate is based on a flawed methodology and unreliable survey data and its therefore improper. (Declaration of Gretchen Cusick at 12).

32.     AR-type rifles are accurate, reliable and easy to reload.  (Exhibit 3 at ¶ 4.)

**RESPONSE:  Assault weapons, such as the AR-type rifles as defined in the Highland Park Ordinance. are not designed for self-defense, but are instead designed for combat situations which include rapid fire, the possibility of multiple targets, and a need for increased magazine capacity to engage multiple targets.  (Declaration of Paul Shafer at 16).  Assault weapons typically have many features that are specifically designed to allow the user to shoot multiple targets in a shorter time period than conventional firearms that are designed for self-defense.  (*Id.* at 19)  As a result, prior to enacting the Ordinance, Highland Park concluded that "The presence of assault weapons in the City would increase the probability that shooting incidents could involve multiple victims."  (*Id.* at 20).**

33.     AR-type rifles are generally lighter in weight, shorter in length and have less recoil than traditionally-styled wooden stock rifles.  (Exhibit 3 at ¶ 4.)

**RESPONSE:  The term "generally" as used by Plaintiffs is vague and ambiguous. Highland Park agrees that some AR-type rifles, but not all, are lighter in weight, shorter in length and/or have less recoil than wooden stock rifles.**

34.     The popularity of AR-type rifles is also based their modular design.  (Exhibit 3 at ¶ 3.)  They have an upper receiver into which the barrel is mounted and a lower receiver that holds the firing assembly and onto which the butt stock and lower grip are mounted.  (*Id.*)  The two receivers can be dismounted allowing for mounting of a different barrel and use of different rifle cartridges to suit different purposes, including target matches, home defense and small and large game hunting.  (*Id.*)

**RESPONSE:  Highland Park agrees that some AR-type rifles have a modular design.  Highland Park is without knowledge as to the purchasing decisions of individual gun owners.  David Lombardo, a firearms instructor, has not been and cannot be presented**

10

as an expert in firearms purchasing or marketing and is unqualified to offer evidence on these issues.

35.     The popularity and common ownership of AR-type rifles in the civilian marketplace is evident to persons who are involved in or regularly observe the community of persons who own and use firearms. (Exhibit 3 at ¶ 5.) AR-type rifles are regularly observed on firearms ranges in Illinois and are the most commonly used rifle over the past five to ten years. (*Id*.). Based on their substantial presence at industry trade shows where products are displayed, the market for AR-type rifles appears to be a growing firearms market segment. (*Id*.; Exhibit 7 at p. 58-59 & 64 – Deposition of James C. Yurgealitis (Highland Park expert witness).)

RESPONSE: Mr. Yurgealitis agreed at his deposition that "there was a substantially greater presentation of AR-type rifles from product manufacturers" at the NSSF SHOT show from 2003 to 2010.  He further stated "I think every time I went there there was another manufacturer stepping into that market."  (Plaintiffs' Ex. 7 at pp. 58-59.)  Mr. Yurgealitis also has stated that assault weapons constitute approximately 2 to 2.5 percent of the overall firearms market.  (Yurgeaitis Decl. at 35.)

36.     In recent years there has been an increase in the popularity and availability of semiautomatic firearms patterned after those initially designed for military purposes. (Exhibit 7 at pp. 63-64.) Gun stores cannot get enough AR-type rifles and they sell very quickly. (*Id*. at pp. 64-65.) They are popular because of reliability and functionality. (*Id*. at p. 65.)

RESPONSE:  Highland Park admits that there has been a recent surge in popularity of these weapons and that for a variety of reasons they appear to be selling quickly.  "A great many of these weapons end up in Mexico" as part of illegal gun trafficking.  (Yurgealitis Decl. at 35.)

37.     An effective home defense firearm is one that will reliably incapacitate a hostile person in a life threatening situation and stop him from continuing his actions. (Exhibit 8 at ¶ 3 – Affidavit of Dr. Gary Roberts.)

11

**RESPONSE:** Dr. Gary Roberts is a dentist in private practice in Palo Alto, California. He also claims to have an expertise in "wound ballistics." Dr. Roberts is not qualified, however, to offer opinions on "an effective home defense firearm." Mark Jones, a career agent of the Bureau of Alcohol Tobacco & Firearms, a former officer in the Glencoe Police Department, and a current member of the University of Chicago Laboratory has stated, however, "To tout the semi-automatic assault weapon as the best or even second best tool for home defense is specious and disingenuous." (Jones Decl. at 46)

38.     The perfect home defense firearm is a firearm which the operator is familiar with and can operate easily. (Exhibit 7 at pp. 153-154.)

**RESPONSE:** Plaintiffs have paraphrased a portion of Mr. Yurgealitis' Deposition Transcript. The answer is full reads:

> Q.     Do you believe that in selecting a firearm and the ammunition for use in that firearm for home defense purposes should in part be dependent upon the amount of recoil that that firearm and ammunition presents and the amount of noise that that firearm and ammunition presents to the homeowner?
>
> A.          I wouldn't say that the noise should necessarily be a consideration. I think the overall – look at it more – I have to look at it more on a – like the sum of its parts again. The comfort level of the operator and their level of training and their ability to accurately place a shot is a combination of a lot of – a lot of criteria.
>
>          If it's a deadly force situation, your hearing will come back. Noise, if it upsets you or you're shocked by it, then perhaps you need to look at a different type of firearm if it's that much of a criteria, but it all comes down to familiarity, ease of operation in a high stress situation, for me at least, and the ability to, you know, put that little piece of metal that comes out of the end of the barrel in the right spot on a bad person when they're coming after you when you pull the curved piece of metal underneath the receiver, and if you can do that reliably and accurately and easily in a high stress situation, that combination to me is the perfect home defense weapon.
> Plaintiffs Ex. 7, pp. 153-54.

39.     A safe home defense firearm is one that minimizes danger to innocent persons in the home.  (Exhibit 8 at ¶ 3.)

**RESPONSE:**  Dr. Gary Roberts is a dentist in private practice in Palo Alto, California.  He also claims to have an expertise in "wound ballistics."  Dr. Roberts is not qualified, however, to offer opinions on "a safe home defense firearm."  Mark Jones, a career agent of the Bureau of Alcohol Tobacco & Firearms, a former officer in the Glencoe Police Department, and a current member of the University of Chicago Laboratory has stated, however, "To tout the semi-automatic assault weapon as the best or even second best tool for home defense is specious and disingenuous."  (Jones Decl. at 46)

40.     An AR-type rifle is a firearm appropriately chosen for home defense purposes from the standpoint of both effectiveness and safety.  (Exhibit 3 at ¶ 4; Exhibit 8 at ¶ 8.)

