UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARIE S. FRIEDMAN, M.D. and | ) | |
| THE ILLINOIS STATE RIFLE | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:13-cv-9073 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| THE CITY OF HIGHLAND PARK, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On June 24, 2013, the City of Highland Park ("Highland Park") passed an ordinance, prohibiting the possession, sale, or manufacture of certain types of weapons and large capacity magazines. On December 12, 2013, two days before the ordinance became effective, Plaintiffs Dr. Arie S. Friedman and the Illinois State Rifle Association ("ISRA") (collectively, "Plaintiffs") brought this action, seeking a determination by the Court that the ordinance is unconstitutional and an injunction barring its enforcement. Plaintiffs filed a Motion for Preliminary Injunction that was consolidated for trial on the issue of the issuance of a permanent injunction, set for October 27, 2014, pursuant to Federal Rule of Civil Procedure 65(a)(2). The parties have also filed cross-motions for summary judgment and briefs in support of and in opposition thereto.

**BACKGROUND**

Highland Park is a municipal corporation located in Lake County, Illinois. (Dkt. No. 42 ¶ 4.) Within Highland Park are fifteen schools, including Highland Park High School and numerous elementary schools, four community centers, and three nursing homes. (Dkt. No. 45 ¶¶ 21-22.) Additionally, Highland Park features multiple locations where large numbers of people frequently congregate, like the Ravinia Festival; the Port Clinton retail and office

development; the Renaissance Place retail and residential development; and the Crossroads

Shopping Center.  (*Id*. ¶ 23.)  The City Council of Highland Park adopted Chapter 136 of the

Highland Park City Code (the "Ordinance") based on the belief that certain designated weapons

pose an undue threat to public safety.  (*Id*. ¶ 4.)  The Ordinance was particularly intended to

address the potential threat of mass shootings involving semi-automatic weapons like those in

Aurora, Colorado (12 killed, 58 injured); Newtown, Connecticut (28 killed); Casas Adobes,

Arizona (6 killed, 14 injured); and Santa Monica College in Santa Monica, California (6 killed, 2

injured).  (*Id*. ¶ 9; Dkt. No. 44 at 3-4.)

The Ordinance provides that "[n]o person shall manufacture, sell, offer or display for

sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity

Magazine, unless expressly exempted in Section 136.006 of this Chapter."  Highland Park, Ill.,

City Code § 136.005.[1]  The Ordinance defines Assault Weapons as any of the following:

> (1) A semiautomatic rifle that has the capacity to accept a Large Capacity
> Magazine detachable or otherwise and one or more of the following: (a) Only a
> pistol grip without a stock attached; (b) Any feature capable of functioning as a
> protruding grip that can be held by the non-trigger hand; (c) A folding,
> telescoping or thumbhole stock; (d) A shroud attached to the barrel, or that
> partially or completely encircles the barrel, allowing the bearer to hold the
> Firearm with the non-trigger hand without being burned, but excluding a slide that
> encloses the barrel; or (e) A Muzzle Brake or Muzzle Compensator;

---

[1] The Ordinance is nearly identical to a ban in neighboring Cook County, Cook County,
Ill. Ordinance No. 06-O-50 (2006), and similar to those passed by numerous other governments.
*See Colo. Outfitters Ass'n v. Hickenlooper*, Civil Action No. 13-cv-01300-MSK-MJW, 2014 WL
3058518, at *16 (D. Colo. June 26, 2014) ("According to Colorado, the General Assembly's
objective in passing [the LCMs ban] was to reduce the number and magnitude of injuries caused
by gun violence, specifically in mass shootings.") (emphasis added); *Kolbe v. O'Malley*, Civil
No. CCB-13-2841, 2014 WL 4243633, *15-18 (D. Md. Aug. 22, 2014); *Fyock v.
City of Sunnyvale*, Case No. C-13-5807-RMW, 2014 WL 984162, at *7 (N.D. Cal. Mar. 5,
2014); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011).

(2) A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of Ammunition;

(3) A semiautomatic pistol that has the capacity to accept a Detachable Magazine and has one or more of the following:  (a) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (b) A folding, telescoping or thumbhole stock; (c) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the Firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; (d) A Muzzle Brake or Muzzle Compensator; or (e) The capacity to accept a Detachable Magazine at some location outside of the pistol grip;

(4) A semiautomatic shotgun that has one or more of the following:  (a) Only a pistol grip without a stock attached; (b) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; (c) A folding, telescoping or thumbhole stock; (d) A fixed magazine capacity in excess of five rounds; or (e) An ability to accept a Detachable Magazine;

(5) Any shotgun with a revolving cylinder;

(6) Conversion kit, part or combination of parts, from which an Assault Weapon can be assembled if those parts are in the possession or under the control of the same person . . . .