**RESPONSE:**  Dr. Gary Roberts is a dentist in private practice in Palo Alto, California.  He also claims to have an expertise in "wound ballistics."  Dr. Roberts is not qualified, however, to offer opinions on "an effective home defense firearms."  Mark Jones, a career agent of the Bureau of Alcohol Tobacco & Firearms, a former officer in the Glencoe Police Department, and a current member of the University of Chicago Laboratory has stated, however, "To tout the semi-automatic assault weapon as the best or even second best tool for home defense is specious and disingenuous."  (Jones Decl. at 46)

41.     Most AR-type rifles are chambered for .223 ammunition, a relatively inexpensive rifle cartridge that has sufficient power to stop a home intruder but loses velocity and momentum relatively quickly after passing through walls and other objects, thus decreasing the risk that an errant shot inadvertently strikes a family member in a home defense situation.  (Exhibit 3 at ¶ 4; Exhibit 8 at ¶¶ 4-8.)

**RESPONSE:** This purported statement of fact conflicts directly with the conclusion of Defendant's Expert Mark Jones. Mr. Jones has stated: "Rifles and shotguns, known collectively in the vernacular as 'long guns' are also not optimal for home defense because they are challenging to manipulate in the close confines found in homes; the overall length of many rifles, even those with folding or collapsible shoulder stocks, renders them unwieldy and hard to maneuver. Rifles are far more powerful than necessary or desirable for most home defense uses -- the velocity of widely available standard military surplus ammunition for AR15 rifles is more than 3000 feet per second and the projectile contains a steel penetrator that greatly increases the possibility of innocents being injured or killed by missed shots or ricochets. (Jones Decl. at 63, 68-69.)

42. Ammunition heavier than .223 ammunition, such as most large caliber ammunition used in pistols and revolvers, retains greater momentum after penetrating walls and other structures than .223 ammunition despite having slower velocities. (Exhibit 8 at ¶ 4.)

**RESPONSE:** Reference to the caliber of ammunition is meaningless without also considering the amount of power in the cartridge, whether the bullet is hollow or solid, and the muzzle velocity of the weapon to be used. All of these in combination will determine the amount of penetration of a given projectile. (Jones Decl. at 69)

43. Twelve gauge 00 Buckshot fired from a shotgun will penetrate an interior wall and put innocent bystanders at risk to virtually the same extent as large caliber handgun ammunition. (Exhibit 8 at ¶ 4.) Both 00 Buckshot and large caliber handgun ammunition will penetrate after passing through an interior wall more than twice as far as a .223 round. (*Id*.)

**RESPONSE:** Dr. Roberts, a dentist in private practice, purports to have studied the effects of certain caliber ammunition on simulated human flesh. Dr. Robert has not

14

provided any basis to extrapolate from this limited experience to the interior walls of homes. Mr. Jones has stated, however, that there is no current regularly used home construction that would prevent penetration by any modern firearms cartridge, rifle, pistol or shotgun. (Jones Decl. at 46.)

44. The correct choice of ammunition by a civilian for use in a potential self-defense encounter should be based on the same criteria relied on by law enforcement: reliable incapacitation while minimizing danger to innocent bystanders. (Exhibit 8 at ¶ 3.)

RESPONSE: Law enforcement officers face different risks, duties and challenges than homeowners. Law enforcement officers also receive extensive training in firearms far beyond that of citizens generally. Any comparison, therefore, is flawed. Law enforcement officers and citizens, however, share a common interest in minimizing danger to innocent bystanders. (See Deposition of Mark Jones and James Yurgealitis.

45. The Federal Bureau of Investigation and others with expertise in wound and terminal ballistics believe that well designed .223 ammunition offers ideal penetration characteristics with less risk of over penetration than typical handgun and shotgun ammunition. (Exhibit 8 at ¶ 7.)

RESPONSE: At Paragraph 7 of his Declaration, Dr. Roberts states that the FBI has studied the effects of .223 caliber ammunition, but he does not provide any citation or attach any documents to support this contention. Because there is no support for his contention, Highland Park denies the statement.

46. In 2012, the Department of Homeland Security issued specifications to purchase 7,000 AR-type rifles chambered for .223 ammunition for use as personal defense weapons "suitable for use in close quarters". (Exhibit 8 at ¶ 6.)

RESPONSE: The 2012 Department of Homeland Security specifications provide:

15

**"DHS and its components have requirement for a 5.56x45mm NATO, select fire firearm suitable for personal defense use in close quarters and/or when maximum concealment is required."  Plaintiffs' Exhibit 8, Exhibit C.**

47.    The Chicago Police Department makes AR-type rifles chambered for .223 ammunition available for police officer use "to enhance officer safety in high threat situations" and when an officer "reasonably believes that he or she may soon confront a threat that may require use of deadly force".  (Exhibit 8 at ¶ 6.)

**RESPONSE:  Plaintiffs refer specifically to the Chicago Police Department's "Police Carbine Operator Program."  That document states in more complete part:**

> **The Police Carbine Operator Program is provided to enhance the Department's ability to protect the lives, property, and rights of all people, to maintain order, and to enforce the laws impartially.   Additionally, the program enhances officer safety in high-threat confrontations involving heavily armed or multiple offenders, active shooting incidents, and violent offenders who are utilizing body armor, shielding, or distances beyond pistol range.**
> **Plaintiffs' Ex. 7, Ex. C at II.A.**

**The Police Carbine Operator Program also requires additional training for police officers:  "To ensure compliance with the Police Carbine Operator Program, Bureau of Patrol exempt members will ensure that any members within their command whose duties include handling carbines attend the Carbine Familiarization Course."  *Id.* at IV.**

**Thus, this document and the Chicago Police Department Program confirms that AR-type rifles require special training even when used by law enforcement and that they are appropriate for active shooters who are heavily armed or wearing body armor.  Or at distances beyond pistol range.  This does not describe, to say the least, the typical home burglary.**

48.     The NSSF published a Modern Sporting Rifle (MSR) Comprehensive Consumer Report ("MSR Survey") in 2103.  (Exhibit 6 at ¶ 6.)  The purpose of the MSR Survey was to gather information for use by NSSF members in their businesses, including demographic information on persons owning AR-type and AK-type rifles (collectively "modern sporting rifles") and information related to consumer purchasing decisions and product use.  (*Id*.)

**RESPONSE:**  The NSSF survey which relied upon solicited internet responses rather than random telephone numbers is based upon a flawed methodology and is therefore unreliable.  (Cusick Decl. at 12)  Plaintiffs own expert on survey data, Gary Kleck, agreed that internet survey of this nature are unreliable absent significant safeguards which are not followed here.  (Kleck Deposition at pp. 90-92.)

49.     Because there is no database of modern sporting rifle owners, the NSSF solicited consumer participation in the MSR Survey through banner advertisements on various websites, blogs and e-newsletters geared toward firearms ownership and hunting.  (Exhibit 6 at ¶ 6.)