*Id*. § 136.001(C)(1)-(6).[2]  Weapons made permanently inoperable and weapons "designed for Olympic target shooting events" are not Assault Weapons.  *Id*. § 136.001(C)(7).  The Ordinance goes on to define Large Capacity Magazines ("LCMs") as:

---

[2] The Ordinance also includes specific weapons in its definition of Assault Weapons: "(a) The following rifles or copies or duplicates thereof: (i) AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR; (ii) AR-10; (iii) AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR; (iv) AR70; (v) Calico Liberty; (vi) Dragunov SVD Sniper Rifle or Dragunov SVU; (vii) Fabrique National FN/FAL, FN/LAR, or FNC; (viii) Hi-Point Carbine; (ix) HK-91, HK-93, HK-94, or HK-PSG-1; (x) Kel-Tec Sub Rifle; (xi) Saiga; (xii) SAR-8, SAR-4800; (xiii) SKS with Detachable Magazine; (xiv) SLG 95; (xv) SLR 95 or 96; (xvi) Steyr AUG; (xvii) Sturm, Ruger Mini-14; (xviii) Tavor; (xix) Thompson 1927, Thompson M1, or Thompson 1927 Commando; or (xx) Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).  (b) The following pistols or copies or duplicates thereof: (i) Calico M-110; (ii) MAC-10, MAC-11, or MPA3; (iii) Olympic Arms OA; (iv) TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or (v) Uzi.  (c) The following shotguns or copies or duplicates thereof:  (i) Armscor 30 BG; (ii) SPAS 12 or LAW 12; (iii) Striker 12; or

any Ammunition feeding device with the capacity to accept more than ten rounds,
but shall not be construed to include the following: (1) A feeding device that has
been permanently altered so that it cannot accommodate more than ten rounds.
(2) A 22 caliber tube Ammunition feeding device. (3) A tubular magazine that is
contained in a lever-action Firearm.

*Id*. § 136.001(G).

Violation of any provision of the Ordinance "is a misdemeanor, punishable by not more

than six months imprisonment or a fine of not less than $500 and not more than $1000, or both."

*Id*. § 136.999. Officers, agents, or employees of any municipality or state or the United States,

members of the United States Armed Forces or state militias, and peace officers are exempt from

the Ordinance to the extent such a person "is otherwise authorized to acquire or possess an

Assault Weapon and/or Large Capacity Magazine and does so while acting within the scope of

his or her duties." *Id*. § 136.006(A). "Qualified retired law enforcement officers"[3] are likewise

exempt from the ban. *Id*. § 136.006(B).

The Ordinance requires that any person who lawfully possessed any Assault Weapon or

LCM is required within Sixty days of the effective date (December 14, 2013) to do one of the

following:

(A) Remove the Assault Weapon or Large Capacity Magazine from within the
limits of the City;

(B) Modify the Assault Weapon or Large Capacity Magazine either to render it
permanently inoperable or to permanently make it a device no longer defined as
an Assault Weapon or Large Capacity Magazine;

(C) Surrender the Assault Weapon or Large Capacity Magazine to the Chief of
Police or his or her designee for disposal as provided in Section 136.025 of this
Chapter; or

---

(iv) Streetsweeper." Highland Park, Ill., City Code § 136.001(C)(7).
    [3] As defined by 18 U.S.C. § 926C(c).

4

(D) Take the steps necessary to cause the Assault Weapon or Large Capacity Magazine to fall within one of the exemptions set forth in Section 136.006 of this Chapter.

*Id*. § 136.020. The Chief of Police shall cause to be destroyed any Assault Weapon or LCM turned over to police or confiscated. *Id*. § 136.025.

Dr. Friedman owns and possesses firearms in Highland Park that fall within the Ordinance's definition of Assault Weapons. (Compl. ¶ 4.) The IRSA has members who live in Highland Park and own firearms and magazines prohibited by the Ordinance. (Compl. ¶ 5.) Plaintiffs seek a declaration that the Ordinance is unconstitutional as an infringement of their Second Amendment rights.