**RESPONSE:**  The NSSF survey which relied upon solicited internet responses rather than random telephone numbers is based upon a flawed methodology and is therefore unreliable.  (Cusick Decl. at 12)  Plaintiffs own expert on survey data, Gary Kleck, agreed that internet survey of this nature are unreliable absent significant safeguards which are not followed here.  (Kleck Deposition at pp. 90-92.)

50.     Online responses to the MSR Survey were received from 21,942 owners of modern sporting rifles.  (Exhibit 6 at ¶ 6.)  The typical person responding to the MSR Survey was 35+ years old, married and had some college education.  (*Id*.)  Three out of every four modern sporting rifles recently purchased by MSR Survey respondents were chambered for .223 ammunition.  (*Id*.)  The average price paid by MSR Survey respondents for their modern sporting rifles was $1,058.  (*Id*.)

**RESPONSE:**  The NSSF survey which relied upon solicited internet responses rather than random telephone numbers is based upon a flawed methodology and is

therefore unreliable. (Cusick Decl. at 12) Plaintiffs own expert on survey data, Gary Kleck, agreed that internet survey of this nature are unreliable absent significant safeguards which are not followed here. (Kleck Deposition at pp. 90-92.)

51.     Persons responding to the MSR Survey ranked accuracy and reliability as the most important reasons for purchasing their modern sporting rifles. (Exhibit 6 at ¶ 7.) Other reasons cited by survey respondents for their purchase of modern sporting rifles included ergonomics, low recoil, ease with which they can be shot and their light weight. (*Id.*)

RESPONSE: The NSSF survey which relied upon solicited internet responses rather than random telephone numbers is based upon a flawed methodology and is therefore unreliable. (Cusick Decl. at 12) Plaintiffs own expert on survey data, Gary Kleck, agreed that internet survey of this nature are unreliable absent significant safeguards which are not followed here. (Kleck Deposition at pp. 90-92.)

52.     MSR Survey respondents ranked recreational target shooting highest among seven reasons for owning a modern sporting rifle. (Exhibit 6 at ¶ 7.) Use of a modern sporting rifle for home defense was ranked by survey respondents as the second highest reason for owning a modern sporting rifle. (*Id.*) Varmint hunting ranked fourth. (*Id.*) Other reasons for owning a modern sporting rifle included collecting, competition shooting, big game hunting and professional use/job related. (*Id.*)

RESPONSE: The NSSF survey which relied upon solicited internet responses rather than random telephone numbers is based upon a flawed methodology and is therefore unreliable. (Cusick Decl. at 12) Plaintiffs own expert on survey data, Gary Kleck, agreed that internet survey of this nature are unreliable absent significant safeguards which are not followed here. (Kleck Deposition at pp. 90-92.)

**Beyond this, assault weapons such as the AR-type rifle, are not appropriate for hunting. Large magazines and rapid-fire capability of assault weapons exceed the requirements needed for successful and humane hunting. (Shafer Decl. at 17)**

53.     Of those responding to the MSR Survey, 56% indicated that they use a 30 round magazine in their most recently purchased modern sporting rifle. (Exhibit 6 at ¶ 6.) Magazines capable of holding more than 10 rounds of ammunition were used by 83% of those responding to the survey. (*Id*.) Research demonstrates that of the approximately 158 million magazines in consumers' possession in the United States, approximately 75 million or 46% are capable of holding more than 10 rounds of ammunition. (*Id*. at ¶ 10.)

**RESPONSE:     The NSSF survey which relied upon solicited internet responses rather than random telephone numbers is based upon a flawed methodology and is therefore unreliable. (Cusick Decl. at 12) Plaintiffs own expert on survey data, Gary Kleck, agreed that internet survey of this nature are unreliable absent significant safeguards which are not followed here. (Kleck Deposition at pp. 90-92.)**

**The NSSF's estimate of the total number of large capacity magazines is based entirely on the guess work of James Cucuruto. At his deposition, Mr. Cucuruto admitted that he relied upon simply the impressions and speculation of his boss, the President of the NSSF, to estimate the total number of large capacity magazines in use and that this was not based in any way on any empirical research. As such, it should be disregarded by the Court. (Cucuruto Deposition at pp. 108-119)**

54.     From January 2013 through May 5, 2014, 779 persons enrolled in Home Protection and Concealed Carry Seminars and NRA Basic Pistol classes in northern Illinois were surveyed by the instructor and asked to identify the type of firearm they owned for personal protection. (Exhibit 3 at ¶ 7). Of those completing the survey, 58.2% indicated that they keep a semi-automatic rifle with a detachable magazine available for personal protection. (*Id*.)

19

**RESPONSE:** **Plaintiffs' Expert, David Lombardo, submits that he is an Illinois Certified Firearms Instructor. (Exhibit 3 at 1). He contends that in this capacity, he conducted a survey of his students in "NRA Basic Pistol Classes" and "Home Protection and Concealed Carry Seminars." He submits that his results indicated that 25 percent of his students answered "none of the above" to the question of what firearm they used for personal protection. This seems to indicate that Mr. Lombardo provided a list of choices to his students. He does not provide the survey, nor the methodology, so any conclusions are difficult to draw. Mr. Lombardo states that 58.2 percent of his students "indicated that they keep a semi-automatic rifle with a detachable magazine available for personal protection. When combined with those answering "none of the above," this leaves at most 16.8 percent of Mr. Lombardo's students who kept a handgun -- the quintessential self-defense weapon according the *District of Columbia v. Heller*, 544 U.S. 570, 629 (1980) -- and considered the most popular firearm in the United States. In fact, given that by Plaintiffs own estimates only 2 to 2.5 percent of the weapons in use are semi-automatic rifles, Mr. Lombardo's claims are highly unlikely based on the other information produced in this case.**

55. According to the FBI's Supplementary Homicide Reports, an average of 430 burglary-related homicides occurred each year from 2003 and 2007. (Exhibit 9 at p. 10 – U.S. Department of Justice, Bureau of Justice Statistics, *Victimization During Household Burglary.*)

**RESPONSE: Admitted.**

56. The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 1,025,520 household burglaries were committed each year from 2003 and 2007 when a household member was present. (Exhibit 9 at p. 9, Table 16.) On average, approximately

2,809 burglaries were committed each day from 2003 to 2007 when a household member was present. (*Id.*)

        **RESPONSE: Admitted.**

57.      The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 266,560 household members became victims of violent crime each year from 2003 to 2007 during the commission of a burglary. (Exhibit 9 at p. 9, Table 17.) On average, approximately 730 burglaries were committed each day from 2003 to 2007 in which a household member became a victim of a violent crime. (*Id.*)

        **RESPONSE:** ==**Highland Park's rate of violent crime is far below these reported national averages. Since 2008, there have been only two reported home invasions during which the residents of the home were present. (Shafer Decl. at 9)**==

58.      The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 114,620 household members were confronted by an armed intruder each year from 2003 to 2007 during the commission of a household burglary. (Exhibit 9 at p. 10, Table 18.) On average, approximately 314 burglaries were committed each day from 2003 to 2007 in which a household member was confronted by an intruder with a weapon. (*Id.*)