## LEGAL STANDARD

Summary judgment is appropriate when there remains "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *See Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). The party seeking summary judgment must first identify those portions of the record that establish there is no genuine issue of material fact. *U.S. v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). To survive such a showing, the nonmoving party must "present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1030-31 (7th Cir. 2006) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995)). Opposition to summary judgment requires more than a scintilla of evidence or some metaphysical doubt. *Nat'l Inspection Repairs, Inc. v.*

5

*George S. May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010) (citations omitted). The evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Wells v. Coker*, 707 F.3d 756, 760 (7th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010) (citations omitted). The court does not make credibility determinations or weigh conflicting evidence. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (citations omitted).

Summary judgment is particularly appropriate when facts in dispute are "legislative," or "tied to legal reasoning and the law making process," rather than "adjudicative," concerning the conduct of the parties. See Fed. R. Evid. 201(a) advisory committee's note. Inasmuch as "[o]nly adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of . . . gun law[s]," the instant case is better suited for resolution through summary judgment than proceeding to trial. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012); *Ill. Ass'n of Firearms Retailers v. City of Chi.*, 961 F. Supp. 2d 928, 932 (N.D. Ill. 2014).

Local Rule 56.1(a) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue" and to cite to the relevant admissible evidence supporting each fact. Local Rule 56.1(b)(3)(B) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *Martin v. Gonzalez*, 526 F. App'x 681, 682 (7th Cir. 2013). Under Local Rule 56.1(b)(3)(C), the nonmoving party may file a statement of additional facts, and the moving party may submit a

concise reply under Local Rule 56.1(a)(3). To the extent that a purported fact is merely a legal conclusion, it is disregarded. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371 (7th Cir. 2008).

A litigant's failure to respond to a Rule 56.1 statement, or to dispute the statement without "specific references to the affidavits, parts of the record, and other supporting material," results in the court's admitting the uncontroverted statement as true. *Banks v. Fuentes*, 545 F. App'x 518, 520 (7th Cir.2013). Similarly, responses containing argumentative denials or extraneous information do not properly dispute a fact. *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005).[4]

## ANALYSIS

Plaintiffs argue, as more fully discussed below, that firearms banned by the Ordinance are commonly used for lawful purposes and, therefore, are "categorically protected" by the Second Amendment to the United States Constitution and that any prohibition should be held unconstitutional without reaching further analysis. (Pls.' Mot. for Summary Judgment ("Pls.' MSJ") at 14.) Plaintiffs argue in the alternative that, if the Ordinance is subjected to further analysis, it does not survive this scrutiny. (Pls.' MSJ at 21.) Both of these arguments rely on interpretation of a body of law that is recently developing. *See Ezell v. City of Chi.*, 651 F.3d 684, 690 (7th Cir. 2011) (noting Second Amendment litigation is "quite new").

---

[4] On August 7, 2014, Plaintiffs filed a Motion to Strike certain of Defendant's material facts. (Dkt. No. 61.) On August 20, 2014, that Motion was denied. Provided, however, Plaintiffs' arguments regarding striking these facts are considered, discussed and resolved herein when necessary.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. Const. amend. II. This right is also "fully applicable to the States." *McDonald v. City of Chi.*, 130 S.Ct. 3020, 3026 (2010).

In *District of Columbia v. Heller ("Heller I")* the Supreme Court determined that there is a guaranteed "individual right to possess and carry weapons in case of confrontation," based on the Second Amendment. 554 U.S. 570, 592, 635 (2008). More particularly, *Heller I* held that a law banning handguns would fail at any level of constitutional scrutiny because it "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense] . . . [and] extends, moreover, to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628. Thus, *Heller I* recognized Second Amendment protection against restrictions by the District of Columbia on use of "the quintessential self-defense weapon" for the "core lawful purpose of self-defense." *Id.* at 629-630.

However, the Court made it clear that there are limitations on this right. *See id.* at 626 (explaining that the holding should not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."). The protection afforded by the Second Amendment to a class of weapons as ubiquitous as handguns does not create "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Indeed, the extensive possession of handguns among weapons used for self-defense distinguished them from "weapons not typically possessed by law-abiding citizens for lawful purposes, such as

8

short-barreled shotguns." *Id*. at 625.  In *McDonald*, the Court reiterated the primacy of the individual right to possess handguns in the home.  130 S.Ct. at 3050.