        **RESPONSE:** ==**Highland Park's rate of violent crime is far below these reported national averages. Since 2008, there have been only two reported home invasions during which the residents of the home were present. (Shafer Decl. at 9)**==

59.      The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 22,278 persons were sexually assaulted each year from 2003 to 2007 during the commission of a household burglary. (Exhibit 9 at p. 9, Table 15.) On average, approximately 61 burglaries were committed each day from 2003 to 2007 in which a household member became a victim of a sexual assault. (*Id.*)

        **RESPONSE:** ==**Highland Park's rate of violent crime is far below these reported national averages. Since 2008, there have been only two reported home invasions during which the residents of the home were present. (Shafer Decl. at 9)**==

60.     The U.S. Department of Justice, Bureau of Justice Statistics has reported that an average of 48,269 persons were victims of aggravated assault each year from 2003 to 2007 during the commission of a household burglary.  (Exhibit 9 at p. 9, Table 15.)  On average, approximately 132 burglaries were committed each day from 2003 to 2007 in which a household member became a victim of an aggravated assault.  (*Id*.)

**RESPONSE:**  Highland Park's rate of violent crime is far below these reported national averages.  Since 2008, there have been only two reported home invasions during which the residents of the home were present.  (Shafer Decl. at 9)

61.     A national survey of adults residing on the lower 48 states in 1993 determined that there are approximately 2.2 to 2.5 million defensive gun uses by civilians annually.  (Exhibit 10 at ¶ 10 – Affidavit of Gary Kleck.)

**RESPONSE:**  Dr. Kleck's 1993 survey data is flawed and highly unreliable.  (Cusick Decl. at 19-23).  These survey results have never been replicated, even by Dr. Kleck.  They are likely to be the result of several phenomena which lead to overstating the results.  These include telescoping, which occurs when respondents are asked to recall events over too long a time period and recall events which occurred before the period under review.  Dr. Kleck also admitted in his deposition that his telephone interviewers flagged many situations where the interviewer had doubts about the respondent's answers but that those doubts were never recorded in the survey results.  (Kleck Deposition at pp. 76-80).  As Dr. Cusick noted, however, a change of one-half of one-percent in Dr. Kleck's survey results would make the numbers twice as high as the true number.  (Cusick Decl. at 20).  A number of commentators, including most notably David Hemenway of Harvard University, have thoroughly criticized Dr. Kleck's research and analysis on "defensive gun uses."  (See

==David Hemenway, __Private Gun, Public Health__ attached as Exhibit L to Defendant's Rule==

==56.1 Statement of Undisputed Material Facts.==

62.     The NSSF published a Sports Shooting Participation in the United States report in 2012 ("Shooting Participation Report") (Exhibit 6 at ¶ 9.)

**RESPONSE:  Admitted.**

63.     The purpose of the Shooting Participation Report was to communicate the results of a telephone survey of 8,335 randomly selected adults, which was designed to determine regional and national participation rates in target shooting and sport shooting.  (Exhibit 6 at ¶ 9.)

**RESPONSE:  Highland Park does not have any information concerning the purpose of the Shooting Participation Report.  ==The Shooting Participation Report, however, is based upon a flaw research methodology and is therefore unreliable.  (Cusick Decl. at 12)==**

64.     The Shooting Participation Report indicated that approximately 11,977,000 persons participated in target shooting with a modern sporting rifle in 2012.  (Exhibit 6 at ¶ 9.)

**RESPONSE:  Highland Park does not have any information concerning the purpose of the Shooting Participation Report.  ==The Shooting Participation Report, however, is based upon a flaw research methodology and is therefore unreliable.  (Cusick Decl. at 12)==**

65.     Defendant's expert witness, James C. Yurgealitis, owns a Colt Model 60-29 AR-type rifle.  (Exhibit 7 at p. 27-28.)  Yurgealitis taught his teenage daughter to fire the rifle, and they both use the rifle for target shooting.  (*Id*. at pp. 34-35.)  Yurgealitis' AR-type rifle is equipped with a telescoping stock, a pistol grip, a barrel shroud and a protruding grip.  (*Id*. at pp. 31 & 106.)  He owns a number of 20 and 30 round magazines for the rifle.  (*Id*. at p. 33.)  Yurgealitis finds his AR-type rifle accurate, reliable and easy to operate.  (*Id*. at pp. 35-36, 40.)

**RESPONSE:  ==Mr. Yurgealitis, as a retired agent of the Bureau of Alcohol, Tobacco, Firearms & Explosives, would be exempt under Sec. 136.006(B) of the Highland Park Assault Weapons Ordinance.  He further testified that he stores his weapons safely in a==**

manner that would comport with the Ordinance. *Id.* As a former federal agent, Mr. Yurgealitis also has extensive training in these firearms.

66. AR-type rifles are also used in the very popular "3 Gun" shooting competitions, the fastest growing shooting sport in the country, in which shooters use a pistol, a shotgun and an AR-type rifle to move through different stages and engage different targets from a variety of positions. (Exhibit 3 at ¶ 8.)

RESPONSE: Highland Park admits that these "3 Gun" shooting competitions may be popular. Highland Park is not aware that any such competition has ever been held within the City of Highland Park.

67. AR-type rifles are also commonly used for small game hunting because they are accurate, reliable and easy to handle. (Exhibit 3 at ¶ 8.) In Illinois, it is legal to use "any type of legal rifle including large capacity semi-automatic rifles" to hunt coyotes (www.dnr.illinois.gov/hunting/documents/hunttrapdigest.pdf). In many other states, they are used for hunting varmints and small game of various kinds, as well as wild boar. (Exhibit 3 at ¶ 7.)

RESPONSE: "Assault weapons are not appropriate for hunting. Hunting requires a weapon to accurately kill an animal humanely, preferably with one shot. Accordingly, the magazine capacity is generally much smaller. Large magazines and rapid-fire capability of assault weapons exceed these hunting requirements." (Shafer Decl. at 17). By way of example, the AR-15 assault weapon (the civilian version of the military M-16) was not designed as a hunting weapon, it was designed for use by the military in combat situations." (*Id.* at 18)

68. Defendant's expert witness, Mark D. Jones, owned an AR-15 rifle chambered for .223 ammunition and equipped with a 20 round magazine, which he used to hunt prairie dogs. (Exhibit 4 at p. 56.) Others with whom Jones hunted prairie dogs also used AR-type rifles. (*Id.* at p. 57.) Jones currently owns a Norinco SKS Type 56 (AK-type) rifle, which is banned under the Ordinance. (*Id.* at p. 54.)