The Seventh Circuit addressed Second Amendment Protection when it reversed the district court's denial of a preliminary injunction against a City of Chicago ordinance conditioning lawful gun ownership on completing one hour of firing range training, while simultaneously banning firing ranges within Chicago city limits.  *Ezell v. City of Chi.*, 651 F.3d 684, 689, 711 (7th Cir. 2011).  Analyzing the ordinance required a two-part approach.  First, the Seventh Circuit drew from *Heller I* and *McDonald* a "textual and historical inquiry" to determine whether the restricted activity is protected by the Second Amendment.  *Id*. at 701-702 (citing *Heller I*, 554 U.S. at 634-35; *McDonald*, 130 S.Ct. at 3047).  This inquiry is conducted in light of the circumstances present for the ratification of the Second Amendment (1791) if a federal law is at issue or the Fourteenth Amendment (1868) if a state law is at issue:

> Accordingly, if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.

*Ezell*, 651 F.3d  at 702-3.  The City of Chicago was unable to make such a showing, and the Seventh Circuit proceeded to the second step of its analysis:  examination of the government's justification for the restriction.  "[T]he rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."  *Id*.  The Seventh Circuit found range training to be "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense"; and, therefore, a complete prohibition was subject to "not quite strict scrutiny."  *Id.* at 708 (internal quotation marks omitted).  To meet its burden, the City of Chicago was required to "demonstrate that

civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified." *Id*. at 709. The City of Chicago presented no data or expert opinion supporting its ban and did "not come close to meeting this standard." *Id*.

This same analysis was present in the Seventh Circuit's consideration of a firearms ban after *Ezell*. In *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the Seventh Circuit ruled an Illinois law unconstitutional that prohibited carrying ready-to-use firearms outside of a person's home, fixed place of business, or the property of another who had given permission because the right to bear arms in self-defense is "as important outside the home as inside." *Id*. at 942. The Court reached this conclusion after determining the historical evidence supporting a tradition of public carriage of firearms was more persuasive than evidence to the contrary. *Id*. at 939 ("In sum, the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law."). The Seventh Circuit then proceeded to analyze Illinois's justification for enacting the ban. In doing so, the Court again discussed the application of varying degrees of justification:

> A blanket prohibition on carrying gun[s] in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would. In contrast, when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need.

*Id*. at 940 (emphasis in original). It is clear that once a restriction implicates Second Amendment rights, it requires "more than merely a rational basis." *Id*. at 942. In *Moore*, the Seventh Circuit

determined that Illinois needed to show much more to justify "the most restrictive gun law of any of the 50 states." *Id*. at 941.

Highland Park's Ordinance is, therefore, subject to the two-part inquiry established by *Ezell* and *Moore*. It is Highland Park's burden to show that regulated activity falls outside of the scope of the Second Amendment. If such a showing cannot be made, Highland Park must present evidence sufficient to demonstrate that the restriction is justified. The greater the burden to the core Second Amendment right to armed self-defense, the greater the burden on Highland Park to justify the restriction. If Highland Park cannot meet this burden, the Ordinance is unconstitutional.

*Second Amendment Protection*

First, it must be determined whether the Assault Weapons and LCMs, as they are defined in the Ordinance,[5] fall within the scope of Second Amendment protection. When a particular class of weapons is at issue, the threshold question is whether those weapons are commonly used for lawful purposes. *See Heller I*, 554 U.S. at 624-25, 627. If the answer is no, restricting the possession of such weapons is consistent with the "historical tradition of prohibiting the carrying of dangerous and unusual weapons," and the law should be considered valid. *Id*. at 627 (internal quotation marks and citations omitted). The parties agree that "common use" is determined on a national, not local, basis.

---

[5] Plaintiffs argue that the term "Assault Weapon" is not defined and, therefore, its use is "argumentative and misleading." (Dkt. No. 51 at 1-2.) Plaintiffs moved to strike all thirteen of Defendant's material facts that use the term. (*See* Dkt No. 64.) Although Plaintiffs have offered some support for this argument that Assault Weapons is a poor choice of words to describe the weapons at issue in this case, they fail to demonstrate how this is relevant to a determination of the Ordinance's constitutionality. As used in this opinion, Assault Weapons are those weapons defined by the Ordinance.

Plaintiffs argue that "the only limitation [*Heller I*] recognized on the type of firearm that can be possessed by a law-abiding person in the home for self-defense use is that the firearm be one that is in common use at the time." (Dkt. No. 52 at 7 (quotation marks and citations omitted).) Therefore, Plaintiffs assert the Ordinance represents a categorical ban like the ban in *Heller I* and should be held unconstitutional without further scrutiny.