**RESPONSE:** **Mr. Jones, as a retired agent of the Bureau of Alcohol, Tobacco, Firearms & Explosives, would be exempt under Sec. 136.006(B) of the Highland Park Assault Weapons Ordinance. He further testified that he stores his weapons safely in a manner that would comport with the Ordinance.** *Id.* **As a former federal agent, Mr. Jones also has extensive training in these firearms.**

69. The rifle features that Highland Park has banned – pistol grips; folding; telescoping and thumbhole stocks; barrel shrouds; protruding grips; muzzle breaks; and muzzle compensators – are each integral to the safe handling of an AR-type rifle. (Exhibit 3 at ¶ 9.)

**RESPONSE: These features may make the weapon safer to operate.** **They may also make the weapon easier to conceal (Yurgealitis Decl, at 33). They also allow the rifle to be fired more rapidly and therefore make the rifle more lethal.** *Id.* **at 45-46.**

70. The presence of one of the individual rifle features that Highland Park has banned – pistol grips; folding, telescoping and thumbhole stocks; barrel shrouds; protruding grips; muzzle breaks; and muzzle compensators – does not make a rifle more dangerous than a rifle without them. (Exhibit 3 at ¶ 9; Exhibit 7 at pp. 120-121.)

**RESPONSE:** **Mr. Jones testified that the combination of these features make them more dangerous. Each of these features must be coupled with the capacity to accept a "Large Capacity Magazine" in order to fall within the Ordinance. Plaintiffs' Ex. 1, Sec. 136.001(C)(1).**

71. Telescoping stocks on AR-type rifles are fairly common. (Exhibit 7 at p. 104.)

**RESPONSE: Admitted.**

72. Telescoping or adjustable stocks are present on AR-type rifles to enable the shooter to adjust the rifle's length to fit his or her physical stature. (Exhibit 3 at ¶ 10.)

**RESPONSE:** ==The telescoping stock also makes a rifle easier to conceal. (Yurgealitis Decl. at 33.)==

73.     If a rifle's stock is too short for the shooter, a right handed person will tend to pull shots to the left, and if the stock is too long, shots will go low and to the left. (Exhibit 3 at ¶ 10.)

**RESPONSE: Admitted.**

74.     The typical difference in the overall length of an AR-type rifle with a telescoping stock fully extended as opposed to fully collapsed is just a few inches. (Exhibit 3 at ¶ 10 and Exhibit E thereto (Video Demonstration).)

**RESPONSE:  Highland Park objects to the phrase 'typical difference'' as vague.** ==**The Department of Homeland Security specification attached as Exhibit C to the Declaration of Gary Roberts states that "The overall length of the firearm shall not exceed 30 inches with the stock fully extended.  The overall length shall not exceed 20 inches with the stock fully retracted and/or folded."  Plaintiffs' Exhibit 7, Exhibit C, 3.12.1 and 3.12.2. Thus, the DHS request permits a differential of up to 10 inches of telescoping in an assault rifle.**==

75.     The telescoping stock on a Smith & Wesson M & P 15 rifle can change the overall length of the rifle from 35 to 32 inches. (Exhibit 3 at ¶ 10.)

**RESPONSE:  Highland Park admits that the Smith & Wesson M & P 15, one example of an AR-type rifle, has a telescoping ability of three inches.**

76.     The change in overall length of a rifle from 35 to 32 inches does turn an otherwise non-concealable firearm into a concealable firearm for criminal purposes. (Exhibit 3, ¶ 10.)

**RESPONSE:  This paragraph is argumentative and conclusory and no response or counter-statement is required.**

77.     Thumbhole stocks are widely used by Olympic and other slow precision target shooting competitors.  (Exhibit 3 at ¶ 10.)

**RESPONSE:  Highland Park objects to the phrase "widely used" as vague and ambiguous.  Thumbhole stocks are used in certain Olympic competitions.  For this reason, the Highland Park Assault Weapons Ordinance provides in part:  "'Assault Weapon' does not include any Firearm that has been made permanently inoperable, or weapons designed for Olympic target shooting events."  Plaintiffs' Exhibit 1, Sec. 136.001(C)**

78.     Thumbhole stocks generally enhance accuracy and do not have an effect the basic function of a semi-automatic rifle.  (Exhibit 3 at ¶ 10.)

**RESPONSE:  Thumbhole stocks are designed to increase accuracy.**

79.     AR-type rifles are designed on a straight line, which serves to reduce "muzzle rise" during recoil.  (Exhibit 2 at ¶ 10; Exhibit 7 at pp. 86-87.)

**RESPONSE:  Highland Park admits that AR-type rifles were designed to reduce recoil.**

80.     A pistol-style grip for the trigger hand is necessary on an AR-type rifle because of the rifle's raised butt-stock in the straight line design.  (Exhibit 2 at ¶ 10; Exhibit 7 at pp. 93-94.)

**RESPONSE:  The straight line design of an AR-type rifle is one reason for a pistol grip.  "A pistol grip also increases the ability of the operator to conceal the firearm, to maneuver in confined space and facilitates firing from positions other than the shoulder.  These capabilities are not consistent with traditional sporting rifles."  (Yurgealitis Decl. at 33.)**

81.     If the trigger-hand grip on an AR-type rifle was made part of the butt-stock, as on a traditionally-styled rifle, the trigger hand would be in an unnatural position.  (Exhibit 2 at ¶ 10; Exhibit 3 at ¶ 12-13 and Exhibit E thereto (Video Demonstration).)

**RESPONSE:** This paragraph asserts a conclusion rather than a statement of undisputed fact.

82. A pistol grip aids in controlling a rifle during aiming and recoil. (Exhibit 7 at pp. 94-95.)

**RESPONSE:** As noted above, a pistol grip also increases the ability of the operator to conceal the firearm, to maneuver in confined space and facilitates firing from positions other than the shoulder. These capabilities are not consistent with traditional sporting rifles. (Yurgealitis Decl. at 33.)

83. Nearly all rifles have some sort of fore end that "shrouds" or encases the barrel, fully or partially, and serves as a place to support the rifle with the non-trigger hand and to protect the shooter's hand from barrel heat build-up. (Exhibit 2 at ¶ 10; Exhibit 3 at ¶ 11 and Exhibit E thereto (Video Demonstration); Exhibit 7 at p. 126.)

**RESPONSE:** Many rifles provide protection of the barrel. A 'barrel shroud' on an AR-type rifle, however, permits the operator "to steady and control the rifle during rapid, repeat firing without getting burned by the hot barrel." Yurgealitis Decl. at 33. This is not necessary during hunting or any conceivable defense of the home. It is extremely deadly, though, in mass shooting incidents.

84. A barrel shroud on an AR-style rifle also serves as the place to incorporate a rail system on which accessories can be mounted, such as a telescopic sight, an optical sight or a flashlight. (Exhibit 3 at ¶ 10.)

**RESPONSE:** The purpose of a barrel shroud is to provide for grip space during rapid, repeat firing without getting burned by the hot barrel. (Yurgealitis Decl. at 33).

85. A barrel shroud on an AR-style rifle also protects the aluminum gas tube, which carries powder gasses back to work the rifle's action. (Exhibit 2 at ¶ 10; Exhibit 7 at pp. 125-126.)