Plaintiffs assert an "overwhelming popularity and common ownership of AR-type[6] rifles among law abiding citizens." (Dkt. No. 41 at 17.) According to the estimates of the National Shooting Sports Foundation ("NSSF"), between 1990 and 2012, approximately 5,128,000 AR-type rifles were manufactured domestically; and approximately 3,145,000 AR-type and AK-type rifles were imported into the United States. (*See* Dkt. No. 42, Ex. 6 ¶ 4.) From 2008 to 2012 alone, approximately 3,457,230 AR-type rifles were manufactured domestically for domestic consumption, accounting for 11.4 percent of all firearms manufactured in the United States for domestic sale in that time period. (*Id.* ¶ 5.) Finally, Plaintiffs assert that, based on a 2012 online survey of firearms dealers, 92.5 percent stocked AR-type rifles and 20.3 percent of all new firearms sold were AR-type rifles. (*Id.* ¶ 8.)

With respect to LCMs,[7] Plaintiffs contend that of approximately 158,000,000 magazines possessed by consumers in the United States, approximately 75,000,000 of those are capable of

---

[6] Without explanation, Plaintiffs initially confine their arguments of common use to a particular type of gun banned by the Ordinance: the "AR-type rifle." (Dkt. No. 41 at 5.) It is unclear whether Plaintiffs refer specifically to the two rifles in the Ordinance named AR (the AR-10 and the AR-15) or to any rifle with characteristics common to the named AR rifles, e.g., modular design. This confusion is compounded when Plaintiffs also include "AK-type rifles" in various statements of fact.

[7] Although Plaintiffs do mention LCMs in their argument, it is primarily only in conjunction with rifles. (*See, e.g.,* Dkt. No. 41 at 14 ("Whether the banned firearms *and magazines* are typically possessed by law-abiding citizens . . . .") (emphasis added).) However,

holding more than 10 rounds of ammunition.  (*Id*. ¶ 10.)  Of rifle owners responding to an NSSF survey regarding modern sporting rifles[8] ("MSR Survey"), 83 percent reported use of a magazine capable of holding in excess of 10 rounds.  (*Id*. ¶ 6.)  Based on these estimated manufacturing numbers and survey results, Plaintiffs argue that AR-type rifles and LCMs are in common use.

Plaintiffs argue that the popularity of AR-type rifles is evident among members of the firearms owners' community because the rifles are frequently used at firing ranges.  (*Id*. Ex. 3 ¶ 5 ("I regularly observe [Aurora Sportsmen's Club] members on the range and the firearms they use; and modern sporting rifles, including AR-type rifles, have been the most commonly used rifles on the range over the past five to ten years.").)  The MSR Survey respondents identified recreational target shooting as the "number one" reason to own a modern sporting rifle.  (*Id*. Ex. 6 ¶ 7.)  An additional survey estimated that approximately 11,977,000 people participated in target shooting with a modern sporting rifle.  (*Id*. Ex. 6 ¶ 9.)  Furthermore, "the fastest growing shooting sport in the country" features competitors using a pistol, shotgun, and AR-type rifle to shoot various targets.  (*Id*. Ex. 3 ¶ 8.)  AR-type rifles are also commonly used for small game hunting.  (*Id*.)

Plaintiffs argue that Assault Weapons are predominantly used for these lawful purposes as criminals prefer to use concealable handguns in the commission of crimes.  (*Id*. Ex. 10 ¶ 9.) Plaintiffs cite a nine-study composite that indicates Assault Weapons account for just .038 percent of guns used in the commission of crimes.  (*Id*. Ex. 10 ¶ 38.)  With specific regard to firearms-related homicides, rifles are infrequently used.  (*Id*. Ex. 11 (Chicago Police Department

---

Plaintiffs have submitted some statements of fact in support of LCMs' common use; and they are considered here.

[8] Plaintiff asserts that AR-type rifles are among the category known as modern sporting rifles.

data reflecting that rifles were used in just 22 of 2,215 homicides in Chicago from 2006 through 2011 in which a firearm was involved); Ex. 4 at 160.)