**RESPONSE: Admitted.**

86. The presence of a barrel shroud on an AR-type rifle does not in and of itself make the rifle more dangerous; it allows for control by the operator. (Exhibit 7 at pp. 126-127.)

**RESPONSE: ==Because the purpose of a barrel shroud is to provide for grip space during rapid, repeat firing without getting burned by the hot barrel, (Yurgealitis Decl. at 33), its use in mass shootings makes it inherently more dangerous.==**

87. A "protruding grip" forward of the trigger guard is sometimes present on AR-type rifles to give the shooter a more secure grip on the firearm, particularly rifles with rail-mounted accessories that the make the barrel shroud more difficult to grasp firmly. (Exhibit 3 at ¶ 11 and Exhibit E thereto (Video Demonstration).)

**RESPONSE: Admitted.**

88. The presence of a protruding grip on an AR-type rifle provides the shooter with better stability, which aids in accuracy, and better control during recoil and safety. (Exhibit 7 at pp. 99-100.)

**RESPONSE: Admitted.**

89. A vertical protruding fore grip potentially increases safety by allowing more accurate fire from a firearm. (Exhibit 7 at pp. 102-103.)

**RESPONSE: A protruding foregrip may increase safety. ==It may also provide for more accurate and lethal fire in a mass shooting event.==**

90. Both "muzzle brakes" and "muzzle compensators" serve to re-channel the gases expelled from the muzzle of a firearm. (Exhibit 3 at ¶ 14.) A muzzle brake will reduce the amount of recoil felt by the operator. (*Id*.) A muzzle compensator will redirect muzzle gases and keep the muzzle down for better acquisition of a target in the event a second shot is taken. (*Id*.) Muzzle brakes and compensators are found on a wide variety of firearms. (*Id*.)

**RESPONSE: ==The ultimate purpose of a muzzle brake or muzzle compensator is to allow the operator to more rapidly fire accurate additional shots if required. (Yurgealitis==**

==Decl. at 33).  This, by design, makes the weapon more dangerous in the event of a mass==

==shooting.==

91.     The presence of a muzzle brake or a muzzle compensator on an AR-type rifle does not in and of itself make the rifle more or less dangerous.  (Exhibit 7 at p. 129.)

**RESPONSE:  ==The ultimate purpose of a muzzle brake or muzzle compensator is to==**

==**allow the operator to more rapidly fire accurate additional shots if required.  (Yurgealitis**==

==**Decl. at 33).  This, by design, makes the weapon more dangerous in the event of a mass**==

==**shooting.**==

92.     Criminals overwhelmingly prefer and use concealable handguns in commission of crimes.  (Exhibit 10 at ¶ 9 – Affidavit of Gary Kleck; Exhibit 4 at p. 162.)

**RESPONSE:  The phrase "overwhelmingly prefer" is vague.  Criminals are, however, more likely to use handguns than long guns.  (Jones Decl. at 38).**

93.     Rifles and shotguns, known in the vernacular as long guns, are statistically less likely to be used in homicides than handguns.  (Exhibit 4 at p. 161.)

**RESPONSE:  "Statistically, rifles and shotguns, known collectively in the vernacular as 'long guns,' are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes.  ==Yet when they are used the carnage that results is== ==stunning."  (Jones Decl. at 38)==**

94.     According to Chicago Police Department data, just 22 of 2,215 firearm homicides (0.99%) that occurred in Chicago from 2006 to 2012 were committed with a rifle of some type. 2,146 of the firearm homicides were committed with handguns.  (Exhibit 11 – Excerpts from Chicago Police Department, Chicago Murder Analysis Reports 2006 – 2102.)

**RESPONSE:  Admitted.**

95.     Semi-automatic "assault weapons" make up a very small percentage of firearms used in armed assaults and homicides in Illinois and nationwide.  (Exhibit 4 at p. 160.)

**RESPONSE:  Admitted.**

96.     AR-type rifles are rarely used by criminals committing firearms related crimes.  (Exhibit 4 at p. 169.)

**RESPONSE:  "Statistically, rifles and shotguns, known collectively in the vernacular as 'long guns,' are less likely to be used in homicides or be recovered by law enforcement authorities in other crimes.  Yet when they are used the carnage that results is stunning."  (Jones Decl. at 38)**

97.     A compilation of 38 studies on the use of "assault weapons" in crime indicated that less than 2% of crime guns are "assault weapons" of all types.  (Exhibit 10 at ¶ 38.)

**RESPONSE:  Plaintiffs' Exhibit 10 cites to a report by Christopher J. Koper discussing 38 separate studies of gun violence.  Mr. Koper's report and each of those studies speak for themselves.  Dr. Kleck's summary is incomplete and misleading.**

98.     Nine of the 38 studies addressed the use of "assault rifles" only (as opposed to "assault pistols" and "assault shotguns").   The nine studies revealed that "assault rifles" accounted for .038% of crime guns on average.  (Exhibit 10 at ¶ 38.)

**RESPONSE:  Plaintiffs' Exhibit 10 cites to a report by Christopher J. Koper discussing 38 separate studies of gun violence.  Mr. Koper's report and each of those studies speak for themselves.  Dr. Kleck's summary is incomplete and misleading.**

99.     Among "assault weapons" reported by the police to the ATF in 1992 and 1993, "assault pistols" outnumbered "assault rifles" by a ratio of 3 to 1.  (Exhibit 12 – Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1993 – 2003*, pp. 16 & 43.)

**RESPONSE:** Plaintiffs' Exhibit 12 consists of six pages of a 108-page report published in June 2004 by Christopher J. Koper, Principal Investigator at the Jerry Lee Center of Criminology at the University of Pennsylvania. Highland Park has provided the complete report at Exhibit J. The report is an assessment of the impact of the Federal Assault Weapons Ban which was in place from 1994 through 2004. In June 2004, the Act was due to expire. Mr. Koper notes:

> If the ban is lifted, it is likely that gun and magazine manufacturers will reintroduce AW (assault weapon) models and LCMs (Large Capacity Magazines), perhaps in substantial numbers. . . . It is also possible, and perhaps probable, that new AWs and LCMs will eventually be used to commit mass murder.

> Koper Report, Defendants' Exhibit J at 101.

100.    Compared to their availability, "assault weapons" are underrepresented among the guns that felons actually used to commit crimes. (Exhibit 10 at ¶ 9.)

**RESPONSE:** Highland Park denies this conclusory statement. Assault Weapons constitute approximately 2 percent of the total number of firearms in the United States, (Yurgealitis Decl. at 35). Some estimates place the percentage of assault weapons used in crimes as high as 8 percent. (Jones Decl. at 14).

101.    Criminals are strongly disinclined to carry an "assault weapon" during commission of their crimes, even when they owned one. (Exhibit 10, ¶ 9).