As further discussed below, Highland Park disputes both of Plaintiffs' contentions: that Assault Weapons are commonly used and that they are used for lawful purposes. Preliminarily, Highland Park asserts that it is difficult to determine the number of Assault Weapons currently in the United States because gun manufacturers do not generally release their sales data. (Dkt. No. 45, Ex. C ¶35.) However, the NRA has estimated that semi-automatic firearms make up 15 percent of privately owned firearms in the United States and that Assault Weapons make up approximately 15 percent of all semi-automatic firearms. (*Id.* ¶ 36.) Based on these estimates, 4,905,000 out of 218,000,000 (or approximately 2.25 percent) privately owned firearms are Assault Weapons. (*Id.*) Additionally, Highland Park points out that accepting Plaintiffs' estimates that 5,128,000 AR-type rifles were manufactured between 1990 and 2012 and that 3,457,230 AR-type rifles were manufactured between 2008 and 2012 necessarily implies that an average of less than 100,000 AR-type rifles were manufactured domestically per year between 1990 and 2007. (Dkt. No. 53 at 5, 9.)

Highland Park next asserts that Assault Weapons are not designed for and, in fact, would be ineffective for self-defense in the home. (*Id.*) AR-type rifles are powerful and relatively large compared to other firearms, making their use in close quarters potentially difficult. (Dkt. No. 45, Ex. D ¶¶ 46, 48 ("To tout the semi-automatic assault weapon as the best or even second best tool for home defense is specious and disingenuous.").) In addition, responsible firearms owners will lock and store their firearms for safety. (*Id.* ¶ 47.) Properly storing a rifle typically requires using a gun safe built for that purpose, which renders the rifle not immediately accessible in the event of a need to defend oneself in a threatening emergency. (*Id.* ("Safes require time to unlock

14

and open, obviating the rifle as the [best self-defense firearm].")  With respect to LCMs, Highland Park asserts that ten rounds are typically sufficient for self-defense.  (*Id*. ¶ 40 ("In police involved shootings[,] the number of shots fired is [on average, less than four]").)

Finally, Highland Park argues that Assault Weapons and LCMs are the types of "dangerous and unusual weapons" specifically excepted from Second Amendment protection.  Primarily, this argument is based on the AR-type rifle's similarity to – and even derivation from – military-grade weapons with offensive purposes.  Accordingly, Assault Weapons typically have features that allow a user to shoot multiple targets in a short period of time.  (Dkt. No. 45, Ex. B ¶ 20.)

The evidence submitted by the parties does not resolve the question of whether Assault Weapons and LCMs are "commonly used for lawful purposes."  The facts submitted by both parties show, at best, only how many AR-type rifles were *manufactured* over a given period of time; and even these numbers are highly disputed.  But knowing how many *people possess* an Assault Weapon, rather than how many *Assault Weapons* are in use, is far more probative in determining common use.  Highland Park argues that these numbers are difficult to ascertain because, as mentioned above, gun manufacturers typically do not release sales data.  Rather, the vast majority of the parties' data is made up of approximations and surveys.  Further, Highland Park persuasively argues that the Assault Weapon is not appropriate for home defense.  The features of an Assault Weapon, as set out in the Ordinance, appear to be more valuable in an offensive capacity than a defensive one.  Therefore, it is apparent that the question of common use is far from settled.  Moreover, *Heller I* made clear that "dangerous or unusual" weapons are also unprotected.  Therefore, the Ordinance implicates consideration of Plaintiffs' Second Amendment rights and must be subjected to further analysis.

*Level of Scrutiny*

As mentioned, the Seventh Circuit has prescribed a sliding-scale approach to levels of scrutiny within the Second Amendment context:

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Ezell*, 651 F.3d at 708.[9]  In arriving at this approach, the Seventh Circuit drew upon the levels of scrutiny associated with claims of infringements on the right of free speech.  *Ezell*, 651 F.3d at