**RESPONSE:** The phrase "strongly disinclines" is vague and ambiguous. Further, the conclusion asserted in this paragraph appears to be based on an analysis by Dr. Gary Kleck which in turn is based on interviews of prison inmates. (Plaintiffs Exhibit 10 at 9). The conclusion is also not relevant. The question is not which firearm criminals prefer, but

which ones create the greatest threat to innocent people.  As a study conducted by Mayor Against Illegal Guns concluded:  "in incidents in which a semi-automatic or fully-automatic assault rifle was used, there were 151%  more casualties and 63% more deaths than in incidents involving other types of guns."  (Jones Decl. at 11)

102.    The rarity with which "assault rifles" are used in crime is attributable to a number of factors, including that they are more difficult to conceal and are more expensive than handguns.  (Exhibit 10 at p. 16.)

**RESPONSE:  Highland Park admits that the size and expense are possible reasons why assault rifles are used less than handguns in the commission of crimes.  "Yet, when they are used the carnage that results is stunning."  (Jones Decl. at 38**)

103.    Empirical analyses of the expired federal "assault weapon" ban indicate that it had no effect on crime rates, homicide rates, the number of gunshot wounds per victim or the number of wounded victims per incident.  (Exhibit 10 at ¶ 18.)

**RESPONSE:  Dr. Kleck's summary of Christopher J. Koper's lengthy analysis of the impact of the Federal Assault Weapons Ban is incomplete and misleading.  Mr. Koper's complete 2004 Report is attached as Exhibit J to Defendants' Statement of Undisputed Materials Facts.  Mr. Koper's Report speaks for itself.**

104.    Empirical studies on the effect of state-level "assault weapon" bans suggest that they have not reduced crime.  (Exhibit 12 at p. 81 n. 95; Exhibit 10 at ¶ 18.)  The impact of state-level bans are likely undermined by the influx of legal "assault weapons" from other states.  (Exhibit 12 at p. 81 n. 95; Exhibit 10 at ¶ 19.)

**RESPONSE:  Dr. Kleck's summary of Christopher J. Koper's lengthy analysis of the impact of the Federal Assault Weapons Ban is incomplete and misleading.  Mr. Koper's**

complete 2004 Report is attached as Exhibit J to Defendants' Statement of Undisputed

Materials Facts.  Mr. Koper's Report speaks for itself.

105.    Highland Park's local ban on "assault weapons" is even less likely to have an impact on firearms violence than federal and state bans because of the ease with which banned firearms can be acquired nearby to Highland Park.  (Exhibit 10 at ¶ 19.)

RESPONSE:  This paragraph is simply speculation about future events and is not a

Statement of Material Fact that requires a response.

106.    Highland Park and North Chicago are the only municipalities in Lake County, Illinois that prohibit possession of "assault weapons" within their city limits.  (Exhibit 10 at ¶ 20.)  The combined population of these two municipalities according to the 2010 census was 65,335, which was just 8.8% of Lake County's total population of 703,462.  (*Id*.)  "Assault weapons" may be legally sold and owned in all other Lake County communities.  (*Id*.) Approximately 91.2% of persons residing in Lake County are free to own "assault weapons." (*Id*.)  "Assault weapons" are banned in just 1.6 % of Lake County's geographical area.  (*Id*.)

RESPONSE:  Highland Park admits that North Chicago and Highland Park are the

only municipalities in Lake County which have banned assault weapons.    Plaintiffs'

calculations based on population and geography are immaterial and irrelevant.

107.    A person prohibited from possessing an "assault weapon" only by virtue of the Highland Park ban would have little difficulty acquiring one by driving only a short distance to a gun store or a private seller outside Highland Park.  (Exhibit 10 at ¶ 20.)

RESPONSE:    This paragraph asserts a conclusion based on speculation and is

therefore not a proper material fact to which a response is required.

108.    It makes little difference whether or not "assault weapons" are readily available to Highland Park residents because other non-banned firearms can be substituted for them, which fire just as fast and are just as lethal as the banned firearms.  (Exhibit 10 at ¶ 21.)

RESPONSE:    This paragraph asserts a conclusion based on speculation and is

therefore not a proper material fact to which a response is required.

109.    Because a Highland Park resident who has the intent to commit a firearm crime has the ability to substitute a non-banned firearm in place of a banned firearm, there is no logical reason to expect that the ban will decrease the number or lethality of gun crimes.  (Exhibit 10 at ¶ 21.)

**RESPONSE:  This paragraph asserts a conclusion based on speculation and is therefore not a proper material fact to which a response is required.**

110.    Mass shootings are rare in absolute terms.  (Exhibit 10 at ¶ 29.)

**RESPONSE:   The phrase "rare in absolute terms" is vague and ambiguous. Highland Park does not agree that mass shootings are rare events in the United States. Mass shootings have resulted in 519 deaths between 2009 and 2013 (Jones Decl. at 37)  A recent study by Mayors Against Illegal Guns found that there were 93 examples of mass shootings between January 2009 and September 2013.**

111.    While tragic and shocking, mass shootings (defined as incidents occurring in relatively public places, involving four or more deaths – not including the shooter – and a shooter who selects victims somewhat indiscriminately) account for few of the murders related to firearms that occur annually in the United States.  (Exhibit 13 at pp. 1-11 – Congressional Research Service, *Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy*, Mar. 18, 2013.)

**RESPONSE:  Highland Park agrees that mass shootings are tragic and shocking. Plaintiffs comparison of mass shooting deaths to all murders by firearms is immaterial and irrelevant and does not require further answer.**

112.    Over the past several decades, mass shootings (defined as incidents in which 4 or more persons were killed, excluding the assailant) have not increased in number or in overall death toll.  (Exhibit 14 at pp. 128-131 – Fox & DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, Vol. 18 Homicide Studies 125-145 (2014).)

**RESPONSE: A copy of the Fox & DeLateur article is also attached as Exhibit M to Highland Park's Statement of Undisputed Material Facts. The data set forth therein speak for themselves. It is also not clear that mass shootings have neither increased in number nor death toll "over the past several decades." Plaintiffs also do not quote the conclusion of this article which states: "Gun restrictions and other initiatives may not stop the next mass murderer, wherever he or she may strike, but we can enhance the well-being of millions of Americans in the process. Besides, doing something is better than doing nothing. . . [T]aking a nibble out of the risk of mass murder, however small, would still be a worthy goal for the nation." Exhibit M, p. 141.**

113. The annual counts of mass shootings (defined as incidents in which 4 or more persons were killed, excluding the assailant) have been randomly variable over the last several decades. (Exhibit 14 at pp. 128-129.)