---

[9] Other Circuit Courts have generally agreed with this analysis, albeit employing a less stringent standard.  *See, e.g., Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012) ("[W]e believe that applying less than strict scrutiny when the regulation does not burden the "core" protection of self-defense in the home makes eminent sense in this context and is in line with the approach taken by our sister circuits."); *Heller II*, 670 F.3d at 1262 (applying intermediate scrutiny, noting, "Although we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right."); *United States v. Marzzarella*, 614 F.3d 85, 97 (3rd Cir. 2010) (applying intermediate scrutiny after finding that the law at issue did "not severely limit the possession of firearms."); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1167-68 (9th Cir. 2014) ("[S]evere restrictions on the 'core' right have been thought to trigger a kind of strict scrutiny, while less severe burdens have been reviewed under some lesser form of heightened scrutiny.")  No case has been found that applied a standard other than intermediate scrutiny to a case involving restrictions of Assault Weapons or LCMs.  *See Kolbe v. O'Malley*, Civil No. CCB-13-2841, 2014 WL 4243633 (D. Md. Aug. 22, 2014) (finding "intermediate scrutiny is appropriate for assessing the constitutionality of Maryland's [Assault Weapons and LCMs] ban because it does not seriously impact a person's ability to defend himself in the home, the Second Amendment's core protection."); *Colo. Outfitters Ass'n*, 2014 WL 3058518, at *15 (holding of an LCMs ban that "the burden is not severe . . . [a]s a result, the Court will examine the statute under the intermediate scrutiny test."); *Fyock*, 2014 WL 984162, at *7 ("Considering both how close the [LCMs ban] comes to the core of the Second Amendment right and the law's burden on that right, the court finds that intermediate scrutiny is appropriate."); *S.F. Veteran Police Officers Ass'n v. City and Cnty. of S.F.*, No. C 13-05351 WHA, 2014 WL 644395, at *5 (N.D. Cal. Feb. 19, 2014) (holding an LCMs ban "does not 'destroy' the right to self-defense; it 'merely burdens' it. . . In turn, the degree of scrutiny required is less severe."); *Shew v. Malloy*, (intermediate scrutiny held appropriate because "[t]he

707 (explaining content-based speech regulations are presumptively invalid, while speech lying farther from the core free speech rights, like commercial speech, need only be reasonably justified); *see also, United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) ("Categorical limits on the possession of firearms would not be a constitutional anomaly.  Think of the First Amendment, which has long had categorical limits:  obscenity, defamation, incitement to crime, and others.").

Plaintiffs argue that any analysis of the constitutionality of the Ordinance by analogy to the First Amendment should be undertaken by analogy to the standard of strict scrutiny imposed when considering content-based speech.  (Dkt. No. 52 at 9.)  However, *Heller I* did not simply recognize a right to possess commonly owned firearms, but to do so in furtherance of "the *core* lawful purpose of self-defense."  554 U.S. at 630 (emphasis added).  "It is not a property right . . . ."  *Moore*, 702 F.3d at 937.  Therefore, to require strict scrutiny, the Ordinance must be shown to severely burden the right to armed self-defense.

Based on the evidence presented by the parties, as discussed above, a severe burden on the right to armed self-defense has not been demonstrated.  Plaintiffs have not provided a single instance of an Assault Weapon used in self-defense.  Nor have they submitted evidence that a prohibition on the banned weapons and magazines limits, in any meaningful way, Highland Park residents' ability to defend themselves.  Indeed, the only evidence that even arguably shows Assault Weapons possess defensive capabilities greater than other, permitted firearms is the

---

challenged legislation provides alternate access to similar firearms and does not categorically ban a universally recognized class of firearms."); *Heller II*, 670 F.3d at 1262 (applying intermediate scrutiny because the Assault Weapons and LCMs ban at issue did "not effectively disarm individuals or substantially affect their ability to defend themselves.").

claim by a majority of survey respondents, stating self-defense as a reason for owning AR-type rifles.

Although the Ordinance provides a marginal burden upon the Second Amendment core right to armed self-defense, it does not severely burden the right. The Ordinance allows residents of Highland Park to keep an exceedingly large number of types of weapons (including the handguns at issue in *Heller I*, "overwhelmingly chosen by American society for that lawful purpose") and an unlimited number of magazines, holding 10 rounds or less, for self-defense. The Ordinance, therefore, need not be subject to strict scrutiny.

The "not quite strict scrutiny" standard requires Highland Park to "establish a close fit between the [Ordinance] and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights." *Ezell*, 651 F.3d at 708-09. That is, Highland Park must show that otherwise lawful ownership of Assault Weapons and LCMs increases the risk to the public to a degree that prohibiting them is justified. *Id.* at 709.

Highland Park asserts an "important, if not compelling[,] interest[] in the public safety of its citizens and police officers alike." (Dkt. No. 44 at 13.) Specifically, Highland Park passed the Ordinance "to address the potential threat of mass shootings involving a semi-automatic assault weapon." (Dkt. No. 45 ¶ 9; *see* Dkt. No. 45, Ex. C ¶ 9.) There can be little doubt that any government's interest in public safety is important,[10] and Plaintiffs do not dispute this contention. Instead, Plaintiffs argue that Highland Park has not shown that the Ordinance is related to public safety.