**RESPONSE: A copy of the Fox & DeLateur article is also attached as Exhibit M to Highland Park's Statement of Undisputed Material Facts. The data set forth therein speak for themselves. It is also not clear that mass shootings have neither increased in number nor death toll "over the past several decades." Plaintiffs also do not quote the conclusion of this article which states: "Gun restrictions and other initiatives may not stop the next mass murderer, wherever he or she may strike, but we can enhance the well-being of millions of Americans in the process. Besides, doing something is better than doing nothing. . . [T]aking a nibble out of the risk of mass murder, however small, would still be a worthy goal for the nation." Exhibit M, p. 141.**

114.    In mass shootings, where large numbers of rounds are fired, it is extraordinarily rare that the presence of a "large capacity magazine" had any impact on the number of victims injured or killed.  (Exhibit 10 at ¶ 8.)

**RESPONSE:**  ==In mass shooting events in Tucson, Arizona and Portland, Oregon bystanders were able to subdue the attacker when he began to reload his magazine.  (Dr. Kleck argues that the magazine may have malfunctioned rather than been exhausted.  In either event, however, the pause allowed bystanders to tackle the gunman.)  A smaller capacity magazine would have resulted in fewer deaths and injuries in each of these situations.  (Plaintiffs' Exhibit 10, Kleck Decl. at 8)==

115.    A study of 81 mass shootings that occurred between 1994 and 2013 (defined as incidents in which more than six persons were shot, fatally or non-fatally) demonstrated that mass shooters have not needed "large capacity magazines" to fire large numbers of rounds because (a) they possessed multiple firearms, (b) they possessed multiple ammunition magazines, or (c) they were able to reload without interference from others.  (Exhibit 10 at ¶ 8.)

**RESPONSE:  Highland Park agrees that many mass shooting events have occurred in which the shooter did not have a Large Capacity Magazine.**  ==Plaintiffs contention that "mass shooters have not needed 'large capacity magazines' is irrelevant and immaterial. The presence of a Large Capacity Magazine in a mass shooting event, by definition, makes that event more dangerous and threatening to innocent bystanders.==

116.    A study of the 81 mass shootings that occurred between 1994 and 2013 (defined as incidents in which more six persons were shot, fatally or non-fatally) revealed that shooters were known to have used magazines in excess of 10 rounds in 21 incidents.  (Exhibit 10 at ¶ 8.) In each of these 21 incidents, the shooter possessed multiple guns and multiple magazines.  (*Id.*) Thus, if the shooters were limited to magazines holding 10 or fewer rounds, they would have been able to continue to fire with an alternative gun or by loading new magazines.  (*Id.*)

**RESPONSE: Highland Park agrees that of the 81 mass shootings cited by Plaintiffs, approximately 25 percent involved Large Capacity Magazines. Highland Park disagrees with Plaintiffs unsupported speculation that "if the shooters were limited to magazines holding 10 or fewer rounds, they would have been able to continue to fire with an alternative gun or by loading new magazines."**

117.   In a study of mass shootings, 93 mass shootings were analyzed and it was determined that the shooter was able to inflict mass casualties without using "assault weapons" or "large capacity magazines" in 79 of the shootings. (Exhibit 4 at pp. 233-236.)

**RESPONSE: Highland Park agrees that Mayors Against Illegal Guns analyzed 93 mass shootings between January 2009 and September 2013. (Jones Decl. at 11). Of those the two most horrific events, Newtown, Connecticut, in which 20 schoolchildren were killed in less than 10 minutes and Aurora, Colorado, in which 70 people were killed, involved assault weapons and large capacity magazines. *Id.* Of the 14 events in which assault weapons were used, the incidents involved 151% more casualties and 63% more deaths than events in which assault weapons were not present. (Jones Decl. at 11)**

118.   In a study of mass shootings, in the 30 mass shootings ranked by number of persons killed, only 4 involved an "assault weapon" while in 28 of the shootings the killer possessed one or more handguns. (Exhibit 4 at pp. 246-249.)

**RESPONSE: The "study" to which Plaintiffs refer is simply a table which its counsel, James Vogts, prepared. The table also did not include whether Large Capacity Magazines were involved in the 28 incidents in which Plaintiffs allege assault weapons were not involved. (See Jones Deposition, Plaintiffs' Exhibit 4, at pp. 246-249)**

119.    "Assault weapons" are almost never used to kill police officers.  (Exhibit 10 at ¶ 39.)

**RESPONSE:  The phrase "almost never" is vague and ambiguous and therefore a response is not necessary.  Assault weapons, however, "are used in a disproportionately high number of shootings of law enforcement officers.  In 1994, they accounted for 16% of gun murders of police officers."  (Jones Decl. at 14)**

120.    For the period 1980-1989, 33 (4%) of the 810 police officers feloniously killed in the U.S. and its territories were killed by "assault weapons" of some type (pistol, rifle or shotgun).  For 1986-1990, 19 (5%) of the 350 officers killed were killed with "assault weapons" of some type.  For the period 1992-1996, there were 4.5 "assault weapon" killings of police officers per year, and 7% of the total were committed with "assault weapons" of some type.  (Exhibit 10 at ¶ 39.)

**RESPONSE:  Accepting Plaintiffs crime statistics as accurate for purposes of argument, this would mean that assault weapons are twice as likely to be used in the murder of a police officer than their absolute numbers would suggest.**

121.    Just 3 out of 276 killings of police officers in the period from January 1992 through May 1996 (approximately 1%) were committed with an AR-15 rifle or an AR-15 copy.  (Exhibit 10 at ¶ 39.)

**RESPONSE:  Highland Park submits that assault weapons are used to murder police officers.  Plaintiffs' data confirm that this has happened.**


DATE:  July 22, 2014                          CITY OF HIGHLAND PARK


                                              By:  /s/ Christopher B. Wilson
                                                   One of Its Attorneys

Christopher B. Wilson, ARDC No. 06202139
Perkins Coie LLP
131 South Dearborn Street, Suite 1700
Chicago, IL  60603
Telephone:  (312) 324-8400
Fax:  (312) 324 - 9400
Cwilson@perkinscoie.com

Steven M. Elrod
Christopher James Murdoch
Hart M. Passman
Holland & Knight, LLP
131 South Dearborn Street
30th Floor
Chicago, Illinois 60603
(312) 263-3600
Steven.elrod@hklaw.com
Chris.murdoch@hklaw.com
Hart.passman@hklaw.com

## CERTIFICATE OF SERVICE

I, Christopher B. Wilson, an attorney, certify that on July 22, 2014, I caused the

foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF**

**MATERIAL FACTS** to be  filed pursuant to the Court's CM/ECF system and served via the

Court's CM/ECF System on the following:


James B. Vogts
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
(312) 222-8517
jvogts@smbtrials.com

Brett Michael Henne
Swanson, Martin & Bell, LLP
1860 West Winchester Road
Suite 201
Libertyville, IL  60048
(847) 949-0057
bhenne@smbtrials.com

Andrew Arthur Lothson
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
alothson@smbtrials.com

Alexander David Marks
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue
22nd Floor
Chicago, IL  60611
(312) 840-7000
amarks@burkelaw.com


_/s/ Christopher B. Wilson_____