---

[10] *See, e.g., Schenk v. Pro-Choice Network of Western New York*, 519 U.S. 357, 375-76 (1997); *McCullen v. Coakley*, 134 S. Ct. 2518, 2535, 189 L. Ed. 2d 502 (2014).

However, the evidence discussed demonstrates that Assault Weapons have a military heritage that makes them particularly effective for combat situations. (Dkt. No. 45 ¶ 27; *see* Dkt. No. 45, Ex. C ¶¶ 15-23.) Indeed, the particular features banned by the Ordinance were developed for or by militaries to increase lethality. (*See* Dkt. No. 45, Ex. C ¶ 33; ("Protruding foregrips allow increased stability . . . thus increasing the hit probability of successive shots . . . . [I]t was not until . . . acceptance by the U.S. Military . . . that foregrips for semiautomatic rifles have grown in popularity."); ("Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space. [They] also facilitate[] easier . . . firing from positions other than the shoulder . . . . Military origins for this type of stock can be found on the M1 carbine in W[orld War II] when modified for paratrooper use."); ("The M1 'Garand' Rifle utilized by the U.S. Military . . . [featured] . . . a wooden handguard . . . to steady and control the rifle during rapid, repeat firing without getting burned by the hot barrel."); ("A muzzle brake . . . allow[s] the operator to control the rifle during rapid, repeat firing without taking time to reacquire the target.").) Likewise, LCMs were developed to serve military goals. (Dkt. No. 45, Ex. C ¶ 33 ("Less time required to reload can equate to more time spent acquiring targets or shooting.").) The military weapons from which consumer Assault Weapons derive have a decidedly offensive function. (*Id*. ¶ 53; *see* Dkt. No. 45, Ex. D ¶ 39 ("Ultimately, the purpose of military assault rifles and submachine guns (the analog for a civilian assault pistol) is offensive - to facilitate the assault and capture of a military objective.").)

The record also demonstrates that these shared components are not simply historical. Many Assault Weapons differ from their military counterparts only in their lack of a setting that allows a user to fire more than one round with a single pull of the trigger. (*Id*. ¶ 32.) Because of the insubstantial differences between the military and consumer versions, Assault Weapons may

be converted to the functional equivalent of a military weapon, and many such illegally converted weapons are recovered annually in the United States. (Dkt. No. 45 ¶ 48.) Even without conversion, a semi-automatic AR-15 will fire at nearly the same rate of speed as a fully automatic rifle. (*Id.* ¶ 49.)[11] As the District of Columbia Circuit noted in *Heller II*, the 30-round magazine of an UZI submachine gun "was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semi-automatic." 670 F.3d at 1263.

The record is clear that the features of the prohibited firearms, including LCMs, derive from military weapons with the decidedly offensive purpose of quickly acquiring multiple targets and firing at those targets without a frequent need to reload. Highland Park maintains a strong interest in protecting the public against this potential use. Therefore, Highland Park has established a close fit between the Ordinance and its stated objective of providing for the protection and safety of its inhabitants. The Ordinance does not violate Plaintiffs' Second Amendment rights.

---

[11] Highland Park has also submitted evidence demonstrating how assault weapons are used in mass shootings. Between January 2009 and September 2013, 93 mass shootings occurred. (Dkt. No. 45 ¶ 58.) In the 14 of these events in which the shooter used a semi-automatic or fully automatic Assault Weapon, 151 percent more casualties and 63 percent more deaths occurred. (*Id.*; Dkt. No. 45, Ex. G at 3.) Relative to the period between 2000 and 2008, "active shooter events" (defined as "an individual actively engaged in killing or attempting to kill people in a confined and populated area, typically through use of a firearm") have doubled in the period from 2009 to 2013. (Dkt. No. 45 ¶ 61.) However, these statements were properly objected to by Plaintiffs as inadmissible hearsay and will not be considered.

**CONCLUSION**

For the reasons discussed above, Highland Park's Motion for Summary Judgment [43] is granted and Plaintiffs' Motion for Summary Judgment [40] is denied. Highland Park City Code Section 136 shall remain in full force and effect.

Date: _____September 18, 2014_____        _____

                                                JOHN W. DARRAH
                                                United States District Court Judge